

ORIGINAL

SEALED

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

2020 SEP 22 AM 9:30

DEPUTY CLERK _____

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITIES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER, DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAINE SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRASKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF | **PLAINTIFFS' EMERGENCY *EX PARTE* MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR A STATUTORY RESTRAINING ORDER**<br><br>Case No.: **3-20CV2910-L**<br><br>Judge: |

INSURANCE, COMMISSIONER OF THE
TENNESSEE DEPARTMENT OF
COMMERCE AND INSURANCE, STATE
OF TEXAS, WASHINGTON STATE
DEPARTMENT OF FINANCIAL
INSTITUTIONS, WEST VIRGINIA
SECURITIES COMMISSION, AND STATE
OF WISCONSIN.

  Plaintiffs,

v.

TMTE, INC. a/k/a METALS.COM, CHASE
METALS, INC., CHASE METALS, LLC,
BARRICK CAPITAL, INC., LUCAS
THOMAS ERB a/k/a LUCAS ASHER a/k/a
LUKE ASHER, and SIMON BATASHVILI,

  Defendants;

and

TOWER EQUITY, LLC,

  Relief Defendant.

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES .................................................................................... iii

I.      PRELIMINARY STATEMENT .................................................................... 2

II.     JURISDICTION AND VENUE ..................................................................... 6

III.    FACTS ............................................................................................................ 7

      A.      Defendants' Defrauded Elderly Investors Into Setting Up SDIRAs To Purchase Precious Metals Bullion ...................................................................... 8

      B.      Metals, Asher, and Batashvili Defrauded Elderly Investors to Buy Overpriced Polar Bear Bullion That Bore No Relationship To The Prevailing Market Price ......................................................................... 10

      C.      Metals Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses........................................................... 12

      D.      Metals Fraudulently Charged Undisclosed Spreads on Polar Bear Bullion That Vastly Exceeded the Spread Represented in Customer Agreements ........... 13

      E.      Metals, Asher, and Batashvili Misrepresented That Polar Bear Bullion Have Numismatic or Semi-Numismatic Value To Deceive Investors and Conceal Defendants' Fraud........................................................................... 16

      F.      Barrick Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses on Fraudulently Overpriced Barrick Bullion ........... 18

IV.     ARGUMENT................................................................................................ 20

      A.      Defendants Committed Fraud in Violation of 7 U.S.C. § 9(1) (2018), and 17 C.F.R. § 180.1(a)(1)-(3) (2019) (Count I)...................................... 23

            1.      Defendants Made Fraudulent Misrepresentations and Omissions.................................................................................. 24

                  a.      Misrepresentations or Omissions of Fact......................... 25

                  b.      Materiality......................................................................... 26

                  c.      Scienter ............................................................................. 29

i

B.   Barrick and Metals are a Common Enterprise ........................................... 30

C.   Derivative Liability ................................................................................... 32

1.   Batashvili and Asher Acted As a Controlling Person for
Defendants ..................................................................................... 32

a.   Control ............................................................................... 33

b.   Lack of Good Faith or Knowing Inducement ................... 33

2.   Batashvili and Asher Acted As Agents for Defendants ................ 35

V.   RELIEF SOUGHT ............................................................................................. 36

A.   The Court Has Jurisdiction and Authority To Grant the Relief Sought
and Plaintiffs Have Established that *Ex Parte* Relief Is Necessary and
Appropriate Here ...................................................................................... 36

1.   Asset Freeze Is Warranted ............................................................. 38

2.   Document Preservation, Inspection, and Copying Is Warranted .. 39

3.   Appointment of a Temporary Receiver is Warranted ................... 42

4.   The Court Should Order Expedited Discovery in Advance of
a Preliminary Injunction Hearing .................................................. 43

VI.   CONCLUSION .................................................................................................. 44

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

*Aaron v. SEC,*
446 U.S. 680 (1980) ............................................................................................... 22

*Amos v. Taylor,*
2020 WL 618824 (N.D. Miss. Feb. 10, 2020) ......................................................... 44

*CFTC v. Baragosh,*
278 F.3d 319 (4th Cir. 2002) .................................................................................. 33

*CFTC v. British Am. Commodity Options,*
560 F.2d 135 (2d Cir. 1977) .................................................................................. 22

*CFTC v. Byrnes,*
58 F. Supp. 3d 319 (S.D.N.Y. 2014) ............................................................... 35, 36

*CFTC v. Cloud,*
2011 WL 1157530 (S.D. Tex. Mar. 24, 2011) ........................................................ 22

*CFTC v. Enron Corp., & Hunter Shively,*
2004 WL 594752 (S.D. Tex. Mar. 10, 2004) .......................................................... 35

*CFTC v. EOX holdings LLC,*
405 F. Supp. 3d 697 (S.D Tex. 2019) ..................................................................... 24

*CFTC v. Gibraltar Monetary Corp.,*
2006 WL 1789018 (S.D. Fla. May 30, 2006) ......................................................... 28

*CFTC v. Groover,*
2011 WL 1490901 (E.D. Tex. Feb. 11, 2011) ................................................... 37, 43

*CFTC v. Hunt,*
591 F.2d 1211 (7th Cir. 1979) ................................................................................ 22

*CFTC v. Hunter Wise Commodities, LLC,*
749 F.3d 967 (11th Cir. 2014) ................................................................................ 22

*CFTC v. Int'l Fin. Servs.,*
323 F. Supp. 2d 482 (S.D.N.Y. 2004) ............................................................... 30, 33

iii

*CFTC v. Khara*,
   2015 WL 10849125 (S.D.N.Y. May 5, 2016) ............................................................... 41

*CFTC v. King*,
   2007 WL 1321762 (N.D. Tex. May 7, 2007) .................................................... 24, 25, 35

*CFTC v. Kraft Foods Grp., Inc.*,
   153 F. Supp. 3d 996 (N.D. Ill. 2015) ......................................................................... 29

*CFTC v. Kratville*,
   796 F.3d 873 (8th Cir. 2015) ............................................................................... 25, 26

*CFTC v. Levy*,
   541 F.3d 1102 (11th Cir. 2008) .................................................................................. 38

*CFTC v. M25 Invs., Inc.*,
   2009 WL 3740627 (N.D. Tex. Sept. 29, 2009) ...................................................... 42, 44

*CFTC v. McDonnell*,
   332 F. Supp. 3d 641 (E.D.N.Y. 2018) ........................................................................ 27

*CFTC v. Monex Credit Company*,
   931 F.3d 966 (9th Cir. 2019) ..................................................................................... 23

*CFTC v. Morgan, Harris & Scott, Ltd.*,
   484 F. Supp. 669 (S.D.N.Y. 1979) .................................................................. 39, 42, 43

*CFTC v. Muller*,
   570 F.2d 1296 (5th Cir. 1978) ...................................................................... 5, 21, 38, 39

*CFTC v. R.J. Fitzgerald & Co.*,
   310 F.3d 1321 (11th Cir. 2002) ........................................................... 24, 25, 27, 29, 33

*CFTC v. Ramirez*,
   2019 WL 4198857 (S.D. Tex. July 12, 2019) .......................................................... 26, 29

*CFTC v. RFF GP, LLC*,
   2013 WL 4083748 (E.D. Tex. July 9, 2013) ................................................................ 41

*CFTC v. S. Tr. Metals, Inc.*,
   894 F.3d 1313 (11th Cir. 2018) ............................................................................. 24, 25

*CFTC v. Schafer*,
   1997 WL 33547409 (S.D. Tex. Dec. 23, 1997) ...................................................... 25, 37

iv

*CFTC v. Shakespeare Guardian Futures, Inc.*,
  2010 WL 11506667 (W.D. Tex. Mar. 17, 2010) ........................................................................ 22

*CFTC v. Steele*,
  2005 WL 3723267 (N.D. Ill. May 26, 2005) ............................................................................... 39

*CFTC v. Trade Exch. Network Ltd.*,
  117 F. Supp. 3d 29 (D.D.C. 2015) .............................................................................................. 31

*CFTC v. U.S. Metals Depository Co.*,
  468 F. Supp. 1149 (S.D.N.Y. 1979) ............................................................................................. 27

*CFTC v. Vishnevetsky*,
  2012 WL 2930302 (N.D. Ill. May 1, 2012) ................................................................................. 41

*CFTC v. Wall Street Underground, Inc.*,
  281 F. Supp. 2d 1260 (D. Kan. 2003) ......................................................................................... 30

*Cook v. City of Dallas*,
  2012 WL 13191445 (N.D. Tex. Nov. 9, 2012) ............................................................................ 44

*Delaware Watch Co. v. FTC*,
  332 F.2d (2d Cir. 1964) ............................................................................................................... 31

*Drexel Burnham Lambert Inc. v. CFTC*,
  850 F.2d 742 (D.C. Cir. 1988) .................................................................................................... 29

*First Commodity Corp. of Boston v. CFTC*,
  676 F.2d 1 (1st Cir. 1982) ........................................................................................................... 29

*FTC v. AmeriDebt, Inc.*,
  343 F. Supp. 2d 451 (D. Md. 2004) ............................................................................................ 31

*FTC v. E.M.A. Nationwide, Inc.*,
  767 F.3d 611 (6th Cir 2014) ................................................................................................. 30, 31

*FTC v. H. N. Singer, Inc.*,
  668 F.2d 1107 (9th Cir. 1982) ..................................................................................................... 21

*FTC v. Health Formulas, LLC*,
  2015 WL 4623126 (D. Nev. Aug. 3, 2015) .................................................................................. 39

*FTC v. John Beck Amazing Profits, LLC,*
  865 F. Supp. 2d 1052 (C.D. Cal. 2012)........................................................................ 31

*FTC v. Kennedy,*
  574 F. Supp. 2d 714 (S.D. Tex. 2008) ....................................................................... 31

*FTC v. Tax Club, Inc.,*
  994 F. Supp. 2d 461 (S.D.N.Y. 2014).......................................................................... 31

*G.A. Thompson & Co., Inc. v. Partridge,*
  636 F.2d 945 (5th Cir. 1981)........................................................................................ 34

*Guttman v. CFTC,*
  197 F.3d 33 (2d Cir. 1999)....................................................................................... 35, 36

*In re Commodities Int'l Corp.,*
  [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 (CFTC Jan. 14, 1997)...... 26

*In re Currency Trading Sys.,*
  2001 WL 1356196, CFTC No. 00-06 (Nov. 6, 2001)................................................... 33

*In re Spiegel,*
  1988 WL 232212, CFTC No. 85-19 (Jan. 12, 1988) ........................................... 33, 34

*JCC, Inc. v. CFTC,*
  63 F.3d 1557 (11th Cir. 1995)...................................................................................... 33

*Luis v. United States,*
  136 S. Ct. 1083 (2016) ............................................................................................... 41

*Mast & Leto v. Best Commodities Servs., Inc. & Shatner,*
  1986 WL 65959, CFTC No. 84-R331 (Dec. 2, 1986)................................................. 36

*Monieson v. CFTC,*
  996 F.2d 852 (7th Cir. 1993)................................................................................... 33, 34

*Phila. Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.,*
  1998 WL 404820 (E.D. Pa. July 15, 1998) .............................................................. 44

*R&W Technical Servs. Ltd. v. CFTC,*
  205 F.3d 165 (5th Cir. 2000)....................................................................................... 26

*SEC v. Abdallah,*
  2014 WL 12597836 (N.D. Ohio May 30, 2014)........................................................ 39

*SEC v. AmeriFirst Funding*, No. 3:07-CV-1188-D,
  2007 WL 2192632 (July 31, 2007) ........................................................................................... 42

*SEC v. Calvo*,
  378 F.3d 1211 (11th Cir. 2004)................................................................................................... 22

*SEC v. Cuban*,
  798 F. Supp. 2d 783 (N.D. Tex. 2011)........................................................................................ 21

*SEC v. First Fin. Grp. of Tex.*,
  645 F.2d 429 (5th Cir. 1981)................................................................................................ 21, 38

*SEC v. Faulkner*,
  2020 WL 4238705 (N.D. Tex. Sep. 25, 2017) ..................................................................... 39, 42

*SEC v. Merchant Capital, LLC.*,
  483 F.3d 747 (11th Cir. 2007)..................................................................................................... 28

*SEC v. Mgmt. Dynamics, Inc.*,
  515 F.2d 801 (2d Cir. 1975)........................................................................................................ 21

*SEC v. Safety Fin. Serv., Inc.*,
  674 F.2d 368 (5th Cir.1982)........................................................................................................ 42

*SEC v. VesCor Cap. Corp.*,
  599 F.3d 1189 (10th Cir. 2010) .................................................................................................. 42

*SEC v. Zale Corp.*,
  650 F.2d 718 (5th Cir. 1981)....................................................................................................... 22

*Spitzburg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014)....................................................................................................... 29

*Stotler & Co. v. CFTC*,
  855 F.2d 1288 (7th Cir. 1988)..................................................................................................... 35

*Virginian R. Co. v. Sys. Federation*,
  300 U.S. 515 (1937) .................................................................................................................... 21

*Zale Corp., Inc. v. FTC*,
  473 F.2d 1317 (5th Cir. 1973)................................................................................................30-31

## STATUTES

7 U.S.C. § 1a (2018) ............................................................................................... 10, 23

7 U.S.C. § 2 (2018) ................................................................................................. 35, 36

7 U.S.C. § 9 (2018) ................................................................................................ Passim

7 U.S.C. § 13a-1 ..................................................................................................... Passim

7 U.S.C. § 13c (2018) .................................................................................................... 32

17 U.S.C. § 1391 (2018) ................................................................................................. 7

28 U.S.C. § 1331 (2018) ................................................................................................. 6

28 U.S.C. § 1345 (2018) ................................................................................................. 6

28 U.S.C. § 1367 (2018) ................................................................................................. 7

## RULES

Fed. R. Civ. P. 26 ...................................................................................................... 5, 43

Fed. R. Civ. P. 30 .......................................................................................................... 43

Fed. R. Civ. P. 45 .......................................................................................................... 43

Fed. R. Civ. P. 65 ................................................................................................... 3, 5, 6

## REGULATIONS

17 C.F.R. § 1.2 (2019) ............................................................................................. 35, 36

17 C.F.R. § 180.1 (2019) ......................................................................................... Passim

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive
   Devices and Prohibition on Price Manipulation,
   76 Fed. Reg. 41,398 (July 14, 2011) ....................................................................... 23

## OTHER

H.R. Rep. No. 97-565 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3902-03, 3942 ........... 38-41

**PLAINTIFFS' EMERGENCY *EX PARTE* MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A STATUTORY RESTRAINING ORDER**

In support of their motion for a statutory restraining order, Plaintiffs Commodity Futures

Trading Commission ("CFTC" or "Commission"), Alabama Securities Commission ("State of

Alabama"), State of Alaska ("State of Alaska"), Arizona Corporation Commission ("State of

Arizona"), California Commissioner of Business Oversight ("State of California"), Colorado

Securities Commissioner ("State of Colorado"), State of Delaware ("State of Delaware"), State

of Florida, Office of the Attorney General and State of Florida, Office of Financial Regulation

(collectively "State of Florida"), Office of the Georgia Secretary of State ("State of Georgia"),

State of Hawaii, Securities Enforcement Branch (State of Hawaii"), Idaho Department of

Finance ("State of Idaho"), Indiana Securities Commissioner ("State of Indiana"), Iowa

Insurance Commissioner, Douglas M. Ommen ("State of Iowa"), Office of the Kansas Securities

Commissioner ("State of Kansas"), Kentucky Department of Financial Institutions

("Commonwealth of Kentucky"), Maine Securities Administrator ("State of Maine"), State of

Maryland Ex Rel the Maryland Securities Commissioner ("State of Maryland"),  Attorney

General Dana Nessel on Behalf of the People of Michigan ("People of Michigan"), Mississippi

Secretary of State ("State of Mississippi"), Nebraska Department of Banking & Finance ("State

of Nebraska"), Office of the Nevada Secretary of State ("State of Nevada"), New Mexico

Securities Division ("State of New Mexico"), The People of the State of New York by Letitia

James, Attorney General of the State of New York ("State of New York"), Oklahoma

Department of Securities ("State of Oklahoma"), South Carolina Attorney General and South

Carolina Secretary of State ("State of South Carolina") South Dakota Department of Labor &

Regulation, Division of Insurance ("State of South Dakota"), Commissioner of the Tennessee

Department of Commerce and Insurance ("State of Tennessee"), State of Texas ("State of

Texas"), Washington State Department of Financial Institutions ("State of Washington"), West Virginia Securities Commission ("State of West Virginia"), and State of Wisconsin ("State of Wisconsin") (collectively "the States"), by and through their undersigned attorneys, state the following:

## I. PRELIMINARY STATEMENT

Plaintiffs have contemporaneously filed a Complaint For Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief ("Complaint"), alleging an ongoing fraudulent scheme being perpetrated from at least September 1, 2017 through the present ("Relevant Period"), by Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Access Unlimited, LLC, (collectively "Metals"), Barrick Capital, Inc. ("Barrick") and their principals, Lucas Thomas Erb *a/k/a* Lucas Asher *a/k/a* Luke Asher ("Asher"), and Simon Batashvili ("Batashvili") (collectively "Defendants"). Plaintiffs further allege Relief Defendant Tower Equity, LLC ("Tower Equity") received transfers of investor money from Defendants or directly from investors that represent ill-gotten gains of Defendants' fraudulent scheme to which the Relief Defendant has no legitimate claim.

Plaintiffs respectfully move this Court, on an emergency, *ex parte* basis, for an order, pursuant to Section 6c(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13a-1 and 13a-2(a) and in accordance with Federal Rule of Civil Procedure 65 that: (1) freezes the assets of Defendants and Relief Defendant, (2) grants the CFTC and the States immediate access to the books, records, and other documents of Defendants and Relief Defendant and the authority to inspect and copy such records; (3) appoints a temporary receiver; and (4) grants expedited

2

discovery in advance of a preliminary injunction hearing (the "Proposed SRO").[1] Plaintiffs need this emergency relief in order to preserve the *status quo*; to prevent the dissipation of any assets; to ensure that any future equitable relief obtained by Plaintiffs, including any restitution to the victims of Defendants' fraudulent scheme, can be effective; and to determine the full scope of the fraudulent scheme, identify the victims of the scheme, and locate the remaining assets of Defendants and Relief Defendant. Providing notice to Defendants and Relief Defendant would give them an opportunity to dissipate funds and destroy books and records evidencing the fraudulent scheme before Plaintiffs have had the opportunity to obtain and serve the Proposed SRO. The ability to inspect and copy records is particularly important here because, as discussed below, the Defendants have previously destroyed records after being served with cease and desist orders from certain States.

Defendants have been engaging in their egregious fraudulent scheme throughout the Relevant Period and continue to solicit new and prospective investors. Defendants are perpetrating a nationwide fraud scheme that solicited and received over $185 million in investors' funds from at least 1,600 persons throughout the United States for the purpose of purchasing gold and silver bullion ("Precious Metals Bullion"). Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in precious metals. Defendants deceived investors into using over $140 million of their retirement savings to purchase fraudulently overpriced Precious Metals Bullion. By making material

---

[1] A temporary restraining order under 7 U.S.C. § 13a-1 is referred to as a "statutory restraining order" or "SRO." An SRO may be sought and entered on an *ex parte* basis against any person who appears to have violated the CEA or CFTC Regulations. 7 U.S.C. § 13a-1(a). For purposes of the instant motion only, Plaintiffs are relying exclusively on 7 U.S.C. § 13a-1 for their application for an SRO. As such, Plaintiffs will not address the State law violations herein. The Plaintiffs will brief those violations at the appropriate time in this civil enforcement action.

misrepresentation and omissions, Defendants deceived investors into purchasing precious metals at prices averaging from one hundred (100) percent to over three hundred (300) percent over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price"). Defendants directed investors to purchase specific Precious Metals Bullion at grossly inflated prices that bore no relationship to the Prevailing Market Price. In particular, Metals failed to disclose that what Metals was charging investors vastly exceeded what Metals represented. In fact, Defendants knew or had a reckless disregard for the truth that virtually every investor lost the vast majority of their funds invested in fraudulently overpriced Precious Metals Bullion.

Defendants perpetuated their fraudulent scheme by falsely representing to investors who questioned the grossly inflated cost of the Precious Metals Bullion after purchase that they were rare and collectible numismatic or semi-numismatic precious metals that carried a premium far above the base melt value of the precious metal. These statements were false because the Precious Metals Bullion were not rare, numismatic, or semi-numismatic metals. The Precious Metals Bullion were worth significantly less than the value Defendants misrepresented to investors because they carried no additional premium over the Prevailing Market Price.

As shown below, and alleged in the contemporaneously filed Complaint, Defendants have engaged, are engaging, and may be about to engage in acts and practices that violate the anti-fraud provisions of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), CFTC Regulation ("CFTC Regulation") 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019), and the laws of the States.

The CFTC and the States are authorized pursuant to 7 U.S.C. §§ 13a-1(a) and 13a-2(a) (2018) to seek, and the Court to grant, an *ex parte* restraining order that: (1) prohibits any person

4

from destroying, altering, or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents; (2) prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and (3) appoints a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate.[2]

To obtain this relief, Plaintiffs need only make a *prima facie* showing that Defendants have engaged in acts or practices that violate the Act and Regulations. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). Though Plaintiffs' Proposed SRO derives from statute, the Plaintiffs note that under Fed. R. Civ. P. 65(b)(2), the Proposed SRO expires in fourteen days after service on the Defendants. Therefore, Plaintiffs respectfully request that the Court issue a briefing schedule and then hold a hearing on a subsequent motion for preliminary injunction within fourteen days from the date of service of the Proposed SRO.  Plaintiffs also move the Court to permit the parties to engage in expedited discovery and remove the prohibition set forth in Fed. R. Civ. P. 26(d) on discovery before the early meeting of counsel pursuant to Fed. R. Civ. P. 26(f).

Plaintiffs' motion for entry of the Proposed SRO incorporates by reference each and every factual allegation made and contained in the Complaint. In accordance with Fed. R. Civ.

---

[2] 7 U.S.C. § 13a-1(b) provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

P. 65(b), this motion is further supported by this memorandum and a fact appendix that contains, among other things, the sworn statements of 38 declarants[3] and numerous supporting exhibits.[4]

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder. 7 U.S.C. § 13a-2(1) (2018), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General or the administrator of the securities laws of States, or such other official that each State may designate, that the interests of the residents of States have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations.

---

[3] To protect investors' privacy and shield them from additional potential harm, investors are identified only by their state of residence and a number, *i.e.* "Alabama Investor 1" herein and in the Appendix. Plaintiffs will separately file under seal a reference list of redacted names.

[4] Plaintiffs have filed an Appendix that includes declarations and exhibits in support of these filings and are incorporated by reference as if fully set forth herein. To assist the court: 1) references to declaration paragraphs cite to page numbers in the Appendix ("App.") as follows: Gomersall Dec. ¶ 1 (App. p. 2); and 2) references to declaration exhibits or attachments cite to page numbers in the Appendix as follows: Gomersall Dec. Exh. A. (App. p. 40) or Att A (App. p. 40).

This Court has supplemental and pendant jurisdiction over the State-law claims pursuant to 28 U.S.C. § 1367(a) (2018). Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA, CFTC Regulations, and State laws occurred, are occurring, or are about to occur within this District, among other places. Venue also lies properly in this District pursuant to 17 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred here.

### III. FACTS

Defendants' nationwide fraud scheme solicited[5] and received over $185 million in investors' funds from at least 1,600 persons throughout the United States for the purpose of purchasing Precious Metals Bullion.[6] [Gomersall Dec. ¶19, 23, 25, 28, 51 (App. pp. 9 -12, 17); Gomersall Dec. Att. G and J (App. pp. 86 and 100)] This fraud is particularly egregious because Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons—between the ages of sixty and ninety—with little experience in Precious Metals Bullion. [Planer Dec. ¶14, 43-44, 75, and 233 (App. pp. 271, 282-83, 296, 325-26)] Defendants' solicitations targeted politically conservative and Christian investors. [Planer Dec. ¶20, 29, 197, 244 and 276 (App. pp. 274, 277, 319, 327, 334] Defendants instructed their sales representatives or other agents to concentrate their solicitations on these persons to gain access to their qualified

---

[5] Defendants solicited existing and prospective investors through telephonic solicitations, social media solicitations, and through their websites, http://www.metals.com and http://barrickcapital.com. [Mack Dec. ¶ 1-6 (App. pp. 258-61)]

[6] The term "bullion" refers to precious metals in the form of bars, ingots, or coins in which the value is typically determined by the value of the precious metal content. [Samuelson ¶14 (App. p. 242)]

7

retirement savings, including but not limited to, retirement savings held in an IRA, 401k, 457b, TSP, insurance, and annuity ("Qualified Retirement Savings"). [Planer Dec. ¶29 (App. p. 277)]

Asher and Batashvili directed sales representatives or other agents to employ solicitations designed to instill fear in elderly and retirement aged investors and build trust with investors based on representations of political and religious affinity. [Planer Dec. ¶29 (App. p. 277)] Defendants placed their advertisements on conservative media and websites. [Planer Dec. ¶23 (App. p. 275)] Asher and Batashvili falsely claimed they were friends with a conservative television and radio personality and that the personality recommended buying Precious Metals Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation. [Planer Dec. ¶22 and 24 (App. pp. 274-75) and Att. B (App. pp. 359-61)]

## A. Defendants' Defrauded Elderly Investors Into Setting Up SDIRAs To Purchase Precious Metals Bullion

Defendants directed at least 1,300 investors to open self-directed individual retirement accounts ("SDIRA") and to transfer funds from their Qualified Retirement Savings to the newly established SDIRAs. [Gomersall Dec. ¶ 52-54, 65 (App. pp. 18, 23); Gomersall Dec. Att. K (App. p. 102)] Metals defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to those accounts by making material misrepresentations and omissions intended to instill fear on the investors including, but not limited to:

1. Misrepresenting that the United States government was going to take Qualified Retirement Savings funds in a "Bail-in" to help banks and government programs; [Roseman Dec ¶ 31 (App. p. 911)];

2. Misrepresenting that traditional IRA custodians are in financial trouble and are likely to collapse; [Fulmer Dec. ¶ 33 (App. p. 1393); Gainey Dec ¶67 (App. p. 1256); Martin Dec ¶53 (App. p. 1479)];

3. Misrepresenting that it is unclear who actually owns the underlying securities in IRA accounts; and [Fuselier Dec. Exh. 9 (App. p. 1456-58); Roseman Dec ¶ 3 (App. p.

906); Gainey Dec ¶67 (App. p. 1256)];

4. Misrepresenting that the government could seize funds held in Qualified Retirement Savings, but could not seize Precious Metals Bullion held in SDIRAs. [Planer Dec. ¶84 and 113 (App. pp. 297, 303-04); Kemper Decl ¶17 (App. p. 1121); Ahuatzi-Delgado Dec. ¶ 34(d) and 59(a) (App. pp. 1208, 1212); Fuselier ¶ 10(m) (App. p. 1415); Vretakis Dec. ¶ 12(a), 13(a)-(b) (App. pp. 1055, 1057); Roseman Dec ¶ 82(c) (App. p. 921);  Martin Dec ¶13 (App. p. 1472)].

A large majority of the funds in the SDIRAs were transfers of funds from existing Qualified Retirement Savings. Metals directed investors to use over $140 million from SDIRAs to purchase fraudulently overpriced Precious Metals Bullion. [Planer Dec. ¶43 (App. p. 282); Gomersall Dec. ¶ 52-54 (App. p. 18)] Also, during the Relevant Period, Defendants instructed investors to send approximately $5 million to Relief Defendant Tower Equity. [Gomersall Dec. ¶ 25-26 (App. p. 11)]   Between November 2018 and July 2019, at least 12 Metals investors were instructed to send funds, through check or wire transfer, into the Tower Equity bank account at Bank of America ending in 7454 to purchase Precious Metals Bullion from Metals. [Gomersall Dec. ¶24-26 App. pp. 10-11); Gomersall Dec. Att M (App. p. 106)]. The money sent to Tower Equity consisted of investors' funds received by virtue of Defendant's illegal activities. [Gomersall Dec. ¶ 26 (App. p. 11; Gomersall Dec. Att. M (App. p. 106)].  Tower Equity has no legitimate claim to these funds and other ill-gotten gains that it received from investors and Defendants.

**B. Metals, Asher, and Batashvili Defrauded Elderly Investors to Buy Overpriced Polar Bear Bullion That Bore No Relationship To The Prevailing Market Price**

Metals, Asher, and Batashvili solicited investors and sold them gold and silver Precious Metals Bullion[7] at fraudulently inflated prices over the Prevailing Market Price. [Planer Dec.¶ 5 (App. p. 268); Gomersall Dec. ¶ 56, 68-70, 73-74 (App. pp. 18-21, 23-26, 27-32); Gomersall Dec. Att. Z, CC, DD, EE, FF, GG (App. pp. 192-97, 217, 219, 221, 223-26, 228-33)] Metals, Asher, and Batashvili fraudulently solicited and sold Precious Metals Bullion in the form of the following three gold and silver bullion coins (collectively "Polar Bear Bullion"):

1. The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;
2. The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and
3. The 1/4 ounce Gold British Standard Bullion.

[Samuelson Dec. ¶47 (App. p. 246); Planer Dec. ¶8 (App. p. 270); Gomersall Dec. ¶43-44 (App. pp. 15-16); Gomersall Dec. Att. V-W (App. pp. 181-86]

The actual value of Polar Bear Bullion is the Prevailing Market Price of the gold and silver precious metal contained in the bullion coins. [Samuelson Dec. ¶20, 35, 59 (App. p. 242, 244-45, 246-47, 253)] Metals charged investors undisclosed excessive Markups on Polar Bear Bullion that bore no reasonable relation to the Prevailing Market Price.  [Samuelson Dec. ¶49 (App. pp. 247-49); Planer Dec. ¶5 (App. p. 268); Gomersall Dec. ¶ 56, 68-70, 73-74 (App. pp. 18- 21, 23-26, 27-32); Gomersall Dec. Att. Z, CC, DD, EE, FF, GG (App. pp. 192-97, 217, 219, 221, 223-26, 228-33)] Importantly, Metals specifically selected and directed elderly and/or retirement-aged SDIRA and Cash Account investors to purchase fraudulently priced Polar Bear

---

[7] Silver and gold precious metals are statutorily-defined commodities under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9) (2018).

Bullion. [Planer Dec. ¶43, 75 (App. pp. 282, 296)] Metals failed to disclose the unreasonable and excessive Markups on Polar Bear Bullion. [Planer Dec. ¶7, 93, and 125 (App. pp. 269-70, 299-300, 306)]. In fact, the fraudulently over-priced Polar Bear Bullion at the time of purchase averaged:

1. 213% for 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of silver bullion;

2. 120% for 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of gold bullion;

3. 116% for 1/4 ounce Gold British Standard Bullion over the Prevailing Market Price of gold bullion; and

4. 21% for all other Precious Metals Bullion over the Prevailing Market Price of the bullion.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49]. In terms of scale, Metals fraudulently sold to SDIRA and Cash Account investors:

1. At least 4.1 million units of 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion for over $102.4 million;

2. At least 106,123 units of 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion for over $31.2 million; and

3. At least 34,120 units of 1/4 ounce Gold British Standard Bullion for over $24 million.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. The percentages of Precious Metals Bullion sold to SDIRA and Cash Account investors by telephone by Metals were:

1. 58% of sales were 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

2. 17% of sales were 1/10 Gold Royal Canadian Mint Polar Bear Bullion;

3. 13% of sales were 1/4 ounce Gold British Standard Bullion; and

4. 10% of sales were every other type of bullion sold by Metals to investors.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)].

11

In sum, approximately ninety percent of the total amount of investors' funds solicited and received by Metals from investors was used to buy Polar Bear Bullion. [Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)].

## C. Metals Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses

Metals and its sales representatives or other agents falsely misrepresented that Precious Metals Bullion were a safe and conservative investment and that investors would not lose their principal. For example, Metals, directly and by and through its sales representatives or other agents:

1. Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama Investor #2, California Investor #3, California Investor #5, Colorado Investor #7, Georgia Investor #1, Maryland Investor #1, South Carolina Investor #1, Texas Investor #1, and Texas Investor #4 that Precious Metals Bullion were safe and secure investments, and safer than Qualified Retirement Savings. [Planer Dec. ¶84-85, 113-115 (App. pp. 297, 303-04); Fulmer Dec. ¶18 (App. p. 1391); Fuselier Dec. ¶7(i); 10(c), 8(e) (App. pp. 1403-04, 1414, 1406); Vretakis Dec. ¶ 12(a)-(b) (App. pp. 1055-56); Roseman Dec. ¶ 82(a)-(b) (App. p. 921); Strickland Dec. ¶32, 54 (App. pp. 849, 852); Gainey Dec. ¶10 (App. pp. 1246-47); Filippenko Dec. ¶IV(a) (App. p. 819)].

2. Misrepresented to Alaska Investor #1, Alabama Investor #1, California Investor #1, Georgia Investor #2, Kentucky Investor #1, South Carolina Investor #2, and Texas Investor #2 that investors would not lose their funds invested in Precious Metals Bullion; and [Planer Dec. ¶85 (App. p. 297); Ahuatzi-Delgado Dec. ¶ 18(c) (App. p. 1205); Fulmer Dec. ¶26 (App. p. 1392); Fuselier Dec. ¶8(f) (App. p. 1406); Vretakis Dec. ¶ 12(a)-(d) (App. pp. 1055-56); Strickland Dec. ¶9 (App. p. 845); Filippenko Dec. ¶IV(a) (App. p. 819); Martin Dec ¶5 (App. p. 1471)];

3. Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama Investor #2, California Investor #1, Colorado Investor #2, Georgia Investor #1, South Carolina Investor #1, and Texas Investor #4 that Precious Metals Bullion are a low risk investment. [Planer Dec. ¶84-85, 113-115 (App. pp. 297, 303-04); Ahuatzi-Delgado Dec. ¶ 46(a)-(c) (App. p. 1210); Fulmer Dec. ¶18, 22 (App. pp. 1391-92); Fuselier Dec.¶10(c) (App. p. 1414); Vretakis Dec. ¶12(a)-(b) (App. pp. 1055-56); Roseman Dec ¶ 10(g), 30 (App. pp. 908, 911); Strickland Dec. ¶9 (App. p. 845); Filippenko Dec. ¶IV(a) (App. p. 819)].

Contrary to Metals misrepresentations and omissions, Metals knew or had a reckless disregard for the truth that virtually all of its SDIRA investors and Cash Account investors

12

suffered large losses on Polar Bear Bullion, yet Metals continued to make these misrepresentations to prospective and current SDIRA investors and Cash Account investors. Metals failed to disclose to its investors that the fraudulently overpriced Polar Bear Bullion materially impacted their ability to profit and the risk of loss. [Samuelson Dec. ¶10, 11, 50, 61 (App. pp. 214, 249, 253)].  Investor's ability to profit and not sustain a loss on the fraudulently overpriced Polar Bear Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and could incur additional transaction costs. [Samuelson Dec. ¶58, 61 (App. pp. 252, 253)] Metals knew or had a reckless disregard for the truth that because of Metal's undisclosed, fraudulent, and exorbitant Markups on Polar Bear Bullion, most investors lost the majority of their investment funds immediately upon consummating the transaction. [Planer Dec. ¶7, 93, and 125 (App. pp. 269-70, 299, 306]

### D. Metals Fraudulently Charged Undisclosed Spreads on Polar Bear Bullion That Vastly Exceeded the Spread Represented in Customer Agreements

During the relevant period, Metals executed with investors a shipping and transaction agreement ("Customer Agreement #1") for the purchase of Precious Metals Bullion.[8] [Gomersall Dec. ¶ 58-60 (App. p. 21); Gomersall Dec. Att. AA (App. pp. 198-206)] Customer Agreement #1 contains terms and conditions of the sale of Precious Metals Bullion. [Gomersall Dec. ¶ 60 (App. p. 21); Gomersall Dec. Att. AA (App. p. 198-206)] The Agreement states, in pertinent part, that:

1. "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons . . ."

---

[8] Beginning on or about June 2019 and continuing thereafter, Metals executed with at least 190 investors a new shipping and transaction agreement ("Customer Agreement #2") for the purchase of Precious Metals Bullion.

2. "At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) ..."

3. "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells." [Gomersall Dec. ¶ 60 (App. p. 21); Gomersall Dec. Att. AA (App. pp. 198-206)]

Section 3(a) of both Customer Agreement #1 and Customer Agreement #2 states:

"Within the Precious Metals industry, the difference between [M]etals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the 'Spread'" (herein: "Spread"). [Gomersall Dec. ¶ 60 (App. p. 21); Gomersall Dec. Att. AA and BB (App. pp. 198-206 and 208-15); Samuelson Dec. ¶ 44 (App. p. 246)] The Spread charged to investors pursuant to Customer Agreement #1 and Customer Agreement #2 represents the difference between what Metals paid for the Precious Metals Bullion and what they charged investors. [Gomersall Dec. ¶ 60, 66 (App. pp. 21, 23); Gomersall Dec. Att. AA (App. pp. 198-206)]

Customer Agreement #2 was substantially similar to Customer Agreement #1, except that it represented that the Spread Metals charged on IRA Precious Metals Bullion transactions was significantly smaller. [Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15)] Customer Agreement #2 represented that the Spread on IRA Precious Metals Bullion transaction only varies between two percent and nineteen point nine percent (2% to 19.9%), rather than (2% to 33%). [Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15)] This is a material purported reduction in the Spread. Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains (1 to 5%), Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to

14

19.9%). [Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15)] Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."[Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15)]

As part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in the Customer Agreements.  In fact, Metals knew or had a reckless disregard for the truth that the Spreads charged by Metals to their elderly or retirement-aged investors for the Polar Bear Bullion averaged:

1.   128 percent for Silver Royal Canadian Mint Polar Bear Bullion;

2.   91 percent for Gold Royal Canadian Mint Polar Bear Bullion; and

3.   108 percent for Gold British Standard Bullion.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]

In fact, none of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in the Customer Agreements. [Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded the ranges in the Customer Agreements.  Metals failed to disclose to investors the true Spreads and excessive Markups on Polar Bear Bullion that they were charging them. [Planer Dec. ¶7, 93, and 125 (App. pp. 269-70, 299, 306)] Instead, Metals instructed their sales representatives or other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price. [Planer Dec. ¶52, 142-144 (App. pp. 285, 309-10].

**E. Metals, Asher, and Batashvili Misrepresented That Polar Bear Bullion Have Numismatic or Semi-Numismatic Value To Deceive Investors and Conceal Defendants' Fraud**

As part of the scheme to defraud, Metals, Asher, and Batashvili fraudulently misrepresented that Polar Bear Bullion was numismatic or semi-numismatic bullion.[9] Contrary to Metals' false claims, Polar Bear Bullion has no numismatic or semi-numismatic value. [Samuelson Dec. ¶15, 16, 18-20, 59 (App. pp. 242, 253)] Polar Bear Bullion is readily available to the public and is not rare. In fact, there are approximately 5 million units of Polar Bear Bullion in circulation. [Samuelson Dec. ¶45 (App. p. 246)] Metals knew or had a reckless disregard for the truth when they falsely represented to investors that Polar Bear Bullion had numismatic or semi-numismatic value and so fraudulently represented to investors the Polar Bear Bullion was worth significantly more than the Prevailing Market Price. [Gomersall Dec. ¶ 55-56, 72-73 (App. pp. 18-21, 26-29); Gomersall Dec. Att. Z, FF (App. pp. 192-97, 223-26)] In fact, Polar Bear Bullion was worth significantly less than the value Defendants misrepresented to investors because they carry no premium over the melt value of the metal. [Gomersall Dec. ¶ 55-56, 72-73 (App. pp. 18-21, 26-29); Gomersall Dec. Att. Z, FF (App. pp. 192-97, 223-26); Samuelson Dec. ¶49-50, 50-52, 60-61 (Section VIIII) (App. pp. 247-49, 253)]

When investors received account statements from their SDIRA administrators showing an account value—the accurate value of the Polar Bear Bullion based on the Prevailing Market Price of the bullion—that was significantly smaller than what Metals misrepresented to

---

[9] Numismatic Precious Metals Bullion is rare, of limited availability, and has significant broad-based market demand and so has a value substantially more than the Prevailing Market Price of the precious metal contained in the bullion. Semi-Numismatic Precious Metals Bullion refers to bullion that is claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content plus some premium from recognized broad-based collector value or demand. [Samuelson Dec. ¶15-16 (App. p. 242)]

investors, Defendants engaged in misrepresentations to conceal their fraud. [Planer Dec. ¶47-50

(App. pp. 283-85)] Metals fraudulently represented to investors that the lower valuation on their

SDIRA statements was an under-valuation that did not reflect the resale value of the Polar Bear

Bullion ("Post-Purchase Misrepresentations"). [Planer Dec. ¶48 (App. p. 284)] For example,

Metals, directly and by and through their sales representatives or other agents:

1. Misrepresented to Alabama Investor #1 and South Carolina Investor #2 that Polar Bear Bullion are exclusive coins and are worth more than other Precious Metals Bullion; [Planer Dec. ¶97 (App. p. 300); Fulmer Dec. ¶29 (App. p. 1393)];

2. Misrepresented to Alabama Investor #2, Colorado Investor #7, and Colorado Investor #13, that Polar Bear Bullion are the hottest item on the market and investors will make more money on Polar Bear Bullion than on other Precious Metals Bullion; [Planer Dec. ¶121 (App. p. 305); Roseman Dec. ¶ 85 (App. p. 922)];

3. Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor #5, South Carolina Investor #1, and South Carolina Investor #2 that the actual value of Polar Bear Bullion was higher than what the SDIRA statement showed; [Planer Dec. ¶98, 102 (App. pp. 300, 301); Ahuatzi-Delgado Dec. ¶46(f) (App. p. 1211); Fulmer Dec. ¶28-29 (App. p. 1393); Gainey ¶122-123 (App. pp. 1270-71); Roseman Dec. ¶ 45(d), 67; (App. pp. 914, 919); Gainey Dec. ¶122-123 (App. pp. 1270-71);  Martin Dec. ¶9-10 (App. pp. 1471-72)];

4. Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor #1, Maryland Investor #5, South Carolina Investor #1, and South Carolina Investor #2 that the SDIRA statements only report the melt value of the Polar Bear Bullion and the melt value does not reflect the fact that Polar Bear Bullion carried a premium above the base melt value of the Precious Metal Bullion contained therein; and [Planer Dec. ¶98, 102 (App. pp. 300, 301); Ahuatzi-Delgado Dec. ¶ 46(a)-(c) (App. p. 1210-11); Fulmer Dec. ¶21, 28-29 (App. pp. 1392-93); Roseman Dec. ¶ 45(d), 67 (App. pp. 914, 919); Gainey Dec. ¶23, 123, 125 (App. pp. 1249, 1270-71)];

5. Misrepresented to Alabama Investor #1, Colorado Investor #2, South Carolina Investor #1, Maryland Investor #1, and Texas Investor #4 that the SDIRA statements displayed the Precious Metals Bullion melt value because it provided a tax break to the investor. [Planer Dec. ¶ 102 (App. p. 301); Ahuatzi-Delgado Dec. ¶ 46(d) (App. p. 1210); Fulmer Dec. ¶21 (App. p. 1392); Roseman Dec. ¶ 16 (App. p. 909); Gainey Dec. ¶25 (App. p. 1250)].

Metals made the Post-Purchase Misrepresentations—referred to as "Tuck-In"—to placate and calm investors who were upset about the losses shown on their SDIRA statements. [Planer Dec. ¶48 (App. p. 284)] In fact, Metals, knowingly or with reckless disregard for the truth, made these misrepresentations and omissions designed to conceal their fraudulent scheme.

**F. Barrick Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses on Fraudulently Overpriced Barrick Bullion**

As part of the scheme to defraud, Barrick, Asher, and Batashvili, directly and by and through their sales representatives or other agents, directed elderly SDIRA and Cash Account investors to purchase the following Precious Metals Bullion in the form of the following three gold and silver bullion coins at fraudulently inflated prices over the Prevailing Market Price ("collectively "Barrick Bullion"):

1. 1/10 ounce Silver Spade Guinea;

2. 1/10 ounce Silver Britannia; and

3. 1/10 ounce Gold Royal Canadian Wildlife Series.[10]

[Gomersall Dec. ¶ 46-47 (App. pp. 16-17); Gomersall Dec. Att. X (App. p. 188); Planer Dec. ¶32 (App. p. 278); Samuelson Dec. ¶47 (App. p. 246)].

The actual value of Barrick Bullion is the Prevailing Market Price of the gold and silver precious metal contained in the bullion coins. [Samuelson Dec. ¶20, 35, 59 (App. p. 242, 244-45, 246-47, 253)] Barrick charged investors undisclosed excessive Markups on Barrick Bullion that bore no reasonable relation to the Prevailing Market Price. [Planer Dec. ¶286-287 (App. pp. 336-

_____

[10] As part of Barrick's scheme to defraud and Barrick and Metals' common enterprise, Barrick failed to disclose to investors that the 1/10 ounce Gold Royal Canadian Wildlife Series was the same item sold by Metals as the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion. [Planer Dec. ¶ 286 (App. pp. 336-37); Gomersall Dec. ¶ 44, 47 (App. p. 16-17)]

37) Samuelson Dec. ¶49 (App. pp. 247-49); Gomersall Dec. ¶ 78-82 (App. pp. 32-37), Gomersall

Dec. Att. II, JJ, KK, LL, MM (App. pp. 239-2 to 239-6)] Importantly, Barrick specifically

selected and directed elderly and/or retirement-aged SDIRA investors to purchase fraudulently

priced Barrick Bullion. Barrick failed to disclose the unreasonable and excessive Markups on

Barrick Bullion. [Planer Dec. ¶286-287 (App. pp. 336-37)] In fact, the fraudulently over-priced

Barrick Bullion at the time of purchase averaged:

1. 312% for 1/10 ounce Silver Spade Guinea over the Prevailing Market Price of silver
   bullion;

2. 287% for 1/10 ounce Silver Britannia over the Prevailing Market Price of silver
   bullion; and

3. 128% for the 1/10 ounce Gold Royal Canadian Wildlife Series over the Prevailing
   Market Price of gold bullion.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. In terms of scale, Barrick

fraudulently sold to SDIRA investors:

4. At least 567,800 units of the 1/10 ounce Silver Spade Guinea for over $3.8 million;

5. At least 93,000 units of the ounce Silver Britannia for over $611,600; and

6. At least 17,660 units of the 1/10 ounce Gold Royal Canadian Wildlife Series for over
   $6.59 million.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. During the Relevant Period, the

percentages of Precious Metals Bullion sold to SDIRA investors by Barrick were:

7. 32.5% of sales were Silver Spade Guinea;

8. 5% of sales were Silver Britannia;

9. 56% of sales were Gold Royal Canadian Wildlife; and

10. 6% of sales were every other type of Precious Metals Bullion sold by Barrick to
    investors.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. Barrick knew or had a reckless disregard for the truth that the Spread charged by Barrick to their elderly or retirement-aged SDIRA investors for the Barrick Bullion averaged:

    11. 114.5% for Silver Spade Guinea;

    12. 100% for Silver Britannia; and

    13. 95.7% for Gold Royal Canadian Wildlife.

[Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]

Barrick failed to disclose to its investors that the fraudulently overpriced Barrick Bullion materially impacted their ability to profit and the risk of loss. [Samuelson Dec. ¶10, 11, 50, 61 (App. pp. 241, 249, 253)] Investor's ability to profit and not sustain a loss on the fraudulently overpriced Barrick Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and could incur additional transaction costs. [Samuelson Dec. ¶58, 61 (App. pp. 252-53)] Barrick knew or had a reckless disregard for the truth that because of Barrick's undisclosed, fraudulent, and exorbitant Markups on Barrick Bullion, most investors lost the majority of their investment funds immediately upon consummating the transaction. [Samuelson Dec. ¶50 (App. p. 249); Planer Dec.¶ 286-287 (App. pp. 336-37)] Notably, on September 15, 2020, Barrick made misrepresentations regarding the Barrick Bullion's value to an investor who called to inquire about his purchases and value. [Planer Dec.¶ 292-301 (App. pp. 338-41)]

## IV. ARGUMENT

As described herein and in the Complaint, Defendants have repeatedly violated the antifraud provisions of the CEA, CFTC Regulations, and State Law.  Defendants are perpetrating

a nationwide fraud scheme and there is a reasonable likelihood that Defendants will continue their fraud scheme unless enjoined by this Court.

The CFTC and the States appear before the Court not as an ordinary litigant, but as a federal agency and State agencies charged with safeguarding the public interest by enforcing Federal commodity laws and/or State laws. *See e.g. SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (noting that the Securities & Exchange Commission, a sister federal agency, appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."); *SEC v. Cuban*, 798 F. Supp. 2d 783, 794 (N.D. Tex. 2011) ("Unlike a private litigant ...when a regulatory agency like the SEC requests injunctive relief, it typically does so because Congress has provided statutory remedy for the public's benefit as a mechanism for effective law enforcement"). The CFTC and States are under a duty in this civil enforcement action to proceed in the best interests of the public and the defrauded investors to arrest this nationwide fraudulent scheme. "[W]hen 'the public interest is involved in a proceeding of this nature, [the district court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982) (quoting *Virginian R. Co. v. Sys. Federation*, 300 U.S. 515, 552 (1937)).

In the instant civil enforcement action, the CFTC and States face a lower burden than a private civil litigant seeking a temporary restraining order or other pretrial relief, such as the proposed *ex parte* restraining order. In order to obtain an *ex parte* statutory restraining order under 7 U.S.C. § 13a-1(a), Plaintiffs must make a *prima facie* showing that Defendants have violated the CEA and CFTC Regulations and there is a reasonable likelihood of future violations. *Muller*, 570 F.2d at 1300; *SEC. v. First Fin. Grp. of Tex.*, 645 F.2d 429, 434 (5th Cir. 1981)

(quoting *Aaron v. SEC*, 446 U.S. 680, 699 (1980)("[The test laid down for injunctive relief [for SEC enforcement] is whether or not 'a proper showing' has been made by the SEC that there is a reasonable likelihood that the defendant is engaged or is about to engage in practices that violate the federal securities laws.")); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (The SEC is entitled to prevail when the inferences flowing from the defendant's prior conduct betoken a reasonable likelihood of future violations); and *CFTC v. Shakespeare Guardian Futures, Inc.*, No. A–09–CV–260–SS, 2010 WL 11506667, at *5 (W.D. Tex. Mar. 17, 2010) (CFTC makes the requisite showing when it presents a *prima facie* case that the defendant has engaged, or is engaging, in illegal conduct, and there is a likelihood of future violations.).[11] Past illegal conduct is highly suggestive of the likelihood of future violations. *Zale Corp.*, 650 F.2d at 720 (5th Cir. 1981); *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004); *CFTC v. Cloud*, No. H-10-706, 2011 WL 1157530, at *9 (S.D. Tex. Mar. 24, 2011) (past misconduct is "highly suggestive of the likelihood of future violations").

As explained below, the evidence presented by Plaintiffs in support of this motion more than satisfies the *prima facie* showing needed to justify issuing a restraining order under 7 U.S.C. § 13a-1(a) to immediately stop this ongoing and pervasive fraud.

---

[11] *See also CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) (The standard for issuing a preliminary injunction under the CEA is only requires a *prima facie* case of illegality is required); *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 141 (2d Cir. 1977) (holding that, in actions for a statutory injunction, "the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits, but only that there is a reasonable likelihood that the wrong will be repeated"); and *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations.") (citation omitted).

**A.      Defendants Committed Fraud in Violation of 7 U.S.C. § 9(1) (2018), and 17 C.F.R. § 180.1(a)(1)-(3) (2019) (Count I)**

7 U.S.C. § 9(1) makes it unlawful for any person, in connection with any contract of sale of any commodity for future delivery, to use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the CFTC shall promulgate. Pursuant to this authority, the CFTC promulgated 17 C.F.R. § 180.1(a)(1)–(3) which makes it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

Defendants have violated and continue to violate 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) because they made material misrepresentations and omissions to investors and prospective investors, all in connection with the purchase and sale of silver and gold, statutorily-defined commodities under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018). The CFTC has stated that "Section 6(c)(1) and final Rule 180.1 augment the Commission's existing authority to prohibit fraud and manipulation." Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011).[12]  In *CFTC v. Monex Credit Company*, the Ninth Circuit held

---

[12] Specifically, the CFTC has addressed the applicability of Regulation 180.1 to precious metals cases: By way of non-exclusive example, if an entity employed a deceptive device to sell

that 7 U.S.C. § 9(1)'s language is unambiguous – "[a]uthorizing claims against '[m]anipulative or deceptive' conduct means what it says: the CFTC may sue for fraudulently deceptive activity, regardless of whether it was also manipulative." 931 F.3d 966, 976 (9th Cir. 2019); *see also CFTC v. EOX holdings LLC*, 405 F. Supp. 3d 697, 709 (S.D Tex. 2019) (the CEA prohibits use of any manipulative or deceptive device in connection with the sale of a commodity in interstate commerce). Courts have held that 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) applies to fraud in connection to non-leveraged precious metals transactions. *See e,g, CFTC v. Atlantic Bullion & Coin, Inc. and Ronnie Wilson*, No. 8:12-cv-01503 (D.S.C. 2012) and *CFTC v. The Tulving Company and Hannes Tulving*, No. 3:15-cv-00424 (W.D.N.C. 2015). Thus, the CFTC and States are clearly authorized to bring this civil enforcement action to enjoin this massive, nationwide fraudulent scheme involving precious metals.

**1.     Defendants Made Fraudulent Misrepresentations and Omissions**

The Defendants defrauded elderly victims whom they solicited to purchase precious metals by misrepresenting and omitting material information.  To establish a claim of fraud under 7 U.S.C. §9(1) and 17 C.F.R. §180.1(a)(1)-(3) through fraudulent misrepresentations and omissions, Plaintiffs must prove: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) materiality; and (3) scienter. *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018); *CFTC v. King*, No. 3:06-CF-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (citing *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)) (same).  Unlike a private litigant, Plaintiffs need not prove reliance on the

---

precious metals to customers as a way for the customers to speculate on the value of such commodities . . . depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1. Id. at 41,401 n.37.

misrepresentations or omissions to establish fraud. *S. Tr. Metals, Inc.*, 894 F.3d at 1325; *CFTC v. Schafer*, No. Civ.A H-96-1213, 1997 WL 33547409, at *5 n.8 (S.D. Tex. Dec. 23, 1997) (the CFTC need not show reliance on defendant's fraudulent misrepresentation when it brings an action to enforce provisions of the CEA).

Whether a misrepresentation has been made is determined holistically, through examination of the "overall message" and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.3d at 1328 (citation omitted); *King*, 2007 WL 1321762, at * 2 (*quoting R.J. Fitzgerald*, 310 F. 3d at 1328) (same). "Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (citation and quotations omitted). The allegedly false or misleading representations should be viewed through the eyes of an objectively reasonable person interpreting their overall message. *R.J. Fitzgerald*, 310 F.3d at 1329

### a.    Misrepresentations or Omissions of Fact

Defendants made numerous material misrepresentations and omissions to investors in violation of Regulation 180.1. Without restating the numerous misrepresentations and omissions described in the Fact Section, *supra*, Plaintiffs wish to highlight the most egregious ones. First, Defendants' failure to disclose unreasonable and excessive Markups on Polar Bear Bullion and Barrick Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Polar Bear Bullion and Barrick Bullion. Second, Defendants failed to disclose to investors that the undisclosed, excessive, and unreasonable Markups over the Prevailing Market Price on Polar Bear Bullion and Barrick Bullion resulted in substantial investor losses. Defendants were fully aware of these material omissions and their devastating impact on an investor's ability to profit. Third, Metals failed to disclose to investors the true

Spread and excessive Markups on Polar Bear Bullion that they were charging. In fact, the

Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in

the Customer Agreements. In fact, none of the actual Spreads on Polar Bear Bullion fell within

the range of Spreads represented to investors in the Customer Agreements. Fourth, Defendants

made numerous explicit or implicit misrepresentations to investors that Precious Metals Bullion

were a safe and conservative investment and that investors would not lose their principal. Fifth,

Metals defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to

those accounts by making material misrepresentations and omissions intended to instill fear in

the investors. Finally, Defendants fraudulently misrepresented that Polar Bear Bullion was

numismatic or semi-numismatic bullion.

### b. Materiality

A statement or omission is material if "there is a substantial likelihood that a reasonable

investor would consider the information important in making a decision to invest." *R&W*

*Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) (discussing the types of facts

and statements that are material to a reasonable investor in connection with fraudulent

transactions). Any fact that enables an investor to assess independently the risk inherent in their

investment and the likelihood of profit is a material fact. *See In re Commodities Int'l Corp.*,

[1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563-64 (CFTC Jan. 14,

1997). "[R]epresentations about profit potential and risk 'go to the heart of a customer's

investment decision and are therefore material as a matter of law.'" *Kratville*, 796 F.3d at 895

(citation omitted). Misrepresentations concerning the likelihood of profiting from trading and

risk of loss are generally deemed to be material and violative of the antifraud provisions of the

CEA. *CFTC v. Ramirez*, No. 4:19-cv-140, 2019 WL 4198857, at *10 (S.D. Tex. July 12, 2019)

(Misrepresentations and omissions concerning profit and risk are material as a matter of law);

*See, e.g. CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1160 (S.D.N.Y. 1979)

(finding that misrepresentations regarding profitability of investment were materially

misleading); *R.J. Fitzgerald*, 310 F.3d at 1328-29 (misrepresentations regarding performance

were material because "a reasonable investor would consider it important in deciding whether to

make an investment."); and *CFTC v. McDonnell,* 332 F. Supp. 3d 641, 720 (E.D.N.Y. 2018)

(citations omitted) (Misrepresentations concerning opportunity to profit and risk go to the heart

of a customer's investment decision and are therefore material as a matter of law).

      In light of this standard, there is no question that the fraudulent misrepresentations and

omissions Defendants made to investors described above are material. Without restating the

numerous misrepresentations and omissions described in the Fact Section, Defendants

misrepresented or concealed material information about the risk of metals investments calling

them a safe and conservative investment and stating that investors would not lose their principal.

Defendants also misrepresented or concealed material information about the ability of investors

to profit from this investment. It is a material fact to an investor who is making an investment

decision that he or she will lose the majority of their funds immediately upon consummating a

transaction. Defendants' failure to disclose unreasonable and excessive Markups on Polar Bear

Bullion and Barrick Bullion is a material undisclosed fact which prevented investors from

making an informed decision on purchasing Precious Metals Bullion.

      Further, during the Relevant Period, Metals was subject to State enforcement actions,

including complaints, emergency actions, disciplinary proceedings, and/or cease and desist

orders ("State Orders and Complaints") taken against Metals and various officers, employees, or

agents by State Securities Regulators. Metals failed to disclose to investors or prospective

investors that it was the subject of numerous State Orders and Complaints.[13] This is a material

fact to investors who were determining or agreeing to do business with Metals. As the Eleventh

Circuit explained: "[t]he existence of a state cease and desist order... is clearly relevant to a

reasonable investor, who is naturally interested in whether management is following the law[.]"

*SEC v. Merchant Capital, LLC.*, 483 F.3d 747, 771 (11th Cir. 2007); *see also CFTC v. Gibraltar*

*Monetary Corp.*, No. 04-80132-CIV, 2006 WL 1789018, at *17 (S.D. Fla. May 30, 2006) ("[A]

reasonable investor would most certainly have considered the previous regulatory violations ...

especially the CFTC cease and desist order ... an important factor in deciding whether to use

Gibraltar's services.").

    Defendants numerous material misrepresentations and omissions are clearly actionable

under the anti-fraud provisions of the CEA, CFTC Regulations, and the laws of the States.

---

[13] State Orders and Complaints include: (1) The Emergency Order issued May 1, 2019 and Agreed Order and Undertaking entered July 1, 2019 by the Texas State Securities Board; (2) A Consent Cease and Desist Order entered May 16, 2019 by the Minnesota Department of Commerce Commissioner; (3) A Consent Cease and Desist order issued July 30, 2019 by the Colorado Securities Commissioner; (4) An Emergency Cease and Desist Order issued July 30, 2019 by the Georgia Commissioner of Securities; (5) A Cease and Desist Order issued August 8, 2019 by the Alabama Securities Commission; (6) An Emergency Cease and Desist Order entered September 6, 2019 by the Kentucky Department of Financial Institutions; (7) An Order to Cease and Desist and Order to Show Cause issued November 1, 2019 and Consent Order entered May 26, 2020 by the Missouri Securities Commissioner; (8) An Administrative Complaint filed December 3, 2019 by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth; (9) A Cease and Desist Order entered March 9, 2020 by the Arkansas Securities Commissioner; (10) A Complaint for Summary Order filed May 26, 2020 and Summary Order to Cease and Desist issued May 26, 2020 by the Nevada Securities Division of the Office of the Secretary of State; (11) A Notice of Proposed Agency Action filed June 4, 2020 and Temporary Cease and Desist Order entered June 4, 2020 by the Montana State Auditor, Commissioner of Securities and Insurance; and (12) A Temporary Cease and Desist Order and Notice of Final Order issued July 20, 2020 by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

### c.   Scienter

Under 17 C.F.R. §180.1(a)(1)-(3), the CFTC and the States must show that Defendants'

conduct was intentional or reckless. *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1007

(N.D. Ill. 2015) (same). This standard is met if a defendant "intended to defraud, manipulate, or

deceive, or if [d]efendant's conduct represents an extreme departure from the standards of

ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328. Plaintiffs can establish recklessness by

showing that the conduct "departs so far from the standards of ordinary care that it is very

difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. of*

*Boston v. CFTC*, 676 F.2d 1, 6-7 (1st Cir. 1982); *Spitzburg v. Houston Am. Energy Corp.*, 758

F.3d 676, 684 (5th Cir. 2014) (scienter is an extreme departure from the standard of ordinary

care, and that presents a danger of misleading the buyer or seller which is either known to the

defendant or is so obvious that the defendant must have been aware of it.) (citation omitted); *see*

*also R.J. Fitzgerald*, 310 F.3d at 1328 (scienter is met when a defendant's conduct "involves

highly unreasonable omissions or misrepresentations …that present a danger of misleading

[customers] which is either known to the Defendant or so obvious that Defendant must have

been aware of it.") (alterations in original and citation omitted); *Drexel Burnham Lambert Inc. v.*

*CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (recklessness is sufficient to satisfy scienter

requirement); and *Ramirez*, 2019 WL 4198857, at *10 (scienter was established where, because

of his level of control over the operation, defendant must have known that his representations

were false).

Based on the facts set forth, there is ample evidence showing that Defendants acted

intentionally or, at a minimum, recklessly. Without restating the Fact Section, Defendants knew

or had a reckless disregard for the truth that that their investors lost the majority of their funds

immediately upon consummating a transaction with them. Defendants knew or had a reckless

disregard for the truth that virtually all of its investors suffered large losses on Polar Bear Bullion and Barrick Bullion. Defendants knew or had a reckless disregard for the truth that they were charged investors undisclosed excessive Markups on Polar Bear Bullion and Barrick Bullion that bore no reasonable relation to the Prevailing Market Price. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded the ranges in the Customer Agreements and that none of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in the Customer Agreements.

### B.     Barrick and Metals are a Common Enterprise

Defendants are jointly and severally liable for the alleged violations because the entities and individuals operated and functioned as a common enterprise. When entities and individuals operate as a common enterprise, each may be held liable for the unlawful acts and practices of other members of the enterprise. *See, e.g., FTC v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 636-37 (6th Cir 2014) (finding a common enterprise where each of the corporate and individual defendants made up a "messy maze of interrelated business entities"); *CFTC v. Int'l Fin. Servs.,* 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004) (common enterprise existed where one company created another and capitalized it to transact the same business at the direction of the same corporate officers and directors); *CFTC v. Wall Street Underground, Inc.,* 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (individual and others held to be part of a common enterprise where each of them operate as a "single economic entity").

In determining whether a "common enterprise" exists, courts look to a variety of factors, including but not limited to: (1) common control, (2) the sharing of office space, (3) common employees, (4) commingling of funds, (5) whether business is conducted through a maze of interrelated companies, and (6) sharing advertising and marketing). *See, e.g., Zale Corp., Inc. v.*

*FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973) (finding common enterprise where there is sharing of office space, common or overlapping officers, and unified advertising); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38-39 (D.D.C. 2015) (quoting *E.M.A. Nationwide, Inc.*, 767 F.3d at 637 (finding common enterprise where two entities were under common control, shared offices on multiple occasions, and intermingled funds); *Delaware Watch Co. v. FTC*, 332 F.2d 746 (2d Cir. 1964)(finding common enterprise where business is transacted through "a maze of interrelated companies"); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008) (citing *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 462 (D. Md. 2004)) (FTC adequately pled common enterprise theory where it alleged that there was a common control group, that business was transacted through a member of interrelated companies, and that there was commingling of corporate funds, unified advertising, and/or other facts that revealed no real distinction between the entities in question.); *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (non-dispositive facts that the court found to plausibly support the existence of a common enterprise included: (1) maintaining offices and employees in common, (2) operating under common control, (3) sharing offices, (4) commingling funds, and (5) sharing advertising and marketing); and *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (found common enterprise where there was no dispute that corporate defendants were controlled by the same persons and shared the same business address and office space).

After the issuance of State Orders and Complaints, on August 20, 2019, Batashvili incorporated Barrick and continued to engage with Asher in the same fraudulent scheme that they perpetrated at Metals. [Planer Dec. ¶16-17 (App. pp. 272-73)] Barrick and Metals are a common enterprise with little to no distinction between the ownership and operations. A number of sales representatives, employees, and other agents of the Metals moved to Barrick and have

performed the same or similar work for Barrick as they did at Metals. [Planer Dec. ¶18 and 64-66 (App. pp. 273, 290-91)] Further, Metals and Barrick operated, at times, out of the same office and share the same overnight mail account. [Planer Dec. ¶62 (App. pp. 290-91)] Both Barrick and Metals had common advertising and marketing. [Planer Dec. ¶61 (App. pp. 289-90)] As part of this common enterprise, Barrick paid bills and expenses on behalf of Metals, including but not limited to over $56,000 to pay for Metals' corporate credit card bill in March 2020. [Gomersall Dec. ¶29 (App. p. 12)]

In sum, Batashvili and Asher used both Metals and Barrick interchangeably to perpetuate the fraudulent scheme. The Defendants' business activities were inextricably intertwined and no real distinction exists between them. The evidence clearly demonstrates that these entities and individuals constitute a common enterprise, and are, thus, jointly and severally liable for violations of the CEA, CFTC Regulations, and the laws of the States.

### C. Derivative Liability

#### 1. Batashvili and Asher Acted As a Controlling Person for Defendants

Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018),[14] states that a controlling person of an entity is liable for the violations of that entity if the controlling person knowingly induced the violations, directly or indirectly, or did not act in good faith. A "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the

---

[14] 7 U.S.C. § 13c(b) (2018), provides that: "Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."

corporation itself." *R.J. Fitzgerald*, 310 F.3d at 1334 (citation omitted); *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995); *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504 (quoting *In re Currency Trading Sys.*, CFTC No. 00-06, 2001 WL 1356196, at *12 (Nov. 6, 2001)).

### a.    Control

The CFTC must show "that the defendant exercised general control over the operation of the entity principally liable *and* possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002) (emphasis in original)). Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contrast, or otherwise." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *4 n.4 (Jan. 12, 1988). "Section 13c(b), therefore, is about power, and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J. Fitzgerald*, 310 F.3d at 1334. The statute is construed liberally, and even indirect means of discipline or influence, short of actual direction, is sufficient to find liability as a controlling person. *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993) (control is "the power or ability to control the specific transaction or activity upon which the primary violation was predicated") (quotation omitted). Liability does not depend on the controlling person's involvement in the daily operations of the business; it depends on his knowledge and power, even if the power of control or influence was not exercised. *R.J. Fitzgerald*, 310 F.3d at 1334.

### b.    Lack of Good Faith or Knowing Inducement

Pursuant to Section 13(b) of the CEA, a controlling person is liable for the controlled person's violations if that controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Proof of recklessness will

33

demonstrate that the controlling person acted in bad faith, although negligence alone is insufficient. *Monieson*, 996 F.2d at 861 (finding chairman of the board liable as controlling person because he failed to enforce supervision system with reasonable diligence, including failing to act in response to repeated charges of illegal behavior from different sources); *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959-60 (5th Cir. 1981) (holding recklessness is sufficient to give rise to liability). To establish "knowing inducement," the CFTC must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, 1988 WL 232212, at *7.

Here, Batashvili holds himself out as a Founder, Chief Executive Officer, and Principal of Metals and as a Founder, Owner, Chief Executive Officer, Managing Partner, and Principal of Barrick. Asher holds himself out as a Founder, Owner, and Principal of Metals and as a Founder, Owner, Chief Executive Officer, and Principal of Metals and Barrick. They are liable as controlling persons of the corporate Defendants. During the Relevant Period, Batashvili and Asher made all financial, operational, and strategic business decisions for the corporate Defendants as well as hired, supervised, and terminated staff. Batashvili and Asher exercised control over the corporate entities. Batashvili and Asher supervised Metals' sales representatives and their solicitation of current and prospective investors. During the Relevant Period, Batashvili directed, among other things, the opening of bank accounts and signing of documents on behalf of Defendants and was a signatory on numerous corporate bank accounts. Asher controls the marketing for Metals and Barrick and the website domains for Metals and Barrick are in Asher's name. Batashvili and Asher are liable for Defendants' fraudulent acts because they directed those fraudulent acts. [Planer Dec. ¶29, 43, 52, 55, 56, 60-62 (App. pp. 277, 282, 285, 286-87, 289-

34

91); Gomersall Dec. ¶ 13-15, 18, 21, 24, 27, 31 (App. pp. 8, 9, 10, 11-13 and Gomersall Att. D,

F, H, I, L, P (App. pp. 68, 74-84, 88-90, 92-98, 104, 128-36)]

Therefore, Batashvili and Asher are liable for the violations of 7 U.S.C. § 9(1) and 17

C.F.R. § 180.1(a)(1)-(3).

### 2.   Batashvili and Asher Acted As Agents for Defendants

Batashvili and Asher engaged in the acts and omissions described above that violated 7

U.S.C. § 9(1) and 17 C.F.R. §180.1(a)(1)-(3) both in their individual capacity and as the owners,

directors, and executives of corporate Defendants.  Pursuant to Section 2(a)(1)(B) of the CEA,

7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019),[15] "it does not matter if

the principal participated in or even knew about the agent's acts; he is strictly liable for them."

*Stoler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197

F.3d 33, 39-40 (2d Cir. 1999); *King*, 2007 WL 1321762, at *3 (principals are strictly liable under

the CEA for their agents' acts, omissions, and failures within the scope of their employment);

*CFTC v. Enron Corp., & Hunter Shively*, No. H-03-909, 2004 WL 594752, at *3 n.1 (S.D. Tex.

Mar. 10, 2004) (principal is liable for the act, omission, or failure of any official, agent, or other

person acting for any individual, association, partnership, corporation, or trust within the scope

of his employment); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-25 (S.D.N.Y. 2014)

(Section 2(a)(1)(B) of the CEA creates vicarious liability for a principal entity for its agent's

violations of other provisions of the CEA).

---

[15] Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2,
17 C.F.R. § 1.2 (2019), both contain the following identical language: The act, omission, or
failure of any official, agent, or other person acting for any individual, association, partnership,
corporation, or trust within the scope of his employment or office shall be deemed the act,
omission, or failure of such individual, association, partnership, corporation, or trust as well as of
such official, agent, or other person.

As discussed above, the corporate Defendants' operations are broadly coextensive with

Batashvili's and Asher's conduct. Batashvili and Asher acted for themselves as well as the

corporate Defendants in taking steps described herein that violated the antifraud provisions

alleged herein. Batashvili and Asher acted as the agents of corporate Defendants; they

participated in customer solicitation on behalf of corporate Defendants; they created and

controlled information on corporate Defendants' website, and directed investor solicitations of

potential and actual investors. Moreover, the fact that their actions are illegal does not

automatically place these acts outside of their scope of employment. *See e.g.*, *Guttman*, 197 F.3d

at 39-40 (denying petition for review of CFTC order and upholding CFTC's finding of

7 U.S.C. § 2(a)(1)(A) of the CEA principal-agent liability, where agent engaged in trading that

was both within scope of employment, and illegal); *Byrnes*, 58 F. Supp. 3d at 323-30 (company

may be liable under 7 U.S.C. § 2(a)(1)(A) for agents' violations of the Act within scope of

employment, including any acts intended to serve any purpose of the employer); *Mast & Leto v.*

*Best Commodities Servs., Inc. & Shatner*, CFTC No. 84-R331, 1986 WL 65959, at *2 (Dec. 2,

1986). Consequently, the corporate Defendants are liable for its agents' acts and omissions in

violation of 7 U.S.C. § 2(a)(1)(B) (2018) and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

## V.     RELIEF SOUGHT

### A.     The Court Has Jurisdiction and Authority To Grant the Relief Sought and Plaintiffs Have Established that *Ex Parte* Relief Is Necessary and Appropriate Here

Because Plaintiffs have made a *prima facie* showing above that Defendants have violated

and continue to violate 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), as well as State law, the

Court should issue the Proposed SRO that: (1) freezes the assets of Defendants and Relief

Defendant; (2) grants the CFTC and States immediate access to the books, records, and other

documents of Defendants and Relief Defendant; (3) appoints a temporary receiver; and (4) grants

expedited discovery. This relief is necessary to preserve the *status quo*, prevent Defendants and

Relief Defendant from dissipating assets, and prevent Defendants and Relief Defendant from

destroying or preventing access to books and records that Plaintiffs need to determine the extent

of Defendants' fraudulent scheme and identify all victims.[16]

     7 U.S.C. §§ 13a-1(a), 13(a)-2(1) authorizes the CFTC and the States to seek injunctive

and other relief in a district court against any person whenever it shall appear to the CFTC that

such person has engaged, is engaging, or is about to engage in any act or practice constituting a

violation of any provision of the CEA or any rule, regulation, or order thereunder. 7 U.S.C. §

13a-1(a) further authorizes the CFTC to seek, and the Court to grant, a restraining order which

provides for certain specific *ex parte* relief, namely, that—

> prohibits any person from destroying, altering, or disposing of, or refusing to
> permit authorized representatives of the Commission to inspect, when and as
> requested, any books and records or other documents or which prohibits any
> person from withdrawing, transferring, removing, dissipating, or disposing of any
> funds, assets or other property, and other than an order appointing a temporary
> receiver to administer such restraining order and to perform such other duties as
> the court may consider appropriate.[17]

     Mindful that notice "may result in the destruction of books and records and the

dissipation of customer funds," Congress authorized courts to issue such relief ex parte in order

---

[16] District courts have applied 7 U.S.C. § 13a-1(a) in the CFTC's enforcement cases to issue *ex parte* SROs. *See, e.g., CFTC v. Groover*, No. 4:11-CV-64, 2011 WL 1490901, at *1 (E.D. Tex. Feb. 11, 2011); *CFTC v. Yancy*, No. 4:10-cv-02955 (S.D. Tex. filed Aug. 18, 2010); *CFTC v. PrivateFX Global One Ltd.*, No. 4:09-cv-01540 (S.D. Tex. filed May 21, 2009); *CFTC v. Rusfeldt*, No. 3:07-cv-00130 (S.D. Tex. filed Mar. 12, 2007); *CFTC v. Schafer*, No. 4:96-cv-01213 (S.D. Tex. filed Apr. 17, 1996).

[17] 7 U.S.C. § 13a-1(b) provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

"to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, at 53-54, 93 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3902-03, 3942.

### 1.   Asset Freeze Is Warranted

As described above and in supporting declarations, Defendants have solicited and accepted over $185 million from investors. In addition, Defendants continue to engage in their fraudulent scheme by soliciting prospective investors. Absent immediate injunctive relief, and if Defendants and Relief Defendant were given notice of this motion and the requested relief, Defendants and Relief Defendant may further dissipate or shield fraudulently-obtained assets. In addition, Plaintiffs need to ensure that what assets remain are available to satisfy any such equitable remedies the Court may later award to the victims of Defendants' fraud. A statutory restraining order to temporarily freeze assets is appropriate in such circumstances. *E.g.*, *Muller*, 570 F.2d at 1301 (upholding asset freeze to ensure court's jurisdiction would not be defeated by defendant's disposition of assets if court ultimately ordered disgorgement of misappropriated funds).

The freeze of Defendants' and Relief Defendant's funds, assets or other property in the Proposed SRO is relief that fits squarely within the Court's authority under the plain language of 7 U.S.C. § 13a-1(a). An asset freeze is especially appropriate where, as here, the CFTC seeks disgorgement and restitution. *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) (holding in the context of an injunction pending satisfaction of judgment that "a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"); *Muller*, 570 F.2d at 1301 (similar in granting a preliminary injunction); *First Fin. Grp. of Tex.*, 645 F.2d at 438 (same); *SEC*

v. *Abdallah*, No. 1:14 CV 1155, 2014 WL 12597836, at *2 (N.D. Ohio May 30, 2014) (similar in

the context of a temporary restraining order); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-

RFB-GWF, 2015 WL 4623126, at *2 (D. Nev. Aug. 3, 2015) ("As it stated in its Temporary

Restraining Order . . . the Court has found that the asset freeze is necessary to preserve the

possibility of future relief[.]"). As another district court explained, "[m]oreover, an order

imposing a temporary freeze of assets is often necessary simply to preserve the status quo while

an investigation is conducted to clarify the sources of various funds." *CFTC v. Morgan, Harris*

*& Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979) (context of a preliminary injunction); *see*

*also CFTC v. Steele*, No. Civ.A. 05C3130, 2005 WL 3723267, at *1 (N.D. Ill. May 26, 2005) (*ex*

*parte* restraining order freezing assets necessary to preserve the status quo); *SEC v. Faulkner*,

No. 3:16-CV-1735-D, 2020 WL 4238705, at *3 (N.D. Tex. Sep. 25, 2017) (same).

### 2.    Document Preservation, Inspection, and Copying Is Warranted

The Proposed SRO also requires Defendants and Relief Defendant to preserve certain

records and allow Plaintiffs to inspect and copy such records.[18] Preservation of the records will

---

[18] Plaintiffs recognize the possibility that there could be potentially privileged information or
documents commingled amongst other relevant, non-privileged materials in the possession of
Defendants—particularly in ESI format, where files are typically stored in a digital format on
computer hard drives in a non-contiguous manner. To account for this possibility, the Proposed
SRO provides that Plaintiffs should undertake reasonable measures to prevent review of the
Defendants' privileged communications and/or other nonbusiness, nonfinancial materials by
Plaintiffs' attorneys and other staff who are part of the litigation team in this matter. It further
provides that Defendants shall promptly contact Plaintiffs' counsel to assert any claims of
privilege or other legal objections relating to the contents of any records that are subject to this
Order and promptly cooperate with Plaintiffs' counsel to develop reasonable protocols to isolate
and prevent disclosure of claimed privileged and/or other nonbusiness, nonfinancial materials to
Plaintiffs' attorneys and other staff who are part of the litigation team in this matter. However,
the Proposed SRO specifically states that none of the above-described provisions excuse the

allow Plaintiffs to identify assets, to identify other victims of Defendants' fraud, and to identify the scope of Defendants' wrongdoing, as well as ensure that Defendants and Relief Defendant do not destroy evidence of their fraud. Defendants have previously destroyed records after being served with cease and desist orders from the States. [(Planer Dec. ¶73 and 91 (App. pp. 295, 299)] This creates an immediate risk of destruction of pertinent and crucial evidence that establish the scope, duration, and operation of this fraudulent scheme.[19] These critical documents are all in the possession of Defendants and Relief Defendant who can easily destroy these documents and have a strong incentive to do so if they become aware of this imminent enforcement action. Plaintiffs need an order preserving these records and making them accessible at the outset of this litigation, without notice to Defendants and Relief Defendant. Absent immediate access, Defendants and Relief Defendant would have an opportunity to frustrate Plaintiffs efforts to hold Defendants liable for the full extent of their wrongdoing, and provide redress to all victims of Defendants' fraud.

---

Defendants from full and immediate compliance with the SRO permitting Plaintiffs to inspect the books and records.

[19] In light of the voluminous nature of ESI [Christianson Decl. ¶5-9 (App. pp. 255-56)], as well as the ease with which such evidence can be destroyed, the twin goals set forth in the statute of 1) preventing possible destruction of evidence, and 2) ensuring that CFTC and State representatives have full access to all such evidence, can only be achieved through a court order that allows the CFTC and State representatives to copy all documents, both paper and electronic. It is extremely common, and indeed almost certain, that most, if not all of the "books and records and other documents" in Defendants' possession will be stored electronically. Due to the intricate, and sometimes sophisticated and covert ways that ESI can be organized, stored, and sometimes hidden or encrypted, the only possible way to ensure that CFTC and State representatives can "inspect" such "documents," and to prevent Defendants from "disposing" or "destroy[ing]" such evidence, is to authorize CFTC and State representatives to obtain copies of all documents, both paper and electronic. The CFTC and State representatives have established extensive protocols to handle ESI information which Plaintiffs intend to apply. [Christianson Dec. ¶1-10 (App. p. 254-57)]

Plaintiffs also request authority to copy the records (with the records being returned to Defendants and Relief Defendant afterwards) as part of the order requiring preservation and allowing inspection of the records. Although 7 U.S.C. § 13a-1(a) does not expressly mention copying of records, "[t]he law has long recognized that the "authorization of an act also authorizes a necessary predicate act." *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring in the judgment). A provision authorizing Plaintiffs to copy the records is a legitimate and practical means to provide Plaintiffs' representatives a meaningful opportunity to inspect, review, and carefully analyze important records related to Defendants' and Relief Defendant's relevant conduct and customer funds. Such relief is consistent with the strong policy enunciated by Congress, "to prevent any possible destruction of evidence and conversion of assets." H.R. Rep. No. 97-565, at 53-54. This relief is particularly appropriate here given that Defendants and Relief Defendant are not registered with either the CFTC or States[20] and therefore are under no regulatory obligation to maintain records that may be material to determining the full extent of the violative conduct. Numerous courts have previously authorized copying of records in similar *ex parte* circumstances. *See, e.g., CFTC v. Khara*, No. 15 cv 03497, 2015 WL 10849125, at *4 (S.D.N.Y. May 5, 2016); *CFTC v. RFF GP, LLC*, No. 4:13–cv–382, 2013 WL 4083748, at *4 (E.D. Tex. July 9, 2013); *CFTC v. Vishnevetsky*, No. 1:12–cv–03234, 2012 WL 2930302, at *3 (N.D. Ill. May 1, 2012).

---

[20] Defendants are not required to register with the CFTC to buy and sell physical precious metals. But, they are required by certain States to obtain a license from and register with these States, as alleged in the Complaint.

41

### 3.    Appointment of a Temporary Receiver is Warranted.

The Proposed SRO appoints a temporary receiver.  The appointment of a receiver is appropriate where, as in this case, it is necessary to protect the public interest. *Morgan*, 484 F. Supp. at 677; *CFTC v. M25 Invs., Inc.,* 2009 WL 3740627, at **4-6 (N.D. Tex. Sept. 29, 2009) (the Court granted the CFTC's motion to appoint a receiver to marshal and preserve assets); *Faulkner*, 2020 WL 4238705, at *3 (the appointment of a receiver is a " 'well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief' ") (quoting *SEC v. AmeriFirst Funding*, No. 3:07-CV-1188-D, 2007 WL 2192632, at *3 (July 31, 2007)). Further, 7 U.S.C. § 13a-1(a) specifically authorizes the CFTC to seek, and the Court to grant, a restraining order which provides for the *ex parte* appointment of a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate.

A temporary receiver is also necessary in this case, given the size and scope of Defendants' fraudulent scheme and their other business activities and the number of corporate entities owned by Defendants that are involved in the fraud in some way.  The appointment of a receiver is particularly appropriate in cases such as this where a corporation, through its management, has defrauded members of the investing public. *First Financial Grp. of Tex.*, 645 F.2d at 438; *see also, SEC v. VesCor Cap. Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) ("[T]he district court has broad powers and wide discretion to determine . . . relief in an equity receivership.") (second alteration in original) (quoting *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372–73 (5th Cir.1982)). Defendants own a number of entities that have a wide variety of business operations and hold extensive assets. [Planer Dec. ¶4(d) through 4(j) (App. pp. 265-66); Gomersall Dec. ¶17-18, 21-22, 24, 27, 30-35 (App. pp. 9, 10-11, 12-14)] Appointing a receiver

42

will help ensure that all available investor funds, as well as any assets obtained using investor

funds, can be used to provide redress to victims.

In addition, because there may not be enough funds available to fully compensate all the

victims of Defendants' fraud, a receiver will facilitate the marshaling of assets and the claims

process and ensure that all investors are treated equitably.  Under the Proposed SRO, the receiver

will be able to accomplish this goal by maintaining the status quo and preventing diversion and

waste of assets to the detriment of investors. *See Morgan*, 484 F. Supp. at 677 (appointing a

receiver to prevent diversion or waste of defendants' assets).

### 4. The Court Should Order Expedited Discovery in Advance of a Preliminary Injunction Hearing

Plaintiffs also move for an order allowing the parties to conduct expedited discovery in

advance of a hearing on Plaintiffs' subsequent Preliminary Injunction hearing.  Expedited

discovery is necessary and appropriate to locate and secure Defendants' and investors' funds,

and further investigate the expanse of Defendants fraudulent scheme.  More specifically,

Plaintiffs seek the ability to take depositions of parties and non-parties subject to two calendar

days' notice pursuant to Fed. R. Civ. P. 30(a) and 45, with notice given personally, by facsimile

or by electronic mail, and, if necessary, the deposition may last more than seven hours.  Such

expedited discovery will allow the Plaintiffs to determine the full extent of Defendants'

wrongdoing (including, but not limited to, the possible involvement of others), locate other

investors, identify Defendants' funds, assets and other property, and clarify the sources of funds,

assets, and other property in advance of a hearing on a Preliminary Injunction upon the

expiration of the Proposed SRO.

Federal Rules of Civil Procedure 26(d) grants district courts discretion to order expedited

discovery where good cause is shown. *See, e.g., Groover*, 2011 WL 1490901, at **1, 5 (court

43

ordered expedited discovery where good cause to believe defendant may have violated the CEA); *M25 Invs.,* 2009 WL 3740627, at **1, 6 (expedited discovery ordered where good cause to believe defendant may have violated the CEA). Expedited discovery is warranted here because the scope of Defendants' wrongful conduct must be uncovered so that irreparable injury can be avoided. *Cook v. City of Dallas*, No. 3:12-cv-03788-P, 2012 WL 13191445, at *2 (N.D. Tex. Nov. 9, 2012) (expedited discovery is warranted where scope of wrongful conduct must be uncovered to avoid irreparable injury) Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings. *Phila. Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, No. 98-CV-2782, 1998 WL 404820, at *2 (E.D. Pa. July 15, 1998) and *Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 618824, at *2 (N.D. Miss. Feb. 10, 2020) (in the context of injunctive proceedings, expedited discovery better enables the court to judge the parties interests and respective chances of success on the merits because it allows for further development of the record before the injunctive hearing).

## VI.    CONCLUSION

Plaintiffs have made a *prima facie* showing that since at least 2017 and continuing to the present, Defendants have engaged, are engaging, or are about to engage in a fraudulent scheme in violation of both federal and state laws. Investors are being deceived into funneling millions of dollars each month into Defendants' fraudulent scheme based on Defendants' misrepresentations and omissions. The CFTC and the States hereby jointly request entry of the Proposed SRO, which will prevent defendants from dissipating or transferring further funds from investors, particularly elderly and retirement-aged investors, permit inspection of records,  appoint a Temporary Receiver to marshal assets for the benefit of investors, and preserve the *status quo* pending a hearing on Plaintiffs' preliminary injunction application.

44

Dated: September 22, 2020

Respectfully submitted,

By: _____

JONMARC BUFFA *pro hac vice pending*
jbuffa@cftc.gov
California Bar # 217324

RICHARD FOELBER *pro hac vice pending*
rfoelber@cftc.gov
Illinois Bar # 0840904

Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street. NW
Washington, DC 20580
(202) 418-5000

FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr

JEFFERY A. "BEAU" BROWN, JR., *pro hac vice pending*
Beau.Brown@asc.alabama.gov
Alabama Bar No. 7258R80B

ANNE GUNTER, *pro hac vice pending*
anne.gunter@asc.alabama.gov
Alabama Bar No. 4666N91P

Attorneys for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
 Montgomery, AL 36104
Telephone: (334) 322-8586
Fax: (334) 242-0240

FOR THE STATE OF ALASKA

By: /s/ Robert Schmidt

ROBERT SCHMIDT, *pro hac vice pending*
rob.schmidt@alaska.gov
Alaska Bar No. 9909048
JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorneys for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697


FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *pro hac vice pending*
cnichols@azcc.gov
Arizona Bar No. 029958

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.
Phoenix, AZ 85007
Telephone: (602) 542-0639
Fax: (602) 714-8120


FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dbo.ca.gov
SEAN ROONEY
Sean.Rooney@dbo.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice pending*
California Bar No. 264784
Danielle.Stoumbos@dbo.ca.gov

46

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS OVERSIGHT
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181


FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Janna Fischer

JANNA FISCHER*, *pro hac vice pending*
janna.fischer@coag.gov
Colorado Bar No. 44952
ROBERT FINKE*, *pro hac vice pending*
robert.finke@coag.gov
Colorado Bar No. 40756
*Counsel of Record

Attorneys for Plaintiff
SECURITIES COMMISSIONER
FOR THE STATE OF COLORADO
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6374
Fax: (720) 508-6037


FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ Katherine M. Devanney

KATHERINE M. DEVANNEY, *pro hac vice
pending*
Deputy Attorney General
Delaware Bar No. 6356
Texas Bar No. 24116281
katherine.devanney@delaware.gov
JILLIAN LAZAR
Director of Investor Protection

47

Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware

FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida

By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice pending*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

By: /s/ A. Gregory Melchior

A. GREGORY MELCHIOR, *pro hac vice pending*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615

48

Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498


FOR THE STATE OF GEORGIA

By: /s/ Logan B. Winkles

LOGAN B. WINKLES, *pro hac vice pending*
Georgia Bar No. 136906
lwinkles@law.ga.gov
RONALD J. STAY, *pro hac vice pending*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239


FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE, *pro hac vice pending*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov
PATRICIA J. MOY
Hawaii Bar No. 5845-0
PMoy@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977

49

FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice pending*
Deputy Attorney General
loren.messerly@finance.idaho.gov
Idaho Bar No. 7434

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Fax: (208) 332-8099


FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Patricia Orloff Erdmann
Chief Counsel of Litigation

By: /s/ Jefferson S. Garn

JEFFERSON S. GARN, *pro hac vice pending*
Deputy Attorney General
Jefferson.Garn@atg.in.gov
Indiana Bar No. 29921-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979


FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen

THOMAS E. KNUTZEN, *pro hac vice pending*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872


FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice pending*
Gary.stephens@ky.gov
Kentucky Bar No. 87740
CATHERINE FALCONER
Catherine.falconer@ky.gov

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL INSTITUITONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787


FOR THE STATE OF MAINE

By: /s/ Gregg D. Bernstein

GREGG D. BERNSTEIN, *pro hac vice pending*
gregg.bernstein@maine.gov
Maine Bar No. 8424

Attorney for Plaintiff

STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 626-8828


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer _____

MAX F. BRAUER, *pro hac vice pending*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532


FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin _____

52

PEOPLE OF THE STATE OF
MICHIGAN, by DANA NESSEL
ATTORNEY GENERAL

Aaron W. Levin, *pro hac vice pending*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-7632


FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon

SETH SHANNON, *pro hac vice pending*
seth.shannon@ago.ms.gov
Mississippi Bar No. 103466
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231


FOR THE STATE OF NEBRASKA
L. JAY BARTEL
Bureau Chief
Legal Services Bureau


By: /s/ Joshua R. Shasserre

JOSHUA R. SHASSERRE, *pro hac vice pending*

Assistant Attorney General
Nebraska Bar No. 23885
joshua.shasserre@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3888
Fax: (402) 471-3297

FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston _____

ERIN M. HOUSTON, *pro hac vice pending*
Deputy Secretary of State, Securities Administrator
Nevada Bar No. 11814
ehouston@sos.nv.gov

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452

FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger _____

ALISSA N. BERGER, *pro hac vice pending*
Securities Enforcement Prosecutor
New Mexico Securities Division
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Securities Division
New Mexico Regulation and Licensing Department
5500 San Antonio Rd NE

54

Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848


FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht

TATYANA "TANYA" TRAKHT, *pro hac vice
pending*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers
PETER POPE
Chief, Investor Protection Bureau
peter.pope@ag.ny.gov

Attorneys for Plaintiff
ATTORNEY GENERAL FOR THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice pending*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams

JONATHAN WILLIAMS, *pro hac vice pending*
jwilliams@scag.gov
South Carolina Bar No. 72509

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Fax: (803) 734-7208


By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice pending*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661


FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice pending*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor & Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1

56

Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369

FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice pending*
Deputy Attorney General
TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance

FOR THE STATE OF TEXAS
KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

By: /s/ Christina Cella

CHRISTINA CELLA
Assistant Attorney General
State Bar No. 24106199
christina.cella@oag.texas.gov
LEA N. BRIGTSEN
Assistant Attorney General
State Bar No. 24054504
lea.brigtsen@oag.texas.gov

Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-2952
Fax: (512) 477-2348
*Attorneys for Plaintiff the State of Texas*

FOR THE STATE OF WASHINGTON

By: /s/ Ian S. McDonald

IAN S. MCDONALD, *pro hac vice pending*
Washington Bar No. 41403
Ian.McDonald@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524

FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum

MICHAEL NUSBAUM, *pro hac vice pending*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305
Telephone: (304) 558-2251
Fax: (304) 558-4211


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice

By: /s/ Shannon A. Conlin_____

SHANNON A. CONLIN, *pro hac vice pending*
Assistant Attorney General
Wisconsin Bar No. 1089101
Conlinsa@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779
WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779

*Attorney for Plaintiff State of Wisconsin*


FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: /s/ Adam J. Kenworthy
ADAM KENWORTHY* pro hac vice pending
Iowa Bar No. AT0012137
Enforcement Attorney
adam.kenworthy@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6562
Fax: (515)-654-6500