DocuSign Envelope ID: F9052625-1ABD-465E-A783-E45B9020C621

# Barrick Capital

DATE: July 16, 2020

INVOKE NO: ▉▉▉▉▉▉



## Purchase Invoice

DELIVERY ADDRESS:

**ACCT NO:** ▉▉▉▉▉▉

**EMAIL:** ira@barrickcapital.com

**ADDRESS:** Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 143 | $419.50 | $59,988.50 |
| 0.5 oz Silver - Canadian Wildlife Series Coin | 2,899 | $22.25 | $64,502.75 |

Subtotal: $124,491.25



GRAND TOTAL

$124,491.25

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

# Barrick Capital

DATE: August 3, 2020
INVOICE NO: 

# D███ W███
# Purchase Invoice

DELIVERY ADDRESS:
**ACCT NO:**
**EMAIL:** ira@barrickcapital.com
**ADDRESS:** Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Silver - Spade Guinea Coin | 6,118 | $8.09 | $49,494.62 |

Subtotal: $49,494.62

## GRAND TOTAL

## $49,494.62

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-10

DocuSign Envelope ID: B915CFB2-1689-41B1-B9EC-0497B03B4DB0

# Barrick Capital

DATE: July 15, 2020

INVOICE NO: ███████



## Purchase Invoice

DELIVERY ADDRESS:

**ACCT NO:** ███████

**EMAIL:** ira@barrickcapital.com

**ADDRESS:** Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 0.5 oz Silver - Canadian Wildlife Series Coin | 926 | $25.25 | $23,381.50 |

Subtotal: $23,381.50

## GRAND TOTAL

$23,381.50



Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-11

DocuSign Envelope ID: 30E08928-5F7B-4C18-A238-09524DD7E58E

# Barrick Capital

DATE: 7/15/2020

INVOICE NO: ████

 H██ P████████

## Purchase Invoice

DELIVERY ADDRESS

**ACCT NO:** ████████

**EMAIL:**   ira@barrickcapital.com

**ADDRESS:** Delaware Depository
3601 N. Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Gold Canadian Wildlife Series – 1/10th oz | 58 | $381.18 | $22,108.44 |
| Silver Spade Guinea – 1/10th oz | 7,307 | $7.17 | $52,391.19 |



### GRAND TOTAL

### $74,499.63

Questions?
Email us at ira@barrickcapital.com
or call us at 1-888-605-5047

Barrick Capital        2368 Lyons Ave #223 New Hall, CA 91321        888-605-5047

239-12

DocuSign Envelope ID: B1EFBDA9-30B9-4ED8-A9B8-44ED54E184DD

# Barrick Capital

**DATE:** June 29, 2020

**INVOICE NO:** ▮▮▮▮▮▮▮



## Purchase Invoice

**DELIVERY ADDRESS:**

**ACCT NO:** ▮▮▮▮▮▮▮

**EMAIL:**     ira@barrickcapital.com

**ADDRESS:**   Delaware Depository Services Co.
            3601 North Market Street
            Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 57 | $413.85 | $23,589.45 |

Subtotal: $23,589.45

## GRAND TOTAL

## $23,589.45



Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-13

DocuSign Envelope ID: 39254747-1BEE-4E57-AFDC-A541CF416B2A

# Barrick Capital

DATE:   07/15/2020

INVOICE NO: █████████

J█████████  J█████

## Purchase Invoice

DELIVERY ADDRESS

ACCT NO: █████████

EMAIL: iradocs@barrickcapital.com

ADDRESS: Delaware Depository
3601N Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|---|---|---|---|
| Gold Canadian Wildlife Series Coin - 1/10th oz | 392 | $381.18 | $149,422.56 |

## GRAND TOTAL
## $149,422.56

Questions?
Email us at ira@barrickcapital.com
Or call us at 1-888-605-5047

Barrick Capital    23638 Lyons Ave Unit 223 New Hall, CA 91321    888-605-5047

239-14

DocuSign Envelope ID: E3A6340E-6258-49C9-8EE2-1F47EC956223

# Barrick Capital

**DATE:** July 1, 2020
**INVOICE NO:** ▮▮▮▮▮▮▮

 J▮▮ Z▮

## Purchase Invoice

**DELIVERY ADDRESS:**
**ACCT NO:** ▮▮▮▮▮▮

**EMAIL:**   ira@barrickcapital.com

**ADDRESS:**   Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 313 | $413.75 | $129,503.75 |

Subtotal: $129,503.75

## GRAND TOTAL

## $129,503.75

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital            23638 Lyons Ave # 223 New Hall , CA 91321            888 - 605 - 5047

239-15

# Barrick Capital

DATE:   7/28/2020

INVOICE NO: 

J  R 

## Purchase Invoice

DELIVERY ADDRESS

ACCT NO:

EMAIL: iradocs@barrickcapital.com

ADDRESS: Delaware Depository
3601 N Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Silver Polar Bear Coin - 1/2 oz | 8,721 | $25.77 | $224,740.17 |

## GRAND TOTAL
## $224,740.17

Questions?
Email us at ira@barrickcapital.com
Or call us at 1-888-605-5047

Barrick Capital    23638 Lyons Ave Unit 223 New Hall, CA 91321    888-605-5047

239-16

DocuSign Envelope ID: 4C078480-89AB-41F3-8F47-48375F77CC33

# Barrick Capital

DATE: July 13, 2020

INVOICE NO: ███████

K█████████
W█████████



## Purchase Invoice

DELIVERY ADDRESS:
**ACCT NO:** ██████████

**EMAIL:** ira@barrickcapital.com

**ADDRESS:** Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1 oz Gold - Bar | 4 | $1,840.00 | $7,360.00 |
| 1 oz Silver - Rounds Coin | 100 | $21.20 | $2,120.00 |
| 1 oz Gold - Royal Canadian Mint Maple Leaf Coin .9999 | 2 | $1,865.00 | $3,730.00 |
| 5 oz Silver - America The Beautiful Coin - - | 22 | $166.95 | $3,672.90 |
| 1/10 oz Gold - Canadian Wildlife Series Coin | 130 | $382.40 | $49,712.00 |
| 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 4,750 | $19.25 | $91,437.50 |

Subtotal: $158,032.40



## GRAND TOTAL

## $158,032.40

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-17

# Barrick Capital

DATE: June 25, 2020

INVOICE NO: ▮▮▮▮▮▮



K▮▮▮ M▮▮▮▮▮
## Purchase Invoice

DELIVERY ADDRESS:

**ACCT NO:** ▮▮▮▮▮▮

**EMAIL:**     ira@barrickcapital.com

**ADDRESS:**  Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 0.5 oz Silver - Canadian Wildlife Series Coin | 1,175 | $25.50 | $29,962.50 |
| 1/10 oz Gold - Canadian Wildlife Series Coin | 243 | $411.65 | $100,030.95 |

Subtotal: $129,993.45

## GRAND TOTAL

### $129,993.45

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

| Barrick Capital | 23638 Lyons Ave # 223 New Hall , CA 91321 | 888 - 605 - 5047 |
|---|---|---|

239-18

DocuSign Envelope ID: FA2E543B-03F2-42D4-B1D5-B11C84506B9E

# Barrick Capital

DATE: 7/2/2020

INVOICE NO: ███████

 K██ W██

## Purchase Invoice

DELIVERY ADDRESS

**ACCT NO:** ███████

**EMAIL:**   ira@barrickcapital.com

**ADDRESS:** Delaware Depository
3601 N. Market St.
Wilmington, DE 19802
BME#135332

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Gold Canadian Wildlife Series 1/10th oz | 642 | $382.18 | $245,359.56 |



**GRAND TOTAL**

$245,359.56

Questions?
Email us at ira@barrickcapital.com
or call us at 1-888-605-5047

Barrick Capital        2368 Lyons Ave #223 New Hall, CA 91321        888-605-5047

239-19

# Barrick Capital

DATE: June 18, 2020
INVOICE NO: ███████



## Purchase Invoice

DELIVERY ADDRESS:
ACCT NO: ██████████

EMAIL:     ira@barrickcapital.com

ADDRESS:  Delaware Depository Services Co.
          3601 North Market Street
          Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 746 | $402.00 | $299,892.00 |

Subtotal: $299,892.00

## GRAND TOTAL

# $299,892.00

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital            23638 Lyons Ave # 223 New Hall , CA 91321            888 - 605 - 5047

239-20

DocuSign Envelope ID: 568D7D55-F114-419C-85CA-6EF05C977654

# Barrick Capital

DATE: 7/13/2020

INVOICE NO: ▮▮▮▮▮



## Purchase Invoice

DELIVERY ADDRESS

**ACCT NO:** ▮▮▮▮▮

**EMAIL:**   ira@barrickcapital.com

**ADDRESS:** Delaware Depository
3601 N. Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Gold Canadian Wildlife Series Coin – 1/10th oz | 500 | $390.92 | $195,460.00 |



### GRAND TOTAL

$195,460.00

Questions?
Email us at ira@barrickcapital.com
or call us at 1-888-605-5047

Barrick Capital        2368 Lyons Ave #223 New Hall, CA 91321        888-605-5047

239-21

# Barrick Capital

DATE:    7/28/2020

INVOICE NO: ▮▮▮▮▮

M▮▮ P▮▮▮

## Purchase Invoice

DELIVERY ADDRESS

ACCT NO: ▮▮▮▮▮

EMAIL: iradocs@barrickcapital.com

ADDRESS: Delaware Depository
3601 N Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|---|---|---|---|
| Gold Canadian Wildlife Series Coin - 1/10th oz | 298 | $380.27 | $113,320.46 |

## GRAND TOTAL
## $113,320.46

Questions?
Email us at ira@barrickcapital.com
Or call us at 1-888-605-5047

Barrick Capital    23638 Lyons Ave Unit 223 New Hall, CA 91321    888-605-5047

239-22

DocuSign Envelope ID: 98FC6EFB-088C-44A8-8EB5-BF71047A5CF6

# Barrick Capital

DATE: June 23, 2020

INVOICE NO: █████████



## Purchase Invoice

DELIVERY ADDRESS:

**ACCT NO:** █████████

**EMAIL:** ira@barrickcapital.com

**ADDRESS:** Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 484 | $412.63 | $199,712.92 |
| 0.5 oz Silver - Canadian Wildlife Series Coin | 1,972 | $25.50 | $50,286.00 |

Subtotal: $249,998.92

GRAND TOTAL



$249,998.92

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-23

DocuSign Envelope ID: BB0B2ABF-4208-46CD-B5FD-283F07830CF4

# Barrick Capital

DATE:  07/17/2020

INVOLCE NO:

M███████ S████████

## Purchase Invoice

DELIVERY ADDRESS

ACCT NO:

EMAIL: iradocs@barrickcapital.com

ADDRESS: Idaho Armored Vaults, LLC
2245 North Samantha Court
Nampa, ID 83687

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Silver Canadian Polar Bear Coin 1/2oz 99.9999 | 2,236 | $22.12 | $49,460.32 |

## GRAND TOTAL
### $49,460.32

Questions?
Email us at ira@barrickcapital.com
Or call us at 1-888-605-5047

Barrick Capital   23638 Lyons Ave Unit 223 New Hall, CA 91321   888-605-5047

239-24

# Barrick Capital

DATE: 07/13/2020

INVOICE NO: ▮▮▮▮▮▮



## Purchase Invoice

DELIVERY ADDRESS

ACCT NO: ▮▮▮▮▮▮

EMAIL: iradocs@barrickcapital.com

ADDRESS: Delaware Depository
3601N Market St.
Wilmington, DE 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| Silver Spade Guinea Coin - 1/10th oz | 4,895 | $7.15 | $34,999.25 |
| Gold Canadian Wildlife Series Coin - 1/10th oz | 230 | $391.30 | $89,999.00 |

### GRAND TOTAL
### $124,998.25

Questions?
Email us at ira@barrickcapital.com
Or call us at 1-888-605-5047

Barrick Capital   23638 Lyons Ave Unit 223 New Hall, CA 91321   888-605-5047

239-25

DocuSign Envelope ID: 0DD209D2-2808-4C2D-B8E3-0E9FFC7083E3

# Barrick Capital

DATE: July 22, 2020

INVOICE NO: █████████

S██ R██

## Purchase Invoice

DELIVERY ADDRESS:

ACCT NO: ████████

EMAIL:      ira@barrickcapital.com

ADDRESS:   Delaware Depository Services Co.
            3601 North Market Street
            Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 0.5 oz Silver - Canadian Arctic Wildlife Series Coin | 902 | $25.50 | $23,001.00 |
| 1/10 oz Gold - Canadian Arctic Wildlife Series Coin | 209 | $433.00 | $90,497.00 |

Subtotal: $113,498.00

## GRAND TOTAL

## $113,498.00



Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-26

# Barrick Capital

DATE: July 7, 2020

INVOICE NO: 


## Purchase Invoice

DELIVERY ADDRESS:
ACCT NO:

**EMAIL:**   ira@barrickcapital.com

**ADDRESS:**   Delaware Depository Services Co.
3601 North Market Street
Wilmington, Delaware 19802

| ITEM | QTY | PRICE | TOTAL |
|------|-----|-------|-------|
| 1/10 oz Gold - Canadian Wildlife Series Coin | 54 | $418.48 | $22,597.92 |
| 0.5 oz Silver - Canadian Wildlife Series Coin | 387 | $25.50 | $9,868.50 |

Subtotal: $32,466.42

## GRAND TOTAL

## $32,466.42

Questions?
Email us at ira@barrickcapital.com .
or call us at 1 - 888 - 605 - 5047

Barrick Capital          23638 Lyons Ave # 223 New Hall , CA 91321          888 - 605 - 5047

239-27

## <u>DECLARATION OF DANA SAMUELSON</u>

## <u>PURSUANT TO 28 U.S.C. § 1746</u>

I, Dana Samuelson, make the following declaration based on my personal knowledge:

## I.  **BACKGROUND**

1.      I have been in the physical precious metals industry for 40-years, my entire professional career. In my first 18 years, before founding American Gold Exchange, Inc. in 1998, I held almost every conceivable position in an escalating career path from vault/shipping manager to senior buyer for one of the largest precious metals mail order companies in the country.

2.      American Gold Exchange has transacted over $800 million in sales to date. We have a flawless record of deliveries and payments for all buy and sell transactions over 22-years. We have maintained an AAA+ rating with the Better Business Bureau for over 15 years and have positive online client ratings with Google, Yelp, Trust Pilot and others.

3.      I have been a member of the Professional Numismatists Guild (PNG) since 2006. The PNG is a non-profit organization composed of the world's top rare coin and paper money experts. As numismatic professionals, their primary mission is to make the hobby safe for collectors and investors by maintaining strict standards of excellence and ethics for their member dealers.

4.      The PNG is the only numismatic organization in the United States that restricts its membership to dealers who possess and demonstrate three essential qualifications: knowledge, integrity, and responsibility. The typical PNG dealer has more than 25 years of experience in the industry and abides by the PNG code of ethics. PNG members must be nominated by their peers for membership and voted into the organization by membership. Most PNG members are industry leading professionals of longstanding in the precious metals and numismatic community.

5.      I served on the PNG board of directors for 12 years, culminating in serving as President of the PNG 2015 – 2017.  During my presidency I helped to conceive of and establish the industry's anti-counterfeiting task force to combat a surge of counterfeit Chinese coins and bars coming into the U.S. Today the task force works with Homeland Security and the Secret Service to help intercept and identify fraudulent merchandise entering and trading in the U.S.

6.      I am recognized as an industry leader with an impeccable national reputation for honesty, integrity, and fairness. I am also a member of the American Numismatic Association (since 1983) - the national coin club, Certified Coin Exchange (since 1998) – a national precious metals and rare coin online trading platform, and an authorized dealer (since 1998) for the two industry respected independent grading certification services, the Professional Coin Grading Service (PCGS) and the Numismatic Guarantee Service (NGC).

240

## II.    **RECORDS REVIEWED**

7.      I received from the Commodity Futures Trading Commission approximately 10,590 documents. In preparation of this declaration, I reviewed the following categories of documents:

    a)   Chase Metals Excel Spreadsheet of customer transactions
    b)   Chase Metals Individual customer invoices
    c)   Chase Metals Individual customer agreements
    d)   Barrick Capital Individual customer invoices
    e)   Barrick Capital Individual customer agreements
    f)   Barrick Capital Individual SIDRA customer files
    g)   Bayside Metals Excel Spreadsheet listing items sold to Chase Metals
    h)   Bayside Metals Excel Spreadsheet listing items sold to Barrick Capital
    i)   Dillon Gage Excel Spreadsheet listing items sold to Chase Metals

## III.    **SUMMARY**

8.      I was interviewed and hired by the Texas Securities Commission to review precious metals IRA sales made by Chase Metals to Texas residents earlier this year. I was then interviewed and hired by the CFTC to analyze the data listed above. This is my analysis of the individual invoices and spreadsheets the CFTC provided to me that originated from Chase Metals, Barrick Capital, Bayside Metals and Dillon Gage from 2016 to 2020.

9.      Chase Metals and Barrick Capital have been in the business of selling precious metals coins and bars to their clients. I analyzed sales made to their clients between 2016 and 2020 and reviewed corresponding purchases they made from industry dealers of the same coins they resold.

10.     The vast majority of precious metals coins sold by Chase Metals (89.37%) and Barrick Capital (93.90%) to their clients consisted almost entirely of gold and silver bullion coins and bars that are seldom included in IRA portfolios or individual investment portfolios due to their inappropriate smaller sizes and lack of prevalence in the competitive national marketplace.

11.     The prices that Chase Metals and Barrick Capital charged their clients for these items significantly exceeded competitive industry pricing, adversely affecting the financial position of their clients in direct proportion to the excessive gains Chase Metals and Barrick Capital made on these sales.

12.     Chase Metals sold 89.37% of their total dollar volume analyzed in just three products at markups over their melt value averaging between 116.07% and 213.23%. They charged their clients spreads averaging between 91.68% and 128.08% above their cost.

241

13.     Barrick Capital sold 93.90% of their total dollar volume analyzed in just three products at markups over their melt value averaging between 128.48% and 312.71%. They charged their clients spreads averaging between 97.54% and 114.56% above their cost.

## III.   DEFINITIONS

14.     **Bullion Coins and Bars –** Precious metal coins or bars consisting primarily of gold, silver, platinum or palladium that are commonly found in the marketplace that have no material market value above their intrinsic precious metals value commonly referred to as melt value.

15.     **Numismatic Coins –** Scarce to rare coins or bars that have value substantially above their intrinsic metal value. These are most often historical coins or bars that survive today in limited quantities that have strong, recognized and broad-based collector demand.

16.     **Semi-Numismatic Coins and Bars –** Coins or bars, usually historic coins or bars, in limited supply that have recognized, broad based collector value above their intrinsic precious metals value. Their value is normally tied to their underlying precious metals value plus their recognized, broad based collector value (premium over their intrinsic value).

17.     **Melt or Intrinsic Value –** The precious metal value of a coin or bar is calculated by multiplying the particular coin's or bar's pure precious metal weight by the market value of its precious metal content.

## IV.   METHODOLOGY

18.     In reviewing the data provided by the CFTC, it was immediately apparent to me that the items sold by Chase Metals and Barrick Capital to their customers were almost all bullion coins and bars whose values are determined by their underlying precious metals value. Market pricing is tied directly to the underlying gold and silver metals prices at the time of their sale.

19.     With the exception of less than 1% of all transactions that consisted of a handful of vintage, pre-1933 U.S. gold coins and modern proof U.S. gold and silver eagles that are considered semi-numismatic coins, none of the items transacted by either Chase Metals or Barrick Capital qualify otherwise as semi-numismatic of numismatic coins. These are bullion coins or bars that have value that approximates their intrinsic precious metals value.

20.     Since all the items under review are bullion, they are valued directly by their intrinsic metal value, commonly referred to as melt value, to determine market pricing on the sales made. It was necessary to establish 1) each item's intrinsic metal content in ounces and 2) what the market values were for an ounce of gold, and silver at the point of sale on the day each sale was made.

21.     Data that was presented in spreadsheets required first adding the item's precious metals content to the spreadsheet next to the item. Then I added that day's gold and silver trading

242

price to the spread sheet to establish melt values for every item on the day they were sold. If a trade date fell on a Saturday or Sunday, I used the previous Friday's precious metals price for market value calculations.

22.     Data that was presented in invoice form was entered into a spreadsheet replicating the original spreadsheet for consistency, and then metal content per item and the daily precious metals prices were again added to the data. All daily precious metals prices used in this analysis originated from the Kitco web site, www.kitco.com, using their historical London PM fix data for gold and silver. Kitco is a recognized and longstanding, reputable precious metals dealer in Canada.

23.     Since the 1970's, the daily London PM gold fix has been the value at which major bullion banks, precious metals trading firms, refineries and mining companies have set the underlying precious metals value for large national and international precious metals transactions. The price is set by the five largest members of the London Gold Pool who are also members of the London Bullion Market Association. Kitco publishes historical data on their website listing every London PM fix of the gold price since Jan. 2, 1975 and the London PM fix of the silver price since Jan. 3, 1984.

24.     The London PM fix is commonly and widely used by the industry for historical precious metals pricing accuracy.

25.     Once underlying precious metals values were added to the data, each items "melt" value was determined. The melt value equals the precious metals price times the items pure metal content of that coin or bar at the point of sale.

## V.     Examples of Calculating Daily Market Values

26.     Following are how these calculations are made for two items sold by Chase Metals and Barrick Capital.

Item                                    Precious metals content

1 oz Canadian Silver Maple Leaf .9999 fine = 1.00 ounce of pure silver.

½ oz Canadian Silver Polar Bear .9999 fine = 0.50 ounces of pure silver

27.     The melt value equals the silver price on the day of the sale (Kitco London PM fix) multiplied by the items intrinsic metal content of gold or silver.

28.     In our example items above, if the silver price on the day of the sale was $14.48 per ounce the melt value of each item would equal:

1 oz Canadian Silver Maple Leaf .9999 fine = 1.00 ounce of pure silver.

1.0 x $14.88 = $14.48 Melt Value

½ oz Canadian Silver Polar Bear .9999 fine = 0.50 ounce of pure silver.

0.50 x $14.48 = $7.24 Melt Value

243

29.     Once melt values for all items were determined, the price markup above the intrinsic metal value of these items was calculated using the sale prices per item minus the intrinsic metal value, yielding the markups above melt each item was sold for were calculated in dollars and then in percentages.

30.     Using our examples above:

<u>1 oz Canadian Silver Maple</u> Leaf sold for          $16.00 per coin

Melt Value = $14.48

Markup over Melt = $16.00 (sales price) - $14.48 (melt value) = $1.52

The dollar markup over melt = $1.52 and the percentage over melt = $1.52 (dollar mark up) divided by $14.48 (melt value) = 1.1049 = **10.49%**

<u>½ oz Canadian Silver Polar Bear</u> sold for          $25.89 per coin

Melt Value = $7.24          ($14.48 silver price x 0.50 silver content = $7.24 melt value)

Markup over Melt = $25.89 (sales price) - $7.24 (melt value) = $18.65

The dollar markup over melt = $18.65 and the percentage over melt = $18.65 (dollar mark up) divided by $7.24 (melt value) = 2.5796 = **257.96%**

31.     The markup for the 1 oz Canadian Silver Maple Leaf was 10.49% while the markup for the ½ oz Canadian Silver Polar Bear was 257.96%. These two examples are taken from a Chase Metals IRA sale to a single customer in a single transaction.

## VI.     Precious Metals Manufacturing

32.     All physical precious metals, no matter the size, shape or precious metals content are made to very exacting standards to be accepted by the marketplace for integrity of weight, purity, and precious metals content. The time and effort required to produce these items, and the number of units made in a production run are significant factors in determining the market premium a manufacturer charges.

33.     Because there are many manufacturers of gold and silver coins and bars including sovereign mints and private manufacturers, there are many choices of products available. As a result, market pricing for comparable items is extremely competitive. It is usually a buyer's market.

34.     Manufactured items are not sold at their melt value. There is always a premium paid to a manufacturer over the items intrinsic metal value to compensate the manufacturer for time, effort, and resources necessary to manufacture these coins and bars.

35.     That said, all bullion items are priced based on their underlying melt value at the point of sale because the melt value is the foundation upon which we trade all precious metal bullion. In

244

the future, when bullion items are sold, the price the seller receives will be directly tied to the underlying precious metal value (melt value) at that time. The precious metals value of that coin or bar will have to rise above the purchase price of that item (melt value plus markup or premium) for the seller to earn a profit.

36.     Most manufacturers do not sell directly to the public. There are middlemen (authorized mint or manufacturer distributors) who buy from manufacturers in volume and then in turn resell the same items at a profit to smaller entities, usually professional precious metals dealers. Precious metals dealers in turn sell to other dealers or to the public at large. There are many precious metals dealers in the United States and around the world, so the end buyer has many choices of who to buy from and what to buy. This diversity of products and dealers creates an extremely competitive national and international marketplace for price and availability of comparable items.

37.     Regarding market pricing there are two factors that need to be taken into consideration to fully understand market premiums, popularity of some items versus others and the relative size of different items. Some precious metals items are more popular than others and some coins and bars are much larger or smaller than others. More popular items tend to have larger mintages or availability of product and hence are more competitively priced than less popular items. The available pool of items and dealers who want to buy and sell those same items is larger for more popular items than it is for less popular items. Greater competition equals more competitive pricing.

38.     When it comes to size of an item, the larger the item the less time and effort is required to make the same amount of precious metals content than a smaller item. For example, a 100-ounce silver bar contains 100 ounces of pure silver. A 10-ounce silver bar contains 10 ounces of pure silver. It takes ten 10 oz silver bars to equal the same precious metals content as a single 100 oz silver bar. A 1-ounce silver bar or coin requires 100 units to equal the same 100-ounce silver bar. The manufacturing time and effort is 100 times greater for the 1-ounce coin or bar and 10 times greater for a 10-ounce bar to equal the precious metals content as the 100-ounce silver bar. As a result, premiums manufacturers charge for the larger items are usually lower than premiums charged for smaller items. And again, the marketplace remains extremely competitive with many choices for almost any size item.

## VII.    Analysis Overview

39.     The only data that I analyzed are items that Chase Metals and Barrick Capital sold to their clients in IRA sales, cash sales and credit card sales with dates of transactions included. If I was unable to properly identify the underlying precious metals prices at the time of sale because no transaction date was indicated, I excluded that item(s) from my analysis. I did not analyze transactions that were IRA liquidations, IRA swaps, or cash liquidations.

40.     My analysis of the data presented is simple and straightforward. First, I determined the melt value for each item sold which required, as I mentioned above, determining the precious metals price for the item on the day the item was sold and multiplying that by the precious metal content of the item. I then determined the dollar amount over the melt value each item was sold for

245

by subtracting the melt value of an item from its sales price. Finally, I determined the percentage markup over melt for each item sold.

41.     With the corresponding supplier pricing information from Bayside Metals and Dillon Gage (suppliers) to Chase Metals and Barrick Capital (sellers) I was then able to obtain average prices paid (cost per item) that Chase Metals and Barrick Capital paid Bayside Metals and Dillon Gage for the same coins sold. As I mentioned earlier, the various manufacturers and middlemen all earn profits, so the prices paid by sellers are above their intrinsic melt value to accommodate for manufacturing charges, distribution costs, and profits.

42.     Having been in the industry for 40-years, I am fully aware of production costs and profit margins manufacturers, distributors and precious metals dealers earn in competitive markets. Based on my review Bayside Metals and Dillon Gage charged Chase Metals and Barrick Capital prices and premiums over melt that that were fair and very competitive.

43.     I then used the average cost per item paid by Chase Metals and Barrick Capital and subtracted that from the sales price of each item sold to determine Chase Metals and Barrick Capital profit margin or spread per item. With the sales price, melt value, and cost basis of each item determined, calculating premiums over melt and premiums over cost in terms of dollars and percentages is simple math.

44.     In the industry the term spread is commonly used to describe the difference between the dealer's cost to acquire or purchase an item and what the dealer would sell the same item for.

45.     With over $188 million in sales and almost 5 million units sold, cost averages and premiums analyzed will not be materially skewed higher or lower by a few items or prices that are abnormally high or low. The accompanying supplier spreadsheets from Bayside Metals and Dillon Gage listing their sales to Chase Metals and Barrick Capital comprises approximately 95% of the identical items sold by Chase Metals and Barrick Capital. In my experience I have found that cost averages amortized over so many units and dollars in value sold are remarkably accurate over time, even with fluctuations in the underlying precious metals prices.

## VIII.   Analysis of the Data

46.     To analyze the data fully I was required to sort the data in multiple ways in the excel spreadsheet. I sorted the data by precious metal type (gold or silver) first to segregate the gold sales and silver sales into their own separate spreadsheets. Once I had the data segregated by metal, I further sorted the data by markup over melt (highest to lowest), then again by spread over cost (highest to lowest), and again alphabetically by item to group like items for the purpose of totaling those individual item sales. I was then able to discern total number of units of each item sold and the proportion of total sales by item.

47.     The results of these different analyses were remarkably consistent. They revealed that an unusually disproportionate amount of sales were concentrated in three items for Chase Metals (1/2 oz Silver Polar Bear, 1/10 oz Gold Polar Bear, and ¼ oz Gold British Standard coin) and three

246

items for Barrick Capital (1/10 oz Silver Spade Guinea, 1/10 oz Silver Britannia, and 1/10 oz Gold Wildlife series).

48.     Based on total dollars sold these items consisted of 89.37% of the Chase Metals total sales and 93.90% of the Barrick Capital total sales.

49.     These items were sold at remarkably high markups over their melt value and their spread over Chase Metals and Barrick Capital's cost. The details follow.

## VIIII.   Chase Metals Sales Analysis

|  | Total Sales in Dollars by Chase Metals | % of Sales |
|---|---|---|
| **Total All Items Sold** | **$176,507,547.50** | **100.00%** |
| ½ oz Silver Polar Bear coins | $102,495,062.14 | 58.07% |
| 1/10 oz Gold Polar Bear coins | $31,215,866.96 | 17.69% |
| ¼ oz Gold British Standard coins | $24,037,234.02 | 13.62% |
| **TOTAL three items above** | **$157,748,163.12** | **89.37%** |
| TOTAL ALL OTHER ITEMS gold and silver | $18,759,384.38 | 10.63% |

### Quantity of Top Three Items Sold Chase Metals

| | |
|---|---|
| ½ oz Silver Polar Bears coins | 4,134,142 coins |
| 1/10 oz Gold Polar Bear coins | 106,123 coins |
| ¼ oz Gold British Standard coins | 34,120 coins |

### Average Markup Over Melt Sold by Chase Metals

| | |
|---|---|
| ½ ounce Silver Polar Bear coins | 213.23% |
| 1/10 oz Gold Polar Bear coins | 120.15% |
| ¼ oz Gold British Standard coins | 116.07% |
| ALL OTHER ITEMS gold and silver | 20.96% |

### Average Spread Over Cost Sold by Chase Metals

| | |
|---|---|
| ½ ounce Silver Polar Bear coins | 128.08% |
| 1/10 oz Gold Polar Bear coins | 91.68% |
| ¼ oz Gold British Standard coins | 108.02% |

247

**Average Price Bayside Metals / Dillon Gage sold to Chase Metals per coin**

| | |
|---|---|
| ½ ounce Silver Polar Bear coins | $10.87 per coin |
| 1/10 oz Gold Polar Bear coins | $153.46 per coin |
| ¼ oz Gold British Standard coins | $338.66 per coin |

**Average Price Chase Metals resold the same coins to their customers per coin**

| | |
|---|---|
| ½ ounce Silver Polar Bear coins | $24.79 per coin |
| 1/10 oz Gold Polar Bear coins | $294.15 per coin |
| ¼ oz Gold British Standard coins | $704.49 per coin |

## X.  Barrick Capital Sales Analysis

| | Total Sales in Dollars by Barrick Capital | % of Sales |
|---|---|---|
| **Total All Items Sold** | **$11,744,306.47** | **100.00%** |
| 1/10 oz Gold Canada Wildlife coins | $6,590745.95 | 56.12% |
| 1/10 oz Silver Spade Guinea coins | $3,825,878.62 | 32.58% |
| 1/10 oz Silver Britannia coins | $611,650.45 | 13.62% |
| **TOTAL three items above** | **$11,028,275.02** | **93.90%** |
| TOTAL ALL OTHER ITEMS gold and silver | $716,031.45 | 6.10% |

**Quantity of Top Three Items Sold by Barrick Capital**

| | |
|---|---|
| 1/10 oz Gold Canada Wildlife coins | 17,663 |
| 1/10 oz Silver Spade Guinea coins | 567,865 |
| 1/10 oz Silver Britannia coins | 93,038 |

**Average Mark Up Over Melt Sold by Barrick Capital**

| | |
|---|---|
| 1/10 oz Gold Canada Wildlife coins | 128.48% |
| 1/10 oz Silver Spade Guinea coins | 312.71% |
| 1/10 oz Silver Britannia coins | 287.74% |

248

**Average Spread Over Cost Sold by Barrick Capital**

| | |
|---|---|
| 1/10 oz Gold Canada Wildlife coins | 97.54% |
| 1/10 oz Silver Spade Guinea coins | 114.56% |
| 1/10 oz Silver Britannia coins | 100.43% |

**Average Price Bayside Metals sold to Barrick Metals per coin**

| | |
|---|---|
| 1/10 oz Gold Canada Wildlife coins | $190.63 per coin |
| 1/10 oz Silver Spade Guinea coins | $3.14 per coin |
| 1/10 oz Silver Britannia coins | $3.28 per coin |

**Average Price Barrick Metals resold the same coins to their customers per coin**

| | |
|---|---|
| 1/10 oz Gold Canada Wildlife coins | $373.14 per coin |
| 1/10 oz Silver Spade Guinea coins | $6.74 per coin |
| 1/10 oz Silver Britannia coins | $6.57 per coin |

## XI.    SUMMARY ANALYSIS

50.    Because Chase Metals and Barrick Capital charged such high prices and spreads over their cost and above the items intrinsic metal value, most buyers suffered immediate and extremely large financial losses once these transactions were completed. Based on the pricing they sold these coins and bars for, Chase Metals and Barrick Capital created abnormally large, and egregious gains for themselves to the immediate detriment of their clients.

51.    Not only is the pricing egregious, most of the items sold by Chase Metals and Barrick Capital are not items that most reputable dealers would sell to their clients as investment vehicles. The most common items sold in the United States for physical precious metals investments are American 1-ounce gold and silver Eagles, Canadian 1-ounce gold and silver Maple Leaf's, 1-ounce, 10-ounce or 32.15 ounce gold bullion bars and 1-ounce, 10-ounce or 100-ounce silver bullion bars. All of these items are extremely competitively priced in the national market place and have very competitive or small buy/sell spreads (the difference a reputable dealer would buy or sell the exact same item at with no underlying change in that items precious metals price) and have relatively low manufacturing premiums.

52.    In reviewing individual Chase Metals IRA sales, cash sales and credit card in the spreadsheets reviewed an overview of invoices revealed many clients bought a very small quantity of the most common items described above, and at competitive market pricing. But clients bought

249

disproportionately large quantities and dollar amounts of the items that Chase Metals and Barrick Capital sold at egregious prices.

53.     For example, I chose the first customer with an IRA Purchase listed on the Chase Metals spreadsheet. A customer bought on 4/1/2019 on spreadsheet trade number – 1730:

| | | | |
|---|---|---|---|
| 1 oz Silver Round | 200 pcs | $15.98 | $3,196.00 |
| ½ oz Silver Polar Bear | 4,635 pcs | $25.31 | $100,478.15 |
| 10 oz Silver Bar | 20 pcs | $159.80 | $3,196.00 |
| 1 oz Gold Maple Leaf | 6 pcs | $1,322.00 | $7,932.00 |
| 1/10 oz Gold Polar Bear | 40 pcs | $273.87 | $10,954.80 |
| ¼ oz Gold British Standard | 15 pcs | $678.67 | $10,180.05 |
| **Invoice Total** | | | **$135,937.00** |

| | | |
|---|---|---|
| **The precious metals prices on 4/1/2019 were:** | **gold = $1,293.50 per oz** | **silver = $15.07 per oz** |

Melt values on 4/1/2019 are as follows:

| | | | |
|---|---|---|---|
| 1 oz Silver Round | 200 pcs | $15.07 | $3,104.00 |
| ½ oz Silver Polar Bear | 4,635 pcs | $7.53 | $34,901.55 |
| 10 oz Silver Bar | 20 pcs | $150.70 | $3,014.00 |
| 1 oz Gold Maple Leaf | 6 pcs | $1,293.50 | $7,761.00 |
| 1/10 oz Gold Polar Bear | 40 pcs | $129.35 | $5,174.00 |
| ¼ oz Gold British Standard | 15 pcs | $323.37 | $4,850.55 |
| **Total Melt Value on 4/1/2019** | | | **$58,805.10** |

250

| **Precious metals prices on 9/11/2020 are:** | | **gold = $1,950.00** | **silver $27.00** |
|---|---|---|---|
| Melt values on 9/11/2020 are as follows: | | | |
| 1 oz Silver Round | 200 pcs | $27.00 | $5,400.00 |
| ½ oz Silver Polar Bear | 4,635 pcs | $13.50 | $62,572.50 |
| 10 oz Silver Bar | 20 pcs | $270.00 | $5,400.00 |
| 1 oz Gold Maple Leaf | 6 pcs | $1,950.00 | $11,700.00 |
| 1/10 oz Gold Polar Bear | 40 pcs | $195.00 | $7,800.00 |
| ¼ oz Gold British Standard | 15 pcs | $487.50 | $7,312.50 |
| Total Melt Value on 9/11/2020 | | | **$100,185.00** |

54.     In summary of this single invoice, of which there are countless others just like it:

| Purchase price 4/1/2019: | $135,937.00 |
|---|---|
| Melt value 4/1/2019: | $58,805.10 |
| Difference from purchase price: | **-$77,131.90** |
| | |
| Melt Value 9/11/2020: | $100,185.00 |
| Difference from purchase price: | **- $35,752.00** |

55.     Between 4/1/2019 and 9/11/2020 the underlying gold price gained $657 per ounce or 51% and the underlying silver price gained $11.93 per ounce or 79%, yet the value of this customers purchase is still $35,752 below his acquisition price, for an unrealized loss of 35%.

56.     Hypothetically, if the customer above had purchased equivalent amounts of silver and gold in the form of the two most common and competitively priced items on his 4/1/2019 invoice, he would have purchased:

| 1 oz Silver Round | 6,687.7440 pcs | $15.98 | $106,870.15 |
|---|---|---|---|
| 1 oz Gold Maple Leaf | 21.987 pcs | $1,322.00 | $29,066.85 |
| **Total Value Common Items 4/1/2019** | | | **$135,937.00** |

251

Melt values on 9/11/2020 are as follows:

| | | | |
|---|---|---|---|
| 1 oz Silver Round | 6,687.7440 pcs | $27.00 | $180,569.08 |
| 1 oz Gold Maple Leaf | 21.987 pcs | $1,950.00 | $42,874.65 |
| **Total Value Common Items 9/11/2020** | | | **$223,443.73** |

| | |
|---|---|
| Value of Hypothetical Purchase today: | $223,443.73 |
| Value of Hypothetical Purchase at point of Purchase | $135,937.00 |
| Difference from purchase price: | **+$87,506.73** |

57.     The example above illustrates that had Chase Metals sold the customer what was in his best interest, today he would enjoy a gain today of approximately $87,506.73. Instead, despite the gold price gaining 51% or $657 per ounce and silver gaining 79% or $11.93 per ounce since his date of purchase, his loss today is $35,752.00.

## XII.   Average Precious Metals Break Even Prices

58.     Based on the average prices Chase Metals and Barrick Capital sold their largest selling coins, precious metals prices must reach the following prices for their clients who purchased these items simply to break even basis their melt value.

| **Average Price Chase Metals sold these coins for:** | | **Gold / Silver Break Even at Melt** |
|---|---|---|
| ½ ounce Silver Polar Bear coins | $24.79 per ½ oz coin | $49.50 per ounce |
| 1/10 oz Gold Polar Bear coins | $294.15 per 1/10 oz coin | $2,941.50 per ounce |
| ¼ oz Gold British Standard coins | $704.49 per ¼ oz coin | $2,817.96 per ounce |

| **Average Price Barrick Capital sold these coins for:** | | **Gold / Silver Break Even at Melt** |
|---|---|---|
| 1/10 oz Gold Canada Wildlife coins | $373.14 per 1/10 oz coin | $3,731.14 per ounce |
| 1/10 oz Silver Spade Guinea coins | $6.74 per 1/10 oz coin | $67.40 per ounce |
| 1/10 oz Silver Britannia coins | $6.57 per 1/10 oz coin | $65.70 per once |

252

## XII.  CONCLUSION

59.     Since these coins are bullion coins and not semi-numismatic or numismatic, with no material collector value above their intrinsic metal value, buyers of these bullion coins have no recourse for gains other than a hope for a substantial appreciation in the underlying gold and silver prices.

60.     Chase Metals and Barrick Capital sold these bullion coins and bars at spreads that are abnormally large by competitive industry standards, giving their clients little or no hope of financial gain based on current precious metals prices, despite substantial gains in the underlying precious metals prices in 2020.

61.     Clients of Chase Metals and Barrick Capital suffered immediate and material financial losses at the point of sale. Clients of Chase Metals will not earn profits on these coins without a further gain in the underlying gold price of 44% to 51% from $1,950 per ounce to between $2,817 and $2,941 and a further gain in the underlying sliver price of 80% from $27.50 per ounce to $49.50 per ounce. Clients of Barrick Capital will not earn profits on these coins without a further gain in the underlying gold price of 91% from $1,950 per ounce to $3,731 per ounce and a further gain in the underlying sliver price of 238% from $27.50 per ounce to $65.70 per ounce.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September, 18, 2020 in Austin, TX

Dana Samuelson

253

## DECLARATION OF JEREMY W. CHRISTIANSON IN SUPPORT OF PLAINTIFF'S MOTION FOR A STATUTORY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF PURSUANT TO 28 U.S.C. § 1746

I, Jeremy W. Christianson, declare pursuant to 28 U.S.C. § 1746 based upon my personal knowledge as follows:

1.      I submit this declaration in support of Plaintiff U.S. Commodity Futures Trading Commission's ("Commission") Motion for a Statutory Restraining Order, Preliminary Injunction, and other Equitable Relief.

2.      I am the Digital Forensics Manager supporting the Commission's Division of Enforcement, 1155 21st Street, N.W., Washington, D.C. 20581. I have been a Digital Forensics Investigator supporting the Division of Enforcement since July 2009, and my primary duties involve forensic collection and analysis of electronic evidence from external sources, which includes the Internet, to be used as evidence in Commission actions.

3.      I have worked conducting digital forensics investigations for the past 19 years for both criminal and civil Government agencies. I hold multiple certifications to include Certified Electronic Evidence Collection Specialist (CEECS) through the International Association of Computer Investigative Specialists (IACIS), Certified Computer Examiner (CCE) through the International Society of Forensic Computer Examiners (ISFCE), EnCase Certified Examiner (EnCE) specifically trained in the use of their core forensic software and other tools, and Department of Defense Computer Forensics Laboratory (DCFL) Certified Examiner. Throughout my career in Digital Forensics I have participated in hundreds of hours of Internet investigations training and actual investigations.

4.      As part of its effort to inspect and copy Defendants' records, in whatever form they are found, under its proposed *Ex Parte* Restraining Order, the Commission is seeking the Courts' permission to take possession of the computer hardware (and associated peripherals) that are believed to contain relevant materials, and to conduct an off-site examination of the hardware

254

for relevant materials, if, upon arriving at the scene, the personnel executing the *Ex Parte* Restraining Order conclude that it would be impractical to examine the computer hardware on-site for this material.

      5.      Forensic collection of electronic evidence primarily refers to making precise duplicates of existing electronic documents. This is done by making an "image" of the storage device or hard drive on which the documents reside. If a computer, other electronic storage medium, or a mobile device (e.g. smartphones, tablets) is identified as containing potentially relevant electronically stored information ("ESI"), a forensic image of the storage device will be obtained for the initial purpose of preservation. This preservation process will allow the parties the ability to conduct a forensically sound analysis of the respectively captured forensic image(s) to ensure that any agreed upon protocol for culling or analyzing the data will be thorough and accurate. It is necessary to make a full forensic image of the respective storage device or hard drive in order to ensure that all potentially relevant evidence is preserved. Without a full forensic image of the respective hard drive or storage medium my office cannot and will not certify that all potentially relevant evidence has been preserved. A forensic image of storage devices is necessary to conduct a forensic analysis to determine if spoliation of ESI took place. A forensic image provides the necessary metadata and other information, which would not otherwise be captured, to properly determine spoliation.

      6.      Based on my knowledge, training, and experience, a single computer hard drive or other storage medium could, and will likely contain potentially relevant structured and unstructured ESI which may or may not be easily recoverable or analyzed. In many instances, deleted data can be recovered, whether in whole or in part, for long periods of time past the point of deletion. There are many ways potentially relevant ESI can be stored on a hard drive or storage medium. This includes, but is not limited to, normal functions of common operating systems such as Windows, Mac OSX, and Linux, storing ESI as artifacts in repositories whether accessible or inaccessible to the end user. Electronic storage devices can store the equivalent of

255

millions of pages of information. Additionally, a party may try to conceal evidence or he or she might store ESI in a manner that is not detectable upon initial examination. This may require the forensics expert conducting the examination to analyze all the stored data to determine what may be potentially relevant to the matter. This examination process could take weeks or months.

7. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction, a controlled environment may be necessary to complete an accurate analysis. The Commission has a controlled environment which is specifically designed and secured for the purpose of protecting the integrity of all forensically collected ESI. This controlled environment is located at the headquarters of the Commission in Washington DC. Access to this controlled environment is limited to Digital Forensic Investigators.

8. This controlled environment serves two purposes. First, as described above, it allows the Digital Forensic Investigator to be certain that the ESI will not be altered once it is in the CFTC's possession. Second, it allows the ESI to be culled of irrelevant and potentially damaging materials. Because it is necessary to obtain a full forensic image (as described above), the image frequently contains computer viruses, software programs, and other obviously irrelevant and potentially damaging materials. Additionally, the full forensic image frequently contains irrelevant personal information as well as potentially privileged materials.

9. After forensically collected ESI has been obtained pursuant to a Court's Order, all digital evidence is stored in the controlled digital forensics laboratory environment and is assigned on a per matter basis to an examiner for the life of the case. The assigned digital forensics examiner is responsible for applying search protocols provided by the legal team. The standard process for culling out potentially responsive data or performing forensic analysis after making a forensic image is to coordinate with the responsible attorney on obtaining a search protocol.

10. The initial copy, sometimes referred to as the "gold" copy, of the forensic image is securely maintained for the life of the matter. The legal team is never given unfettered access

256

to all data on the forensic image. Moreover, we make substantial efforts to exclude non-responsive data for efficiency, system integrity, and security. Only data responsive to a search protocol is provided to the Commission's legal technology services team where it is normalized and loaded into its in-house document review platform (Relativity). Relativity is the document review platform that the legal team utilizes to review the responsive data.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2020

_Jeremy Christianson_
Jeremy W. Christianson

257

**Declaration of Salma Mack**
**Pursuant to 28 U.S.C. § 1746**

I, Salma Mack, hereby make the following declaration based upon my personal knowledge:

1.       I am a Digital Forensics Investigator for the Commodity Futures Trading Commission Office of Information Technology Services, 1155 21st Street, N.W., Washington, D.C. 20581. I have been a Digital Forensics Investigator with the Office of Data & Technology since July 2015. Some of my routine duties involve preserving websites and other Internet-related content to be used as evidence in Commission actions.

2.       On 11/27/2018, Michael Solinsky, a Chief Trial Attorney with the Commission's Division of Enforcement, submitted a request to download and preserve a website at the Internet address "https://metals.com". On 11/29/2018, a true and accurate copy of the website was downloaded, as it appeared on that day, using X1 Social Discovery, Adobe Acrobat, and Offline Explorer Pro. The resulting copies were stored in Portable Document Format ("PDF") and native web format.

3.       On 5/7/2020, Patricia Gomersall, a Futures Trading Investigator with the Commission's Division of Enforcement, submitted a request to download and preserve three websites at the Internet addresses: "www.silvergoldbull.com", "www.towerequity.com", and "www.barrickcapital.com". On 5/18/2020, a true and accurate copy of the three websites were downloaded, as they appeared on that day, using X1 Social Discovery, Adobe Acrobat, and HTTrack. The resulting copies were stored in Portable Document Format ("PDF") and native web format.

4.       On 7/8/2020, Patricia Gomersall, a Futures Trading Investigator with the Commission's Division of Enforcement, submitted a request to download and preserve a website at the Internet addresses: "www.chasemetalshelp.com. On 7/8/2020, a true and accurate copy of

258

the website was downloaded, as it appeared on that day, using Offline Explorer Pro, and Magnet WPS. The resulting copies were stored in Portable Document Format ("PDF") and native web format. The domain name "www.chasemetalshelp.com" had a registered and active website with an IP address of 198.71.233.254, which resolves to Scottsdale, Arizona, and according to public domain information, is hosted by a company named GoDaddy.com, LLC. The domain name Registrant contact information is shown as private and therefore not listed in the public domain record.

5. On 7/20/2020, Patricia Gomersall, a Futures Trading Investigator with the Commission's Division of Enforcement, submitted a request to download and preserve a website at the Internet addresses: "www.barrickcapital.com". On 7/23/2020, a true and accurate copy of the website was downloaded, as it appeared on that day, using HTTrack, Magnet WPS, and Fireshot. The resulting copies were stored in Portable Document Format ("PDF") and native web format. The domain name "www.barrickcapital.com" had a registered and active website with an IP address of 32.208.18.168, which resolves to Mountain View, California, and according to public domain information, is hosted by a company named GoDaddy.com, LLC. The domain name Registrant contact information is shown as private and therefore not listed in the public domain record.

6. On 9/16/2020, Patricia Gomersall, a Futures Investigator with the Commission's Division of Enforcement, submitted a request to download and preserve a copy of the websites with the following Internet addresses: "https://metals.com" and "https://buygoldinalabama.com". Additional research for other active websites with the Internet address starting with "buygoldin<statename>.com" was also requested. On 9/16/2020, a true and accurate copy of the websites were downloaded, as they appeared on that day, using Offline Explorer Pro and

259

Adobe Acrobat.  The resulting copies were stored in Portable Document Format ("PDF") and native web format. The domain name "https://metals.com" had a registered and active website with an IP address of 22.227.38.65, which resolves to Ottawa, Ontario, and according to public domain information, is hosted by a company named Network Solutions, LLC.  The current domain name Registrant contact information is shown as private and therefore not listed in the public domain record.  However, historical domain records from May 29, 2017 showed the domain name "Registrant Contact" as Barry Shapiro – 140 N Sierra Vista Dr., Tucson, AZ 85719 – Phone: 520-599-9655.  The domain name "https://buygoldinalabama.com" had a registered and active website with an IP address of 107.180.34.195, which resolves to Scottsdale, Arizona, and according to public domain information, is hosted by a company named GodDaddy.com, LLC.  The current domain name Registrant contact information is shown as private and therefore not listed in the public domain record.  According to domain history records for "https://buygoldinalabama.com", there are two connected domains, created on October 23, 2018, with the following Internet Addresses: "buygoldinnebraska.com" and "buygoldinpennsylvania.com".  Internet research for other active websites with the Internet address starting with "buygoldin<statename>.com" revealed the website with Internet address "https://buygoldinwyoming.com" as active with a blank index webpage.  The domain name "https://buygoldinwyoming.com" had a registered and active website with an IP address of 107.180.34.195, which resolves to Scottsdale, Arizona, and according to public domain information, is hosted by a company named GoDaddy.com, LLC.  The current domain name Registrant contact information is shown as private and therefore not listed in the public domain record.  According to domain history records for "https://buygoldinwyoming.com", there are two

260

connected domains, created on October 23, 2018, with the following Internet Addresses:

"buygoldinmaryland.com" and "buygoldinwisconsin.com".

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2020, by:                    Salma Mack

261

## DECLARATION OF ELIZABETH PLANER
## PURSUANT TO 28 U.S.C. § 1746

I, Elizabeth Planer, hereby make the following declaration based upon my personal knowledge:

### I.      BACKGROUND

1.      My name is Elizabeth Planer (hereinafter "Declarant"), Declarant is a POST-certified law enforcement officer in Alabama, and Declarant is a Special Agent with the Alabama Securities Commission (hereinafter "Commission") in Montgomery, Alabama.   Declarant has worked in this capacity for the Commission since November 1, 2017.   Declarant has been a law enforcement officer for twenty-two years. Before becoming a Special Agent for the Commission, Declarant was a Probation and Parole Officer for the Alabama Board of Pardons and Paroles for eleven years.   Before becoming a Probation and Parole Officer for the Alabama Board of Pardons and Paroles, Declarant was a Police Officer for the Montgomery Police Department for seven years.   Declarant was an investigator for five years of that time, in which Declarant investigated violent crimes and property crimes, which included financial crimes. Declarant attended Auburn University Montgomery and graduated in 1999 with a Bachelor of Science in Justice and Public Safety.

2.      Declarant's responsibilities as a Special Agent include the

262

investigation of fraud involving broker dealers, the investigation of fraud involving investment advisers and investment adviser representatives, any type of fraud involving securities, and fraud that targets the elderly. While working for the Commission, Declarant has routinely analyzed and reviewed thousands of financial documents, including, but not limited to, bank records and investment account documents. Declarant has also reviewed and analyzed hundreds of internet websites.

3. On June 11, 2019, Declarant began an investigation into possible investment adviser fraud based on information received from the Texas State Securities Board ("TSSB"). Based on this information, Declarant began the process of issuing subpoenas for records and interviewing possible victims and witnesses.

## II. **RECORDS REVIEWED**

4. Declarant reviewed the following documents and websites in the preparation of this declaration:[1]

   a. The California Secretary of State website at

      https://businesssearch.sos.ca.gov for business entity information on

---

[1] The documents that I reviewed for the preparation of this Declaration are voluminous and therefore not all are attached; a number are summarized herein or listed. All documents can be made available for review upon request. Personal identifying information, such as account numbers and social-security numbers, have been redacted.

TMTE Inc. DBA Metals.com, Barrick Capital, Inc., Tower Equity, LLC, LTK Marketing, LLC, Mettabel, Inc., Chasing Gold, Inc., First American Savings, Inc., Gooner Enterprises, Inc., Ferdman Group, Inc., Andrew Eilers Consulting, Inc., IQ Capital Advisors, Inc., Hurricane Holdings, Inc., Deep State Marketing, Inc., Amerigold, Inc., Ellipses Marketing Inc., Rich Dough, Inc., 9inth Level, LLC, Architech Business Consulting, Inc., Verastan Group, LLC, Harper Metals Group, LLC, Harper Metals Group, Inc., Midwood Capital, Inc., Poor Trap Entertainment, Inc., Eco Blue Inc., Halimi Group, Inc., TOTM Production Group, LLC, USA Marketing, Inc., Revo, LLC, Instribution, LLC, Tower Holdings, LLC, Street Invasion, Inc.,;

b. The Wyoming Secretary of State website at https://wyobiz.wyo.gov/Business/FilingSearch.aspx for business entity information on Metals.com, LLC, Tower Equity, LLC, USA Marketing, Inc., The Voice, Inc., Bearhunter, LLC., XAN, LLC, The Voice Inc., MPERA Corp., Plantech Productions, Inc., Tower Holdings, LLC;

c. The Delaware Secretary of State website athttps://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx for business entity information on Barrick Capital, Inc., Chasing

264

Gold Inc., Instribution, LLC, TPH Boss, Inc., Revo, LLC,

d. Bank records obtained from Bank of America ("BOA") for accounts in the name of Barrick Capital, Inc., Tower Equity, LLC, Chase Metals, Inc., TMTE, Inc. DBA Metals.com, Bayside Metal Exchange, Simon Batashvili, and Fainche MacCarthy;

e. Bank records obtained from Capital One ("CO") held in the name of Lucas Asher, Randy Kohl, and Erika and Walter Vera;

f. Bank Records obtained from JP Morgan Chase Bank ("JPMCB") held in the name of Tower Holdings, Inc., Best New Inc., Batashvili Management Inc., Midwood Capital, Verastan, LLC, Verastan Group, LLC, AN Properties, LLC, Magicstar Arrow, LLC, Deric Ned, Walter Vera, and Kyle Sanna;

g. Bank records obtained from Wells Fargo Bank ("WFB") for accounts in the name of Barrick Capital, LLC, Tower Equity, LLC, Tower Estates, Inc., Chasing Gold, Inc, Chasing Metals, LLC,  Instribution, LLC, Revo, LLC, Precious Metals Client TR, LLC, First American Estate and Trust, LLC, Merrill Gold, LLC, Deep State Marketing, LLC, Fainche MacCarthy, Simon Batashvili,  including account statements, deposit information, wire transfers and checks;

h. Bank records obtained from Opus Bank in the name of Tower

265

Holdings, Inc including account statements, deposit information, wire transfers and checks;

i.  Bank records obtained from CIT Bank in the name of Tower Equity, LLC, Tower Estates, Inc., Tower Property One, LLC, and Chase Metals, LLC  including account statements, deposit information, wire transfers and checks, and associated credit and/or debit card statements;

j.  Bank records obtained from First Bank in the name of Administrative Account Services including account statements, deposit information, wire transfers and checks, and associated credit and/or debit card statements;

k.  Bank records obtained from Regions Bank for accounts related to an elderly investor;

l.  Records obtained from American Express for Tower Estates, Inc. Tower Equity, LLC, Chase Metals,  Fainche J MacCarthy, Kyle Sanna, and Deric Ned;

m. Records obtained from Paypal, Inc. for the accounts of Lucas Asher and Simon Batashvili;

n.  The defendants' websites: www.chasemetals.com, www.metal.com, www.barrickcapital.com, www.usamint.com, www.towertrust.com,

www.towerholdings.com, www.towerira.com,

www.towerequity.com;

o. Records obtained from GoDaddy for the accounts associated with
Lucas Asher, Simon Batashvili, and the purchase of the domains for
www.chasemetals.com, www.barrickcapital.com, www.usamint.com,
www.towertrust.com, www.towerholdings.com, www.towerira.com,
and www.towerequity.com;

p.  Records obtained from Network Solutions for the accounts
associated with Lucas Asher for the purchase of the domains for
www.metals.com.

q. Records obtained from Trinet Group, Inc., for the human resources
and payroll accounts associated with Simon Batashvili, Lucas Asher,
Chase Metals, Inc., Revo, LLC, First American Estate and Trust,
LLC, and Tower Equity, LLC;

r.  Records obtained from iHeartMedia for the Cease and Desist Letter
against Metals.com, the response associated with the Letter, and the
details of advertising purchased from iHeartMedia by Metals.com.

s. Records obtained from Fed Ex for shipment data for all mailings to
or from the various addresses associated with the accounts for Simon
Batashvili, Lucas Asher, Chase Metals, Inc., Chase Metals, LLC,

267

Metals.Com, Tower Equity, LLC, and USA Mint, Inc.;

t.  Records obtained from the following qualified savings retirement account providers: American Equity, American National, Athene Annuity and Life, Avadian Credit Union, Edward Jones, Fidelity Brokerage Services, Fidelity Netbenefits, Secure Investment Management, T Rowe Price, TD Ameritrade, Wells Fargo Advisors;

u.  Records obtained from the following Self Directed IRA providers: American Estate and Trust Company, Directed Trust Company, Equity Trust Company, IRA Trust Services, Kingdom Trust Company, Mountain Trust Company, New Direction Trust Company, Pensco Trust Company, and The Entrust Group.

v.  Records obtained from Metals.com to include customer invoices, Shipping and Transaction Agreements, email communications.

### III.   SUMMARY

5.    Declarant's analysis of the documents reviewed coupled with witness and elderly investor interviews, which included former employees of Chase Metals and Metals.com, revealed that the Defendants listed in the complaint operated a fraudulent scheme with the goal of obtaining as much money as possible for their own benefit without the knowledge of elderly investors via large, undisclosed spreads.

268

6.     This was accomplished by the Defendants, or sales representatives or agents working for the Defendants, contacting elderly investors by phone or through digital advertisements. Once contact was made, they then used fear tactics to advise and induce the elderly investors to liquidate their qualified retirement savings, such as IRA's and 401k's.

7.     These fear tactics often included investment advice, specifically: comparing securities to precious metals; advising about market trends; advising about the advantages of investing in precious metals bullion versus securities; and forecasting the value of securities. The intent was to advise and induce the elderly investors to sell their investments, including securities, by leading elderly investors to believe that an investment in anything other than precious metals bullion would place their retirement funds in significant risk of loss no matter how conservative the investment.  To accomplish this, the Defendants, by and through their sales representatives and agents, made fraudulent, deceitful, and deceptive statements or omissions about securities and precious metals bullion. This was the first step of the process that gave the Defendants access to large sums of retirement funds held by the elderly investors as cash.  The second step involved liquidated retirement funds being used to fund a self-directed IRA (hereinafter "SDIRA") that allowed the elderly investors to purchase precious metals bullion as an investment. Finally, the Defendants' scheme resulted in the Defendants obtaining the majority of the

elderly investors' funds for their own benefit through large, undisclosed spreads charged on the precious metals bullion sold to the elderly investors.

8.      Generally, four types of precious metals bullion made up the majority of investment purchases: the ½-ounce Silver Royal Canadian Mint Polar Bear Bullion; the ½-ounce silver Canadian Wildlife Series coin once Metals transitioned to Barrick; the 1/10-ounce Gold Royal Canadian Mint Polar Bear Bullion (also identified as the 1/10-ounce gold Canadian Wildlife Series coin once Metals transitioned to Barrick); and the ¼-ounce Gold British Standard Bullion.

9.      The elderly investors were not made aware of the large spreads that would be charged by the Defendants, which resulted in the loss of the majority of the elderly investors' funds.

10.     Those elderly investors who later contacted the Defendants to inquire into the loss of their funds were generally told that they had not incurred a loss, the real value was more than what was listed on the SDIRA valuation statement, and/or the value was more because the precious metals bullion coins were exclusive to the Defendants.

11.     The Defendants did not appear to have any concern as to the circumstances of the elderly investors or how this loss would affect the elderly investors, such as their inability to retire as planned or their encountering financial problems as a result of the Defendants' actions.

270

## IV.   CASE DETAILS

12.    In or about June 11, 2019, Declarant was assigned a case involving possible securities fraud and/or investment adviser fraud based on records provided by the TSSB of New Direction Trust Company (hereinafter "New Direction") clients who purchased precious metals from Chase Metals and TMTE Inc., d/b/a Metals.com. New Direction is a SDIRA that maintains records of investments and values associated with those investments for SDIRA account customers. Based on this information, I began the process of issuing subpoenas for records and interviewing possible elderly investors and witnesses.

13.    Through the course of the investigation, Declarant learned that Lucas Asher (hereinafter "Asher"), who is also known as Lucas Erb, and Simon Batashvili (hereinafter "Batashvili") owned, led, directed, operated, and/or were the principals of companies that sold, or were used to support the sales of, precious metals bullion to elderly individuals in Alabama. Those companies were TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., (hereinafter "Metals"), Barrick Capital, Inc. (hereinafter "Barrick") and Tower Equity, LLC (hereinafter "Tower").

14.    The elderly Alabama investors targeted were 60 years of age or older and held politically conservative views.

**Corporate History**

15.    The first name of the company making sales that Declarant is aware of was Chase Metals. The name of Chase Metals was changed to Metals.com in or about November 2018.  Specifically, Access Unlimited was formed as an LLC in Wyoming on April 30, 2008.  On April 13, 2016, Access Unlimited registered the trade name Chase Metals, Inc. in Wyoming.  On August 29, 2016, a name change from Chase Metals, Inc. to Chase Metals, LLC was filed in Wyoming.  On September 6, 2016 Chase Metals, LLC filed as a foreign corporation in California. On March 18, 2017 Chase Metals, LLC, changed to a corporation, Chase Metals, Inc., in Wyoming. On November 20, 2017, Chase Metals, Inc., filed as a foreign corporation in California. On July 23, 2018 Chase Metals, Inc. changed its name to TEM Inc. in Wyoming. On August 2, 2018 TEM Inc. changed their name to TMTE Inc. in Wyoming. On November 9, 2018, Chase Metals, Inc. changed their name to TEM Inc., d/b/a Chase Metals Inc. in California, and in a separate amendment on the same day, changed their name from TEM Inc., d/b/a Chase Metals Inc. to TMTE Inc.  On November 16, 2018 TMTE Inc. registered the trade name Metals.com in Wyoming. To my knowledge, the trade name Metals.com was never reported to the California Secretary of State.

16.    The sales of precious metals bullion were transitioned from Metals to Barrick Capital in or about August 2019.  Metals began the transition to Barrick on

272

August 20, 2019 by incorporating the business in Delaware. The
www.barrickcapital.com domain was purchased from GoDaddy by Asher on
October 23, 2019, and one week later, Batashvili opened an account in the name of
Barrick Capital at Bank of America (hereinafter "BOA") on October 29, 2019.
The first sale of precious metals by representatives of Barrick Capital occurred on
December 5, 2019. On February 6, 2020, Barrick filed as a foreign corporation in
California. On March 5, 2020, Batashvili opened an account in the name of
Barrick Capital at Wells Fargo (hereinafter "WF").

17.     The transition from Metals to Barrick Capital coincided with the
issuance of multiple Cease and Desist Orders from state securities regulators,
including one issued by the Alabama Securities Commission on August 8, 2019.
Attachment A is a true and correct copy of the Cease and Desist Order issued by
the Alabama Securities Commission[2].

18.     A number of the sales representatives and employees of Barrick were
the same sales representatives and employees of Metals, for example, Randall
Kohl, Kyle Sanna, Deric Ned (who also went by the names Deric Scott and Luke
McCain), Walter Vera (who also went by the name Walt Edward), Athena Hunter,
and Kenia Rodriquez.

---

[2] All attachments contained herein are true and correct copies.

19.     The approach that Metals sales representatives took was somewhat different than the approach Barrick sales representatives took. Due to that, Declarant will generally separate the companies throughout the remainder of this section unless they share an aspect of the conduct.

### How Elderly Investors encountered the Defendants

20.     During the course of the investigation, Declarant discovered that at least thirty-six Alabama residents invested in precious metals bullion through Metals or Barrick between September 26, 2016 and June 23, 2020. In general, a sales representative from Metals or Barrick would cold-call an elderly investor. In the case of Metals, these leads were provided to the sales representatives via an internal company system.  Many of the elderly investors were conservative and had qualms about the strength of the U.S. Dollar and the stock market. The elderly investors called generally did not know how the Metals or Barrick sales representatives obtained their information or knew that they had concerns about the economy.

21.     Some elderly investors saw advertisements for Metals online and contacted Metals based on what they saw. The advertisements were described as being centered around Sean Hannity with statements concerning the fragile state of the economy.

22.     Declarant learned that iHeartMedia issued a cease and desist letter to

Page 13 of 83

274

Metals on March 28, 2018, in which iHeartMedia alleged that Metals registered the domain names www.rushlimbaugh.com.co and www.hannity.com.co without authorization and requested that the activity and implied associations with Hannity and Limbaugh cease and desist immediately. On April 6, 2018, Metals responded and denied the allegations. Attachment B is a copy of the Cease and Desist Letter issued by iHeartMedia.

23.     However, on March 22, 2018, Metals purchased advertising from iHeartMedia.  iHeartMedia described the content of advertising as banner ads on the Sean Hannity website, www.hannity.com. There were further discussions between an iHeartMedia sales representative and Asher to expand the advertising package to include a radio spot on Hannity's radio show, but that never materialized.

24.     Declarant spoke with a representative of iHeartMedia and was told that iHeartMedia suspected Metals of creating fake pages on Facebook for Hannity but had no proof because the pages were removed as fast as they were created. Due to that, it was neither addressed in their Cease and Desist Letter, nor was it addressed in their formal response to the subpoena.

**How the Defendants Proceeded Once Contact was Made**

25.     Once elderly investors were contacted by Metals sales representatives, one of the first steps by Metals sales representatives was to determine if the elderly

275

investors had a qualified retirement savings account. A qualified retirement savings account is a retirement account that qualified for a transfer to a SDIRA. A SDIRA allows for holdings, such as certain precious metals, outside of what a typical IRA is authorized to hold. However, only certain retirement accounts are eligible for transfer to a SDIRA, such as 401k's or IRA's, whereas pension accounts are not.

26.    Metals sales representatives also attempted, often successfully, to determine the amount held in a qualified retirement savings account by requesting statements with the balance of the account or contacting the company that held an elderly investor's retirement account.

27.    At the same time, Metals sales representatives established a foundation of fear with the elderly investors. The underlying basis for this fear was generally that the economy was going to falter or the stock market was going to crash that would result in the elderly investors losing their retirement funds or the United States Government was going to seize retirement accounts. The point of these claims was to begin the process of advising elderly investors that their retirement investments, no matter what they were comprised of, were at significant risk.

28.    Additionally, the Metals sales representatives led the elderly investors to believe that they shared the same or similar philosophies on economics, financial markets, and politics in order to create trust. This set the stage for Metals

276

sales representatives to advise elderly investors about the safety of gold and silver.

29.    Asher instructed and directed the Metals sales representatives on how to scare the elderly investors in order to access their retirement funds. Asher led morning meetings in which he determined, and instructed the sales representatives on, what advice and recommendations should be given to elderly investors in order to advise and induce elderly investors to liquidate their qualified retirement savings accounts, some of which contained securities. Asher did this in part by highlighting articles for the sales representatives to provide to elderly investors that supported their fear-based approach. Asher also handled the marketing of Metals and Barrick.

30.    The goal and strategy of the Defendants was to obtain all the money that they could induce the elderly investors to liquidate through the Metals and Barrick sales representatives. Metals sales representatives were instructed to first focus on having the elderly investors liquidate their retirement accounts and transfer those funds to a SDIRA. Once the funds were in a SDIRA, it was easier to convince the elderly investors to purchase precious metals bullion with full amount of available funds.

**Fraudulent Investment Advice and Sales of Securities, and**

**Failure to Act as a Fiduciary**

31.    The Defendants, by and through their sales representatives, provided

Page 16 of 83

277

investment advice to those elderly investors who held securities. The investment advice generally fell into three categories: 1) advising about the advantages of investing in precious metals versus securities, 2) advising on market trends, i.e. that the stock market was going to fall or crash, and/or 3) advising on asset allocation. This advice, as well as other misrepresentations and/or omissions, was provided to induce the elderly investors to sell their securities so that Metals sales representatives could then sell them precious metals bullion and obtain the majority of their retirement funds via large, undisclosed spreads.

32.     The majority of the precious metals sold to the elderly investors consisted of one, or a combination of, four types of precious metals bullion coins: 1) ½-ounce silver Royal Canadian Mint Polar Bear coin, also called ½-ounce silver Canadian Wildlife Series coin once Metals transitioned to Barrick; 2) 1/10-ounce gold Royal Canadian Mint Polar Bear coin, also called 1/10-ounce gold Canadian Wildlife Series coin once Metals transitioned to Barrick; 3) ¼-ounce gold British Sovereign Mint Standard coin; and 4) 1/10-ounce silver Spade Guinea.

33.     Defendants profited from the sale of these specific precious metals bullion via large, undisclosed spreads after elderly investors sold their securities based on what they were told by the Defendants, acting by and through their sales representatives. These large, undisclosed spreads were fraudulent and deceptive, and created a conflict of interest since the Defendants were not acting for the

278

primary benefit of the elderly investors that they were advising.

34.    Elderly investors were not told the truth as to how Metals and Barrick and its representatives made money.  Compounding the fraud, elderly investors were routinely told by Metals and Barrick sales representatives that there would not be any fees and/or that there would not be any commissions associated with the sale. Additionally, the Shipping and Transaction Agreement from Metals that the elderly investors signed set out spreads well below the large, undisclosed spreads ultimately charged by the Defendants.

35.    Examples of what elderly investors were told by Metals include an elderly investor who was told that there would not be any commissions because the sale was associated with Sean Hannity. A Metals sales representative told another elderly investor that he worked on salary.  An elderly investor who purchased through Barrick was told by the Defendant's sales representatives that there would not be any fees for five years.

36.    In truth, the Metals sales representatives were paid on commission, and the more money that they could induce elderly investors to liquidate and then use to purchase precious metals bullion resulted in more money for the sales representatives and the Defendants via large, undisclosed spreads. Metals and its representatives prioritized their own benefit and profit rather than working primarily for the benefit of the elderly investors and took steps to conceal their

actions.

37.     Metals sales representatives did not apprise elderly investors of the volatility of the precious metals market; instead, they told elderly investors that they would not lose money, would not lose any principal, and/or the only way to keep their retirement funds secure is by investing in precious metals bullion.

38.     The Defendants, by and through their sales representatives, did not tell elderly investors that it was recommended that only a percentage of a person's overall retirement holdings should be invested in precious metals bullion, if at all, as stated in the Shipping and Transaction Agreements (Metals) and Account Agreements (Barrick). Instead, elderly investors were told by the Defendants' sales representatives to use all available retirement funds to invest in precious metals bullion. The only type of diversification that was ever raised was by one Metals sales representative who told an elderly investor that most of the elderly investor's funds should be invested in gold, with the remainder of the funds to be invested in silver.

39.     The Metals sales representatives did not take steps to determine if precious metals were a suitable investment for the elderly investors, most of whom were retired or intended to retire in the near future. Metals sales representatives used fear to advise and convince elderly investors to liquidate their retirement holdings and failed to work primarily for the benefit of the elderly investors.

Page 19 of 83

280

40.    In one circumstance, an elderly investor very clearly told the Metals sales representative that she wanted a conservative investment approach and achieved that with her IRA holdings at the time. Despite this, the Metals sales representative preyed on her fears of the economy and of having her IRA seized by the government in order to convince her to liquidate her conservative IRA that held securities, and purchase ½-ounce silver Polar Bear coins with a majority of her retirement funds. Other elderly investors were very clear that they had plans to retire in the near future. Despite this, the Metals sales representatives advised them to liquidate their retirement accounts and purchase precious metals bullion.

### Defendants Assisted in the Liquidation Process

41.    Elderly investors were often assisted by the Defendants, by and through their sales representatives and agents, in liquidating their retirement holdings and transferring their retirement funds to a SDIRA.  Metals sales representatives routinely called the companies where the elderly investors held their retirement accounts in order to start or expedite the liquidation process. At times, the elderly investor would be a party to the call and other times they would not be on the call. The sales representatives would at times represent to the companies holding the qualified retirement savings accounts that they worked for a SDIRA rather than the Defendants.

42.    The Defendants, by and through their sales representatives or other

agents, generally designated themselves as an "interested party" on investors' SDIRA accounts. This designation as an interested party authorized unlimited access to the elderly investors' SDIRA account information. The SDIRA's were selected by the Defendants, and not the elderly investors.

### Defendants Determined What Precious Metals Bullion
### Elderly Investors Purchased and the Price

43.    When elderly investors bought precious metals bullion on the advice of the Metals sales representatives, Batashvili made the decision as to what precious metals bullion was sold and the price that was charged.  During the sales process, the elderly investors generally had no input as to what they purchased, and a number of them described the process as confusing. Additionally, the elderly investors were not knowledgeable about the precious metals bullion market; not even having familiarity with basic terms such as spot price or spread. Batashvili's decisions as to what precious metals bullion was sold to the elderly investors resulted in the majority of each elderly investors' account being weighed down with the significantly overpriced precious metals bullion coins listed above.

44.    The Defendants capitalized on the elderly investors' lack of knowledge and paired that with the fraudulent and deceptive conduct of the Defendants and the sales representatives.  The results were elderly investors saddled with significant losses of retirement funds and with little recourse once

discovered, as there was no other outlet where the elderly investors could recoup their losses based on the prices charged.

## Discovery of the Loss of Retirement Funds Due to
## the Large, Undisclosed Spreads

45.     After the purchase, elderly investors expected that the SDIRA account statements would report a value equal to or greater than the amount of funds used to invest in precious metals bullion based on the fraudulent statements, and omissions, of the Defendants, by and through their sales representatives.  Those elderly investors who looked at their SDIRA statements were shocked to discover that their actual SDIRA account values were significantly less. The elderly investors lost the majority of their investment funds.

46.     For example, an Alabama Investor #1 (hereinafter "AI#1") liquidated her security holdings and purchased 1,979 ½-ounce silver Royal Canadian Mint Polar Bear Coins for $50,444.71. Upon looking at her SDIRA statement, she discovered the actual value of her investment was $15,635.94. AI#1 realized a loss of $34,808.77 at the time she purchased the precious metals bullion from Metals.

## How the Defendants Addressed the Loss

47.     Several of the elderly investors called Metals to determine why they lost so much of their retirement funds.  Metals received so many of these types of

calls that they hired a person named Anthony Bowers (hereinafter "Bowers"), who also went by the name Brock Bowers, to handle them.

48.    Metals, first through the sales representatives and ultimately through Bowers, performed what was internally referred to as a "tuck-in". This process was meant to calm the elderly investors by explaining away the loss as simply the SDIRA reporting the melt value rather than the actual value of the coins. At times, elderly investors were told that this was a tax loophole to reduce their tax liabilities. The elderly investors were told that they did not actually have a loss, and some were told that they needed to call Metals in order to learn the real value of their holdings, which would be more in line with the purchase price.

49.    For example, after Alabama Investor #2 (AI#2) learned that he lost the majority of his investment funds after purchasing ½-ounce silver Polar Bear coins according to the valuation reported by the SDIRA, he contacted Metals about his loss. Metals representatives told him that he did not actually have a loss. AI#2 was told that the melt value was reported on the SDIRA statement and that the SDIRA reported value based on weight and not worth. AI#2 was told that to learn to real value of his precious metals bullion going forward, he would need to call Metals to be told the purported real value of his ½-ounce silver Polar Bear coins.

50.    When AI#2 called, Metals representatives would provide a value that was higher than the amount reported by the SDIRA and more in line with the price

he paid for the Polar Bear coins. For example, he called Metals about his SDIRA invoice dated October 31, 2019, that listed the value of his precious metals, and was told that the listed value of $35,787.04 for his Polar Bear coins was not the actual value. Purportedly, the actual value was $108,004.14. Attachment C is an example of the valuations provided by the SDIRA and AI#2's notes where he was told the real value of the Polar Bear coins by a Metals representative.

51.     Some elderly investors were very upset and would demand some or all of their money back. Other elderly investors would call needing to access some of their funds to pay expenses or other needs. In these circumstances, Batashvili often determined what precious metals bullion would be repurchased and at what price.

52.     Whereas Asher was described as handling the marketing side of the business and directing the approach of the sales representatives, Bastashvili was described as handling the money side of the business by updating the Metals sales representatives on the previous days sales, what goals they were to work for, and determining what would be sold or repurchased and for what amount.

### Shipping and Transaction Agreements

53.     Although the Defendants' sales representatives evaded the discussion of spreads, or misrepresented that there were no fees or commissions while discussing the sale of precious metals bullion with elderly Alabama investors, the

285

Metals Shipping and Transaction Agreement stated that there was a spread of 2 to 33% for IRA Sales. Attachment D is a copy of a Shipping and Transaction Agreement signed by an elderly Alabama investor.

54.    Despite the range of the spreads listed in the Shipping and Transaction Agreements provided to elderly Alabama investors, Metals failed to abide by that range and charged significantly higher spreads than the amount listed. Each elderly Alabama investor lost the majority of their retirement funds based on the large, undisclosed spreads charged by the Defendants.

<b>Ownership, Control and Direction</b>

55.    Both Asher and Batashvili were identified as the owners and corporate officers who directed the strategy and course of business for Metals.  The following records corroborate this.

56.    Batashvili is listed as controlling bank accounts associated with Metals, Barrick, and Tower. The funds in these accounts flow from the Chase Metals account(s) and Barrick account(s) into the Tower Equity account(s) and are used to then fund accounts controlled by Batashvili and/or Asher. According to the signature card for Chase Metals Inc., BOA account #4024, Batashvili is listed as the President/Secretary and CEO. (Attachment E). The signature card for Barrick Capital Inc., BOA account #6672, listed Batashvili as the Managing Partner. (Attachment F).  The signature card for Barrick Capital Inc., WF account #9973,

listed Batashvili as the Owner with Control of the Entity. (Attachment G). The
signature card for Tower Equity, LLC, BOA account #7454, listed Batashvili as
the manager. (Attachment H). The signature card for Tower Equity, LLC, WF
account #4517, listed Batashvili as owner with control of the company.
(Attachment I). The signature card for Tower Equity, LLC, OneWest account
#2789, listed Batashvili as a Member, and the only signer on the account.
(Attachment J). The signature cards for First American Estate and Trust, LLC, WF
accounts #8592 and #9138, listed Batashvili as sole owner of the entity.
(Attachment K). Funds from First American Estate and Trust are used to fund
payroll through Trinet for Metals and/or Barrick employees. Trinet will be
discussed further in a later paragraph. Attachments E through K are true and
correct copies.

57.     Asher is listed as controlling, or being paid from, accounts associated
with Metals, Barrick and Tower.  It appears that some of accounts that Asher
controls are used to receive money from Tower and Barrick, and in some
circumstances are used to fund a Tower account. Asher is listed as the President of
Tower Holdings on the signature card for Tower Holdings, Inc., Opus Bank
account #9270. (Attachment L). This account was closed on August 6, 2019 and
the closing balance was deposited by cashier's check into the Tower Holdings, Inc.
account held at JPMCB.  Asher is listed as the president on the signature card for

Tower Holdings, Inc., JPMCB account #1682. (Attachment M). Funds from the

Tower Equity, LLC, BOA account #7454 were deposited into the Tower Holdings,

Inc., JPM account, #1682.  Beginning in July 2019 through October 31, 2019, the

majority of those funds were used to pay luxury leases. Attachments L and M are

true and copies.

58.    Asher is also listed as the president of Best New on the signature card

for JPMCB account #6901. Asher originally utilized the Best New account to

receive payments from multiple Tower accounts and is now using the account to

receive funds from Barrick's account, #6672, held at BOA. Specifically, The Best

New, Inc., JPMCB account #6901 was opened on July 25, 2019 and opening funds

were deposited by check number 1120 issued from Tower Holdings Opus Bank

account #9270 in the amount of $5000.  On October 17, 2019 Asher deposited

$2000 by check number 6312 drawn from Tower Holdings, Inc., JPMCB account

#1682 into Best New, Inc., JPMCB account #6901.  The majority of funds

deposited into Best New JPMCB account #6901 originated from the Tower Equity

BOA account #7454 beginning July 26, 2019 and continuing until the final deposit

on December 12, 2019. Then, beginning December 31, 2019, the overwhelming

majority of funds deposited into the Best New, Inc. JPMCB account #6901

originated from Barrick Capital, Inc., BOA account #6672.  Attachment N is a

copy of the Best New, Inc., JPMCB account #6901 signature card.

59.    Most of the funds from the Best New, Inc. JPMCB account #6901 were used to pay "invoices" to various individuals and entities. Asher routinely transferred funds from Best New, Inc., JPMCB account #6901 back to Tower Holdings, Inc., JPMCB account #1682. These transfers started on January 16, 2020 and were the primary source of funds for the Tower Holdings, Inc. JPMCB account from that point forward.  The majority of funds from Tower Holdings, Inc., JPMCB account #1682 were used to pay luxury leases.

60.    Asher also controls another account, Administrative Account Services, LLC, in which money from Tower Equity is deposited and shows his continued ties to Metals and Barrick. The signature card for Administrative Account Services, LLC, First Bank account #7204 indicates that Asher is the only authorized signer.  The majority of funds coming into this account can be traced from the Tower Equity account at Wells Fargo, #4517.  The majority of the funds from that Tower Equity account are from Barrick Capital, LLC account #9973 held at Wells Fargo. Most importantly, the majority of the funds from the Administrative Account Services, LLC, account controlled by Asher, are being used to pay Metals.com liquidations. Attachment O is a copy of the Admin. Acct. Services, LLC First Bank acct. #7204 signature card.

61.    According to records obtained from GoDaddy.com, LLC, Asher is responsible for the purchase of the domains associated with Tower and Barrick,

specifically www.barrickcapital.com, www.usamint.com,

www.towerholdings.com, www.towerira.com, www.towerequity.com,

www.barrickmetals.com, and many others. According to records obtained from

GoDaddy.com, LLC, Batashvili is responsible for the purchase of

www.chasemetals.com. Additionally, Batashvili registered domains to advertise

the purchase of precious metals. This includes the registration of a domain titled

buygoldinalabama.com which was registered to Batashvili on or about October 22,

2018 and is presently active. Batashvili's contact email address on this specific

GoDaddy Shopper ID Account is Asher@famelab.com, an email also associated

with Asher's GoDaddy Shopper ID accounts. It appears that domains were

registered for all 50 states. Finally, according to records obtained from Network

Solutions, LLC, Asher is responsible for the purchase of the domain associated

with Metals.com. Attachment P is a copy of the records from the domain

providers showing the purchases.

62.     Additionally, Batahsvili and Asher listed their positions on records for

a company named Trinet that handles human resources functions for Metals and

Tower. The Trinet records indicate the following: the Common Ownership

Agreement lists Batashvili as 100% owner of Chase Metals, Inc.; The Trinet

Passport Services Agreement Form listed Batashvili as the President of Chase

Metals; and the Trinet paystubs for Chase Metals indicate Asher is the "CMO,"

and Batashvili as the "CEO." Additionally, the Trinet records indicate that Asher

was last paid by Chase Metals on November 15, 2019.  However, beginning

November 29, 2019, Asher was paid through Revo, LLC as the "CMO."  The

Trinet records indicate that Revo, LLC is located at 8383 Wilshire Blvd., Suite

700, Beverly Hills, CA 90211, the same address as Tower, Metals, and Barrick as

listed in these or other records I obtained. Attachment Q are true copies of the

listed Trinet Records.

**Lack of Registration**

63.    The Defendants, by and through their sales representatives, held

themselves out as investment advisers or investment adviser representatives.

However, the Defendants were never registered as investment advisers or

investment adviser representatives in the State of Alabama, nor did they perfect an

exemption from registration. Attachments R through V are Certificates of Non-

registration in Alabama.

**Transition from Metals to Barrick**

64.    Between May and August of 2019, multiple states issued Cease and

Desist Orders against Metals and sales representatives for Metals who defrauded

elderly investors in the various states. During this time, Metals transitioned

business to the newly established to Barrick.

65.    This transition is made evident in the unusual circumstances of

Page 30 of 83

291

Alabama Investor #8 (hereinafter "AI#8), who is 88 years old and was defrauded

by Metals in the manner set out above. On December 5, 2019, AI#8 purchased

$68,591.89 worth of precious metals bullion from Metals, specifically: 125 1/10-

ounce gold Royal Canadian Mint Polar Bear Coins at $340.93 per unit for a total

purchase of $42,616.25; 800 ½-ounce silver Royal Canadian Mint Polar Bear

Coins at $26.31 per unit for a total purchase of $21,048.00; and 112 one-ounce

silver Royal Canadian Mint Maple Leaf Coins at $18.72 per unit for a total

purchase of $2,096.64.

66.    During the process of talking with the Metals sales representative,

Randall Kohl (hereinafter "Kohl"), AI#8 believed that she and Kohl had formed a

close friendship. Metals sales representatives generally took a personal approach in

their attempts to defraud the elderly investors, and many of the elderly investors

reported that the Metals sales representatives were more personal in their approach

than usual sales people which engendered trust on the part of the elderly investors.

However, Kohl made that approach seem tame when he stayed at AI#8's home for

a weekend in January 2020 before selling her more precious metals bullion, this

time as a Vice President for Barrick. Kohl sold for Barrick just under 40 days from

the time he sold on behalf of Metals. Additionally, the precious metals bullion sold

by Kohl for Barrick, ½-ounce silver Canadian Wildlife Series Coins, are Polar

Bear coins that were renamed.  These Polar Bear coins were allegedly exclusive to

Metals.

### Barrick Capital

67.    Barrick victimized a number of elderly investors in Alabama after the
transition. The approach that Barrick took was expanded, in that it included an
angle that elderly investors should liquidate current precious metals bullion
holdings for allegedly better valued precious metals bullion through Barrick. In
these transactions, the elderly investors lost a significant amount of their funds
based on ~~the prices~~ large, undisclosed spreads that they paid Barrick for the
precious metals bullion. For example, an elderly investor was cold-called by sales
representatives for Barrick who informed him that the precious metals bullion he
held at that time was considered U.S. Currency and as a result, was subject to tax
liability; however, if the elderly investor liquidated his precious metals bullion and
purchased precious metals bullion minted in Canada, the taxes would be deferred,
because Canadian minted bullion was not considered U.S. Currency.

68.    Based on this advice, on February 20, 2020 the elderly investor
liquidated 1529 one-ounce silver American Eagle coins, 90 one-ounce gold
American Eagle proof coins, and a single 1000-ounce silver bar, with a total value
of $195,404.76. On the same date, he purchased 6,952 1/10-ounce silver Spade
Guinea coins, for a unit price of $6.75 per unit, a single 1/10-ounce silver Spade
Guinea for a unit price of $5.26 per unit, and 413 1/10-ounce gold Canadian

293

Wildlife Series coins for a unit price of $359.50 per unit, for a total of $195,404.76.

69.     Barrick bought these precious metals bullion coins from Bayside Metal Exchange (hereinafter "Bayside"). Barrick bought 6,953 1/10-ounce silver Spade Guinea, for $3.38 per unit and 413 1/10-ounce gold Canadian Wildlife Coins for $190.91 per unit, for a total of $102,346.97. Barrick then charged the elderly investor $93,057.79 more than they purchased them for, or almost double what they paid Bayside for the precious metals bullion.

70.     Barrick sales representatives continued to use the approach that was successful at Metals as well. AI#8, the elderly investor that Kohl had the close relationship with, was advised by Kohl to sell her securities in order to purchase precious metals bullion that carried large, undisclosed spreads. In fact, Kohl provided the AI#8 with a letter on Metals.com letterhead after the sale on behalf of Metals, but before the sale by Barrick, in which he advised AI#8 to liquidate her holdings in securities and use the majority of those funds to purchase precious metals bullion. Kohl continued to recommend this course of action as a Barrick Vice President when AI#8 made an additional purchase in January 2020. Kohl did not tell AI#8 either the spread, or what Kohl stood to gain personally from her liquidation and investment in precious metals.  Attachment W is a copy of the letter.

71.    A second elderly investor was advised by a different Barrick Capital sales representative to liquidate his securities holdings in order to purchase precious metals. In each circumstance that Barrick sold precious metals bullion to elderly Alabama investors, the large spreads were not revealed by the Barrick sales representatives, and there was no discussion about commissions or fees that would be applied. There was no disclosure that the purpose of the investment advice was to induce the elderly investors to liquidate securities holdings so that Barrick could access, obtain, and ultimately benefit from the elderly investors' retirement funds via large, undisclosed spreads.

### Continued Conduct by Metals and Barrick

72.    The Defendants continue to operate. AI#1 was recently told by Bowers that Bowers would have to find a buyer to purchase AI#1's precious metals bullion in order for her to liquidate. Separately, A "tuck-in" was conducted on an elderly Barrick victim as recently as September 15, 2020. This will be discussed further in the sections summarizing Alabama Investors #1 and #9, below.

### Recorded Transaction Calls Deleted

73.    I attempted to obtain the transaction calls for each precious metals bullion sale for each elderly Alabama investors that were recorded by Metals. In August 2019, I was told that Metals no longer had access to those recordings, as they were deleted.

**Elderly Investor Examples**

74.     All of the elderly investors listed below liquidated qualified retirement savings accounts; however, not all of the accounts contained securities.

**Metals Victims**

75.     All of the elderly investors listed below were 60 years of age or older. The majority or all of the elderly investors listed below invested most, if not all, of their retirement funds in precious metals bullion through Metals. All lost more than $2,500.00. Asher and Batashvili commented on the age of the elderly investors targeted so that it was understood the elderly investors were targeted in part due to their age.

**Alabama Investor #1**

76.     On January 17, 2020, I interviewed Alabama Investor #1 (hereinafter "AI#1").

77.     AI#1 is a resident of Alabama and was in the State of Alabama when the following events occurred.

78.     AI#1 is currently retired.

79.     AI#1 received a phone call from a Metals sales representative in or around May 2019. Soon thereafter, a second representative with Metals, Kohl, contacted AI#1.

296

80.   Kohl told AI#1 that he got her phone number from information submitted to the Sean Hannity website, but AI#1 had never contacted Sean Hannity.

81.   Kohl determined what type of investments AI#1 owned, which were two different IRA's with values of approximately $50,000.00 and $19,000.00.

82.   Kohl stated that he wanted to help protect AI#1's retirement funds, and AI#1 told Kohl that she wanted a conservative and safe investment vehicle that protected her principal.

83.   Kohl provided investment advice in relation to the sale of securities. Kohl advised about the advantages of precious metals bullion versus stocks, bonds, and the Dollar.

84.   Specifically, Kohl stated or affirmed AI#1's belief that the government could seize retirement accounts but could not seize precious metals bullion holdings, and that any investment other than precious metals bullion would put AI#1 in significant risk of losing her retirement funds.

85.   AI#1 asked Kohl if she could lose any of her principal if she invested in precious metals bullion. Kohl responded that she would not, and that gold was stable and safe. Kohl never discussed the volatility of the precious metals market.

86.   AI#1 asked Kohl what he would get out of selling AI#1 precious metals bullion. Kohl stated that he received a salary for his work. He said that he

297

helped customers to protect and grow their investments in precious metals bullion.

87.    Kohl never told AI#1 that he was paid by commission, that the more money AI#1 spent would result in more money for him, how much he would make on the sale, or that she would lose a majority of her retirement funds as a result of the purchase. Had AI#1 known any of this, she would not have invested.

88.    Kohl encouraged AI#1 to liquidate both of her IRA accounts and transfer those funds to a SDIRA to purchase precious metals bullion. AI#1 initially intended to do that based on Kohl's advice but decided to liquidate only the larger of the two accounts because she received distributions from the smaller account. The liquidated account was an IRA held with T. Rowe Price, which held securities that were sold when she liquidated. AI#1 took this action based on the advice of, and the trust she had in, Kohl.  Attachment X is a copy of her T. Rowe Price holdings just before liquidation.

89.    Kohl and others at Metals assisted AI#1 with the liquidation process by completing the paperwork and calling her broker on her behalf with AI#1 on the line to authorize Kohl's involvement.

90.    After the SDIRA was funded with AI#1's retirement funds, Kohl called AI#1 to complete the sales process. Up to this point, AI#1 understood that she was going to buy gold. However, Kohl suddenly changed that to silver. AI#1 acquiesced based in part on her belief that Kohl was an adviser, though she felt

298

ignored.

91.    The sales process involved a recorded transaction call for which AI#1 was not prepared and did not understand what was happening. After the Commission issued a Cease and Desist Order, Declarant attempted to obtain this recorded call as well as the other recorded transaction calls from Metals, but was informed that that Metals could not comply with the request because all of the recorded transaction calls were deleted.

92.    Kohl told AI#1 that she was purchasing approximately 2,000 two-ounce silver Canadian Orca coins for $25.49 per unit with the approximately $50,000.00 in retirement funds that she transferred to the SDIRA. AI#1 later learned that she purchased approximately 2,000 ½-ounce silver Canadian Polar Bear coins. Attachment Y is a copy of the Metals.com invoice for this purchase.

93.    AI#1 understood that the value of her precious metals purchase would be equal to, if not greater than, the amount she transferred to the SDIRA, minus $500.00 that would remain in cash in the SDIRA. However, AI#1 later discovered that she lost the majority of her funds. Had AI#1 known that she would lose a majority of her funds and that the listed value of the precious metals bullion would not be equal to or greater than the amount of money she transferred to the SDIRA, she would have never invested in precious metals. Attachment Z is a copy of a SDIRA statement showing the valuations of her precious metals bullion ½-ounce

silver Polar Bear coins.

94.    There was no discussion of spot price or spread at the time of the purchase, and AI#1 had no idea what those terms meant at the time of the sale.

95.    AI#1 called Metals in January 2020 after learning of the loss of the majority of her retirement funds, as well as learning that she bought precious metals bullion different than what she was told by Kohl. AI#1 recorded some of her phone calls with the Metals sales representatives she spoke with.

96.    Kohl spoke with AI#1 initially, and Kohl did not dispute her statement that she was sold precious metals bullion different from what she was told.  Kohl instead brought Bowers into the call, as Bowers handled these issues.

97.    Bowers stated that Metals would not sell AI#1 an Orca coin, because that was not a coin that Metals sold. Bowers specifically referenced the recorded transaction call, which was deleted and was not played for, or provided to, AI#1 as proof that AI#1 was not sold silver Orca coins. Bowers went on to say that the ½-ounce silver Polar Bear coins that were sold to AI#1 were exclusive to Metals.

98.    Bowers also told AI#1 that she had not taken a loss on her investment. What AI#1 saw as the reported value was the melt value and not the real value of her ½-ounce silver Polar Bear coins. The reported value was not the full market value.

99.    Bowers told AI#1 that if she liquidated her ½-ounce silver Polar Bear

coins through Metals, that Bowers would buy them back at the price she paid for them. When AI#1 told Bowers that she wanted to do that, Bowers balked and said that Metals was a precious metals retailer, not a fiduciary, and did not have to buy back precious metals bullion. Bowers told AI#1 that Metals would buy back $5,000.00 of her Polar Bear coins for the price she paid.

100.   At the close of the call, Bowers asked AI#1 if she was part of a group of people that the State of Alabama contacted who purchased metals. Attachment AA is a copy of the transcript of the recorded phone call with Bowers and Kohl.

101.   Another Metals sales representative, Joseph Eff (hereinafter "Eff"), called AI#1 to complete the $5,000.00 buy back. Eff told AI#1 that Metals would not do as Bowers said and buy the Polar Bear coins back at the price AI#1 paid, but for approximately $2.00 less per coin instead.

102.   Eff also told AI#1 that she needed to contact Metals to get the actual value of her coins, and that the lower value listed on the SDIRA valuation is due to an Internal Revenue Service loophole. AI#1 was also told by Eff that if she took the coins to a pawn shop that she would be paid less than the melt value, but that Metals will pay her the market price. Attachments BB and CC are copies of the transcripts of the recorded phone calls with Eff.

103.   On or about August 24, 2020, AI#1 contacted Bowers at Metals to initiate a third liquidation of $5000.00. Bowers informed her that he would have to

**301**

find a buyer for the precious metals bullion. On September 4, 2020 AI#1 was able to liquidate the precious metals bullion.

104. On September 8, 2020, AI#1 called Bowers at Metals to arrange to liquidate the remainder of her precious metals bullion holdings. Bowers told AI#1 that he would have to line up a buyer for her liquidation and would call her when that was done. AI#1 contacted multiple times after September 8, 2020 to follow-up on Metals' efforts to find a buyer, and heard a voicemail stating that Metals is inundated with calls due to Governor Newsom issuing an order on July 13, 2020 "for indoor businesses to cease operations". As a result, Metals is requesting additional time to return calls.

105. On September 16, 2020, Bowers returned AI#1's call to inform her that he and the trade desk are working to find a buyer for her precious metals bullion and will be in touch with her by Friday, September 18, 2020.

**Alabama Investor #2**

106. On January 16, 2020, I interviewed Alabama Investor #2 (hereinafter "AI#2"), who is 68 years old.

107. AI#2 is a resident of Alabama and was in the State of Alabama when the following events occurred.

108. AI#2 is currently working part-time for an auto parts store.

109. AI#2 stated that he saw an advertisement for Metals in or around June

302

2018 on Facebook or AOL, but he was not sure. It appeared to AI#2 that Sean Hannity backed Metals. AI#2 believes that he called Metals. After he called, AI#2 said that representatives from Metals called him every week or two. One of the Metals sales representatives that AI#2 recalls dealing with was Ari Ferdman, who is also known as Joshua Ferdman (hereinafter "Ferdman").

110.   Metals sales representatives determined that AI#2 possessed a retirement account that qualified for a transfer to a SDIRA.

111.   Metals representatives advised AI#2 about the advantages of investing in precious metals bullion versus securities, market trends, and asset allocation.

112.   AI#2's recollection is that during the first contact, Metals sales representatives encouraged him to consider where the stock market was going so that he could make up his mind soon. AI#2 was already worried because he saw his investments with T.D. Ameritrade losing value and thought Metals sales representatives could be right about the stock market.

113.   AI#2 was provided investment advice by Metals sales representatives, specifically: that the stock market was going to take a "dump"; that any money held in an IRA or retirement accounts was going to be taken or seized by the Government; and that a stock market crash was probably going to happen and that AI#2 should get out of his current investments and into gold. However, Metals sales representatives advised AI#2 that an investment in precious metals bullion

303

would not be subject to seizure, and that precious metals bullion was a safe investment as compared to stocks.

114.   AI#2 was also sent emails with links to articles reinforcing these statements, one of which was an article by Sean Hannity.

115.   AI#2 was told by Metals sales representatives that he would not lose any money if he invested in precious metals bullion.

116.   Ultimately, Metals sales representatives advised AI#2 to liquidate his retirement holdings and invest all of his funds in precious metals bullion.

117.   There was never any discussion of the volatility of the precious metals market.

118.   AI#2 liquidated his TD Ameritrade account based on the advice of the Metals sales representatives and their apparent knowledge.  This IRA account included securities that were sold as part of the process. AI#2 purchased precious metals bullion on the advice of Metals sales representatives. AI#2 transferred approximately $109,000.00 from his TD Ameritrade account to a SDIRA to purchase precious metals bullion from Metals.  Attachment DD is a copy of AI#2's TD Ameritrade IRA holdings just before liquidation.

119.    AI#2 recalled the phone call when he purchased precious metals bullion, and described it as confusing. AI#2 did not have any input as to what type of silver he purchased. AI#2 was sold a significant amount of ½-ounce silver Polar

304

Bear coins. Specifically, of the $109,656.63 that AI#2 invested in precious metals bullion, $100,741.32 was used to purchase ½-ounce silver Royal Canadian Mint Polar Bear coins.

120.   After his purchase, AI#2 discovered that the value of his precious metals bullion was significantly less than the amount of money he invested. This confused AI#2, because AI#2 was led to believe that the listed value of his precious metals bullion holdings would be equal to or greater than the amount of funds he invested.

121.   AI#2 called Metals to determine why the value was so low. AI#2 was told by Ferdman that the Polar Bear coins were the hottest item on the market and would make more money than the rest, which is why Metals put so many of them in his account.  AI#2 was also told that the Polar Bear coins will make the most money.

122.   AI#2 was told that the lower value reported was the melt value, and to learn the purported real value AI#2 must call Metals.  AI#2 did call Metals in order to learn the value of his holdings per a Metals agent and took notes of the values provided by Metals as compared to the values provided by the SDIRA. Attachment EE is a copy of the SDIRA valuation and notes by AI#2 with the values provided by Metals representatives.

123.   AI#2 does not recall being told what the spot price was, if at all. AI#2

305

was not told what the spread was, and he did not know what the term spread meant.

124.   AI#2 thinks that Metals sales representatives may have told him that they charged a commission, but he assumed that they would charge a commission of approximately 1%. Metals did not tell AI#2 that Metals would keep more than 1%, because AI#2 would not have made purchase if that was the case.

125.   Metals did not tell AI#2 that upon purchasing metals, Metals would keep the majority of his retirement funds immediately. Had AI#2 known Metals would keep the majority of his retirement funds, he stated that he would have never made the investment.

**Alabama Investor #3**

126.   On January 16, 2020, I interviewed Alabama Investor #3 (hereinafter "AI#3"), who is 71 years old.

127.   Alabama Investor #3 is a resident of Alabama and was in the State of Alabama when the following events occurred.

128.   AI#3 is currently retired.

129.   In or around April 2018, AI#3 received a call from Metals.

130.   The Metals sales representative, Deric Scott (hereinafter "Scott"), knew that AI#3 listened to Sean Hannity, was concerned about the economy, and was interested in gold and silver.

131. During the course of my investigation, I learned that Scott also uses the names Deric Ned and Luke McCain.

132. One of the first things that Scott did was determine what investment accounts AI#3 held, and on April 26, 2019, went so far as to contact Athene Annuity and Life, where AI#3 had an annuity, to determine the value of the annuity. On that phone call, both Scott and AI#3 learned that AI#3 would lose approximately $10,000.00 as a surrender charge if AI#3 withdrew the funds at or around that time. Attachment FF is a copy of a transcript of this recorded call with Scott and Athene Annuity.

133. Scott provided investment advice to AI#3 throughout the process. Scott compared precious metals bullion to stocks to show that precious metals bullion performed better than stocks, stated that precious metals bullion would hold value, said that precious metals bullion would be more profitable than the investments AI#3 held at the time that included securities, stated that stocks and AI#3's investments were going to keep losing value, said that gold would hold its value but stocks would not, and  stated that precious metals bullion was the best place to put all of his investment funds.

134. Scott also sent AI#3 emails with links to articles about the economy that included topics dealing with a U.S. debt bomb, economic collapse, and social unrest. Attachment GG are copies of four emails sent by Scott as described in the

307

paragraph.

135.    There was no discussion of volatility in the precious metals bullion market.

136.    Scott advised that all of AI#3's retirement funds should be invested in precious metals bullion.

137.    Based on the advice, statements, and tactics of Scott, AI#3 liquidated three of his investment accounts on or about May 2, 2018. Once liquidated, the three investment accounts yielded over $250,000.00.  One of the investment accounts was a Fidelity account that held securities. Those securities were sold during the liquidation process.  Attachment HH are copies of documents associated with the holdings that AI#3 liquidated.

138.    Metals representatives, which included Scott, assisted with this liquidation. Scott, using the name "Luke," called Athene Annuity and Life (hereinafter "Athene") where AI#3 held an annuity. "Luke" made the call without AI#3 on the call and identified himself as AI#3's broker.  Additional calls were made to Athene regarding the liquidation by Metals sales representatives Tiffany Terrell (hereinafter "Terrell") on May 8, May 18, and May 22, 2018. Terrell identified herself as being with American Estate and Trust rather than Metals. AI#3 was not a party to any of these calls.

139.    AI#3's retirement funds were transferred to a SDIRA, specifically

American Estate and Trust, LC. However, the letterhead of the Application and Transfer Request forms listed a company named Tower rather than American Estate and Trust, LC. Attachment II are copies of the Transfer Request forms.

140. Section V. of the Tower SDIRA account application, titled "Appointment of Custodian and Third-Party Administrator," defines American Estate and Trust, LC as the Custodian of the account ("Custodian"), and Tower Trust as the Third-Party Administrator of the account ("TPA"). It is also stated in this section that "the TPA is independent of the Custodian and is not empowered or authorized to obligate or bind the Custodian. Additionally, nothing in this Agreement shall be construed to render the TPA an employee, partner, agent of, or joint venture with, the Custodian. The Custodian shall not be responsible or liable under any circumstances for any representations or statements made by the TPA." Attachment JJ is a copy of the first two pages of the Appointment of Custodian and Third-Party Administrator document.

141. The transfer documents were completed by a Metals representative for AI#3. Scott also handled liquidation phone calls for AI#3 while AI#3 was on the line.

142. AI#3 invested in precious metals bullion in May and June 2018. His first invoice that listed his precious metals bullion was dated May 30, 2018 in which he invested $159,454.73. His second invoice listing his precious metals

Page 48 of 83

309

bullion was dated June 15, 2018 in which he invested $90,605.58. Most of AI#3's retirement funds were used to purchase ¼-ounce gold British Sovereign Standard coins or 1/10-ounce gold Royal Canadian Mint Polar Bear coins. Of the total amount of $250,060.31 AI#3 invested, $186,322.01 was used to purchase those two types of coins. Attachments KK and LL are copies of the two invoices.

143.  AI#3 also invested in precious metals bullion in January 2019. AI#3 was contacted by a Metals sales representative to ask if AI#3 had anything to invest. AI#3 invested $61,086.20 per the associated Metals invoice.

144.  During this purchase, Polar Bear coins were mentioned for the first time, and AI#3 was told that the Polar Bear coins were a good investment. Per the invoice, $42,662.70 of AI#3's funds were used to purchase ½-ounce silver Royal Canadian Mint Polar Bear coins and 1/10-ounce gold Royal Canadian Mint Polar Bear coins per an invoice dated January 17, 2019. Attachment MM is a true and correct copy of the invoice.

145.  AI#3 was told that the value of his precious metals bullion would be valued at same amount or greater than the amount of funds that he transferred to the SDIRA.

146.  There was never any discussion about the spread when AI#3 made the purchases.

147.  AI#3 asked twice if there would be any commissions charged by

Metals. AI#3 was told that there would not be any fees charged the first year, and later was told that there would not be any commissions charged for the first year due to some involvement of Sean Hannity.

148.   However, AI#3 later learned that he lost the majority of his funds based on the prices charged as compared to the prices of silver and gold. AI#3 stated that had he been aware of the amount of money he would lose, then he would never have made the investment.

149.   AI#3's loss associated with the precious metals bullion sales were compounded by the $10,000.00 loss he took when he liquidated his annuity.

150.   AI#3's SDIRA account statements were produced by the TPA, Tower Trust, and AI#3's precious metals bullion was valued significantly higher than their melt value, and significantly higher than the value of the precious metals bullion held in other SDIRAs, such as New Direction and DTC. Attachment NN are copies of Tower Trust valuation statements.

**Alabama Investor #4**

151.   On June 17, 2019, I interviewed Alabama Investor #4 (AI#4), who is 73 years old.

152.   Alabama Investor #4 is a resident of Alabama and was in the State of Alabama when the following events occurred.

153.   AL#4 is retired.

311

154.   In or around March of 2019, AI#4 saw an advertisement for Metals on Facebook that appeared to be an endorsement of Metals from Sean Hannity. Based on this advertisement, AI#4 contacted Metals

155.   Kohl was the primary Metals sales representative who AI#4 spoke with.

156.   Kohl told AI#4 that Sean Hannity was affiliated with Metals.

157.   AI#4 described the process with Metals as rushed and that he felt pressured. AI#4 further explained that he was pushed hard to purchase precious metals bullion.

158.   Kohl told AI#4 that his retirement funds were at risk and that AI#4 would lose his retirement funds, but there was no risk if he invested in precious metals bullion. Kohl advised AI#4 to move his retirement funds to precious metals bullion because the Government can take control his IRA.

159.   Other Metals sales representatives told AI#4 that there was going to be a recession and that money held in stocks or bonds would be lost but money invested in precious metals bullion would be stable.

160.   As a result of the statements and tactics of Metals sales representatives, AI#4 decided to invest in precious metals bullion by liquidating his annuity.

161.   AI#4 owned a fixed annuity held in an IRA with a value of

312

approximately $68,000.00 that also had a surrender charge of just over $2,000.00.

162.   Metals sales representatives, which included Kohl, handled the liquidation process for AI#4. Specifically, between April 2 and April 16, 2019, Metals sales representatives called AI#4's annuity company 6 times regarding the liquidation process. These calls occurred on April 2, April 4, April 8, April 10, April 11, and April 16, 2019. They were recorded by American National, the company that held AI#4's annuity.  AI#4 was a party to only 3 of these phone calls.

163.   The Metals sales representatives, including Kohl, identified themselves as being with New Direction on each of the 6 calls. They never identified themselves as being with, or working for, Metals.

164.   On April 2, 2019, Kohl led the phone call with American National with AI#4 only on the line to authorize Kohl to discuss his account. Kohl identified himself as an outside administrator with New Direction, and AI#4 as mutual client. Kohl learned the amount that the annuity was worth. During this call, Kohl discussed the liquidation process. The American National representative stated on this call that there would be surrender charges. Kohl acknowledged that he understood, but AI#4 did not say anything.

165.   AI#4 did not understand that he would lose just over $2,000.00 as a surrender charge until the phone call on April 11, 2019. During that call, Kohl,

Metals employee Mimi Fremont (hereinafter "Fremont") and AI#4 were on the line. Kohl introduced Fremont and stated that their mutual client, AI#4, was on the line. They called for an update on the status of the transfer. During this call, the surrender charge was explained fully, and AI#4 understood he would lose money by liquidating. AI#4 was upset by this news.

166.   AI#4 does not recall being told about the spread.

167.   AI#4 invested all the funds that he received from his liquidated annuity in precious metals bullion on the advice of Metals sales representatives. It was approximately $65,000.00.

168.   AI#4 does not recall any discussion about a commission that Metals would charge.

169.   AI#4 understood that the reported value of his precious metals would be the same amount or greater than the amount he transferred to the SDIRA, approximately $65,000.00. AI#4 did not know that Metals would take any of his money. AI#4 definitely did not know that he would lose the majority of his retirement as a result of the investment.

170.   AI#4 would not have invested if he had been aware that he would lose the majority of his retirement funds. AI#4 invested in precious metals bullion in April 2019. His purchase invoice is dated April 18, 2019 in which he invested $65,978.35. The majority of the funds were used to purchase ¼-ounce gold British

Standard coins, 1/10-ounce gold Royal Canadian Mint Polar Bear coins, and ½-ounce silver Royal Canadian Mint Polar Bear Coins. Attachment OO is a true and correct copy of the invoice.

171.   Per a New Directions holding report dated May 3, 2019, the total of AI#4's holdings was $22,221.41. The 1/10-ounce gold Royal Canadian Mint Polar Bear coins were given a total value of $4,479.30, which he purchased for $10,469.90. The ½-ounce silver Royal Canadian Mint Polar Bear coins were given a total value $14,958.00, which he purchased for $50,440.00. Finally, the ¼-ounce gold British Standard coins were given a total value of $1,599.75, which he purchased for $3,706.25. Attachment PP is a true and correct copy of the New Direction holding report.

**Alabama Investor # 5**

172.   On July 10, 2019, I interviewed Alabama Investor #5 (hereinafter "AI#5") who is 64 years old.

173.   Alabama Investor #5 is a resident of Alabama and was in the State of Alabama when the following events occurred.

174.   AI#5 is retired.

175.   In or around March 2018, a Metals sales representative contacted AI#5.

176.   AI#5 described the contact that followed this first call as constant and

Page 54 of 83

stated that the phone numbers associated with the calls would at times display Alabama area codes. AI#5 dealt with a number of Metals sales representatives, including Walter Vera (hereinafter "Vera").

177.   AI#5 is not aware of how Metals obtained her phone number, but AI#5 recalls that a Metals sales representative told her that her phone number was referred from a talk news radio show. AI#5 also said that it was possible that she clicked on an advertisement on Facebook.

178.   Metals sales representatives told AI#5 "filth" about the stock market, and to invest in silver and gold as precious metals bullion would increase in value. AI#5 was told by Metals sales representatives that money in the stock market was not safe and that the stock market will decline. Metals sales representatives told AI#5 that the value of silver was expected to increase a lot because of solar panels, but that gold was not expected to perform as well. Whenever Metals sales representatives called, they always asked if AI#5 had checked the market.

179.   AI#5 described the Metals sales representatives' questions as being more personalized than a typical sales pitch. The Metals sales representatives were very "buddy-buddy" with AI#5. For example, Metals sales representatives discussed where they went to church and spoke about family. This led AI#5 to trust them.

180.   Metals sales representatives asked where her retirement funds were

316

invested.

181.   AI#5 decided to invest in precious metals based on the advice, statements, and tactics of the Metals sales representatives that included the trust that they engendered.

182.   AI#5 handled the rollover herself, as she had rolled-over an account previously. Metals sales representatives did instruct AI#5 to call when she was completing the paperwork so that Metals could tell her how to do so.

183.   AI#5 invested approximately $122,000.00 that was liquidated from a qualified retirement account.

184.   There was no mention of commissions, fees, or costs associated with the investment. In fact, AI#5 specifically asked if there were any fees and was told that there were none. The Metals sales representatives claimed that Metals made money by being paid by the government. Vera specifically told AI#5 that Metals would not receive anything.

185.   AI#5 was not familiar with the term spot price until after her investment.

186.   On May 4, 2018, AI#5 signed a Precious Metals Buy Direction Letter with New Direction IRA, Inc. that listed Chase Metals as the precious metals dealer. However, AI#5 received an invoice dated June 1, 2018 with the business name Metals.com. Attachments QQ copies of the Precious Metals Buy Direction

Letter and Metals.com Invoice.

187. The Metals invoice listed her precious metals bullion purchase as including 4,481 ½-ounce silver 2018 Royal Canadian Mint Polar Bear Coins valued at $26.00 per coin, with a total listed value of $116,506.00. AI#5 invested a total of $122,021.00.

188. AI#5 was specifically told that the precious metals bullion that she was purchasing would increase in value.

189. AI#5 understood that the New Direction statement would list the value of her precious metals bullion holdings at no less than the amount she invested, $122,021.00, based on the statements of the Metals sales representatives. However, six to eight months after her purchase, AI#5 discovered that the reported value showed that she lost the majority of her retirement funds. AI#5 was never told that Metals would retain the majority of her retirement funds as a result of her investment.

190. Specifically, New Direction, the SDIRA for AI#5, issued a holdings report on July 13, 2018 that assigned a fair value of $7.89 per Polar Bear coin. However, Metals sold the Polar Bear coins to AI#5 for $26.00 per unit. Metals initially purchased the ½-ounce silver Royal Canadian Mint Polar Bear coin for $11.11 per unit from Bayside, which resulted in AI#5 paying more than twice as much than Metals paid for the Polar Bear coins. Attachment RR is a copy of the

SDIRA holdings report.

191.  Had AI#5 known that Metals would retain the majority of her retirement funds, she would have never invested.

### Alabama Investor #6

192.  On January 10, 2020, I interviewed Alabama Investor #6 (hereinafter "AI#6"), who is 67 years old.

193.  Alabama Investor #6 is a resident of Alabama and was in the State of Alabama when the following events occurred.

194.  AI#6 is retired.

195.  AI#6 began speaking with a Metals sales representative in March 2019. Scott was one of the representatives he spoke with.

196.  Metals sales representatives called multiple times until AI#6 made the investment in precious metals.

197.  Scott spoke to AI#6 about going to church and sermons Scott heard. AI#6 stated that Scott used their shared Christian values to build trust.

198.  Scott told AI#6 that everyone needed precious metals bullion because the Dollar was losing value. Scott also commented on a previous purchase of precious metals bullion that AI#6 made through another company, telling AI#6 that he got a bad deal but that Scott would get AI#6 out of the bad deal if AI#6 used the funds in his current IRA account to purchase precious metals bullion.

199.   There was no discussion with AI#6 about commissions or spread.

200.   Metals sales representatives pushed AI#6 to invest 100% of his retirement funds in precious metals bullion. There was no mention of any recommended industry standard regarding the percentage of retirement funds that should be invested in precious metals bullion, if at all.

201.   AI#6 made the decision to liquidate his IRA held with Avadian Credit Union and transfer those funds to a SDIRA in order to invest in precious metals bullion based on the trust built between the Metals sales representatives and what he was told by Metals sales representatives.

202.   Metals chose the SDIRA, and at the time AI#6 did not know what a SDIRA was.

203.   Scott directed AI#6 through the process of liquidating his IRA and establishing his SDIRA. AI#6 stated that the required documents were completed for him and he only had to sign them. AI#6 electronically signed the documents.

204.   On March 19, 2019, AI#6 signed a Precious Metals Buy Direction Letter with New Direction.

205.   AI#6 received an invoice from Metals dated April 18, 2019. Of the $62,666.56 used by AI#6 to purchase precious metals, $49,602.06 was used to purchase 2,151 ½-ounce silver Royal Canadian Mint Polar Bear Coins, with a value of $23.06 per coin. By comparison, AI#6 purchased 500 one-ounce silver

Page 59 of 83

320

American Eagle coins at $17.18 per coin for a total expenditure of $8,590.00. Attachment SS is a copy of the invoice.

206.   AI#6 understood that the listed value of his precious metals bullion investment by the SDIRA would be equal or greater to the amount of the funds he liquidated, specifically $62,666.56. AI#6 later discovered that was not the case.

207.   Ultimately, AI#6 learned that he lost the majority of his retirement funds as a result of the investment in precious metals. Had he known he would take a loss, much less lose the majority of his retirement funds, AI#6 would not have made the investment.

208.   Once New Direction was notified that the precious metals bullion was received, New Direction assigned a value to the precious metals bullion based on the current market value. On May 3, 2019, upon receipt of the ½-ounce silver Royal Canadian Mint Polar Bear coin, New Direction assigned a fair value of $7.48 per unit. Metals purchased the ½-ounce silver Royal Canadian Mint Polar Bear coins from Bayside for $10.42 each. Metals sold them to AI#6 for $23.06 per unit, more than double what they paid, and more than triple what they were worth. Attachment TT is a copy of the May 3, 2019 SDIRA holdings report.

209.   New Direction also issues annual statements. The statement issued for the period covering January 1, 2019 through December 31, 2019 indicated that the precious metals bullion held in AI#6's account, valued at $27,555.83 by New

321

Direction on May 3, 2019, increased in value by only $5,477.11 over the statement period. Therefore, on December 31, 2019, AI#5 had a loss of $29,833.62. Attachment UU is a copy of the SDIRA annual statement.

210.    After learning from New Direction that his precious metals bullion was valued significantly less than what he paid, he called Metals. On December 11, 2019, he spoke to a person named Anthony. CI#6 cannot remember Anthony's last name. Anthony gave him the current "sell" prices for the precious metals bullion AI#6 purchased. Anthony would not provide AI#6 with a statement detailing the value of his precious metals bullion, but instead Anthony told him over the phone that the one-ounce silver American Eagles were selling for $17.00 each, and 5 oz. silver America the Beautiful coins were selling for $92.00 each, but Anthony could not give AI#6 the value of the Royal Canadian Mint Polar Bear coins.

211.    Had AI#6 known Metals would retain approximately half of his retirement funds for their own benefit, he would not have invested.

212.    In addition to advising AI#6 to liquidate his Avadian Credit Union IRA, Metals sales representatives also attempted to convince him to liquidate a shared account AI#6 had with his elderly mother that was worth more than $300,000.00. AI#6 ultimately decided not to liquidate that account. AI#6's mother is now deceased.

322

**Alabama Investor #7**

213.   On June 17, 2019, I interviewed Alabama Investor #7 (hereinafter "AI#7"), who is 62 years old.

214.   Alabama Investor #7 is a resident of Alabama and was in the State of Alabama when the following events occurred.

215.   AI# is on disability.

216.   AI#7 reported that a representative from Metals contacted him in order to have AI#7 invest in precious metals bullion.

217.   In order to convince AI#7 to invest in precious metals bullion, Metals sales representatives told AI#7 that the stock market would decline and precious metals bullion would increase in value. AI#7 was sent emails stating that the stock market would fall.

218.   Metals sales representatives stated that they recommend to clients to liquidate their stock holdings and invest in precious metals bullion.

219.   AI#7 described the approach of Metals sales representatives as very persistent and as hounding him.

220.   AI#7 at one point accused Metals of being fraudulent, and in response Metals sales representatives sent AI#7 emails to establish that Metals was not fraudulent.

221.   The name of the company changed from Chase Metals to Metals in

the middle of the contact with AI#7.

222.   On July 19, 2018, Metals sales representative, Timothy Porritt (hereinafter "Porritt"), participated in a call to Wells Fargo Advisors with AI#7 in which Porritt's goal was to obtain a statement detailing AI#7's principal balance on the account. Porritt controlled the call and spoke on behalf of AI#7, who he referred to as a "mutual client."

223.   AI#7 decided to liquidate his retirement holdings and invest in precious metals based on the advice, statements, and tactics of the Metals sales representatives.

224.   AI#7 had an IRA with Wells Fargo that held securities. AI#7 signed the IRA transfer form with New Direction IRA, Inc. on July 20, 2018. Attachment VV is a copy of the IRA transfer form.

225.   Metals sales representatives assisted AI#7 in liquidating his IRA, in part by participating in the liquidation call with Wells Fargo  AI#7 recalls the Metals sales representatives as identifying himself as his account representative or adviser.

226.   AI#7 expected that the costs associated with investing in metals would be minimal, and that the listed value of his investment in precious metals bullion would be close to the amount of money that he invested. AI#7 does not believe that Metals sales representatives discussed how much he would be charged for his

324

investment. AI#7 was not aware of the loss that he would incur.

227.   There was no discussion about the spread.

228.   An invoice dated July 31, 2018 listing Metals.com as the company shows that AI#7 used $52,534.50 of his retirement funds to invest in precious metals. The invoice further shows that of the $52,534.50 AI#7 spent, $49,950.00 was used to purchase 1,998 ½-ounce silver Royal Canadian Mint Polar Bear Coins at a price of $25.00 per coin. Attachment WW is a copy of the invoice.

229.   A holdings report from New Direction listing the value of AI#7's holdings as of August 16, 2018, a half month after the invoice date, lists the total value of his holdings as $16,855.71, less than half of what AI#7 invested, and the value of the 1,998 Polar Bear coins as $14,718.27. Attachment XX is a copy of the SDIRA holdings report.

230.   Metals purchased the precious metals bullion sold to AI#7 from Bayside for $23,706.36, also less than half of AI#7's investment funds.

231.   AI#7 lost the majority of his retirement funds by investing in precious metals bullion with Metals.

232.   AI#7 stated that had he known that he would incur a loss of the majority of his funds with Metals, he would not have invested.

### Transition from Metals to Barrick

233.   All of the elderly investors listed below were 60 years of age or older.

Page 64 of 83

325

All lost more than $2,500.00.

**Alabama Investor #8**

234.   On June 23, 2020, I interviewed Alabama Investor #8 (hereinafter "AI#8"), who is 88 years old.

235.   Alabama Investor #8 is a resident of Alabama and was in the State of Alabama when the following events occurred.

236.   AI#8 is retired.

237.   Metals contacted AI#8 sometime in 2018 but AI#8 did not engage with Metals at that time.

238.   Metals again contacted AI#8 in November 2019 about investing in precious metals bullion and Kohl took the lead in communicating with AI#8.

239.   At the time that AI#8 was transferred from the first Metals sales representatives to Kohl, who knew that AI#8 had approximately $269,000.00 available to invest in precious metals.

240.   AI#8 described Kohl as being a very good salesman. They spoke often, at times daily for hours on end. AI#8 described Kohl as becoming a good friend.

241.   Kohl and AI#8 would discuss personal matters. Kohl would often end the phone calls by saying a prayer.  These personal discussions started almost immediately. The stories of Kohls' personal life caused AI#8 to have sympathy for

326

him.

242.   At one point, Kohl texted AI#8 a photograph of himself in a bathrobe.

243.   During these conversations, AI#8 told Kohl about her investments, including specific IRA accounts she held, where they were held, and brokers that she worked with.

244.   AI#8 is politically conservative and learned that Kohl was as well. AI#8 believed she and Kohl thought the same way.

245.   The relationship that AI#8 felt that she had with Kohl factored into her decision to invest in precious metals because she trusted Kohl.

246.   AI#8 made it clear to Kohl that she was not knowledgeable in the precious metals bullion market, and Kohl told her he would look out for her and do her right.

247.   Kohl also told AI#8 that he would look after her and make sure that AI#8 made money.  Kohl also told AI#8 that she could trust him.

248.   Kohl participated on at least three calls with AI#8 and TD Ameritrade. The first call occurred on November 13, 2020, and the purpose of the call was to determine the account balances. On November 20, 2019, Kohl represented himself as an agent of Equity Institutional and the purpose of the call was to initiate the liquidation of AI#8's traditional IRA account that held securities.  The third call, on December 5, 2020, was to inquire about the transfer request of AI#8's

327

traditional IRA account. Account notes indicate that Kohl managed the phone call and acted as AI#8's advisor. Account notes also reference the friendly and joking relationship AI#8 had with Kohl, who the notes identify as AI#8's adviser. TD Ameritrade flagged this call as potentially fraudulent and had to investigate further. Attachment YY are copies of the TD Ameritrade notes.

249. Kohl advised AI#8 about her investments. Specifically, AI#8 compared securities to precious metals bullion, gave advice on investing in precious metals bullion versus the stock market, and forecasted what the stock market would do.

250. More specifically, Kohl told AI#8 that she needed to liquidate her stock holdings and that the stock market was not a reliable place to invest her funds, as it was risky. Kohl advised that AI#8 should instead invest her funds in gold and silver, though gold was better than silver because it was increasing in value more. Kohl also said that if AI#8 put her money in gold and silver, she would not lose.

251. AI#8's first investment was on December 5, 2019 with Metals in which AI#8 used $68,591.89 to purchase precious metals. To effectuate this investment, AI#8 liquidated an IRA, that contained securities, held with TD Ameritrade. AI#8 transferred her funds to a SDIRA with Equity Institutional at the direction of Metals and used those funds to invest in precious metals bullion.

Metals sales representatives completed the SDIRA transfer paperwork for AI#8.

252.   A Metals invoice dated December 5, 2019 listed AI#8's precious metals bullion holdings as including 125 1/10-ounce gold Royal Canadian Mint Polar Bear Coins at $340.93 per unit for a total purchase of $42,616.25, and 800 ½-ounce silver Royal Canadian Mint Polar Bear Coins at $26.31 per unit for a total purchase of $21,048.00.  Attachment ZZ is a true and correct copy of the December 5, 2019 Metals.com invoice.

253.   By comparison, AI#8 was also sold 112 one-ounce silver Royal Canadian Mint Maple Leaf Coins at $18.72 per unit for a total purchase of $2,096.64.

254.   After the first sale, Kohl sent AI#8 an investment proposal letter on Metals.com letterhead in which Kohl listed the retirement accounts that he was aware AI#8 owned with their values.  Kohl indicated that AI#8 had one non-qualified account.  He also listed AI#8's traditional IRA account that was liquidated to fund AI#8's purchase of precious metals bullion from Metals on December 5, 2019 through Equity Institutional. The last account referenced was AI#8's Individual Brokerage account also held at TD Ameritrade, which held $311,000 according to the proposal letter.  Kohl advised AI#8 to liquidate this account and invest a total of $200,000.00 in precious metals bullion, specifically gold. Kohl advised that AI#8 should place the remaining funds, $100,000.00, in a

savings account. He did not give any advice on what to do with the remaining $11,000. The account that Kohl advised AI#8 to liquidate held securities. See attachment W that is a copy of the letter referenced earlier in this document.

255.   After her first purchase, AI#8's adult son believed that AI#8 had been defrauded based on the prices that she paid. AI#8 told Kohl this, and Kohl responded that her son did not know what he was talking about. AI#8 chose to believe Kohl and make a second investment.

256.   AI#8 made a second purchase in January 2020 at the end of Kohl's stay at her home. Kohl arrived to stay the weekend with AI#8 on or about January 10, 2020. They had only spoken on the phone and had not previously met in person.

257.   During this weekend visit, Kohl stated that he owned Barrick despite giving AI#8 a business card that listed him as a Senior Vice President and Trader for Barrick. AI#8 made a purchase with $50,000.00 that she held in cash in her bank account. Kohl took credit for the liquidation based on the advice he provided her, telling AI#8 that he gave her good advice. AI#8 states that she made the decision independently. Attachments AAA and BBB are copies of the business card and check used to make the purchase.

258.   An invoice issued by Barrick Capital dated January 13, 2020 includes 1,065 ½-ounce silver Canadian Wildlife Series Coins at $23.50 per unit for a total

of $25,027.50 and 50 1/10-ounce gold Canadian Wildlife Series Coins at $360.50 per unit for a total of $20,909.00. The Wildlife Series Coins are the same as the Polar Bear Coins, simply renamed, which the Defendants state are exclusive to Metals. Attachment CCC is a true and correct copy of the January 13, 2020 Barrick invoice.

259. AI#8 understood that these precious metals bullion coins would be held through her SDIRA, but they were mailed to her directly. Kohl stated that was a mistake, but the precious metals bullion coins were never added to her SDIRA holdings.

260. AI#8 later discovered that she lost the majority of her investment funds. She understood that Kohl would be paid as a part of this process, but she did not know that the majority of her funds would be lost.

261. When AI#8 contacted Metals about her loss, Metals sales representatives told AI#8 that her precious metals were worth more than the listed value.

262. Bowers learned that an employee of the Commission was talking with AI#8 about the Defendants' actions, and Bowers told AI#8 that Declarant was harassing AI#8 because Declarant is a Democrat and AI#8 is a Republican. Bowers also stated that Declarant was lying to AI#8 about her precious metals bullion coins being overpriced and that securities regulators do not know anything about

gold and silver.  Bowers equated the knowledge a securities regulator has about the precious metals industry to that of a plumber having any knowledge of the securities industry.  AI#8 suggested that she would get an independent opinion from a member of the American Numismatic Association.  Bowers responded that "they don't know anything because there is all kinds of different gold and silver." Bowers also informed AI#8 that within sixty days that Metals was going to sue the Alabama Securities Commission and all the state regulators coming after Metals for damaging Metals relationship with their clients and costing Metals and their clients money.

263.   Separately, Kohl told AI#8 not to talk with Declarant.

264.   AI#8's son contacted Kohl after the sale through Barrick and called Kohl despicable. At this time, Kohl alleged that he was working for Barrick. However, Bowers, who worked for Metals, contacted AI#8 the next day and told her that Metals would provide a full refund of the Metals purchase.

265.   This refund has not been provided.

266.   Despite all of this, AI#8 and Kohl remained in contact until approximately three weeks before this summarized interview. To that point, Kohl was discussing AI#8 coming to Los Angeles to visit him or their traveling to Las Vegas.

267.   Had AI#8 known that she would lose the majority of the retirement

funds she invested in precious metals bullion, then she would not have invested.

**Barrick Capital Victim**

**Alabama Investor # 9**

268.  On August 25, 2020, I interviewed Alabama Investor #9 (hereinafter "AI#9"), who is 65 years old.

269.  Alabama Investor #9 is a resident of Alabama and was in the State of Alabama when the following events occurred.

270.  AI#9 is a Nurse Manager at KabaFusion.

271.  AI#9 received a call from a representative of Barrick on or about June 9, 2020.  He does not remember the name of the Barrick sales representative, and the Barrick sales representative did not explain how he got AI#9's number.

272.  The Barrick sales representative initially did not discuss precious metals bullion, but instead pitched the benefits of a SDIRA over a traditional retirement account such as the 401K account AI#9 held at Fidelity Netbenefits.

273.  Specifically, the Barrick sales representative informed AI#9 that a new law was recently passed in which the federal government could seize the funds and/or investments held in AI#9's Fidelity account, which held securities; however, funds and/or investments held through a SDIRA were safe, protected, and could not be seized.

274.  The Barrick sales representative did not further explain this new law,

why the funds could be seized, or what they would be used for.  He did, however, send AI#9 an article by email supporting this claim.

275.   In addition to the new law regarding the seizure of investment accounts, the Barrick sales representative stated that the stock market was unstable due to an uncertain economy and an investment in gold was safer. The Barrick sales representative revealed after a few phone calls that Barrick was actually a precious metals bullion dealer.

276.   During multiple calls between the sales representative and AI#9, they discussed guns and politics, specifically their approval of President Trump and the direction the President is taking the country.  AI#9 believed that the sales representative shared his views on President Trump and guns, and as a result, AI#9 trusted the sales representative to act in his best interest.

277.   AI#9 decided to liquidate his retirement account as a result of the trust built through their common interests.  AI#9 was then transferred to a second sales representative for Barrick who assisted AI#9 by acting as his adviser on phone calls with Fidelity Netbenefits to liquidate AI#9's retirement account in order to use those funds to open a SDIRA at the Entrust Group.  The second Barrick sales representative also assisted AI#9 by preparing the documents to open the SDIRA account and transfer the funds from Fidelity Netbenefits.

278.   Once the account at Fidelity Netbenefits was liquidated, which

334

involved selling securities, AI#9 mailed the check for the liquidated funds to Barrick. The Barrick sales representative then determined what precious metals bullion AI#9 would purchase. AI#9 stated that the Barrick sales representative asked what he thought of gold and silver, and AI#9 responded that the Barrick sales representative should invest on AI#9's behalf, believing the Barrick sales representative was acting in AI#9's best interest. AI#9 did not ask any questions about the precious metals bullion at the time.

279.    The Barrick sales representative did not explain to AI#9 the options he had regarding the various precious metals bullion products sold by Barrick or that the precious metals bullion AI#9 purchased were significantly overpriced.

280.    According to AI#9's purchase invoice, dated June 23, 2020, he invested $249,998.92. The majority of the funds were invested in 1/10-ounce gold Canadian Wildlife Series coins, and the remainder of his funds were invested in ½-ounce silver Canadian Wildlife Series coins. Attachment DDD is a true and correct copy of the June 23, 2020 Barrick invoice.

281.    Neither of the Barrick sales representatives told AI#9 that they earned a commission from the sale or that the amount of their commission was directly impacted by the amount AI#9 invested.

282.    No representative of Barrick Capital told AI#9 what the spot price was of the precious metals purchased was on June 23, 2020. At the time of the

335

purchase, AI#9 did not question the value of the metals

283.   AI#9 did not recall hearing a trade confirmation call in which Barrick informed him of the metals purchased, the quantity, or the price paid individually for the metals.

284.   When discussing the costs involved with the purchase of precious metals through Barrick, AI#9 was informed that all costs associated such as the self-directed IRA fees and the depository fees would be paid for by Barrick Capital for a period of five years.

285.   AI#9 stated that he has purchased precious metals bullion coins from Ebay in the past and considers gold to be a sound investment during times of chaos. When making purchases for precious metals bullion coins on Ebay, AI#9 considered a fair spread to be five to six percent over the spot price.  AI#9 has never invested in precious metals bullion though a dealer such as Barrick before or utilized a SDIRA in these circumstances.

286.   According to the purchase invoice, AI#9 purchased 484 1/10-ounce gold Canadian Wildlife Series coins for $412.62 per unit. By comparison, Barrick purchased the same precious metals bullion from Bayside for $205.63 per unit. Barrick sold AI#9 the 1/10-ounce gold Canadian Wildlife Series coins for more than double their purchase price per unit. Although the 1/10-ounce gold Canadian Wildlife Series coins were the significant majority of AI#9's investment, the ½-

336

ounce silver Canadian Wildlife Series coins made up the remainder of the investment.  Additionally, the coins are the same as the 1/10-ounce gold Polar Bear coins and ½-ounce silver Polar Bear coins, which Metals claimed were exclusive.

287.   Had AI#9 known that he would lose the majority of his funds through this investment, he would not have purchased precious metals bullion through Barrick.

288.   Since the purchase on June 23, 2020, the spot price of gold and silver has continued to rise. Despite this increase, AI#9 noticed that the value of his holdings listed on statements from Entrust Group remained the same. This concerned AI#9, so he has made multiple attempts to contact Barrick.  AI#9 did not receive an answer to this concern until a phone call from a Barrick sales representative on September 15, 2020, which will be summarized in the following paragraphs.

289.   Since August 25, 2020, AI#9 has made at least two attempts to obtain documentation explaining what type of precious metals bullion he purchased, the price he purchased it at, and what the value is. On August 25, 2020, he called Barrick and spoke to a person who AI#9 recalls giving him the name William, who said that he would email a document providing the requested information to AI#9, but William did not follow through.  When AI#9 tried to call him back about getting the information, William would not take his calls.

290.   On September 15, 2020, at approximately 3:00 PM, AI#9 called Barrick again to obtain documentation explaining what type of precious metals bullion he purchased, the price he purchased at, and the current value. AI#9 spoke to Ryan Hudson ("Hudson"). AI#9 told Hudson that he was concerned he paid double what his precious metals bullion is worth, but AI#9 doesn't know for sure because he doesn't know what type of precious metals bullion is in his account.

291.   Hudson promised to send the requested information.  Hudson also told AI#9 that if his precious metals bullion appear to cost half of the purchase price, then AI#9 must have purchased "premium coins." Hudson also informed AI#9 that one of the best features of the premium coins is that it appears to the IRS that the taxable value of his SDIRA is half the true value, thus decreasing AI#9's tax liability.

292.   On September 15, 2020, at approximately 5:30 pm, Declarant was speaking with AI#9 on the phone about his experience with Barrick. At that time, he had not received the promised documents from Hudson. While on the call, AI#9 had an incoming call from Barrick. AI#9 merged the Barrick call with the Declarant's call, which allowed Declarant the opportunity to listen in and record the conversation.

293.   Hudson identified himself and apologized for his delayed response in providing the document clarifying the metals purchased, the purchase amounts,

338

and the value.  The document he sent was the purchase invoice dated June 23, 2020. See attachment DDD.

294.  AI#9 observed that he purchased 484 1/10-ounce gold Canadian Wildlife series coin for $412.63 each and remarked that was a high price for only a 1/10th of an ounce.  Hudson defined the coin as "an exclusive coin or an exclusive merchandise product from the Canadian Mint," and offered this explanation: "exclusive coins have a lower spread.  They do obviously have a, there is a higher manufacturing and higher retail premium attached to those. They do have what's called a lower liquidation spread."

295.  Hudson then compared the 1/10-ounce gold Maple Leaf coin to the 1/10-ounce gold Canadian Wildlife Series; however, he referred to it as a "Polar Bear coin." In the comparison, Hudson described the Maple Leaf as having a spread of 28% to 29% whereas the spread on an exclusive bullion coin such as the Polar Bear "is going to be somewhere round 4%, maybe on the upwards of about 8%. At the highest. But what you are looking at is about 4% average."

296.  AI#9 requested the current bid or ask price of the Polar Bear. Hudson advised that a current bid price was unavailable due to "low inventory" but offered instead to look up the "historical price." Hudson told AI#9 he was looking at a liquidation of the 1/10-ounce gold Canadian Wildlife Series coin from Mid-August, and the liquidation price represents the buyback price.  The price Barrick

bought-back the 1/10-ounce gold Canadian Wildlife Series coin at that time was
$401.89 for 52 coins.

297.   Hudson then offered to buy back AI#9's 1/10-ounce Canadian Series
Wildlife coins at a "similar price," but not spot price. And the price of the buyback
would be determined by factors such as the when the transaction occurred, and
how many transactions it took.  The price could vary from transaction to
transaction; however, AI#9 "would get close to what you paid for it, considering
where the market is right now, and with about a 4% to 8% spread attached to it."
Hudson then offered the warning, "If you sell metals right now, you probably
won't be able to get them for some time."

298.   When AI#9 confirmed his interest in liquidating based on the
representations Hudson made, Hudson then stated he could not liquidate now,
because a buyer would have to be located first, similar to what AI#1 was told about
liquidating some of her coins. Hudson further stated that he "typically" would not
agree to liquidate because AI#9 did not hold the precious metals bullion for three
years as recommended.

299.   AI#9 stated he was not comfortable with the price he paid for his
precious metals bullion, and Hudson responded that "you couldn't buy those
products cheaper." Hudson then told AI#9 that he wanted AI#9 to understand what
would happen if he liquidated the exclusive precious metals bullion; "you are

Page 79 of 83

**340**

going to get somewhere around $190,000 worth of product purchased back. So, it looks like you overpaid for a product because it's an exclusive product. You are paying a higher above spot price, but that particular product has a lower spread attached to it."

300.   Hudson also made the comparison again with the Maple Leaf's purported higher spread and called precious metals bullion such as the Maple Leaf "high mintage" and "non-exclusive," and as such, those coins "have a higher risk" long term than the seemingly similar "exclusive" 1/10-ounce gold Canadian Wildlife Series coin because "it's much more beneficial to be holding on to products that have lower spread as opposed to a higher spread." Hudson further advised that when a person purchase precious metals bullion, it is best to pay the lowest spread.

301.   Hudson ended the call by advising that either he or the trade desk would contact AI#9 by Thursday, September 17, 2020 to initiate the liquidation.

## CONCLUSION

302.   Asher and Batashvili used the companies of TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Barrick Capital, Inc., and Tower Equity, LLC to defraud elderly investors who were all 60 years of age or older and who resided in the State of Alabama, by means of fraud, deceit, the misrepresentation or omission of material facts, and/or deception.

303.   Asher and Batashvili, acting as principals, owners, officers, and/or directors, led and coordinated the sales representatives and others who worked for the Defendants and directed their actions. Asher and Batashvili's goal, by and through their sales representatives and agents, was to access as much of the retirement funds held by elderly investors by means of fear tactics through fraud, deceit, the misrepresentation or omission of material facts, and/or deception, and then convince the elderly investors to spend all of those funds on the purchase of precious metals bullion with large, undisclosed spreads.

304.   Asher and Batashvili, by and through their sales representatives and agents, advised elderly investors to liquidate whatever qualified retirement account that they held in order to gain access the retirement funds. Some of these accounts contained securities, which were sold based on the fraudulent investment advice and misrepresentations and omissions of material facts. Acting as investment advisers and/or investment adviser representatives, the Defendants ignored their fiduciary duty by acting for their best interests rather than that of the elderly investors they target. The Defendants weaponized trust, as the elderly investors believed that the sales representatives were knowledgeable and looking out for their best interests.   Fear was, and continues to be, the avenue that the Defendants used to advise and induce the elderly investors to liquidate their securities by comparing the dangers of the stock market to the alleged safety of precious metals

342

bullion, by forecasting the imminent collapse of the stock market, and/or stating that investment funds holding anything other than precious metals are subject to forfeiture by the government. The deceptive practices of the Defendants led to the elderly investors losing a majority of their retirement funds.

305.   The elderly investors had no idea of the loss that they would incur as a result of their investment in precious metals due to the large, undisclosed spreads charged by the Defendants. Upon discovering the loss, some elderly investors called the Defendants and were told that they had not incurred a loss, and their precious metals bullion was worth the same or more than they paid. This was not true, as the majority of the funds were taken by the Defendants for their own benefit by means of large, undisclosed spreads. Had the elderly investors known the loss that they would take, they would not have made the investment. Many of the elderly investors have had to postpone or reassess retirement plans as a result of this fraud.

306.   These actions continue at the present time, as AI#1 was recently told that in order for Metals to liquidate her precious metals bullion, Metals would need to find a buyer for her precious metals bullion coins. Additionally, AI#9 was "tucked-in" on September 15, 2020 with false statements as to the spreads and value of his coins. Finally, the website buygoldinalabama.com is presently active in the State of Alabama, and the registration of this domain by Batashvili is

343

associated with the email Asher@famelab.com, an email also associated with

Asher's GoDaddy Shopper ID accounts.

## V.   **DECLARATION**

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on September 17, 2020, in Montgomery, AL.

Elizabeth Planer

**ATTACHMENT A**

**COPY OF CEASE AND DESIST ORDER ISSUED BY ALABAMA
SECURITIES COMMISSION**

STATE OF ALABAMA
ALABAMA SECURITIES COMMISSION

IN THE MATTER OF:                          )
                                           )
TMTE, INC. D/B/A METALS.COM,               )
CHASE METALS, INC.,     .                  )
MICHAEL KENDALL,                           )   ADMINISTRATIVE ORDER NO.
TIMOTHY PORRITT,                           )   CD-2019-0025
RANDALL KOHL, and                          )
ALEXANDER GIAIME,                          )
                                           )
Respondents.                               )
                                           )

## CEASE AND DESIST ORDER

The Alabama Securities Commission ("Commission"), having authority to administer and

provide for the enforcement of all provisions of Title 8, Chapter 6, *Code of Alabama* (1975), the

Alabama Securities Act ("Act"), upon due consideration of the subject matter hereof, and having

confirmed information of the offers for sale and/or sale of securities, into, within or from the

state of Alabama, has determined as follows:

## RESPONDENTS

1.      **TMTE, INC. ("TMTE")**, is a Wyoming corporation originally formed under the

name Access Unlimited on April 30, 2008 with a principal address of 433 N. Camden Drive,

Suite 970, Beverly Hills, California, 90210.   **TMTE** has transacted business in the state of

Alabama as **CHASE METALS, INC,** and **METALS.COM.**   Hereinafter, **TMTE, CHASE**

**METALS, INC,** and **METALS.COM** will be collectively referred to as **METALS.COM.**

**METALS.COM** can be served with process through its registered agent, Corporate Agents,

LLC, at 1712 Pioneer Avenue, Suite 100, Cheyenne, Wyoming, 82001.

346

2.    **MICHAEL KENDALL ("KENDALL")**, at all times relevant, has identified himself as an agent of **METALS.COM** with a business address of 433 N. Camden Drive, Suite 970, Beverly Hills, California, 90210.

3.    **TIMOTHY PORRITT ("PORRITT")**, at all times relevant, has identified himself as an agent of **METALS.COM** with a business address of 433 N. Camden Drive, Suite 970, Beverly Hills, California, 90210.

4.    **RANDALL KOHL ("KOHL")**, at all times relevant, has identified himself as an agent of **METALS.COM** with a business address of 433 N. Camden Drive, Suite 970, Beverly Hills, California, 90210.

5.    **ALEXANDER GIAIME ("GIAIME")**, at all times relevant, has identified himself as an agent of **METALS.COM** with a business address of 433 N. Camden Drive, Suite 970, Beverly Hills, California, 90210.

<b><u>OTHER RELATED PARTIES</u></b>

6.    **SIMON BATASHVILI ("BATASHVILI")**, at all times relevant, has identified himself as the Chief Executive Officer of **METALS.COM** with a business address of 433 N. Camden Drive, Suite 970, Beverly Hills, California, 90210.

<b><u>STATEMENT OF FACTS</u></b>

7.    **METALS.COM** raised capital from investors nationally, including Alabama residents, by offering and selling Precious Metals IRAs.

8.    On June 11, 2019, the Commission received information that agents of **METALS.COM** solicited at least twelve Alabama investors through unsolicited telephone calls. This tactic is referred to as "cold-calling."

9.    **METALS.COM** also solicited potential investors through Facebook, accessible

2

347

to Alabama investors at https://www.facebook.com/metalscom/.

10.    **METALS.COM** solicited potential investors and through an internet website, accessible to Alabama investors at https://www.metals.com.

11.    An Alabama investor initially learned about metals.com through a Facebook fan page for conservative media personality, Sean Hannity ("Hannity"). The investor stated that articles were posted that gave the impression Hannity believed that the stock market would decline and that conservatives should move their money to an investment in precious metals. Opening the article led the Alabama investor to **METALS.COM**.

12.    The Alabama investor was then contacted via telephone by **KOHL** who identified himself as an agent of **METALS.COM**. **KOHL** advised the Alabama investor that he knew Sean Hannity personally. **KOHL** advised the Alabama investor that his securities holdings through his traditional individual retirement account ("IRA") were not safe, and his money would be lost. **KOHL** stated that there was no risk in an investment in precious metals, and his money would be safe.

13.    **METALS.COM**, through **KOHL**, advised the Alabama investor to sell his securities holdings and invest in precious metals through a self-directed IRA because an investment in precious metals, unlike securities, will not lose value based on stock market fluctuations.

14.    A second Alabama investor received a cold-call from **PORRITT**, who identified himself as an agent of **METALS.COM**. **PORRITT** advised that the stock market was in decline and investments in precious metals were more secure.

15.    The second Alabama investor was also contacted by **KENDALL**, who was described as an account specialist for **METALS.COM**. **KENDALL** also advised the Alabama

3

348

investor to sell his traditional securities holdings and invest in precious metals through a self-directed IRA.

16.    **PORRITT** assisted the Alabama investor in his transfer of his securities holdings by participating on a phone call to the investor's traditional IRA firm. During the phone call **PORRITT** referred to himself as the investor's advisor and account representative.

17.    A third Alabama investor was cold-called by **GIAIME**, who identified himself as a junior account executive of **METALS.COM**. **GIAIME** advised the Alabama investor that an investment in precious metals is an important investment alternative to a traditional IRA. **GIAIME** assisted the Alabama investor in transitioning funds from his traditional IRA to a self-directed IRA.

18.    The dates of the investments of precious metals sold to Alabama investors through self-directed IRAs ranged from May 4, 2018 through March 27, 2019.

19.    All the Alabama investors who invested in **METALS.COM** were between the ages of sixty and eighty-two (60-82).

20.    Agents of **METALS.COM**, including **KENDALL**, **PORRITT**, **KOHL**, and **GIAIME**, provided the legal documents Alabama residents must use to sell securities and/or invest in precious metals through a self-directed IRA already completed. All the Alabama investors need to do is sign the legal documents and return them to **METALS.COM**.

21.    The legal documents require each investor to declare under penalty of perjury, that the potential investor either deals in precious metals due to the investor's "occupation, or as a result of Customer's avocations as a collector, speculator, or investor holds him or herself out as having knowledge or skill peculiar to such articles or the practices involved in the sale of such articles."

4

349

22.     None of the Alabama investors are dealers in precious metals in any aforementioned capacity nor are they knowledgeable in the practices involved in the purchase or sale of precious metals.

23.     The legal documents require that the potential investor "acknowledges and agrees that Customer assumes the risk of all investment decisions regarding any and all Precious Metals the Customer purchases from metals and metals makes no guarantee or representation regarding Customer's ability to profit (or avoid loss)... Any purchases from metals are made subject to Customer's own prudence, judgement, and ultimate decision."

24.     The legal documents require potential investors to waive express and implied warranties, waive consequential damages, and limit the liability of **METALS.COM**, and potential investors waive the right to a jury trial to settle any disputes, and must instead rely upon arbitration.

25.     The legal documents require potential investors to agree to hold **METALS.COM** harmless for any damages arising out of its performance under the contracts.

26.     The legal documents represent that "Precious Metals should be considered a long-term investment" of "at least three to five years... Customer should not invest more than twenty percent (20%) of Customer's available investment funds in Precious Metals."

27.     Alabama investors were told there were no fees associated with the purchase of precious metals and that investors need only pay the retail price of precious metals.

28.     Potential investors are paying compensation to **METALS.COM** when they accept its advice, transfer their funds from a dealer or investment advisor, and use the money to invest in precious metals.

29.     Agents of **METALS.COM**, including **KENDALL, PORRITT, KOHL,** and

5

350

**GIAIME**, failed to disclose to Alabama investors that they received commission, and, according to the legal documents, the commission is "based, at least in part, on the amount and profit margin of the Precious Metals they sell."

30.     The compensation is purportedly equal to the difference between the price paid by potential investors and the wholesale price of precious metals. This monetary difference is referred to as a "spread."

31.     The spread varies from potential investor to potential investor.  The "metals Spread on IRA Precious Metals transactions varies between two percent and thirty-three percent (2% - 33%)." This range is subject to change and potential investors may be responsible for more than the general rate.

32.     Alabama investors were not informed of a spread, believing that they were paying the retail value for the precious metals they purchased.

33.     A review of the files of the Registration Division of the Alabama Securities Commission was conducted on June 21, 2019, disclosing no record of registration for **METALS.COM** as a broker dealer agent, investment advisor, or investment advisor representative in the State of Alabama.

34.     A review of the files of the Registration Division of the Alabama Securities Commission was conducted on June 21, 2019, disclosing no record of registration for BATASHVILI as a broker dealer agent, investment advisor, or investment advisor representative in the State of Alabama.

35.     A review of the files of the Registration Division of the Alabama Securities Commission was conducted on June 21, 2019, disclosing no record of registration for **KENDALL** as a broker dealer agent, investment advisor, or investment advisor representative in

the State of Alabama.

36.    A review of the files of the Registration Division of the Alabama Securities Commission was conducted on June 21, 2019, disclosing no record of registration for **PORRITT** as a broker dealer agent, investment advisor, or investment advisor representative in the State of Alabama.

37.    A review of the files of the Registration Division of the Alabama Securities Commission was conducted on June 21, 2019, disclosing no record of registration for **KOHL** as a broker dealer agent, investment advisor, or investment advisor representative in the State of Alabama.

38.    A review of the files of the Registration Division of the Alabama Securities Commission was conducted on July 3, 2019, disclosing no record of registration for **GIAIME** as a broker dealer agent, investment advisor, or investment advisor representative in the State of Alabama.

39.    Agents of **METALS.COM,** including **KENDALL, PORRITT, KOHL,** and **GIAIME,** failed to disclose to Alabama investors that they are not licensed brokers of precious metals.

40.    Agents of **METALS.COM,** including **KENDALL, PORRITT, KOHL,** and **GIAIME,** failed to disclose to Alabama investors that they are not registered investment advisors.

41.    Agents of **METALS.COM,** including **KENDALL, PORRITT, KOHL,** and **GIAIME,** failed to disclose to Alabama investors their experience in valuing securities, forecasting economic conditions, calculating market volatility, or determining the suitability of securities and other investments.

7

352

42.     Agents of **METALS.COM**, including **KENDALL**, **PORRITT**, **KOHL**, and **GIAIME**, failed to disclose to Alabama investors any information regarding complaints, including complaints related to fraudulent, deceptive, or illegal practices sent, submitted, or otherwise levied by prior investors.

43.     **KENDALL**, **PORRITT**, **KOHL**, and **GIAIME**, failed to disclose to Alabama investors the identity of BATASHVILI as the owner, principal or manager of **METALS.COM**, and as a result his business repute.

44.     BATASHVILI and/or **CHASE METALS, INC** have been named as a defendant in at least three lawsuits: Daniel Always vs Chase Metals LLC et al, filed on August 31, 2018, in the jurisdiction of Los Angeles County District Courts, International Bullion Exchange LLC vs Lucas Erb et al, filed on March 13, 2014, in the jurisdiction of Los Angeles County District Courts, and Stephen Matteo v. Chase Metals Service Corporation et al, filed on 2/19/2019 in the United Stated District Court Central District of California.

45.     On May 1, 2019, the Texas Securities Board issued an Emergency Cease and Desist Order against **METALS.COM**.

46.     On July 1, 2019, **METALS.COM** entered into an Order with the Texas Securities Board in which they acknowledge that at least one agent of **METALS.COM** acted as an investment advisor without the benefit of registration. **METALS.COM** also agreed to offer rescission to the Texas investors.

47.     On July 12, 2019, **METALS.COM** entered into an Order with the Colorado Securities Board in which they acknowledge that respondent, "Metals" acted as an investment advisor to Colorado investors without the benefit of registration. **METALS.COM** has agreed to offer rescission to the Colorado investors.

353

## CONCLUSIONS OF LAW

49.     Pursuant to Section 8-6-2(18), *Code of Alabama* (1975), the definition of "investment advisor" includes any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities. "Investment advisor" also includes financial planners and other persons who, as an integral component of other financially related services, provide the foregoing investment advisory services to others for compensation and as part of a business or who hold themselves out as providing the foregoing investment advisory services to others for compensation.

50.     Pursuant to Section 8-6-3(b), *Code of Alabama* (1975), it is unlawful for a person to transact business in this state as an investment advisor unless such person is registered under the Act. Respondent **METALS.COM** is acting as an investment advisor while not registered under the Act in violation of Section 8-6-3(b).

51.     Pursuant to Section 8-6-2(19), *Code of Alabama* (1975), the definition of an investment advisor representative is

(19) Any partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with an investment advisor, except clerical or ministerial personnel, who:

> a.   Makes any recommendation or otherwise renders advice regarding securities,
> b.   Manages accounts or portfolios of clients,
> c.   Determines which recommendation or advice regarding securities should be given,
> d.   Solicits, offers, or negotiates for the sale of or sells investment advisory services, unless the solicitation, offering, or selling activities are solely incidental to his or her profession and such person is a dealer or salesman

9

354

registered under Section 8-6-3 and the person would not be an investment advisor representative except for the performance of activities described in subdivision (18)d. of this section, or
e. Supervises employees who perform any of the foregoing.

52.     Pursuant to Section 8-6-3(b), *Code of Alabama* (1975), it is unlawful for any person to transact business in the State of Alabama as an investment advisor representative unless such person is registered under the Act. Respondent **KENDALL** is acting as an investment advisor representative while not registered under the Act in violation of Section 8-6-3(b).

53.     Pursuant to Section 8-6-3, *Code of Alabama* (1975), it is unlawful for any person to transact business in the State of Alabama as an investment advisor representative unless such person is registered under the Act. Respondent **PORRITT** is acting as an investment advisor representative while not registered under the Act in violation of Section 8-6-3(b).

54.     Pursuant to Section 8-6-3, *Code of Alabama* (1975), it is unlawful for any person to transact business in the State of Alabama as an investment advisor representative unless such person is registered under the Act. Respondent **KOHL** is acting as an investment advisor representative while not registered under the Act in violation of Section 8-6-3(b).

55.     Pursuant to Section 8-6-3, *Code of Alabama* (1975), it is unlawful for any person to transact business in the State of Alabama as an investment advisor representative unless such person is registered under the Act. Respondent **GIAIME** is acting as an investment advisor representative while not registered under the Act in violation of Section 8-6-3(b).

56.     Pursuant to Section 8-6-3(j)(7), *Code of Alabama* (1975), the Commission may suspend, revoke, censor, or bar any registrant or any officer, director, partner, or person occupying a similar status or performing similar functions for a registrant, from employment

355

with a dealer or investment advisor, or restrict or limit a registrant as to any function or activity of the business for which registration is required in this state if the Commission finds that the order is in the public interest and that the registrant or, in the case of a dealer or investment advisor, any partner, officer or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the dealer or investment advisor, has engaged in dishonest or unethical business practices. Respondent **METALS.COM** and its investment advisor representatives **KENDALL, PORRITT, KOHL,** and **GIAIME** failed to inform their investment advisory clients of the fees they were to receive and did receive for advising their clients to sell their securities and invest in precious metals in violation of the Act.

57.     Pursuant to Section 8-6-17(b), *Code of Alabama* (1975), it is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analysis or reports or otherwise, to engage in dishonesty or unethical practices as the Commission may define by rule. **METALS.COM** acted as an investment advisor, and its investment advisor representatives **KENDALL, PORRITT, KOHL,** and **GIAIME** engaged in dishonest and unethical behavior by failing to disclose to their investment advisory clients in writing they were receiving compensation while advising their clients to sell securities and purchase precious metals.

58.     This Order is appropriate in the public interest for the protection of investors and is consistent with the purposes of the Act.

59.     This Order does not prevent the Commission from seeking such other civil or criminal remedies that may be available to it under the Alabama Securities Act.

11

356

60.     Additionally, if the allegations set forth herein are found to be true, through either administrative adjudication, failure of the **RESPONDENTS** to make a timely request for hearing, or default of the **RESPONDENTS**, it is the intention of the Commission to impose sanctions upon the **RESPONDENTS**. Such sanctions may include, inter alia, an administrative assessment imposed on **RESPONDENTS**, an additional administrative assessment for investigative costs arising from the investigation of the violation(s) described herein against **RESPONDENTS**, and a permanent order to bar **RESPONDENTS** from participation in any securities related industry in the state of Alabama.

**ACCORDINGLY, IT IS HEREBY ORDERED** that RESPONDENTS, **METALS.COM, KENDALL, PORRITT, KOHL,** and **GIAIME**, immediately **CEASE AND DESIST** from further offers or sales of any security into, within or from the state of Alabama.

Entered at Montgomery, Alabama, this __8th__ day of __August__, 2019.



ALABAMA SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
Montgomery, AL 36104
(334) 242-2984

BY:

JOSEPH P. BORG
Director

12

357

**ATTACHMENT B**

**CEASE AND DESIST LETTER ISSUED BY IHEART RADIO**



**iHeart**
MEDIA

San Antonio, TX 78258

o 
f

www.iHeartMedia.com
www.iHeartRadio.com
iHeartradio

Lesia Skrypoczka
Senior Corporate Counsel - Intellectual Property

March 28, 2018

*Via Certified Mail (RRR)*

Mr. Thomas Gould

Grand Rapids, MI 49503

Metals.com

Beverly Hills, Ca 90222

Metals.com

Beverly Hills, CA 90210

Re: Misrepresentation of Association with iHeartMedia, Inc.

Dear Sirs:

iHeartMedia, Inc. is the owner, through its subsidiary company Premiere Networks, Inc. (collectively "iHeartMedia") of the well-known radio programming of its talent Sean Hannity and Rush Limbaugh ("Programs") and all Intellectual Property associated therewith ("Intellectual Property"). iHeartMedia has spent significant time and resources developing and promoting its longstanding talent, Programs, and Intellectual Property, and as such, they have come to be widely known across the United States and worldwide.

The WHOIS database records indicate that you registered the Domain Names www.rushlimbaugh.■■■and www.hannity.■■■ ("Domain Names"). As of the date of this letter, the Domain Names direct to the official websites corresponding to our Programs, without authorization. By using the Domain Names, you are seeking, in bad faith, to misdirect unsuspecting Internet traffic to your unauthorized sites.

Given the facts of this case, this is an egregious case of cybersquatting and trademark infringement. Your registration and use of our Intellectual Property as your Domain Names for your web site constitute a violation of applicable federal and state law, including, without limitation, trademark infringement under Section 32 of the Lanham Act, dilution in violation of Section 43(c) of

the Lanham Act, a violation of Section 43(a) of the Lanham Act in that, among other things, your above-referenced acts are likely to cause confusion, mistake, and to deceive internet users, and, violation of Section 43(d) of the Lanham Act (unlawful cybersquatting).

It is clear you have undertaken these piratical and unlawful actions in order to commercially exploit and financially profit from your wrongful misappropriation of our Intellectual Property and the goodwill and notoriety associated therewith.

In addition, it has come to our attention that you have represented via your websites, including but not limited to www.metals.com, social media posts, and phone calls and in-person meetings with prospective customers, that you are affiliated with Sean Hannity and Rush Limbaugh. Any false representation that you are in any way affiliated with iHeartMedia or its talent is not only fraudulent, but misleads current and potential iHeartMedia clients and damages iHeartMedia's reputation.

It is indisputable that your wrongful conduct has been, and continues to be, willful and deliberate, thereby making you liable for punitive and treble damages and for our legal fees and expenses. Although ignorance of the law is no excuse, it is highly doubtful that you were unaware of the unlawful nature of your actions, or our Intellectual Property when you registered the Domain Names and have made intentionally fraudulent misrepresentations of any associate between your company and iHeartMedia.

iHeartMedia will not tolerate your blatant theft and misappropriation of our valuable Intellectual Property.

Accordingly, we demand that you do the following:

1.  Immediately cease and desist from any use of any type or nature whatsoever of the www.rushlimbaugh.■■■■ and www.hannity.■■■■ Domain Names or any other colorable imitation thereof as a name, mark, domain name, metatag, email address or component thereof (including, without limitation, the .org and .net variants of the domain name) including, without limitation, (a) operating a web site either at or otherwise linked in any manner to those Domain Names; (b) selling, transferring, and/or licensing; and/or (c) offering to sell, transfer, and/or license the Domain Names and the registration thereof.

2.  Immediately cooperate with us to transfer the Domain Names and registrations thereof from you to iHeartMedia as expeditiously as possible, including, without limitation, providing all information and signing whatever documentation is necessary to effectuate such a transfer (such as domain name transfer documentation.)

3.  Send to the undersigned within (ten) days of the date of this letter written confirmation that you have complied with, and will comply with, each and all of the foregoing. Such written confirmation should also include the name and URL of the domain name registrar through which you registered the Domain Names.

iHM000002

360

4.    Immediately cease and desist use of any trademarks, service marks, design marks, or logos, belonging to iHeartMedia, including but not limited to any talent names, images, or likeness.

5.    Immediately cease and desist from making any representations, whether verbal or written, that implies any association whatsoever with iHeartMedia or its talent.

You have **ten (10) business days from receipt of this letter** to confirm in writing its willingness to comply with each of iHeartMedia's demands. While it is iHeartMedia's desire to resolve this matter without the further expense of litigation, be advised that if you do not comply with the assurances provided, iHeartMedia will have no choice but to consider all available legal remedies. We therefore urge you to give this matter your serious and immediate attention.

Nothing contained or omitted in this letter is intended to be, nor should be deemed to be or construed as, a waiver or relinquishment of any of iHeartMedia's rights, remedies, claims, and contentions in respect to the matter, whether legal, equitable, or factual; each and all of which are expressly hereby reserved.

I look forward to your reply to this matter.

Very truly yours,

**AGREED TO AND INTENDING TO BE LEGALLY BOUND:**

_____        Date: _____, 2018

iHMC00003

361

**ATTACHMENT C**

**VALUATIONS PROVIDED BY SDIRA AND AI'S#2 NOTES**

**Invoice #:** 1965280

**Invoice Date:** 10/31/2019
**Account Type:** Traditional IRA
**Account #:** ██8275

**New Direction**
**TRUST COMPANY**

Louisville, CO 80027
P(877)█
F(303)█
www.ndtco.com

*(handwritten: Opt 1?)*

**Billing Summary**      11/02/2019- 11/01/2020

| Date | Billing Description | Market Value | Amount |
|---|---|---|---|
| 11/01/2019 | Delaware Depository | | $125.00 |
| | Portfolio value tier: 0.00 to 125,000.00 | | |
| | 1 OZ. SILVER CANADIAN MAPLE LEAF | $539.68 | |
| | .50 OZ. SILVER CANADIAN POLAR BEAR | $35,787.04 | |
| | 1 OZ. SILVER ROUND BUFFALO | $357.00 | |
| 11/01/2019 | Precious Metals Admin Fee | | $95.00 |
| | Portfolio value tier: 0.00 to 100,000.00 | | |
| | 1 OZ. SILVER CANADIAN MAPLE LEAF | $539.68 | |
| | .50 OZ. SILVER CANADIAN POLAR BEAR | $35,787.04 | |
| | 1 OZ. SILVER ROUND BUFFALO | $357.00 | |

*(handwritten annotations: 14.76, 112.66; 27.13, 113,024.1; 17.33, 346.62; 109.304.72)*

| | |
|---|---|
| Current Fees | $220.00 |
| Previous Balance Due | $0.00 |
| Payments/Adjustments | $0.00 |
| Amount Due | $220.00 |

Payments/Adjustments includes any credits, adjustments, and cash applied from your account.
If payment is not received by the due date, we may pay your fee from any cash balance that may exist in your account. Do not remit payment if you have placed a credit card on file and wish to use it to pay for your annual fee. Fees are subject to change with 30-day notice. A $25 late fee will be assessed for every 30 days the invoice is past due.

Sending a payment? Please return the bottom portion with your payment.

**Invoice #:** 1965280
**Account Name:** ████
**Account Types:** Traditional IRA
**Account #:** ██9275
**Billing Period:** 11/02/2019 ~ 11/01/2020
**Amount Due:** $220.00
**Due Upon Receipt**

**Mail Payment To:**

New Direction Trust Company
████
Louisville, CO 80027

**Did you Know?**
You can make your payment online using a Visa,
MasterCard, or Discover by visiting:
**www.myDirection.com**

---

**Select Your Payment Option:**

☐ **CHECK PAYMENT** - I elect to mail in a check to pay my annual fee due on my account. Make Payable To: New Direction Trust Company

☐ **CASH BALANCE** - I elect to deduct the total amount due from my available cash balance. *Cash must be available in your account to select this option.

**We thank you for your business.**

363

**ATTACHMENT D**

**SHIPPING AND TRANSACTION AGREEMENT SIGNED BY AN
ELDERLY ALABAMA INVESTOR**

## SHIPPING AND TRANSACTION AGREEMENT



metals.com / TMTE, Inc. (and its affiliates) (collectively, "metals") and the individual identified above ("Customer") agree that the following terms of this Shipping and Transaction Agreement ("Agreement") shall govern the pending and all future transactions between the parties involving all precious metals, in any form, that is the subject of all transactions between metals and Customer, and shall include, but is not limited to, bullion bars and coins, semi-Numismatic coins and bars, Numismatic coins and bars, "junk silver," and bags (and partial bags) of coins (collectively "Precious Metals.") This Agreement shall apply to all purchases from and sales to metals involving Customer, present and future. metals is not an investment advisor, consultancy, licensed brokerage, or banking institution.

1. <u>Delivery of Precious Metals Purchased:</u> Customer must deliver funds sufficient to cover the entirety of Customer's purchase from metals within five (5) business days of Customer's placement of the order ("Purchase Funds"). Purchase Funds may be delivered by check, credit card, or wire transfer. With the limited exception noted in Paragraph 8a, all sales, including credit card sales, are final (i.e., the Precious Metals cannot be exchanged or returned for a refund). Checks may be made out to Metals.com (For wire transfer instructions, please contact your metals sales representative.) metals shall deliver the Precious Metals specified in Customer's order to a suitable delivery service for delivery to Customer no more than twenty-eight (28) days after metals verifies that the Purchase Funds provided are backed by good funds. (Please note that it may take 12 business days to verify personal checks.) If Customer fails to provide the Purchase Funds within five (5) business days of Customer's placement of the order, metals may exercise the rights set forth in Paragraph 4, below.

2. <u>Delivery of Precious Metals:</u> metals shall cause all Precious Metals purchased and paid for to be delivered to Customer's address set forth above. metals only uses reputable, nationally recognized delivery services to deliver its Precious Metals. If, however, Customer's order is lost prior to delivery, Customer is instructed to notify metals, in writing, immediately. Notice of any such alleged loss should be sent to: metals.com, Attention: Customer Service, 330 S Center St,
suite 407 Casper, WY 82601. If the delivery service verifies that Customer's Precious Metals were never delivered, metals shall, within forty-five (45) days of such verification, in its sole discretion, either refund to Customer the full purchase price for such undelivered Precious Metals or replace such Precious Metals with other Precious Metals of the same denomination/type and grade. metals assumes no responsibility for Precious Metals lost, damaged, stolen, or otherwise subject to casualty after delivery to Customer. metals assumes no risk of loss for any Precious Metals

Confidential

TMTE_AL_00030

purchased from a Customer until such materials are delivered to and accepted by an authorized representative of metals.

3. Purchase Price:

a. Sales: The purchase price Customer has been quoted and agreed to pay includes metals operating margin on the transaction. Within the Precious Metals industry, the difference between metals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the "Spread." Spreads vary significantly - by Precious Metal, by customer, and over time. For Customer to make a profit, Customer must be able to sell the Precious Metals in the future for a price high enough to cover Customer's initial investment, including Spreads. Spreads may be subject to negotiation, and Spreads charged to Customer in a specific transaction may be more or less than the Spread charged to others in similar transactions or charged to Customer in prior or future transactions. At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%), and (ii) metals's Spread on semi-Numismatic and Numismatic coins and bars is generally between seventeen percent and thirty-three percent (17 to 33%). Spreads for semi-Numismatic and Numismatic coins and bars are often in the range of approximately twenty-nine percent (29%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons. The actual Spread on any particular transaction could be any amount within those ranges (or even possibly outside those ranges). For example, if a bullion coin or bar was quoted by metals at $400, and included a ten percent (10%) spread, metals cost for the bullion coin or bar would be $360. Similarly, if metals quoted a Numismatic coin or bar at $400, and included a twenty-five percent (25%) spread, metals cost for that coin would be $300. metals Spread range may be different (higher and/or lower), and the Spread metals charges may be higher or lower, at the time of and for any given transaction. Customer acknowledges that the spot prices of Precious Metals do not necessarily move in tandem with the Precious Metals the Customer purchases. That means that the spot price and the liquidation value of the Precious Metals purchased by the Customer under this Agreement may perform differently from one another.

b. IRA Sales: Individual retirement account ("IRA") transactions are more expensive to process and can require metals to assume certain investment risk in connection with the transaction. As such, notwithstanding the general ranges set forth in Paragraph 3a, at the time this Agreement was transmitted for Customer's signature, metals Spread on IRA Precious Metals transactions varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons. The actual Spread on any particular transaction could be any amount within that range (or even possibly outside that range). Moreover, metals Spread range may be different (higher and/or lower), and the Spread metals charges may be higher or lower, at the time of and for any given transaction. For example, a bullion coin or bar that ordinarily would be quoted by metals (outside an IRA) at $400, with a ten percent (10%) Spread, might be quoted at $480, with a twenty-five percent (25%) Spread, if the bullion coin or bar is purchased as an IRA investment. In both those examples, however, metals cost for the bullion coin or bar would be $360. metals makes no representations regarding the tax consequences of holding Precious Metals as an investment in an Individual retirement account ("IRA"). Client expressly acknowledges that Client has been advised to seek independent tax advice, from a qualified professional, regarding the tax consequences of such an investment. Further, please note that holding Precious Metals as an investment in an IRA may result in additional fees charged by third parties, not metals, such as depositary and custodial fees that would be charged directly to the Client by such third parties. metals makes no opinions, statements, or recommendations in regards to how much or what percentage of Client's retirement account should be invested in precious metals.

c. Re-purchases: metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells. metals may, at its sole discretion, elect to re-purchase the Precious Metals that metals sells, and metals does not guarantee that it will re-purchase Precious Metals that Customer purchases from metals. In the event Customer seeks to sell its Precious Metals to metals, Customer understands and acknowledges that metals re-purchase offer may be raised or lowered on a daily, even hourly or more basis, depending upon various market conditions, inventory needs, and the price and availability of comparable Precious Metals. metals does not guarantee that any re-purchase offer will equal the price that metals would pay to acquire the same denomination/type and grade of Precious Metal from a wholesaler, or that any offer made will be higher or equal to what someone else might offer for the same Precious

Metals.

d. Certification: Customers who are selling Precious Metals to metals declare under penalty of perjury pursuant to 28 U.S.C. §1746 that (i) Customer either deals in such articles or otherwise by Customer's respective occupation or as a result of Customer's avocations as collector, speculator, or investor has and holds him or herself out as having knowledge or skill peculiar to such articles or the practices involved in the sale of such articles, and (ii) any sale to metals of coins, hallmark bars, registered ingots, and other items as Numismatic objects is for their Numismatic value. Customers who are buying Precious Metals from metals declare under penalty of perjury pursuant to 28 U.S.C. §1746 that (i) Customer either deals in such articles or otherwise by Customer's respective occupation or as a result of Customer's avocations as collector, speculator, or investor has and holds him or herself out as having knowledge or skill peculiar to such articles or the practices involved in the purchaser of such articles, and (ii) any purchase from metals of coins, hallmark bars, registered ingots, and other items as Numismatic objects is for their Numismatic value.

e. Quotes on Customer's Holdings: Customers may request a quote on their holdings at any time. When requesting a quote, please specify whether you are looking to purchase additional Precious Metals or sell your existing holdings - as metals bid (buy from customer) and ask (sell to customer) quotes will vary. metals bases such quotes on a variety of factors, which are not necessarily tied or related to the prices quoted by, or factors considered by, its competitors.

f. Classification as Bullion, semi-Numismatic, or Numismatic: Whether a Precious Metal is classified as Bullion, semi-Numismatic, or Numismatic may turn on a number of objective and subjective factors, including the age of the Precious Metal, its condition, the number of known copies, the likelihood of additional minting, the originating country, relevant historical events or owners (e.g., shipwreck; royalty), relevance to the formation of various Precious Metal collections, and an investor's personal attraction to the piece. metals classification of Precious Metals is only an opinion and may change over time (e.g., if additional quantities of the Precious Metal are discovered). In addition, given the subjective nature of the classification process, other dealers or investors may classify the same coin differently. metals prices and spreads are based on its classification determination.

g. Customer Assumes Investment Risk; Investment Decisions.  Customer acknowledges that purchases and sales of Precious Metals involve considerable risk. Market prices are at times volatile and may be affected by a variety of factors including, among others, general economic conditions, political events, monetary policies of various countries, fluctuations in production and demand, stock-piles, speculative activity and the degree of concern people have about these matters. It is impossible to forecast accurately how or to what degree these or other factors will affect prices. Customer acknowledges and agrees that Customer assumes the risk of all investment decisions regarding any and all Precious Metals the Customer purchases from metals and metals makes no guarantee or representation regarding Customer's ability to profit (or avoid loss) from any purchase or any representation regarding any tax implications of any purchase and the decision to purchase or sell Precious Metals. Any purchases from metals are made subject to Customer's own prudence, judgment and ultimate decision. Customer expressly acknowledges and agrees to hold metals harmless for any damages arising out of the performance by metals of this Agreement. Customer understands that past performance cannot be an indicative of future results.

4. Remedy for Customer's Failure to Perform: If Customer refuses to accept delivery of the Precious Metals ordered or fails to make payment when due, metals, in its sole discretion, may cancel the transaction and resell such Precious Metals on a wholesale basis. If the proceeds from such resale are less than the contract price with Customer, metals shall be entitled to recover from Customer the difference between the resale price and Customer's contract price, plus any incidental damages occasioned by Customer's breach. If the proceeds from such resale are more than the contract price with Customer, metals shall be entitled to keep the excess amount to cover metals incidental damages.

5. Investment Objectives; Holding Period; Investment Risk; No Advice; Commissioned Sales Representatives:

a. metals is a seller and purchaser of Precious Metals. While metals is always prepared to compare and contrast the different Precious Metals that are available for purchase or that metals is willing to purchase, Customer acknowledges and agrees that (i) no fiduciary relationship exists between metals and Customer, (ii) the decision to purchase or sell Precious Metals, and which Precious Metals to purchase or sell, are the Customer's decision alone, and (iii) purchases or sales are made subject to Customer's own prudence and judgment.

b. In metals opinion, Precious Metals should be considered a long-term investment. Customer should be prepared to hold any Precious Metals purchased - whether from metals or elsewhere - for at least a three to five year period, and preferably five to ten years, to maximize the potential for gains. In metals opinion, Customer should only invest capital that can be held for at least this period of time. However, Precious Metals, like all investments, carry capital risk. Precious Metals may appreciate, depreciate, or stay the same depending on a variety of factors. metals cannot guarantee, and makes no representation, that the Precious Metals will appreciate at all or appreciate sufficiently to make Customer a profit at the expiration of this or any other period of time.

c. In metals opinion, Customer should not invest more than twenty percent (20%) of Customer's available investment funds in Precious Metals. Moreover, Precious Metals do not yield income and thus are not an appropriate investment vehicle for investors seeking current or future income.

d. The success of an investment in Precious Metals is dependent, in part, upon extrinsic economic forces including but not limited to supply, demand, international monetary conditions, and inflation or the expectation of inflation. The impact of these forces on the values of Precious Metals in general or any particular Precious Metal cannot be predicted. Customer acknowledges that the Precious Metals market can be volatile and that Precious Metal prices may rise or fall over time. Customer further acknowledges that past performance is no guarantee of future performance.

e. metals does not provide tax, investment, or legal advice or advisory services, and no one associated with metals is authorized to provide any such advice or services. Any written or oral statements by metals, its officers, agents, sales representatives, or other representatives relating to future events or the attributes of certain Precious Metals are opinions only. Such statements, if any, are not representations of fact. Customer agrees, acknowledges, and represents that Customer has not, at any time, sought or been provided with tax, investment, or legal advice or advisory services, of any kind or nature from metals or any of its, affiliates, assigns, successors, agents, employees, contractors or other representatives.

f. metals sales representatives are commissioned salespersons - i.e., their salary is based, at least in part, on the amount and profit margin of the Precious Metals they sell. In addition, from time to time, metals sales representatives may receive other compensation tied to sales activity - e.g., sales contests; bonuses tied to the sale of certain denominations/types or grades of Precious Metals. metals sales representatives are not licensed brokers and their knowledge of Precious Metals and the Precious Metals marketplace varies markedly.

g. metals makes no representations regarding the tax consequences of holding Precious Metals as an investment in an IRA. Customer expressly acknowledges that Customer has been advised to seek independent tax advice, from a qualified professional, regarding the tax consequences of such an investment. Any written or oral statements by metals, its officers, agents, account executives, or other representatives relating to future events or the attributes of certain Precious Metals are opinions only. Such statements, if any, are not representations of fact.

h.  Customer understands, agrees, and acknowledges that metals records telephone calls with potential customers and/or including Customer, to avoid and/or prevent fraud, for purposes of verifying Customer's assent to the terms and conditions of the purchase from metals, for quality control and/or other reasons. Customer consents to all such recordings of Customer by metals to the extent consent is required under any state or federal laws or statutes.

6. Grades:

a. metals is not a grading service. metals purchases Precious Metals for re-sale to its customers. metals is not a grading service. metals does not independently assess the Precious Metals it purchases for re-sale, but relies upon the opinions and assessments of independent grading services such as Professional Coin Grading Service, Inc., Numismatic Guaranty Corporation of America, and ANACAS, or others. Grading is a subjective process and it is not uncommon for grading services, or individual examiners within the same grading service, to reach different conclusions regarding the appropriate grade for a particular Precious Metal. Moreover, grading standards are constantly evolving. metals does not guarantee that the Precious Metals it sells will achieve the same grades in the future. In selling graded Precious Metals, metals warrants that the Precious Metal is genuine (i.e., not a counterfeit) and states that the grade is as opined by the grading service when graded by that service, if graded.

368

b. <u>Grading is subjective</u>. Grading is a subjective determination. While numerical grading may give the impression of precision, the numbers in fact represent a nuanced opinion that even experts cannot consistently and systematically agree upon. The grade reflects the opinion of the cataloger (or grader) as to the state of preservation, method of strike, and overall appearance of a particular Precious Metal or lot.

c. <u>Terminology</u>. The term "proof" or "specimen" is used to describe a method of manufacture. Those terms do not connote a grade, condition or attribution.

d. <u>Cleaning/Toning</u>. metals does not represent that a Precious Metal has or has not been cleaned, that any toning is natural or artificial, that a Precious Metal has a particular provenance or pedigree, that a Precious Metal is struck or not struck, that a Precious Metal is produced or not produced in a particular manner or style, and/or that a different grading service (or even a different grader within the same grading service) would assign the same grade now or in the future to the same Precious Metal.

e. <u>Acknowledgment</u>. Where metals sells a Precious Metal that is encapsulated by a grading service and bears the grade or condition ascribed to it by the grading service, Customer acknowledges and agrees that other grading services or knowledgeable purchasers might reach a different conclusion as to the item's grade. Customer further acknowledges that metals has provided the grader's description for the customer's information and makes no warranty as to its accuracy or the standards used to determine that grade.

7. <u>Representation/Warranty; Sales Representatives Not Authorized To Make Other Representations or Warranties</u>: metals represents and warrants that, upon the delivery of Purchase Funds (as provided for in Paragraph 1), and subject to the other terms and restrictions set forth in this Transaction Agreement, metals will cause to be delivered to Customer the denomination/type and grade of Precious Metals specified in Customer's order, as classified and/or graded by one of the following independent grading services: Professional Coin Grading Service, Inc. (PCGS), Numismatic Guaranty Corporation of America (NGC), ANACAS, or any other independent grading service of similar standing. The only representation and warranty that Customer may rely upon in purchasing Precious Metals from or selling Precious Metals to metals is the representation set forth in this Paragraph 7. Neither metals, nor any of its officers, agents, employees, sales representatives, or other representatives are authorized to make any other representations or warranties concerning any Precious Metals that metals is selling or purchasing under this Transaction Agreement.

8. <u>Exchange/Refund Policy</u>:

a. <u>Replacement of Semi-Numismatic or Numismatic Coins Where Grade Disputed</u>: Customer agrees to inspect each delivery carefully upon receipt. If, for any reason whatsoever, Customer is dissatisfied with the quality of a semi-Numismatic or Numismatic coin or bar (specific kinds of Precious Metals) purchased from metals, Customer should immediately notify metals. If Customer notifies metals of its dissatisfaction within fifteen (15) days of delivery of the semi-Numismatic or Numismatic coin or bar and the original holder in which the semi-Numismatic or Numismatic coin or bar in question was delivered has not been opened, removed, or tampered with in any respect, metals shall replace the semi-Numismatic or Numismatic coin or bar in question with another semi-Numismatic or Numismatic coin or bar (as appropriate) of the same denomination/type and grade. metals, in its sole discretion, may permit Customer to upgrade to a higher value semi-Numismatic or Numismatic coin or bar (either in denomination/type or grade) as part of this replacement process, provided Customer pays the difference between the contract price of the semi-Numismatic or Numismatic coin or bar previously purchased and metals current sale price for the higher value semi-Numismatic or Numismatic coin(s) or bar(s) to be substituted. If metals determines, in its sole discretion, that another semi-Numismatic or Numismatic coin or bar of the same denomination/type and grade is not reasonably, commercially available, metals may elect, at its sole option, to replace the semi-Numismatic or Numismatic coin or bar purchased with a reasonably comparable semi-Numismatic or Numismatic coin or bar, even though of a different denomination/type and grade.

b. <u>Cancellation Period; Certain States' Rights</u>. With the exceptions noted in Paragraph 8a and the Addendum attached hereto (certain state residents only), metals offers Customers a seven (7) day right to request cancellation of their purchase with metals for semi-Numismatic or Numismatic coin or bar purchases. Because Precious Metals, including all other purchases other than semi-Numismatic or Numismatic coin or bars, are subject to price fluctuations

369

outside of metals control, the metals is unable to rescind, cancel, refund, or exchange Customer's order or this Agreement for all purchases other than semi-Numismatic or Numismatic coin or bars, other than as noted herein, in Paragraph 8a above, and as set forth in the attached Addendum.

9. Disclaimer of Express and Implied Warranties: EXCEPT AS SET FORTH IN PARAGRAPH 7, THE PRECIOUS METALS SOLD BY METALS PURSUANT TO THIS TRANSACTION AGREEMENT ARE SOLD ON AN "AS IS" BASIS AND METALS MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND OR FITNESS FOR A PARTICULAR PURPOSE.

10. No Liability for Consequential Damages; Limitation of Liability: IN NO EVENT SHALL METALS HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN TORT, CONTRACT, WARRANTY, OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, OR STRICT LIABILITY), FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES SUSTAINED OR ARISING FROM OR RELATED TO ANY TRANSACTION COVERED BY THIS TRANSACTION AGREE- MENT, EVEN IF METALS IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, METALS LIABILITY TO CUSTOMER FOR ANY REASON AND UPON ANY CLAIMS SHALL AT ALL TIMES BE LIMITED TO THE AMOUNT ACTUALLY PAID BY CUSTOMER FOR THE PRECIOUS METALS IN DISPUTE.

11. Application to Future Transactions: This Transaction Agreement shall control all transactions between metals and Customer unless and until such time as it is amended by metals. Customer agrees that metals may amend this Transaction Agreement at any time and from time to time, that metals may give notice to Customer of any amendment by mailing a copy of the amended Transaction Agreement to the address set forth above (or any updated address provided by Customer in the interim), and that following such mailing, the amended Transaction Agreement shall govern succeeding transactions and any interaction with metals.

12. Force Majeure: Neither metals nor Customer shall be liable for any failure or delay in its or their performance under this Transaction Agreement due to any cause beyond its or their respective reasonable control, including acts of war, terrorism, acts of God, earthquake, flood, embargo, riot, sabotage, labor shortage or dispute, governmental act or failure of the Internet including, but not limited to, any disruption, failure and/or error in or of metals internal computer systems, or any disruption, failure and/or error in or of any third-party Internet service providers as metals may use from time to time.

13. Arbitration of Disputes; Waiver of Jury Trial: ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS TRANSACTION AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION OR VALIDITY THEREOF, INCLUDING THE DETERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, OR ANY OTHER DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF ANY INTERACTION BETWEEN METALS AND CUSTOMER, SHALL BE BROUGHT AND BE DETERMINED BY ARBITRATION IN LOS ANGELES, CALIFORNIA, BEFORE ONE ARBITRATOR. THE ARBITRATION SHALL BE ADMINISTERED BY ADR SERVICES, INC. CUSTOMER AND METALS WAIVE THEIR RIGHTS, IF ANY, TO BRING ANY CLAIM THAT IS SUBJECT TO THIS ARBITRATION PROVISION AS A CLASS ACTION, "MASS" ACTION, OR OTHERWISE ON A REPRESENTATIVE BASIS. JUDGMENT ON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION. THIS CLAUSE SHALL NOT PRECLUDE PARTIES FROM SEEKING PROVISIONAL INJUNCTIVE REMEDIES IN AID OF ARBITRATION FROM A COURT OF APPROPRIATE JURISDICTION.

14. Choice of Law: The substantive law of California shall govern all claims brought by or against metals in connection with this Transaction Agreement or otherwise arising out of any interaction between metals and Customer, without any regard for conflict of law principles.

15. Limitation on Time to Bring Any Claim: Except where the law prescribes a shorter applicable statute of limitation, or prohibits shortening the otherwise applicable longer statute of limitations, any claim or legal action of any kind arising in connection with or relating in any way Customer's purchases from metals, metals, or in any way relating to metals or this Agreement, must be brought within one year after the purchase or sale or other event giving rise to the claim or legal action. If this clause is determined to be unenforceable as to any particular claim or claims under the law of the applicable jurisdiction, it shall remain fully enforceable as to all other claims.

16. <u>Jurisdiction</u>: Jurisdiction and venue for any dispute, claim or controversy arising out of or in any way relating to this Transaction Agreement or the breach, termination, enforcement, interpretation or validity thereof, or any other interaction between metals and Customer, shall be in Los Angeles, California, and any party making a claim against metals in whatever form hereby submits to personal jurisdiction in that forum for any and all purposes. By entering into this Agreement, Customer agrees to be subject to the personal jurisdiction of the State of California, agreeing and acknowledging that entering into this Agreement shall constitute sufficient minimum contacts with the State of California to confer both general and specific personal jurisdiction.

17. <u>Finality; Integration Clause</u>: This Agreement is intended by metals and Customer as a final expression of their agreement concerning the matters set forth herein, and is also intended as a complete and exclusive statement of the terms of their agreement. This Agreement supersedes any oral or written statements made prior to, contemporaneous with, or in the future regarding this Agreement or the transactions covered hereunder. Customer shall not rely upon any statement made by or on behalf of metals that is inconsistent with this Transaction Agreement.

18. <u>Severability</u>: If any provision of this Transaction Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in full force and effect.

## ADDENDUM OF STATE-SPECIFIC PROVISIONS

*Alaska.* metals provides all customers the right to receive a full refund for the return of undamaged and unused metals or coins, provided the customer gives metals timely notice of the return within seven (7) calendar days after the date the customer receives the merchandise. Timely notice is given if the return request is made in person within the seven (7) days or if the return or request is mailed, properly addressed and postmarked, postage prepaid, within the seven (7) days. Receipt of metals or coins is deemed to occur at the earliest of: (a) the date the customer receives actual possession of the metals or coins; or (b) the date the customer receives written confirmation that the metals or coins have been deposited on the customer's behalf in an independent depository. metals, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Connecticut, Nebraska, Maryland, Louisiana, Kansas.* metals provides all **first time customers** the right to a refund for the return of undamaged and unused metal or coins, provided that TMTE, Inc. receive written notice of cancellation within seven (7) calendar days after the date you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Hawaii, Mississippi, West Virginia, Arizona, Colorado, Montana, Oklahoma, Utah,
Texas (credit card purchases only), Oregon, Nevada.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within seven (7) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Indiana, Pennsylvania, Vermont, Wyoming, South Dakota.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within ten (10) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Michigan, Virginia, Arkansas.* metals provides all customers the right to a full refund provided that Metals.com receive written notice of cancellation (see notice provided with your trade confirmation) **within three (3) business days** after the date that you sign this Agreement. metals shall, upon written notice of cancellation, issue a full refund within ten (10) calendar days from the date you send us the notice of cancellation (notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.) If you decide to cancel, **return all items shipped to you (if any) in substantially as good condition as when received to the address that appears on the form, ATTN: Operations Dept.**

*North Dakota.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within fifteen (15) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Maine.* metals provides all **first time customers** the right to a refund, provided that Metals.com receive written notice of cancellation within seven (7) calendar days after the date your trade confirmation is mailed to you (based upon the postmark) or delivered to a third-party carrier such as FedEx. (Prior purchasers have the right to receive a full refund provided that metals receive written notice of the cancellation **within three (3) business days** after the date your trade confirmation is mailed or delivered, as above.) metals shall, upon written notice of cancellation, issue a full refund within fifteen (15) calendar days from the date you send us the notice of cancellation (notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.) If you decide to cancel, **return all items shipped to you (if any) in substantially as good condition as when received to the address that appears on the form, ATTN: Operations Dept.**

*West Virginia.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within seven (7) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. For purposes of this subsection, it will be presumed that goods were received seven days after they were mailed unless it can be clearly demonstrated that the goods were not received or received at a later date. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later. metals will provide a cash refund for a cash purchase or issuing a credit for a credit purchase, which credit is applied to the account to which the purchase was debited in connection with the return of its unused and undamaged merchandise or canceled services.

*Wisconsin.* metals provides all customers the right to a full refund provided that metals receive written notice of cancellation (see notice provided with your trade confirmation) **within three (3) business days** after the date that you sign the Addendum to this Trade Confirmation. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals

whichever is later. (Notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.)



# Signature Certificate

Document Ref.: QFRDW-DGVPD-Q2YYJ-OHCKV

Document signed by:

Verified E-mail:

Document completed by all parties on:
17 Apr 2019 17:42:48 UTC
Page 1 of 1

Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

374

**ATTACHEMENT E**

**BOA ACCOUNT #4024 - SIGNATURE CARD FOR CHASE METALS
INC. - BATASHVILI, PRESIDENT/SECRETARY AND CEO**

Date: 11/7/2017 Time: 4:22:07 PM (US Central Time) Scanned From IP:10,166,66,137

**Bank of America** 〰️
BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card
with Substitute Form W-9**

| Account Number: | 4024 | Bank Number: | 318 |
|---|---|---|---|

**Account Type:** ☒ Checking (DDA)   ☐ Savings (SAV)   ☐ Certificate of Deposit (CD)

**Account Title:**
CHASE METALS, INC.

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☒ C Corporation   ☐ S Corporation

☐ Partnership  (Enter the type of partnership: General, LP, LLP or LLLP)

☐ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor) _____

☐ Other (Defined in W-9 instructions) _____

Social Security Number _____ (or)  Employer Identification Number  81 - 2393636

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, I/we acknowledge the receipt of these documents.  By signing below, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

☐ Nonresident Alien Status (if applicable) If the beneficial owner of this account is a foreign person, check here, and complete and sign the applicable Form(s) W-8.

Substitute Form W-9. Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions) and (4) the FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification Instructions:  You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS instructions for Form W-9).

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

Exemptions (codes apply only to certain entities, not individuals; see instructions the IRS instructions for Form W-9):

> **The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|
| 1. SIMON BATASHVILI | President / secretary | | 10-31-17 |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

© 2016 Bank of America, N.A.  All Rights Reserved

NCA
00-14-9297M  11-2016

Page 1 of 2

376

Date: 11/7/2017 Time: 4:22:07 PM (US Central Time) Scanned From IP:10.166.66.137

**Account Number:** _____ 4024 _____

☐ Signature Card Addendum on File

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

_____     President / Secretary
Authorized Signer                                    Title

**Review Information**

**Customer 1.**

Name SIMON BATASHVILI

ID Type: US Driver's License w/ ID#: _____  ID Issuer: _____  Iss. Date 07/2018  Exp. Date 08/2021

ID Type: Major Finl Credit Card ID#: _____  ID Issuer: NA  Iss. Date N.A.  Exp. Date 09/2022

**Customer 2:**

Name _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Customer 3:**

Name _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Customer 4:**

Name _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Customer 5:**

Name _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Bank Information**

**Date** 10/31/2017

**Financial Center Name** LAKE COLORADO

**Employee's Name** Jovena Mendia

**Employee's Phone Number** _____

NCA
00-14-9297M  11-2016

Page 2 of 2

377

Date: 1/9/2018 Time: 7:25:09 PM (US Central Time) Scanned From IP:10.165.66.137

04/Dec/2017 10:45:45 AM          Bank of America                          5/6

**Bank of America** 🇺🇸
BANK OF AMERICA, N.A. (THE "BANK")          Business Signature Card
                                            with Substitute Form W-9

Account Number: _____4024          Bank Number: 318

Account Type: ☒ Checking (DDA)   ☐ Savings (SAV)   ☐ Certificate of Deposit (CD)

Account Title:
CHASE METALS, INC.

_____

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☒ C Corporation   ☐ S Corporation
☐ Partnership  (Enter the type of partnership: General, LP, LLP or LLLP)
☐ Limited Liability Company (Enter tax classification C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor) ____
☐ Other (Defined in W-9 instructions) _____

Social Security Number _____ (or) Employer Identification Number 81-2293b36

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, I/we acknowledge the receipt of these documents. By signing below, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

☐ Non resident Alien Status (If applicable) If the beneficial owner of this account is a foreign person, check here, and complete and sign
the applicable Form(s) W-8.

Substitute Form W-9. Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions) and (4) the FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification Instructions: You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS Instructions for Form W-9).

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

Exemptions (codes apply only to certain entities, not individuals; see instructions the IRS Instructions for Form W-9):

| | The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. |
|---|---|

| | Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|---|
| 1. | SIMON BATASHVILI | President / SECRETARY | | 12/4/2017 |
| 2. | FANGHE JEAN MACLARTHY | SIGNOR | | 12/4/2017 |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

© 2016 Bank of America, N.A. All Rights Reserved

NCA
00-14-9297M 11-2016                    [barcode]                    Page 1 of 2

378

Date: 1/9/2018 Time: 7:25:09 PM (US Central Time) Scanned From IP:10.165.66.137

| 04/Dec/2017 10:45:45 AM | Bank of America 828-463-8260 | 6/6 |

**Account Number:** _____4024_____

☐ **Signature Card Addendum on File**

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive unmanned teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

| Authorized Signer | | Title |
|---|---|---|

**Signer Information**

**Customer 1:**

Name  SIMON BATASHVILI

ID Type US DRIVERS LICENSE ID#: _____ ID Issuer: _____ Iss. Date 1/2016 Exp. Date 9/2021
ID Type MATRIX PIN'L CARD ID#: _____ ID Issuer: _____ Iss. Date N/A Exp. Date 9/2022

**Customer 2:**

Name  PAINCHE JEAN MACCARTHY

ID Type US DRIVERS LICENSE ID#: _____ ID Issuer: _____ Iss. Date 1/2017 Exp. Date 8/2018
ID Type MATRIX PIN'L CARD ID#: _____ ID Issuer: _____ Iss. Date N/A Exp. Date 8/2022

**Customer 3:**

Name  _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____
ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Customer 4:**

Name  _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____
ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Customer 5:**

Name  _____

ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____
ID Type: _____ ID#: _____ ID Issuer: _____ Iss. Date: _____ Exp. Date: _____

**Bank Information**

| Date | 12/04/2017 |
|---|---|
| Financial Center Name | LAKE COLORADO |
| Employee's Name | Jovana Mendin |
| Employee's Phone Number | _____ |

NCA
80-14-9297M  11-2016                ‖‖‖‖‖‖‖‖‖‖                Page 2 of 2

379

**Bank of America**
**Merrill Lynch**

**Deposit Account Documentation**
**Signature Card**

### I. ACCOUNT INFORMATION

| Select One: | ☐ Update (Add/Delete) Signers (existing accounts only) | ☑ Replace Existing Signature Card with this card | ☐ New Account |
|---|---|---|---|

**Account #:** ▓▓▓▓4024
(if non-account, Bank will complete)

**Primary Purpose of Account:**
*Does not apply to Certificate of Deposit
☑ General Business Operators (payables, receivables, payroll, taxes)   ☐ Money Services Business**   ☐ Casinos or Gaming**
**Additional information may be required prior to opening an account.

| Account Holder Legal Name: (Must match exact name on Formation Documents) | TMTE Inc | State of Formation: WY |
|---|---|---|

☐ Owner Business Name of Disregarded Entity: (Must match 1st line of W9)

☐ Third Party/Funds Owner: (if applicable, W-9/W-8 required from Third Party/Funds Owner)

☑ DBA Name: (Must provide copy of fictitious filing)   Metals.com

Optional Descriptive Account Title:

**Statement Address:** ▓▓▓▓▓▓

| City: Los Angeles | State: CA | Country: USA | Postal Code: 90024 |
|---|---|---|---|

### II. BUSINESS TYPE

**Business Type**
☑ Corporation   ☐ Sole Proprietorship   ☐ Joint Venture   ☐ Limited Liability Partnership
☐ General Partnership   ☐ Limited Partnership   ☐ Unincorporated Organization Association
☐ Government Authority Agency   ☐ Other
☐ Limited Liability Company-Manager Managed   ☐ Limited Liability Company-Member Managed   ☐ Limited Liability Company-Sole Member

### III. Designated Accounts Signers

| Add or Delete | Printed Name | Title (If signer also on Banking Resolution, Title Must Match) | Signature | Signer Limited to Check Signing ONLY |
|---|---|---|---|---|
| Add | Simon Batashvili | CEO | | ☐ |
| Add | Painche Jean MacCarthy | Signor | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

380

**DEPOSIT ACCOUNT DOCUMENTATION-SIGNATURE CARD**

**IV. CUSTOMER ACKNOWLEDGEMENT & AGREEMENT**

| Simon Bataahvili | CEO | [signature] | 11/14/18 |
|---|---|---|---|
| **Printed Name** | **Title** | **Signature** | **Date** |

E-mail Address for electronic delivery (Required for new account openings) **Simon @ metals . com**

**VI. SUBSTITUTE FORM W9 / CERTIFICATION   (If foreign entity, W-8 required. Section VI leave blank.)**

1. Name (as shown on your income tax return) do not leave this line blank.
   TMTE Inc

2. Business name/disregarded entity name, if different from above

3. ☑ Employer Identification Number   81-2393636
   ☐ Social Security Number

4. Federal Tax Classification: check only ONE of the following seven boxes

☐ Individual/sole proprietor or single member LLC   ☑ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=corporation, S=S corporation, P=partnership)

☐ Other (see instructions here P4)

| Simon Bataahvili | CEO | [signature] | 11/14/18 |
|---|---|---|---|
| **Printed Name** | **Title** | **Signature** | **Date** |

Page 2 of 2
**Bank of America – Confidential**

© 2015 Bank of America Corporation

381

**Bank of America**
**Merrill Lynch**

**ACCOUNT SIGNER INFORMATION FORM**

| Client Name: | TNTS Inc | | Client Taxpayer ID | |
| --- | --- | --- | --- | --- |
| Account Number(s) | | Account Name(s) | | |
| | ...54 | TNTS Inc DBA Metals.com | | |

For each authorized account signers on the listed account(s), Please provide his/her name and at least one additional field of information as indicated in the table below.

| Full Legal Name | Date of Birth (mm/dd/yyyy) | Physical Address | | | | | Government-Issued Identification Document *Note: US citizens must provide Social Security Number* | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Street | City | State / Province | Zip/Postal Code | Country | Type | Place of Issuance | Document ID Number |
| Steven Bellavicki | 08/11/1978 | | | | | | | | |
| Feinahn Jean MacCarthy | 08/02/1970 | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Page 1 of 1
Bank of America – Confidential

©2017 Bank of America Corporation

382