# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and | § § § | |
| ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAIN SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRAKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF INSURANCE, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF COMMERCE AND | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Case No.: 3-20CV2910-L |

---

**INITIAL REPORT OF THE RECEIVER**     1

INSURANCE, STATE OF TEXAS,                        §
WASHINGTON STATE DEPARTMENT OF                    §
FINANCIAL INSTITUTIONS, WEST VIRGINIA             §
SECURITIES COMMISSION, AND STATE OF               §
WISCONSIN                                         §
                                                  §
            **Plaintiffs,**                       §
                                                  §
**v.**                                            §
                                                  §
TMTE, INC. a/k/a METALS.COM, CHASE                §
METALS, INC., CHASE METALS, LLC,                  §
BARRICK CAPITAL, INC., LUCAS THOMAS               §
ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER,           §
and SIMON BATASHVILI,                             §
                                                  §
            **Defendants,**                       §
                                                  §
and                                               §
                                                  §
TOWER EQUITY, LLC,                                §
                                                  §
            **Relief Defendant**.                 §
                                                  §

## INITIAL REPORT OF THE RECEIVER

      Kelly M. Crawford, as the court-appointed Receiver ("Receiver"), submits the following initial report pursuant to this Court's *Statutory Restraining Order, Order for an Accounting, Order for Appointment of Receiver, Order for Expedited Discovery, and Other Equitable Relief and Order to Show Cause Regarding Preliminary Injunction* [Docket No. 16] (the *"SRO"*).[1]

---

[1] The *SRO* was continued in force by Consent Orders entered by the Court regarding the Defendant entities and the individual Defendants Asher and Batashvili [Docket Nos. 164, 165].  The Receiver requests the Court to take judicial notice of the pleadings on file in this lawsuit.

# I.
## INTRODUCTION

This report is based upon the Receiver's investigation and information gathered since his appointment by the Court on September 22, 2020 – less than 50 days ago.[2]  As discussed more specifically herein, the scope of this receivership is significant, with more than $185 million received by the Defendants from investors throughout the United States. The revelation of the Defendants' scheme devastated the investors – mostly elderly whom were persuaded by the Defendants to invest their life's savings and retirement in the grossly overpriced coins sold by the Defendants.   This voicemail message from a 76 year old woman in Minnesota is typical of the desperate investor calls flooding the Receiver's office:

*"Good morning Mr. Crawford.  I received your letter today. (heavy sigh).  I have to tell your right now I'm very numb. (another heavy sigh).  I just need to know what this is all about with Metals.com.  All my money that I had – just about all is that precious metals.  I need to hear something before I....it's going to affect my health I know that...I can't tell you how distraught I am.  Please call me when you can.  Thank you."*

The Receiver's job is to recover as many assets as possible, liquidate the same, and distribute the assets to the investors to provide them some relief.  This report outlines the steps taken toward that end by the Receiver to date.

---

[2] This report reflects the opinions of the Receiver based upon the information gathered to date.  The sources for this information include numerous discussions with investors; interviews with former employees; interviews with neighboring tenants; review of documents seized; review of mail forwarded to the Receiver; inspection of the residences of Defendants Asher and Batashvili; inspection of the principal office of the Defendants; and the pleadings on file with the Court.

**INITIAL REPORT OF THE RECEIVER**     3

## II.
## THE WOLVES OF BEVERLY HILLS

Defendants Simon Batashvili, 41, and Lucas Asher[3], 35, operated their commodities boiler room out of 24,000 square feet on the 7th floor of 8383 Wilshire Blvd in Beverly Hills, California. They shared a large office with glass walls at the back of the lease space so they could keep an eye on the dozens of dialers and closers seated next to each other, armed with a phone and computer screen. Asher and Batashvili installed cameras and microphones to watch and listen to everyone. Asher focused on marketing while Batashvili concentrated on operations. Both were involved in sales – training the salespersons and closing the biggest sales.

At 9:00 a.m., each morning, standing next to a money machine blowing cash[4], Asher shouted over a microphone to his army of dialers and closers – "ARE YOU READY TO MAKE MONEY?" The dialers and closers knew huge commissions and gifts from Batashvili and Asher awaited them if they were successful in getting money from investors that day. The massive financial rewards paid by Batashvili and Asher to closers were best seen by the Ferraris' and other luxury automobiles in the garage of 8383 Wilshire Blvd.[5] Indeed, Batashvili and Asher created a real life Beverly Hills version of the hedonistic brokerage firm portrayed in *"The Wolf of Wall Street."*[6]

---

[3] Lucas Asher's original name was Luke Thomas Erb, until 2012 when he obtained a Decree from the Los Angeles Superior Court changing his name to Lucas Asher.

[4] A photograph of the money machine is attached hereto as **Exhibit A.**

[5] The description of the activities in the office of the Defendants is based upon the Receiver's interviews of neighboring tenants of 8383 Wilshire Blvd who observed the activity.

[6] *"The Wolf of Wall Street"* is a 2013 film starring Leonardo DiCaprio as the founder of Wall Street brokerage firm that defrauded wealthy investors out of millions, creating an empire of excess while partaking in a hedonistic brew of sex, drugs, and thrills before being shut down by the SEC and FBI.

Batashvili and Asher worked together as sellers of precious metals at Goldline International before starting their own company called Metals.com in or about 2017. As evidenced by the scripts given by Batashvili and Asher to their sales force and information shared by investor victims, it is apparent that Batashvili and Asher encouraged their sales crew to use lies, high pressure tactics, and fear to persuade elderly investors to move substantially all, if not all, of their life's savings and retirement into self-directed IRA's and use the monies in the self-directed IRA's to purchased gold and silver coins from the Defendants. The melt value of the coins was only a fraction of the price paid by the investor victims. Once investors received the coins, realized the actual value of the coins was worth significantly less than the amount they paid, many of the investors complained. Batashvili and Asher taught their sales force to tell the investors the coins were collector items and as such had value far in excess of the melt value – a complete lie.

As millions of dollars from investor victims poured into the enterprise created by Batashvili and Asher, the number of complaints from investor victims to regulators throughout the country and civil lawsuits also increased.[7] In an effort to keep the money machine running and get away from the regulators and civil lawsuits, Batashvili and Asher purported to sell "Metals.com" and they started a new company called Barrick Capital. Hoping to stay in front of the regulators, Batashvili and Asher also closed their bank accounts at Bank of America and opened new ones at Wells Fargo Bank and other banks. They also hired Jones Day and other national law firms to defend the entities from a myriad of regulatory actions and civil lawsuits.

Funded by millions of dollars stolen from elderly investors, Batashvili and Asher lived lavish lifestyles. Asher focused on his image. He rented a house on the hillside of Beverly Hills for

---

[7] Batashvili and Asher did not want investors to see the boiler room from which they operated Metals.com. Therefore, they rented an office at 433 N. Camden Drive, Suite 970 in Beverly Hills, California ("Suite 970"). They never occupied the space, but used it solely as a mail drop. While checks to Metals.com were being mailed to that address Batashvili and Asher had the mail picked up on a regular basis from the receptionist for Suite 970.

$25,000 per month, drove a Ferrari, wore red leather coats, and Gucci shoes.  He was featured on the cover of the Beverly Hills magazine "Resident" with the title "LUCAS ASHER Self-Made Technology Millennial Millionaire."  He purported to invest in cutting edge technology, wrote music, and spent his spare time skydiving.  Batashvili, on the other hand, led a less transient life, but created a lavish lifestyle for himself, his wife Fainche MacCarthy, a set decorator for films, and their 6 year old daughter.  They rented a 4,800 square foot house valued at $6.8 million near Beverly Hills and furnished it with expensive furniture and art work.  Batashvili showered his wife with jewelry.  Batashvili, like Asher, loves music as shown by his collection of guitars, and also drove a Ferrari until it was totaled and replaced with a 2020 Shelby Mustang.

With  millions of dollars of investor monies at their disposal, Batashvili and Asher set up a myriad of entities they owned and controlled.  In addition, they used investor funds to hire programmers to develop a web based business. They rented a separate office on the 7th floor of 8383 Wilshire for developing software.  They also used investor monies to diversify into real estate, venture capital, and technology investments.  Tower Equity, LLC, a Relief Defendant controlled by Asher and Batashvili, and affiliated entities, purchased numerous houses in Philadelphia, Pennsylvania at a Sheriff's sale and purchased fractional real estate interests in commercial, industrial, and multi-family properties in Florida, Tennessee, Pennsylvania, and Texas. They also solicited investors to invest monies in collateralized notes in which they promised investors payment of a guaranteed annual return of 7.5%, payable monthly.

### III.

### **THE FIRST 48 HOURS**

On the morning of September 24, 2020, dozens of FBI agents executed a search warrant and raided the Defendants' office at Suite 700, 8383 Wilshire.  For neighboring tenants, once they saw

---

the FBI agents approach the building, there was no question where they were headed. Neither Batashvili nor Asher were in their office at the time of the raid. Asher was in Mexico skydiving and Batashvili hid. Due to COVID-19, many of the employees were not in the office. Nevertheless, the FBI agents spent several hours seizing evidence pursuant to the search warrant and interviewing those employees who were present and willing to cooperate.

In the afternoon of September 24, 2020, the FBI released the Defendants' office to the Receiver. The Receiver and his team[8] changed the locks to the office; posted notices warning that the premises were now in the possession of the Receiver; and made an inventory of the contents of the office. The Receiver also posted notice that pursuant to the *SRO*, the Receiver removed Defendants Batashvili and Asher from serving as an officer or director for the entities in receivership. A copy of such notice was sent to Jones Day, the law firm representing the entities at the time of the receivership, and the Receiver advised Jones Day that it was no longer authorized to represent the entities in receivership.

In addition, the Receiver interviewed Samara Mills, the Human Resource Manager, who remained in the office after the FBI agents left. She said the employees had been paid through the previous week, but she expressed concern for how the employees would be paid for the week leading up to the receivership and whether the employees were still employed. The Receiver explained the receivership to Ms. Mills; that the entities were no longer operating; that the employees were terminated as of that date; and that the Receiver would determine how employees would be paid, if at all, for the last week of their employment.

The Receiver and his team discovered the records of the Defendants' operations were stored on cloud platforms hosted by Microsoft, Dropbox, Google, Salesforce, Intuit, and Amazon. The

---

[8] The Receiver engaged Scheef & Stone, LLP, a law firm in Dallas, Texas, of which the Receiver is a partner, as his attorneys. In addition, the Receiver engaged Brandlin & Associates in Los Angeles, California as his forensic accountant.

**INITIAL REPORT OF THE RECEIVER     7**

Receiver's team located the person in charge of IT for the Defendants, interviewed him, and sought his assistance in gaining access to the documents. He explained to the Receiver that intricate passwords for access to the documents were stored on the laptop computers taken into evidence by the FBI, so the IT administrator was unable to gain access to the cloud. Nevertheless, he remained willing to assisting the Receiver. The Receiver found hard copies of files for more than 700 investors, boxed up the files and shipped them to the Receiver's office in Dallas, Texas.

The Receiver seized gold and silver on the premises worth approximately $10,000.

During the course of gathering information at the Defendants' office, the Receiver and his team became aware of a number of entities owned or controlled by the Defendants. The Receiver, working together with the CFTC, sent the *SRO* to various financial institutions that may have accounts for the Defendants or the entities owned or controlled by the Defendants. Indeed, the CFTC sent the *SRO* to more than 20 banks believed to be associated with the Defendants.

With the assistance of the CFTC, the Receiver sent letters to each of the custodians of the Self-Directed IRA's that were being used by investors to purchase metals from the Defendants. The Receiver provided the *SRO* to the Custodians and advised the Custodians that any powers of attorney that had been executed by the investors in favor of the Defendants were revoked and that the Custodians were no longer authorized to take instruction from any of the Defendants regarding the investors' accounts. The Receiver explained to the Custodians that the metals in the depository for the investors remained the property of the investors and that the monies in the Self-Directed IRA's remained the property of the investors.

The Receiver also provided the *SRO* to Bayside Metals, the wholesale supplier of metals ordered by the Defendants. The Receiver spoke to the attorney for Bayside Metals and confirmed that Bayside Metals was in receipt of the *SRO* and had frozen all pending transactions. In addition,

**INITIAL REPORT OF THE RECEIVER**     8

the Receiver's team sent a copy of the *SRO* to the two primary depositories for the metals sold to the investors by the Defendants – the Delaware Depository and Brinks.

The Receiver's team also changed the address at the U.S. Post Office for the Defendants' mail so that it would be sent to the Receiver's office.

## A. BATASHVILI'S HOME

The Plaintiff's Complaint and other pleadings, including the *SRO*, were served upon Batashvili by serving Batashvili's wife at Batashvili's residence. Immediately after service of the pleadings, the Receiver and his team introduced themselves to Batashvili's wife, who informed the Receiver that Batashvili was not in the house. She refused to disclose his whereabouts. The Receiver spoke with Mark Rasmussen of Jones Day who had been handling the regulatory and civil actions against the Defendants, and they agreed that an inventory of Batashvili's house could be made by the Receiver the following day when Batashvili's daughter was out of the house. The following day the Receiver and his team made an inventory of the contents of Batashvili's house. In a subsequent trip to Batashvili's house, the Receiver took possession of certain furniture and artwork. Batashvili's wife also turned over to the Receiver the jewelry she received during the marriage. The house was surrendered to the landlord.

## B. ASHER'S HOME

The Plaintiff's Complaint and other pleadings, including the *SRO*, were also served upon Asher by serving an adult male who lived in part of the house rented by Asher. The Receiver and his team gained access to the house rented by Asher and made an inventory of its contents. The Ferrari driven by Asher was parked in the garage of 8383 Wilshire, but the key to the Ferrari was not available. As a result, the Receiver and his team hired a repossession company to remove the Ferrari from the garage and put it in storage. The Receiver discovered the Ferrari was not insured

and immediately purchased insurance on the Ferrari.  In a subsequent visit to Asher's rented home the Receiver took possession of certain of Asher's personal property and the landlord took possession of the house.

## IV.

## ESTABLISHING NATIONAL JURSIDICTION FOR THE RECIEVERSHIP

Pursuant to 28 U.S.C. Section 754, a Receiver may be vested with complete jurisdiction and control of all property within the territory of a federal district court if the Receiver, within 10 days of his appointment, files with the federal district court a copy of the complaint and the order appointing him Receiver.  Because of the breadth of the Defendants' scheme and their solicitation of investors throughout the United States, the Receiver filed a copy of the complaint and the order appointing him Receiver in all 94 federal district courts of the United States, including Puerto Rico. These filings establish national jurisdiction for the receivership and allow the Receiver to recover assets of the Defendants that may be found in any part of the United States.

## V.

## INVESTORS

The Receiver used the investor files found at the Defendants' office to prepare a database of investors.  To date, this database includes the names of 941 known investors.[9]  After numerous demands upon Microsoft, and with the cooperation of a former employee of the Defendants, the Receiver gained access to the cloud records regarding the investors.  From these records, the Receiver will be able to insure the database of investors prepared by the Receiver is complete.

In order to advise investors of the receivership, the Receiver established a website, www.metalsandbarrickcapitalreceivership.com, where the Receiver provides his contact

_____

[9] The Receiver has received calls from some investors for which there was no hard file maintained by the Defendants. The Receiver is adding these names of the investors to the database of investors.

information, answers to frequently asked questions, a timeline of events, and copies of the Complaint, and the orders of the Court.  In addition, the Receiver gained control of the domain names for metals.com, chasemetals.com, and barrickcapital.com so that they are now redirected to the Receiver's website.

Because most of the investors are elderly, many do not have access to a computer or are unable to find a website easily.  For that reason, the Receiver mailed a letter to each known investor explaining the receivership and providing the Receiver's contact information.  Since that time, the Receiver has been flooded with calls and emails.  Although the Receiver returns some of the calls and emails, the Receiver has an attorney on his team who is dedicated to returning investor calls.  Each call is lengthy because the investors are distraught and it takes time to insure the investor clearly understands the receivership process and what to expect.  The Receiver's goal  is to insure investor calls are returned the same day they are received or the following day.

The Receiver has a paralegal dedicated to recovering and maintaining information from each investor to facilitate communications with the investors during the claims process described herein.

## VI.

## ASSETS RECOVERED TO DATE

The assets recovered to date by the Receiver are as follows:

| | |
|---|---|
| Wells Fargo Bank: | $5,932,333.63[10] |
| First City Bank: | $198,144.11 |
| Chase: | $11,720.36 |
| Signature Bank[11]: | $1,000,000 |

---

[10] The Receiver opened a receivership bank account in which to deposit monies and assets received.

INITIAL REPORT OF THE RECEIVER     11

| | |
|---|---|
| Real Property[12]: | $1,300,000 (approximate equity) |
| Office computers and furnishings[13]: | Not yet determined |
| 2020 Shelby Mustang | $75,000 (estimated FMV) |
| 2016 Mercedes G-Class[14] | $10,000 (estimated FMV less lien) |
| Furniture and Artwork | Not yet determined |
| Jewelry | Not yet determined |

The Receiver has leads on other assets that have not yet been turned over to the Receiver.[15]

## VII.

## POTENTIAL SOURCES OF RECOVERY

The Receiver also has the following additional sources for recovery of investor monies.

## A.     REAL PROPERTY

During the Receiver's investigation, the Receiver discovered that in 2019 Defendant Tower Equity, LLC, or an affiliated Tower entity, purchased at a Sheriff's sale and owns 17 residential properties in Philadelphia, Pennsylvania.   According to public records, Tower paid a total of $1,254,000 for these properties.   Based on Realtor.com, the current fair market value of the 17 residential properties is $2,729,997.  A schedule of the 17 residential properties is attached hereto as **Exhibit B**.

The Receiver filed in the real property records a Notice of Lis Pendens, including a copy of the Court's *SRO*, with respect to each of the 17 properties.

---

[11] Signature Bank confirmed the amounts frozen by the *SRO* and is in the process of turning over the funds to the Receiver, but the funds have not yet been received.
[12] See *infra* part VII, A.
[13] Includes 150 Apple computers, 37 PC monitors, 17 large screen TV's, desks, chairs, artwork, kitchen appliances, etc.
[14] Subject to a lien of approximately 60,000.
[15] For instance, the Receiver is aware that some Defendants had a PayPal account.  As a result the Receiver served the *SRO* upon PayPal with a demand that any monies in the accounts be turned over to the Receiver.

In addition, Defendant Asher testified in his asset deposition that Defendant Tower Equity, LLC, or an affiliated Tower entity, purchased fractional interests in properties in Florida, Tennessee, Texas, and Pennsylvania – ranging from commercial to industrial to multi-family. Although Asher testified he made the decision to invest in these fractional interests, he claimed he could not remember in what cities these real properties were located.[16]

## B.    COMMISSIONS

The law is well established that a Receiver may recover commissions received from sales persons for their role in soliciting investor monies for an unlawful scheme. *Warfield v. Byron,* 436 F.3d 551, 560 (5th Cir. 2006).  In such instance, sales persons are not being paid with profits earned from a legitimate enterprise, but instead are being paid commissions from the principal amount received from investors in the scheme.  Regardless of whether the salespersons knew or should have known that Metals.com or Barrick capital or the other Defendant entities were being operated illegally, the commissions the salespersons received are recoverable as fraudulent conveyances. *Id.* As the recipient of a fraudulent transfer, the salesperson must be able to show that he or she received the commissions in good faith *and* in exchange for reasonably equivalent value.  While a salesperson may be able to claim he or she received the commissions in good faith, the salesperson cannot show he or she provided reasonably equivalent value in exchange for the money received. Adding more investors to a fraudulent scheme does not provide value, but rather only enlarges the number of victims.

The Receiver is aware of several million dollars of investor funds paid in commissions.[17] With the significant amount of investor funds used to compensate salespersons, and which the

---

[16] Presumably such information will be contained in the documents of Tower Equity digitally stored in the Google platform.
[17] The specific amounts paid to each salesperson will be determined once the forensic accounting of the Defendants' records is complete.

Receiver contends are recoverable as a matter of law, the Receiver intends to pursue an ancillary action against the salespersons to recover the commissions and/or seek to settle such claims subject to the approval of this Court

### C.    INVESTMENTS BY THE DEFENDANTS

The Receiver discovered that Defendant Tower Equity LLC owns 200 shares of stock in Spotify Technology S.A., which as of November 6, 2020 traded at $262.95 per share.  The Receiver is in the process of transferring ownership of the shares to the Receiver so that the shares of stock may be sold.  This could generate in excess of $50,000 for the receivership estate.

At his asset deposition Defendant Asher testified that he used Defendant Tower Equity LLC to make a number of venture capital, equity, or stock purchases, including an investment of approximately $300,000 in Space Exploration Technologies Corp.  A list of the known entities in which Defendant Tower Equity LLC invested  is attached hereto as **Exhibit C**.    Although Defendant Asher made the decision to invest in the entities, he claimed to be unable to remember how much was invested or any specifics regarding the investments.  The Receiver provided a copy of the *SRO* to the entities and made demand upon such entities to provide information regarding monies received and the investment.  Defendant Asher also testified there could be additional entities in which Defendant Tower Equity LLC invested that he could not recall.[18]   Despite Asher' lack of cooperation, the Receiver will continue his search for any such investments and take control of the investments pursuant to the Court's orders.

### D.    MONIES AND METALS HELD BY BAYSIDE METAL EXCHANGE

Once the Defendants received monies from the investor victims, the Defendants placed orders for the metals themselves with Bayside Metal Exchange ("BME").  BME would in turn

---

[18] Presumably such information will be contained in the documents of Tower Equity digitally stored in the Google platform.

usually deliver the metals to the depository for the investor.   The Defendants, of course, would take their illegal gains from the monies received from the investors before transferring monies to BME for the purchase of the metals.

When BME learned of the receivership, BME froze all pending transactions with the Defendants[19].   BME, in cooperation with the Receiver, provided the Receiver a list of all pending transactions.   While the Receiver prefers that BME turn over to the Receiver (for distribution to the investors who placed the pending orders) the money BME received for unfilled transactions, BME prefers to complete the pending transactions and deliver the metals in their inventory.   The Receiver and BME are continuing negotiations regarding the frozen open transactions.

### E.   THE MYRIAD OF ENTITIES OWNED BY DEFENDANTS

The *SRO* extends to the entities owned and controlled by the Defendants.   The Receiver made demand upon Batashvili and Asher to identify the entities they own or control.   Batashvili and Asher ignored the Receiver's request and failed to provide a list of entities until the Receiver filed an *Emergency Motion for Show Cause Order* seeking to hold Batashvili and Asher in contempt of Court for their refusal to comply with the Court's Orders.   Attached hereto as **Exhibit D** is a true and correct copy of the list finally provided to the Receiver by Defendants Batashvili and Asher.

The Receiver gathered corporate documents indicating that the list of entities provided by Defendants Batashvili and Asher is far from complete.   Attached hereto as **Exhibit E** is a list of additional entities in which Defendants Batashvili or Asher are identified as owners, officers, or directors.

The Receiver also obtained documents showing that Defendant Asher set up two Panamanian offshore entities.   At his asset deposition Defendant Asher testified that he set up the

---

[19] BME identified the following accounts as the Defendants or under the possession and control of the Defendants, and froze pending transactions with Barrick Capital, Glencore Financial, Metals.com, Newmont Financial, Northwestern Finance, and USA Mint.

offshore entities because of his strong interest in ecology and desire to live in Panama.  He later admitted he made only one trip to Panama, which was to set up the Panamanian offshore entities. Defendant Asher testified that the offshore entities were funded with less than $10,000 and that they held the stock of Defendant TMTE.

The Receiver intends to continue his investigation into the myriad of entities to determine if any of the entities hold assets that may be recovered for the benefit of the receivership estate.

## VIII.

### PENDING REGULATORY AND CIVIL ACTIONS AGAINST THE DEFENDANTS

At the time the Receiver was appointed, there were regulatory actions pending against the Defendants by 21 States.  In addition, the States of Minnesota and Missouri recently entered into settlement agreements with the Defendants regarding their regulatory actions.

The Receiver sent a letter to each of the regulators regarding their pending action against the Defendants informing them of the Receiver's intent to cooperate with the regulators in entering into a Consent Decree or Final Judgment, provided that any award of damages, fines, or orders of restitution are submitted to this Court as part of the claims process discussed herein.  In addition, the Receiver sent a letter to the regulators of the States of Minnesota and Missouri to inform them that the settlement agreements could not be funded, but that any damages, fines, or orders of restitution to be paid under a settlement agreement must be submitted to this Court as part of the claims process discussed herein.

## IX.

### FORMER EMPLOYEES OF DEFENDANTS

As of September 24, 2020 when the Defendants' operations were shut down, the employees of the Defendants had been paid through September 18, 2020.  Upon learning of the receivership,

the former employees made demand upon the Receiver for payment of the time they worked from September 18, 2020, plus accrued vacation and unused sick leave.

The Receiver reviewed the employment manual for the Defendants and found that sick leave was not compensable and therefore determined that regardless of the circumstances there was no obligation to pay former employees for unused sick leave. In addition, the Receiver's team interviewed numerous former employees to find out their role in the operation of the Defendants. Most of the former employees were dialers or administrative assistants who proclaimed to know nothing about the illegal sales activity being conducted by the Defendants. These former employees admitted, however, that their compensation in part was based upon commissions earned from sales to investors.

Based on the foregoing, the Receiver informed the former employees who had any connection to the sales process that they would not be paid anything further because, regardless of whether they worked in good faith, they did not provide any value to the Defendants in exchange for the monies they were paid. Indeed, they only added to the number of victims and would have no defense to a fraudulent conveyance claim by the Receiver.

The Receiver also informed management of the Defendants that they would not be paid anything further because not only did they not provide any value to the Defendants, they also did not receive the monies in good faith.

With respect to the engineers, programmers and marketing person working on software in a different office on the 7th floor of 8383 Wilshire, the Receiver provided them with an Affidavit to complete attesting to their lack of knowledge of the wrongful actions of the Defendants and that they played no role in the sales process. The Receiver informed these handful of employees that

upon receipt of the executed Affidavit the Receiver would determine whether to seek permission from the Court to pay them for their last week of work.

Finally, the Receiver determined the Defendants used Tri-Net to manage payroll. The Receiver made demand upon Tri-Net to turn over to the Receiver any monies received from the Defendants that have not been distributed to payroll.

<h2 style="text-align:center">X.</h2>

<h3 style="text-align:center">RECORDS OF THE DEFENDANTS AND RELIEF DEFENDANT</h3>

The vast majority of the records of the Defendants and Relief Defendant are digitally stored on various cloud platforms such as Microsoft, Google, Drop Box, Salesforce, Intuit, and Amazon. Defendants Asher and Batashvili, as well as the IT managers for the Defendant entities, claim that because their personal computers were seized by the FBI they are unable to retrieve their login and passwords required to access the cloud platforms. They claim that such logins and passwords change often and are stored on the seized computers.

The Receiver provided the *SRO* to each of the cloud platforms and demanded that they grant the Receiver access. After much delay, Microsoft finally complied with the *SRO* and granted access to the Receiver. To further compel Google, Drop Box, and Sales Force to grant access to the Receiver, the Receiver obtained from Defendants Asher and Batashvili their declarations consenting to the cloud platforms to grant access to the Receiver. The Receiver provided the Declarations to the cloud platforms and repeated his demands for access. Because of Google's continued refusal to comply with the Court's Orders and even the declaration of Defendant Batashvili the Receiver filed an *Emergency Motion for "Show Cause" Hearing to Hold Google, Inc. in Civil Contempt"*. The Motion is pending before the Court. The Receiver intends to seek

the same relief against other cloud platforms if they continue their failure to comply with the *SRO* and the consents of Defendants.

## XI.

## <u>RECOMMENDATIONS OF THE RECEIVER</u>

Based on the foregoing, the Receiver make the following recommendations to assist in the continuation of the receivership.

### A. PROCEDURES FOR RECEIVERSHIP

On October 27, 2020, the Receiver filed his *Motion for Order Governing the Administration of the Receivership, Procedures Governing the Sale or Abandonment of Personal Property, Notice of Intended Sale and Disposition of Various Items, Fee Application Procedures.* By this Motion, the Receiver requests this Court to establish procedures for the Receiver to efficiently administer the receivership estate and sell personal and real property. The Motion is pending before the Court.

### B. CLAIMS PROCESS FOR INVESTORS

Due to the amount of assets recovered to date, there are sufficient assets to justify the Court implementing a claims process for the distribution of assets. Prior to November 30, 2020, the Receiver will seek authority from this Court to establish procedures for a claims process that: 1) approves a proof of claim form to be sent by the Receiver to all known investors and creditors; 2) establishes a bar date or deadline by which all proof of claim forms with supporting documentation must be submitted by investors and creditors to the Receiver; 3) establishes a process for the Receiver to inform the Court regarding the claims received, make recommendations regarding the claims, and provide an opportunity for investors or creditors to object to the Receiver's recommendation regarding claims; and 4) sets a hearing date for the Court to rule upon the claims submitted by the Receiver and consider any objections to the Receiver's recommendations

regarding the claims.

Once the Court enters an Order with a list of approved investor and creditor claims the Receiver will make a proposal to the Court regarding the classification of the claims and the means of distributing assets to approved claimants.  Upon entry of an Order from the Court approving the means of distribution of assets to approved claimants, the Receiver can begin distributing monies. The Receiver anticipates the claims process can be completed within the first quarter of 2021 and that an initial distribution of assets can be made soon thereafter.

### C.  COMPELLING DISCLOSURE OF SOURCE OF ATTORNEYS' RETAINER

The Receiver requested counsel for Defendants Batashvili and Asher to disclose the source of payment of the fees he is charging for representing Defendants, and specifically requested copies of "all documents relating to all funds received by you or your firm, from, on behalf of, or for the benefit of any of the Defendants…"

Instead of providing the requested information, however, counsel for the individual Defendants responded only that he has not received a retainer or been paid by  Defendants Batashvili or Asher.  This answer, of course, is nonresponsive to the requested information and does not comply with the attorney's obligations under the *SRO*.  The Defendants' attorney has not provided to the Receiver any documents or information regarding the source of the retainer he received, nor articulated any privilege that would preclude production of the information.  At their asset depositions, Defendants Batashvili and Asher testified as to the source of payments to their counsel that they were aware of, but such testimony does not relieve the Defendants' attorney of his obligations under the *SRO*.

The *SRO*,[20] as well as Fifth Circuit precedent compel the compliance of Defendants' counsel with the Receiver's request. In *FTC v. Assail, Inc.*, 410 F.3d 256 (5th Cir. 2005), *cert. denied*, *sub nom., Draskovich v. Robb Evans & Assoc. LLC*, 126 S.Ct. 735, 163 L.Ed.2d 569 (2005) the Fifth Circuit held:

> "[T]here is a clear principle that an attorney is not permitted to be willfully ignorant of how his representation is funded… [W]hen an attorney is objectively on notice that his fees may derive from a pool of frozen assets, he has a duty to make a good faith inquiry into the source of those fees. Failure to make such an inquiry in the face of this duty will result in disgorgement of the funds." *Id.* at 265.

*Assail* relies on numerous cases that discuss an attorney's obligation to "do more than simply take his client at his word" regarding the source of fees, *id. at 266*, where an attorney is on notice that the fees could be subject to forfeiture. *See, McGraw v. Connelly*, 838 F.2d 844 (6th Cir. 1988)(attorney who received fees from client whose assets were in receivership "was under a duty of inquiry as to the source of his fees"); *SEC v. Princeton Economic International, Ltd.,* 84 F.Supp.2d 443, 446, 447 (S.D.N.Y. 2000)("A lawyer who blindly accepts fees from a client under circumstances that would cause a reasonable lawyer to question the client's intent in paying the fees accepts the fees at his peril"); *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F.Supp. 463 (E.D. Va. 1994)(requiring forfeiture of funds paid to firm that made no efforts to ascertain the source of funds paid by defendant indicted for sale of narcotics).

The only means by which the Receiver can determine with certainty whether counsel for Batashvili and Asher complied with the Fifth Circuit standard is to learn from the attorney the source of the monies he received as a retainer.

---

[20] "34. …and all other persons or entities served with a copy of this order, shall cooperate fully with and assist the Temporary Receiver. This cooperation and assistance shall include, but not be limited to, providing any information to the Temporary Receiver that the Temporary Receiver deems necessary to exercising the authority; …"

Moreover, the lawyer is not entitled to any privilege or protection precluding disclosure of the source of the funds he received.   First, the Fifth Circuit and other courts recognize that the source of payment of attorney's fees is not generally protected by the attorney-client privilege.   *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 913 F.2d 1118, 1123 (5th Cir. 1990); *see also, In re Grand Jury Subpoenas,* 906 F.2d 1485, 1488 (10th Cir. 1990)("It is well recognized in every circuit, including our own, that the identity of an attorney's client and the source of payment for legal fees are not normally protected by the attorney-client privilege").   Further, even without regard to the freeze provisions of the *SRO*, defendants are not entitled to utilize the proceeds of fraud to fund their defense.   *SEC v. Quinn,* 997 F.2d 287, 289 (7th Cir. 1993)("Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of his crime"); *SEC v. Princeton Econ. Int'l Ltd.,* 84 F.Supp.2d 443, 447 (S.D.N.Y. 2000)(holding that defendant in securities fraud action "may not use funds obtained by fraud to pay his defense"); *see also, Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623, 109 S.Ct. 2646, 2651, 105 L.Ed.2d 528 (1989)(even funds not previously restrained by freeze order are subject to subsequent forfeiture after they have been transferred to an attorney for payment of fees, if the funds were derived from criminal activity).

There is no basis for Defendants' counsel to continue his refusal to disclose the source of his retainer or the source of payment of any fees incurred to date.   Indeed, in similar forfeiture proceedings in which the government seeks the recovery of attorney's fees  paid from ill-gotten gains, the government may compel the attorney's *testimony* as well as the production of documents regarding his fee arrangement and the source of his fees.   *United States v. Saccoccia*, 898 F.Supp.53, 60 (D. R.I. 1995); *see also, In re Grand Jury Subpoena c/d 91R0052 -11,* 142 F.R.D.

122, 128 (M.D.N.C. 1992)(ordering attorneys to comply with subpoena for the production of documents and statements related to the payment of attorney's fees). Here, by counsel for the Defendants ignoring the repeated requests of the Receiver, the Defendants' counsel is effectively telling the Receiver, "it is none of your business." The information is unmistakably relevant to the Receiver's duties and obligations under the *SRO*, however, and the Fifth Circuit mandate to attorneys to investigate the source of their retainers in cases such as this underlines the relevance. The Receiver requests this Court to compel the attorney for the Defendants Asher and Batashvili to produce documentation showing the source of the monies counsel has received for representing the Defendants in this case.

### D.    ENFORCE DEFENDANTS' COMPLIANCE WITH THE SRO

To date, Defendants Asher and Batashvili are choosing when to comply with the SRO and at their discretion, the provisions of the *SRO* they wish to follow.

1.    Despite the injunction against the Defendants transferring any assets, the Receiver discovered the following email in which Defendant Asher attempted to sell his Ferrari[21].

"On Mon, Sep 28, 2020 at 7:10 AM Lucas Asher <asher@towerequity.com> wrote:

Good morning Donny,

I am leaving town for business and interested in selling back my 488 I bought from you. Perfect condition. Brixton Forged ceramic wheels and novitec rear spoiler (about 20k in extras) Will be open to a fast offer if you're interested.

Best,

Lucas 310-866-6213"

Fortunately the Receiver took possession of the Ferrari before it could be sold.

---

[21] When confronted with this evidence, Defendant Asher contends he did not authorize the email.

**INITIAL REPORT OF THE RECEIVER**    23

2      The Receiver requested Defendants Asher and Batashvili to provide a sworn declaration regarding the vehicles they own or lease.  After several requests Defendants Asher and Batashvili provided such declaration.  In the Declaration, Defendant Asher lied to the Receiver.  He claimed under oath that he leased a Mercedes G Class when in fact the Receiver discovered he owned the Mercedes.

3.      The Receiver made numerous requests for Defendants Asher and Batashvili to provide a list of the entities they own or control.  The lists were not produced until the Receiver had to file an Emergency Show Cause Motion seeking to have the Defendants held in contempt for violating the *SRO*.  The list finally submitted is incomplete at best according to the books and records discovered by the Receiver that show Defendants Asher and Batashvili owning many more entities than they disclosed.

4.      Contrary to their express obligations under the *SRO*, Defendants Asher and Batashvili have not voluntarily produced assets or documents to the Receiver.  Instead, they wait for the Receiver to identify an asset and make several requests of their attorney for turnover of the assets.  During their depositions Defendants Asher and Batashvili identified persons who might have knowledge about certain assets or be able to assist in the turnover of such assets, but there was no evidence of Asher and Batashvili taking any affirmative steps to contact such persons about turning over the assets to the Receiver.

5.      At his most recent asset deposition Defendant Asher claimed he could not recall even basic information such as the address at which he was living, the name of the friend who let him stay in the house, or even his cell phone number.  Defendant Batashvili was likewise just as evasive.  The evasiveness of Defendants Asher and Batashvili in their asset deposition demonstrates

their failure to cooperate with the Receiver and affirmatively take steps to turn over assets and records as required by the *SRO*.[22]

The Receiver interprets the foregoing as the Defendants Asher and Batashvili having no respect for this Court's Orders. If the Defendants Asher and Batashvili continue to disregard the *SRO*, the Receiver intends to seek a hearing at which the Defendants Asher and Batashvili can appear before the Court and explain to the Court why they are not fully complying with the *SRO*.

### E.     TIMELINE FOR THE RECEIVERSHIP

The Receiver recommends continuation of the receivership to complete the discovery, seizure, and liquidation of additional assets; pursuit of claims against recipients of fraudulent transfers; completion of the claims process described above; and distribution of the assets recovered to the approved claimants. With the significant scope of the receivership, number of investor victims, and amount of loss, the Receiver estimates it will be necessary to continue the receivership in place through 2021 and into 2022.

Respectfully submitted, November 10, 2020.

**RECEIVER KELLY M. CRAWFORD**

*/s/  Kelly M. Crawford*
Kelly M. Crawford, Receiver
State Bar No. 05030700
SCHEEF & STONE, L.L.P.
500 North Akard, Suite 2700
Dallas, Texas 75201
Tele:  214/706-4200
Fax:  214/706-4242

---

[22] The Receiver intends to file a motion to compel with the Court citing the numerous evasive answers given by Defendants Asher and Batashvili in their depositions.

**INITIAL REPORT OF THE RECEIVER**     25

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 10, 2020 I electronically filed the foregoing document with the clerk of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

/s/  Kelly M. Crawford
KELLY M. CRAWFORD



**PHILADELPHIA PROPERTIES**

|  | | Date to Tower | How | Purchase Amount | Assessed Value | Realtor 2020 Value |
|---|---|---|---|---|---|---|
| 1 | 6885 N. 19th | 4.8.19 | Sheriff Deed | $120,000 | $180,184 | $ 234,800 |
| 2 | 6308 Chester | 6.24.19 | Sheriff Deed | $48,000 | $58,277 | $ 70,000 |
| 3 | 6616 Chew | 12.15.18 | Sheriff Deed | $70,000 | $107,464 | $ 141,000 |
| 4 | 6139 Chancellor | 3.12.19 | Sheriff Deed | $50,000 | $41,400 | $ 101,000 |
| 5 | 5135 Jackson | 3.12.19 | Sheriff Deed | $40,000 | $68,175 | $ 123,000 |
| 6 | 5782 Haddington | 6.24.19 | Sheriff Deed | $80,000 | $72,600 | $ 148,999 |
| 7 | 2222 S Clarion | 3.12.19 | Sheriff Deed | $125,000 | $184,224 | $ 257,000 |
| 8 | 1921 S. Croskey | 9.24.19 | Sheriff Deed | $75,000 | $83,100 | $ 167,200 |
| 9 | 1851 S Ringgold | 1.28.19 | Sheriff Deed | $76,000 | $63,933 | $ 186,100 |
| 10 | 827 Rhawn | 12.15.18 | Sheriff Deed | $145,000 | $185,335 | $ 242,300 |
| 11 | 1679 E Hunting Park | 3.12.19 | Sheriff Deed | $54,000 | $87,600 | $ 143,999 |
| 12 | 532 E Penn | 6.24.19 | Sheriff Deed | $59,000 | $75,548 | $ 179,999 |
| 13 | 443 W Roosevelt | 6.24.19 | Sheriff Deed | $60,000 | $74,033 | $ 126,800 |
| 14 | 434 E Cheltenham | 6.24.19 | Sheriff Deed | $97,000 | $120,695 | $ 240,000 |
| 15 | 404 N Wanamaker | 6.24.19 | Sheriff Deed | $38,000 | $57,772 | $ 100,100 |
| 16 | 178 Rosemar | 6.24.19 | Sheriff Deed | $55,000 | $94,940 | $ 111,300 |
| 17 | 106 E Roosevelt | 7.19.19 | Sheriff Deed | $62,000 | $112,817 | $ 156,400 |
|  | | | | $ 1,254,000.00 | | $ 2,729,997 |



## INVESTMENTS BY TOWER EQUITY

1. Spotify USA Inc.
2. Space Exploration Technologies Corp.
3. Slack Technologies, Inc.
4. Palantir Technologies
5. Pintrest
6. BuzzFeed, Inc.
7. Planet Labs, Inc.
8. Airbnb, Inc.
9. DoorDash, Inc.
10. Postmates, Inc.
11. Hyperloop technologies, Inc. (Virginhyperloop)
12. Robinhood Financial, LLC – Robinhood.com
13. Adaptive Biotechnologies
14. Flexport, Inc.
15. Betterment, LLC
16. Bittrex, Inc.
17. Bitfinex
18. Dave.com
19. Circle
20. Ripple



Dated:  October 26, 2020

## Corporate Entities Owned or Controlled by Lucas Asher

The following is a list of entities that Lucas Asher believes are in his ownership or control.  The list was compiled from memory, and without the benefit of any documentation or outside assistance.  As  a general practice, Mr. Asher relied on lawyers and other professionals to create corporate entities and manage the corporate governance issues, so he does not have personal knowledge of all the entities that may be listed in his name.  Some of the entities are technically owned by other entities, but the relevant legal documents are not available for immediate review.  For all these reasons, the list may be inaccurate or incomplete.

Best New, Inc.
Tower Holdings, Inc.
TMTE, Inc.
Tower Equity LLC (partial)
Street Invasion, Inc
Faulkner Music LLC
Prometheus Laboratories Int Corp (IBC)
Prometheus Laboratories Int Corp (PIF)

Graham Norris, Norris Law Group referenced the following entities which Mr. Asher recognizes, but does not know his role, e.e., whether he has legal possession of control of any of these entities or their assets.

*Chase Metals, Inc.*
*Chase Metals, LLC*
*Access Unlimited, LLC*
*Retirement Insider, LLC*
*USA Marketing , Inc.*
*Stuttgart Industrial, Inc.*
*Aqua Billboards, Inc.*
*Reagan Financial, Inc.*
*Egon Pearson, LLC*
*TX Admin, Inc.*



Dated:  October 26, 2020

## Corporate Entities Owned or Controlled by Simon Batashvili

The following is a list of entities that Simon Batashvili believes are in his ownership or control.  The list was compiled from memory, and without the benefit of any documentation or outside assistance.  As a general practice, Mr. Batashvili relied on lawyers and other professionals to create corporate entities and manage the corporate governance issues, so he does not have personal knowledge of all the entities that may be listed in his name.  Some of the entities are technically owned by other entities, but the relevant legal documents are not available for immediate review.  Accordingly, this list may be inaccurate or incomplete.

Tower Equity LLC
Barrick Capital Inc.
First American Estate and Trust, LLC
Tower Estates Inc
Tower Property One, LLC
Delaware Wholesale Inc.
chasing metals inc.
Merrill Gold, LLC
Tower Property 2, LLC
Tower Estates Holdings, Inc.

Graham Norris, Norris Law Group referenced a number of entities which Mr. Batashvili does not recall or recognize.


EXHIBIT
D

## ADDITIONAL ENTITIES OWNED OR CONTROLLED BY
## DEFENDANTS LUCAS ASHER AND/OR SIMON BATASHVILI

Access Unlimited LLC
Administrative Account Services, LLC
Amerivise, LLC
Best New, Inc.
Brighthouse Estates, Inc.
Chasing Gold
Egon Pearson, LLC
Faulkner Management Corp.
Federal Services, LLC
First American Savings, Inc.
Instribution, LLC
Newmont Admin.Inc. and/or Newmont Financial or Nemont, Inc.
Northwestern Metals
Reagan Financial, Inc.
Retirement Insider, LLC
Revo, LLC
Select Financial, Inc.
Stuttgart Industrial, Inc./Aqua Billboards
Tower, LLC
Tower Property One, LLC
TX Admin, Inc.
USA Accounts, Inc.
USA Marketing, Inc.
Republic House Committee



EXHIBIT
E