UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, *et. al*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>TMTE, INC. a/k/a metals.com, Chase Metals Inc., Chase Metals, LLC, Barrick Capital, Inc., Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher, and Simon Batashvili,<br><br>        Defendants. | Civil Action No. 3:20-CV-2910-L |

**EMERGENCY MOTION TO MODIFY PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ................................................................4

        A.      Background of Lucas Asher and Simon Batashvili ....................................4

        B.      The Founding and Operation of metals.com and Barrick Capital ............6

        C.      metals.com and Barrick Make Retail Sales of Coins................................8

        D.      The CFTC Sues and Freezes Batashvili's and Asher's Assets ...............9

        E.      Individuals are Effectively Without Legal Counsel................................11

        F.      Plaintiffs and Receiver Object to Withdrawal of Individuals' Counsel ...............12

        G.      Individuals are the Target of a Long-Term Parallel Criminal Investigation .........13

III.    LEGAL ARGUMENT .........................................................................................13

        A.      Asher and Batashvili are Entitled to Counsel of Their Choice .............15

        B.      Plaintiffs are Unlikely to Succeed on the Merits. .................................18

                1.      The CFTC Lacks Jurisdiction Over the Sale of Bullion Coins.................18

                2.      The CFTC Lacks Jurisdiction Over the Non-Leveraged, Retail Sale of
                        Commodities................................................................................19

                3.      Aside from the CFTC's lack of jurisdiction, Plaintiffs are unlikely to
                        succeed on the merits. ...............................................................22

        C.      The requested assets are unconnected to the alleged fraud....................24

IV.     CONCLUSION....................................................................................................25

CERTIFICATE OF CONFERENCE.................................................................................27

CERTIFICATE OF SERVICE .........................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bell South Corp.*,
334 F.3d 941 (11th Cir. 2003) ................................................................15

*CFTC v. Am. Precious Metals, LLC*,
845 F. Supp. 2d 1279 (S.D. Fla. 2011) ....................................................21

*CFTC v. Battoo*,
790 F.3d 748 (7th Cir. 2015) ..................................................................13

*CFTC v. Dinar Corp.*,
No. 1:15-CV-538-WKW, 2016 WL 814893 (M.D. Ala. Feb. 29, 2016) ........................14, 25

*CFTC v. Monex Credit Co.*,
931 F.3d 966 (9th Cir. 2019) ............................................................21, 22

*CFTC v. My Big Coin Pay, Inc.*,
334 F. Supp. 3d 492 (D. Mass. 2018) ......................................................19

*CFTC v. R.J. Fitzgerald & Co.*,
310 F.3d 1321 (11th Cir. 2002) ..............................................................23

*CFTC v. S. Tr. Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018) ..............................................................22

*CFTC v. Total Call Grp., Inc.*,
No. 4:10-CV-00513-RAS, 2012 WL 1642196 (E.D. Tex. Mar. 30, 2012) ..........................23

*CFTC v. Walsh*,
2010 WL 882875 (S.D.N.Y. Mar, 9, 2010) ..............................................17

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
835 F.2d 554 (5th Cir. 1987) ........................................................14, 16, 24

*FTC v. Consumer Def., LLC*,
No. 2:18-CV-30 JCM (PAL), 2018 WL 2972927 (D. Nev. May 4, 2018)........................14, 16

*FTC. v. Liberty Supply Co.*,
No. 4:15-CV-829, 2016 WL 4182726 (E.D. Tex. Aug. 8, 2016)......................................13, 14

*FTC v. Next-gen, Inc.*,
No. 4:18-CV-00128-DGK, 2018 WL 8754140 (W.D. Mo. Aug. 3, 2018) ............................14

ii

*FTC v. U.S. Mortg. Funding, Inc.*,
    No. 11-CV-80155, 2011 WL 2293377 (S.D. Fla. June 9, 2011) ............................................14

*Luis v. U.S.*,
    136 S. Ct. 1083 (2016) ....................................................................................................16

*Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
    552 F. Supp. 332 (S.D.N.Y. 1982) ................................................................................24

*Monex Deposit Company, et al., Petitioners v. CFTC*,
    2020 WL 2749086 (U.S.) ...............................................................................................21

*Potashnick v. Port City Const. Co.*,
    609 F.2d 1101 (5th Cir. 1980), *cert. denied*, 449 U.S. 820 (1980).............................15, 16, 17

*SEC v. Bremont*,
    954 F. Supp. 726 (S.D.N.Y. 1997) ................................................................................24

*SEC v. Cope*,
    No. 14CV7575 (DLC), 2016 WL 7429445 (S.D.N.Y. Dec. 23, 2016) ...................................14

*SEC v. Dobbins*,
    No. 3:04-CV-0605-H, 2004 WL 957715 (N.D. Tex. Apr. 14, 2004) .....................................14

*SEC v. Dowdell*,
    175 F. Supp. 2d 850 (W.D. Va. 2001) ......................................................................14, 16

*SEC v. Duclaud Gonzalez de Castilla*,
    170 F. Supp. 2d 427 (S.D.N.Y. 2001)....................................................................13, 15, 18

*SEC v. Gryphon Holdings, Inc.*,
    No. 10CV1742JBWJO, 2010 WL 11623063 (E.D.N.Y. June 28, 2010) ...........................14, 16

*SEC v. I-Cubed Domains, LLC*,
    664 F. App'x 53 (2d Cir. 2016) ......................................................................................24

*SEC v. Int'l Loan Network, Inc.*,
    770 F. Supp. 678 (D.D.C. 1991), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992)..............................15

*SEC v. Lee*,
    No. 14-CV-347-LAB-BGS, 2019 WL 4934181 (S.D. Cal. Oct. 7, 2019)..........................14, 18

*SEC v. Petters*,
    No. 09-1750 ...................................................................................................................14

*U.S. v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)........................................................................................................17

iii

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...................................................................................................20

**Statutes**

7 U.S.C. § 1a(9) of the CEA .......................................................................................3, 19

7 U.S.C. § 2(c)(2)(D)(i)(II) ................................................................................................20

7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa) .......................................................................................20

7. U.S.C. § 6(a)(1) .............................................................................................................20

7 U.S.C. § 6(c)(1) ......................................................................................3, 9, 18, 19, 20, 21, 22

7 U.S.C. § 6(c)(3) ..............................................................................................................20

7 U.S.C. § 9(1) .........................................................................................................9, 18, 19

7 U.S.C. § 13c ...................................................................................................................24

7 U.S.C. § 17 .....................................................................................................................21

Dodd-Frank Act, Pub. L. No. 111-203, § 753 .................................................................19

**Other Authorities**

156 Cong. Rec. S3348 .......................................................................................................19

Hearing to Review Implications of the CFTC v. Zelener Case: Hearing Before the
    Subcomm. on General Farm Commodities & Risk Mgmt. of the H. Comm. on
    Agric., 111th Cong. 9 (June 4, 2009) ...........................................................................20

Prohibition on the Employment, or Attempted Employment, of Manipulative and
    Deceptive Devices and Prohibition on Price Manipulation, 76 FR 41398-01 ..................20, 21

Defendants Lucas Asher and Simon Batashvili (collectively, "Individuals") respectfully submit this Motion to Modify Preliminary Injunction ("Motion") to allow for the use of untainted assets to pay for attorneys' fees.

## I.    INTRODUCTION

Lucas Asher and Simon Batashvili come before this Court to request its assistance in protecting their most basic rights—the right of due process and the right to counsel.    The Commodity Futures Trading Commission ("CFTC") has confirmed that this matter is proceeding in parallel with an active criminal investigation by the Department of Justice and Federal Bureau of Investigation concerning the same "fraud" at issue in this action.    Indeed, the records seized from Defendants for purposes of this action were obtained through a search warrant believed to be issued in connection with that investigation.    Individuals do not know how many states may also be investigating them for alleged criminal activity, but based on the fact that twenty-nine states have appeared as Plaintiffs, including through attorney generals, the answer is likely high.

While Asher and Batashvili previously agreed to the entry of an injunction order freezing their assets, they did so without a full understanding of the parallel criminal investigation they were facing, the magnitude of fees they would incur to fight the accusations against them, or the fact that their current counsel of record would stop providing legal advice.    Asher and Batashvili have functionally been unrepresented in this matter since at least early January, when their counsel of record informed them that he was closing his private practice and would no longer participate in their case, prejudicing Individuals in this matter and the related criminal investigation.

Despite the CFTC having confirmed the existence of a parallel criminal investigation and being informed that Individuals are essentially unrepresented, the CFTC will not consent to a carve-out to the asset freeze for the use of untainted assets, including future earnings in other non-

1

commodity industries.  In rejecting the request for a carve-out, the CFTC claimed that Individuals are "professional fraudsters."  While Individuals adamantly deny this allegation, which is untried, the question of whether Individuals are entitled to assets to retain counsel is not based on likability or unproven misconduct, but on constitutional rights and equity.  The government cannot simply make accusations, freeze all assets leaving the defendants *pro se,* and only then go about trying to prove the accusations after ensuring that the defendants have no means of retaining counsel.

Here, the government has initiated a criminal investigation—including executing an expansive search warrant—while simultaneously using a parallel civil action to tie-up Individuals' untainted assets so that they cannot access funds to retain counsel concerning the matters under investigation.[1]  In essence, the civil action serves as a discovery expedition for the government that Individuals are forced to participate in without access to funds for counsel while the federal government shores up its ongoing criminal case.  Moreover, the Receiver, presumably at the insistence of the CFTC, is aggressively pursuing related, but non-tainted assets to further deprive Individuals of their ability to fund their own defense.  This is particularly unjust because (1) the CFTC has not proven any wrongdoing; (2) the CFTC is aware that Individuals are essentially without counsel; and (3) the CFTC has argued that counsel for Individuals is necessary for this case to operate efficiently.  Further, Individuals have made clear that they are only requesting access to untainted funds, including assets earned in the future that would indisputably have no connection to the alleged wrongdoing or the commodities industry.

---

[1]  Contrast these Individuals with an ordinary white-collar defendant in a criminal proceeding.  In a criminal matter, the defendant would likely be released on conditions and encouraged to maintain employment.  She would be entitled to counsel of her choice and would be allowed to utilize resources (particularly untainted resources from future earnings) to fund a defense.  The CFTC's refusal to allow Individuals to fund their own defense when they are targets of a related criminal investigation—even from clearly untainted future earnings—is a gross deprivation of Individuals' right to counsel.

2

The situation is even more troubling because this is an extraordinarily complicated matter of first impression where experienced lawyers are essential to the presentation of issues.  The CFTC is suing Individuals based on a relatively untested theory of the agency's regulatory jurisdiction: namely, that Section 6(c)(1) of the Commodities Exchange Act ("CEA") grants the CFTC authority to regulate the retail sales of goods unconnected to a futures trading market absent allegations of market manipulation.  In other words, through this action, the CFTC seeks to extend its authority under Section 6(c)(1) to regulate specific instances of alleged fraud in the non-leveraged retail sales of physical coins that are: (a) not commodities (as defined in Section 7 U.S.C. § 1a(9) of the CEA); and (b) even if they were commodities, are delivered to customers within 28 days.  The CFTC includes no allegations that these goods are related to the futures or derivatives markets, or that the alleged fraud resulted in the manipulation of commodity prices.

While applied to the retail sale of metal coins in this case, such broad regulatory jurisdiction would extend the power of the CFTC into activities traditionally reserved for the states and/or other regulatory bodies.  This does not respect the jurisdiction that Congress conferred upon the Commission, and no appellate court in the United States has sanctioned such a sweeping interpretation of the CFTC's regulatory authority.  These jurisdictional questions are ones of first impression in the Fifth Circuit, and any decision by this Court will have precedent-setting effects on issues of enormous public import.  Based on the complexities at work, the involvement of counsel in presenting these issues will be critical in facilitating the proper adjudication of this matter, benefitting the Court and the public at large.

Because there is no process by which civil defendants receive court-appointed counsel if they cannot afford counsel, a denial of this motion would essentially equate to the Court ruling that absent some unknown, theoretical generous benefactors, Individuals must proceed *pro se* in

an extraordinarily complicated matter with direct criminal implications. This would be a gross violation of equity and the Individuals' constitutional rights.

Asher and Batashvili therefore respectfully seek modification of the agreed injunction to allow them access to their existing or future untainted assets for the purpose of paying attorneys' fees in this matter. This is particularly necessary where, as here: (i) there is an ongoing criminal investigation involving the same facts at issue; and (ii) the case involves complex matters of first impression that will have a lasting impact on jurisprudence in this Circuit and potentially beyond.

Individuals are effectively without counsel and therefore seek this modification on an emergency basis. Plaintiffs are pushing for discovery to be finalized in the next six to eight months, and they are also threatening to report Asher to the Court for not providing follow-up material to his second deposition. Individuals are not positioned to engage in discovery or provide materials without counsel. Individuals are also concerned that the Receiver is moving forward with the liquidation of assets—as opposed to maintaining the status-quo—which is not appropriate prior to a finding of wrongdoing, and Individuals require counsel for assistance in opposing any such action.

## II.    STATEMENT OF RELEVANT FACTS[2]

### A.    Background of Lucas Asher and Simon Batashvili

Lucas Asher is a self-taught computer programmer with a multi-decade history in software development. Declaration of Lucas Asher ("Asher Decl.") at ¶ 1. He helped developed the early prototype of an online car dealership while in his late teens, later receiving venture backing for his

---

[2] Individuals have assembled facts based on their personal knowledge and memory, as well as relying on limited documents available to them. Many of the documents relevant to this action that would evidence points in this Motion, however, are in the Receiver's possession and Individuals cannot access them. If allowed access to the full set of records in the Receiver's possession, Individuals could provide additional evidence in support of this Motion.

software company and helping to spearhead the buying and selling of automobiles online during the first internet boom. *Id.* at ¶ 2.  Asher has also invested in multi-family and commercial properties nationwide and deployed income from those ventures to invest in pre-IPO technology companies like SpaceX, Pinterest, Robinhood, Adaptive Biotechnologies, Palantir and others.  *Id.* at ¶ 3.  He founded a digital software agency, and he has a publishing company that owns copyrights with a Grammy award-winning artist and others. *Id.* at ¶ 4. He was involved in writing computer code for a music streaming company that forged API relationships with both Apple and Spotify.  *Id.* at ¶ 5.  Asher was later employed as an account executive at a national coin dealer called Goldline, where he met Batashvili.  *Id.* at ¶ 7.  Asher has also donated his expertise to assist with music-related exhibitions for a local museum, with proceeds benefitting charity.  *Id.* at ¶ 6.

Simon Batashvili was born in the Republic of Georgia (at the time part of the Soviet Union) and moved to the United States as a young child with his family to escape religious persecution. Declaration of Simon Batashvili ("Batashvili Decl.") at ¶ 1.  After attending school, he worked in real estate from roughly 2001-2009, including at some of the top real estate brokerages in Los Angeles.  *Id.* at ¶ 2.  He later founded a real estate financial company and helped develop a business model that assisted first-time homebuyers purchasing single-family homes in the foreclosure market following the 2008 financial crisis.  *Id.* at ¶¶ 2-3.  Following a long interest in precious metals, Batashvili entered the retail coin industry as an account executive with retail coin dealer Goldline, where he met Asher with whom he went on to found other retail coin companies.  *Id.* at ¶ 4.  While working in the retail coin industry, he continued to invest in multi-family and commercial properties.  *Id.* at ¶ 6.  He worked with Asher to put together a team of engineers for the music streaming company described above, and he has invested in the same pre-IPO technology companies mentioned above.  *Id* at ¶ 7.  In addition, he was a board member for an

5

organization that is dedicated to improving the lives of children by providing arts education to underserved public schools and communities.  *Id.* at ¶ 8.

### B.      The Founding and Operation of metals.com and Barrick Capital

In 2016, Asher and Batashvili leveraged their experience at Goldline to launch a retail metals website that would pioneer offering customers the option to purchase bullion coins online without having to speak to commission-earning sales representatives.  Asher Decl. at ¶ 7; Simon Decl. at ¶ 5.  That business became known as metals.com, which is operated by Defendant TMTE, Inc., formerly known as Chase Metals, LLC.[3]  Asher Decl. at ¶ 8.  This online model helped ensure price transparency and allowed customers to compare prices without having to visit coin shops or engage in sales calls, using e-commerce to feature hundreds of retail metal products.  *Id.* at ¶ 10.

metals.com paid for the privilege of being the exclusive purchaser (and therefore seller) of several coins minted by the Royal Canadian Mint (a corporation owned by the Canadian government that operates under the Department of Finance), including the ½ oz. Silver Polar Bear coin and the $^{1}/_{10}$ oz. Gold Polar Bear coin.  *Id.* at ¶ 11.  These exclusive arrangements are not unusual in the industry, with different companies having different "exclusive" coins.  *Id.*

metals.com strived for transparency in its customer agreements.  While the metals.com customer agreements changed over time, each version disclosed numerous important facts, including that metals.com charged a premium over its costs and that a customer would need to sell her coins above her cost of purchase—including the spread—in order to make a profit.  Asher Decl. at ¶¶ 12-13, Exs. A and B, at §3(a).  The contracts disclosed a general range for those spreads, but also expressly stated that the spread in any transaction may fall above or below that range.

---

[3] The metals.com domain name is owned by Relief Defendant Tower Equity, LLC and leased from Tower Equity, LLC by TMTE, Inc. Asher Decl. at ¶ 8.

Exs. A and B at §3(a).  metals.com also disclosed that the spot price of precious metals may differ from the liquidation value of the coins sold.  *Id.*

The agreements were also explicit that metals.com was a retailer, and its coins would be delivered within twenty-eight days.  *Id.* at §§1-2.  ("metals shall deliver … to Customer no more than twenty-eight (28) days after metals verifies [the customer's funds]….  metals shall cause all Precious Metals purchased and paid for to be delivered to Customer's address….")  The agreements further clearly stated that "no fiduciary relationship exists between metals and Customer" (*id.* at §5(a)) and that metals.com "does not provide tax, investment, or legal advice or advisory services" (*id.* at § 5(e)).  *See also, e.g.*, *id.* at §§ 5(b) – 5(g).  metals.com trained its sales representatives on compliance issues and retained internal and external counsel, as well as a professional management team, to ensure compliance with all applicable laws and regulations.  Asher Decl. at ¶ 14.

In addition to metals.com, Asher and Batashvili also founded Barrick Capital, Inc. ("Barrick") with a third party; Barrick operated through a more traditional sales model where customers purchased coins through sales representatives by telephone.  *Id.* at ¶¶ 16-17.  Like metals.com, Barrick aimed for transparency in its dealings with customers and disclosed the same type of information in its customer agreements as metals.com.  Asher Decl. at ¶ 18.  Also like metals.com, Barrick acted as a retailer and ensured that all coins purchased by its customers were delivered to them within twenty-eight days.  *Id.* at ¶ 19.  Finally, Barrick engaged both in-house and outside counsel, as well as a professional management team, to ensure that it was in full conformity with its legal obligations, and Barrick trained its sales representatives regarding compliance issues.  *Id.* at ¶ 20.

C.    **metals.com and Barrick Make Retail Sales of Coins**

Bullion coins are almost always purchased and sold for a premium over the commodity spot price for precious metals.  This is based in part on the market value of the coins to the public (which is commonly above the spot price), and in part because the mint, the wholesaler, and the retailer include their own margin or spread in the retail distribution chain to compensate for their roles.  *Id*. at ¶ 21.  The ultimate price of a particular coin depends on various objective and subjective factors, including availability, customer demand, craftsmanship, design costs, the age of the precious metal, the originating country, aesthetic properties, and an investor's personal attraction to the piece.  *Id*. at ¶ 22; *see also* Ex. A at § 3(f).  Given the subjective nature of valuing coins, investors may price coins differently.  Below are just a few examples of third parties selling bullion coins significantly above the per-ounce spot price of precious metals:

- JM Bullion is currently selling a ¼ ounce Mexican Silver Libertad coin for $21.03, a premium of 334% of the spot value of silver.[4] Asher Dec. at ¶ 23, Ex. C.

- APMEX is currently selling a ¼ ounce Canadian silver coin featuring a spider and web for $79.99, a premium of 1,272% over the spot value of silver.  *Id.* at ¶ 24, Ex. D.

- APMEX is also currently selling a ½ ounce silver coin from the Royal Canadian Mint for $49.99, a premium of 397% over the spot value of silver.  *Id.* at ¶25, Ex. E.

- Walmart currently lists a ½ ounce Australian silver coin on its website featuring a mouse for $144.32, a premium of 1,148% over the spot value of silver.  *Id.* at ¶26, Ex. F.

- International Coins & Currency is currently selling a ½ ounce silver polar bear and cub coin from the Royal Mint of Canada for $99, a premium of 787% over the current spot price of silver.  *Id.* at ¶ 27, Ex. G.

It is not, however, just third-party corporations that sell bullion coins above spot value, but governments as well—*including the United States Government.*  The United States Mint (a bureau of the United States Department of the Treasury) regularly sells coins at prices that are multiples

---

[4] The spot price for silver is calculated at $25.15 per ounce, as of March 24, 2021.

of the per-ounce spot price of precious metals.  For example, the United States Mint website currently lists a widely minted American Eagle 2020 1 ounce silver coin for $67.00 – approximately 266% over the current spot price of silver.  *Id.* at ¶ 28, Ex. H.  The Royal Canadian Mint also sells coins at prices significantly above the per-ounce spot price.  A ½ oz. silver coin featuring a beaver is being sold by the Royal Canadian Mint for $39.74 ($49.95 CAD), approximately 316% over the current spot price of silver.  *Id.* at ¶ 29, Ex. I.

### D.   The CFTC Sues and Freezes Batashvili's and Asher's Assets

The CFTC filed its Complaint on September 22, 2020, and on the same date obtained an ex parte restraining order.  Dkt. 16.  The CFTC alleges that Batashvili and Asher, through metals.com and Barrick, violated Section 6(c)(1) of the Commodities Exchange Act ("CEA") (codified as 7 U.S.C. § 9(1)).  Complaint ("Compl.") at ¶ 14.  Specifically, the CFTC alleges that Defendants defrauded investors into establishing self-directed individual retirement accounts to purchase precious metals bullion (*id.* at ¶ 31), and defrauded investors to buy "overpriced" bullion coins at "fraudulently inflated prices over the Prevailing Market Price" (*id.* at ¶¶ 41, 43, 92).  Notably, the CFTC defines the "Prevailing Market Price" for the coins as its "base melt value or spot price" (*id.* at ¶ 3), but it provides no evidence for the proposition that the proper valuation of a bullion coin is its melt value.  As previously explained, bullion coins are regularly sold above their spot price, including by the U.S. Government, and pricing bullion coins above the spot price is generally not considered "above market," let alone fraudulent. [5]  The Complaint also alleges that

---

[5]  The CFTC attempts to bolster its argument by alleging that investors received account statements from their SDIRA administrators showing an account value "that was significantly smaller than what Metals misrepresented to investors."  Compl. at ¶ 82.  The CFTC ignores, however, that values on a SDIRA account statement are provided for tax purposes, and that the "value" provided on the account statement does not necessarily equate to the price at which the coin can be sold, nor does it account for dealer mark-ups, commissions, etc.  *See, e.g.*, Investing in Precious Metals with a Self-Directed IRA, Strata Trust Company, at 4, available at https://www.stratatrust.com/content/uploads/2017/11/Whitepaper-Precious-Metals.pdf  ("Spot values do not include any mark-ups, mark-downs, premiums or commissions.  Spot vales should be used as an indication of value only….").

Defendants acted as unregistered investment advisers but recognizes that these claims are governed by the "Laws of the States." *Id.* at ¶ 107. Noticeably, the Complaint is silent as to which retail product qualifies as a "commodity" under the terms of the CEA, or why.

Based on these allegations and the consent of the parties alone, the Court entered a Consent Order of Preliminary Injunction applicable to Batashvili and Asher on October 14, 2020. Dkt. 165 (the "Order"). Individuals signed the Order without a full understanding of the parallel criminal investigation, the complexities of the legal issues at play in this action, the magnitude of fees they would incur to fight the accusations against them, or the fact that their current counsel of record would be closing his private practice. Asher Decl. at ¶ 30; Batashvili Decl. at ¶ 9.

The Order, among other things, prevents Individuals from withdrawing, transferring, removing, dissipating, and disposing of their funds, assets, or other property. There is no carve-out in the Order for the use of assets to retain counsel. Further, the Order freezes all of Individuals' assets, even if there is no allegation, much less proof, that those assets are tied to wrongdoing.

Many of the records that would show the source of the frozen assets are in the possession of the Receiver, having been stored in the same location as the records for metals.com and Barrick, and thus seized during the FBI raid on those offices. Asher Decl. at ¶ 31; Batashvili Decl. at ¶ 10. If Individuals are provided access to those records, they will be able to identify frozen assets that are clearly unrelated to any alleged wrongdoing. Asher Decl. at ¶ 32; Batashvili Decl. at ¶ 11. These include, for example, college savings accounts for Batashvili's children, which include assets that were provided by unconnected third parties. Batashvili Decl. at ¶ 12.

The Order permits Individuals to engage in certain employment, but any "new income" will only be excluded from the restraints of the Order for the limited purposes of covering agreed-to reasonable living expenses. Thus, even though Individuals are willing to operate businesses

10

outside of the commodities space and use the income generated from those unrelated businesses for attorneys' fees (Asher Decl. at ¶ 33; Batashvili Decl. at ¶ 13), the Order currently prevents that. Such future funds would obviously be untainted and would not only allow Individuals the ability to retain counsel, but also potentially increase the funds available for any future restitution.

### E.   Individuals are Effectively Without Legal Counsel.

Approximately the second week of January, Individuals' counsel, Arnold Spencer, informed them that he had taken a new position and would be leaving private practice. Asher Decl. at ¶ 34; Batashvili Decl. at ¶ 16. Mr. Spencer did not file a motion to withdraw at that time, but did stop providing legal advice to Individuals. Asher Decl. at ¶ 34; Batashvili Decl; at ¶ 14. For example, when Asher was deposed in January 2021, Mr. Spencer would not attend, despite Asher's request that he do so. Asher was forced to find a substitute attorney without knowledge of the case the evening before the deposition. Asher Decl. at ¶ 35. This is particularly troubling because Asher was questioned on subjects directly relevant to an ongoing criminal investigation. The CFTC was aware of Mr. Spencer's refusal to participate. With regard to filings and correspondence, Mr. Spencer forwards materials to Individuals, but will not assist Individuals with responding to them. Asher Decl. at ¶ 36; Batashvili Decl; at ¶ 15. Thus, Individuals have effectively been without counsel for approximately two months.

Mr. Spencer recently confirmed his intent to continue with this pattern, forwarding Individuals an order in this matter and stating:

> As you know, I have filed a Motion to Withdraw and am not working on your case. I understand substitute counsel has been identified, but they have not filed motions of appearance. I will continue to forward orders until I am released from the case, but am not in position to review or file any motions.

11

*See* Asher Decl. at ¶ 37, Ex. J.  Mr. Spencer is incorrect that substitute counsel has been identified, as counsel on this Motion is only appearing for the limited purpose of requesting a carve-out to the asset freeze for the retention of counsel.

This lack of counsel has clearly prejudiced Individuals.  For example, Individuals effectively do not have counsel to advise them with regard to the Receiver's February 1, 2021 Motion for Order Establishing Claims Adjudication Process.  Dkt. 219.  Asher Decl. at ¶ 38; Batashvili Decl. at ¶ 16.  They also do not have counsel to advise them how to respond to requests for information from Plaintiffs and the Receiver, which they fear could lead to them being held in contempt for failing to comply with requests.  *Id.*

### F.   Plaintiffs and Receiver Object to Withdrawal of Individuals' Counsel

On February 14, 2021, Mr. Spencer filed a motion to withdraw.  Dkt. No. 222.  Following Mr. Spencer's request to withdraw, both Plaintiffs and the Receiver filed objections to the motion on February 21 and February 22, respectively.  Dkt. Nos. 223 and 224 (the "Objections").

In the Objections, Plaintiffs and Receiver argue that "unless Asher and Batashvili represent to the Court their intent to proceed *pro se*, Spencer should remain in place until new counsel formally undertakes this representation."  Dkt. 223 at 7.  Asher and Batashvili will not willingly agree to proceed *pro se*.  Asher Decl. at ¶ 39; Batashvili Decl. at ¶ 17.  Nor would it be advisable for them to do so in a matter with a parallel criminal proceeding that involves extraordinarily complicated legal issues of first impression.  Mr. Spencer cannot be expected to remain counsel of record for what may be years without payment when he is closing his practice, and new substitute counsel is not going to undertake representation absent some means of payment.

Plaintiffs and Receiver make other arguments in the Objections, arguments with which Individuals agree.  For example, Plaintiffs and Receiver argue that counsel is necessary to ensure

that the case proceeds efficiently.  Dkt. 223 at 7.  Individuals agree.  Plaintiffs' Objection also complains that Asher has not produced items which he allegedly agreed to provide during the deposition that his counsel of record would not attend.  *Id.* at 8.  Plaintiffs argue that to allow counsel to withdraw while such issues are pending would interrupt the adjudication of the case "to the detriment of the Plaintiffs and the Court."  *Id.*  Individuals *agree* that they require counsel to facilitate the exchange of information, and they seek this Court's assistance to retain such counsel.

### G.   Individuals are the Target of a Long-Term Parallel Criminal Investigation

Asher and Batashvili are the targets of a criminal investigation that is tied directly to the matters at issue in this case.  The raid at Defendants' offices that occurred at the outset of this matter was executed under a search warrant.  When the CFTC was approached concerning its position on a carve-out for attorneys' fees, it confirmed that there was an ongoing parallel criminal investigation concerning the fraud at issue in this matter.  The Receiver has also confirmed his knowledge of an active ongoing criminal investigation.  While the Department of Justice refused to engage in substantive communications, an Assistant United States Attorney confirmed being assigned to the Individuals' matter and did not deny the existence of the investigation.

### III.   LEGAL ARGUMENT

A district court may, in its discretion, modify a preliminary injunction to release frozen assets if persuaded that the modification has "benefits for the parties and the public interest."  *See CFTC v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015).  "Just as this Court has the authority to freeze assets in a civil enforcement action, it also has the discretion to unfreeze those assets when equity requires."  *FTC. v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *2 (E.D. Tex. Aug. 8, 2016); *see also SEC v. Duclaud Gonzalez de Castilla,* 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001) ("[T]his Court has authority to freeze personal assets temporarily and the corollary authority to release frozen personal assets, or lower the amount frozen.").

"When determining the release of frozen assets the Court must consider… (1) the plaintiff's interest in protecting the assets for consumer restitution; and (2) the defendant's interest in having access to the funds." *See Liberty Supply Co.*, 106 WL 4182726 at \*2-3; *see also  SEC v. Dobbins*, No. 3:04-CV-0605-H, 2004 WL 957715, at \*2 (N.D. Tex. Apr. 14, 2004).  Courts also consider the likelihood of success on the merits and whether the assets defendants seek are "untainted."  *See SEC v. Lee*, No. 14-CV-347-LAB-BGS, 2019 WL 4934181, at \*6 (S.D. Cal. Oct. 7, 2019).

Applying these standards in the context of attorneys' fees, courts frequently authorize the release of frozen assets to enable defendants to retain the counsel of their choice.  *See*, *e.g.*, *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987) ("[T]he district court should modify its order so as to allow each defendant's reasonable request for a release of assets that are necessary to pay attorneys"); *FTC v. Next-gen, Inc.*, No. 4:18-CV-00128-DGK, 2018 WL 8754140, at \*2 (W.D. Mo. Aug. 3, 2018) (modifying asset freeze for reasonable attorney fees); *FTC v. Consumer Def., LLC*, No. 2:18-CV-30 JCM (PAL), 2018 WL 2972927, at \*4 (D. Nev. May 4, 2018) (authorizing release of frozen funds for attorney fees);  *SEC v. Cope*, No. 14CV7575 (DLC), 2016 WL 7429445, at \*2 (S.D.N.Y. Dec. 23, 2016) (modifying asset freeze to release funds for attorney fees);  *CFTC v. Dinar Corp*., No. 1:15-CV-538-WKW, 2016 WL 814893, at \*6 (M.D. Ala. Feb. 29, 2016) (modifying preliminary injunction to allow for requested attorneys' fees in light of equitable considerations);  *FTC v. U.S. Mortg. Funding, Inc.*, No. 11-CV-80155, 2011 WL 2293377, at \*2 (S.D. Fla. June 9, 2011) (modifying asset freeze for reasonable attorney fees); *SEC v. Gryphon Holdings, Inc.*, No. 10CV1742JBWJO, 2010 WL 11623063, at \*2 (E.D.N.Y. June 28, 2010) (modifying asset freeze to release additional funds for attorney fees); *SEC v. Petters*, No. 09-1750 ADM/JSM, 2009 WL 3379954, at \*2 (D. Minn. Oct. 20, 2009) (releasing frozen funds for living expenses and reasonable attorney fees);  *SEC v.*

14

*Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001) (modifying asset freeze for reasonable attorney fees);  *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d at 430 ("[I]t is appropriate to modify the freeze… to permit the payment of legal fees and disbursements");  *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992).

Here, no wrongdoing has been proven, and equity weighs in favor of unfreezing the untainted assets for attorneys' fees because (1) Individuals are entitled to counsel, particularly in light of a parallel criminal investigation; (2) Plaintiffs do not have a high likelihood of success on the merits, and (3) the requested assets are unconnected to the alleged fraud in this action.  Further, the Court and the public will benefit from Individuals having experienced counsel to assist in ensuring that the CFTC operates within its statutory jurisdiction and the case proceeds efficiently.

## A.    Asher and Batashvili are Entitled to Counsel of Their Choice

A civil litigant has a constitutional right to counsel of choice.  *See Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980), *cert. denied*, 449 U.S. 820 (1980) ("Our analysis of the fifth amendment to the United States Constitution establishes that a civil litigant has a constitutional right to retain hired counsel.");  *see also In re Bell South Corp.*, 334 F.3d 941, 955, 961 (11th Cir. 2003) ("a party is presumptively entitled to the counsel of his choice") (citations omitted).  As the Fifth Circuit has explained, this right to counsel in civil actions derives from the Due Process Clause of the Fifth Amendment and is analogous to the Sixth Amendment right to counsel in criminal cases:

> [T]he Supreme Court has indicated in its criminal decisions that the right to retain counsel in civil litigation is implicit in the concept of fifth amendment due process…. The right develops out of the principle that notice and hearing are preliminary steps essential to the passing of an enforceable judgment and that they constitute basic elements of the constitutional requirement of due process of law.
> * * * *
> [As with the Sixth Amendment right to counsel in criminal cases], the litigant [in a civil action] usually lacks the skill and knowledge to adequately prepare his

15

case, and he requires the guiding hand of counsel at every step in the proceedings against him…. In each instance, the right to counsel is one of constitutional dimensions and should thus be freely exercised without impingement.

*Potashnick*, 609 F.2d 1101 at 1117-18 (citations omitted).

In *Federal Savings & Loan Insurance Corp. v. Dixon*, the Fifth Circuit cautioned that "the court cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend themselves," and concluded that "some kind of an allowance must be made to permit each defendant to pay reasonable attorneys' fees if he is able to show that he cannot pay them" from unrestrained assets. 835 F.2d at 565. The court's concern was premised on the fundamental notions of fair play that undergird our adversarial system—"[t]he basis of our adversary system is threatened when one party gains control of the other party's defense as appears to have happened here." *Id.* Similarly, the court in *SEC v. Gryphon Holdings, Inc.* modified an asset freeze to provide for attorneys' fees because "the defendants' right to due-process weighs heavily against the kind of unrestricted deprivation of property that would render them unable to mount a defense and make [the defendant] a ward of the state." 2010 WL11623063, at *2; *see also SEC v. Dowdell* 175 F. Supp. 2d. at 856 ("The court does not believe that it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel."); *FTC v. Consumer Def., LLC*, 2018 WL 2972927, at *4 ("The lack of availability of other funds and the fact that the [defendants] have not yet been found liable . . . are considerations courts have evaluated when determining whether to release funds for attorney's fees.").

In addition to the rights secured by the Fifth Amendment, the existence of an ongoing criminal investigation implicates Individuals' Sixth Amendment right to counsel of their choice. The Supreme Court has recognized a Sixth Amendment right to use untainted funds for the retention of counsel in a criminal case. *Luis v. U.S.*, 136 S. Ct. 1083, 1093 (2016) ("[I]n our view,

16

insofar as innocent (*i.e.*, untainted) funds are needed to obtain counsel of choice, we believe that the Sixth Amendment prohibits the court order that the Government seeks."). Courts have also concluded that defendants are entitled to the use of funds subject to an injunction in a civil case to pay attorneys' fees in a parallel criminal proceeding. *See, e.g.*, *CFTC v. Walsh*, 2010 WL 882875 (S.D.N.Y. Mar, 9, 2010) ("The Government has failed to cite any case law which stands for the proposition that a defendant is not entitled to use untainted funds, frozen in a civil action, in order to pay legal fees for his counsel of choice in a parallel criminal action."). Allowing the government to use a civil enforcement action to freeze defendant's assets, tainted or not, would violate his Sixth Amendment right to counsel of his choice. *See generally U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 147048 (2006) ("The right to select counsel of one's choice... has been regarded as the root meaning of the constitutional guarantee [of the Sixth Amendment].")

While Individuals have not yet been indicted, in light of the confirmed criminal investigation and legal jeopardy they are facing, it would offend due process and fundamental fairness to deny them counsel of their choice in this case at this time. The claims in this action are complex and the stakes are high. This is not a case that *pro se* litigants can be expected to defend, particularly with the resources of the CFTC and twenty-nine state governments aligned against them. Indeed, according to a press release by the CFTC: "This enforcement action is the largest joint filing in CFTC history with state regulators...." CFTC Release Number 8254-20 (September 25, 2020) [https://www.cftc.gov/PressRoom/PressReleases/8254-20].

The evidence discovered in this case, including the deposition and trial testimony of Individuals, would be directly relevant to any potential criminal action in the future such that Individuals would be prejudiced severely (even criminally so) without "the guiding hand of counsel at every step in the proceedings against [them]." *Potashnick*, 609 F.2d at 1118. In short,

without effective representation, Individuals risk losing not only their livelihoods and assets, but their freedom.

**B.**      **Plaintiffs are Unlikely to Succeed on the Merits.**

In determining whether to release frozen assets for attorneys' fees, courts will consider whether the plaintiff has shown a likelihood of success on the merits. *See SEC v. Lee*, No. 14-CV-347, 2019 WL 4934181, at *6 (S.D. Cal. Oct. 7, 2019); *SEC v. Duclaud Gonzalez de Castilla* 170 F. Supp. 2d 427 at 430 (court modified preliminary injunction to release frozen assets for attorneys' fees because "the inference upon which the freeze was granted may not be supported by the necessary quantum of proof").

Here, not only are Plaintiffs unlikely to succeed on the merits, but because of the complexities of the issues present and the precedent-setting effect that any determination concerning the CFTC's jurisdiction will have, it is essential that Individuals have access to sophisticated counsel to present their arguments to the Court.

**1.**      **The CFTC Lacks Jurisdiction Over the Sale of Bullion Coins**

The CFTC pleads violations of the CEA as a basis for the Court's exercise of federal question jurisdiction (Compl. ¶ 16) and more specifically alleges that Individuals violated Section 6(c)(1) of CEA (*id.* at ¶ 14). Section 6(c)(1) prohibits the use, "in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention" of rules promulgated by the CFTC. 7 U.S.C. § 9(1). This case, however, involves neither swaps or futures contracts, nor commodities as that term is defined in the CEA.

In the Complaint, the CFTC fails to adequately plead that the bullion coins at issue are commodities, much less explain why that would be the case. Nor is such an explanation obvious.

18

According to the CEA, a "commodity" includes an enumerated list of agricultural products and a provision for "all other goods and articles… and all services rights and interests... in which contracts for future delivery are presently or in the future dealt in"—*i.e.*, futures markets.  7 U.S.C. § 1a(9).   The CFTC, however, does not allege that Defendants were selling metals futures contracts, nor could it when the coins were sold on a retail basis and delivered to the customers within twenty-eight days.  The CFTC also does not allege that the coins sold by Defendants exist in a category of goods in which a futures market exists.[6]  Accordingly, the CFTC cannot exercise jurisdiction here.[7]

### 2.   The CFTC Lacks Jurisdiction Over the Non-Leveraged, Retail Sale of Commodities

Even if the bullion coins could be construed as commodities, the CFTC lacks jurisdiction over the non-leveraged, retail sale of commodities.   Section 6(c)(1) of the CEA is entitled "Prohibition Against Manipulation."   7 U.S.C. § 9(1).   This provision was added to the Commodities Exchange Act in 2010 as part of the Dodd-Frank Act, Pub. L. No. 111-203, § 753. The purpose of the amendment, according to its sponsor, is to "strengthen[] the [CFTC]'s authority *to go after manipulation and attempted manipulation in the swaps and commodities markets*.  It makes it unlawful to manipulate or attempt to manipulate the price of a swap or commodity using any manipulative device or contrivance."   156 Cong. Rec. S3348 (emphasis added).

In passing Dodd-Frank, Congress also extended the reach of the CFTC to a small subset of retail transactions—contracts involving commodities "on a leveraged or margined basis, or

---

[6] The CEA requires the existence of futures trading with a certain class (e.g., 'natural gas') in order for all items within that class (e.g., 'West Coast' natural gas) to be considered commodities.  *See CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (finding that the CFTC had jurisdiction to regulate bitcoin because bitcoins existed in a class of goods with futures trading—virtual currency).  The coins sold by metals.com and Barrick do not fall within a class for which there is a futures market.

[7] The Complaint's allegations concern bullion coins.  To the extent that the CFTC's allegations involve the sale of precious metals that would fall within the definition of commodity, its case should be limited to those sales alone.

financed by the" seller.  7 U.S.C. § 2(c)(2)(D)(i)(II).  This specific amendment was intended to regulate transactions that operated like futures and, thus, excluded contracts involving actual delivery within twenty-eight days, 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).  In prepared testimony preceding the passage of this amendment, the then-president and CEO of the National Futures Association stated, "[i]f there is actual delivery of the contract, we don't want to deal with it.  We don't want to interfere with the spot market."  Hearing to Review Implications of the CFTC v. Zelener Case: Hearing Before the Subcomm. on General Farm Commodities & Risk Mgmt. of the H. Comm. on Agric., 111th Cong. 9 (June 4, 2009) (Daniel Roth).

In light of this legislative history, it does not appear that Congress intended to confer, via a prohibition on market manipulation, expansive power to regulate *any* retail sale of *any* commodity.  Indeed, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  The authority claimed by the CFTC would grant it the power to regulate matters traditionally reserved for the states, arguably including even a customer's purchase of a single potato in a grocery store.

Indeed, even the CFTC has indicated that Section 6(a)(1) of the CEA does not grant the Commission limitless authority to regulate retail commercial transactions.  The CFTC adopted final rules for Sections 6(c)(1) and 6(c)(3) of the CEA on July 14, 2011.  *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 FR 41398-01.  In the notice-and-comment rulemaking process, the CFTC specifically stated that the comments expressing concern that the rules would "apply to virtually every commercial transaction in the economy" were "misplaced."  *Id.* at *41,401.  The CFTC proceeded to explain that it would exercise its authority under Section 6(c)(1) in a more

limited manner that "respects the jurisdiction that Congress conferred upon the Commission." *Id.* at *41,401.  For example, the CFTC explained that it would "exercise its authority… under Section 6(c)(1)" "if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities." *Id.* at *41,401, n.37.

Here, the CFTC is not exercising its authority under Section 6(c)(1) to prevent speculation on commodity prices.  Nor is the CFTC exercising its authority in a manner that "respects the jurisdiction that Congress conferred upon the Commission."  Instead, the CFTC is attempting to exercise its authority under Section 6(c)(1) to rectify individual instances of alleged fraud in retail commercial transactions, without making *any* allegations that the alleged fraud is connected to a derivatives or quasi-derivatives market or that Defendants manipulated the market prices of commodities generally.  This litigation position conflicts directly with the CFTC's prior written interpretation of Section 6(c)(1).  *See CFTC v. Am. Precious Metals, LLC*, 845 F. Supp. 2d 1279, 1286–87 (S.D. Fla. 2011) (finding that the CFTC did not have the authority to regulate non-leveraged precious metal sales under Section 17 of the CEA and noting that the CFTC's conflicting interpretations of its own regulation were not entitled to deference).

Neither the Supreme Court nor the Fifth Circuit has yet determined if Section 6(c)(1) grants the CFTC power to regulate non-leveraged retail commodities.  This issue was recently presented to the Ninth Circuit in *CFTC v. Monex Credit Co.*, 931 F.3d 966, 977 (9th Cir. 2019), but the Ninth Circuit was careful to expressly limit its holding to "stand-alone fraud claims in the sale of leveraged commodities."  *See also* Brief of the CFTC, *Monex Deposit Company, et al.*, *Petitioners v. CFTC*, 2020 WL 2749086 (U.S.), at *19 ("[T]he court of appeals did not have before it a claim of fraud in connection with a non-leveraged commodity transaction.").

Accordingly, even if the coins sold by Defendants are commodities (which they are not), this Court would be faced with a matter of first impression in this Circuit as to whether the CFTC has authority to regulate these non-leveraged retail sales. The answer to that question will have expansive effects, not just on Defendants but on the public at large.

3.      **Aside from the CFTC's lack of jurisdiction, Plaintiffs are unlikely to succeed on the merits.**

Even if the CFTC has jurisdiction, Plaintiffs are still unlikely to succeed on the merits. The fraud allegations lack merit because they rely on a central and fundamentally flawed premise: namely, that Defendants defrauded investors by selling bullion coins above spot value.

In order to establish fraud under Section 6(c)(1) of the CEA, Plaintiffs must show: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. S. Tr. Metals, Inc.,* 894 F.3d 1313, 1325 (11th Cir. 2018). Claims of fraud require additional specificity, including the "who, what, when, where, and how." *CFTC v. Monex Credit Co.*, 931 F.3d at 972. Plaintiffs' case relies on the central allegation that Defendants "did not disclose the actual value" of the coins to investors. Compl. at ¶ 8. Defendants, however, disclosed in their customer agreements that the prices of the coins they sold did not necessarily reflect the spot value of the underlying precious metals. Exs. A and B at ¶ §3(a). Further, the "actual value" of the coins is determined by the market.

Moreover, it is the normal practice to sell bullion coins at above the spot price for precious metals. This practice is employed by retail coin dealers and official government mints. Each coin is valued based its unique properties and availability, coupled with the mint, design, wholesale, and retail costs associated with each transaction. Plaintiffs' bare and conclusory allegation that the coins sold by Defendants were not "numismatic or semi-numismatic" (Compl. at  ¶ 10) are insufficient to show that they are likely to succeed in proving that the coins lacked qualities

22

sufficient to sell at premium prices.  Indeed, it appears that Plaintiffs' only basis for this allegation is their unremarkable claim that the Polar Bear Bullion Coins "are readily available to the public" and "there are over 6 million units of Polar Bear Bullion in circulation."  Compl. at ¶ 80.  The United States Mint, however, sells tens of millions of American Eagle coins *each year* at premiums well-above spot price. [8]  For example, the 1 ounce silver American Eagle coins are sold for a price that is significantly above the spot value of silver (approximately 266% above spot).  *See* Ex. H. Accordingly, Plaintiffs have not adequately alleged that Defendants made a misrepresentation, misleading statement, or deceptive omission in connection with the sale of their coins by selling bullion coins above spot value.

Similarly, Plaintiffs have not adequately demonstrated scienter by showing that Defendants "intended to defraud, manipulate, or deceive, or [that the] defendant's conduct represents an extreme departure from the standards of ordinary care." *CFTC v. Total Call Grp., Inc.*, No. 4:10-CV-00513-RAS, 2012 WL 1642196, at *8 (E.D. Tex. Mar. 30, 2012) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)).

Finally, even if the corporate defendants in this case are liable for misconduct, Plaintiffs are unlikely to succeed on the merits of extending this liability to Individuals.  The CEA states: "Any person who, directly or indirectly, controls any person who has violated any provision of this chapter… may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of

---

[8] *2020 American Eagle (Sales totals by Month)*, United States Mint, https://www.usmint.gov/about/production-sales-figures/bullion-sales?program=American+Eagle&+AmericatheBeautifulSilverBullion5ozCointype=&+AmericanBuffalotype=&+AmericanEagletype=Sales+totals+by+Month&AmericatheBeautifulSilverBullion5ozCoinSalestotalsbyMonthyear=&AmericatheBeautifulSilverBullion5ozCoinYear-datedcoinssoldyear=&AmericanBuffaloSalestotalsbyMonthyear=&AmericanBuffaloYear-datedcoinssoldyear=&AmericanEagleSalestotalsbyMonthyear=1067&AmericanEagleYear-datedcoinssoldyear= (accessed March 30, 2021).

proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."  7 U.S.C. § 13c.  Plaintiffs allege that Individuals controlled the corporate defendants, but they have failed to adequately plead that Individuals did not act in "good faith" or "knowingly induced" the illegal conduct of the corporate defendants.  Under the Federal Civil Rules of Procedure, a plaintiff cannot categorize individual members in "various 'groups'" and then make "reference[s] only to the activities of the 'groups,' [and] not to the activities of the individual defendants."  *See Minpeco, S.A. v. ContiCommodity Servs., Inc.,* 552 F. Supp. 332, 338 (S.D.N.Y. 1982).  Accordingly, Plaintiffs are unlikely to prevail on the merits of establishing liability against Individuals.

## C.  <u>The requested assets are unconnected to the alleged fraud.</u>

The equities do not mandate the freezing of existing and future untainted assets where an underlying violation of law has not been proven.  Further, a preliminary injunction—which is an equitable remedy—should not be used to freeze assets unconnected to other equitable remedies such as restitution and rescission without a finding of wrongdoing.  *See Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987).  Accordingly, district courts should unfreeze assets that are demonstrably not the product of the defendant's alleged fraud.  *See id.* (holding that the district court's preliminary injunction should be modified to unfreeze assets that were not "ill-gotten"); *SEC v. Bremont,* 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (holding that assets unrelated to the investigation could not be frozen);  *SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53, 57 (2d Cir. 2016) (noting that the SEC has the burden of demonstrating that assets are ill-gotten in order to maintain an asset freeze).  This is particularly the case where, as here, the assets are being requested to retain counsel in a matter with parallel criminal investigation.

Notably, because Individuals consented to the initial preliminary injunction, Plaintiffs have never made a proper showing that *all* of the Individuals' assets are connected to illegal activity. In a similar matter where the defendants had consented to an initial preliminary injunction, the court found that "[b]ecause there has been no finding that Plaintiff made a 'proper showing' of a Commodities Exchange Act violation or that the frozen funds are related to such a violation, the court will not assume that, at this point, Defendants carry the burden of demonstrating that the funds they seek to access are untainted funds." *See CFTC v. Dinar Corp*, 2016 WL 814893, at *4. Accordingly, the court held: "In light of all relevant equitable considerations, the preliminary injunction will [be] modified to allow for the requested attorney's fees." *Id.* at *6.

Here, Individuals are requesting to use future earnings from work outside of the commodities industry for the purpose of retaining counsel, such that there can be no question that the requested assets are unconnected to the alleged misconduct.  If provided access to their seized records, Individuals will also identify additional specific assets that are not connected to allegations of wrongdoing for unfreezing.

## IV.   CONCLUSION

For the foregoing reasons, Individuals request that this Court modify the Preliminary Injunction to allow Individuals the use of untainted assets to pay for attorneys' fees.

Dated: March 30, 2021                    Respectfully submitted,


                                         By: */s/ Gene R. Besen*
                                         Gene R. Besen
                                         Texas Bar No. 24045491
                                         gbesen@bradley.com
                                         Lane M. Webster
                                         Texas Bar No.24089042
                                         lwebster@bradley.com

                                         Bradley Arant Boult Cummings LLP
                                         1201 Elm Street, Suite 4400
                                         Dallas, Texas 75270
                                         Telephone (214) 939-8700
                                         Facsimile (214) 939-8787


                                         By: */s/ Elizabeth M. Devaney*
                                         QUINN EMANUEL URQUHART & SULLIVAN,
                                         LLP
                                         Elizabeth M. Devaney
                                         Texas Bar No. 24040100
                                         Pennzoil Place, 711 Louisiana Street, Suite 500
                                         Houston, Texas 77002
                                         Telephone: (713) 221-7000
                                         Facsimile: (713) 221-7100
                                         lizdevaney@quinnemanuel.com

                                         Alex Spiro (pro hac vice forthcoming)
                                         Elinor C. Sutton (pro hac vice forthcoming)
                                         51 Madison Ave., 22nd Floor
                                         New York, New York 10010
                                         Telephone: (212) 849-7000
                                         Facsimile: (212) 849-7100
                                         alexspiro@quinnemanuel.com
                                         elinorsutton@quinnemanuel.com

                                         ATTORNEYS FOR LUCAS ASHER
                                         AND SIMON BATASHVILI

## CERTIFICATE OF CONFERENCE

I certify that Quinn Emanuel conferred with counsel for the CFTC on March 18, 2021, regarding the relief sought in this Motion, and they stated that the CFTC is opposed.  I have also conferred with the Receiver, Kelly Crawford, on March 25, 2021, and he is opposed to the relief sought herein.

*/s/ Gene R. Besen*
Gene R. Besen

## CERTIFICATE OF SERVICE

I certify that all counsel of record who have consented to electronic service were served with a true and correct copy of the foregoing document via the Court's CM/ECF system on this 30th day of March, 2021.

*/s/ Gene R. Besen*
Gene R. Besen