**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI,<br><br>Defendants,<br><br>TOWER EQUITY, LLC,<br><br>Relief Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br>3:20-CV-2910-L |

**RECEIVER'S RESPONSE  TO NOTICE OF  LIMITED APPEARANCE [Dkt.231]**
**AND EMERGENCY MOTION**
**TO MODIFY PRELIMINARY INJUNCTION [Dkt.232]**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   DEFENDANTS' COUNSEL'S "LIMITED APPEARANCE" AND EMERGENCY
      MOTION TO MODIFY SHOULD BE STRICKEN .................................................. 3

III.  STATEMENT OF RELEVANT FACTS ................................................................ 5

IV.   RESPONSIVE LEGAL ARGUMENT .................................................................. 11

   A.  Asher and Batashvili Waived any Right to Seek Modification of the Preliminary
       Injunction Order. ...................................................................................... 11

   B.  The Defendants Have Unclean Hands and There is No Equitable Basis to Modify the
       Preliminary Injunction. ............................................................................. 13

      (1)   Modification of Consent Order Is Not in Best Interest of the Receivership Estate ... 13

      (2)   Release of Frozen Funds Typically Denied Where Frozen Funds are Insufficient for
            Potential Disgorgement Order ............................................................. 15

      (3)   Defendants Cannot Identify Untainted Assets ......................................... 18

   C.  Asher and Batashvili are not Entitled to Counsel Under the Constitution ............... 19

      (1)   No Sixth Amendment Right to Counsel ................................................. 19

      (2)   No Fifth Amendment Right to Counsel .................................................. 21

   D.  Defendants' Authority is Inapplicable or Distinguishable from this Case ............... 22

V.    CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**.................................................................................................................**Page(s)**

*Commodity Futures Trading Comm'n v. Morse*,
   762 F.2d 60 (8th Cir. 1985) ........................................................................19

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
   835 F.2d 554 (5th Cir. 1987) ..............................................................22, 23

*Folta v. Winkle*,
   No. CV-14-01562-PHX-PGR (ESW), 2016 WL 4087103 (D. Ariz.
   July 28, 2016)............................................................................................4

*FTC v. Triangle Media Corp.*,
   No. 18CV1388-MMA (NLS), 2018 WL 4051701 (S.D. Cal. Aug. 24, 2018),
   *aff'd sub nom. FTC v. Hardwire Interactive, Inc.*, 765 F. App'x 184 (9th Cir.
   2019) ......................................................................................................14

*FTC v. World Patent Mktg., Inc.*,
   No. 17-CV-20848, 2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) .........................13

*Estate of Hirshberg*,
   101 F.3d 109 (2d Cir. 1996)........................................................................19

*In re Krause*,
   349 B.R. 272 (D. Kan. 2006).......................................................................15

*Potashnick v, Port City Const. Co.*,
   609 F.2d 1101 (5th Cir. 1980) ...............................................................21, 22

*S.E.C. v. Current Fin. Services*,
   62 F. Supp. 2d 66 (D.D.C. 1999)..................................................................19

*S.E.C. v. FTC Capital Markets, Inc.*,
   09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010)............16

*Sec. & Exch. Comm'n v. Bremont*,
   954 F. Supp. 726 (S.D.K.Y. 1997) ...............................................................23

*Sec. & Exch. Comm'n v. Dobbins*,
   No. 3:04-CV-0605-H, 2004 WL 957715 (N.D. Tex. April 14, 2004)........12, 14, 20

*Sec. & Exch. Comm'n v. ETS Payphones, Inc.*,
   408 F.3d 727 (11th Cir. 2005) .....................................................................13

*Sec. & Exch. Comm'n v. Grossman*,
   887 F. Supp. 649 (S.D.N.Y. 1995), *aff'd*, 173 F.3d 846 (2d Cir. 1999)............15, 19

*Sec. & Exch. Comm'n v. I-Cubed Domains, LLC*,
   664 F. App'x 53 (2d Cir. 2016) ..........................................................................................23

*Sec. & Exch. Comm'n v. Lauer*,
   445 F. Supp. 2d 1362 (S.D. Fla. 2006) ....................................................................11, 13, 16

*Sec. & Exch. Comm'n v. Lee*,
   14-CV-347-LAB-BGS, 2019 WL 4934181 (S.D. Cal. Oct. 7, 2019) ......................14, 17, 19

*Sec. & Exch. Comm'n v. Petters*,
   No. 09-1750 ADM/JSM, 2010 WL 11561260 (D. Minn. Jan. 25, 2010)...............................15

*Sec. & Exch. Comm'n v. Private Equity Mgmt. Grp., Inc.*,
   No. CV 09-2901 PSG, 2009 WL 2058247 (C.D. Cal. July 9, 2009)......................................15

*Sec. & Exch. Comm'n v. PTG Cap. Partners Ltd.*,
   No. 15-CV-4290 (LAK), 2015 WL 13882367 (S.D.N.Y. July 23, 2015) ....................4, 5, 6, 7

*Sec. & Exch. Comm'n v. Stanford Int'l Bank*,
   309-CV-298-N [Dkt. 544 at p. 1] (N.D. Tex. July 1, 2009) ...................................................18

*Sec. & Exch. Comm'n v. Forte*,
   598 F. Supp. 2d 689 (E.D. Pa. 2009) ......................................................................13, 14, 19

*Sec. & Exch. Comm'n v. Santillo*,
   No. 18-CV-5491 (JGK), 2018 WL 3392881 (S.D.N.Y. July 11, 2018)..........................16, 20

*Sec. & Exch. Comm'n v. Quinn*,
   997 F.2d 287 (7th Cir. 1993) .........................................................................................16, 18, 23

*TFFI Corp. v. Williams*,
   No. 8:13-CV-01809-AW, 2013 WL 6062385 (D. Md. Nov. 15, 2013) ...................................4

*U.S. v. Medunjanin*,
   752 F.3d 576 (2d Cir. 2014)...................................................................................................20

*Urciolo v. Urciolo*,
   449 A.2d 287 (D.C. 1982), *overruled on other grounds by In re Estate of
   Chuong,* 623 A.2d 1154 (D.C. 1993)..................................................................................4, 5

*In the Matter of Wynn*,
   889 F.2d 644 (5th Cir. 1989) ..............................................................................................21, 22

COMES NOW, Kelly Crawford, as the court-appointed receiver ("Receiver"), and files his Response to Notice of Limited Appearance [Dkt. 231] and Emergency Motion to Modify Preliminary Injunction [Dkt. 232] ("Receiver's Response"), respectfully showing the Court as follows.

## I.

## INTRODUCTION

On March 30, 2021, Gene R. Besen ("Besen") of the law firm of Bradley Arant Boult Cummings LLP ("Bradley Arant"), and Elizabeth M. Devaney ("Devaney"), Alex Spiro ("Spiro") and Elinor C. Sutton ("Sutton") of the New York based law firm of Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel"), as "Attorneys for Lucas Asher and Simon Batashvili" filed a *Notice of Limited Appearance* ("Limited Appearance") [Dkt. 231] and *Emergency Motion to Modify Preliminary Injunction* ("Emergency Motion") [Dkt. 232]. In filing the Limited Appearance and Emergency Motion, Besen, Spiro, Sutton, Bradley Arant and Quinn Emanuel (individually and/or collectively, as the case may be, the "Proposed New Counsel"), seek, ostensibly on behalf of Defendants Lucas Asher ("Asher") and Simon Batashvili ("Batashvili") (Asher and/or Batashvili, individually and/or collectively, as the case may be, the "Individual Defendants" or "Defendants Asher and Batashvili") the "modification of the agreed injunction to allow (the Defendants) access to their existing or future untainted assets for the purpose of paying attorney's fees in this matter." *See* Emergency Motion, p.4. The "agreed injunction" Proposed New Counsel seeks to modify, however, is none other than the *Consent Order of Preliminary Injunction and Other Equitable Relief Against Defendants Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher and Simon Batashvili* (the "Consent Order") [Dkt. 165] entered in

this case on October 14, 2020.  Indeed, this Consent Order was negotiated and agreed to by current counsel for the Individual Defendants as well as the Individual Defendants.

There are five (5) well-established meritorious reasons for the Court to deny the relief sought by the Defendants and Proposed New Counsel.

First, the Limited Appearance, and thus the Emergency Motion, should be summarily dismissed because Proposed New Counsel failed to seek, much less obtain, leave of court to enter a limited appearance and file the Emergency Motion on behalf of the Individual Defendants.

Second, the Court should not modify a Consent Order—entered by the Court more than six months ago—that was expressly agreed to by the Individual Defendants *while they were represented* by their attorney of choice, thus waiving any alleged right to modify the Consent Order.

Third, the Court should decline to modify the Consent Order because the Defendants Asher and Batashvili have unclean hands.  It is fundamental in a receivership governed by equity that a defendant seeking to modify the scope or terms of a freeze order must have clean hands. The Defendants Asher and Batashvili, however, come before this Court with hands that are not only unclean, but filthy.  Specifically, the Individual Defendants brazenly violated this Court's Orders; intentionally lied under oath in their asset depositions; and continue to arrogantly refuse to provide information to the Receiver they promised to provide or are required to provide. There is simply no basis for the Court to accept the Individual Defendants' word they can identify "untainted assets" or will earn "untainted assets" to pay Proposed New Counsel. Moreover, modifying the Consent Order is not in the best interest of the receivership because the

assets recovered by the Receiver to date fall woefully short of the investor losses caused by the Individual Defendants.

Fourth, despite their claims to the contrary, there is no entitlement to counsel under the Sixth or Fifth Amendment rendering Proposed New Counsel's arguments to the contrary at best, red-herring arguments or at worse, disingenuous.

Finally, the caselaw cited by Proposed New Counsel in the Emergency Motion, when scrutinized carefully, fails to support the Individual Defendants' entitlement to the relief sought in the Emergency Motion.

The Individual Defendants' precious metals operation duped more than 1,600 investors, primarily retirement-aged and elderly, out of close to $185 million and left hundreds of families living a nightmare. Defendants should not be rewarded by being allowed to modify the Consent Order previously agreed to by the Individual Defendants while they were represented by counsel. Given Individual Defendants' well documented proclivities to disregard Court orders and abuse authority, if the relief sought in the Emergency Motion is granted, it will only serve to facilitate the Individual Defendants real goal of funding their defense while victimizing others.

## II.

### DEFENDANTS' COUNSEL'S "LIMITED APPEARANCE" AND EMERGENCY MOTION TO MODIFY SHOULD BE STRICKEN

On March 30, 2021, Proposed New Counsel presumptively entered their "limited appearance" as attorneys of record for Defendants Asher and Batashvili without first seeking leave of court. These attorneys seek to limit the scope of representing the Individual Defendants to challenging the freezing of some or all of the Defendants' (as defined herein) assets for the purposes of retaining counsel.

The Federal Rules of Civil Procedure, however, do not expressly authorize an attorney's limited appearance in a federal action. *Folta v. Winkle*, No. CV-14-01562-PHX-PGR (ESW), 2016 WL 4087103, at *1 (D. Ariz. July 28, 2016). While the Local Rules of Civil Procedure in some districts expressly authorize limited scope appearances, the Local Rules of Civil Procedure in the Northern District of Texas are silent as to such appearances. Proposed New Counsel's Limited Appearance Notice, which cites to no rule or authority for its "limited appearance", has no basis in the Federal Rules of Civil Procedure or the Local Rules and as such should be stricken.

The decision of whether to allow counsel to enter a limited appearance on behalf of a litigant is within the trial court's sound discretion. *See TFFI Corp. v. Williams*, No. 8:13-CV-01809-AW, 2013 WL 6062385, at *3 (D. Md. Nov. 15, 2013); *see also*, *Sec. & Exch. Comm'n v. PTG Cap. Partners Ltd.*, No. 15-CV-4290 (LAK), 2015 WL 13882367, at *1 (S.D.N.Y. July 23, 2015) (the Court, in the exercise of discretion, declined to permit representation of defendants in a limited capacity). "[T]he trial court has the discretionary authority to permit counsel, retained by a pro se litigant, to appear in a short-lived capacity and for a particular purpose..." *Urciolo v. Urciolo,* 449 A.2d 287, 290 (D.C. 1982), *overruled on other grounds by In re Estate of Chuong,* 623 A.2d 1154 (D.C. 1993). Therefore, the Court has discretion whether or not to allow Proposed New Counsel to enter a "limited appearance" as attorneys for the Individual Defendants.

By filing its Limited Appearance, without first seeking leave of this Court, Proposed New Counsel ignored the Court's discretionary authority. Indeed, Proposed New Counsel limited the scope of their appearance as *they* saw fit, without regard for the Court. Accordingly, the Limited

Appearance is procedurally deficient and should be stricken along with the contemporaneously filed Emergency Motion to Modify.

### III.

### STATEMENT OF RELEVANT FACTS

1.      On September 22, 2020, Plaintiffs filed a thirty-count Complaint that alleges that from at least September 1, 2017, the above styled defendants, including the Individual Defendants (individually and/or collectively, as the case may be, the "Defendants") engaged in a fraudulent scheme to deceive at least 1,600 retirement-aged and elderly persons throughout the United States. [Dkt. 14 at p. 2]. Plaintiffs allege that Defendants caused these elderly persons to invest more than $185 million with the Defendants to purchase gold and silver precious metals. [Id.] Plaintiffs further allege that Defendants sold the metals in question at "grossly inflated fictitious prices by fraudulently not disclosing excessive price markups averaging from 100% to over 200% above the prevailing market price." [Id.]

2.      Crucially, Plaintiffs allege that Defendants "(1) deliberately failed to disclose to investors excessive fraudulent price markups that bore no reasonable relation to the prevailing market price or standard retail pricing in the precious metals industry; (2) were fully aware of their failure to disclose the fraudulent price markups and the devastating impact the markups had on an investors' ability to profit; (3) directed elderly investors to purchase fraudulently priced precious metals bullion by falsely representing to them that the purchase was a safe investment and that there would be no loss of their principal and (4) lied to investors questioning the fraudulent prices by falsely representing that precious metals bullion was semi-numismatic bullion that had a higher value than the prevailing market price." [Id. at p. 4.]. Defendants targeted the Qualified Retirement Savings of elderly persons with little experience in precious

metals by allegedly preying on their inexperience and by making material misrepresentations and omission concerning the value of these metals. [Dkt. 5 at p. 13-14]. Namely, as alleged by Plaintiffs, these metals "were not rare, numismatic, or semi-numismatic metals.... [and] were worth significantly less than the value Defendants misrepresented to investors because they carried no additional premium over the Prevailing Market Price." [Id. at p. 14].

3.     Because Plaintiffs feared that Defendants would hide, transfer, or dissipate assets or destroy or obfuscate records of their actions, Plaintiffs moved the Court to appoint a Temporary Receiver to preserve the status quo and protect these assets and records. [*see generally* Dkt. 15.]

4.     On September 22, 2020, this Court entered an Order Granting Plaintiff's Emergency Ex Parte Motion for Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief (the "SRO") [Dkt. 16]. Pursuant to the SRO, this Court appointed Kelly M. Crawford as Receiver of the assets of the Defendants and Relief Defendant and vested the Receiver with certain authority to recover assets and investigate claims. The SRO was extended by an order entered by the Court on October 5, 2020 [Dkt. 148].

5.     On October 14, 2020, the Court entered the Consent Order.  Defendants Asher and Batashvili were both represented by counsel of their choice when the Consent Order was negotiated.[1] Indeed, as a result of the negotiation, Section IX of the Consent Order entitled "Restricted Business Activities and Employment" was added.  This section of the Consent Order provided a mechanism for Defendants Asher and Batashvili to seek gainful employment under certain circumstances to cover their reasonable and necessary living expenses.[2]

---

[1] The Consent Order includes the signatures of both Defendants, as well as their counsel Arnold Spencer. [Dkt. 165].
[2] *See* App., p.8, ¶11.

Receiver's Response to Notice of Limited Appearance [Dkt. 231] and Emergency Motion to Modify Preliminary Injunction [Dkt. 232]                                                                                          Page 6

6.      Although they agreed to the entry of the Consent Order, Defendants Asher and Batashvili repeatedly violated the Consent Order.

7.      For example, Receiver made demand upon the Individual Defendants to identify entities they owned or controlled but both failed to respond to the Receiver's demand.[3] Accordingly, the Receiver was forced to file an *Emergency Motion for "Show Cause" Hearing to Hold Defendants Asher and Batashvili in Civil Contempt* ("First Contempt Motion") [Dkt. 175]. Soon after the First Contempt Motion was filed, the attorney for Defendants Asher and Batashvili sent the Receiver an email identifying the entities his clients admitted to owning or controlling.  This email later proved to be woefully incomplete as the Receiver's investigation revealed the existence of numerous other entities owned or controlled by Defendants that the Court later determined comprised the Receivership estate. [Dkt. 230]. The Individual Defendants' omission of their control of these entities belies any claim of good-faith cooperation with the Court pursuant to their own Consent Order.

8.      More egregiously, Defendant Asher repeatedly violated key provisions of the SRO despite admitting full knowledge of the Order. Specifically, on September 28, 2020, the Receiver learned Defendant Asher was attempting to sell his Ferrari in violation of the SRO. [Dkt. 195 at p. 4]. That evening, Defendant Asher left a voicemail for the Receiver denying any violation of the SRO and pledging his full compliance with same. [*Id.* at pp. 4-5]. The next day, Defendant Asher again violated the SRO by transferring $550,000 from an account under his control at Bank of America. [*Id.* at p. 5]. Defendant Asher admitted and confessed to this violation of the SRO in the Asher Agreed Contempt Order. [Dkt. 216 at pp. 3-4]. Having found Defendant Asher in violation of the SRO, the Court ordered him to complete the purging of his contempt by providing "full, complete, and accurate testimony" concerning the assets under his

---

[3] *Id.* at p.5, ¶4.

Receiver's Response to Notice of Limited Appearance [Dkt. 231] and Emergency Motion to Modify Preliminary Injunction [Dkt. 232]                                                              Page 7

control. [Dkt. 216 at p. 5].

9.      Defendant Asher failed to comply with the Asher Agreed Contempt Order by failing to provide pertinent information concerning the assets under his control, despite promising to do so at a subsequent asset deposition.  Amongst the information Defendant Asher promised to provide were income derived from Defendant Chase Metals in 2019, telephone numbers used by him over the past three years, bank accounts for Magic Star Arrow, information concerning the investments of Relief Defendant Tower Equity, LLC, and dividends for Relief Defendant Tower Equity.[4] Furthermore, Defendant Asher failed to: consent to the release of his tax returns; turn over to the Receiver monies deposited at Balboa Bank & Trust in Panama; and provide information regarding the ownership of certain entities relevant to the Receivership estate.[5] During the time Defendant Asher made these promises in his deposition to provide information to the Receiver, he was represented by the counsel of his choice.  Despite repeated correspondence from the Receiver to Defendant Asher's counsel urging Asher to comply with the Asher Agreed Contempt Order and the promises made at this deposition, Defendant Asher has not complied.[6]

10.      In addition, during Defendant Asher's asset deposition, the Receiver learned that Defendant Asher set up a Panamanian offshore trust called Prometheus Laboratories.  The Receiver specifically asked Defendant Asher "Have you ever owned any interest in any other offshore entity or offshore trust other than Prometheus Laboratories that we discussed here today?"[7]. Defendant Asher unequivocally testified under oath "No."[8] The Receiver later

---

[4] *See* App., Ex. A, at p.6, ¶7; Exhibit A-1, A-2.
[5] *See* App., Ex. A, at p.5, ¶4.
[6] *See Id.* at p.6, ¶7; Ex. A-1, A-2.
[7] *See* App., Ex. A, at p.7, ¶10; Ex. A-6.
[8] *See Id.*

discovered that Defendant Asher's testimony was flatly false.[9] Asher set up an offshore trust called Kotel International Trust in the Cook Islands for Relief Defendant Tower Equity.[10] Indeed, in setting up the offshore trust, Defendant Asher executed an *Affidavit of Solvency* on behalf of Relief Defendant Tower Equity, LLC wherein Defendant Asher represented that "Tower Equity, LLC is a settlor of the Kotel International Trust, and contemplates making transfers of property thereto in addition to its initial nominal contribution thereto."[11] Moreover, Defendant Asher conducted business under the name of Kotel Int. Ltd. showing an address at P.O. Box 11, ANZ House Avanua, Raratonga Cook Islands, and used an email address for the Kotel trust at Asher@KotelHoldings.com.[12]

11.     Defendant Batashvili likewise failed to provide the Receiver with information he promised to provide in his asset deposition, including, but not limited to, his total compensation for the year 2018, a list of all financial institutions in which he has been a signatory, and contact information for his accountant.[13] Defendant Batashvili was represented by counsel during his deposition when he made the promises to provide the information.

12.     Furthermore, in the course of his deposition and despite repeated questions on the subject, Defendant Batashvili falsely testified he had no interest in any jewelry assets.[14] The Receiver specifically asked "Do you own any interest in any jewelry?" to which Defendant Batashvili responded "Not that I'm aware of."[15] After confronting Defendant Batashvili with information given to the Receiver by Batashvili's wife regarding a watch Batashvili purchased in Europe, Batashvili admitted he purchased a watch in London, but claimed it cost less than $3,000

---

[9] *See* App., Ex. A, at p.7, ¶10; Ex. A-7.
[10] *See Id.*
[11] *See Id.*
[12] *See* App., Ex. A, at p.7, ¶10; Ex. A-9.
[13] *See* App., Ex. A, at p.7, ¶8; Ex. A-3.
[14] *See* App., Ex. A, at p.7, ¶9; *See* generally Ex. 4.
[15] *See* App., Ex. A-4.

and was either in his house or lost.[16]   Defendant Batashvili's testimony could not have been further from the truth.

13.     The Receiver obtained documents revealing Defendant Batashvili's attempt to insure approximately $300,000 worth of jewelry assets six months prior to his deposition. Specifically, Defendant Batashvili sought insurance on two watches he owned, including a Men's Rolex Daytona 116528 – GLDD Champagne Diamon 18k Yellow Gold watch valued at $36,600, and a Men's Rolex Cosmograph Daytona, Oyster, 40mm, Yellow Gold watch valued at $28,500.[17]  Defendant Batashvili violated the Receivership Orders of this Court by failing to turn over the two watches he owns to the Receiver.  Moreover, he intentionally lied at his deposition claiming to have no interest in any jewelry.

14.     Despite their express obligations under the Receivership Orders, the Defendants Asher and Batashvili have not voluntarily turned over any Receivership Assets to the Receiver, other than two cars.[18]

15.     Although Section IX of the Consent Order includes provisions that allow Defendants Asher and Batashvili to seek gainful employment, with certain restrictions, to cover their reasonable and necessary living expenses, to date neither Defendant has notified the Receiver of securing any "New Income", as defined in the Consent Order.[19] Indeed, at his deposition on January 29, 2021, Defendant Asher testified he has not made any attempts to gain employment because of the pandemic, and the disruption in his life.  He testified he does not "have clarity yet on the direction" he wants to go.[20]

---

[16] *See Id.*
[17] *See* App., Ex. A-5.
[18] *See* App., Ex. A, at p.9,  ¶14.
[19] *See* App., Ex. A, at ¶11.
[20] *See* App., Ex. A-10.

16.      Due to the commingling of investor monies from sales of precious metals with Relief Defendant Tower Equity, LLC and other entities owned and controlled by Defendants Asher and Batashvili since 2017, the Receiver is not aware of any assets that are "untainted". Contrary to the assertion by Defendant Batashvili in his Declaration, the college fund for his daughter was funded by the Defendants or entities in receivership.[21]   Moreover, Defendant Asher's investments in pre-IPO technology companies (SpaceX, Pinterest, Robinhood, Adaptive Biotechnologies, Palantir) that Defendant Asher identified in his Declaration were, in reality, made by Relief Defendant Tower Equity, LLC in Forge and/or Equity Zen using tainted monies.[22]

## IV.

## RESPONSIVE LEGAL ARGUMENT

**A.    Asher and Batashvili Waived any Right to Seek Modification of the Preliminary Injunction Order.**

17.      In *Sec. & Exch. Comm'n v. Lauer*, 445 F. Supp. 2d 1362 (S.D. Fla. 2006), the defendant (Lauer) moved to modify the preliminary injunction order to permit access to his frozen funds for legal defense costs.  Lauer had previously agreed to a blanket asset freeze in the case, and the Court found that he therefore waived any argument as to the *amount* and *scope* of the freeze. *See id.,* at 1367. ("… Lauer forgets that he agreed, while represented by counsel, to the blanket asset freeze, not just once, but twice. He has waived any argument that the amount frozen is improper.").  Indeed, citing the Fifth Circuit Court of Appeals, the Court noted that a "consent order is interpreted as a contract" and therefore the Defendant is bound to it.  *See id.* at n. 3 (citing *Robinson v. Vollert,* 602 F.2d 87, 92 (5th Cir. 1979)).  Further, a Northern District of

---

[21] *See* App., Ex. A, at p.9, ¶13; Ex. A-12.
[22] *See* App., Ex. A, at pp.8-9, ¶12; Ex. A-11.

Texas court found that when a defendant consents to a preliminary injunction and is represented by counsel, the defendant waives the right to later modify the preliminary injunction. *See, Sec. & Exch. Comm'n v. Dobbins*, No. 3:04-CV-0605-H, 2004 WL 957715 at *1, 4 (N.D. Tex. April 14, 2004) (the defendant's consent was among the reasons that Judge Sanders denied the defendant's request to modify the preliminary injunction order).

18.     In the instant case, not only did Defendants Asher and Batashvili agree to the terms of the freeze of their assets, but they did so while represented by counsel of their choice, and with full understanding of the consequences.[23] Accordingly, the Defendants waived their right to seek a modification of the Consent Order. Indeed, the Defendants have not identified any change in circumstances since agreeing to the Consent Order that justifies a modification. They were aware at the time of entering into the Consent Order of the claims being alleged against them in the Complaint; that the FBI executed a search warrant of their offices; and that the Consent Order included a freeze of all assets.  Nothing has changed since that time, other than the Defendants' counsel seeking to withdraw.  The Defendants have not produced any evidence indicating they have been indicted, that a criminal case has been filed against them, or that they have been identified as a target by the U.S. Attorney's office.  Moreover, the claims in the Complaint that were filed against them in this case have not changed.  Simply because the Individual Defendants' current counsel seeks to withdraw does not provide a basis for new counsel to re-negotiate the terms of the Consent Order.  Pointing the finger at the Individual Defendants' current counsel, and arguing that he was not effective, also rings hollow.  The Defendants' have not identified any malpractice or misfeasance by current counsel in representing the Individual Defendants' at the time the Consent Order was enacted.  Moreover, even if current counsel failed to provide adequate legal services, the Individual Defendants

---

[23] *See* App., Ex. A, at pp.6-7, ⁋7.

arguably would have a right to pursue, if warranted, a malpractice claim against their current counsel of record, but they do not have a right to undo agreed orders that were entered six months ago.

**B.**   **The Defendants Have Unclean Hands and There is No Equitable Basis to Modify the Preliminary Injunction.**

19.   Equity demands that "he who comes into equity must come with clean hands.  It is a self-imposed ordinance that closes the door ... to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Lauer,* 445 F. Supp. 2d at 1366-67 (quoting *Precision Instrument v. Auto. Maint. Mach.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)).  The Court concluded that "under this cardinal rule of equity, Lauer's unclean hands have closed the door on any attempt by Lauer to seek relief from the Court's equitable asset freeze order, an order to which he agreed." *Id.*  In denying Lauer's request to modify the Preliminary Injunction, the Court found that Lauer "*knowingly, willfully, intentionally and repeatedly violated" multiple Court Orders. He failed to disclose numerous assets and diverted assets from the freeze in violation of the very same order of which he now seeks an equitable modification for his own benefit*." (internal citations omitted) (emphasis added). *Id.* at 1366. Defendants Asher and Batashvili are no different than Lauer in that they seek to modify, for their own benefit, the terms of the Consent Order they have been brazenly violating.

(1)   Modification of Consent Order Is Not in Best Interest of the Receivership Estate

20.   The purpose of an asset freeze is "to preserve the status quo by preventing the dissipation and diversion of assets." *See Sec. and Exch. Comm'n v. Forte*, 598 F. Supp. 2d 689, 692 (E.D. Pa. 2009) (citing *Sec. & Exch. Comm'n v. Infinity Group Co.,* 212 F.3d 180, 197 (3rd Cir. 2000)); *see also Sec. & Exch. Comm'n v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005) (an asset freeze is "justified as a means of preserving funds for the equitable remedy

of disgorgement").

21.    The Court "must assess whether a modification of the Preliminary Injunction is in the best interests of the defrauded investors." *See Dobbins*, 2004 WL 957715 at *2; *see also Forte*, 598 F. Supp. 2d at 692 (before a Court will unfreeze assets, the defendant must "establish that [the] modification is in the interest of the defrauded investors.") (citing *Sec. & Exch. Comm'n v. Grossman,* 887 F. Supp. 649, 661 (S.D.N.Y. 1995) (denying release of funds to pay attorneys' fees and funeral and burial expenses), *aff'd,* 173 F.3d 846 (2d Cir. 1999). Here, Defendants fail to establish that the modification of the preliminary injunction is in the best interest of the defrauded investors. Funding Defendants' defense of the lawsuit is of no interest to the investors, will not help the investors, and in fact, will harm the investors as the pool for recovery will be diminished.

22.    Courts have overwhelmingly found that allowing an amendment to a preliminary injunction would eviscerate the investor protections that the asset freeze was intended to provide. For example, in *Sec. & Exch. Comm'n v. Lee*, 14-CV-347-LAB-BGS, 2019 WL 4934181, at *1 (S.D. Cal. Oct. 7, 2019), the Court found that a request by judgment debtors to unfreeze assets to pay for attorney's fees constituted a dissipation of assets, as those expenditures would deplete the assets available for investor redress. (citing, *e.g.*, *FTC v. World Patent Mktg., Inc.*, No. 17-CV-20848, 2017 WL 3508639, at *17 (S.D. Fla. Aug. 16, 2017) ("even absent an illicit movement of assets", a request to unfreeze assets to pay for legal fees constituted a "dissipation of assets" available for consumer redress); *FTC v. Triangle Media Corp.*, No. 18CV1388-MMA (NLS), 2018 WL 4051701, at *7 (S.D. Cal. Aug. 24, 2018) (where it was unlikely frozen assets would adequately redress consumer injuries, maintenance of the asset freeze was warranted), *aff'd sub nom. FTC v. Hardwire Interactive, Inc.*, 765 F.

App'x 184 (9th Cir. 2019). Any frozen assets must be maintained to compensate the victims of the Defendants' actions. *See, e.g.*, *Sec. & Exch. Comm'n v. Private Equity Mgmt. Grp., Inc.*, No. CV 09-2901 PSG, 2009 WL 2058247, at *2–3 (C.D. Cal. July 9, 2009) (denying defendant's request to utilize frozen assets to pay attorney's fees in light of the "importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another"); *Grossman*, 887 F. Supp. at 661 (defendant "must establish that such a modification [of the asset freeze to pay attorney's fees] is in the interest of the defrauded investors"); *Sec. & Exch. Comm'n v. Petters*, No. 09-1750 ADM/JSM, 2010 WL 11561260, at *2 (D. Minn. Jan. 25, 2010) (denying request for reasonable living expenses when defendant had pleaded guilty to wire fraud because "the frozen assets should be used to compensate defrauded investors, and should not be depleted").

23.     Courts have found the interests of preserving the assets for the victims outweigh funding counsel for the defendant.  A district court in *In re Krause,* 349 B.R. 272, 283 (D. Kan. 2006), in upholding the continued freeze of assets for the victims and thus denying use of frozen assets for debtor's special counsel, acknowledged the following:

> "while there is no doubt that the involvement of competent counsel on all sides will advance the search for the truth in this case, or at least facilitate it, the contemplated arrangement will not benefit the creditors if what little they can hope to recover will be entirely dissipated in [Defendant's] position.  Thus, even if none of these assets turns out to be property of his estate, the Court considers it well within its bounds of permissible choice to deny [Debtor] the use of those funds for his purpose at this time."

(emphasis added).

(2)   Release of Frozen Funds Typically Denied Where Frozen Funds are Insufficient for Potential Disgorgement Order

24.     In this case, pursuant to the claims procedures adopted by this Court[24], the

---

[24] *See* Order Establishing Claims Adjudication Process [Dkt. 227].

Receiver distributed claim confirmation forms to more than 1,600 purchasers of metals from the Defendants.[25]   To date, the Receiver has $8.3 million in the receivership account.[26]   The Plaintiffs allege the Defendants received more than $185 million from investors. There are, without question, insufficient funds in the receivership to fund any disgorgement remedy that might by ordered by the Court.

25.   In *Sec. and Exch. Comm'n v. Santillo,* No. 18-CV-5491 (JGK), 2018 WL 3392881,*4 (S.D.N.Y. July 11, 2018), the Court held that to unfreeze assets to pay for attorneys' fees in any civil action, including an SEC civil enforcement action, "the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established." (*See id.*, quoting *Sec. & Exch. Comm'n v. Stein*, No. 07-cv-3125, 2009 WL 1181061, *1 (S.D.N.Y.   April 30, 2009).   Accordingly, the Court found that assets should remain frozen when the defendant has not demonstrated there are sufficient frozen assets to pay victims. *See Santillo*, 2018 WL 339288, at *4. (citing *e.g., Lauer*, 445 F. Supp. 2d at 1369.   The *Santillo* Court also noted that "[u]nder this standard, defendants have been barred from utilizing frozen assets to pay legal fees associated with representation in a civil action when it is not clear 'whether the frozen assets exceed the SEC's request for damages or disgorgement." *Santillo*, 2018 WL 339288, at *4. (citing *S.E.C. v. FTC Capital Markets, Inc.*, 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010) (quoting *Sec. & Exch. Comm'n v. Bremont*, 954 F. Supp. 726, 733 (S.D.K.Y. 1997) ); s*ee also SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993).   The *Santillo* Court found in the SEC civil enforcement action that the defendant did not come close to showing he is entitled to relief from the asset freeze to pay for legal expenses

---

[25] *See* App., Ex. A, at p9, ⁋15.
[26] *See Id.*; [Dkt. 233 at p. 4] (Receiver's Third Report.).

when there was a potential disgorgement obligation of $51.2 million.

26.     In *Lee*, 2019 WL 4934181, disgorgement orders had been entered against the judgment debtors, but defendants provided no proof whether the judgment debtors' frozen assets exceed the ordered disgorgement. The *Lee* Court therefore found that use of the funds to pay for attorney's fees should be barred. *See id.*, *(*citing *Santillo,* 2018 WL 3392881, at *4 ("assets should remain frozen when the defendant has not demonstrated that there are sufficient frozen assets to pay disgorgement"); *S.E.C. v. Current Fin. Services*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) ("frozen assets clearly do not exceed plaintiff's approximation of liability, and thus, the Court will continue the freeze order"); *Sec. & Exch. Comm'n v. Bivona*, No. 16-CV-01386-EMC, 2016 WL 2996903, at *3 (N.D. Cal. May 25, 2016) (refusing to modify asset freeze to pay legal fees as defendants had not provided "a complete picture of their finances"); *FTC Capital Markets*, 2010 WL 2652405, at *7 ("defendants have been barred from utilizing frozen assets to pay legal fees associated with representation in a civil action when it is not clear whether the frozen assets exceed the SEC's request for damages or disgorgement" (internal quotations omitted)); *Century—ML Cable Corp. v. Carrillo Diaz*, 43 F. Supp. 2d 166, 174 (D.P.R. 1998) (refusing to modify asset freeze because "Defendants have made no accounting or other showing that their assets were derived from legitimate conduct"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 2186582, at *13 (S.D.N.Y. Sept. 27, 2004) (court's refusal to modify an asset freeze, "in the face of the [defendants'] continued refusal to make full disclosure of their assets," was not an abuse of discretion)).

27.     Pursuant to the Consent Order, to date the frozen assets the Receiver has been able to identify fall far short of the amount that will be required to repay the losses suffered by more than 1,600 investors. This factor alone is sufficient for the Court to deny the Defendant's

request to release funds for the benefit of the Individual Defendants.

    (3)  <u>Defendants Cannot Identify Untainted Assets</u>

    28.    The Individual Defendants argue they intend to use "untainted assets" to pay their Proposed New Counsel attorneys. The Individual Defendants bear the burden of identifying "untainted assets" and yet they offer no proof that any frozen assets are not tainted. *See S.E.C. v. Stanford Intern. Bank, Ltd.*, 309-CV-298-N [Dkt. 544 at p. 1] (N.D. Tex. July 1, 2009) (defendants bear burden to show assets are untainted). In fact, Individual Defendants merely claim they will be able to identify untainted assets, not that any have been identified with the exception of maybe a college fund. And, the college fund is tainted and was properly frozen because it was funded by monies from entities in receivership.[27] Indeed, the Receiver expressly requested the Proposed New Counsel for the Individual Defendants to identify the untainted assets they seek to use. The Proposed New Counsel refused the Receiver's request.[28]

    29.    The Individual Defendants cannot identify untainted assets because the scope of their fraud upon investors was so broad and profitable. In the absence of said defendants meeting their burden of proving the existence of untainted assets, all of their assets are rightfully frozen pursuant to their own agreement as set forth in the Consent Order. "Parties to litigation usually may spend their resources as they please to retain counsel. 'Their' resources is a vital qualifier. *Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.*" *See Quinn,* 997 F.2d at 289 (internal citations omitted & emphasis added).

    30.    Furthermore, requests for the release of frozen assets to pay attorney's fees have

---

[27] *See* App., Ex. A, at p.9, ¶13.
[28] See App., Ex. A, at pp.9-10, ¶16.

been routinely denied where the frozen assets fell short of a potential disgorgement order, regardless of whether the funds were tainted (*i.e.* traceable to illegal activity*). See Commodity Futures Trading Comm'n v. Morse,* 762 F.2d 60 (8th Cir. 1985) (affirming district court' s denial of request to pay attorneys' fees out of receivership estate where only $42,000 remained to satisfy $1.2M in claims of disappointed investors); *Lee,* 2019 WL 4934181 (S.D. Cal.) (citing *Commodities Futures Trading Comm'n v. Noble Metals Intl., Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (fact frozen assets fell short of the amount needed to compensate defrauded customers "was reason enough" to deny attorney's fees application)); *Current Fin. Servs.*, 62 F. Supp. 2d at 68 (denying release of funds when funds available for disgorgement, traceable to illegally gotten gains or not, are grossly diminished so "that the potential disgorgement [the SEC] could receive ... far exceeds the amount that is frozen."); *Forte*, 598 F. Supp. 2d at 693 ("because it appears likely that the investor losses dwarf Defendant's remaining assets, even if Defendant could show that some of the frozen funds are from 'untainted' sources, I would not release those funds."); *Grossman*, 887 F. Supp. at 661 ("It is irrelevant whether the funds affected by the Asset Freeze are traceable to illegal activity...."), *aff'd sub nom. Sec. & Exch. Comm'n v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996).

### C. Asher and Batashvili are not Entitled to Counsel Under the Constitution

31.     Proposed New Counsel use red herrings, if not fatally defective constitutional arguments regarding the "right to counsel" in an effort to distract the Court's attention away from the unclean hands, inequities, and waiver arguments that preclude a modification of the Consent Order.

### (1) No Sixth Amendment Right to Counsel

32.     There is no criminal action pending against Defendants Asher and Batashvili.

They have not been indicted and there is no evidence the U.S. Attorney has even identified them as targets.  Yes, the FBI executed a search warrant and seized documents and information from the operations of the Defendants, but that does not mean that Defendants Asher and Batashvili are or will be indicted.  The existence of a criminal investigation, no matter how big or small, does not invoke the Sixth Amendment right to counsel.  In *Sec. & Exch. Comm'n v. Santillo*, 2018 WL 3392881, at *2, the Court found that Santillo's request for attorneys' fees to pay for counsel in any criminal proceeding was premature because no criminal proceeding had been initiated against Santillo, and therefore he had no ripe Sixth Amendment right to counsel.  The Court further added that "before [criminal] proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." *See id.* at *2 (citing *Davis v. U.S.*, 512 U.S. 452, 457 (1994) (citation omitted)); *U.S. v. Medunjanin*, 752 F.3d 576, 589 (2d Cir. 2014) (concluding that the Sixth Amendment right to counsel attached only when an indictment was filed against the defendant).  Here, no indictments have been issued to Defendants Asher and Batashvili and a criminal case has not been filed.  Despite Defendants Asher and Batashvili attempts to skew the basis of their request to use frozen assets for attorneys' fees to defend a criminal investigation, the only grounds for defense costs are their defense of this civil case.

33.    Even assuming arguendo that indictments are issued in the future, Defendants Asher and Batashvili still have no automatic right to frozen assets for defense costs.  *See Dobbins*, 2004 WL 957715 at *2 ("Because the use of frozen assets to pay attorney fees can be disallowed even in criminal cases, a civil litigant has no greater right to counsel than one who stands accused of a crime.").

(2)  No Fifth Amendment Right to Counsel

34.     Defendants Asher and Batashvili rely heavily upon *Potashnick v, Port City Const. Co.,* 609 F.2d 1101, 1117 (5th Cir. 1980) and its progeny for the proposition that there is a constitutional right to counsel of one's choice in a civil case. The *Potashnick* Court concluded that, "If in any case, *civil or criminal,* a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* at 1118 (emphasis in original) (quoting *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932)).

35.     *Potashnick* is factually distinguishable from the case at hand.  In *Potashnick,* the Fifth Circuit considered the issue of whether a civil litigant has a due process right to counsel but in an entirely different context than what is at issue here.  The trial court in *Potashnick* prohibited an attorney from having any contact with a witness during breaks in testimony.[29] The Fifth Circuit found that the witness needed to have contact with defendant's counsel for advice and to give information for the defense of the case, and by the court's prohibiting this witness from talking with defendant's counsel during the entire period of his testimony—seven days—the court was effectively depriving the defendant corporation of any representation at all. *Id.* at 1119.

36.     In *In the Matter of Wynn*, 889 F.2d 644 (5th Cir. 1989), the Fifth Circuit distinguished its own opinion in *Potashnick* and upheld a district court decision that a debtor

---

[29] During the course of trial, counsel for defendant violated the judge's rule by conferring with the witness who was the sole stockholder and president of Defendant company, during a recess in the witness's testimony.  *Potashnick* 609 F.2d at 1117. As a result of the defendant's misunderstanding and subsequent violation of the Judge's rule, the Judge forced Defendant to choose among 1) declaring a mistrial, 2) excluding any further testimony by the witness, or 3) proceeding without a jury. *See id.* Defendant chose to proceed without a jury, and subsequently argued on appeal that the trial Judge's rule violated Defendant's constitutional right to retain hired counsel and resulted in the loss of its right to trial by jury. *Id.*

has *no* constitutional right to counsel.  Specifically, the Fifth Circuit stated:

> Next [Appellee] advances *Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) for the proposition that the Fifth Circuit "has repeatedly recognized such constitutional right of counsel of choice in *civil* litigation." *Potashnick,* however, stands for no such thing.
>
> *Potashnick* held merely that the district court denied a civil defendant his right to counsel when it ordered the defendant not to consult with his attorney during short court recesses while in the process of testifying. It is therefore inapposite here, and the bankruptcy court did not err when it permitted [Appellee's counsel] to withdraw.

*See In the Matter of Wynn*, 889 F.2d at 646 (upholding a decision of the Honorable Jerry Buchmeyer, N. D. Tex.).   In distinguishing the underlying case, the Fifth Circuit, post-*Potashnick*, further added that there is no such right to counsel of choice in civil litigation, instead, "*a litigant must be afforded a fair opportunity to secure counsel of his choice, not that he has an absolute right to select any counsel he desires.*"  *See In the Matter of Wynn*, 889 F.2d at 646 (emphasis added).

37.     Further, even assuming *arguendo* that there was a right to counsel in Defendant Asher and Batashvili's situation here, there is no right for them to employ high priced legal teams, including attorneys from New York, which historically charge the highest legal fees in the country.  In this regard, any unfrozen assets could be depleted in a New York minute to the detriment of the investors.

**D. Defendants' Authority is  Inapplicable or Distinguishable from this Case**

38.     Defendants cite a string of cases to suggest the relief they seek is so anodyne and righteous as to be naturally just. [Dkt. 232 at p. 19.] But the cases cited by the Individual Defendants fail to support this position.  Rather, the fact specific inquiries of the courts in those decisions make the requested relief look outrageous by comparison.

39.     For instance, *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987) is cited by the Individual Defendants for the proposition that the district court's

preliminary injunction should be modified to unfreeze assets that were not "ill-gotten". In *Dixon*, the Court made allowance for reasonable attorney's fees because those defendants demonstrated they could not obtain legal representation without this modification. *Id.* Since Defendants have not earned any "New Income" under the Consent Order, and instead are presumably relying upon the gifts of friends, there is no reason to believe third parties are unwilling to fund the said defendants' payment to their attorneys. Furthermore, given their history of blatant disregard for the Court's authority, the possibility of dissipation of assets is not difficult to predict. Finally, the *Dixon* case presents no indication the injunction at issue was ever consented to or agreed to by the appealing parties. Only Defendants are audacious enough to try to re-trade the deal they already struck.

40.     The Defendants' citation to *Sec. & Exch. Comm'n v. I-Cubed Domains, LLC*, 664 F. App'x 53, 57 (2d Cir. 2016), is even less remarkable because the court therein simply laid out a burden shifting analysis with respect to the release of funds. This burden shifting analysis included the moving parties' identification of purportedly improperly unfrozen assets before the district court and the SEC's response that the funds in question should not be unfrozen. In this case, the Individual Defendants have not met their initial burden of identifying untainted frozen assets.

41.     Defendants cite *Bremont*, 954 F. Supp. at 733 for the proposition that assets unrelated to the investigation cannot be frozen. However, in *Bremont*, "Defendants were not permitted to use frozen assets to pay attorney's fees." *Id.* at 726. And, when asked to unfreeze the assets, the *Bremont* court made the "Bank Robber" analogy set out in *Quinn*. *Id.* at 733 (citing *Quinn*, 997 F.2d at 289.)

## V.

## __CONCLUSION__

For the reasons set forth herein, Receiver prays that this Court strike the Limited Appearance and/or deny the Emergency Motion, not allow the Consent Order to be re-negotiated, and continue to secure the Defendants' assets for recovery by the harmed investors. The relief the Individual Defendants seek should be denied for reasons that have less to do with the meritless legal arguments in their Emergency Motion, and everything to do with their actions and activities since the filing of the Complaint which bar their relief as a matter of law and equity. Stated simply, trusting these particular defendants, when it comes to any representations made to the Court about anything they have done or will do, constitutes an exercise in futility that will accrue to the detriment of not only those victims identified in the Complaint, but the receivership process, and the receivership estate. Indeed, at this juncture, the documented transgressions likely represent just a fraction of the transgressions yet to be uncovered and/or fully investigated by the Receiver. Accordingly, the Limited Appearance and Emergency Motion should be denied for all the reasons detailed hereinabove.

Respectfully submitted April 20, 2021.

**RECEIVER KELLY M. CRAWFORD**

*/s/ Peter C. Lewis*

Peter C. Lewis
State Bar No. 12302100

Scheef & Stone, LLP
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
Telephone: 214.706.4200
Telecopier: 214.706.4242

**ATTORNEYS FOR RECEIVER**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 20, 2021 I electronically filed the foregoing document with the clerk of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Peter C. Lewis*
PETER C. LEWIS