IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITIES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER, DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAINE SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRASKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION**<br><br>Case No.: **3-20-CV-2910-L**<br><br>Judge: Judge Sam A. Lindsay |

INSURANCE, COMMISSIONER OF THE
TENNESSEE DEPARTMENT OF
COMMERCE AND INSURANCE, STATE
OF TEXAS, WASHINGTON STATE
DEPARTMENT OF FINANCIAL
INSTITUTIONS, WEST VIRGINIA
SECURITIES COMMISSION, AND STATE
OF WISCONSIN.

 Plaintiffs,

v.

TMTE, INC. a/k/a METALS.COM, CHASE
METALS, INC., CHASE METALS, LLC,
BARRICK CAPITAL, INC., LUCAS
THOMAS ERB a/k/a LUCAS ASHER a/k/a
LUKE ASHER, and SIMON BATASHVILI,

 Defendants;

and

TOWER EQUITY, LLC,

 Relief Defendant.

# TABLE OF CONTENTS

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION ........................................................ 1

I.   PROCEDURAL HISTORY.................................................................................. 2

II.   FACTS ............................................................................................................... 2

III.   ARGUMENT ...................................................................................................... 7

    A.   The Consent Order Was the Result of Significant Negotiation and Should Not Be Disturbed .............................................................................. 7

        1.   Defendants Freely and Voluntarily Agreed to the Terms of the Consent Order While Being Represented by Experienced Counsel ........................ 7

        2.   The Consent Order Specifically Addresses Future Earnings/Assets and Banned Activities .................................................................................... 10

    B.   Plaintiffs Have Made a *Prima Facie* Showing that Defendants Violated the CEA and State Laws and Will Prevail at Trial .................................................... 11

        1.   Defendants Directly and Actively Participated in the Fraud ................... 14

        2.   Defendants' Defense of Their Sales Operations and Fraudulently Priced Bullion Is Unavailing and Disingenuous ....................................... 15

    C.   The Plain Language of 7 U.S.C. § 9(1), and CFTC Regulation 180.1 and Cases Applying Those Provisions, Clearly Apply to Defendants' Fraudulent Scheme .. 18

    D.   Balancing the Equities, the Attorney's Fee Motion Should Be Denied Because the Consent Order's Asset Freeze Is Necessary and Appropriate ....................... 26

        1.   The Court Has Broad Equitable Power to Maintain the Asset Freeze ...... 26

        2.   The Court Has Discretion *Not* to Exempt Frozen Assets To Pay Attorney's Fees ...................................................................................... 27

        3.   Release of Funds Is *Not* in the Interest of the Defrauded Investors .......... 31

        4.   This Asset Freeze Serves the Public Interest ........................................... 32

        5.   The Court Should Restrain After-Acquired Funds and Earnings Because There Are Insufficient Funds to Satisfy a Judgment in this Matter .......... 34

            a)   To grant Defendants' request would be inequitable because it would require the victimized investors to pay for Defendants' defense ......................................................................................... 34

b)    There is no requirement that frozen asset be traceable to the fraud ........................................................................................ 35

6.    Defendants Have Unclean Hands Because They Intentionally Violated Lawful Orders, including the Court's SRO and Consent Order ............... 35

E.    Defendants' Claim for Attorney's Fees for a Potential Criminal Defense is *Not* Ripe for Adjudication and Should Be Denied................................................. 37

F.    The Attorneys' Fees Motion Should Be Denied Because Defendants Failed to Provide Crucial Missing Information .................................................................. 39

IV.    CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aaron v. SEC*,
   446 U.S. 680 (1980) ........................................................................................... 12

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ........................................................................................... 24

*Cannon v. Univ. of Chi.*,
   441 U.S. 677 (1979) ........................................................................................... 24

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617 (1989) ...................................................................................... 28, 29

*CFTC v. Am. Metals Exch. Corp.*,
   991 F.2d 71 (3rd Cir. 1993) ............................................................................... 34

*CFTC v. Cloud*,
   2011 WL 1157530 (S.D. Tex. Mar. 24, 2011) .................................................. 12

*CFTC v. Co Petro Mktg. Grp, Inc.*,
   680 F.2d 573 (9th Cir. 1982) ............................................................................. 34

*CFTC v. Crown Colony Commodity Options, Ltd.*,
   434 F. Supp. 911 (S.D.N.Y. 1977) .................................................................... 13

*CFTC v. Hunt*,
   591 F.2d 1211 (7th Cir. 1979) ........................................................................... 13

*CFTC v. Hunter Wise Commodities LLC*,
   21 F. Supp. 3d 1317 (S.D. Fla. 2014) ............................................................... 25

*CFTC v. Levy*,
   541 F.3d 1102 (11th Cir. 2008) ......................................................................... 26

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ............................................................... 25

*CFTC v. Monex Credit Company*,
   931 F.3d 966 (9th Cir. 2019), *cert denied* 141 S. Ct. 158 (2020)................ 22, 24

*CFTC v. Morse*,
   762 F.2d 60 (8th Cir. 1985) ............................................................................... 32

iii

*CFTC v. Muller*,
   570 F.2d 1296 (5th Cir. 1978) ......................................................................... 12, 26

*CFTC v. My Big Coin Pay, Inc.*,
   334 F. Supp. 3d 492 (D. Mass. 2018) .............................................................. 21, 25

*CFTC v. Noble Metals Int'l, Inc.*,
   67 F.3d 766 (9th Cir. 1995) ............................................................................. Passim

*CFTC v. PMC Strategy, LLC*,
   903 F. Supp. 2d 368 (W.D.N.C. 2012) ................................................................... 13

*CFTC v. Premium Income Corp.*,
   2007 WL 4563469 (N.D. Tex. Dec. 28, 2007) ........................................................ 26

*CFTC v. Rogers*,
   326 F. App'x 718 (5th Cir. 2009) .......................................................................... 12

*CFTC v. S. Trust Metals, Inc.*,
   2016 WL 4523851 (S.D. Fla. Aug. 29, 2016) ......................................................... 25

*CFTC v. Shakespeare Guardian Futures, Inc.*,
   2010 WL 11506667 (W.D. Tex. Mar. 17, 2010) ...................................................... 12

*CFTC v. Sterling Trading Grp., Inc.*,
   605 F. Supp. 2d 1245 (S.D. Fla. 2009) .................................................................. 13

*CFTC v. United Investors Group, Inc.*,
   440 F. Supp. 2d 1345 (S.D. Fla. 2006) .................................................................. 34

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................. 23

*Chiarella v. United States*,
   445 U.S. 222 (1980) ............................................................................................. 24

*Custis v. United States*,
   511 U.S. 485 (1994) ............................................................................................. 23

*Dunn v. CFTC*,
   519 U.S. 465 (1997) ............................................................................................. 21

*Equity Grp, Inc. v. Univ. Symetrics Corp.*,
   53 F.3d 159 (6th Cir. 1995) .................................................................................. 23

*Federal Savings & Loan Insurance Corp. v. Dixon*,
    835 F.2d 554 (5th Cir. 1987) ......................................................................... 29

*First Fin. Grp. of Tex.*,
    645 F.2d 429 (5th Cir. 1981) ......................................................................... 12

*FTC v. Abili-Staff, Ltd*,
    2010 WL 11598073 (W.D. Tex. Oct. 7, 2010) ...................................... 28, 30, 31, 32

*FTC v. Ameridebt, Inc.*,
    373 F.Supp. 2d 558 (D.Md. 2005) .................................................................. 33

*FTC v. Assail, Inc.*,
    410 F.3d 256 (5th Cir. 2005) ......................................................................... 31

*FTC v. H. N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ....................................................................... 26

*FTC v. Sw. Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) ......................................................................... 26

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988) ....................................................................... 31

*FTC v. World Wide Factors*,
    882 F.2d 344 (9th Cir. 1989) ..................................................................... 28, 29

*Garcia v. United States*,
    469 U.S. 70 (1984) ...................................................................................... 22

*Grupo Mexicano de Desarrollo, S.A., v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) .................................................................................... 33

*HUD v. Rucker*,
    535 U.S. 125 (2002) .................................................................................... 22

*In re Krause*,
    349 B.R. 272 (D. Kan. 2006) ......................................................................... 33

*Lara-Torres v. Ashcroft*,
    383 F.3d 968 (9th Cir. 2004) ......................................................................... 28

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
    51 F.3d 982 (11th Cir. 1995) ................................................................ 27, 33, 35

v

*Matter of Wynn,*
  889 F.2d 644 (5th Cir. 1989) ................................................................. 30

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006) ............................................................................... 24

*Porter v. Warner Holding Co.,*
  328 U.S. 395 (1946) ............................................................................. 26

*Potashnick v. Port City Const. Co.,*
  609 F.2d 1101 (5th Cir. 1980) ............................................................. 29

*Precision Instrument v. Auto. Maint. Mach.,*
  324 U.S. 806 (1945) ............................................................................. 36

*Robinson v. Vollert,*
  602 F.2d 87 (5th Cir. 1979) ................................................................... 8

*Russello v. United States,*
  464 U.S. 16 (1983) ............................................................................... 23

*SEC v. AmeriFirst Funding, Inc.,*
  2007 WL 2192632 (N.D. Tex. July 31, 2007) ...................................... 27

*SEC v. Banner Fund Int'l,*
  211 F.3d 602 (D.C. Cir. 2000) ............................................................. 35

*SEC v. Bremont,*
  954 F. Supp. 726 (S.D.N.Y. 1997) ................................................. 32, 33

*SEC v. Brooks,*
  1999 WL 493052 (N.D.Tex. July 12, 1999) ................................... 27, 36

*SEC v. Calvo,*
  378 F.3d 1211 (11th Cir. 2004) ........................................................... 12

*SEC v. Capital Counselors, Inc.,*
  512 F.2d 654 (2d Cir. 1975) ................................................................ 27

*SEC v. Cherif,*
  933 F.2d 403 (7th Cir. 1991) ............................................................... 29

*SEC v. Coates,*
  1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) ..................................26-27

*SEC v. Comcoa Ltd.*,
   887 F. Supp. 1521 (S.D. Fla. 1995), aff'd, 70 F.3d 1191 (11th Cir. 1995)..........................27-28

*SEC v. Cuban*,
   798 F. Supp. 2d 783 (N.D. Tex. 2011) ................................................................. 11

*SEC v. Current Fin. Servs.*,
   62 F. Supp. 2d 66 (D.D.C. 1999).......................................................................... 35

*SEC v. Dobbins*,
   2004 WL 957715 (N.D. Tex. Apr. 14, 2004) ............................................. 31, 33, 39

*SEC v. Dowdell*,
   175 F. Supp. 2d 850 (W.D. Va. 2001) ................................................................. 39

*SEC v. Duclaud Gonzalez de Castilla*,
   170 F. Supp. 2d 427 (S.D.N.Y. 2001) ................................................................. 27

*SEC v. ETS Payphones, Inc.*,
   408 F.3d 727 (11th Cir. 2005) ............................................................................ 27

*SEC v. Glauberman*,
   1992 WL 175270 (S.D.N.Y. 1992) ..................................................................... 35

*SEC v. Grossman*,
   887 F. Supp. 649 (S.D.N.Y. 1995) ............................................................... 32, 35

*SEC v. Infinity Grp Co.*,
   212 F.3d 180 (3d Cir. 2000) ............................................................................... 27

*SEC v. Lorin*,
   76 F.3d 458 (2d Cir. 1996) .......................................................................... 28, 35

*SEC v. Manor Nursing Ctrs, Inc.*,
   458 F.2d 1082 (2d Cir. 1972) ............................................................................. 27

*SEC v. Mgmt. Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975) ........................................................................ 11, 13

*SEC v. Patel*,
   61 F.3d 137 (2d Cir.1995) ................................................................................. 28

*SEC v. Quinn*,
   997 F.2d 287 (7th Cir. 1993) ............................................................................. 28

*SEC v. Roor*,
    1999 WL 553823 (S.D.N.Y. 1999) ................................................................. 35

*SEC v. Schiffer*,
    1998 WL 901684 (S.D.N.Y. June 25, 1998) ................................................ 39

*SEC v. Stein*,
    2009 WL 1181061 (S.D.N.Y. Apr. 30, 2009) ............................................. 33

*SEC v. Tex. Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) ........................................................................ 24

*SEC v. United Commc'ns, Ltd.*,
    899 F. Supp. 9 (D.D.C. 1995) ...................................................................... 27

*SEC v. Zale Corp.*,
    650 F.2d 718 (5th Cir. 1981) ................................................................. 12, 13

*SEC v. Zandford*,
    535 U.S. 813 (2002) ..................................................................................... 24

*SEC v. Zubkis*,
    2003 WL 22118978 (S.D.N.Y. Sept. 10, 2003) .......................................... 27

*Turner v. Rogers*,
    564 U.S. 431 (2011) ..................................................................................... 27

*United States v. Armour & Co.*,
    402 U.S. 673(1971) ........................................................................................ 8

*United States v. ITT Continental Baking Co.*,
    420 U.S. 223 (1975) ....................................................................................... 8

*United States v. Grider*,
    2010 WL 4514623 (N.D. Tex. Nov. 2, 2010) .............................................. 12

*United States v. Madeoy*,
    652 F. Supp. 371 (D.D.C. 1987) .................................................................. 27

*United States v. Monsanto*,
    491 U.S. 600 (1989) ..................................................................................... 29

*United States v. Woods*,
    571 U.S. 31 (2013) ....................................................................................... 22

*US by Mitchell v. Hayes Int'l Corp.*,
  415 F.2d 1038 (5th Cir. 1969) ............................................................ 12


Statutes

7 U.S.C. § 1a ........................................................................................ 20

7 U.S.C. § 6b ........................................................................................ 22

7 U.S.C. § 9(1) .............................................................................. Passim

7 U.S.C. § 13a-1 ............................................................................ 12, 13

7 U.S.C. § 13a-2 ............................................................................ 12, 13

15 U.S.C. § 78j .................................................................................. 23-24

Ca. Corp. Code § 25008 .................................................................... 11

Ca. Corp. Code § 25110 .................................................................... 11

Ca. Corp. Code § 25230 .................................................................... 11

Ca. Corp. Code § 25235 .................................................................... 11

Ca. Corp. Code § 25530 .................................................................... 11

Ca. Corp. Code § 29520 .................................................................... 11

Ca. Corp. Code § 29537 .................................................................... 11

Ca. Corp. Code § 29536 .................................................................... 11

Ca. Corp. Code § 29540 .................................................................... 11

Regulations

17 C.F.R. § 180.1 ........................................................................ Passim

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive
  Devices and Prohibition on Price Manipulation,
  76 Fed. Reg. 41,398 (July 14, 2011) ............................................ 21, 23

Other Authorities

156 Cong. Rec. S3348 ...................................................................................... 24

Restatement (Second) of Torts § 551(2)(b) (1977)....................................................... 22

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO MODIFY PRELIMINARY INJUNCTION**

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants Lucas Thomas Erb *a/k/a* Lucas Asher *a/k/a* Luke Asher ("Asher"), and Simon Batashvili ("Batashvili") (collectively "Defendants") Motion to Modify Preliminary Injunction for the purpose of paying attorney's fees ("Attorney's Fee Motion") (Docket Entry ("D.E.") 232).[1] The Attorney's Fee Motion[2] is not an emergency filing—though  it is styled as such—and doesn't raise novel questions of law or ones of first impression. Rather, it is an attempt to undermine the enormous evidence gathered by thirty-one federal and state regulators to expeditiously stop a nationwide fraud and overturn Defendants' agreement to this Court's order stopping Defendants from further weaponizing trust, religion, and political affinity to defraud elderly investors out of their retirement savings.

Plaintiffs oppose the Attorney's Fee Motion because: (1) Defendants freely and voluntarily agreed to the terms of a Consent Order which provided significant material benefits to Defendants while also making material concessions to Plaintiffs; (2) Plaintiffs have made a *prima facie* showing that Defendants violated the Commodity Exchange Act ("CEA"), and State laws; (3) the plain language of 7 U.S.C. § 9(1), Commodity Futures Trading Commission

---

[1] Plaintiffs incorporate by reference, Plaintiffs' Motion for an *Ex Parte* Restraining Order, Memorandum of Law in Support of an *Ex Parte* Restraining Order and their Fact Appendix with supporting exhibits and declarations ("SRO Application") D.E. # 4-6; 12.

[2] Plaintiffs object and move to strike proposed substitute counsel's limited appearance. D.E. #231. Limited appearances are reserved to the sound discretion of the Court for good cause shown. Defense counsel has failed to get the permission of the Court before filing the Attorney's Fee Motion. They also have failed to provide any basis for the request for a limited appearance rather than making a general appearance. They should not be allowed to participate in this action until such time as the Court approves their application for a limited appearance.

("CFTC") Regulation 180.1, and cases applying those provisions, clearly apply to Defendants' fraudulent scheme; and (4) the equities in this civil enforcement action warrant denying the Attorney's Fee Motion.

## I.   PROCEDURAL HISTORY

On September 22, 2020, Plaintiffs filed a Complaint for Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief ("Complaint"), alleging that Defendants are perpetrating a nationwide precious metals fraudulent scheme. (D.E. #2) Contemporaneously with the filing of the Complaint, Plaintiffs moved the Court for a Statutory Restraining Order ("SRO") (D.E. #16) which Judge David C. Godbey granted the same day.  (D.E. # 4-6; 11-12; 16).

On October 14, 2020, the Court entered a Consent Order of Preliminary Injunction ("Consent Order") as to Defendants Asher and Batashvili. (D.E. #165). After a hearing on December 15, 2020, the Court found Asher in contempt, via an agreed-to order, for violating the SRO and Consent Order (D.E. # 216).

## II.   FACTS

The SRO Application[3] has an extensive and comprehensive recitation of the relevant facts and discusses in detail the applicable law. Each allegation in the Complaint is supported by admissible evidence. The Complaint alleges that from at least September 1, 2017 through the present ("Relevant Period"), Defendants have been perpetrating a nationwide fraud scheme that

---

[3] The SRO Application is supported by a 1490-page fact appendix that contains, among other things, the sworn statements of 38 declarants and numerous supporting exhibits. It is incorporated by reference as if fully set forth herein.

soliciting and received over $185 million in investors' funds from at least 1,600 persons throughout the United States for the purpose of purchasing gold and silver bullion ("Precious Metals Bullion") (D.E. #2).[4]  Relief Defendant Tower Equity received transfers of investor money from Defendants or directly from investors that represent ill-gotten gains of Defendants' fraudulent scheme to which the Relief Defendant has no legitimate claim.[5]

Defendants' nationwide fraudulent scheme is particularly egregious because Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons—between the ages of sixty and ninety—with little experience in precious metals.[6]  Defendants' solicitations also targeted politically conservative and Christian investors.[7] Defendants instructed their sales representatives or other agents to concentrate their solicitations on these persons to gain access to their qualified retirement savings, including but not limited to, retirement savings held in an IRA, 401k, 457b, TSP, insurance, and annuity.[8]

Defendants preyed upon elderly victims' trust, religion, and political affinity to defraud them.[9] Defendants deceived investors into using over $140 million of their retirement savings to purchase fraudulently overpriced Precious Metals Bullion.[10]  By making material misrepresentation and omissions, Defendants deceived investors into purchasing precious metals

---

[4] Gomersall Dec. ¶¶19, 23, 25, 28, 51 (App. pp. 9 -12, 17); Gomersall Dec. Att. G and J (App. pp. 86 and 100).

[5] Gomersall Dec. ¶¶24-26 App. pp. 10-11); Gomersall Dec. Att M (App. p. 106).

[6] Planer Dec. ¶¶14, 43-44, 75, and 233 (App. pp. 271, 282-83, 296, 325-26).

[7] Planer Dec. ¶¶20, 29, 197, 244 and 276 (App. pp. 274, 277, 319, 327, 334.

[8] Planer Dec. ¶¶29 (App. p. 277).

[9] *Id.*

[10] Planer Dec. ¶43 (App. p. 282); Gomersall Dec. ¶¶ 52-54 (App. p. 18).

at prices averaging from one hundred (100) percent to over three hundred (300) percent over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price").[11]   Defendants directed investors to purchase specific Precious Metals Bullion at grossly inflated prices that bore no relationship to the Prevailing Market Price.[12] In particular, Metals.com[13] failed to disclose that what Metals.com was charging investors vastly exceeded what Metals.com represented.[14]   In fact, Defendants knew or had a reckless disregard for the truth that **virtually every investor** lost the vast majority of their funds invested in fraudulently overpriced Precious Metals Bullion. [15]

During the relevant period, Metals.com executed with investors two Customer Agreements for the purchase of Precious Metals Bullion.[16] Section 3(a) of both Customer Agreements states: "Within the Precious Metals industry, the difference between [M]etals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the 'Spread'" (herein: "Spread").[17] The Spread charged to investors pursuant to Customer Agreements represents the difference between what Metals.com

---

[11] Samuelson Dec. ¶¶49-50 (Section VIIII) (App. pp. 247-49).

[12] Planer Dec. ¶¶52, 142-144 (App. pp. 285, 309-10.

[13] Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Access Unlimited, LLC are collectively referred to herein as "Metals.com"

[14] Planer Dec. ¶¶7, 93, and 125 (App. pp. 269-70, 299, 306).

[15] Samuelson Dec. ¶¶49-50 (Section VIIII) (App. pp. 247-49).

[16] Gomersall Dec. ¶¶58-60 (App. p. 21); Gomersall Dec. Att. AA (App. pp. 198-206).

[17] Gomersall Dec. ¶ 60 (App. p. 21); Gomersall Dec. Att. AA and BB (App. pp. 198-206 and 208-15); Samuelson Dec. ¶ 44 (App. p. 246)

paid for the Precious Metals Bullion and what they charged investors.[18] Customer Agreement #2 was substantially similar to Customer Agreement #1, except that it represented that the Spread Metals charged on IRA Precious Metals Bullion transactions was significantly smaller.[19] Customer Agreement #2 represented that the Spread on IRA Precious Metals Bullion transaction only varies between two percent and nineteen point nine percent (2% to 19.9%), rather than (2% to 33%).[20] This is a material purported reduction in the Spread. Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains (1 to 5%), Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to 19.9%).[21] Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."[22]

As part of the scheme to defraud, the Spreads on Polar Bear Bullion[23] were materially and exorbitantly higher than those represented in the Customer Agreements.  In fact, Metals.com knew or had a reckless disregard for the truth that the Spreads charged by Metals.com to their elderly or retirement-aged investors for the Polar Bear Bullion averaged:

---

[18] Gomersall Dec. ¶¶60, 66 (App. pp. 21, 23); Gomersall Dec. Att. AA (App. pp. 198-206).

[19] Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15).

[20] *Id.*

[21] *Id.*

[22] *Id*.

[23] The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion; the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and the 1/4 ounce Gold British Standard Bullion are collectively "Polar Bear Bullion."

1. 128 percent for Silver Royal Canadian Mint Polar Bear Bullion;

2. 91 percent for Gold Royal Canadian Mint Polar Bear Bullion; and

3. 108 percent for Gold British Standard Bullion.[24]

In fact, **none** of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in the Customer Agreements. Defendants knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded the ranges in the Customer Agreements. Metals.com failed to disclose to investors the true Spreads and excessive markups on Polar Bear Bullion that they were charging them.[25] Instead, Metals.com instructed their sales representatives or other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price.[26] Defendants failed to disclose to its investors that the fraudulently overpriced Polar Bear Bullion and Barrick Bullion[27] materially impacted their ability to profit and the risk of loss.[28]

When investors received account statements from their SDIRA administrators showing an account value—the accurate value of the Precious Metals Bullion based on the Prevailing Market Price of the bullion—that was significantly smaller than what was misrepresented to investors, Defendants engaged in misrepresentations to conceal their fraud.[29] Defendants

---

[24] Samuelson Dec. ¶¶49-50 (Section VIIII) (App. pp. 247-49).

[25] Planer Dec. ¶¶7, 93, and 125 (App. pp. 269-70, 299, 306).

[26] Planer Dec. ¶¶52, 142-144 (App. pp. 285, 309-10.

[27] The 1/10 ounce Silver Spade Guinea; 1/10 ounce Silver Britannia; and 1/10 ounce Gold Royal Canadian Wildlife Series are collectively "Barrick Bullion."

[28] Samuelson Dec. ¶¶10, 11, 50, 61 (App. pp. 241, 249, 253).

[29] Planer Dec. ¶¶47-50 (App. pp. 283-85).

perpetuated their fraudulent scheme by falsely representing to investors who questioned the grossly inflated cost of the Precious Metals Bullion after purchase that they were rare and collectible numismatic or semi-numismatic precious metals that carried a premium far above the base melt value of the precious metal.[30]  These statements were false because the Precious Metals Bullion were not rare, numismatic, or semi-numismatic metals. *Id.* The Precious Metals Bullion were worth significantly less than the value Defendants misrepresented to investors because they carried no additional premium over the Prevailing Market Price. *Id.*

In sum, Defendants operated a fraudulent scheme where virtually every elderly investor lost the vast majority of their funds invested in fraudulently overpriced Precious Metals Bullion as soon as they consummated a transaction. These losses immediately became massive ill-gotten gains for the Defendants.

## III. ARGUMENT

### A.  The Consent Order Was the Result of Significant Negotiation and Should Not Be Disturbed

1.  Defendants Freely and Voluntarily Agreed to the Terms of the Consent Order While Being Represented by Experienced Counsel

Defendants freely and voluntarily agreed to the Consent Order with the advice and consent of counsel. After entry of the SRO, Plaintiffs' counsel and Arnold Spencer ("Spencer") —current counsel for Defendants—extensively negotiated the terms of the Consent Order. The Consent Order is the result of those negotiations. Defendants agreed to the terms of the Consent Order, should be bound by their agreement, and not be able to rewrite it now. No facts,

---

[30] Gomersall Dec. ¶¶55-56, 72-73 (App. pp. 18-21, 26-29); Gomersall Dec. Att. Z, FF (App. pp. 192-97, 223-26); Samuelson Dec. ¶¶49-50, 50-52, 60-61 (Section VIIII) (App. pp. 247-49, 253).

circumstances, or equities have changed in this matter to warrant revisiting their voluntary Consent Order.

It is longstanding Fifth Circuit precedent that: "[c]onsent orders are interpreted as contracts and are to be construed only by reference to the 'four corners' of the order itself." *Robinson v. Vollert*, 602 F.2d 87, 92 (5th Cir. 1979), *referencing United States v. ITT Continental Baking Co*., 420 U.S. 223 (1975); *United States v. Armour & Co*., 402 U.S. 673(1971). The Fifth Circuit continued: "Reference to extrinsic evidence, such as the circumstances of formation, is permissible only if the order is ambiguous in some respect." *Id.* Nothing is ambiguous in the Consent Order and so it should be enforced as written.

To the extent Defendants challenge the Consent Order, and contrary to their insinuations in their brief, Spencer[31] provided knowledgeable advice and counsel to Defendants.[32] Spencer had a long career at the U.S. Department of Justice culminating in him serving as First Assistant U.S. Attorney in the Eastern District of Texas. As such, Arnold was well aware of legal considerations and jeopardy that his clients faced in this civil enforcement action and any criminal proceeding. This background makes Spencer clearly qualified to competently advise his

---

[31] Plaintiffs' opposition to Spencer's withdrawal was grounded in the concern that Asher and Batashvili have not provided Plaintiffs and the Court with a reliable means to contact/serve them and outstanding discovery issues. (D.E. #223).

[32] Contrary to Defendants' specious claims, Defendants have had—and continue to have—the benefit of experienced counsel throughout this case. In fact, on March 26, 2021, Plaintiffs' counsel, the Receiver, and Spencer held a telephonic conference to meet and confer on a joint case status report and proposed scheduling order. Therefore, Spencer was actively representing his clients on important case related matters in the days just before the instant filing on March 30, 2021.

clients.[33]

Defendants received significant benefits by agreeing to the Consent Order. They avoided a preliminary injunction hearing where they would have been called to testify and Plaintiffs would have been able to present witnesses and admit documentary evidence at the preliminary injunction hearing. This would have brought into stark relief the ample evidence establishing that the Defendants violated the anti-fraud provisions of 7 U.S.C. § 9(1) (2018) and 17 C.F.R. § 180.1(a)(1)-(3) (2019), and the laws of the States.[34] Finally, the Consent Order allowed Defendants to seek gainful employment outside of the financial services arena to pay reasonable living expenses via a clear and efficient process.

As with any negotiation, in return for the benefits, Defendants made concessions to Plaintiffs to which they must now abide.[35] After receiving the benefits and protections of the Consent Order, now Defendants want to rewrite the terms of the deal to the detriment of Plaintiffs and, most importantly, Defendants' victims. To grant the Attorneys' Fee Motion would result in the Plaintiffs losing the benefits of their bargain as discussed in the next section.

---

[33] To the extent Defendants purport to claim Spencer gave them poor advice, their only remedy is to bring a malpractice claim against him. Displeasure with counsel does not allow Defendants to seek reconsideration of settled issues after the time for reconsideration has long since elapsed.

[34] To promote judicial efficiency and the conservation of judicial resources, Plaintiffs will not restate the comprehensive legal argument and factual presentation in the SRO Application—it is incorporated by reference in footnote 1 *supra*—that describes in detail that Defendants have repeatedly violated, and continue to violate, the antifraud provisions of the CEA, CFTC Regulations, and State laws.

[35] Pursuant to the terms of the Consent Order, Defendants consented and admitted to venue, the Court's jurisdiction over the parties, and over the subject matter of this civil enforcement action. *See* Consent Order ¶ 6 (p. 4) and ¶¶10-17 (pp. 6-7) (consenting to personal jurisdiction, subject matter jurisdiction, and venue).

2.   <u>The Consent Order Specifically Addresses Future Earnings/Assets and Banned Activities</u>

The Attorneys' Fee Motion is clearly an attempt at a second bite at the apple. Defendants are trying to overturn two extensively negotiated provisions of the Consent Order. First, Defendants challenge Paragraph 25 (page 11) of the Consent Order that states: "The funds, assets, or other property affected by this Order **shall include both** existing funds, assets, or other property, **and funds, assets, or other property acquired after the effective date of this Order**, except as described in Sections VIII and IX of this Order." (Emphasis Added); *see also* Sections VIII and IX of the Consent Order. After negotiation, the parties agreed that *all* after-acquired funds and future earnings are subject to the asset freeze. This language of the Consent Order ensures that any new funds be restrained and then marshalled by the Receiver to compensate the 1600-plus victims of Defendants' nationwide fraud.

Second, Defendants challenge Paragraph 38 (page 16) of the Consent Order. Given the evidence that Defendants' fraud violated both commodities and securities laws, the Consent Order prohibits Defendants from engaging in any activity in the financial services space:

> Defendants Asher and Batashvili agree that they will not engage in any activity related to securities, commodities, or derivatives, including but not limited to soliciting, receiving, or accepting any funds from any person or entity for the purpose of purchasing, selling, or otherwise investing in precious metals, securities, commodities, derivatives, virtual currency, binary options, or foreign currency or receive any income, salary, wages, commissions, dividends, draws, or other forms of compensation or passive income from any person or entity engaged in said activities.

*Id.* This voluntary, agreed-to ban on activities covers more than just the cash sales of commodities; it includes securities and derivatives. This provision recognizes that there are 30 sovereign states (State Attorneys General and State Securities Administrators) who are also Plaintiffs as to the CEA violations with 10 States who are seeking to vindicate important State

securities law claims, including providing unlicensed investment advice. Pursuant to these State securities laws, Plaintiffs are entitled to enjoin Defendants from engaging in securities related activities. In addition to State-specific securities injunctions, notably, the securities and commodities regulator in California, who is a Plaintiff in this case, may obtain a nationwide injunction against individuals domiciled or doing business in California.  Ca. Corp. Code §§ 25530, 29540.  The California Commissioner has nationwide jurisdiction over offers and sales of securities and commodities made from or originating in California, and investment advice emanating from California.  Ca. Corp. Code §§ 25008, 25110, 25230, 25235, 29520, 29537, 29536.  Furthermore, Defendants voluntarily agreed to not engage in *any* activity related to securities, commodities, or derivatives. Therefore, any future earnings or after-acquired assets cannot come from these prohibited activities.

### B.  Plaintiffs Have Made a *Prima Facie* Showing that Defendants Violated the CEA and State Laws and Will Prevail at Trial

The CFTC and the States appear before the Court not as ordinary litigants, but as a federal agency and State agencies charged with safeguarding the public interest by enforcing Federal commodity laws and/or State securities laws.  *See e.g. SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (noting that the Securities & Exchange Commission, a sister federal agency, appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."); *SEC v. Cuban*, 798 F. Supp. 2d 783, 794 (N.D. Tex. 2011) ("Unlike a private litigant . . . when a regulatory agency like the SEC requests injunctive relief, it typically does so because Congress has provided statutory remedy for the public's benefit as a mechanism for effective law enforcement.").  The CFTC and States are under a duty in this civil enforcement action to proceed in the best interests of the public and the defrauded investors to arrest this nationwide fraudulent scheme. "Congress has

authorized the CFTC to bring actions in the district courts of the United States to enjoin acts or practices that violate the Commodity [Exchange] Act, to enforce compliance with rules and regulations, and to impose civil penalties." *CFTC v. Rogers*, 326 F. App'x 718, 719 (5th Cir. 2009). In the instant civil enforcement action, the CFTC and States face a lower burden than a private civil litigant seeking a preliminary injunction. In order to obtain a preliminary injunction under 7 U.S.C. § 13a-1 and 13a-2(a), Plaintiffs need only make *prima facie* showing that Defendants have engaged in acts or practices that violate the CEA and CFTC Regulations. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *SEC. v. First Fin. Grp. of Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) ("[T]he test laid down for injunctive relief [for SEC enforcement] is whether or not 'a proper showing' has been made by the SEC that there is a reasonable likelihood that the defendant is engaged or is about to engage in practices that violate the federal securities laws.") (citing *Aaron v. SEC*, 446 U.S. 680, 699 (1980); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (The SEC is entitled to prevail when the inferences flowing from the defendant's prior conduct betoken a reasonable likelihood of future violations); *CFTC v. Shakespeare Guardian Futures, Inc.*, 2010 WL 11506667, at *5 (W.D. Tex. Mar. 17, 2010) (("[CFTC] makes the requisite showing when it presents a *prima facie* case that the defendant has engaged, or is engaging, in illegal conduct, and that there is a likelihood of future violations."); *United States v. Grider*, 2010 WL 4514623, at *3 (N.D. Tex. Nov. 2, 2010) ("'[i]rreparable injury should be presumed from the very fact that the statute has been violated.") (quoting *US by Mitchell v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969)

Past illegal conduct is highly suggestive of the likelihood of future violations. *Zale Corp.*, 650 F.2d at 720; *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004); *CFTC v. Cloud*, 2011 WL 1157530, at *9 (S.D. Tex. Mar. 24, 2011) (past misconduct is "highly suggestive of the

likelihood of future violations") (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979),

*cert. denied* 442 U.S. 921 (1979)). The Court may infer a reasonable likelihood of future

violations based on defendants' past unlawful conduct. *CFTC v. PMC Strategy, LLC,* 903 F.

Supp. 2d 368, 380 (W.D.N.C. 2012) (explaining in the context of a permanent injunction: "In

order to obtain permanent injunctive relief in an action under Section 6c of the Act [7 U.S.C. §

13a-1], the Commission must not only establish that a violation of the Act has occurred, but also

that there is a reasonable likelihood of future violations."). The *PMC Strategies* court continued:

"[t]o be sure, while past misconduct does not require the conclusion that there is a likelihood of

future misconduct, it is 'highly suggestive of the likelihood of future violations.'" *Id.* at 380

(quoting *Hunt*, 591 F.2d at 1220)[36]

      Defendants erroneously claim that Plaintiffs are unlikely to succeed on the merits at trial

(Attorney's Fee Motion at 18). Contrary to this claim, the record before the Court contains

overwhelming evidence establishing that Defendants violated the anti-fraud provisions of the

CEA, CFTC Regulations, and State law. Plaintiffs have clearly demonstrated that Defendants

engaged in these illegal acts and omissions repeatedly, and with scienter. The SRO Application

provides detailed and overwhelming legal and factual support for every allegation in the

Complaint, and expressly addresses all of the elements to establish a claim of fraud under 7

U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).  Specifically, the evidence submitted by Plaintiffs

shows that Defendants made fraudulent misrepresentations and omissions that were: (1) false,

---

[36] *see also* CFTC *v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911, 919 (S.D.N.Y.
1977) ("[T]he commission of past illegal conduct is highly suggestive of the likelihood of future
violations.") (quoting *Mgmt. Dynamics*, 515 F.2d at 807); and *CFTC v. Sterling Trading Grp.,
Inc.*, 605 F. Supp. 2d 1245, 1291 (S.D. Fla. 2009) (relevant considerations in the "reasonable
likelihood" analysis include the nature of the past violation, the defendant's present attitude, and
objective constraints on (or opportunities for) future violations) (citing *Zale*, 650 F.2d at 720).

misleading, or deceptive; (2) material; and (3) intentional.  Accordingly, the injunctive relief in the Consent Order is necessary and appropriate because the evidence presented by Plaintiffs more than satisfies the *prima facie* showing of likelihood of future violations needed to justify the injunctive relief in the Consent Order.

1.  <u>Defendants Directly and Actively Participated in the Fraud</u>

Defendants go to great lengths in their brief to attempt to transform themselves from professional fraudsters into purported paradigms of virtue. They make broad claims about compliance programs, training, supervision, and other efforts to comply with the law. Sadly, all of this is nothing more than window dressing.  The evidentiary record demonstrates that Defendants actively engaged in and directed this nationwide fraudulent scheme; their attempts to paper over the fraud are to no avail.  As the Court-appointed Receiver explained in his first report:

> At 9:00 a.m., each morning, standing next to a money machine blowing cash, Asher shouted over a microphone to his army of dialers and closers - "ARE YOU READY TO MAKE MONEY?" **The dialers and closers knew huge commissions and gifts from Batashvili and Asher awaited them if they were successful in getting money from investors that day.** The massive financial rewards paid by Batashvili and Asher to closers were best seen by the Ferraris' and other luxury automobiles in the garage of 8383 Wilshire Blvd. **Indeed, Batashvili and Asher created a real life Beverly Hills version of the hedonistic brokerage firm portrayed in "The Wolf of Wall Street**."

D.E. #181 at 4 (emphasis added).  This Wolves of Beverly Hills operation was expressly designed to defraud. The Receiver continued:

> As evidenced by the scripts given by Batashvili and Asher to their sales force and information shared by investor victims, it is apparent that **Batashvili and Asher encouraged their sales crew to use lies, high pressure tactics, and fear to persuade elderly investors to move substantially all, if not all, of their life's savings and retirement** into self-directed IRA's and use the monies in the self-directed IRA's to purchased gold and silver coins from the Defendants.

D.E. #181 at 5 (emphasis added).

Plaintiffs have submitted overwhelming evidence showing that, both Asher and Batashvili personally solicited and defrauded investors, in addition to directing staff to make material misrepresentations. [Ex. 1, ¶5]. Both made telephonic solicitations of victims. *Id.* Plaintiffs have these and other recordings—disclosed in our Rule 26 Initial Disclosures—as well as other direct evidence of Asher's and Batashvili's active participation in, and direction of, this fraudulent scheme. This clearly refutes Defendants' claim that "[f]inally, even if the corporate defendants in this case are liable for misconduct, Plaintiffs are unlikely to succeed on the merits of extending this liability to Individuals." (Attorney's Fee Motion at 23).

2.  Defendants' Defense of Their Sales Operations and Fraudulently Priced Bullion is Unavailing and Disingenuous

Defendants claim to be "pioneer[s] offering customers the option to purchase bullion coins online without having to speak to commission-earning sales representatives… This online model helped ensure price transparency and allowed customers to compare prices without having to visit coin shops or engage in sales calls…" (Attorney's Fee Motion at 6). These claims are baseless. Two other online major bullion sellers, among others, established widely and broadly adopted online retail sales websites in 2000 and 2011—16 years and 5 years prior to Defendants' companies' founding. [Ex. 1, ¶10]. Most importantly, Defendants specifically did not use an online operation/model to sell fraudulently priced Polar Bear Bullion and Barrick Bullion. [Ex. 1, ¶¶12, 19]. Instead, they required their victims to speak to sales agents, and did not provide an opportunity for victims to compare prices. [Ex. 1, ¶¶12, 15-16]. In fact, Defendants sold the Polar Bear Bullion and Barrick Bullion *exclusively* via phone sales with *no* price transparency. [Ex. 1, ¶17]. Actually, online sales represented approximately *only 1.4 percent* of their total sales. [Ex. 1, ¶¶11,22].

15

Defendants unconvincingly try to justify their fraudulent massive overcharges in the Attorney's Fee Motion. Contrary to their misleading claims, nothing in the marketplace or intrinsic to these bullion can justify their fraudulent pricing. [Gomersall Dec. ¶ 55-56, 72-73 (App. pp. 18-21, 26-29); Gomersall Dec. Att. Z, FF (App. pp. 192-97, 223-26); Samuelson Dec. ¶49-50, 50-52, 60-61 (Section VIIII) (App. pp. 247-49, 253)]. Indeed, Defendants are conspicuously silent as to one of the main allegations of the complaint: the fact that **none** of the actual Spreads[37] on Polar Bear Bullion fell within the range of Spreads represented to investors in the Customer Agreements.[38] [Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]. They promised Spreads of either at 2% to 19.9% or 2% to 33%. [Gomersall Dec. ¶ 63 (App. p. 22)]. Yet, as part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in the Customer Agreements.  In fact, Defendants

---

[37] The Spread is charged to investors represents the difference between what Metals paid for the Precious Metals Bullion and what they charged investors. [Gomersall Dec. ¶ 60, 66 (App. pp. 21, 23); Gomersall Dec. Att. AA (App. pp. 198-206)]

[38] Defendants attempt to denigrate, to no avail, the importance of the SDIRA statements and valuation to investors (Attorney's Fee Motion at 9, n 5). Defendants made affirmative representations that these were safe and conservative investments and that investors would not lose their principal. [Planer Dec. ¶47-50 (App. pp. 283-85)] During the fraud, Defendants were keenly aware of how damning and detrimental the SDIRA statements were to their fraudulent scheme. When investors received account statements from their SDIRA administrators showing an account value—the accurate value of the precious metals—that was significantly smaller than what Defendants misrepresented to investors, Defendants engaged in additional misrepresentations to conceal their fraud. [Planer Dec. ¶47-50 (App. pp. 283-85)] Defendants fraudulently represented to investors that the lower valuation on their SDIRA statements was an under-valuation that did not reflect the resale value of the precious metals. [Planer Dec. ¶48 (App. p. 284)] Defendants made these misrepresentations—so regularly made that the Defendants and their employees coined a phrase to describe it as "Tuck-In"—to placate and calm investors who were upset about the losses shown on their SDIRA statements. [Planer Dec. ¶48 (App. p. 284)] In fact, these post-sale misrepresentations and omissions were designed to perpetuate and conceal their fraudulent scheme.

knew or had a reckless disregard for the truth that the Spreads charged by Metals.com to their elderly or retirement-aged investors for the Polar Bear Bullion averaged:

1.  128 percent for Silver Royal Canadian Mint Polar Bear Bullion;

2.  91 percent for Gold Royal Canadian Mint Polar Bear Bullion; and

3.  108 percent for Gold British Standard Bullion. [Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49)]

Defendants cannot defend this misconduct. They made material representations that they would charge specific spreads to unsophisticated elderly investors and instead fraudulently charged them exorbitant prices far higher than the Spreads. Defendants attempt to distract the Court from the core of this fraud by claiming the high prices of their coins are akin to prices of other coins. (Attorney's Fee Motion at 8). This claim is erroneous because it is based on cherry-picked coins that are high priced primarily because they are low mintage[39] with extremely limited availability in the marketplace. [Ex. 1, ¶¶27-38]. In fact, at least **41** Metals.com victims each bought more than 5,000 pieces of 1/2 ounce Silver Polar Bear bullion **in single transactions,** which is more than the entire mintage of the 2020 Mexican Libertad proffered in the Attorney's Fee Motion. [Ex. 1, ¶43]. Further, four of the seven coins referenced in the Attorney's Fee Motion are special limited edition, numismatic collector coins. [Ex. 1, ¶39]. This is not the case with the coins sold by Defendants. There is a major difference between single collector transactions that may be overpriced and a practice and pattern of selling fraudulently overpriced, high-mintage bullion as an investment with the intent to defraud. Defendants directed investors to purchase Polar Bear Bullion and Barrick Bullion at grossly inflated prices that bore no relationship to the Prevailing Market Price. Planer Dec. ¶52, 142-144 (App. pp. 285, 309-

---

[39] These proffered coins collectively have a very low mintage in the tens of thousands vs. Polar Bear Bullion and Barrick Bullion which had mintage over 4.2 million. [Ex. 1, ¶42].

10). In fact, approximately ninety percent of the total amount of investors' funds solicited and received by Metals.com from investors was used to buy Polar Bear Bullion. Samuelson Dec. ¶49-50 (Section VIIII) (App. pp. 247-49).

Finally, the references to the US Mint and Walmart are an apples-to-oranges comparison, designed to obfuscate the difference between selling a few coins to retail buyers for their collection versus selling hundreds or thousands of coins for investment purposes. For retail sales, the US Mint's and Walmart's business models are geared toward only selling individual bullion coins or coin sets to consumers in small quantities. [Ex. 1, ¶41] Notably, the US Mint represents that the American Eagle coin—cited by Defendants—is intended for collectors. [Ex. 1, ¶35] Similarly, the 2008 Australia ½ ounce silver coin sold by Walmart—actually sold by APMEX— is also a very low mintage collector coin. [Ex. 1, ¶¶32-33]. Unlike the low mintage collector coins cited by Defendants, here, Defendants sold high mintage coins for investment purposes. The US Mint's and Walmart's sales are more comparable to a gift shop than Defendants' investment shop.

### C.  The Plain Language of 7 U.S.C. § 9(1), and CFTC Regulation 180.1 and Cases Applying Those Provisions, Clearly Apply to Defendants' Fraudulent Scheme

Defendants wrongly attempt to transmute a straight-forward fraud matter into something complex through unsupported rhetoric. In fact, both Metals.com and Barrick[40] are modern-day boiler-room operations designed to defraud unsophisticated elderly investors via telephonic sales.

---

[40] Barrick was started after multiple states issued cease and desist orders against Metals in an effort to stay ahead of the regulators so they could continue defrauding elderly victims. [Ex. 1, ¶4(g); 6]

The plain language of 7 U.S.C. § 9(1) (also cited as Section 6(c) of the CEA), CFTC Regulation 180.1, and cases applying those provisions, cover Defendants' fraudulent scheme. These provisions clearly prohibit fraud in connection with contracts of sale of a commodity in interstate commerce. This broad-based prohibition against fraud is not limited to leveraged precious metals transactions and extends to fraud in connection with all contracts of sale of precious metals in interstate commerce.   In fact, this matter is the *prototypical* fraud case that 7 U.S.C. § 9(1) and CFTC Regulation 180.1 were intended to address.

The CFTC has anti-fraud and anti-manipulation enforcement authority over transactions that are contracts for the sale of a commodity in interstate commerce, sometimes called "spot" or "physical" transactions. Under the Dodd-Frank Act, Congress gave the CFTC new and enhanced enforcement authority over spot or physical transactions mirroring the Securities and Exchange Commission's Rule 10b-5 enforcement authority. As part of the Dodd-Frank Act, Congress added 7 U.S.C. § 9(1) and the CFTC subsequently adopted Rule 180.1 implementing 7 U.S.C. § 9(1) which prohibits any manipulative device, scheme or artifice to defraud involving non-leveraged spot transactions as occurred here.

Defendants make a number of specious arguments about CFTC jurisdiction that contradict the plain reading of the CEA and CFTC regulations as well as the ruling of federal courts. Defendants wrongheaded legal claims cannot withstand scrutiny and are meritless. The clear language of the CFTC's statutory mandate and the rulings of federal courts have established that the CFTC has authority to enforce these anti-fraud provisions. 7 U.S.C. § 9(1) makes it unlawful for any person, in connection with any contract of sale of any commodity in interstate commerce, to use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the CFTC shall promulgate.  Pursuant to this

authority, the CFTC promulgated CFTC Regulation 180.1(a)(1)–(3) which makes it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

Defendants have violated 7 U.S.C. § 9(1) and CFTC Regulation 180.1(a)(1)–(3) because they made material misrepresentations and omissions to investors and prospective investors, all in connection with the purchase and sale of silver and gold, statutorily-defined commodities under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9) (2018).

Defendants wrongly claim the silver and gold precious metal bullion[41] at issue here are not commodities. *See, e.g.,* Attorney's Fees Motion at pp. 3, 18, 19, 22. The plain reading of 7 U.S.C. § 1a(9) (2018) contradicts this claim. The statute defines a commodity as "all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) **in which contracts for future delivery are presently or in the future dealt in**." (emphasis added). Silver and gold have had futures contracts on them for decades which clearly makes them commodities. Further, the definition of commodity is intended to be expansive, covering asset categories from agricultural commodities; to natural

---

[41] The term "bullion" refers to precious metals in the form of bars, ingots, or coins in which the value is typically determined by the value of the precious metal content. [Samuelson ¶14 (App. p. 242)]

resources such as oil, gas, and precious metal bullion; to services, rights, and interests; and more. *See, e.g., Dunn v. CFTC*, 519 U.S. 465, 469 (1997) (stating that Congress "dramatically expanded the coverage" of the Act by broadening the definition of "commodity" in the 1974 CFTC Act); *CFTC v. My Big Coin Pay, Inc.,* 334 F. Supp. 3d 492, 497 (D. Mass. 2018) (The My Big Coin court further held: "[t]his broad approach also accords with Congress's goal of 'strengthening the federal regulation of the . . . commodity futures trading industry,' . . . since an expansive definition of 'commodity' reasonably assures that the CEA's regulatory scheme and enforcement provisions will comprehensively protect and police the markets.") *Id*. at 497. Simply put, a "commodity" for purposes of §1a(9) is broader than any particular type or brand of that commodity and indisputably covers the spot/cash silver and gold bullion transactions at issue here.

The CFTC has stated that "Section 6(c)(1) and final Rule 180.1 augment the Commission's existing authority to prohibit fraud and manipulation." Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011) (final rules). Specifically, the CFTC has addressed the applicability of CFTC Regulation 180.1 to precious metals cases:

> By way of non-exclusive example, **if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities**, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking to hedge price risk in that commodity, depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1.

21

*Id.* at 41,401 n.37 (emphasis added). Here, Defendants' sales pitch to victims was centered around the promise of making money by speculating on increases in the value of precious metals. Defendants' fraudulent scheme clearly matches the example in the CFTC's guidance.

Defendants contend that, in CEA Section 6(c)(1), 7 U.S.C. § 9(1), Congress did not intend "to confer, via a prohibition on market manipulation, expansive power to regulate any retail sale of any commodity." (Attorney's Fee Motion at 20).  This assertion was rejected in *CFTC v. Monex Credit Company*, where the Ninth Circuit held that 7 U.S.C. § 9(1)'s unambiguous language "[a]uthorizing claims against '[m]anipulative or deceptive' conduct means what it says: the CFTC may sue for fraudulently deceptive activity, regardless of whether it was also manipulative." 931 F.3d 966, 976 (9th Cir. 2019), *cert denied* 141 S. Ct. 158 (Mem) (2020).  This is so because the conjunction "or" generally connects words that should "be given separate meanings." *Garcia v. United States*, 469 U.S. 70, 73 (1984); *see United States v. Woods*, 571 U.S. 31, 45 (2013) (explaining that the term "or" "is almost always disjunctive"). Thus, as the statute's language makes plain, the CFTC may bring an enforcement action for conduct that is either manipulative *or* deceptive.  Similarly, the word "any" to describe the broad range of manipulative or deceptive devices or contrivances covered by the statute underscores the absence of any further limitation on the provision's reach.  *See HUD v. Rucker*, 535 U.S. 125, 131 (2002).[42] If Congress had intended to limit Section 6(c) as Defendants claim, it would

---

[42] Statutory context confirms the plain meaning of the text.  Under Section 6(c)(1), the CFTC's rules may not require market participants to disclose certain information, except where disclosure is "necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect."  7 U.S.C. 9(1).  That prohibition of material omissions reflects a classic fraud principle, see Restatement (Second) of Torts § 551(2)(b) (1977), and borrows from another anti-fraud provision, Section 4b(b) of the CEA, 7 U.S.C. 6b(b).  It would have made little sense for Congress to focus on fraudulent omissions if it

have been easy for Congress do so. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.").

Defendants further mistakenly claim that the CFTC is trying to regulate the whole economy and "arguably including even a customer's purchase of a single potato in a grocery store." (Attorney's Fee Motion at 20). The "grocery store" argument is unpersuasive.[43]  Section 6(c)(1) indisputably prohibits minor acts, particularly when they qualify as an "attempt."  7 U.S.C § 9(1).  The fact that a *de minimis* violation is conceivable does not make the statutory text absurd or unenforceable.  *Cf. Invs. Equity Grp, Inc. v. Univ. Symetrics Corp.*, 53 F.3d 159, 162-63 (6th Cir. 1995) (permitting rescission of securities sale for "de minimis" statutory violations regardless of whether result was "absurd").

Section 6(c)(1)'s prohibition on "any manipulative or deceptive device or contrivance" is also the exact same phrasing used in Section 10(b) of the Securities Exchange Act.  15 U.S.C.

---

did not intend to prohibit fraud (outside of market manipulation) in the first place.  And another CEA provision addresses "manipulative device[s]" without mentioning fraud, underscoring that when Congress meant to address manipulation alone, it "knew how to do so."  *Custis v. United States*, 511 U.S. 485, 492 (1994).

[43] Indeed, the CFTC rejected identical arguments when it promulgated Regulation 180.1. See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011) (noting that the CFTC intends to interpret Section 6(c)(1) "not technically and restrictively, but flexibly to effectuate its remedial purposes," but explaining that it did not understand the Dodd-Frank amendments to give the CFTC power over "'virtually every commercial transaction in the economy,'" but only contracts of sale for a commodity in interstate commerce involving fraud or manipulation). The CFTC's interpretation of Section 6(c), as set forth in CFTC Regulation 180.1, is entitled to deference pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), because the Congress explicitly called on the CFTC to promulgate rules setting forth how Section 6(c) could be violated.

§ 78j(b).  When Congress enacted Section 6(c)(1), decades of case law had established that the phrase "manipulative or deceptive device" in Section 10(b) covers all forms of fraud.  *See, e.g., SEC v. Zandford*, 535 U.S. 813, 820-25 (2002); *Chiarella v. United States*, 445 U.S. 222, 226 (1980); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-154 (1972); *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 860-861 (2d Cir. 1968) (*en banc*).  Congress is presumed to be "thoroughly familiar" with such "important precedents."  *Cannon v. Univ. of Chi.*, 441 U.S. 677, 699 (1979).  As a result, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citation, ellipses, and internal quotation marks omitted).[44]

This Court should reject Defendants' contention that Section 6(c)(1) does not apply to the non-leveraged, retail sale of commodities.  Though the Ninth Circuit in *Monex* did not address non-leveraged transactions—because there were not any at issue there—several courts have applied 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) to fraud in connection with non-leveraged precious metals bullion transactions. *See e,g, CFTC v. Atlantic Bullion & Coin, Inc. and Ronnie Wilson*, No. 8:12-cv-01503 (D.S.C. 2012); *CFTC v. The Tulving Company and*

---

[44] Section 6(c)(1)'s legislative history supports this result.  Senator Cantwell, who introduced Section 6(c)(1) as an amendment to the proposed Dodd-Frank bill, explained that she had borrowed its language from Section 10(b) of the Securities Exchange Act so that "courts and the Commission will interpret the new authority in a similar manner."  156 Cong. Rec. S3348 (daily ed. May 6, 2010) (reciting that, "when Congress uses language identical to that used in another statute," it is presumed to intend the same meaning, and observing that courts could thus refer to "the 75 years" of "case law [that] ha[d] developed around th[ose] words.").

*Hannes Tulving*, No. 3:15-cv-00424 (W.D.N.C. 2015); *CFTC and State of Utah v. Rust Rare Coin, Inc., et al*., No.  2: 18-cv-892 (D.UT. 2018).[45]

Courts have similarly applied Section 6(c)(1) and Regulation 180.1 to fraud involving non-leveraged sales of virtual currency commodities.  Two decisions are worth highlighting.  First, in *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018), the Court held that the CFTC had anti-fraud authority in connection with spot transactions for virtual currencies.  After finding that virtual currencies are a commodity, the court held that Section 6(c)(1) and Regulation 180.1 prohibit fraud in connection with a contract of sale of a commodity in interstate commerce.  "Although the CFTC has traditionally limited its jurisdiction primarily to 'future' contracts for commodities, its expansion into spot trade commodity fraud is justified by statutory and regulatory guidelines." *McDonnell,* 287 F. Supp. 3d at 228-29. Second, in *CFTC v. My Big Coin Pay, Inc.*, the U.S. District Court for the District of Massachusetts held that "both Section 6(c)(1) and Regulation 180.1 prohibit fraud in connection with a contract of sale of a commodity in interstate commerce." 334 F. Supp. 3d 492, 498 (D. Mass. 2018),

The law, statutory construction, and legislative history overwhelmingly support the Plaintiffs' position.  With the statutory text squarely against them, Defendants urge the Court to

---

[45] In addition, the CFTC has successfully prevailed in a number of enforcement actions under Section 6(c)(1) of the CEA and Regulation 180.1 for fraudulent conduct since Regulation 180.1 became effective in 2011.  *See CFTC v. S. Trust Metals, Inc.*, No. 1:14-CV-227389, 2016 WL 4523851 (S.D. Fla. Aug. 29, 2016) (holding that misappropriation and false statements fraud was covered by Section 6(c)(1) and Regulation 180.1, and that the elements were the same as under Section 4(b)), *aff'd*, 880 F.3d 1252 (2018); *CFTC v. Hunter Wise Commodities LLC*, 21 F. Supp. 3d 1317,1347–48 (S.D. Fla. 2014) (referencing precedents under Section 10(b) and Rule 10b-5 under the Securities Exchange Act to hold that fraud was actionable under Section 6(c)(1) and Regulation 180.1).

disregard the statute's text on the basis of a red-herring reference to a cherry-picked and misleading statement of a witness, Mr. Roth, at a Congressional hearing. (Defense Brief at 20). The hearing did not address the antifraud prohibitions of Section 6(c) as part of the enactment Dodd-Frank Act.  Instead, the hearing was concerned with an entirely different section of the CEA, namely Section 2(c)(2)(D) (which only applies to leveraged, margined or financed transactions).[46] Thus, any comments by Mr. Roth aren't relevant or applicable here.   In sum, Plaintiffs have anti-fraud jurisdiction over cash or spot transaction such as the ones at issue here.

### D.  Balancing the Equities, the Attorney's Fee Motion Should be Denied Because the Consent Order's Asset Freeze is Necessary and Appropriate

1.  <u>The Court Has Broad Equitable Power to Maintain the Asset Freeze</u>

The Court has broad power to fashion appropriate relief pursuant to the CEA.[47]  District courts have jurisdiction to grant ancillary relief in order to protect jurisdiction to award equitable relief. *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982). "It is well settled that a district court has the authority in a securities fraud case to grant ancillary relief in the form of [an] order[] . . . temporarily freezing assets." *SEC v. Coates*, 1994 WL 455558, at * 1 (S.D.N.Y.

---

[46] The authority granted under CEA section 2(c)(2)(D) is in addition to, and independent of, the Plaintiffs' ability to bring enforcement actions for fraud under CEA Sections 6(c) and Regulations 180.1. Defendants' faulty argument reflects its fundamental misunderstanding of Section 2(c)(2)(D)(ii) itself. Section 2(c)(2)(D)(ii) makes clear that the actual delivery exception, if satisfied, means only that a transaction is excepted from Section 2(c)(2)(D). The statute simply ***does not*** say that a defendant is excluded from ***the entire CEA*** if the exception is met.

[47] *See e.g. CFTC v. Premium Income Corp.*, 2007 WL 4563469, at *6 (N.D. Tex. Dec. 28, 2007) (district courts enjoy broad discretion in fashioning appropriate relief for violations of the CEA and the commodities regulations) *citing Muller*, 570 F.2d at 1300 (5th Cir. 1978); *CFTC v. Levy*, 541 F.3d 1102, 1113 (11th Cir. 2008) ("It is undisputed that the [Act] drapes the district court with broad equitable power.  "[W]hen 'the public interest is involved in a proceeding of this nature, [the district court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982) ((quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

Aug. 23, 1994) (*citing SEC v. Manor Nursing Ctrs, Inc.,* 458 F.2d 1082, 1103, 1105 (2d Cir. 1972); *see also SEC v. United Commc'ns, Ltd.*, 899 F. Supp. 9, 11-12 (D.D.C. 1995); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986 (11th Cir. 1995) (equitable powers extend to asset freeze). Further, "[o]nce the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *SEC v. Zubkis*, 2003 WL 22118978, at *5 (S.D.N.Y. Sept. 10, 2003) quoting *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1103.

The purpose of an asset freeze is "to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp Co.*, 212 F.3d 180, 197 (3d Cir. 2000); *SEC v. AmeriFirst Funding, Inc.,* 2007 WL 2192632, at *1 (N.D. Tex. July 31, 2007), *citing SEC v. Brooks,* 1999 WL 493052, at *2 (N.D.Tex. July 12, 1999) ("The court is empowered to freeze defendants' assets to preserve the status quo and prevent dissipation of ill-gotten gains so that they remain available to pay subsequent disgorgement orders and civil penalties.").[48]

2.   The Court Has Discretion *Not* to Exempt Frozen Assets To pay Attorney's Fees

Whether to exempt assets from a freeze order to pay for legal fees falls within the sound discretion of the district court. *See, e.g., SEC v. Capital Counselors, Inc.,* 512 F.2d 654, 658 (2d Cir. 1975)*; United States v. Madeoy,* 652 F. Supp. 371, 376 (D.D.C. 1987). There is no requirement for a court to exempt assets from a freeze order to pay for legal fees. *Turner v. Rogers*, 564 U.S. 431, 441 (2011) (Sixth Amendment right to counsel "does not govern civil cases"); *SEC v. Comcoa Ltd.*, 887 F. Supp. 1521, 1524-25 (S.D. Fla. 1995), aff'd, 70 F.3d 1191

---

[48] *See also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (an asset freeze is "justified as a means of preserving funds for the equitable remedy of disgorgement"); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001) ("[T]he primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial . . . .").

(11th Cir. 1995). *See also SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993); *Lara-Torres v. Ashcroft*, 383 F.3d 968, 973 (9th Cir. 2004), and *World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989) ("[a]ny doubt as to the constitutionality of freezing assets and precluding entirely their use for payment of attorney fees in circumstances even more extreme than this case have now been resolved by the [US Supreme Court]").

"A district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets." *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). The trial court "must be given wide latitude in these matters." *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (quoting *SEC v. Patel,* 61 F.3d 137, 140 (2d Cir.1995)). The *Lorin* court continued "any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.*

As the Supreme Court has ruled:

> A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice. A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense.

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *see also FTC v. Abili-Staff, Ltd*, 2010 WL 11598073, at *2-3 (W.D. Tex. Oct. 7, 2010), *quoting SEC v. Quinn*, 997 F. 2d 287, 289 (7th Cir. 1993) ("Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.") (collecting authority); *World Wide Factors, Ltd*., 882 F.2d at 347-48 ("[c]ourts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees."); *Noble Metals Int'l, Inc.*, 67 F.3d at 775 (affirming order

28

denying payment of attorneys' fees from frozen assets). Indeed, there is no constitutional bar to restricting even criminal defendants from using tainted funds to pay for their legal defense. *See United States v. Monsanto*, 491 U.S. 600, 608 (1989); *Caplin & Drysdale,* 491 U.S. at 626; *accord World Wide Factors*, 882 F.2d at 347. "It would be anomalous to hold that a civil litigant has any superior right to counsel than one who stands accused of a crime." *SEC v. Cherif,* 933 F.2d 403, 417 (7th Cir. 1991). In fact, *Cherif* directly distinguished one of the Defendants' lead cases, *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987), by stating: "[t]he recent Supreme Court cases of *Caplin & Drysdale, Chartered v. United States* and *United States v. Monsanto* held that the use of frozen assets for attorney's fees could be disallowed in circumstances much more extreme than in *Dixon* or in this case.") *Id.* (internal citations omitted).

Defendants cite a number of cases that are inapposite, distinguishable, and do not support their request for attorneys' fees.[49] For example, Defendants mistakenly rely on *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980) for the proposition that a civil litigant somehow has a constitutional right to counsel of his or her choice. (Attorney's Fee Motion at 20). However, Defendants fail to provide the underlying facts of the case as well as the crucial

---

[49] Many of the Defendants' proffered cases are clearly distinguishable because they involved scenarios where there was an indictment and grant of fees was for the criminal not civil action. For example, Defendants cite *CFTC v. Walsh.* In that matter, the Court limited the attorney's fees only for the criminal case where the defendants had been indicted and restricted the source of funds to those that pre-existed the fraud. In *SEC v. Gryphon Holdings, Inc.*, the defendant was indicted and the SEC stipulated to the release of funds. This is very different than this matter where the criminal exposure of defendants is at most amorphous. Similarly, in *CFTC v. Dinar*, the defendant was indicted. Further, *Dinar* addressed a wholly different fraud section dealing with foreign currency transaction under the CEA—forex is not a commodity under the CEA— and so is inapposite here. Finally, after *Dixon*, the Supreme Court issued its *Monsanto* and *Caplin* rulings and sister circuits ruled in *Noble* and *Cherif*, that the courts are well within their authority to deny attorney's fees in situations similar to the instant matter.

point that the Fifth Circuit later distinguished this case and so significantly curtailed the precedential value of this proposition. The facts of *Potashnick* are critical. The court in *Potashnick* improperly prohibited a litigant from "consulting with his attorney during breaks and recesses in the litigant's testimony[.]" *Id.* The Fifth Circuit was focused on the right to communicate with counsel during a proceeding rather than a right to hire counsel of choice.

Nine years later, the Fifth Circuit in *Matter of Wynn* 889 F.2d 644 (5th Cir. 1989) significantly distinguished and clarified the holding in *Potashnick.* In *Wynn*, a litigant advanced the same argument that Defendants are advancing here, namely that in a civil case, they have the right to hire counsel of their choice. Relying on *Potashnick*, the defendant claimed that the Fifth Circuit "'has repeatedly recognized such constitutional right of counsel of choice in *civil* litigation.'" *Id.* at 646 (emphasis in original).  The *Wynn* court held that, "*Potashnick*, however, stands **for no such thing**." *Id.* (emphasis added). The Fifth Circuit concluded that *Potashnick* was inapplicable to Wynn's circumstances because *Potashnick* was limited to a circumstance where a litigant was prohibited from communicating with counsel during a proceeding resulting in a denial of the litigant's right to counsel, rather than a right to hire counsel of choice. *Id.* There is no constitutional right in a civil matter to counsel of choice, but instead "a litigant must be *afforded a fair opportunity to secure counsel of his choice*, not that he has an absolute right to select any counsel he desires." *Id.* (emphasis in the original).

Similarly, a sister Texas district court addressing an asset freeze stated: "[d]efendants' lawyers, when they agreed to represent defendants, knew or should have known that if defendants are found to have engaged in fraudulent conduct, they have no inherent right to use frozen assets to pay their legal fees."  *FTC v. Abili-Staff, Ltd*, 2010 WL 11598073, at *2 (W.D.

Tex. Oct. 7, 2010), citing *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995).[50]

The *Abili-Staff* court continued "[w]hile the Court understands that wrongdoing on the part of the defendants has not been proven, where as in this case the FTC has shown the likelihood that it will succeed on the merits, the Court has a duty to preserve assets to ensure the availability of funds to pay restitution. *Id. (citing FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988)).

   3.   Release of Funds Is *Not* in the Interest of the Defrauded Investors

Defendants seek to unfreeze restrained assets as well as use future earnings or after acquired assets for attorney's fees. They state: "Asher and Batashvili therefore respectfully seek modification of the agreed injunction to allow them **access to their existing or future untainted assets** for the purpose of paying attorneys' fees in this matter." (Attorney's Fee Motion, 4) (emphasis added). However, unfreezing any of the Defendants' assets or releasing any after-acquired assets or future earnings will greatly risk additional harm to the investors. "The Court must assess whether a modification of the Preliminary Injunction is in the best interests of the defrauded investors." *SEC v. Dobbins*, 2004 WL 957715, *2 (N.D. Tex. Apr. 14, 2004). As the record in this case shows, Defendants orchestrated a fraudulent scheme that solicited and received over $185 million from elderly and retirement aged victims; mostly their retirement

---

[50] Similarly, attorneys have a duty of inquiry as to attorney fees. *FTC v. Assail, Inc.*, 410 F.3d 256, 264 (5th Cir. 2005).  In *Assail*, the court found that the circumstances of the fee payment should have alerted the attorney to a concern. *Id*. at 266. The court cited that fact that the attorney was aware that the client was "accused of perpetrating a massive telemarketing fraud, that all of his assets were frozen, and that supposedly unrelated third parties were paying his fees." *Id*. Those circumstances are present in this matter. The *Assail* court stated that the attorney, "needed to do far more than simply take his client at his word that the fees were not tainted in order to make a reasonable claim for fees. Trusting [the client's] truthfulness unconditionally was especially unreasonable considering that he was accused of fraud, an allegation going directly to his honesty." *Id.*

savings. The Receiver's and Plaintiffs' initial investigation—stymied by Defendants failure to cooperate—of their assets indicates a strong probability that Defendants do not have sufficient assets to remotely cover the victim losses incurred because of their fraud.

Any dispersing or dissipation of funds would serve to further reduce the likely recovery for the victims of this scheme." *Abili-Staff, Ltd*,  2010 WL 11598073, at *2-3 (where a receivership estate lacks sufficient funds to pay claims of defrauded customers, it would be inequitable to further deplete the funds to pay the attorneys retained by defendant) (citing *CFTC v. Morse,* 762 F.2d 60, 63 (8th Cir. 1985). Importantly, Defendants have presented no evidence that any of their currently frozen assets are derived from sources other than investor funds or illicit activities. Even if Defendants were to find gainful employment, victims' losses dwarf Defendants' potential future earnings and those earnings should be restrained. *See e.g. Noble Metals Int'l, Inc.*, 67 F.3d at 775 (affirming the discretion of district court to deny attorneys' fees from frozen assets due to the amount of frozen assets being less than amount needed to compensate the victim).

4.   The Asset Freeze Serves the Public Interest

An asset freeze serves the public interest because the Plaintiffs seek to return funds to the victims of Defendants' massive nationwide fraud.  In civil enforcement actions, courts regularly deny "carve-outs" from asset freezes, whether for living or legal expenses, even where the funds at issue were not proceeds of the alleged fraud.  *See SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) ("Until such time as the Court can determine whether the frozen assets exceed the SEC's request for damages, defendants will not be permitted to use any of the frozen assets"); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) (maintaining original asset freeze warranted even as to funds that are not proceeds of alleged fraud).

The public interest in maintaining an asset freeze is far greater where the amount frozen is insufficient to satisfy disgorgement and restitution. *See, e.g. SEC v. Dobbins*, 2004 WL 957715, at *2-3 (N.D. Tex. 2004) (denying carve-out based on court's "duty to ensure" that assets are available to repay alleged victims and where there was insufficient evidence that defendant had assets not derived from alleged fraud); *FTC v. Ameridebt, Inc.*, 373 F.Supp. 2d 558, 564-65 (D.Md. 2005) (denying carve-out where public interest in preserving proceeds of fraud outweighed defendant's personal hardship); *SEC v. Stein*, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) ("To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted **and** that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial.") (emphasis added).[51]

Where, as here, the disgorgement remedy serves the public interest—i.e., allowing the Plaintiffs to recover funds to discourage similar future conduct—there is a particularly strong basis for equity to operate without a tracing requirement. *See generally Grupo Mexicano de Desarrollo, S.A., v. Alliance Bond Fund, Inc*., 527 U.S. 308, 326 (1999) ("courts of equity will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved") (citations and internal quotations omitted).

---

[51] *See, e.g., Bremont*, 954 F. Supp. at 733 ("until such time as the Court can determine whether the frozen assets exceed the SEC's request for damages, defendants will not be permitted to use any of the frozen assets"); *In re Krause*, 349 B.R. 272, 283 (D. Kan. 2006) ("where there is insufficient property to compensate one's victims or repay one's creditors, courts are entirely justified in exercising their discretion to deny use of frozen funds for attorney's fees"); *Levi Strauss & Co.*, 51 F.3d at 987 (holding in an action for injunctive relief in a trademark case that the district court had the authority to freeze "those assets which could have been used to satisfy an equitable award of profits").

At this juncture, given the massive breadth and scope of Defendants' securities and commodities violations and the massive investor losses, it is highly likely that the Defendants' available assets—or any after-acquired assets or earnings—are insufficient to make the victims whole. Accordingly, Plaintiffs urge the Court to continue the freeze over Defendants' assets. The Court should reject the release of any frozen funds and impose a restraint on any and all future earnings or after-acquired assets.

    5.   The Court Should Restrain After-Acquired Funds and Earnings Because There Are Insufficient Funds to Satisfy a Judgment in this Matter

    a) To grant Defendants' request would be inequitable because it would require the victimized investors to pay for Defendants' defense

Any and all after-acquired assets or earnings must remain subject to restraint. It is well settled that an asset freeze is "designed to preserve the status quo by preventing the dissipation and diversion of assets pending" a disposition of the merits of the action. *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3rd Cir. 1993) (citing *CFTC v. Co Petro Mktg. Grp, Inc.,* 680 F.2d 573, 582-83 (9th Cir. 1982)). An asset freeze order may cover not only the assets of defendants that exist upon entry of the order, but it also may encompass all after-acquired assets of defendants up to and until a final judgment is rendered on the merits of the action. *See CFTC v. United Investors Group, Inc*., 440 F. Supp. 2d 1345, 1358-59 (S.D. Fla. 2006).

To grant Defendants' request would be inequitable because it would require the victimized investors to pay for Defendants' defense.  Any and all after-acquired assets or earnings must remain subject to immediate restraint and oversight and control by the Receiver. The freeze must reach any future assets obtained by Defendants in order to repay the victims of Defendants' massive and pervasive fraud. Carving out future assets and earnings would allow the Defendants to enrich themselves to the detriment of their defrauded investors. This would perpetrate rather than correct an inequity.

b) There is no requirement that frozen asset be traceable to the fraud

Courts have found that there is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit. *Levi Strauss & Co.*, 51 F.3d at 982 (a district court may freeze assets not specifically traced to illegal activity); *SEC v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (refusing to release personal funds not traceable to the fraud because defendant's liability exceeded total funds frozen); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 109 (2d Cir. 1996) ("it is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity"); *SEC v. Roor*, 1999 WL 553823 at *2 (S.D.N.Y. 1999) (denying motion to release so-called "untainted" funds from mortgage of property that pre-existed alleged fraud); *SEC v. Glauberman*, 1992 WL 175270 at *2 (S.D.N.Y. 1992) (rejecting defendant's argument that funds subject to disgorgement must be traced "dollar for dollar" to the illegal activity). Plaintiffs need only show a reasonable approximation of that amount. *Lorin*, 76 F.3d at 462. The same holds true for an award of restitution.

A tracing requirement would, as the D.C. Circuit put it, lead to "absurd" results: "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000). This would create "a monstrous doctrine for it would perpetuate rather than correct an inequity." *Id.*

6. Defendants Have Unclean Hands Because They Intentionally Violated Lawful Orders, including the Court's SRO and Consent Order

The Court should reject this effort to modify the asset freeze because Defendants' unclean hands prevent them from seeking modification of the Court's equitable order, since they have repeatedly violated it. A cardinal rule of equity is "he who comes into equity must come with clean hands [i]t is a self-imposed ordinance that closes the door to one tainted with

35

inequitableness or bad faith relative to the matter in which he seeks relief." relief[.]" *Precision Instrument v. Auto. Maint. Mach.*, 324 U.S. 806, 814 (1945) (internal quotation marks and citation omitted); *see also S.E.C. v. Brooks*, 1999 WL 493052, at \*2 (N.D. Tex. July 12, 1999) (freezing defendants' assets, in part, because defendant's "refusal to divulge information that could help recover any monies, show that he is attempting to hide assets and thwart the S.E.C.'s efforts to protect investors.")

Notably, prior to the instant action, Defendants repeatedly violated lawfully imposed State Orders and Complaints[52] by continuing to solicit and accept funds from investors in these States. [Ex. 1, ¶7] Even after being enjoined by several States, Defendants knowingly continued to defraud elderly investors out of their hard-earned retirement funds. Further, Defendants have refused to cooperate with the Receiver and withheld important information in violation of the Court's orders. [Ex. 1, ¶49] Next, they have provided false and misleading testimony at their depositions and at Asher's contempt hearing.[53] In fact, Asher was evasive and misleading during the Contempt hearing. In a colloquy with Asher about his knowledge and understanding of the SRO, the Court found Asher's testimony: "a bit troubling. . . [n]o, no, no, no. Let me drive up and blow the horn again." [Ex.1, ¶48] After numerous attempts to elicit the facts, the Court was able to get Asher to admit his knowledge and understanding of the terms of the SRO. Given Asher's indisputable violations of this Court's orders, Asher was held in contempt for violating the SRO and Consent Order (D.E. # 216). Asher still has not purged his contempt by meeting his obligations. Given that Defendants have a demonstrable and disturbing unwillingness to comply

---

[52] Metals was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Orders and Complaints") taken against Metals and various officers, employees, or agents by State Securities Regulators.

[53] *See e.g.* [Ex. 1, ¶47-48]

with lawful orders, the Court *cannot* assume that any restrictions it places on these Defendants will be honored and complied with. These acts show unclean hands and so foreclose the equitable relief sought here.

### E. Defendants' Claim for Attorney's Fees for a Potential Criminal Defense is *Not* Ripe for Adjudication and Should Be Denied

In addition to their request for attorney's fees in this civil enforcement matter, Defendants claim that they require a modification of the Consent Order to defend a parallel criminal matter. This is based on unsubstantiated claims that the United States Attorney's Office for Northern District of Texas ("USAO") may be conducting an amorphous criminal investigation of Defendants that, according to them, overlaps with the facts underlying this litigation.

Defendants take Plaintiffs' counsel's statements out of context and add a self-serving spin to those statements. Plaintiffs forthrightly disclosed that we were aware of the FBI's search of the corporate office of Metals.com, but we declined to make any substantive comments about the USAO's activities because we are not privy to them. We recommended that defense counsel call the USAO directly as the USAO is best positioned to answer their questions.

The USAO advised defense counsel that per USAO policy, they declined to comment and "refused to engage in substantive communications" with them. (Attorney's Fee Motion at 13). Importantly, the USAO did *not* confirm that defendants are targets of a criminal investigation and the USAO has not issued a target letter to either defendant. Thus, for defendants to describe themselves as targets is unsupported by any evidence and is rank speculation.

Defendants falsely contend that "[w]hile Asher and Batashvili previously agreed to the entry of an injunction order freezing their assets, they did so without a full understanding of the parallel criminal investigation they were facing. . . ." (Attorney's Fee Motion, 1). In fact, Spencer

advised Plaintiffs' counsel that he had spoken to the USAO and was aware of the search warrant that was executed a few days after the filing of this civil enforcement action. No new facts, events, or developments have arisen that would change Defendants' "understanding of the parallel criminal investigation." *Id.* As mentioned above, as the former First Assistant US Attorney, Spencer clearly understood the implications of the USAO's actions and was well positioned to advise his clients accordingly.

Defendants concede that they have not been charged with any crime. (Attorney's Fee Motion, 17). Their concerns about defending themselves in a parallel criminal proceeding are premature, amorphous, and speculative. At this point, whether there will be any criminal prosecution against Defendants—and what charges would form the basis of any such prosecution—are pure conjecture. The record before the Court is too sparse for the Court to evaluate their criminal attorney's fee request.

This issue is simply not ripe for adjudication. The court should deny any fees for a criminal defense until any criminal case goes from speculation to reality. This will maintain the *status quo* and allow the Court to evaluate a carve-out request based on a complete and accurate factual record. Operating based on conjecture and speculation is not necessary or warranted.

Unable to show that they are targets of a criminal investigation, Defendants make erroneous and incendiary insinuations that Plaintiffs are using this case to advance a parallel criminal investigation: "[i]n essence, the civil action serves as a discovery expedition for the government that Individuals are forced to participate in without access to funds for counsel while the federal government shores up its ongoing criminal case." (Attorney's Fee Motion at 2). To make such an assertion without even a modicum of evidentiary support is reckless and potentially sanctionable.

Throughout this proceeding, Plaintiffs have gathered evidence of wrongdoing through their own independent investigations into Defendants' conduct and have not engaged in fact discovery for the USAO. Plaintiffs have not participated in a "discovery expedition" for any criminal proceedings and have not engaged in any joint fact finding. Plaintiffs have had their own independent basis to undertake discovery, wholly unrelated to any criminal considerations. Plaintiffs have not, and would never take, directions from the USAO on how to conduct their investigations or serve as a stalking horse for them.  Rather, Plaintiffs will continue to proceed with this enforcement action to seek justice for these elderly victims, independently of the USAO, regardless of whether the USAO seeks and obtains an indictment against Defendants.

### F.  The Attorneys' Fees Motion Should Be Denied Because Defendants Failed to Provide Crucial Missing Information

The Attorney's Fee Motion should be rejected because Defendants have failed to provide crucial information documenting the source of attorneys' fees. *See e.g. SEC v. Dobbins*, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004); *SEC v. Schiffer*, 1998 WL 901684, at * 3 (S.D.N.Y. June 25, 1998) (preserving an asset freeze until "the court could obtain an accurate picture of the whereabouts of the proceeds of the [alleged fraud].") Pertinent information is conspicuously missing from the Attorney's Fee Motion and its supporting declarations. In determining whether or not to release funds, these courts have first "look[ed] for evidence of the defendant's overall assets or income." *SEC v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001).  Given their history of financial fraud and their aggressive efforts to conceal the source of funds, the Court should be very concerned about the province of any newfound income or assets likely being tainted or associated with this fraud.  In that regard, Plaintiffs and the Receiver must be given an opportunity to investigate the source of any funds purported to be used for attorneys' fees and provide the results of their investigation to the Court.

In order to evaluate fully Defendants' request for attorney's fees, the Court needs a complete and reliable record of the Defendants' assets and particulars of where any new earning and funds will be coming from.  That is not possible here because the Defendants have not yet provided the most basic information on this newfound employment or the amount of attorneys' fees sought. Nowhere in the Attorney's Fee Motion do Defendants identify where they will be employed, owners/agents/operators of the employer, what specific work they will be undertaking, amount and sources of compensation, the source of funds used to pay their compensation or to be used for attorney's fees, or the amount of attorney's fee requested. As the court is aware, Defendants used a web of interconnected companies and affiliates to perpetrate the fraud, hid the beneficial owners of accounts, obscured the true province of funds, and undertook financial transactions designed to conceal the identity, source, and destination of illicit funds and the fruits of their fraud.

It is clear that the record before the Court is missing important facts necessary to evaluate a request for attorney's fees. Fulsome discovery of Defendants' assets and proposed employment must be completed to permit the Court to evaluate the source of funds for attorney's fees and balance the equities.  Courts need to balance: "[t]he defendant's interest in having access to funds needed to pay ordinary and necessary living expenses . . . against the government's interest in preventing the depletion of potentially forfeitable assets." *Id.* at *3. As such, Plaintiffs respectfully request that the Court *deny* the Attorneys' Fee Motion and maintain the *status quo* for the benefit of all the elderly victims of Defendants' massive nationwide fraud.

## IV.    CONCLUSION

For the foregoing reasons, the Attorney's Fee Motion should be denied.

Dated: April 20, 2021                    Respectfully submitted,


                                         By: /s/ JonMarc P. Buffa

                                         JONMARC P. BUFFA
                                         jbuffa@cftc.gov
                                         California Bar # 217324

                                         RICHARD P. FOELBER
                                         rfoelber@cftc.gov
                                         Illinois Bar # 0840904

                                         Attorneys for Plaintiff
                                         COMMODITY FUTURES TRADING
                                         COMMISSION
                                         1155 21st Street. NW
                                         Washington, DC 20580
                                         (202) 418-5000


                                         FOR THE STATE OF ALABAMA

                                         By: /s/ Jeffery A. "Beau" Brown, Jr

                                         JEFFERY A. "BEAU" BROWN, JR., *pro hac vice*
                                         Beau.Brown@asc.alabama.gov
                                         Alabama Bar No. 7258R80B

                                         ANNE GUNTER, *pro hac vice*
                                         anne.gunter@asc.alabama.gov
                                         Alabama Bar No. 4666N91P

                                         Attorneys for Plaintiff
                                         STATE OF ALABAMA
                                         SECURITIES COMMISSION
                                         445 Dexter Avenue, Suite 12000
                                          Montgomery, AL 36104
                                         Telephone: (334) 322-8586
                                         Fax: (334) 242-0240


                                         FOR THE STATE OF ALASKA

                                         By: /s/ Robert Schmidt

ROBERT SCHMIDT, *pro hac vice*
rob.schmidt@alaska.gov
Alaska Bar No. 9909048
JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorneys for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697


FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *pro hac vice*
cnichols@azcc.gov
Arizona Bar No. 029958

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.
Phoenix, AZ 85007
Telephone: (602) 542-0639
Fax: (602) 714-8120


FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dbo.ca.gov
SEAN ROONEY
Sean.Rooney@dbo.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice*
California Bar No. 264784
Danielle.Stoumbos@dbo.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA

DEPARTMENT OF BUSINESS OVERSIGHT
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181


FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado


By: /s/ Janna Fischer


JANNA FISCHER*, *pro hac vice*
janna.fischer@coag.gov
Colorado Bar No. 44952
ROBERT FINKE*, *pro hac vice*
robert.finke@coag.gov
Colorado Bar No. 40756
*Counsel of Record

Attorneys for Plaintiff
SECURITIES COMMISSIONER
FOR THE STATE OF COLORADO
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6374
Fax: (720) 508-6037


FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware


By: /s/ Katherine M. Devanney


KATHERINE M. DEVANNEY, *pro hac vice*
Deputy Attorney General
Delaware Bar No. 6356
Texas Bar No. 24116281
katherine.devanney@delaware.gov
JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware

FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida

By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

By: /s/ A. Gregory Melchior

A. GREGORY MELCHIOR, *pro hac vice*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498

44

FOR THE STATE OF GEORGIA

By: /s/ Logan B. Winkles

LOGAN B. WINKLES, *pro hac vice*
Georgia Bar No. 136906
lwinkles@law.ga.gov
RONALD J. STAY, *pro hac vice*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239


FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE, *pro hac vice*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov
PATRICIA J. MOY
Hawaii Bar No. 5845-0
PMoy@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977


FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

45

STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice*
Deputy Attorney General
loren.messerly@finance.idaho.gov
Idaho Bar No. 7434

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Fax: (208) 332-8099


FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Patricia Orloff Erdmann
Chief Counsel of Litigation

By: /s/ Jefferson S. Garn

JEFFERSON S. GARN, *pro hac vice*
Deputy Attorney General
Jefferson.Garn@atg.in.gov
Indiana Bar No. 29921-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979


FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen

THOMAS E. KNUTZEN, *pro hac vice*

46

*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872


FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice*
Gary.stephens@ky.gov
Kentucky Bar No. 87740
CATHERINE FALCONER
Catherine.falconer@ky.gov

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL INSTITUITONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787


FOR THE STATE OF MAINE

By: /s/ Gregg D. Bernstein

GREGG D. BERNSTEIN, *pro hac vice*
gregg.bernstein@maine.gov
Maine Bar No. 8424

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800

47

Fax: (207) 626-8828


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer

MAX F. BRAUER, *pro hac vice*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532


FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin

PEOPLE OF THE STATE OF
MICHIGAN, by DANA NESSEL
ATTORNEY GENERAL

Aaron W. Levin, *pro hac vice*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-7632

FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon

SETH SHANNON, *pro hac vice*
seth.shannon@ago.ms.gov
Mississippi Bar No. 103466
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231


FOR THE STATE OF NEBRASKA
L. JAY BARTEL
Bureau Chief
Legal Services Bureau


By: /s/ Joshua R. Shasserre

JOSHUA R. SHASSERRE, *pro hac vice*
Assistant Attorney General
Nebraska Bar No. 23885
joshua.shasserre@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3888
Fax: (402) 471-3297


FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston

ERIN M. HOUSTON, *pro hac vice*

49

Deputy Secretary of State, Securities Administrator
Nevada Bar No. 11814
ehouston@sos.nv.gov

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452


FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger

ALISSA N. BERGER, *pro hac vice*
Securities Enforcement Prosecutor
New Mexico Securities Division
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Securities Division
New Mexico Regulation and Licensing Department
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848


FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht

TATYANA "TANYA" TRAKHT, *pro hac vice*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers
PETER POPE

Chief, Investor Protection Bureau
peter.pope@ag.ny.gov

Attorneys for Plaintiff
ATTORNEY GENERAL FOR THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742


FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams

JONATHAN WILLIAMS, *pro hac vice*
jwilliams@scag.gov
South Carolina Bar No. 72509

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Fax: (803) 734-7208

51

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661


FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor & Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1
Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369


FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice*
Deputy Attorney General
TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division

P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance



FOR THE STATE OF TEXAS
KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

By: */s/ Christina Cella*

CHRISTINA CELLA
Assistant Attorney General
State Bar No. 24106199
christina.cella@oag.texas.gov
LEA N. BRIGTSEN
Assistant Attorney General
State Bar No. 24054504
lea.brigtsen@oag.texas.gov

Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-2952
Fax: (512) 477-2348

*Attorneys for Plaintiff the State of Texas*


FOR THE STATE OF WASHINGTON

By: /s/ Ian S. McDonald

IAN S. MCDONALD, *pro hac vice*
Washington Bar No. 41403
Ian.McDonald@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524


FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum

MICHAEL NUSBAUM, *pro hac vice*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305
Telephone: (304) 558-2251
Fax: (304) 558-4211


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice

54

By: /s/ Shannon A. Conlin _____

SHANNON A. CONLIN, *pro hac vice*
Assistant Attorney General
Wisconsin Bar No. 1089101
Conlinsa@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779

*Attorney for Plaintiff State of Wisconsin*


FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: /s/ Adam J. Kenworthy
ADAM KENWORTHY* *pro hac vice*
Iowa Bar No. AT0012137
Enforcement Attorney
adam.kenworthy@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6562
Fax: (515)-654-6500

**<u>CERTIFICATE OF SERVICE</u>**

On April 20, 2021, I electronically filed the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION with the Clerk of this Court in the above captioned matter using the CM/ECF system and I am relying upon the transmission of the Clerk's Notice of Electronic Filing for service upon all parties in this.


<u>/s/ JonMarc P. Buffa</u>

56