# Exhibit 1

## Declaration of
## Patricia Gomersall

## DECLARATION OF PATRICIA GOMERSALL
## PURSUANT TO 28 U.S.C. § 1746

I, Patricia Gomersall, hereby make the following declaration based upon my personal knowledge:

### I.      Background and Documents Reviewed

1.      I am a Senior Futures Trading Investigator in the Division of Enforcement ("Division") at the Commodity Futures Trading Commission (the "Commission" or "CFTC") in Washington, D.C.  I have worked in this capacity for the Commission since August 1987.

2.      I am submitting this declaration in response to Defendant's Complaint For Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief (D.E. #232) filed September 22, 2020, and the Declarations of Lucas Asher ("Asher") and Simon Batashvili ("Batashvili");

3.      In September 2020, I submitted a sworn declaration that is included as part of the Fact Appendix in support of Plaintiffs Motion for an *Ex Parte* Restraining Order ("SRO. Application") D.E. # 4-6; 12. It is incorporated by reference as if fully set forth herein.

4.      I reviewed documents and information in the preparation of this declaration from the following sources:

   a.   Plaintiffs Complaint For Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief (DE #2) filed September 22, 2020;

   b.   Fact Appendix in support of Plaintiffs Motion for an *Ex Parte* Restraining Order (DE #196)

   c.   Defendants Emergency Motion to Modify Preliminary Injunction (DE #232) ("Attorney's Fees Motion") filed March 30, 2021;

   d.   The declaration of Lucas Asher ("Asher") filed with the Attorney's Fees Motion;

e.  The declaration of Simon Batashvili ("Batashvili") filed with the Attorney's Fees Motion;

f.  Websites for the following entities:

   i.  JM Bullion:  *www.jmbullion.com;*

   ii.  APMEX:  *www.apmex.com;*

   iii.  Walmart:  *www.walmart.com;*

   iv.  International Coins & Currency:  *www.iccoin.com;*

   v.  The United States Mint:  *www.usmint.gov;*

   vi.  The Royal Canadian Mint:  *www.mint.ca;*

   vii.  Strata Trust Company  *www.stratatrust.com; and*

   viii.  Free Bullion Investment Guide  *www.free-bullion-investment-guide.com*

g.  Regulatory Actions Filed by Eight States Against Defendants that pre-date the operations of Barrick:

   i.  Texas States Securities Board, Emergency Cease and Desist, May 1, 2019;

   ii.  State of Minnesota, Department of Commerce, Consent Cease and Desist, May 16, 2019;

   iii.  Securities Commissioner, State of Colorado, Consent Cease and Desist, July 12, 2019;

   iv.  Commissioner of Securities, State of Georgia, Emergency Order to Cease and Desist, July 30, 2019;

   v.  State of Alabama, Alabama Securities Commission, Cease and Desist Order, August 8, 2019;

   vi.  Department of Financial Institutions, Commonwealth of Kentucky,

Emergency Cease and Desist, September 6, 2019;

    vii.  State of Missouri, Office of Secretary of State, Order to Cease and Desist, November 1, 2019; and

    viii.  Commonwealth of Massachusetts, Securities Division, Administrative Complaint, December 3, 2019.

  h.  Documents provided by other Plaintiffs and witnesses.

## II.  Summary

5.    Asher and Batashvili personally solicited and defrauded investors, in addition to directing staff to make material misrepresentations. Both made telephonic solicitations of victims. [*see* Gomersall Dec. ¶ 4, (App. p. 5-6)].) Fuselier Dec. ¶ 4(f); (App. P.1402) ;  Kemper ¶ 10-18, (App. P.1120-1122);  Kemper Ex. A, (App. p. 1129-1162); Receivers' First Report at page 5, D.E. #181.]

6.    During the Relevant Period, Metals was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Orders and Complaints") taken against Metals and various officers, employees, or agents by State Securities Regulators.[1]

---

[1] State Orders and Complaints include: (1) The Emergency Order issued May 1, 2019 and Agreed Order and Undertaking entered July 1, 2019 by the Texas State Securities Board; (2) A Consent Cease and Desist Order entered May 16, 2019 by the Minnesota Department of Commerce Commissioner; (3) A Consent Cease and Desist order issued July 30, 2019 by the Colorado Securities Commissioner; (4) An Emergency Cease and Desist Order issued July 30, 2019 by the Georgia Commissioner of Securities; (5) A Cease and Desist Order issued August 8, 2019 by the Alabama Securities Commission; (6) An Emergency Cease and Desist Order entered September 6, 2019 by the Kentucky Department of Financial Institutions; (7) An Order to Cease and Desist and Order to Show Cause issued November 1, 2019 and Consent Order entered May 26, 2020 by the Missouri Securities Commissioner; (8) An Administrative Complaint filed December 3, 2019 by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth; (9) A Cease and Desist Order entered March 9, 2020 by the Arkansas Securities Commissioner; (10) A Complaint for Summary Order filed May 26, 2020 and Summary Order to

7.      Defendants violated these State Orders and Complaints by continuing to solicit and accept funds from investors in these States.

8.      Eight state regulatory agencies filed actions against Metals.com before Barrick first began accepting customer funds. *See* 4(g) above.

9.      Defendants rely almost solely on the declarations of Lucas Asher and Simon Batashvili for the facts to support the Attorney's Fees Motion.

10.     Asher states in paragraph 7 that he and Batashvili, in 2016, "launch(ed) a retail metals site called metal.com" which "helped pioneer providing customers the option to purchase bullion coins without having to speak to commission-earning sales people." My review indicates that Defendants did not pioneer online precious metals sales. In fact, APMEX.com—one of the largest online metals retailers—was established in 2000 and JMBullion.com was established in 2011, both of which Asher cites as sources for bullion coins in his declaration.

11.     The online sales of Metals.com was a minuscule part of the overall metals business. Based on information provided by the defendants, during the relevant time frame of September 2017 and March 2020, Metals.com online sales amounted to $2,573,420—or approximately 1.4% of their total coin and bullion sales.

12.     In reality, the Metals.com business model was overwhelmingly phone sales and so "a more traditional sales model", as Asher describes his and Batashvili's successor company, Barrick Capital ("Barrick"), in paragraph 16 of his declaration. Barrick never had a website

---

Cease and Desist issued May 26, 2020 by the Nevada Securities Division of the Office of the Secretary of State; (11) A Notice of Proposed Agency Action filed June 4, 2020 and Temporary Cease and Desist Order entered June 4, 2020 by the Montana State Auditor, Commissioner of Securities and Insurance; and (12) A Temporary Cease and Desist Order and Notice of Final Order issued July 20, 2020 by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

where coins were sold to the public.

13.    As Batashvili and Asher state in their declarations, they also founded Barrick. Batashvili opened a bank account for Barrick in October 2019 with a personal check for $1,000. In December 2019, Barrick began to solicit and accept funds from investors. Barrick and Metals.com had overlapping operations and activity. Metals.com continued accepting customer funds through at least March 2020. [Gomersall Dec. ¶ 20-21 (App. p. 10). Planer Dec. ¶ 16-18 (App. p. 272-273]

14.    Funds from the Barrick bank account were used to pay bills and expenses for Metals.com. [Gomersall Dec. ¶ 29 (App. p. 12)]

15.    In paragraph 10 of his declaration, Asher states that "the online model of Metals.com was designed to help ensure price transparency and allow customers to compare prices." Asher omits the extremely important fact that **none** of the Polar Bear Bullion[2] or Barrick Bullion[3] named in the Commission's complaint were listed on or sold through the Metals.com website. There was **no** "price transparency" for the Polar Bear Bullion and Barrick Bullion. The Polar Bear Bullion and Barrick Bullion were **only** sold over the phone by Metals.com sales representatives, who earned a percentage of the total dollar amount of the customer's account.

16.    Metals.com customers never had the opportunity look on the website for Polar Bear Bullion and Barrick Bullion—they weren't listed—or review the price that Metals.com was charging for them. This prevented investors from "comparing prices" with other sellers.

---

[2] The 1/2 ounce Silver Canadian Mint Polar Bear, the 1/10 ounce Gold Canadian Mint Polar Bear, and the ¼ ounce Gold British Standard are collectively referred to as the "Polar Bear Bullion".

[3] The 1/10 ounce Gold Canadian Mint Polar Bear, the 1/10 ounce Silver Spade Guinea and the 1/10 ounce Silver Britannia are collectively referred to as the "Barrick Bullion."

17.     Defendants sold the Polar Bear Bullion and Barrick Bullion *exclusively* via phone sales with *no* price transparency.

18.     Asher states in paragraph 11 that "Metals.com paid for the privilege of being the exclusive purchaser (and therefore seller) of several coins minted by the Royal Canadian Mint, including the ½ oz. Silver Polar Bear coin and the 1/10th ounce Gold Polar Bear coin."  In fact, Defendants had no business relationship to the Royal Canadian Mint. They purchased bullion from their wholesale supplier, Bayside Metals Exchange, who purchased bullion from a distributor who dealt with the Royal Canadian Mint. [Gomersall Dec. ¶ 40-45 (App. p. 15-16)].

19.     As stated in my September 18, 2020 declaration, over 1,600 Metals.com and Barrick investors purchased Precious Metals Bullion by phone sales. The vast majority of these investors used retirement savings, including but not limited to, retirement savings held in tax advantaged accounts such as Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings") into Self-directed IRA accounts ("SDIRA") to purchase Precious Metals Bullion, or by purchasing Precious Metals Bullion by check, wire transfer, or credit card directly from the Defendants ("Cash Account"). [Gomersall Dec. ¶ 6 (App. p. 6)].

20.     Defendants investors could not purchase bullion coins for their SDIRA accounts through purchases on the internet. All of Defendants SDIRA sales were done by telephonic sales to customers.

21.     Between September 1, 2017 and June 1, 2020, over $185 million in investor funds were deposited into bank accounts owned and controlled by Defendants for the purchase of Precious Metals Bullion from Metals.com and Barrick.  This figure $185 million includes

purchases made **only** through phone sales, and does **not** include any online sales from the

Metals.com website. Online sales for Metals.com sales amounted to $2,573,420.

22.    Therefore, online sales represented 1.4 percent of Defendants total sales.

### III. Asher's Examples of Bullion Coins

23.    Asher states in paragraph 22 of his declaration "bullion coins are often sold for a

premium over the commodity price for precious metals." Asher continues in paragraph 22: "The

ultimate price of a particular coin depends on a number objective and subjective factors,

including availability, customer demand, craftsmanship, design costs, the age of the precious

metal, the originating country, aesthetic properties, and an investor's personal attraction to the

piece". Asher then identifies and attempts to describe seven different coins that he found listed

for sale on the internet. He says that he printed these screenshots on March 26, 2021.

24.    Asher was easily able to find these examples, because they are readily available to

anyone with an internet connection, and the prices are clearly stated next to the description of

each coin.

25.    However, Asher does not provide much needed context or explanation to allow

one to understand the comparability of these coins to what was sold by Defendants.

26.    While these factors identified by Asher may be important in determining the price

of a souvenir or collectible coin—many times sold in specialty packaging—that is intended for

display by the owner, most of these factors do not apply to bullion held in SDIRA accounts

which are then stored in third-party depositories.

27.    One of the most important facts in determining the price of a bullion coin is the

total number of these items made by a mint, which is commonly referred to as the "mintage."  As

described on the website for the Royal Canadian Mint: "Mintage is the maximum number of

coins that will be produced. The lower the mintage, the rarer the coin." *See* www.mint.ca

28.     Asher included with his declaration examples of seven bullion coins that he found on various websites on the internet on March 26, 2021. He states that each of these coins is offered at prices above the spot price of the underlying metal.

29.     Asher's Declaration Exhibit C (page 25) is a listing from JM Bullion—a major online retail coin dealer—of a ¼ ounce Mexican Silver Libertad Coin listed for $21.03. Asher's Exhibit C states that: "[t]he ¼ oz Silver Libertad is available to purchase individually inside of a protective plastic flip or in multiples of 25 housed in mint tubes." As noted in Asher's Exhibit C, 2020 was the 30th anniversary of the release of the ¼ ounce silver Libertad. This is a popularly sought-after and collected coin. The mintage of the 2020 ¼ ounce Silver Libertad was only 4,450 coins, the lowest mintage in the 30-year history of the coin. (*see* Gomersall Attachment A). As Asher's Exhibit shows, the coin was out of stock when Asher printed the sales page from the internet.

30.     Asher's Declaration Exhibit D (page 27) is a listing from APMEX, another online retail coin dealer, for the 2014 Canada ¼ oz Silver $3 Animal Architects Spider and Web bullion coin listed for $79.99. This was the second coin in the 6-coin 2014 Royal Canadian Mint's Animal Architects limited-edition series. As shown in Asher's Exhibit D, under the Product Details section: "A low mintage of only 10,000 coins adds to the collectability of this issue" and the coin itself comes "packed in a maroon clamshell beauty box from the mint along with a certificate of authenticity."

31.     Asher's Declaration Exhibit E (page 30) is another listing from APMEX for the 2020 Canada ½ oz Silver $10 The Great Outdoors bullion coin for $49.99. This coin is part of the 2020 Royal Canadian Mint's "O'Canada" 6-Coin limited-edition series, created by the Royal

Canadian Mint. Asher's Exhibit E states that there is a "Limited mintage of only 10,000 coins".

Asher's Exhibit E states that this bullion "comes in a maroon clamshell box with a black beauty

box and includes a certificate of authenticity."

32.     Asher's Declaration Exhibit F (page 34) is a listing for the 2008 Australia ½ oz

Silver Year of the Mouse, which Asher found on Walmart's website for $149.99. Asher's

Exhibit F states that this bullion has a "Low mintage of 17,114."

33.     Walmart is a nationwide chain of home goods stores that sell items ranging from

grocery and entertainment to sporting goods and crafts, but is generally not recognized as a

bullion coin dealer. As such, the actual sale of this bullion is done by APMEX. In fact, Asher's

Exhibit F shows that the 2008 Australia ½ oz Silver Year of the Mouse is "Sold and shipped

from APMEX", which is known as a precious bullion dealer.

34.     Asher's Declaration Exhibit G (page 37) is a listing from International Coins and

Currencies, another online retail bullion coin dealer, for the Canada 2020 Polar Bear ½ oz

Brilliant for $99. This bullion is also part of the 2020 Royal Canadian Mint's "O'Canada" 6-

Coin limited-edition series. Importantly, this should not to be confused with the ½ ounce silver

Polar Bear bullion that was sold in mass quantities by the Defendants. Under the Product

Description section in Asher's Exhibit G, it states "…a very limited 10,000 specimens will be

produced…Each [coin] is housed in handsome Royal Mint packaging."

35.     Asher's Declaration Exhibit H (page 40) is a listing for the American Eagle 2020

One Ounce Silver Uncirculated Coin, sold by the US Mint for $67.00. Asher's Exhibit H shows

that there is no mintage limit for this particular bullion coin, but that the coin is out of stock.  As

Asher's Exhibit H states: "Perfect for any collection or special occasion…[it] is a favorite of

many collectors and gift givers. Each coin…is packaged in a blue presentation box accompanied

by a Certificate of Authenticity." This bullion is intended for collectors. Asher found this particular bullion on the website catalog.usmint.gov/on/demandware.store, which is essentially the website of the US Mint's gift shop.

36.    The US Mint website sells hundreds of collectible coins. As stated directly on the website for the US Mint, under the section titled "How to Buy United States Mint Coins":

> "The United States Mint, like other world mints, does not sell its bullion coins directly to the public. Instead, we distribute our coins through a network of official distributors called "authorized purchasers", who, in turn, create a two-way market buying and selling to precious metals wholesalers, private investors, and local bullion coin dealers". The US Mint has 13 authorized purchasers located around the world. (see Gomersall Attachment B)

37.    The home page of the US Mint's for retail sales states:

> "Coin collecting, one of the world's oldest hobbies, was once practiced only by royalty and the very wealthy. Today, anyone can be a coin collector and own a piece of history from the U.S. Mint. Our selection of numismatic items includes gold, silver, and platinum coins, as well as program coins, annual coin sets, proof sets, commemorative coins, and uncirculated coins." [Gomersall Attachment C]

38.    Asher's Declaration Exhibit I (page 42) is a listing for the ½ ounce Silver "The Beaver" Bullion Coin, sold by the Royal Canadian Mint on their gift shop website for $39.74. This bullion is also part of the 2020 Royal Canadian Mint's "O'Canada" 6-Coin limited-edition series, and Asher's Exhibit I shows that the mintage of this bullion is also only 10,000. Asher's Exhibit I also states: "This series is your dose of Canadiana in 2020 and it will add several iconic Canadian images to your collection. The perfect addition or gift for those seeking a piece of

Canada that fits in the palm of your hand."

39.     Four of the seven coins referenced in the Attorney's Fee Motion are special limited edition, numismatic collector coins

40.     As the Royal Canadian Mint states on its website "The Mint produces limited-mintage numismatic coins honoring major national achievements and themes. Though they bear a denomination, they are not meant for circulation, and their actual worth is usually significantly greater than their face value." (Gomersall Attachment D). Asher's Exhibits D, E, G and I are examples of these limited-edition collectible bullion coins; whereas the bullion sold by Defendants is not.

41.     For retail sales, the US Mint's and Walmart's business models are geared toward only selling individual bullion coins or coin sets to consumers in small quantities.

42.     For comparison, defendants sold to their investors [Samuelson Dec. ¶ 49 (App. p. 247-249)]:

   a.  4,134,142 of the ½ ounce Silver Polar Bear Bullion;

   b.  123,786 of the 1/10 ounce Gold Polar Bear Bullion;

   c.  34,120 of the ¼ ounce Gold British Standard bullion;

   d.  567,865 of the 1/10 ounce Silver Spade Guinea Bullion; and

   e.  93,038 of the 1/10 ounce Silver Britannia Bullion.

43.     In fact, my analysis based on information and documents provided by the Defendants, at least 41 Metals.com customers each bought more than 5,000 pieces of ½ ounce Silver Polar Bear bullion **in a single transaction**. This is more than to the mintage of the 2020 Mexican Libertad proffered in the Attorney's Fee Motion.

| Date | Bullion | Amount | Price |
|------|---------|--------|-------|
| 3/19/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 18,628 | $23.12 |
| 9/1/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 18,250 | $22.92 |

| 9/19/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 15,304 | $22.58 |
|---|---|---|---|
| 1/10/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 12,119 | $23.96 |
| 3/12/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 10,000 | $24.91 |
| 10/5/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 10,000 | $22.50 |
| 3/6/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 9,980 | $23.00 |
| 12/26/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 9,900 | $23.95 |
| 3/19/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 9,282 | $25.00 |
| 3/14/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 8,692 | $23.01 |
| 4/24/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 8,000 | $25.12 |
| 7/11/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,819 | $23.99 |
| 11/21/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,700 | $23.50 |
| 10/2/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,664 | $22.00 |
| 3/22/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,605 | $23.67 |
| 10/9/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 7,593 | $26.10 |
| 1/23/19 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,500 | $24.80 |
| 10/2/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 7,500 | $20.00 |
| 4/29/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 7,142 | $22.89 |
| 3/21/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 7,059 | $23.17 |
| 8/30/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 6,936 | $26.10 |
| 10/11/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 6,896 | $26.10 |
| 4/13/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 6,811 | $23.80 |
| 4/29/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 6,775 | $22.89 |
| 10/18/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 6,544 | $22.89 |
| 10/21/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 6,467 | $26.10 |
| 3/20/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 6,400 | $25.00 |
| 10/13/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 6,165 | $24.01 |
| 6/19/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,999 | $23.99 |
| 8/14/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,980 | $23.00 |
| 10/4/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,712 | $22.92 |
| 12/8/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,531 | $23.50 |
| 12/13/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,500 | $22.55 |
| 10/31/17 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,435 | $23.00 |
| 3/20/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 5,309 | $23.17 |
| 1/24/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,150 | $24.23 |
| 1/30/18 | 1/2 oz Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 | 5,032 | $26.00 |
| 4/16/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 5,011 | $22.94 |
| 4/3/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 5,010 | $25.28 |
| 6/7/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 5,000 | $25.27 |
| 4/16/19 | 1/2 oz Silver - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 5,000 | $25.22 |

44.     As shown in the charts in paragraphs 40 and 41 above, Defendants were **not** selling low mintage, limited-edition collectable bullion to their customers. Instead, the "items sold by [defendants] to the customers were almost all bullion coins and bars whose values are determined by their underlying precious metals value." [Samuelson Dec. ¶ 18 (App. p. 242)].

45.     Defendants cite, in footnote 5 on page 9, from a pamphlet found on the website of

Page 12 of 15

Strata Trust, a SDIRA custodian. Both Metals.com and Barrick had a financial relationship with Strata Trust, and directed dozens of their clients to open SDIRA accounts with that firm.  The language in Attorney's Fee Motion is found under the section titled "Valuation and Pricing of your Precious Metals" (see Gomersall Attachment E).

46.    However, defendants footnote fails to note the first line of the paragraph: "Values for precious metals shall reflect the spot price value, which is the current spot price multiplied by the ounces of fine metal contained in the coin or bar."  SDIRA account statements are provided for tax purposes, to both customers and the IRS, because it is important to have an **accurate** value of the SDIRA account.

## V. Defendants Misrepresentations and Misleading Statements.

47.    At Asher's asset deposition on November 5, 2020, Asher provided testimony that was untrue and deliberately calculated to mislead the parties on numerous areas related to the assets of the Defendants and Relief Defendant. [*see* Gomersall Attachment F]

a.  Asher misrepresented that he had turned over all of his assets to the Receiver. Asher did not turnover funds from bank accounts and a luxury vehicle to the Receiver.

b.  When asked about his finances, Asher stated that he had only $20.00 and that he did not own/control any assets anywhere in the world. This false because Asher had substantial undisclosed assets under his control.

c.  Asher misleads about bank accounts. In particular, he states:

Q. "As of September 21st of 2020, what bank accounts are you aware of that were active that you were using in which you were a signatory?"

A. "JPMorgan."

Q. "Okay."

A. "That's all I recall at this time."

These statements are false because Asher knew that as of September 21, 2020, and continuing into the days following the issuance of the SRO, that he was the sole signatory on the USA Accounts bank account at Bank of America. In fact, on September 29, 2020, Asher used his signatory power to dissipate $550,000 out of this account. He admitted to improper transfer as part of his agreed-to contempt finding.

48.   Asher's Contempt hearing

    a.   At December 4, 2020 contempt hearing, Asher mislead the court regarding his knowledge of the SRO. After numerous colloquies with the Court, he finally conceded that he was aware of the SROs terms; but still refused to be forthcoming.  [*see* Gomersall Attachment G]  In the Agreed Order Finding Asher in Contempt D.E. #216, he admitted: "As of September 28, 2020, Asher had actual knowledge of and was aware of the terms of the Order Granting Plaintiffs' Emergency Ex Parte Motion for Statutory Restraining Order, Appointment of Receiver, and Other Equitable Relief (the "SRO") issued on September 22, 2020."

    b.   In this colloquy, the Court found his answers "a bit troubling or perhaps not coming full circle." Page 154 at 10-11. The continues "No, no, no, no. Let me drive up and blow the horn again." Page 154 at 18-19.

49.   Defendants have refused to cooperate with the Receiver and withheld important information in violation of the Court's orders. They have not provided promised documents or information within their or their agents' control even after agreeing to do so on numerous

occasions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2021, in Washington, DC.

_____
Patricia Gomersall

# Attachment A

HOME SAFES

NEWS LINKS & Precious Metals FORUMS

NEWS LINKS

PrecMetals FORUMS

BULLION NEWS & CHART ARCHIVES

ARCHIVED NEWS

QRTLY Charts & News

WISE OLD INVESTORS

INVESTING GURUS

CANCER RESEARCH ADVOCACY

GOLD NANO Research

GOLD-NANO BLOG

CANCER AWARENESS MONTHS

Cancer RIBBONS/INFO

GIVING BACK

LEDGER / JOURNAL

Ledger Spreadsheet

'AoH' Cancer Fund

The 'Angel Of Healing'

Affiliates

DONATE / SUPPORT

DONATIONS

ABOUT

ABOUT

NEWSLETTER

SITE INFO

Contact

Legal

SiteMap

**This Guide Advocates for**

**Gold Nanoparticle Cancer Research**

## Obverse



The obverse side of the 1/4 oz. silver Libertad displays the National Coat of Arms of Mexico.

The Coat of Arms depicts the Mexican Golden Eagle perched on-top a cactus with a snake in its beak.

It symbolizes Tenochtitlan, the Aztec Capital, now Mexico City.

Below the Golden Eagle is a wreath, made from one-half of oak leaves the other half is of laurel leaves.



The Laurel leaves represent Victory and the Oak leaves commemorate those who have given their lives for Mexico.

The words above the Golden Eagle, on the coin, says "ESTADOS UNIDOS MEXICANOS", Mexico's official name in the Spanish language.

This version of the Mexican Coat of Arms has been used since 1968, the 1 oz. and larger Silver Libertad display earlier versions of the coat of arms, encircling the current one, in the middle, above.

The Edge on the 1/4 oz. Silver Libertad is Reeded.



## Reverse

This site uses cookies, some of which are required for its operation. Learn more.    [ Agree & Continue ]



*Bullion News on the Homepage*

*updated - daily*

*(except Saturdays)*

**Updated**

United States Bullion Coin Mintages



---

**2021**

**America the Beautiful**

**Tuskegee Airman**



---

**2020**

**Silver Libertad**

**Mintage Figures**

Case 3:20-cv-03210-L    Document 239-1    Filed 04/20/21    Page 19 of 55    PageID 3578



## Recent Articles

### February 2021 - Angel of Healing Fund Donation

Mar 15, 21 01:51 PM



The Angel of Healing's Process of choosing the recipient of its February 2021 Donation

Read More

### September 2020 - Donation from the Angel of Healing Fund

Oct 15, 20 11:13 AM

The Angel of Healing Fund's Process of choosing the recipient of its September 2020 Donation

Read More

### July 2020 - Donation from the Angel of Healing Fund



The reverse side of the 1/4 oz. Silver Libertad features the "Winged Victory" Angel design.

The "Winged Victory" Angel is towering above the volcanoes Popocatépetl and Iztaccihuatl.

Inscribed along the top of the Silver Libertad is "1/4 ONZA" (ounce) & "PLATA PURA" (pure silver).

The year of issue is displayed at the top of the coin, along with "Ley .999", representing the silver purity of the 1/4 oz. Libertad.

"O" over "M," is the Mint Mark of the Mexican Mint, it's inscribed near the left wing of the Winged Angel.

The 1/4 oz. Mexican Silver Libertad has No Face Value.

## Mexican Libertad
## Are they Bullion Coins or Rounds?

The Mexican Libertad is technically a Bullion 'Round,' and Not a Bullion 'Coin,' the differences are slight but important to know.

Bullion Coins have a 'face value' because the term 'Coin' is used specifically for government backed legal tender.

Bullion Rounds have no 'face value' because in most cases 'Rounds' are manufactured by a private mint or a privately held entity, and no government backs them.

There are some exceptions to this rule, one example being the Mexican Libertad.

The Mexican Mint produces Gold and Silver Libertads, under the authority of the Central Bank of Mexico (Banco de Mexico), and the Mexican Government.

However, Silver and Gold Libertads DO NOT have a Face Value, and for this reason, they are often referred to as Rounds and not Coins.



2020

Gold Libertad

**Mintage Figures**



1 oz. Gold Libertad



Fractional Gold Libertads

Updated

2019 & 2020

Mintage Figures for



Silver Lunar

This site uses cookies, some of which are required for its operation. Learn more.    [ Agree & Continue ]



The Angel of Healing Fund's Process of choosing the recipient of its July 2020 Donation

Read More

# 1/4 oz. Mexican Silver Libertad Coin Information

**Introduction:**.......1991

**IRA approved:**......Yes

**Grade:**................Uncirculated

**Face Value:**..........No

**Silver Content:**.....1/4 Troy oz. (ozt.)

**Total Weight:**.......7.78 grams

**Purity:**................99.90% / .999

**Diameter:**............25.00mm (1991 - 1995)

**Diameter:**............27.00mm (1996 - Present)

**Mint Mark:**...........Yes

**Edge:**..................Reeded

 

## Buy Mexican Silver Libertads

from one of **our Affiliated Dealer** links below.

The Links below will take you directly to the page described.

To See Customer Reviews on the Dealers listed below, **click this link**, then click the dealer's name.

**BGASC**
**Silver Libertad page**

BGASC - Trust Pilot Customer Reviews link



**Gold Kangaroo**



**Silver Kookaburra**



**Silver Koala**

**found on the**

**Perth Mint & Australian Bullion** page

**Updated**

**2019 & 2020**



**Silver Kangaroo Mintage Figures**

**2020**

**Jerusalem of Gold**

**Bullion Coin**

This site uses cookies, some of which are required for its operation. Learn more.    [ Agree & Continue ]



**1991**....50,017

**1992**....104,000

**1993**....90,500

**1994**....90,100

**1995**....50,000

**1996**....50,000

**1997**....20,000

**1998**....6,400

**1999**....7,000

**2000**....29,000

**2001**....5,000

**2002**....50,000

**2003**....22,000

**2004**....15,000

**2005**....15,000

**2006**....15,000

**2007**....3,500

**2008**....9,000

**2009**....10,000

**2010**....15,500

**2011**....15,500

In the early 1300s, an Aztec tribe also known as the Mexica tribe, who had no homeland, wandered around the northern areas of the country, known as Mesoamerica, in search of a place to build their Empire.

As the legend goes, in 1323, the tribe's leader received a vision in a dream that they were to settle at the place where they saw an eagle with a snake in its beak, while perched at the top of a prickly pear cactus.

Two years later, the dream was fulfilled on a swampy island, in Lake Texcoco.

Scouts for the tribe found the eagle, snake, and cactus in the same fashion that the leader described to them, in his vision.

This is where the tribe settled and built the city of Tenochtitlan, which became the center of the Aztec Empire.

Today, Tenochtitlan is known as Mexico City.



**Weekly**

**pages**

[Archangel Raphael](#)

[The Angel of Healing](#)

[Home page](#)

This site uses cookies, some of which are required for its operation. [Learn more](#)    Agree & Continue

**2013**....9,600

**2014**....6,950

**2015**....17,900

**2016**....17,700

**2017**....8,100

**2018**....18,000

**2019**....5,450

**2020**....4,450



### Mexican Silver Libertads

| **1 kilo.** | **5 oz.** | **2 oz.** | **1 oz.** | **1/2 oz.** | **1/4 oz.** | **1/10 oz.** | **1/20 oz.** |

## Other Pages You May Like...

**Bullion Market & Financial Forums**



**1 oz. Australian Silver Lunar Bullion Coin**



**1 oz. Canadian Silver Maple Leaf Bullion Coin**

**Graded/Certified Bullion Coin Guide**

Nice Charts

**Engelhard**

Bullion Refiner

**Silver Price Charts**

**Gold Krugerrand**

**The 'Troy' System of Weight**

**Mexican Silver Libertad**

**Johnson Matthey**

Bullion Refiner

**Gold Bullion Buying Guide**

**Affiliate Ad**

This site uses cookies, some of which are required for its operation. Learn more.    [ Agree & Continue ]

# Attachment B

Case 3:20-cv-02910-L    Document 238-1    Filed 04/20/21    Page 24 of 55    PageID 3583

IMPORTANT COVID-19 UPDATES.
READ MORE

X

SIGN IN  |  REGISTER     0

MENU

MENU

SEARCH

| COINS | PAPER CURRENCY | ENGRAVED PRINTS | MEDALS | ENROLLMENTS | STORAGE | FOR KIDS |

# AUTHORIZED PURCHASERS OF UNITED STATES MINT BULLION

The United States Mint, like other world mints, does not sell its bullion coins directly to the public. Instead, we distribute the coins through a network of official distributors called "authorized purchasers" who, in turn, create a two-way market buying and selling to precious metal wholesalers as well as private investors.

## Authorized Purchasers of United States Mint Bullion Coins

### UNITED STATES

### A-Mark Precious Metals, Inc.
El Segundo, California 90245
*Silver, Gold, Platinum, Palladium*

### American Precious Metals Exchange (APMEX)
Oklahoma City, Oklahoma 73012

*Silver, Gold, Platinum, Palladium*

### Coins & Things, Inc. (CNT)

Bridgewater, Massachusetts 02324

*Silver, Gold, Platinum, Palladium*

### Dillon Gage Inc. of Dallas

Addison, Texas 75001

*Silver, Gold, Platinum, Palladium*

### Fidelitrade, Inc.

Wilmington, Delaware 19802

*Silver, Gold, Platinum, Palladium*

### Jack Hunt Coin Broker, Inc.

Kenmore, New York 14217

*Silver, Gold, Platinum, Palladium*

### Manfra, Tordella, & Brookes, Inc. (MTB)

New York, New York 10036

*Silver, Gold, Platinum, Palladium*

### ScotiaMocatta (Scotia Bank)

New York, New York 10281

*Silver, Gold, Platinum, Palladium*

### StoneX Bullion

Santa Monica, California 90401

*Silver, Gold, Platinum, Palladium*

### The Gold Center

Springfield, Illinois 62704

*Silver Only*

### EUROPE

### Bayerische Landesbank

Nürnberg, Germany D-90449

*Silver, Gold, Platinum, Palladium*

### Deutsche Bank AG

Frankfurt, Germany

*Silver, Gold, Platinum, Palladium*

## FAR EAST

### Tanaka Kinkinzoku

TOKYO, 100-6422, Japan

*Platinum*

---

*The U.S. Government, including the United States Mint (the sponsoring Federal Agency of usmint.gov), neither endorses nor guarantees in any way the external organizations, services, advice, or products included in these website links. Furthermore, the U.S. Government neither controls nor guarantees the accuracy, relevance, timeliness, or completeness of the information contained in non-government website links.*

*Please note: not all of these authorized purchasers sell bullion products to consumers. To find a dealer near you, see our Bullion Dealer Locator button below.*

Bullion Dealer Locator

## WHAT IS A BULLION COIN?

### Learn More

# Attachment C

**IMPORTANT COVID-19 UPDATES.**
READ MORE                                                                          X



**UNITED STATES MINT**                                                            0

MENU    🔍 SEARCH

COINS    PAPER CURRENCY    ENGRAVED PRINTS    MEDALS    ENROLLMENTS    STORAGE    FOR KIDS

# Coins

Coin collecting, one of the world's oldest hobbies, was once practiced only by royalty and the very wealthy. Today, anyone can be a coin collector and own a piece of history from the U.S. Mint. Our selection of numismatic items includes gold, silver, and platinum coins, as well as program coins, annual coin sets, proof sets, commemorative coins, and uncirculated coins.

## Best Sellers

The United State Mint's best sellers are a wonderful place to start for gifts and foundation pieces to begin a new collection.

Shop All





# Attachment D

**SHOP**



---

**The Royal Canadian Mint has resumed safe and sustainable operations at full capacity.**
Please note that delivery carriers are experiencing higher than normal volumes at this time that may result in delays to your parcel delivery.
Read here for our latest information. >

Returns are FREE (Canada only)



# OUR PRODUCTS

## Circulation coins

The Mint's high-tech plant in Winnipeg produces over 1 billion circulation coins each year. You find them in your pocket and use them for tips, parking meters, vending machines, piggy banks… As they say – change is good!

The Mint also issues special circulation coins to mark events or occasions, such as the coloured Poppy quarter, the Millennium series of 25-cent coins and the 2010 Vancouver Olympic mascot coins.

> **Did you know?**
>
> Winnipeg's high-speed circulation presses can produce 20 million coins each day. That's 750 coins per second!

Shop circulation coins | History of Canadian circulation coins

## Collector coins

The Mint produces limited-mintage numismatic coins honouring major national achievements and themes. Though they bear a denomination, they are not meant for circulation, and their actual worth is usually significantly greater than their face value.

Crafted of gold, silver or platinum, the Mint's collector coins are individually handled as they enter the presses. A single coin may be struck up to three times to achieve a crisp, flawless impression. Certain coins feature the Mint's proprietary technologies: double holograms, selective plating, colouring or laser enhancement.

> **Did you know?**
>
> In 1998, the Royal Canadian Mint struck a 99999 fine gold collector coin, 34 mm in diameter – the largest coin ever produced with so high a level of purity.

Shop our collector coins

## Gifts souvenirs

## SHOP

Collector coins are valuable gifts that last a lifetime and beyond. You're sure to find something to please a sports fan, history buff, nature lover or a collector of Canadiana. And if you're looking for a unique gift, the Mint's exclusive watches feature numismatic coins perfectly reproduced to form beautiful, functional faces.

---

**Did you know?**

About 60% of the gold used by the Royal Canadian Mint is from Canadian sources.

---

Learn about our refinery services | Shop gift sets, watches, etc.

## Bullion

The Mint refines and produces Maple Leaf bullion coins, gold kilo bars, trade bars and gold wafers. All are struck with their weight, gold purity level and the Royal Canadian Mint hallmark.

Introduced in 1979, our precision-crafted 24-karat Gold Maple Leaf coins have become the standard by which other bullion coins are measured. The world's first bullion coins to reach the heightened level of 9999 purity, each one bears the 9999 hallmark, a mint mark and a reverse-proof maple leaf.

---

**Did you know?**

In 1998, the Mint produced a "5 nines" or "99999 fine" numismatic coin for the first time, hallmarked to designate gold of the highest recognized level of purity.

---

Investing | Bullion

### SIGN UP FOR EMAIL UPDATES FROM THE MINT AND BE IN THE KNOW

| SIGN-UP |
| --- |

Click OK to receive emails from the Mint and be among the first to hear what's new! You may unsubscribe at anytime. Contact us or view our privacy notice.

### CALL US AT 1-800-267-1871
### We are open 8a.m. - 7p.m. EST, Mon. to Fri.

## CONTACT US

## CHECK OUT OUR FAQS





## **SHOP**

You can be assured that the Mint fully guarantees the superior quality and craftsmanship of its products. If you are not completely satisfied with your purchase, you can simply return it to us in its original packaging within 30 days and we will gladly offer you a replacement (subject to product availability) or send you a full refund. In the case of a defective product, we will accept the return up to one year from the date of purchase.



INTELLECTUAL PROPERTY    ACCESS TO INFORMATION    PRIVACY    TERMS OF USE    AFFILIATE
VISIT THE MINT

© 2021 - ROYAL CANADIAN MINT - ALL RIGHTS RESERVED



# Attachment E



# INVESTING IN PRECIOUS METALS WITH A SELF-DIRECTED IRA



Case 3:20-cv-02910-L   Document 238-1   Filed 04/20/21   Page 35 of 55   PageID 3594
INVESTING IN PRECIOUS METALS WITH A SELF-DIRECTED IRA

1

# GETTING STARTED

Financial professionals all agree that asset diversification is the key to success when it comes to investing—and precious metals offer one way to reduce risk in times of an uncertain economy. To most investors, diversifying their retirement portfolio with precious metals may take the form of owning shares of an ETF or mutual fund which holds a pool of metals, such as gold or silver. Another popular strategy uses a self-directed IRA to invest in physical gold and precious metals on a tax-deferred or tax-free basis.

As with any investment, there are risks involved. Investors can better protect their retirement savings by reviewing any investments and investment sponsors thoroughly.

# SELECTING A DEALER

You determine and select the precious metals dealer to be used for your precious metals transaction. Therefore, you are responsible for all necessary due diligence regarding your precious metals dealer.

Before making any precious metals investment, you should perform the necessary due diligence on the dealer. You can find helpful consumer education information on the U.S. Mint's website (www.usmint.gov) and the American Numismatic Association's website (www.money.org). You may also wish to check the Better Business Bureau website, (www.bbb.org).

The accountholder is responsible for negotiating all details of the precious metals transaction, including the negotiation of the precious metals you direct for purchase, sale or exchange as well as the price, directly with the dealer. In addition, you must provide direction using our Investment Direction for Precious Metals form.

As an IRA custodian, STRATA Trust Company ("STRATA") is not affiliated with any dealer and does not sell any investments or offer any investment, tax or legal advice.

*"In the absence of the gold standard, there is no way to protect savings from confiscation through inflation. There is no safe store of value."*

*—Alan Greenspan, former chairman of the Federal Reserve*

STRATA Trust Company ("STRATA") performs the duties of a directed (passive) custodian, and as such does not provide due diligence to third parties regarding prospective investments, platforms, sponsors, dealers or service providers. As a custodian, STRATA does not sponsor, endorse or sell any investment and is not affiliated with any investment sponsor, issuer or dealer. STRATA does not provide investment, legal or tax advice. Individuals should consult with their investment, legal or tax professionals for such services.

Investments Products:  Not FDIC-Insured  •  No Bank Guarantee  •  May Lose Value

# FUNDING OF YOUR PRECIOUS METALS TRANSACTIONS

Your Precious Metals IRA should be established. Purchases can only be made with cash available in your IRA account. New account applications and forms are available on our website, www.StrataTrust.com.

Cash deposits made recently may not be immediately available and are subject to our Funds Availability policy.

Review the dealer's invoice for accuracy. Important: Precious metal purchases made within your IRA require that we release funds in advance to your dealer before your dealer arranges for the delivery of metal to your selected depository.

Obtain the estimated date/time frame for delivery from your dealer and include it in Section 6 on our Investment Direction. The dealer is instructed to deliver your precious metals to your selected depository.

## The following precious metals are permitted to be held in IRAs under Internal Revenue Code 408(m)(3)(A)(i)-(iv) and 408(m)(3)(B):

- ⌘ Gold Coins: American Eagle bullion and proof, American Buffalo bullion (no proofs), Australian Kangaroo/Nugget, Austrian Philharmonic and Canadian Maple Leaf

- ⌘ Silver Coins: American Eagle bullion and proof, America the Beautiful bullion (no proofs), Australian Kookaburra, Austrian Philharmonic, Canadian Maple Leaf and Mexican Libertad

- ⌘ Platinum Coins: American Eagle bullion and proof, Australian Koala, Canadian Maple Leaf and Isle of Man Noble

- ⌘ Gold, Silver, Platinum and Palladium Bars and Rounds: if produced by a refiner/assayer/manufacturer accredited/certified by NYMEX/COMEX, NYSE/LIFFE, LME, LBMA, LPPM, TOCOM, ISO 9000 or national government mint that meets minimum fineness requirements: gold 99.5%, silver 99.9%, platinum 99.95% and palladium 99.95%

Call us if you have questions before placing your order with your dealer.

STRATA Trust Company ("STRATA") performs the duties of a directed (passive) custodian, and as such does not provide due diligence to third parties regarding prospective investments, platforms, sponsors, dealers or service providers. As a custodian, STRATA does not sponsor, endorse or sell any investment and is not affiliated with any investment sponsor, issuer or dealer. STRATA does not provide investment, legal or tax advice. Individuals should consult with their investment, legal or tax professionals for such services.

**Investments Products:  Not FDIC-Insured  •  No Bank Guarantee  •  May Lose Value**

# PRICE SPREADS AND PROOF AMERICAN EAGLE COINS

Generally, the value of precious metals at the bid price will be less than the amount paid if precious metal prices have not changed. The difference between the price at which precious metals can be bought and the price at which they can be sold at a particular time is called "price spread." Price spread has generally been greater for proof coins than the price spread for bullion precious metals. Obtain all necessary information from your dealer before investing.

# STORAGE OF YOUR PRECIOUS METALS

When providing your investment direction to STRATA Trust Company for the purchase of precious metals, you will be required to select a third-party depository for the physical storage of your IRA-owned precious metals. STRATA works with the following nationally recognized depositories for the safekeeping and storage of our clients' precious metals:

① Brink's Global Services USA, Inc. (www. brinksglobal.com), located in Los Angeles, CA or Salt Lake City, UT

② Delaware Depository (www.delawaredepository.com), located in Wilmington, DE

You may select commingled or segregated storage of your metals and you will be responsible for any storage related fees. Note: All Silver will be held in commingled storage and segregated storage is not an option.

## What is commingled storage?

If you select commingled storage, your precious metals will be held in a segregated storage area for STRATA customers but will be commingled with other STRATA customers within the storage area. When you later decide to sell, exchange or take an in-kind distribution of your precious metals, you will receive "like" precious metals (not the exact metals that you initially purchased).

## What is segregated storage?

If you select segregated storage, your precious metals will be held in a segregated storage area for STRATA customers and will be segregated, marked and stored with your name and IRA account number. When you later decide to sell, exchange or take an in-kind distribution of your precious metals, you will receive the exact metals that you initially purchased.

STRATA Trust Company ("STRATA") performs the duties of a directed (passive) custodian, and as such does not provide due diligence to third parties regarding prospective investments, platforms, sponsors, dealers or service providers. As a custodian, STRATA does not sponsor, endorse or sell any investment and is not affiliated with any investment sponsor, issuer or dealer. STRATA does not provide investment, legal or tax advice. Individuals should consult with their investment, legal or tax professionals for such services.

**Investments Products:  Not FDIC-Insured  •  No Bank Guarantee  •  May Lose Value**

Your chosen depository will notify us when delivery has been made of your metals. Upon receiving this confirmation from your depository, we will update your account accordingly.

Some dealers promote a so-called Home Storage IRA. However, the IRS website states that precious metals must be stored "in the physical possession of a bank or an IRS-approved nonbank trustee. The rule also applies to an indirect acquisition, such as having an IRA-owned Limited Liability Company (LLC) buy the bullion."

## VALUATION AND PRICING OF YOUR PRECIOUS METALS

Values for precious metals shall reflect the spot value, which is the current spot price multiplied by the ounces of fine metal contained in the coin or bar. Spot values do not include any mark-ups, mark-downs, premiums or commissions. Spot values should be used as an indication of value only and should not be construed as a firm bid price to buy by any broker or dealer. The actual precious metal type and quantity of a transaction may affect the price received for any given bullion item.

Proof coins must be encapsulated in complete, original mint packaging, including certificate of authenticity, and in excellent condition. Non-proof coins must be in Brilliant Uncirculated condition and free from damage. Price indications for specific bullion products may be obtained from various sources, including your precious metals broker dealer or on the internet at sites such as www.BullionValues.org.

## FEES

Expect to pay an annual IRA fee to your custodian, as well as the annual depository fee. Other fees may include processing, wiring or shipping fees. Please refer to STRATA's IRA Fee Schedule.

## STATEMENTS AND ONLINE ACCOUNT ACCESS

Access to your account information is available 24/7 on STRATA's website, www.StrataTrust.com. You may also download and view your quarterly account statements, tax forms, invoices and other important notices we issue. Go to our website, select the Account Access button and follow the prompts to self-enroll.

STRATA Trust Company ("STRATA") performs the duties of a directed (passive) custodian, and as such does not provide due diligence to third parties regarding prospective investments, platforms, sponsors, dealers or service providers. As a custodian, STRATA does not sponsor, endorse or sell any investment and is not affiliated with any investment sponsor, issuer or dealer. STRATA does not provide investment, legal or tax advice. Individuals should consult with their investment, legal or tax professionals for such services.

Investments Products:  Not FDIC-Insured  •  No Bank Guarantee  •  May Lose Value



## SUMMARY

Knowing the rules associated with holding precious metals in your IRA is essential, and speaking with your legal and tax advisor is recommended. As a custodian, STRATA cannot give advice about specific investments or strategies, but we can provide answers, educational resources and point out the legal issues to think about for your precious metals transaction.

On the next page, we have collected the most common questions asked by novice and experienced precious metal investors:

STRATA Trust Company ("STRATA") performs the duties of a directed (passive) custodian, and as such does not provide due diligence to third parties regarding prospective investments, platforms, sponsors, dealers or service providers. As a custodian, STRATA does not sponsor, endorse or sell any investment and is not affiliated with any investment sponsor, issuer or dealer. STRATA does not provide investment, legal or tax advice. Individuals should consult with their investment, legal or tax professionals for such services.

Investments Products:  Not FDIC-Insured  •  No Bank Guarantee  •  May Lose Value

# Attachment F

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF TEXAS

 3

 4                                  )
    COMMODITY FUTURES TRADING       )
 5  COMMISSION et al,               )
                                    )
 6         Plaintiffs,              ) Case No.:
                                    ) 3:20-CV-2910-L
 7      vs.                         )
                                    )
 8  TMTE, INC. A/k/a METALS.COM,    )
    CHASE METALS, INC., CHASE       )
 9  METALS, LLC, BARRICK            )
    CAPITAL, INC., LUCAS THOMAS     )
10  ERB a/k/a LUCAS ASHER a/k/a     )
    LUKE ASHER, and SIMON           )
11  BATASHVILI                      )
                                    )
12         Defendants.              )
                                    )
13      and                         )
                                    )
14  TOWER EQUITY, LLC,              )
                                    )
15  Relief Defendant                )
                                    )
16

17      REMOTE VIDEO-RECORDED DEPOSITION OF LUCAS ASHER

18                 Thursday, November 5, 2020

19                        VOLUME I

20

21  Stenographically Reported by:
    Mechelle S. Gonzalez
22  CSR No. 13250
    Job No. 96642
23

24

25  PAGES 1 - 291
```

1       mail or other deliveries, inventory, checks, notes,

2       accounts (including, but not limited to bank

3       accounts and accounts or other financial

4       institutions, credits, receivables, lines of credit,

5       contracts (including spot, futures, options, or

6       swaps contracts), insurance policies, and all funds,

7       wherever located, whether in the United States or

8       outside the United States."

9              Do you see that definition?

10      A.   I see the definition.

11      Q.   And have you reviewed this order from the

12      court to make sure that you are complying with the

13      order of the court?

14      A.   I've reviewed the order of the court.

15      Q.   And using the term "assets" as defined in

16      this order that is before you, have you turned over

17      to me, as we sit here, all of your assets?

18      A.   To the best of my understanding, yes, I

19      have.

20      Q.   Let's go down to paragraph -- or page 17.

21              Under paragraph 32, Mr. Asher, this is a

22      provisional order that requires each defendant, and

23      relief defendant, within five business days

24      following the service of this order: To transfer to

25      the territory of the United States and deliver to

1          A.   It's no longer solvent.

2          Q.   Was the project -- was the project stopped

3     prior to receivership?

4          A.   I believe it was stopped before the

5     receivership.

6          Q.   How long before?

7          A.   I would say probably six months before.

8          Q.   Any other software or apps owned by Tower

9     Equity other than what we've talked about?

10          A.   There's going to be an extensive amount of

11     software because I invested in a lot of software,

12     and I just don't even recall off the top of my head

13     all the various software I invested in, but there

14     will be records of it in the bank accounts, and we'd

15     certainly be willing to help you comply and find

16     those records.  I just don't have access to any of

17     those records right now.

18          Q.   Do you have any cash?

19          A.   I believe I have $20 in my backpack.

20          Q.   Where did you get that $20?

21          A.   It was always there.

22          Q.   Do you own any life insurance policies?

23          A.   No.

24          Q.   Have you ever owned any life insurance

25     policies?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1          Q.   Premier Bank?

 2          A.   It's certainly possible.  I may have at one

 3     time banked with virtually every bank, so it's

 4     certainly possible.  I just don't remember all their

 5     names.

 6          Q.   As of September 21st of 2020, what bank

 7     accounts are you aware of that were active that you

 8     were using in which you were a signatory?

 9          A.   JPMorgan.

10          Q.   Okay.

11          A.   That's all I recall at this time.

12          Q.   Have you ever done any business in the past

13     with Merrill Lynch?

14          A.   I believe some of the entities I was

15     involved with might have, but not me individually.

16          Q.   What entities might have done business with

17     Merrill Lynch?

18          A.   Well, I didn't confirm, actually, that I

19     have done; I said they might have, and it would have

20     been with Tower Equity.

21          Q.   Not any of the defendants or relief

22     defendant have done business with Merrill Lynch,

23     other than I guess you mentioned Tower Equity is a

24     possibility?

25          A.   Yes.  And just to add some clarity behind
```

1    the name Luke Erb was used with respect to a company

2    that sold gold and silver, correct, Amerivise?

3         A.  To the best of my knowledge, that was

4    before 2014, sir.

5         Q.  Okay.  So it's your testimony under oath

6    that since 2014, you did not use any alias name

7    other than your -- your current name of Lucas Asher?

8         A.  I don't recall using any name at -- after

9    2014 other than Lucas Asher, and that's the name on

10   my passport and driver's license.

11        Q.  Do you own any assets anywhere in the world

12   in the name of Lucas (Luke) Erb?

13        A.  No.

14        Q.  Any -- do you own any assets anywhere in

15   the world under the name of just Lucas Erb?

16        A.  No.

17        Q.  Do you own any assets anywhere in the world

18   under the name of Luke Erb?

19        A.  No.

20        Q.  Do you -- have you ever gone by the name of

21   Luke Emanuel?

22        A.  I've seen that name on this document

23   before, but I don't even know who he's addressing

24   there because I haven't used that name, to my

25   knowledge.

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1          Q.   Have you ever used the name Luke Francis?

2          A.   Not to my recollection.

3          Q.   Do you -- have you ever used any nicknames?

4          A.   Yes.

5          Q.   And what are some of your nicknames?

6          A.   When I was programming in Silicon Valley,

7     some of the programmers called me Eons.

8          Q.   Eons?

9          A.   Yes, sir.  It's the large -- E-o-n-s.  It's

10    the largest biological time frame.

11         Q.   And do you own any assets anywhere in the

12    world under the name of Eons?

13         A.   I do not.

14         Q.   Have you ever gone by any other nicknames?

15         A.   Yes.

16         Q.   And what other nicknames?

17         A.   Some of my friends in music sometimes call

18    me Lucky.

19         Q.   And you're also referred to as El Swingo?

20         A.   People call me a lot of things.  We could

21    go on and on.  Yes, people have called me that.

22         Q.   Do you own any assets anywhere in the world

23    under the name of Lucky or El Swingo?

24         A.   No.

25         Q.   Have you ever used any other name to hold

1    any assets anywhere in the world other than the

2    names we've discussed here today?

3         A.   Not -- not to my knowledge.

4         Q.   We have talked a lot today about assets.

5    Do you -- again going back to the definition of

6    "assets" under the court order, do you own any other

7    assets anywhere in the world other than what we've

8    talked about here today?

9         A.   Not to my knowledge.

10             MR. CRAWFORD:  I'll pass the witness back

11   to Mr. Buffa.

12             MR. SPENCER:  Why don't we take a

13   five-minute break, JonMarc can get his list

14   together, and we can start in five minutes.  Okay?

15             MR. BUFFA:  That's fine.

16             THE VIDEOGRAPHER:  The time is now

17   5:30 p.m., going off the record.

18             (Recess taken from 5:30 p.m. to 5:38 p.m.)

19             THE VIDEOGRAPHER:  We're back on the

20   record.  The time is 5:38.

21

22                       EXAMINATION

23             BY MR. BUFFA:

24        Q.   Good afternoon, Mr. Erb -- Mr. Asher.  My

25   name is JonMarc Buffa, and as I said before, I'm

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    with the United States Commodity Futures Trading

2    Commission.

3           Before I begin my questioning, I want to

4    remind you that you're under oath, that the rules

5    that you agreed with Mr. Crawford still apply, and

6    as I said before, remind you that under 18 U.S.C.

7    1001, you have an obligation to answer truthfully.

8           Do you understand that?

9      A.   I understand, Mr. Buffa.

10     Q.   So Mr. Crawford ended his questioning

11   asking about certain names and aliases you may have

12   used.  Have you ever gone by a name Thomas Erb?

13     A.   Yeah.  That was a middle name for Luke

14   Thomas Erb that I had used prior to 2013.

15     Q.   Did you ever open any bank accounts with

16   that name?

17     A.   Prior to 2013, I believe I did.

18     Q.   And where were those accounts held?

19     A.   Potentially, Bank of America.

20     Q.   And did those accounts -- are those

21   accounts still in existence today?

22     A.   No.  That name doesn't exist anymore.

23     Q.   But do the accounts that that name was used

24   to open still exist?

25     A.   No.

1          Q.  Does Thomas Erb have any assets anywhere in

2     the world?

3          A.  No.

4          Q.  What I'm going to do is -- Mr. Crawford

5     asked you a number of questions, and I'm going to

6     follow up on some of them and then take us to a few

7     new area -- new areas that I'd like to discuss.

8              The first question I have for you is:  You

9     said earlier that you worked for a company called

10    Gold Line.  What dates did you work for Gold Line?

11    What was your range of employment?

12         A.  I don't recall the dates.

13         Q.  Do you know the year that you worked for

14    them?

15         A.  I believe, to the best of my ability, it

16    was 2011.

17         Q.  And after you left Gold Line, where did you

18    go work?

19         A.  Another retail precious metals company

20    called Merit Financial.

21         Q.  And how long were you at Merit?

22         A.  I don't recall.

23         Q.  Do you know the years you were at Merit?

24         A.  I don't recall all the years.  One of them

25    was 2012.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

# Attachment G

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION

3

COMMODITY FUTURES TRADING      )
4  COMMISSION, et al.,          )
                               )
5               Plaintiff,      )
   vs.                          )Case No. 3:20-CV-2910-L
6                               )
LUCAS THOMAS ERB also known    )
7  as LUCAS ASHER also known as )
LUKE ASHER,                     )
8  TMTE, Inc.,et al.,           )
                               )
9               Defendants.     )
   ————————————————————————————————————————

10         REPORTER'S TRANSCRIPT OF PROCEEDINGS

11            HAD ON FRIDAY, DECEMBER 4, 2020
12         CONTEMPT HEARING FOR LUCAS ASHER

13   BEFORE THE HONORABLE SAM A. LINDSAY, JUDGE PRESIDING

14            **A P P E A R A N C E S**

15  MR. JONMARC PHILLIP BUFFA (By Video Teleconference)
    MR. RICHARD P. FOELBER
16  Commodity Futures Trading Commission
    1155 21st Street, NW
17  Washington, DC 20581
    (202)418-5332
18  jbuffa@cftc.gov, rfoelber@cftc.gov

19  COUNSEL FOR THE COMMODITY FUTURES TRADING COMMISSION

20  MR. PETER C. LEWIS
    MR. JAMES STAFFORD
21  MR. WALKER YOUNG
    Scheef & Stone, LLP
22  500 N. Akard, Suite 2700
    Dallas, TX 75201
23  (214)706-4241
    peter.lewis@solidcounsel.com,
24  james.stafford@solidcounsel.com,
    walker.young@solidcounsel.com
25
    COUNSEL FOR THE RECEIVER

1        MR. SPENCER: Nothing further, Your Honor.  Pass
2   the witness.

3        THE COURT:  Thank you.

4     Mr. Lewis, any questions?

5        MR. LEWIS:  Nothing further, Your Honor.

6        THE COURT: Before we move off, there was a
7   recording left by Mr. Asher.  Do we have a hard copy of
8   that?

9        MR. LEWIS: Well, Your Honor, we have it recited
10  in the motion.  I believe it is.  It was transcribed for
11  you.  One second.

12       THE COURT: Okay, was it part of the exhibits or
13  not?  The recording was played, but I thought there was a
14  transcript.

15       MR. LEWIS:  Yes, Your Honor, it is Exhibit C to
16  the declaration which is docket number 196, so Exhibit C.
17  It is on the screen.

18       THE COURT: All right, it is on the screen now.
19  Hold it right there then.

20     All right, that email was on September 28, 2020 at
21  7:46 p.m.  Mr. Asher, you can see that on the screen; can
22  you not?

23       THE WITNESS: Yes, Your Honor.

24       THE COURT: We discussed this a little, but I may
25  have a few questions.  About midway in that paragraph,

1  the first paragraph, you state, quote, I deny that

2  accusation.  I am in full compliance with the Honorable

3  Judge Lindsay's order, and I will continue to be in full

4  compliance.

5      In reading that, you would agree, would you not, that

6  at least as of September 28, 2020, you had read the order

7  -- the statutory restraining order, you had read it; is

8  that correct?

9          THE WITNESS: Yes, Your Honor, parts of it.

10          THE COURT: I guess that's what I find a bit

11  troubling or perhaps not coming full circle.  You said

12  you had read parts of it.  My question is this.  For a

13  person to boldly assert or declare that he or she is in

14  full compliance with a court order, would not the person

15  have to be familiar with what the order says?

16          THE WITNESS: Your Honor, I was under the

17  impression that the order --

18          THE COURT: No, no, no, no.  Let me drive up and

19  blow the horn again.  You are not hearing me.  Once

20  again, if a person tells me or tells you that I am in

21  full compliance with this contract.  Or I am in full

22  compliance with the letter that sets out my

23  responsibilities between the two of us.  Is not the

24  reasonable inference that can be drawn is that you are

25  familiar with that document?

 1              THE WITNESS:  Yes, Your Honor.  I was familiar

 2   with the document.

 3              THE COURT:  What I am getting to is this.  If

 4   you are in full compliance as you state in that email

 5   message, would it not necessarily follow that you knew

 6   what the order said you could and could not do?

 7              THE WITNESS: Your Honor, respectfully, in the

 8   interest of accuracy I didn't send an email.  It was a

 9   voicemail, and I was scared because many of my friends

10   had been receiving calls and threatened, and I was scared

11   and I left a voicemail because I didn't have Counsel to

12   speak to.

13              THE COURT: All right, voicemail, email,

14   whatever.  That was your voice; was it not?

15              THE WITNESS: Yes, Your Honor.

16              THE COURT: You were talking?

17              THE WITNESS: Yes, Your Honor.

18              THE COURT: The question I have is, you made a

19   statement that you were in full compliance with the order

20   that had been issued, the statutory restraining order,

21   and all I am saying or all I am asking is this.  For a

22   person to make that statement, would not that necessarily

23   mean that he or she was familiar with the order?

24              THE WITNESS: Yes, Your Honor.

25              THE COURT:  Now, if I understood your testimony

1 correctly, prior to that, you had seen bits and pieces on

2 a screen shot; is that correct?

3          THE WITNESS: Yes, Your Honor.

4          THE COURT: Now, is it your understanding of the

5 restraining order that it would prohibit or bar you from

6 transferring or otherwise disposing of any assets to

7 which you have access?

8          THE WITNESS: Yes, Your Honor.

9          THE COURT: So those funds that you transferred

10 have been the subject of a lot of discussions.  You are

11 telling the Court, are you not, that you had access to

12 those funds?

13          THE WITNESS: I did have access, Your Honor.

14          THE COURT: All right, let me ask you another

15 question.  I am just curious here really.  Can you clear

16 up for the Court -- can you clear up for the Court the

17 different names that you go by?

18          THE WITNESS: Sir, my name I go by is Lucas

19 Asher.  I was the victim of domestic violence, and I

20 joined -- I joined a witness protection program called

21 the Safe At Home Organization, and in order to avoid

22 abuse as a victim, it was a sealed lawful name change,

23 and my only name I go by is Lucas Asher, as I am here

24 before you today.

25          THE COURT: All right, thank you, sir.  I believe