# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, *et al*.<br><br>　　　Plaintiffs,<br><br>v.<br><br>TMTE, Inc. a/k/a metals.com, Chase Metals Inc., Chase Metals, LLC, Barrick Capital, Inc., Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher, and Simon Batashvili,<br><br>　　　Defendants. | Civil Action No. 3:20-CV-2910-L |

## DEFENDANTS' COMBINED REPLY IN SUPPORT OF EMERGENCY MOTION TO MODIFY PRELIMINARY INJUNCTION AND REQUEST FOR ORAL ARGUMENT

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

   A.  Asher and Batashvili Are Entitled to Counsel of Their Choice.......................................... 1

   B.  Asher and Batashvili Did Not Waive Their Right to Seek Modification of the Preliminary Injunction Order............................................................................................................. 3

   C.  Equity Weighs in Favor of Allowing Future Earnings and the Unfreezing of the Untainted Assets for Attorneys' Fees................................................................................................ 4

   D.  Plaintiffs Have Not Met Their Burden to Keep the Requested Assets Frozen.................. 8

      1.  Plaintiffs Have Failed to Show that Metal Coins are "Commodities" under the CEA. 9

      2.  Plaintiffs Have Failed to Show that the Anti-Manipulation Provision of the CEA Applies to Non-Leveraged Retail Transactions ........................................................ 10

            a.  The Proper Scope of Section 6(c)(1) is a Matter of First Impression for this Court. ............................................................................................................................... 11

            b.  The CFTC's Interpretation of Section 6(c)(1) Upends the Regulatory Structure of the CEA.................................................................................................................. 11

            c.  The CFTC's Interpretation of Section 6(c)(1) Leads to Surplusage.................. 13

            d.  The Plain Language of Section 6(c)(1) Requires Manipulation. ....................... 13

            e.  The Legislative History of Section 6(c)(1) Shows That Manipulation is Required. ............................................................................................................................... 14

            f.  The CFTC's Interpretation is Not Entitled to *Chevron* Deference. .................. 15

      3.  Plaintiffs Fail to Show that Defendants' Retail Transactions Were Fraudulent......... 17

   E.  The Notice of Limited Appearance and Motion Should Not Be Stricken. ....................... 19

REQUEST FOR ORAL ARGUMENT ....................................................................... 19

CONCLUSION.............................................................................................................. 19

CERTIFICATE OF SERVICE .................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bell South Corp.*,
334 F.3d 941 (11th Cir. 2003) ........................................................................2

*CFTC and State of Utah v. Rust Rare Coin, Inc., et al.*
No. 2:18-cv-892 (D. UT 2018) ......................................................................11

*CFTC v. Am. Precious Metals, LLC*,
845 F. Supp. 2d 1279 (S.D. Fla. 2011) .........................................................16

*CFTC v. Atlantic Bullion & Coin, Inc. and Ronnie Wilson*,
No. 8:12-cv-01503 (D.S.C. 2012) .................................................................11

*CFTC v. Dinar Corp.*,
No. 1:15-CV-538-WKW, 2016 WL 814893, at *4 (M.D. Ala. Feb. 29, 2016).......................7

*CFTC v. My Big Coin Pay, Inc.*,
334 F. Supp. 3d 492 (D. Mass. 2018) ...........................................................10

*CFTC v. The Tulving Company and Hannes Tulving*
No. 3:15-cv-00424 (W.D.N.C. 2015) ............................................................11

*CFTC v. Walsh*,
No. 09 CR 722 (MGC), 2010 WL 882875 (S.D.N.Y. Mar. 9, 2010) .......................2

*CFTC v. Zelener*,
373 F.3d 861 (7th Cir. 2004) ........................................................................10

*De Sylva v. Ballentine*,
351 U.S. 570 (1956)......................................................................................14

*Federal Savings & Loan Insurance Corp. v. Dixon*,
835 F.2d 554, 565 (5th Cir. 1987) ..........................................................1, 2, 3, 6

*FTC v. Abili-Staff, Ltd*,
No. SA-10-CA-88-OG, 2010 WL 11598073 (W.D. Tex. Oct. 7, 2010) ..................5

*FTC v. Ameridebt, Inc.*,
373 F. Supp. 2d 558 (D. Md. 2005)...............................................................5

*FTC v. Consumer Def., LLC*,
No. 2:18-CV-30 JCM (PAL), 2018 WL 2972927 (D. Nev. May 4, 2018)................3

*FTC v. Liberty Supply Co.*,
    No. 4:15-CV-829, 2016 WL 4182726 (E.D. Tex. Aug. 8, 2016) ........................................3, 5

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988) ...........................................................................................5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ..........................................................................................................10

*Potashnick v. Port City Constr. Co.*,
    609 F.2d 1101 (5th Cir. 1980), *cert. denied*, 449 U.S. 820 (1980) ...............................1, 2

*Salomon Forex, Inc. v. Tauber*,
    8 F.3d 966 (4th Cir. 1993) ...........................................................................................11, 12

*SEC v. Bremont*,
    954 F. Supp. 726 (S.D.N.Y. 1997) ....................................................................................6

*SEC v. Dowdell*,
    175 F. Supp. 2d 850 (W.D. Va. 2001) ...............................................................................2

*SEC v. Duclaud Gonzalez de Castilla*,
    170 F. Supp. 2d 427 (S.D.N.Y. 2001) ...............................................................................8

*SEC v. I-Cubed Domains, LLC*,
    664 F. App'x 53 (2d Cir. 2016) .........................................................................................6

*SEC v. Lauer*,
    445 F. Supp. 2d 1362 (S.D. Fla. 2006) ..........................................................................3, 4

*SEC v. Lee*,
    No. 14-CV-347, 2019 WL 4934181 (S.D. Cal. Oct. 7, 2019) ............................................8

*SEC v. Stanford Int'l Bank, Ltd.*,
    No. 3:09-cv-00298-N (Dkt. 544) (N.D. Tex. July 1, 2009) ................................................7

*U.S. Commodity Futures Trading Comm'n v. Reed*,
    481 F. Supp. 2d 1190 (D. Colo. 2007) .............................................................................12

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..........................................................................................................12

**Statutes**

7 U.S.C. § 1a(9) (2018).............................................................................................................9

7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa) .............................................................................................13

7 U.S.C. § 4(b)........................................................................................................13, 14

7 U.S.C. § 6(b)........................................................................................................13, 15

7 U.S.C. § 6(c)(1)....................................................8, 10, 11, 12, 13, 14, 15, 16

7 U.S.C. § 9(1)........................................................................................................11, 14

Securities Exchange Act Section 10(b)................................................................14, 15

**Other Authorities**

17 C.F.R. § 180.1(a)(1)–(3) ......................................................................................11

156 Cong. Rec. S3348 ...............................................................................................15

Commodity Futures Exchange website,
    https://www.cftc.gov/IndustryOversight/MarketSurveillance/SpeculativeLimit
    s/index.htm...........................................................................................................16

Commodity Futures Exchange website,
    https://www.cftc.gov/IndustryOversight/MarketSurveillance/SpeculativeLimit
    s/speculativelimits.html ......................................................................................16

Commodity Futures Trading Commission website,
    https://www.cftc.gov/About/AboutTheCommission .............................................12

iv

TO THE HONORABLE JUDGE SAM A. LINDSAY:

As the Fifth Circuit cautioned in *Federal Savings & Loan Insurance Corp. v. Dixon*: "The basis of our adversary system is threatened when one gains control of the other party's defense." 835 F.2d 554, 565 (5th Cir. 1987). Plaintiffs and the Receiver seemingly suggest that the Court should ignore these words of caution because, in short, Asher and Batashvili (the "Individual Defendants") are bad people. Plaintiffs' and the Receiver's arguments in opposition to the Individual Defendants' Emergency Motion to Modify the Preliminary Injunction ("Motion")— that Asher and Batashvili have no right to counsel and there is no equitable basis to modify the preliminary injunction to allow them to retain counsel—would leave Asher and Batashvili proceeding *pro se* in this extraordinarily complicated matter with potentially far-reaching consequences for both the law and the Individual Defendants.

The equities of the case demand a more measured approach and the Court should exercise its discretion in allowing the modification of the Preliminary Injunction to provide Asher and Batashvili with reasonable means to mount their defense.

## A.      Asher and Batashvili Are Entitled to Counsel of Their Choice

Plaintiffs' and Receiver's argument that the Individual Defendants have no right to counsel turns constitutional jurisprudence on its head and ignores relevant case law. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Modify Preliminary Injunction ("Plaintiffs' Opposition" or "Opp.") at 29-30; Receiver's Response to Notice of Limited Appearance and Emergency Motion to Modify Preliminary Injunction ("Receiver's Response" or "Resp.") at 21-22. The law is clear: "a civil litigant has a constitutional right to retain hired counsel." *Potashnick v. Port City Constr. Co*., 609 F.2d 1101, 1118 (5th Cir. 1980), *cert. denied*,

1

449 U.S. 820 (1980)[1]; *see also In re Bell South Corp.*, 334 F.3d 941, 955, 961 (11th Cir. 2003) ("[A] party is presumptively entitled to the counsel of his choice."). This right is all the more critical where the civil matter has direct implications for an ongoing criminal investigation. *See CFTC v. Walsh*, No. 09 CR 722 (MGC), 2010 WL 882875, at *3 (S.D.N.Y. Mar. 9, 2010) ("[T]he present action involves asset freeze orders in civil actions, with Defendants also being tried in a parallel criminal proceeding. These unique circumstances require the court to pay particular attention to the Defendants' Fifth and Sixth Amendment rights. . . . Defendants Walsh and Greenwood's motions are granted to the extent that Defendants are entitled to pay for lawyers of their choice with untainted funds."). Here, while Asher and Batashvili have not yet been indicted, the CFTC has confirmed a parallel criminal investigation into the same facts underlying this matter, and Asher and Batashvili will be severely prejudiced without effective representation.

Applying these principles in the context of an equitable modification of a preliminary injunction for attorneys' fees similar to the facts here, the Fifth Circuit found in *Federal Savings & Loan Insurance Corp. v. Dixon* that "the court cannot assume the wrongdoing before judgment in order to remove the defendant's ability to defend themselves." 835 F.2d at 565, "Some kind of an allowance must be made to permit each defendant to pay reasonable attorneys' fees." *Id.* Such conclusions have been echoed by other courts who are similarly concerned with fundamental notions of fair play. *See SEC v. Dowdell*, 175 F. Supp. 2d 850, 856 (W.D. Va. 2001) ("The court does not believe that it could achieve a fair result at the preliminary injunction hearing were it to

---

[1] Plaintiffs' and the Receiver's attempt to distinguish *Potashnick* is unavailing. The Fifth Circuit in *Potashnick* did not limit its holding to the narrow facts of the case, but conducted a careful analysis of the origin of the right to counsel in civil actions generally. *See* Mot. at 15-16. Further, *In the Matter of Wynn* concerned the issue of whether the bankruptcy court erred in allowing the defendant's counsel to withdraw, distinguishing it from *Potashnick* on its facts. *Wynn* did not alter the Court's original analysis in *Potashnick* regarding the fundamental right to counsel in civil actions.

deny defendant the ability to retain counsel."); *FTC v. Consumer Def., LLC*, No. 2:18-CV-30 JCM (PAL), 2018 WL 2972927, at *4 (D. Nev. May 4, 2018) ("The lack of availability of other funds and the fact that the [defendants] have not yet been found liable . . . are considerations courts have evaluated when determining whether to release funds for attorneys' fees.").

Given the seriousness of the accusations in this matter and the confirmed criminal investigation, it is critical that Individual Defendants be granted access to untainted funds to retain effective counsel.

**B.     Asher and Batashvili Did Not Waive Their Right to Seek Modification of the Preliminary Injunction Order**

The fact that Individual Defendants initially agreed to the terms of the injunctions does not prevent them from seeking modification of it at this stage, and the Court should reject the Plaintiffs' and Receiver's arguments otherwise. *See* Opp. at 9; Resp. at 11-12. Not only do district courts have complete discretion to modify a preliminary injunction to release frozen assets "when equity requires" (*FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *2 (E.D. Tex. Aug. 8, 2016)), but courts frequently authorize the release of frozen assets to enable defendants to retain counsel. *See, e.g.*, *Dixon*, 835 F.2d at 565 ("[T]he district court should modify its order so as to allow each defendant's reasonable request for a release of assets that are necessary to pay attorneys."); *see also* Mot. at 14-15 (citing cases).

Plaintiffs cite to no case law to support their position, and the Receiver cites to a single, inapposite case, *SEC v. Lauer*, 445 F. Supp. 2d 1362 (S.D. Fla. 2006). In *Lauer*, the defendant consented to the entry of a preliminary injunction order freezing his assets and then moved to modify that order to allow the proceeds from the sale of his condominium to be released to fund his legal defense. *Id*. at 1363. In rejecting the defendant's motion, however, the court noted that

3

the instant motion was his *17th attempt* to modify the asset freeze. *Id.* at 1365. The court's discussion of waiver focused on the fact that the court had *previously granted* the relief sought by the defendant, who, apparently unsatisfied with the terms of the modified order, later requested that the court reinstate the original preliminary injunction. Under these specific facts—facts bearing no similarity to those before this Court—the court in *Lauer* found waiver on the part of the defendant. The *Lauer* case says nothing to support the Receiver's contention that consenting to a preliminary injunction automatically waives a party's right to later seek a modification of that order. If anything, it says the opposite.

**C.    Equity Weighs in Favor of Allowing Future Earnings and the Unfreezing of the Untainted Assets for Attorneys' Fees**

In arguing that Asher and Batashvili have no equitable basis for seeking the modification of the preliminary injunction, Plaintiffs and Receiver ignore the relevant case law and misconstrue Asher's and Batashvili's request for modification. Asher and Batashvili are requesting a modification of the Order to allow any "new income" from future work outside the prohibited areas of employment, as well as a release of any "untainted" assets currently frozen by the Order, for the purposes of retaining counsel.[2] To be clear, Asher and Batashvili do not intend to seek employment in any field prohibited by the injunction, including the securities, commodities, or derivatives fields.

Regarding the equities, the Court is not required to, and should not, ignore the interests of the Individual Defendants in securing competent counsel. Indeed, the equities require a court to

---

[2] While the Order permits Asher and Batashvili to engage in certain employment, the Order specifies that any "new income" will only be excluded from the restraints of the Order for the limited purpose of covering agreed-to reasonable living expenses. The Order also broadly freezes all of Asher and Batashvili's assets, even if there is no allegation that those assets are tied to wrongdoing, and there is no carve-out in the Order for the use of assets to retain counsel.

consider *both* the plaintiff's interest in protecting assets and the defendant's interest in having access to funds. *See FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *2-3 (E.D. Tex. Aug. 8, 2016) ("When determining the release of frozen assets the Court must consider . . . (1) the plaintiff's interest in protecting the assets for consumer restitution; and (2) the defendant's interest in having access to the funds."). Even certain cases cited by Plaintiffs ultimately find that the balance of equities require carving-out funds in an asset freeze to afford the defendants' the ability to retain counsel. *See, e.g., FTC v. Abili-Staff, Ltd*, No. SA-10-CA-88-OG, 2010 WL 11598073, at *6 (W.D. Tex. Oct. 7, 2010) (finding that the defendants "have adequately shown that the frozen funds are necessary to pay their attorneys' fees"); *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 566 (D. Md. 2005) (setting up a process for the defendants to obtain approval for attorney fees from receiver); *see also FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1032 (7th Cir. 1988) (finding that a defendants' motion for additional attorney fees was premature where court had recently granted the defendants' $175,000 in funds for litigation expenses).

This case is a complicated matter of first impression in this Circuit where experienced lawyers are essential to the effective presentation of the issues. Moreover, the CFTC has confirmed that the matter is proceeding in parallel with an active criminal investigation by the Department of Justice and the FBI concerning the same allegations at issue in this action. Twenty-nine states have appeared as Plaintiffs and are likely also investigating Asher and Batashvili for alleged criminal activity. Against this tidal wave of litigation and investigations, Asher and Batashvili have been functionally unrepresented by counsel since at least early January with no

means under the current Order to retain new counsel.[3]  It would be a gross miscarriage of equity and due process to require Asher and Batashvili to move forward *pro se* in defending themselves in such a matter with direct criminal implications.

Further, allowing the use of untainted assets or income from future employment to pay for counsel would not "require the victimized investors to pay for Defendants' defense."  Opp. at 34. Plaintiffs do not cite to a single case where a court withheld attorneys' fees from future, untainted assets.  If Asher and Batashvili each began working tomorrow in a permitted industry and used their incomes to retain counsel, no alleged victim has been "required" to pay for counsel, particularly when Asher and Batashvili are not required to seek employment.  Courts routinely allow the use of untainted assets to pay counsel.  *See, e.g., Dixon*, 835 F.2d at 565 (finding that the district court's preliminary injunction should be modified to unfreeze assets that were not "ill-gotten."); *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (holding that assets unrelated to the investigation could not be frozen); *SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53, 57 (2d Cir. 2016) (finding SEC has burden of demonstrating that assets are ill-gotten in order to maintain asset freeze).

Finally, Plaintiffs and the Receiver fault Asher and Batashvili for being unable to specifically identify untainted assets.  This ignores the fact that Asher's and Batashvili's offices and homes have been raided and they no longer have the ability to identify such assets with specificity without access to their records.  It is disingenuous to both take control of Asher and

---

[3] While Plaintiffs point to a March 26, 2021 "meet and confer" with Individual Defendants' counsel, Arnold Spencer, as evidence that Defendants are still represented, they overlook entirely the email Spencer sent Asher and Batashvili telling them that he was no longer working on this matter.  The fact that Mr. Spencer engaged in a single meet and confer does not change the fact that he has not provided legal advice to Individual Defendants since at least early January, or that he did not attend Mr. Asher's deposition.  *See* Asher Decl. at ¶ 37, Exhibit J.

Batashvili's records and accounts and also fault them for being unable to point to such records in support of their motion. Setting aside the fundamental flaws in its argument, the Receiver offers no support for this proposition aside from an unpublished order, which unremarkably denied a motion for modification where the defendant had failed to provide an accounting of personal assets as ordered by the court but nevertheless *allowed* an application for reasonable attorneys' fees. *See SEC v. Stanford Int'l Bank, Ltd*., No. 3:09-cv-00298-N (Dkt. 544) (N.D. Tex. July 1, 2009).

In any event, the Receiver and Plaintiffs are wrong on the law. In *CFTC v. Dinar Corp*., where the defendants had similarly consented to an initial preliminary injunction and later sought a modification to allow for funds to pay for attorneys' fees, the court found that "[b]ecause there has been no finding that Plaintiff made a 'proper showing' of a Commodities Exchange Act violation or that the frozen assets are related to such a violation, the court will not assume that, at this point, defendants carry the burden of demonstrating that the funds they seek to access are untainted funds." No. 1:15-CV-538-WKW, 2016 WL 814893, at *4 (M.D. Ala. Feb. 29, 2016). As such, the court found that "[i]n light of all relevant equitable considerations, the preliminary injunction [should be] modified to allow for the requested attorney's fees." *Id*. at *6.

With regard to the arguments made by the Receiver and Plaintiffs in connection with the Individual Defendants "unclean hands," while the Receiver is currently threatening to report Asher and Batashvili to the Court for failing to provide follow up material to their depositions, as well as a host of other allegations regarding alleged non-compliance with the Consent Order, Asher and Batashvili have been *functionally unrepresented* by counsel since January. The issues pointed to by the Receiver highlight the very reason that this Court should allow Asher and Batshvili access

to funds to retain counsel—so that they can obtain legal advice and respond to these types of requests.

**D.      Plaintiffs Have Not Met Their Burden to Keep the Requested Assets Frozen**

Plaintiffs concede that they must "make a *prima facie* showing that Defendants have engaged in acts or practices that violate the Commodities Exchange Act ("CEA") and CFTC Regulations" in order to obtain a preliminary injunction.  Opp. at 12.  Indeed, the likelihood of success on the merits is one of many factors courts consider when determining whether to modify preliminary injunctions (*see SEC v. Lee*, No. 14-CV-347, 2019 WL 4934181, at *6 (S.D. Cal. Oct. 7, 2019), and courts will release frozen funds for attorneys' fees in instances where it is established that a plaintiff has failed to meet its burden of demonstrating a *prima facie* showing (*see, e.g.*, *SEC v. Duclaud Gonzalez de Castilla,* 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001)).

Here, Plaintiffs allege that the Defendants have violated CEA Section 6(c)(1) and CFTC Rule 180.1, which prohibit the use of "any manipulative or deceptive device or contrivance" "in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  Accordingly, to make a *prima facie* showing of this violation against Asher and Batashvili in this case, Plaintiffs must establish — at a minimum — that:

(1) the metal coins sold by Defendants are "commodities" under the CEA;

(2) Section 6(c)(1) grants the CFTC authority to regulate retail transactions disconnected from any market manipulation;

(3) Defendants knowingly engaged in fraud in connection with the sale of their metal coins; and

(4) Defendants' alleged conduct can be imputed to Asher and Batashvili in their individual capacity.

Plaintiffs have not met this burden.

1.     **Plaintiffs Have Failed to Show that Metal Coins are "Commodities" under the CEA**

Not once, in Plaintiffs' 40-page brief, does the CFTC seriously engage Defendants' argument that the metal *coins* at issue are not commodities under the CEA, instead focusing on the rather obvious proposition that precious metals themselves are commodities.  *See* Opp. at 20-21. The CEA's definition of "commodity" includes goods "in which contracts for delivery are presently or in the future dealt in."  7 U.S.C.  § 1a(9) (2018).  Arguing that because the coins are made of silver or gold, which are commodities, the coins are also commodities, however, is akin to saying that gold jewelry, silver utensils, or gold art should also be commodities.  Just as there is no futures market for gold art, there is no futures market for gold coins.  As such, the CFTC has failed to demonstrate that it has jurisdiction to regulate the coins at issue in this case.

Plaintiffs' response to the Individual Defendants' identification of seven different examples of silver coins selling from 334% to 1,148% above the spot value of silver is instructive on this issue.  In attempting to differentiate Plaintiffs' examples from the coins sold by Defendants based on factors such as their "low mintage," "limited availability in the marketplace," 'special limited edition" designs, "numismatic" qualities, collectability, and target retail population, Plaintiffs bolster the very point made by the Individual Defendants—that the prices of coins vary based on numerous factors such as their mint, design, age, availability, demand, and craftsmanship. While Plaintiffs note obliquely that the definition of commodity is "expansive" and "is broader than any particular type or brand of that commodity," Opp. at 21, the coins in this case are not a

"type" or "brand" of silver or gold, but rather are products *made out of* silver and gold.[4] As Plaintiffs establish in justifying the high price of some coins, but not others, the process of minting and designing silver and gold coins creates new classes of items with idiosyncratic properties that limit their price uniformity and fungibility.  The Supreme Court has explained that "commodities subject to [futures] contracts" must be "fungible."  *Merrill Lynch, Pierce, Fenner & Smith, Inc.  v. Curran*, 456 U.S. 353, 358 (1982); *see also Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) ("The contracts are not fungible and thus could not be traded on an exchange.").  Because metal coins are not fungible, they cannot (and, in fact, are not) traded on a futures exchange.  Accordingly, the CFTC lacks the ability to regulate the sale of metal coins under the anti-manipulation provisions of the CEA.

### 2. Plaintiffs Have Failed to Show that the Anti-Manipulation Provision of the CEA Applies to Non-Leveraged Retail Transactions

The CFTC's sweeping claim of regulatory authority over even small retail transactions should be rejected by this Court as such a claim finds no support in either the plain language or the legislative history of the CEA.

While Plaintiffs argue that Section 6(c)(1) of the CEA "indisputably prohibits minor acts" of attempted fraud in retail commodity transactions even if these minor transactions do not manipulate (or bear any relation to) the futures market, Opp. at 23, their positions are unsustainable as a matter of statutory construction and Rule 180.1 is not entitled to *Chevron* deference.

---

[4] Plaintiffs cite to *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018), which held that a virtual currency qualified as a commodity under the CEA because it existed within a class of goods in which there was futures trading (specifically involving Bitcoin).   The reasoning in *My Big Coin* appropriately extends to silver mined from different locations or distributed under different branding labels.  However, it does not apply to silver coins – which is, itself, its own class of goods.

10

a.    **The Proper Scope of Section 6(c)(1) is a Matter of First Impression for this Court.**

The case law upon which Plaintiffs rely in their Opposition does not support the CFTC's interpretation of Section 6(c)(1).  The CFTC cites to three cases to support its claim that "several courts have applied 7 U.S.C.  § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) to fraud in connection with non-leveraged precious metals bullion transactions."  (Opp. at 24 citing *CFTC v. Atlantic Bullion & Coin, Inc. and Ronnie Wilson*, No.  8:12-cv-01503 (D.S.C. 2012); *CFTC v. The Tulving Company and Hannes Tulving* No.  3:15-cv-00424 (W.D.N.C. 2015); and *CFTC and State of Utah v. Rust Rare Coin, Inc*., et al., No.  2: 18-cv-892 (D. UT 2018)).  However, not one of these court cases actually supports the CFTC's contention.  Instead, *all three* of the cases settled before the court rendered any actual opinion on the matter.  Indeed, the defendants in both *Atlantic Bullion & Coin, Inc.* and *The Tulving Company* settled with CFTC before they even filed a response to the complaint.

As it stands today, there is no binding precedent upon this Court that has determined if Section 6(c)(1) grants the CFTC the power to regulate fraud in connection with the sale of non-leveraged retail commodities disconnected from any market manipulation.  This Court is faced with a matter of first impression, and it would benefit from having these key legal issues fully briefed by sophisticated counsel on both sides before making any decisions that will have expansive effects on the public at large.

b.    **The CFTC's Interpretation of Section 6(c)(1) Upends the Regulatory Structure of the CEA.**

The CEA is "aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contacts and options, as distinguished from the commodity itself . . . ." *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993).  "Congress never purported to

11

regulate 'spot' transactions (transactions for the immediate sale and delivery of a commodity)." *Id.* Indeed, the stated mission statement of the CFTC is "to promote the integrity, resilience, and vibrancy *of the U.S. derivatives markets* through sound regulation."[5] (emphasis added). Accordingly, the CFTC has historically only regulated retail commodity transactions in instances of price manipulation—where such "manipulation could affect the price of . . . futures and options contracts traded on [an exchange]." *U.S. Commodity Futures Trading Comm'n v. Reed*, 481 F. Supp. 2d 1190, 1196 (D. Colo. 2007).

Now, however, the CFTC claims to have the unfettered authority to regulate retail commodity transactions entirely unconnected to market manipulation—the sort of retail transactions traditionally reserved for the states or other federal agencies. Under the CFTC's theory, every retail transaction involving a commodity falls within its regulatory authority; such an interpretation is clearly not reasonable. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.")

In their Opposition, Plaintiffs respond by pointing to the CFTC's prior statement that it intends to interpret Section 6(c)(1) "not technically and restrictively, but flexibly to effectuate its remedial purposes," while also noting that the existence of a *de minimis* violation "does not make the statutory text absurd or unenforceable." *See* Opposition at 23. However, a statute should have a consistent meaning that does not rely on the CFTC exercising restraint in order to avoid absurd results. Indeed, Individual Defendants are not arguing that it would be absurd for the CFTC to

---

[5] "About the Commission," Commodity Futures Trading Commission website, https://www.cftc.gov/About/AboutTheCommission.

have authority to regulate *de minimis* violations on a derivatives exchange.  What is absurd, is the CFTC having the power to regulate everyday retail transactions at pawn shops and grocery stores.

### c.     The CFTC's Interpretation of Section 6(c)(1) Leads to Surplusage

The CFTC's interpretation of CEA Section 6(c)(1) would render Section 4(b), which prohibits fraud in connection with futures contracts, superfluous.  Section 4(b) of the CEA prohibits fraud "in connection with an order to make, or the making of, any contract of sale of any commodity for future delivery or swap." 7 U.S.C.  § 6(b).  While Congress extended this provision to cover leveraged retail transactions, it exempted, through the "Actual Delivery Exception," those retail transactions involving actual delivery within twenty-eight days.   7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).  That is, Congress made clear that it did not intend to bring non-leveraged retail sales into the CEA's regulatory scheme.  According to the CFTC, however, the Actual Delivery Exception is meaningless: Section 6(c)(1) reaches any allegation of fraud in connection with the sale of any commodity in any setting, even those transactions that Congress specifically exempted from the fraud provisions of Section 4(b).  The CFTC's interpretation of Section 6(c)(1) obliterates a carefully constructed and bargained-for exception in the CEA, while rendering Section 4(b) wholly inoperative because *all* fraudulent activity related to *any* transaction could now be regulated under Section 6(c)(1).

### d.     The Plain Language of Section 6(c)(1) Requires Manipulation.

Section 6(c)(1), prohibits the use of "any manipulative or deceptive device or contrivance" "in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  Importantly, the section is entitled, "Prohibition Against Manipulation," *not* "Prohibition Against Retail Fraud."  Plaintiffs argue that connecting "manipulative or deceptive" with the disjunctive "or" means the terms

13

should be given separate meanings; however, as explained by the Supreme Court, "[T]he word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity." *De Sylva v. Ballentine*, 351 U.S. 570 (1956).

Here, Section 6(c)(1) is cabined under a heading focused on prohibiting "manipulation." Meanwhile, Section 4(b) of the CEA—which is actually concerned with fraudulent activity—is titled "Contracts designed to defraud or mislead." 7 U.S.C. § 9(1). Section 6(c)(1) is followed by a sub-provision, Section 6(c)(1)(A), titled, "Special Provision for Manipulation by False Reporting." This sub-provision elucidates the scope of "manipulative or deceptive device," by specifying instances of unlawful manipulation where fraudulent conduct leads the manipulation of "the price of any commodity in interstate commerce." Accordingly, the context of Section 6(c)(1) (including its heading and the provisions that follow) makes clear that the term "manipulative or deceptive device" should be construed to require *both* manipulative and deceptive conduct. Given this context, it is unambiguous that the term "or" should be interpreted as a *clarifier* of the operative term "manipulative"—and not a disjunction that would give the CFTC a limitless power it never before possessed to regulate spot transactions of suspected retail fraud entirely unconnected to any futures market.

      e.     **<u>The Legislative History of Section 6(c)(1) Shows That Manipulation is Required.</u>**

The legislative history of Section 6(c)(1) shows that Congress did not intend for the provision to combat fraud in retail commodity transactions absent market manipulation. Nowhere in the legislative history is this ever contemplated. While Plaintiffs quote Senator Cantwell (who introduced Section 6(c)(1)) to argue that she "borrowed" language from Section 10(b) of the Securities Exchange Act so that "courts and the Commission will interpret the new authority in a

similar manner," Opp. at 24, they tellingly omit the remainder of Senator Cantwell's statement in which she explains that that her reference to Section 10(b) was intended *only* to lower the scienter standard to prosecute market manipulation.[6]  There is nothing in the legislative history indicating that Congress intended Section 6(b) to operate identically to Section 10(b) of the Securities Exchange Act.  Indeed, the full legislative record makes clear that the purpose of Section 6(c)(1) was to "strengthen[] the [CFTC]'s authority to go after *manipulation and attempted manipulation* in the swaps and commodities markets."  156 Cong.  Rec.  S3348 (Senator Cantwell) (emphasis added).   As Senator Lincoln explained, Section 6(c)(1) was intended to be a "new anti-manipulation provision . . . addressing fraud-based manipulation, including manipulation by false reporting."  *Id.* at S5925.

### f.    The CFTC's Interpretation is Not Entitled to *Chevron* Deference.

The statements made by the CFTC in the promulgation of Rule 180.1 show that the agency previously did not believe that Section 6(c)(1) granted it limitless authority to regulate retail fraud. This is demonstrated by the very quotation the CFTC cites to in its Opposition.  On July 14, 2011, when addressing the scope of Rule 180.1, the CFTC explained:

> By way of non-exclusive example, if an entity employed a deceptive device to sell precious metals to customers as a way for the customers **to speculate on the value of such commodities**, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking **to hedge price risk in that commodity**, depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1.

---

[6] When introducing the legislation, Senator Cantwell stated, "Current law makes it very difficult for the Commodity Futures Trading Commission to prove market manipulation.  The CFTC has to prove that someone had specific intent to manipulate, and that is a very difficult standard to prove. . . .  In fact, the law is so weak that in the CFTC's 35-year history, it has only had one successfully prosecuted case of market manipulation . . . .  This language in this amendment is patterned after the law that the SEC uses to go after fraud and manipulation; that there can be no manipulative devices or contrivances.  It is a strong and clear legal standard that allows regulators to successfully go after reckless and manipulative behavior."  *Id.* at S3348

Opp. at 21.  Neither of these transactions are at issue in this case.  Instead, *speculating* and *hedging* are trading activities that do not apply to non-leveraged retail transactions like these.  Speculation is a high-risk financial transaction that (most typically) utilizes derivatives to make short-term profits on price fluctuations.[7]  "A hedge is a derivative transaction or position that represents a substitute for transactions or positions to be taken at a later time in a physical marketing channel."[8]

To fit the CFTC's prior (conservative) guidance, with its new (aggressive) enforcement efforts, Plaintiffs attempt to redefine the commonly understood meaning of speculation, arguing that "Defendants' sales pitch to victims was centered around the promise of making money by *speculating* on increases in the value of precious metals."  Opp. at 22 (emphasis added).  Plaintiffs describe typical investment activity supercharged with the inapposite terminology of "speculating" in order to squeeze otherwise milquetoast activities into the world of speculation and, therefore, the CFTC's prior guidance.  In so doing, Plaintiffs show that the present litigation conflicts directly with the CFTC's prior written interpretation of Section 6(c)(1) and is thus not entitled to *Chevron* deference.  *See CFTC v. Am. Precious Metals, LLC*, 845 F. Supp. 2d 1279, 1286–87 (S.D. Fla. 2011) (finding that the CFTC's conflicting interpretations of its regulatory authority was not entitled to *Chevron* deference).

Finally, as demonstrated by Plaintiffs devoting approximately 8 pages of their Opposition to the issue of the CFTC's jurisdiction, this is a complicated matter that requires sophisticated briefing from counsel.  Asher and Batashvili should be afforded the right to hire the counsel of

---

[7] *See "*Position Limits for Derivatives," Commodity Futures Exchange website,
https://www.cftc.gov/IndustryOversight/MarketSurveillance/SpeculativeLimits/index.htm ("Protecting the futures markets from excessive speculation is critical to maintaining market integrity, resiliency, and vibrancy.").
[8] "Speculative Limits," Commodity Futures Exchange website,
https://www.cftc.gov/IndustryOversight/MarketSurveillance/SpeculativeLimits/speculativelimits.html

their choice in the face of these complex legal matters of regulatory jurisdiction and statutory interpretation.

>    **3.**    **Plaintiffs Fail to Show that Defendants' Retail Transactions Were Fraudulent**

Plaintiffs' central allegation against Defendants is that they defrauded investors by selling bullion coins at prices above the spot value of metal.  However, as shown in the Individual Defendant's Motion, as well as Plaintiffs' Opposition, there are competing issues of fact on this issue that will require sophisticated counsel to guide the parties through discovery and trial. Moreover, the fact that highly contested factual disputes remain shows that Plaintiffs have not met their burden of making a *prima facie* showing.

Plaintiffs repeatedly claim, in both their Complaint and SRO application, that the "actual value" of the coins sold by Defendants "is the Prevailing Market Price of the gold and silver precious metal contained in the bullion coins."  Compl. at ¶ 8; SRO at 10.  In response to these allegations, Asher and Batashvili explained that it is the norm in the coin industry for coins to sell at prices above the spot value of gold and silver, and they collected seven (readily available) examples of silver coins selling from 334% to 1,148% above the spot value of silver.

Plaintiffs' Opposition fails to adequately address Asher's and Batashvili's arguments.  In particular, Plaintiffs attempt to distinguish the coins sold by the U.S.  Mint or other retailers by stating that "US Mint's and Walmart's sales are more comparable to a gift shop than Defendants' investment shop."  Opp. at 18.  If the U.S. Mint is a mere gift shop, it is a very large one: collecting over $3.6 billion in revenue in 2020—approximately $2.1 billion of which came from bullion coins, with $490.5 million of that coming from the American Eagle Silver coin, a bullion coin that

17

sells for well above spot.  This American Eagle Silver coin is the coin the US Mint listed on its website for 266% above the spot value of silver.[9]

Likewise, Plaintiffs claim that the coins selected by Asher and Batashvili were "cherry picked" and priced high "primarily because they are low mintage with extremely limited availability in the marketplace."  Plaintiffs' Opp. at 17.  But the U.S. Mint sold over 30 million pieces of the aforementioned American Eagle Silver coin in 2020 alone.  This mintage dwarfs the mintage of the coins sold by Defendants, which Plaintiffs represent as being "over 4.2 million." *See* Plaintiffs' Opp. at 17.

Regarding any argument that Defendants misrepresented the "Spread" that they charged to their customers, the very contracts upon which Plaintiffs rely state clearly that the "Spread" is only a "general range[] and approximation[], which [is] subject to change for a variety of reasons."  The contracts continue:  "The actual Spread on any particular transaction could be any amount within those ranges (or even possibly outside those ranges)."  *See* Asher Decl.  (Doc. No. 232) at 17.

Accordingly, even if the CFTC had jurisdiction in this case, Plaintiffs would still be unlikely to succeed on the merits because they have failed to make an adequate showing that the market transactions at issue in this case were fraudulent.

* * *

In sum, Plaintiffs' have failed to make the *prima facie* showing required to secure injunctive relief, and there remain significant and complex jurisdictional issues to be decided. Because Plaintiffs have not made this showing, they have not met their burden for obtaining an injunction against the Defendants.  Accordingly, this Court should modify the Consent Order to

---

[9]   United States Mint, "2020 Annual Report" at p. 6,  https://www.usmint.gov/wordpress/wp-content/uploads/2021/02/2020-Annual-Report.pdf

release the assets needed for Asher and Batashvili to hire the counsel of their choice and defend themselves in court.

**E.      The Notice of Limited Appearance and Motion Should Not Be Stricken.**

The Receiver (and Plaintiffs, in a footnote) have moved to strike the Notice of Limited Appearance [Dkt. 231] of proposed new counsel for Asher and Batashvili, and the Motion itself, because counsel failed to seek leave of court to enter their limited appearance.

Neither the Receiver nor the Plaintiffs have referred the Court to any law or rule that requires counsel to seek leave of the court to enter a Notice of Limited Appearance. The Individual Defendants are aware of no such law or rule supporting the relief requested, and the motion to strike should be denied.

**REQUEST FOR ORAL ARGUMENT**

Given the complexity and novel nature of the issues presented regarding the CFTC's jurisdiction and the magnitude of the equitable interests at stake in this case, the Individual Defendants request an oral argument on this Motion.

**CONCLUSION**

For the foregoing reasons, as well as those in their Motion, Asher and Batashvili request that this Court modify the Preliminary Injunction to allow them to use untainted assets and future earnings outside of the prohibited industries to pay for attorneys' fees.


Dated: May 4, 2021                          Respectfully submitted,

                                            By: */s/ Gene R. Besen*
                                            Gene R. Besen
                                            Texas Bar No. 24045491
                                            gbesen@bradley.com
                                            Lane M. Webster

19

Texas Bar No. 24089042
lwebster@bradley.com

Bradley Arant Boult Cummings LLP
1201 Elm Street, Suite 4400
Dallas, Texas 75270
Phone: (214) 939-8700
Fax: (214) 939-8787

By: */s/ Elizabeth M. Devaney*
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
Elizabeth M. Devaney
Texas Bar No. 24040100
Pennzoil Place, 711 Louisiana Street, Suite 500
Houston, Texas 77002
Phone: (713) 221-7000
Fax: (713) 221-7100
lizdevaney@quinnemanuel.com

Alex Spiro (pro hac vice forthcoming)
Elinor C. Sutton (pro hac vice forthcoming)
51 Madison Ave., 22nd Floor
New York, New York 10010
Phone: (212) 849-7000
Fax: (212) 849-7100
alexspiro@quinnemanuel.com
elinorsutton@quinnemanuel.com

ATTORNEYS FOR LUCAS ASHER
AND SIMON BATASHVILI

## CERTIFICATE OF SERVICE

I certify that all counsel of record who have consented to electronic service were served

with a true and correct copy of the foregoing document via the Court's CM/ECF system on this

3rd day of May, 2021.

*/s/ Gene R. Besen*
Gene R. Besen

20