IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITIES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER, DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAINE SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRASKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF | **PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO COMPEL**<br><br>Case No.: **3-20-CV-2910-L**<br><br>Judge: Judge Sam A. Lindsay |

INSURANCE, COMMISSIONER OF THE
TENNESSEE DEPARTMENT OF
COMMERCE AND INSURANCE, STATE
OF TEXAS, WASHINGTON STATE
DEPARTMENT OF FINANCIAL
INSTITUTIONS, WEST VIRGINIA
SECURITIES COMMISSION, AND STATE
OF WISCONSIN.

 Plaintiffs,

v.

TMTE, INC. a/k/a METALS.COM, CHASE
METALS, INC., CHASE METALS, LLC,
BARRICK CAPITAL, INC., LUCAS
THOMAS ERB a/k/a LUCAS ASHER a/k/a
LUKE ASHER, and SIMON BATASHVILI,

 Defendants;

and

TOWER EQUITY, LLC,

 Relief Defendant.

## <u>TABLE OF CONTENTS</u>

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO COMPEL ................................................................................................................. 1

I.     PROCEDURAL HISTORY ............................................................................ 2

II.    FACTS ......................................................................................................... 3

       A.    Defendants Engaged in a Sophisticated Nationwide Precious Metals Fraudulent Scheme that Defrauded Elderly Investors Out of Their Retirement Savings ................................................................................. 3

       B.    Defendants' Extensive Commingling of Funds, Contemptuous Dissipation of Restrained Funds, and the Massive Amounts of Missing Victim Funds Justify the Receiver's Demand for Transparency and an Accounting of the Source of Funds Paid to the Bradley/Quinn Attorneys ............................................................ 8

III.   ARGUMENT .............................................................................................. 11

       A.    The Receiver Is Entitled to Know and Investigate the Source of the Retainer ..... 11

       B.    Bradley/Quinn Attorneys Must Document Their *Assail* Inquiry, Disclose Whatever Information Was Obtained by this Inquiry, and Provide an Accounting to the Receiver Regarding the Source of the Funds Used for Their Retainer ................................................................................. 13

       C.    The Bradley/Quinn Attorneys Have No Legal Basis to Refuse to Provide the Information Requested by the Receiver Because Information Regarding the Source of Funds Paid to the Bradley/Quinn Attorneys Is *Not* Privileged ............. 16

IV.    CONCLUSION ........................................................................................... 19

i

# **TABLE OF AUTHORITIES**

Cases                                                                                            Page(s)

*Crites, Inc., v. Prudential Ins. Co. of America,*
   322 U.S. 408 (1944) ............................................................................................ 11

*Eberhard v. Marcu,*
   530 F.3d 122 (2d Cir. 2008) ............................................................................... 11

*EEOC v. BDO USA, L.L.P.,*
   876 F.3d 690 (5th Cir. 2017) .............................................................................. 17

*FTC v. Assail, Inc.,*
   410 F.3d 256 (5th Cir. 2005) .......................................................................Passim

*FTC v. Johnson,*
   2013 WL 4039069 (D. Nev. Aug. 5, 2013) ...................................................... 15

*FTC v. Network Servs. Depot, Inc.,*
   617 F.3d 1127 (9th Cir. 2010) ............................................................................ 14

*FTC v. Sharp,*
   1991 WL 214076 (D. Nev. Jul. 23, 1991) ........................................................ 18

*FTC v. Williams, Scott & Assoc., LLC,*
   2015 WL 7351993 (N.D. Ga. Sep. 22, 2015) ................................................... 18

*Harris v. United States,*
   413 F.2d 316 (9th Cir. 1969) .............................................................................. 17

*In re Bell & Beckwith,*
   838 F.2d 844 (6th Cir.1988) ............................................................................... 13

*In re Grand Jury Proceedings,*
   517 F.2d 666 (5th Cir. 1975) .............................................................................. 17

*In re Moffitt, Zwerling & Kemler, P.C.,*
   846 F. Supp. 463 (E.D. Va. 1994), *aff'd,* 83 F.3d 660, 665 (4th Cir. 1996) ............................. 18

*Jones v. Wells Fargo Bank, N.A.,*
   666 F.3d 955 (5th Cir. 2012) .............................................................................. 11

*Najjar v. United States,*
   2003 WL 21254772 (S.D. Ind. Apr.11, 2003)................................................... 18

*O'Donnell v. Sullivan*,
  364 F.2d 43 (1st Cir. 1966), *cert. denied*, 385 U.S. 969 (1966)................................................ 17

*SEC v. First Security Bank of Utah, N.A.*,
  447 F.2d 166 (10th Cir. 1971), *cert. denied*, 404 U.S. 1038 (1972) ........................................ 17

*SEC v. W Financial Grp., LLC*,
  2009 WL 636540 (N.D. Tex. Mar. 9, 2009)............................................................................. 17

*U.S. v. Ponder*,
  475 F.2d 37 (5th Cir. 1973) ..................................................................................................... 17

*Zacarias v. Stanford Int'l Bank, Ltd.*,
  945 F.3d 883 (5th Cir. 2019) ................................................................................................... 11

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO COMPEL

Plaintiffs—U.S. Commodity Futures Trading Commission and 30 sovereign states (State Attorneys General and State Securities Administrators)—respectfully submit this Memorandum of Law in Support of the Receiver's[1] Motion To Compel ("Receiver's Motion to Compel") (Docket Entry ("D.E.") 254).[2] The Receiver has moved to compel the law firms of Bradley Arant Boult Cumming, LLP and Quinn Emanuel Urquhart & Sullivan, LLP ("Bradley/Quinn Attorneys") to disclose the source of any retainer or security interest they received in order to represent Defendants Simon Batashvili ("Batashvili") and Lucas Thomas Erb *a/k/a* Lucas Asher *a/k/a* Luke Asher ("Asher").

Plaintiffs support the Receiver's Motion to Compel and respectfully request that the Court order the Bradley/Quinn Attorneys to provide the requested information because: (1) the Receiver is entitled to the information pursuant to the Court's Orders;[3] (2) the Bradley/Quinn Attorneys must document their inquiry pursuant to *FTC v. Assail, Inc.*, 410 F.3d 256 (5th Cir. 2005), disclose and document whatever information was obtained by this inquiry, and provide an accounting to the Receiver regarding the source of the funds used for their retainer; and (3) the Bradley/Quinn Attorneys have no legal basis to refuse to provide the information requested by

---

[1] The Court appointed Kelly Crawford as Receiver in the SRO. The Consent Preliminary Injunction converted the temporary receivership into a permanent receivership.

[2] Plaintiffs incorporate by reference, the Receiver's Motion to Compel, D.E. #254, and Fact Appendix D.E. #255.

[3] The Statutory Restraining Order ("SRO") (D.E. #16), Consent Order of Preliminary Injunction ("Consent Order") as to Defendants Asher and Batashvili (D.E. #165), and Consent Order as to the Corporate Defendants ("Entities Consent Order") (D.E. #164) are collectively referred to as "Court's Orders."

the Receiver because the information related to the source of funds paid to Bradley/Quinn

Attorneys is *not* privileged.

## I.  PROCEDURAL HISTORY

On September 22, 2020, Plaintiffs filed a Complaint for Permanent Injunction, Civil

Monetary Penalties, and Other Equitable Relief ("Complaint"), alleging that Defendants are

perpetrating a nationwide precious metals fraud scheme targeting elderly and retirement aged

victims. (D.E. #2). Contemporaneously with the filing of the Complaint, Plaintiffs moved the

Court for an SRO which Judge David C. Godbey granted the same day. (D.E. # 4-6; 11-12; 16). [4]

The Complaint alleges that from at least September 1, 2017 through the present ("Relevant

Period"), Defendants perpetrated a massive nationwide fraudulent scheme that solicited and

received over $185 million in investors' funds from at least 1,600 persons throughout the United

States for the purpose of purchasing gold and silver bullion. (D.E. #2). On October 14, 2020, the

Court entered the Consent Order and Entities Consent Order.

On March 30, 2021, the Bradley/Quinn Attorneys filed their Notice of Limited

Appearance (D.E. #231) and their Motion to Modify Preliminary Injunction for the purpose of

paying attorneys' fees ("Attorney's Fee Motion") (D.E. #232). On April 16, 2021, the Receiver

sent correspondence to the Bradley/Quinn Attorneys requesting an accounting of all assets or

security interests received from Asher and Batashvili to fund their firms' retainer, if any, or for

other purposes (collectively "Retainer"). Receiver's Motion to Compel at ¶4. This

correspondence specifically requested the Bradley/Quinn Attorneys identify the source of the

---

[4] Plaintiffs incorporate by reference, Plaintiffs' Motion for an *Ex Parte* Restraining Order, Memorandum of Law in Support of an *Ex Parte* Restraining Order and their Fact Appendix with supporting exhibits and declarations ("SRO Application") D.E. # 4-6; 12.

monies and collateral, provide copies of any documents evidencing such payments or security agreements, and disclose the due diligence conducted to ensure the monies or security interests were not subject to the Court's Orders. *Id.* To-date, the Bradley/Quinn Attorneys refuse to provide any information requested by the Receiver as to source of funds. *Id.* at 5-8. This refusal necessitated the Receiver's Motion to Compel. *Id.* at 8.

On May 24, 2021, the Court referred the Receiver's Motion to Compel to United States Magistrate Judge Rene Harris Toliver for hearing, if necessary, and determination. D.E. #256.

## II.  FACTS

### A. Defendants Engaged in a Sophisticated Nationwide Precious Metals Fraudulent Scheme that Defrauded Elderly Investors Out of Their Retirement Savings

The SRO Application[5] has an extensive and comprehensive recitation of the relevant facts and discusses in detail the applicable law. Each allegation in the Complaint is supported by admissible evidence.[6] The Complaint alleges that from at least September 1, 2017 through the present ("Relevant Period"), Defendants perpetrated a nationwide fraud scheme that solicited and received over $185 million in investors' funds from at least 1,600 persons throughout the United States for the purpose of purchasing gold and silver bullion ("Precious Metals Bullion") (D.E. #2).[7] Relief Defendant Tower Equity received transfers of investor money from Defendants or

---

[5] The SRO Application is supported by a 1,490-page fact appendix that contains, among other things, the sworn statements of 38 declarants and numerous supporting exhibits. ("SRO Fact Appendix") (D.E. #12). It is incorporated by reference as if fully set forth herein.

[6] The citations that begin with: "D.E. #12" refer to the SRO Fact Appendix. The citations that begin with: "Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel" are citations to the Fact Appendix filed as part of this filing.

[7] D.E. #12: Gomersall Dec. ¶¶ 19, 23, 25, 28, 51 (App. pp. 9-12, 17); Gomersall Dec. Att. G and J (App. pp. 86 and 100).

directly from investors that represent ill-gotten gains of Defendants' fraudulent scheme to which the Relief Defendant has no legitimate claim.[8]

 Defendants' nationwide fraudulent scheme is particularly egregious because Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons—between the ages of sixty and ninety—with little experience in precious metals.[9] Defendants' solicitations also targeted politically conservative and Christian investors.[10] Defendants instructed their sales representatives or other agents to concentrate their solicitations on these persons to gain access to their qualified retirement savings, including but not limited to, retirement savings held in an IRA, 401k, 457b, TSP, insurance, and annuity; and then convince the victims to rollover their qualified retirement savings into Self-Directed IRAs ("SDIRA") in order purchase Precious Metals Bullion.[11]

 Defendants deceived investors into using over $140 million of their retirement savings to purchase fraudulently overpriced Precious Metals Bullion.[12] By making material misrepresentation and omissions, Defendants deceived investors into purchasing precious metals at prices averaging from one hundred (100) percent to over three hundred (300) percent over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price").[13] Defendants directed investors to purchase specific Precious Metals Bullion at grossly

---

[8] D.E. #12: Gomersall Dec. ¶¶ 24-26 (App. pp. 10-11); Gomersall Dec. Att. M (App. p. 106).

[9] D.E. #12: Planer Dec. ¶¶ 14, 43-44, 75, and 233 (App. pp. 271, 282-83, 296, 325-26).

[10] D.E. #12: Planer Dec. ¶¶ 20, 29, 197, 244 and 276 (App. pp. 274, 277, 319, 327, 334).

[11] D.E. #12: Planer Dec. ¶ 29 (App. p. 277).

[12] D.E. #12: Planer Dec. ¶ 43 (App. p. 282); Gomersall Dec. ¶¶ 52-54 (App. p. 18).

[13] D.E. #12: Samuelson Dec. ¶¶ 49-50 (Section VIIII) (App. pp. 247-49).

4

inflated prices that bore no relationship to the Prevailing Market Price.[14] In particular, Metals.com[15] failed to disclose that what Metals.com was charging investors vastly exceeded what Metals.com represented.[16] In fact, Defendants knew or had a reckless disregard for the truth that **virtually every investor** lost the vast majority of their funds invested in fraudulently overpriced Precious Metals Bullion. [17]

During the relevant period, Metals.com executed with investors two Customer Agreements for the purchase of Precious Metals Bullion.[18] Section 3(a) of both Customer Agreements states: "Within the Precious Metals industry, the difference between [M]etals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the 'Spread'" (herein: "Spread").[19] The Spread charged to investors pursuant to Customer Agreements represents the difference between what Metals.com paid for the Precious Metals Bullion and what they charged investors.[20] Customer Agreement #2 was substantially similar to Customer Agreement #1, except that it represented that the Spread Metals.com charged on IRA Precious Metals Bullion transactions was significantly smaller.[21]

---

[14] D.E. #12: Planer Dec. ¶¶ 52, 142-44 (App. pp. 285, 309-10).

[15] Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Access Unlimited, LLC are collectively referred to herein as "Metals.com"

[16] D.E. #12: Planer Dec. ¶¶ 7, 93, and 125 (App. pp. 269-70, 299, 306).

[17] D.E. #12: Samuelson Dec. ¶¶ 49-50 (Section VIIII) (App. pp. 247-49).

[18] D.E. #12: Gomersall Dec. ¶¶ 58-60 (App. p. 21); Gomersall Dec. Att. AA (App. pp. 198-206).

[19] D.E. #12: Gomersall Dec. ¶ 60 (App. p. 21); Gomersall Dec. Att. AA and BB (App. pp. 198-206 and 208-15); Samuelson Dec. ¶ 44 (App. p. 246).

[20] D.E. #12: Gomersall Dec. ¶¶ 60, 66 (App. pp. 21, 23); Gomersall Dec. Att. AA (App. pp. 198-206).

[21] D.E. #12: Gomersall Dec. ¶ 63 (App. p. 22); Gomersall Dec. Att. BB (App. pp. 208-15).

Customer Agreement #2 represented that the Spread on IRA Precious Metals Bullion transaction only varies between two percent and nineteen point nine percent (2% to 19.9%), rather than (2% to 33%).[22] This is a material purported reduction in the Spread. Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains (1 to 5%), Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to 19.9%).[23] Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."[24]

The specific Precious Metals Bullion fraudulently sold by Defendants to investors are Polar Bear Bullion[25] and Barrick Bullion.[26] As part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in the Customer Agreements. In fact, Metals.com knew or had a reckless disregard for the truth that the Spreads charged by Metals.com to their elderly or retirement-aged investors for the Polar Bear Bullion averaged:

1. 128 percent for Silver Royal Canadian Mint Polar Bear Bullion;

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion; the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and the 1/4 ounce Gold British Standard Bullion are collectively "Polar Bear Bullion."

[26] The 1/10 ounce Silver Spade Guinea; 1/10 ounce Silver Britannia; and 1/10 ounce Gold Royal Canadian Wildlife Series are collectively "Barrick Bullion."

2. 91 percent for Gold Royal Canadian Mint Polar Bear Bullion; and

3. 108 percent for Gold British Standard Bullion.[27]

In fact, **none** of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in the Customer Agreements. Defendants knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded the ranges in the Customer Agreements. Metals.com failed to disclose to investors the true Spreads and excessive markups on Polar Bear Bullion that they were charging them.[28] Instead, Metals.com instructed their sales representatives or other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price.[29] Defendants failed to disclose to its investors that the fraudulently overpriced Polar Bear Bullion and Barrick Bullion materially impacted their ability to profit and the risk of loss.[30]

When investors received account statements from their SDIRA administrators showing an account value—the accurate value of the Precious Metals Bullion based on the Prevailing Market Price of the bullion—that was significantly smaller than what was misrepresented to investors, Defendants engaged in misrepresentations to conceal their fraud.[31] Defendants perpetuated their fraudulent scheme by falsely representing to investors who questioned the

---

[27] D.E. #12: Samuelson Dec. ¶¶ 49-50 (Section VIIII) (App. pp. 247-49).

[28] D.E. #12: Planer Dec. ¶¶ 7, 93, and 125 (App. pp. 269-70, 299, 306).

[29] D.E. #12: Planer Dec. ¶¶ 52, 142-144 (App. pp. 285, 309-10).

[30] D.E. #12: Samuelson Dec. ¶¶ 10, 11, 50, 61 (App. pp. 241, 249, 253).

[31] D.E. #12: Planer Dec. ¶¶ 47-50 (App. pp. 283-85).

grossly inflated cost of the Precious Metals Bullion after purchase that they were rare and collectible numismatic or semi-numismatic precious metals that carried a premium far above the base melt value of the precious metal.[32] These statements were false because the Precious Metals Bullion were not rare, numismatic, or semi-numismatic metals. *Id.* The Precious Metals Bullion were worth significantly less than the value Defendants misrepresented to investors because they carried no additional premium over the Prevailing Market Price. *Id.*

In sum, Defendants operated a fraudulent scheme where virtually every elderly investor lost the vast majority of their funds invested in fraudulently overpriced Precious Metals Bullion as soon as they consummated a transaction. These losses immediately became massive ill-gotten gains for the Defendants.

**B. Defendants' Extensive Commingling of Funds, Contemptuous Dissipation of Restrained Funds, and the Massive Amounts of Missing Victim Funds Justify the Receiver's Demand for Transparency and an Accounting of the Source of Funds Paid to the Bradley/Quinn Attorneys**

The Receiver's Motion to Compel has an extensive and comprehensive recitation of the relevant facts to the instant motion—it is incorporated by reference in footnote 2 *supra*. In the interest of avoiding duplication of the Receiver's Motion to Compel, Plaintiffs wish to briefly outline certain pertinent facts.

The evidence in the record shows that substantial commingling of funds occurred and that investor funds held by the various entities owned or controlled by Asher and Batashvili were

---

[32] D.E. #12: Gomersall Dec. ¶¶ 55-56, 72-73 (App. pp. 18-21, 26-29); Gomersall Dec. Att. Z, FF (App. pp. 192-97, 223-26); Samuelson Dec. ¶¶ 49-50, 50-52, 60-61 (Section VIIII) (App. pp. 247-49, 253).

transferred, dissipated, or diverted by the Defendants.[33]  These commingled investor funds were dispersed without regard for corporate formalities or distinctions.[34] This commingling of funds was integral to the operation of this massive fraudulent scheme.[35]

Asher and Batashvili controlled a myriad of interrelated entities whose assets are part of the Receivership Estate and so are restrained by the Court's Orders.[36] The Receiver's subsequent investigation uncovered approximately thirty entities that properly belong within the Receivership Estate ("Affiliated Entities"). D.E. # 228 and 230. On March 22, 2021, the Court held: "[a]ccordingly, the court finds that the following Affiliated Entities were owned or controlled by one or more of the Defendants and/or Relief Defendant on September 22, 2020 . . . ." D.E. # 230. The Court ordered:

> It is, therefore, hereby ordered, that the following Affiliated
> Entities are included within the definition of "Receivership
> Defendants" for purposes of identifying the "Receivership Estate"
> and are subject to the SRO, [Consent Order], and the [Entities
> Consent Order]. . . .

*Id*. This extensive network of interconnected entities and their assets are subject to the Court's Orders—notably, the asset freeze and cooperation requirements. These restrained assets cannot be the source of funds used to pay a Retainer to the Bradley/Quinn Attorneys.

Further, both Asher and Batashvili violated the Court's Orders by surreptitiously dissipating restrained funds for their own benefit. On December 15, 2020, the Court found Asher in contempt, via an agreed-to order, for violating the SRO and Consent Order. (D.E. # 216).

---

[33] Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel, ¶¶ 5-6.

[34] Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel, ¶ 6.

[35] Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel, ¶ 7.

[36] Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel, ¶¶ 8-10.

Asher admitted and confessed that he made improper transfers of approximately $550,000 in violation of the SRO. *Id.* Similarly, pending before the Court is a contempt application against Batashvili. D.E. # 250. The evidence shows that Batashvili transferred at least $492,500 of Receivership assets to his family members to hide these funds from the Receiver and the Plaintiffs.[37] It is noteworthy and highly suspect that both Asher and Batashvili concealed and dissipated approximately $500,000 of victim funds—funds clearly restrained by the SRO— within a few days of each other. This brings to mind the old adage: "there is no such thing as coincidences."

To-date, the Receiver has only recovered approximately $10 million out of the over $185 million that Defendants solicited and received from victims.[38] Investigation continues into other potentially suspect money transfers. Given Asher's and Batashvili's aggressive efforts to conceal personal and corporate assets and systematically transfer and dissipate restrained funds, the Court should be wary about the provenance of any funds or assets provided to the Bradley/Quinn Attorneys. These funds are likely tainted or associated with this fraud. In that regard, the Bradley/Quinn Attorneys must produce the requested items and then the Receiver should be given an opportunity to investigate the source of any funds purportedly to be used for attorneys' fees by the Bradley/Quinn Attorneys.

---

[37] D.E. #251: Crawford Decl. ¶¶ 7-8; and App. at 22, 24, 26-27, 29-33, 35.

[38] Receiver's Motion to Compel at ¶ 14; *see also* Receiver's Third Report at p. 4 (D.E. # 233).

## III. ARGUMENT

### A.  The Receiver Is Entitled to Know and Investigate the Source of the Retainer

The Receiver is indisputably entitled to know and investigate the provenance of any funds or assets provided to the Bradley/Quinn Attorneys. Pursuant to the Court's Orders, Asher and Batashvili are required to assist the Receiver as he deems necessary to exercise his duties, particularly when it comes to assets and records.

A receiver serves not as an agent of a party but as "an officer or arm of the court . . . appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody[.]" *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 896 (5th Cir. 2019) (*quoting Crites, Inc., v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414 (1944)). This position as officer of the court, then, imbues the Receiver with the ability to enforce certain requests pursuant to his court-appointed duties. *See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 n.11 (5th Cir. 2012) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 131–32 (2d Cir. 2008) (recognizing that certain receivers are "equipped with a variety of tools to help preserve the status quo," are "directed to marshal the assets of the defendant," and thus must "prevent the dissipation of defendant's assets pending further action by the court") (internal quotation marks omitted)). The Receiver is authorized to demand reasonable information from the Bradley/Quinn Attorneys and/or their clients about the source of funds for the Retainer pursuant to the Court's Orders.

The Court assigned the Receiver with the responsibility of protecting the interests of the Receivership Estate by marshalling all assets within the scope of the Court's Orders, whether

currently held or still to be recovered. *See SRO*, ¶¶ 29–30.[39] In the exercise of his responsibilities, the Receiver requested that the Bradley/Quinn Attorneys disclose the source of their Retainer and provide an accounting to ensure that any such payments by, or for, Asher and Batashvili were untainted and not subject to the Court's Orders.

The Court's Orders impose a duty on Asher and Batashvili to "cooperate fully with and assist" the Receiver, which expressly includes a duty to provide information which *the Receiver* deems necessary to fulfill his duties to the Receivership Estate. *SRO*, ¶ 34. This provision also requires the Bradley/Quinn Attorneys to provide information because it requires that "persons or entities served with a copy of this order shall cooperate fully with and assist the Temporary Receiver." *Id.* The SRO continues: "[t]his cooperation and assistance shall include, but not be limited to providing information to the Temporary Receiver deems necessary to exercising the authority as provided in this Order." *Id.*[40]

Notably, Arnold Spencer ("Spencer") —current counsel of record for Asher and Batashvili—*agreed* to allow the Receiver to investigate the source of funds used to pay *his* attorneys' fees. Just as he is doing with the Bradley/Quinn Attorneys, the Receiver made a demand of Spencer about his retainer. Spencer agreed to provide the information by having his clients testify about the source of funds at their scheduled asset depositions. At both Asher's and

---

[39] The SRO is incorporated into the Entities Consent Order and Consent Order. Thus, for simplicity, we will only cite to the SRO.

[40] Similarly, Plaintiffs, pursuant to the SRO, are "immediately allowed to **inspect any records** relating or referring to the **business activities or business or personal finances** of the Defendants and Relief Defendants, including, but not limited to, both hard-copy documents and electronically stored information, **wherever they may be situated** and **whether they are in the possession of the Defendants, or Relief Defendant, or others.** *Id*. at 23 (emphasis added).

12

Batashvili's asset depositions, the Receiver made a thorough inquiry into the source of funds used for Spencer's retainer.[41] With this information in hand from the depositions, the Receiver and Plaintiffs are able to evaluate and investigate whether or not the source of Spencer's retainer is tainted and subject to the Court's Orders.

Given that the request made by the Receiver to the Bradley/Quinn Attorneys is narrowly tailored, the Receiver is entitled to the requested information regarding the Retainer and the Bradley/Quinn Attorneys are under a legal obligation to provide it. They have cited no legal authority in their filing (D.E. # 264) to justify withholding discoverable and relevant information.

## B. Bradley/Quinn Attorneys Must Document Their *Assail* Inquiry, Disclose Whatever Information Was Obtained by this Inquiry, and Provide an Accounting to the Receiver Regarding the Source of the Funds Used for Their Retainer

It is well-established law in the Fifth Circuit that attorneys bear an affirmative duty to independently investigate the lawfulness of any payment offered by an existing or potential client. *Assail,* 410 F.3d at 263. The Fifth Circuit held:

> [T]here is a clear principle that an attorney is **not permitted to be willfully ignorant of how his representation is funded**.... [W]hen taken together, [the legal authorities] teach that when an attorney is **objectively on notice that his fees may derive from a pool of frozen assets**, he has a duty to make a good faith inquiry into the source of those fees. **Failure to make such an inquiry in the face of this duty will result in disgorgement of the funds**.

*Id.* at 265 (emphasis added); *see also In re Bell & Beckwith,* 838 F.2d 844, 849 (6th Cir. 1988) (attorney not entitled to *bona fide* purchaser status where the circumstances surrounding the payment of his fees were sufficient to place him on notice that client's funds were obtained by fraud). The Ninth Circuit succinctly stated: "[t]he 'clear principle' recognized in *Assail* and *Bell*

---

[41] Fact Appendix to Plaintiffs' Memorandum In Support of Receiver's Motion to Compel, Exh. 1: pp. 41:23-44:24 and Exh. 2: pp. 40:3-42:1.

*& Beckwith* is applicable here: an attorney is not permitted to be willfully ignorant of how his fees are paid." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143–44 (9th Cir. 2010).

This duty to inquire adheres once the attorney is reasonably on notice that the funds might be tainted or might otherwise come from an unlawful source. *Assail,* 410 F.3d at 263. Indeed, the evidence already in the record "clearly demonstrate[d] sufficient facts to trigger [the lawyer's] duty of inquiry as to the source of [his client's] funds." *Network Servs. Depot*, 617 F.3d at 1143–45 (9th Cir. 2010) ("an objectively reasonable and diligent inquiry would have revealed that Appellant's assets were potentially tainted by their participation in the [illegal] scheme.").

Here, the Bradley/Quinn Attorneys claim to represent Asher and Batashvili in a limited manner regarding the scope of the asset freeze. There is thus no question as to whether the Bradley/Quinn Attorneys were actually on notice of the risks which give rise to the *Assail* duty to inquire. Acknowledging this duty, the Bradley/Quinn Attorneys responded to the Receiver's request for information by affirming that they have undertaken such investigations as required by *Assail* and additionally by asserting that they are not going to provide an accounting or other information to the Receiver to verify their claims of having satisfied *Assail*. Motion to Compel ¶¶ 4-8.

To properly discharge the *Assail* duty to inquire, there must be a "good-faith inquiry" by counsel into the source of the assets. *Assail,* 410 F.3d at 265–66. By arguing that this duty stops there, with no collateral duty to "show your work" to the Receiver from the necessary audit, the Bradley/Quinn Attorneys would remove the court's ability to probe and enforce defense counsel's duties under *Assail* and to determine whether the Retainer was paid from tainted or suspect sources.

14

For the Bradley/Quinn Attorneys, this interaction between *Assail*'s duty to inquire and the duties imposed by the Receivership creates an affirmative duty to respond to the Receiver's request for information as to the source of funds. In *FTC v. Johnson*, the Court held, applying *Assail*, that Defense counsel was affirmatively obliged to respond to the Receiver's inquiries as to the source of certain assets. No. 2:10-cv-02203-MMD-GWF, 2013 WL 4039069, at *6 –7 (D. Nev. Aug. 5, 2013).  Following a discussion of the *Assail* duties and their application to the facts at hand, *Johnson* held that "pursuant to the responsibilities placed upon the Receiver to maintain the integrity of the Receivership estate, inquiries made by the Receiver as to the source of any [funds] must be responded to." *Id.* at *7. The *Johnson* court continues "[t]he rulings in *Assail* and in *Network Services Depot* **apply equally to payments made by parties or payments made by nonparties**; so long as the payments originate in frozen assets, and so long as counsel is apprised that his fees 'may derive from a pool of frozen assets,' the duty to inquire is triggered." *Id.* (citations omitted) (emphasis added).

According to the Receiver, a substantial amount of frozen assets have not been identified and therefore could potentially be part of the funds used for the Retainer. Further, Asher has been found in contempt and Batashvili has a contempt proceeding pending because of their efforts to hide and dissipate restrained funds. Given this, it is reasonable for the Receiver to demand an accounting of the source of funds for the Retainer and documentation of Bradley/Quinn Attorney's investigations under *Assail*. The Receiver explains: "[n]eedless to say, there are millions of dollars of "assets" subject to the Court's Orders that have not yet been identified by the Receiver and the Individual Defendants have only exacerbated this problem by hiding assets from the Receiver, transferring assets in violation of the Court's Orders, and refusing to provide information requested by the Receiver." Receiver's Motion to Compel at ¶ 14. Thus, these

assurances by the Bradley/Quinn Attorneys—that they have satisfied *Assail* and that further disclosure is unnecessary—plainly fail to satisfy the responsibility owed to the Receiver and the Court.

A meager affirmation from the Bradley/Quinn Attorneys that they are subjectively comfortable with accepting the money does not meet *Assail*. To ensure *Assail* is met, the Court should order Bradley/Quinn Attorneys to document their inquiry into the source of funds, disclose whatever information was obtained by this inquiry, and provide an accounting to the Receiver. Their self-serving representations are *not* "the end of this matter." D.E. #264 at p. 2.

The *Assail* inquiry is particularly important here where defense counsel has claimed previously—in the pending Attorney Fee Motion—that they lack sufficient records to identify with reasonable certainty which assets are untainted or not subject to the Court's Orders. D.E. #245 at p. 6. If they lack such vital information, one is hard-pressed to believe that they can undertake the diligent inquiry required by *Assail*. Bradley/Quinn Attorneys' assurances that *Assail* has been satisfied are thus plainly insufficient. The evidence in the record clearly creates a factual basis to question: 1) the source of funds for the Retainer; 2) the Bradley/Quinn Attorneys' ability to undertake the requisite inquiry; and 3) the sufficiency and accuracy their inquiry. Therefore, the only objectively reasonable way to actually show whether the duty to inquire was satisfied is to grant the relief sought in the Receiver's Motion to Compel.

**C. The Bradley/Quinn Attorneys Have No Legal Basis to Refuse to Provide the Information Requested by the Receiver Because Information Regarding the Source of Funds Paid to the Bradley/Quinn Attorneys Is *Not* Privileged.**

The Bradley/Quinn Attorneys have no legal basis—and cited no case law—to refuse to provide the information requested by the Receiver because the information related to the source of funds paid to Bradley/Quinn Attorneys is not privileged. For the privilege to attach, there must be a confidential communication with an attorney (or subordinates) for the purpose of receiving

16

legal advice. *See EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017). The party

alleging the privilege bears the burden of proving applicability. *Id.* "Because the attorney-client

privilege 'has the effect of withholding relevant information from the fact-finder,' it is

interpreted narrowly so as to 'appl[y] only where necessary to achieve its purpose.'" *Id.*

(quotation and citations omitted).

   The Fifth Circuit has held that "[t]he identity of a client is a matter not normally within

the privilege, . . . nor are matters involving the receipt of fees from a client usually privileged[.]"

*In re Grand Jury Proceedings*, 517 F.2d 666, 670–71 (5th Cir. 1975) (quoting *U.S. v. Ponder*,

475 F.2d 37, 39 (5th Cir. 1973) (internal citations omitted). A sister court in the Northern District

of Texas held: "[b]ank records relating to the transfer of funds into and out of a lawyer's trust

account are **not** privileged communications." *SEC v. W Fin. Grp., LLC*, No. 3-08-CV-0499-N,

2009 WL 636540, at *1 (N.D. Tex. Mar. 9, 2009) (emphasis added) (citing *SEC v. First Security

Bank of Utah, N.A.*, 447 F.2d 166, 167 (10th Cir. 1971), *cert. denied*, 404 U.S. 1038 (1972);

*Harris v. United States*, 413 F.2d 316, 319–20 (9th Cir. 1969); *O'Donnell v. Sullivan,* 364 F.2d

43, 44 (1st Cir. 1966), *cert. denied*, 385 U.S. 969 (1966)). The *W Financial Grp* court continued:

"[t]hat is because the attorney-client privilege extends only 'to the substance of matters

communicated to an attorney in professional confidence,' and '[t]he deposit and disbursement of

money in a commercial checking account are not confidential communications.'" *Id.* (quotations

and citations omitted). The *W Financial Grp* quotes from a "strikingly similar case" from

Indiana:

> Case law establishes that [the lawyer's] bank records are not
> protected by the attorney-client privilege… Even if the transactions
> could be viewed by a large stretch of the imagination to be
> communicative, in no way could they be considered confidential.
> If the [lawyer] and [her] clients sought confidentiality regarding

> the monetary transactions, they blew any cover of secrecy by
> utilizing a commercial banking enterprise.

*Id*. at *1-2, (quoting *Najjar v. United States*, No. 1:02-cv-1807-JDT-WTL, 2003 WL 21254772 at *2 (S.D. Ind. Apr.11, 2003)). Here, the Receiver seeks information on the source of the funding paid to the Bradley/Quinn Attorneys for their representation of Asher and Batashvili— including payments made from non-specified sources, regardless of their connection to Defendants or lack thereof. This information is not privileged because it is not a confidential communication for the purpose of receiving legal advice.

Finally, the information sought in the Motion to Compel is, in fact, beneficial to the Bradley/Quinn Attorneys because it will remove any doubt about the provenance of the Retainer. If after a thorough and objective inquiry, the Retainer is untainted and not subject to the Court's Orders, then the Bradley/Quinn Attorneys may use the Retainer as compensation for their efforts. However, as discussed above, if the Retainer is tainted and subject to the Court's Orders, then they will be required to surrender those funds to the Receiver. *See, e.g.*, *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 474 (E.D. Va. 1994), *aff'd* 83 F.3d 660, 665 (4th Cir. 1996) (tainted funds used to pay attorneys' fees may be "subject to forfeiture, even in the attorney's hands"). Failure to comply with *Assail*'s duty to inquire also necessitates disgorgement of funds, even funds already paid. *Assail*, 410 F.3d at 256. If counsel reasonably should have known that the funds were subject to an asset freeze, then generally "the fairest course of action is to require counsel to bear the risks of nonpayment." *FTC v. Williams, Scott & Assocs., LLC*, No. 1:14-CV-1599-HLM, 2015 WL 7351993, at *3 (N.D. Ga. Sep. 22, 2015); *see also FTC v. Sharp*, No. CV-S89-870 RDF, 1991 WL 214076, at *1–2 (D. Nev. Jul. 23, 1991).

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court grant the Receiver's Motion to Compel and order the Bradley/Quinn Attorneys to provide the requested information because: (1) Receiver is entitled to the information under the Court's Orders; (2) the Bradley/Quinn Attorneys must document their inquiry, disclose whatever information was obtained by this inquiry, and provide an accounting to the Receiver regarding the source of the funds used for their retainer; and (3) the Bradley/Quinn Attorneys have no legal basis to refuse to provide the information requested by the Receiver because the information related to the source of funds paid to the Bradley/Quinn Attorneys is *not* privileged.  Thus, the Court should grant the Receiver's Motion to Compel.

Dated: June 11, 2021                                     Respectfully submitted,


By: /s/ JonMarc P. Buffa

JONMARC P. BUFFA
jbuffa@cftc.gov
California Bar # 217324

RICHARD P. FOELBER
rfoelber@cftc.gov
Illinois Bar # 0840904

Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street. NW
Washington, DC 20580
(202) 418-5000


FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr

JEFFERY A. "BEAU" BROWN, JR., *pro hac vice*
Beau.Brown@asc.alabama.gov

19

Alabama Bar No. 7258R80B

ANNE GUNTER, *pro hac vice*
anne.gunter@asc.alabama.gov
Alabama Bar No. 4666N91P

Attorneys for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
 Montgomery, AL 36104
Telephone: (334) 322-8586
Fax: (334) 242-0240


FOR THE STATE OF ALASKA

By: /s/ Robert Schmidt

ROBERT SCHMIDT, *pro hac vice*
rob.schmidt@alaska.gov
Alaska Bar No. 9909048
JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorneys for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697


FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *pro hac vice*
cnichols@azcc.gov
Arizona Bar No. 029958

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.

20

Phoenix, AZ 85007
Telephone: (602) 542-0639
Fax: (602) 714-8120


FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dbo.ca.gov
SEAN ROONEY
Sean.Rooney@dbo.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice*
California Bar No. 264784
Danielle.Stoumbos@dbo.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS OVERSIGHT
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181


FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Janna Fischer

JANNA FISCHER*, *pro hac vice*
janna.fischer@coag.gov
Colorado Bar No. 44952
ROBERT FINKE*, *pro hac vice*
robert.finke@coag.gov
Colorado Bar No. 40756
*Counsel of Record

Attorneys for Plaintiff
SECURITIES COMMISSIONER
FOR THE STATE OF COLORADO
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6374

21

Fax: (720) 508-6037


FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ Katherine M. Devanney

KATHERINE M. DEVANNEY, *pro hac vice*
Deputy Attorney General
Delaware Bar No. 6356
Texas Bar No. 24116281
katherine.devanney@delaware.gov
JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware


FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida


By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325

Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515


By: /s/ A. Gregory Melchior

A. GREGORY MELCHIOR, *pro hac vice*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498


FOR THE STATE OF GEORGIA

By: /s/ Logan B. Winkles

LOGAN B. WINKLES, *pro hac vice*
Georgia Bar No. 136906
lwinkles@law.ga.gov
RONALD J. STAY, *pro hac vice*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239


FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

23

RAYNI M. NAKAMURA-WATANABE, *pro hac vice*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov
PATRICIA J. MOY
Hawaii Bar No. 5845-0
PMoy@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977


FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN


By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice*
Deputy Attorney General
loren.messerly@finance.idaho.gov
Idaho Bar No. 7434

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Fax: (208) 332-8099


FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Patricia Orloff Erdmann
Chief Counsel of Litigation


By: /s/ Jefferson S. Garn

24

JEFFERSON S. GARN, *pro hac vice*
Deputy Attorney General
Jefferson.Garn@atg.in.gov
Indiana Bar No. 29921-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979


FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen

THOMAS E. KNUTZEN, *pro hac vice*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872


FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice*
Gary.stephens@ky.gov
Kentucky Bar No. 87740
CATHERINE FALCONER
Catherine.falconer@ky.gov

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL INSTITUITONS
500 Mero St. 2SW19

25

Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787


FOR THE STATE OF MAINE

By: /s/ Gregg D. Bernstein

GREGG D. BERNSTEIN, *pro hac vice*
gregg.bernstein@maine.gov
Maine Bar No. 8424

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 626-8828


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer

MAX F. BRAUER, *pro hac vice*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532


FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin

PEOPLE OF THE STATE OF
MICHIGAN, by DANA NESSEL
ATTORNEY GENERAL

Aaron W. Levin, *pro hac vice*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-7632

FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon

SETH SHANNON, *pro hac vice*
seth.shannon@ago.ms.gov
Mississippi Bar No. 103466
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231

FOR THE STATE OF NEBRASKA
L. JAY BARTEL
Bureau Chief
Legal Services Bureau

By: /s/ Joshua R. Shasserre

27

JOSHUA R. SHASSERRE, *pro hac vice*
Assistant Attorney General
Nebraska Bar No. 23885
joshua.shasserre@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3888
Fax: (402) 471-3297

FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston

ERIN M. HOUSTON, *pro hac vice*
Deputy Secretary of State, Securities Administrator
Nevada Bar No. 11814
ehouston@sos.nv.gov

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452

FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger

ALISSA N. BERGER, *pro hac vice*
Securities Enforcement Prosecutor
New Mexico Securities Division
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Securities Division

28

New Mexico Regulation and Licensing Department
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848


FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht _____

TATYANA "TANYA" TRAKHT, *pro hac vice*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers
PETER POPE
Chief, Investor Protection Bureau
peter.pope@ag.ny.gov

Attorneys for Plaintiff
ATTORNEY GENERAL FOR THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant _____

ROBERT FAGNANT, *pro hac vice*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742

29

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams

JONATHAN WILLIAMS, *pro hac vice*
jwilliams@scag.gov
South Carolina Bar No. 72509

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Fax: (803) 734-7208

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661

FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor & Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1

30

Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369


FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice*
Deputy Attorney General
TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance


FOR THE STATE OF TEXAS
KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

31

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division


By: */s/ Christina Cella*           

CHRISTINA CELLA
Assistant Attorney General
State Bar No. 24106199
christina.cella@oag.texas.gov
LEA N. BRIGTSEN
Assistant Attorney General
State Bar No. 24054504
lea.brigtsen@oag.texas.gov

Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-2952
Fax: (512) 477-2348
*Attorneys for Plaintiff the State of Texas*


FOR THE STATE OF WASHINGTON


By: /s/ Ian S. McDonald           

IAN S. MCDONALD, *pro hac vice*
Washington Bar No. 41403
Ian.McDonald@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524


FOR THE STATE OF WEST VIRGINIA


By: /s/ Michael Nusbaum           

MICHAEL NUSBAUM, *pro hac vice*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305
Telephone: (304) 558-2251
Fax: (304) 558-4211


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice

By: /s/ Shannon A. Conlin

SHANNON A. CONLIN, *pro hac vice*
Assistant Attorney General
Wisconsin Bar No. 1089101
Conlinsa@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779

*Attorney for Plaintiff State of Wisconsin*


FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: /s/ Adam J. Kenworthy
ADAM KENWORTHY* *pro hac vice*
Iowa Bar No. AT0012137
Enforcement Attorney
adam.kenworthy@iid.iowa.gov

33

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6562
Fax: (515)-654-6500

## <u>CERTIFICATE OF SERVICE</u>

On June 11, 2021, I electronically filed the foregoing PLAINTIFFS MEMORANDUM

OF LAW IN SUPPORT OF RECEIVER'S MOTION TO COMPEL with the Clerk of this Court

in the above captioned matter using the CM/ECF system and I am relying upon the transmission

of the Clerk's Notice of Electronic Filing for service upon all parties in this.


<u>/s/ JonMarc P. Buffa</u>

35