# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, *et al.* | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-CV-2910-L |
| TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI, | § § § § § § § | |
| Defendants, | § § | |
| TOWER EQUITY, LLC, | § § | |
| Relief Defendant. | § § | |

## RECEIVER'S EMERGENCY MOTION FOR "SHOW CAUSE" HEARING TO HOLD DEFENDANTS LUCAS ASHER AND SIMON BATASHVILI IN CIVIL CONTEMPT, AND BRIEF IN SUPPORT

COMES NOW, Kelly M. Crawford ("Receiver") and respectfully requests, on an emergency basis, a hearing for Defendants Lucas Asher ("Asher") and Simon Batashvili ("Batashvili") to appear before this Court in person and show cause as to why they should not be held in contempt for their intentional, deceptive, and brazen violations of the clear orders of this Court, and in support thereof, the Receiver respectfully shows the Court as follows.

RECEIVER'S EMERGENCY MOTION FOR "SHOW CAUSE" HEARING TO HOLD DEFENDANTS LUCAS ASHER AND SIMON BATASHVILI IN CIVIL CONTEMPT, AND BRIEF IN SUPPORT

PAGE 1

## TABLE OF CONTENTS

I.      Introduction……………………………………………………..Page 4

II.     Factual Background ...........................................................Pages 5 - 14

        A.  The Relevant Orders ........................................................Page 5

        B.  The Development of "Portfolio Insider" by Defendants ..................Page 7

        C.  Portfolio Insider Is Included within the "Receivership Estate".........Page 10
            Under the SRO

        D.  The Misappropriation of Receivership Assets by Defendants...........Page 10

        E.  Violation of the Consent Order.........................................Page 12

        F.  Defendants Hid Their Violations of the Court Orders by Lying
            to the Court and in Depositions ........................................Page 12

        G.  Demand to Cure the Contempt……………………………………...Page 17

III.    Argument ......................................................................Page 18

        A.  The Court Orders were in Effect at the Time of the Violations.........Page 18

        B.  The Defendants Had Knowledge of the Court Orders......................Page 18

        C.  The Defendants Knowingly Violated the Court Orders................Page 19

IV.    Relief Requested ................................................................Page 23

V.     Conclusion ......................................................................Page 25

## TABLE OF AUTHORITIES

*Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461 (9th Cir. 1989) .................Page 23

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29(D.D.C. 2015)................Page 21

*CFTC v. Wall Street Underground, Inc.,* 281 F.Supp.2d 1260 (D. Kan.2003) ......Page 20

*Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297 (11th Cir. 1991) .....Page 18

*Cook v. Ochsner Found. Hosp.*, 559 F.2d 270 (5th Cir. 1977)..............................Page 18

*FTC v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 637 (6th Cir.2014)......................Page 20

*FTC v. J.K. Publications, Inc.,* No. CV 99-00044 ABC AJW, 2009 WL 997421
(C.D. Cal. Apr. 13, 2009)................................................................................Pages 19-20

*FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104 (S.D. Cal. 2008) ..................................Page 20

*Gifford v. Heckler*, 741 F.2d 263 (9th Cir. 1984) ....................................................Page 23

*Harris v. Joslin,* No. 3:02-CV-192-B, 2006 WL 3770506 (N.D. Tex. 2006) ........Page 23

*In re Bradley*, 588 F.3d 254 (5th Cir. 2009) ...........................................................Page 18

*In re Hartman,* 102 B.R. 90 (Bankr. N.D. Tex. 1989)............................................Page 19

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821,
114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ...............................................................Page 23

*Matter of Nix,* 864 F.2d 1209 (5th Cir. 1989)..........................................................Page 19

*SEC v. First Financial Group of Texas, Inc.,* 659 F2d 660 (5th Cir. 1981) ............Page 18

*SEC v. Resource Development Int'l,*
No. 3:02-CV-0605-R, 2004 WL 2599886 (N.D. Tex. 2004) .................................Page 23

*Sunshine Art Studios, Inc. v. FTC, 481 F.2d 1171 (1st Cir.1973)*........................Page 20

*Zale Corp. v. F.T.C., 473 F.*2d 1317 (5th Cir. 1973)...............................................Page  21

# I.

# **INTRODUCTION**

This is the third contempt motion against Defendants Asher and/or Batashvili. On November 23, 2020, the Receiver filed a contempt motion against Asher for transferring and hiding $550,000 in Receivership Assets [Dkt. No. 195][1] and on May 13, 2021, the Receiver filed a contempt motion against Batashvili for transferring and hiding $492,500 in Receivership Assets and renewed the contempt motion against Asher [Dkt. No. 250][2]. In continued, arrogant disrespect for the authority of this Court, Defendants Asher and Batashvili are violating the Court's clear orders by using Receivership Assets to operate a business begun prior to the receivership that is in receivership and engaging in activities related to securities and commodities despite the Court's prohibition. All the while, they have been doing so while lying under oath, repeatedly, to this Court and to the Receiver. Defendants Asher and Batashvili should be compelled to personally appear before this Court and show cause as to why the Court should not find each of them in civil contempt and incarcerate them until such time as they comply with the Court's Orders and purge themselves of their contemptuous conduct.

---

[1] As the Court will recall, after being confronted with a voicemail message he left with the Receiver two days after issuance of the *SRO* claiming he was in "full compliance" of the *SRO*, Asher finally admitted in open court that he was aware of the SRO at the time he hid $550,000 from the Receiver. See *Receiver's Emergency Motion for "Show Cause" Hearing to Hold Defendant Asher in Civil Contempt* [Dkt. 195] and *Appendix in Support* [Dkt. 196].

[2] This is the same Simon Batashvili who testified in his deposition that he was "here to help", while he proceeded to lie under oath about monies he had hidden from the Receiver in violation of the *SRO*. See *Appendix in Support of Receiver's Emergency Motion for "Show Cause" Hearing to Hold Defendants Lucas Asher and Simon Batashvili in Civil Contempt* ("App.") filed contemporaneously with this Motion, at pp. 266-273. See also *Receiver's Motion for "Show Cause" Hearing to Hold Simon Batashvili in Civil Contempt* [Dkt. 250] and *Appendix in Support* [Dkt. 251].

## II.

## FACTUAL BACKGROUND

### A.    THE RELEVANT ORDERS

1.    On September 22, 2020, this Court entered an *Order Granting Plaintiff's Emergency Ex Parte Motion for Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief (the "SRO")* [Dkt. No. 16].    Pursuant to the *SRO,* the Court appointed Kelly M. Crawford as Receiver of the assets of the Defendants and Relief Defendant and vested the Receiver with certain authority to recover assets and investigate claims.  On October 14, 2020, the Court entered a *Consent Order of Preliminary Injunction and Other Equitable Relief Against Defendants Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher and Simon Batashvili (the "Consent Order")* [Dkt. No. 165].   On March 22, 2021, the Court entered an *Order Granting Receiver's Motion to Identify Certain Entities in Receivership (the "Additional Entities Order")* [Dkt. No. 230].    The *SRO*, the Consent Order, and the Additional Entities Order are collectively referred to herein as the "Orders".

2.    The *SRO* provides that:

> "*Defendants and Relief Defendant are immediately restrained and enjoined, except as otherwise ordered by this Court, from directly or indirectly withdrawing, transferring, removing, dissipating, or otherwise disposing of any assets, wherever located…..*"

*SRO*, ¶ 19.

Furthermore, Paragraph 33 of the *SRO* required Defendants to "*immediately or within such time as permitted by the Temporary Receiver in writing, deliver over to the Temporary Receiver:*

> a.    *Possession and custody of all assets of the Receivership Estate, owned beneficially or otherwise, wherever situated;* ...

3.     The "Receivership Estate" is defined in paragraph 30 of the *SRO* as *"all funds, properties, premises, accounts, income, now or hereafter due or wing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants…"*

4.     "Assets" is defined in paragraph 15 of the *SRO* as:

*"any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts…"*

5.     On October 14, 2020, Defendants Asher and Batashvili, while represented by counsel of their choice, entered into a *Consent Order of Preliminary Injunction and Other Equitable Relief Against Defendants Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher and Simon Batashvili ("Consent Order") [Dkt. No. 165]* that incorporated the terms of the *SRO* and that included the following restriction on their business activities: *"Defendants Asher and Batashvili agree that they will not engage in any activity related to securities, commodities, or derivatives…." Consent Order, ¶38.*

6.     On March 22, 2021, the Court entered an *Order Granting Receiver's Motion to Identify Certain Entities in Receivership [Dkt. No. 230]* that found that Retirement Insider, LLC, among other entities, was owned or controlled by the Defendants or Relief Defendant, in receivership, and subject to the *SRO*.

## B.     THE DEVELOPMENT OF "PORTFOLIO INSIDER" BY DEFENDANTS

7.      Retirement Insider, LLC ("Retirement Insider") is a Wyoming limited liability company organized on October 10, 2018, that was owned by Defendants Asher and Batashvili. Defendant Asher was appointed the manager of Retirement Insider.[3]

8.      In a deposition of Asher taken by the Receiver on November 5, 2020 ("Asher Deposition"), Defendant Asher  described Retirement Insider as "a startup that never got off the ground, and the intention was for it to be a news and media company." [4] After acknowledging Retirement Insider had employees, Defendant Asher testified that its operations were funded "by the sale partially of a newsletter, and then potentially there was some seed capital put in there as well from Tower Equity".[5]

9.      Monies received by the Defendants from the sales of metals were used, in part, to finance Relief Defendant Tower Equity, LLC.  ("Tower").[6]  In addition, Tower solicited funds from investors which, in turn, not only invested in real estate and/or equities, but also funded the start-up of Retirement Insider.[7]

10.      Retirement Insider operated in a smaller suite on the same floor as the primary office of Defendants Chase Metals and Barrick Metals, at Suite 700, 8383 Wilshire Blvd, Beverly Hills, California.[8]

11.      Retirement Insider employed Konstantin Yurchenko  as its Chief Technology Officer ("Chief Technology Officer"), Gwen Thomas as its Marketing Officer ("Marketing

---

[3] Retirement Insider also did business as Tower Trade, with Asher as Chief Executive Officer.  App. at pp. 160, 168, and 170.
[4] App. at p.175.
[5] App. at pp. 175-176.
[6] App. at pp. 159-160.
[7] App. at p. 160.
[8] App. at p. 175.

Officer"), Anthony Peterson, and others to develop a financial newsletter.[9]   Although Jennifer Hacker was technically employed by another entity owned by Defendants Asher and Batashvili, she too worked on developing the financial product to be sold by Retirement Insider, as its' Marketing Director.[10]

12.     In addition, Chris Daigle, a consultant ("Daigle"), was hired to assist in the development of the Retirement Insider product, as its' Vice President of Business Development.[11]   The Receiver traced more than $133,000 of investor monies paid to Daigle's entity for his work[12].

13.     At Daigle's recommendation, Defendants Asher and Batashvili retained a third-party company—*Intrinio*-- to provide the data feed of securities sales to Retirement Insider to include in the financial services product to be sold.[13]   The Receiver traced more than $28,000 of investor monies paid to Intrinio.[14]

14.     In July 2020, Defendant Asher and Batashvili agreed to call the financial product being developed by Retirement Insider, "Portfolio Insider".[15]   In fact, according to Jennifer Hacker, the Marketing Director for Retirement Insider, "Portfolio Insider was also Retirement Insider".   Ms. Hacker explained that "[t]he name Portfolio Insider sounded less restrictive for investors not actively planning for retirement."[16]   Accordingly, on July 18, 2020, Defendant Batashvili purchased the domain name for "www.portfolioinsider.com".[17]   In the months prior to the receivership, Defendant Asher promoted Portfolio Insider as his vision for providing

---

[9] App. at pp. 160, 178-187.
[10] App. at pp. 108, and 188.
[11] App. at pp. 160-161, 191-207.
[12] Chris Daigle does business through an entity he owns called Foxwood Family, LLC. App. at pp. 160-161, 191-192.
[13] App. at pp. 161, 209-253.
[14] App. at pp. 161, 238.
[15] App. at pp. 108, 161.
[16] App. at p 108
[17] App. at pp. 5-106, 108.

financial information to investors to assist them in investing in securities, in competition with the Bloomberg terminal.[18]

15.     On July 13, 2020, Relief Defendant Tower entered into a consulting agreement with Peter Coyne of Complete Control, LLC ("Complete Control") to provide marketing expertise regarding the Portfolio Insider product for a fee of $10,000 per month.[19]

16.     With Intrinio retained to license data feeds for stock purchases, the employees and consultants retained by the Receivership Defendants (and paid for with investor monies that are the subject of this lawsuit) began working on a website and marketing campaign for "Portfolio Insider" that included the following pitches:

> "*What if a company took the tools the billionaires and investment banks have, and made them available to the average person?*
>
> *What if Wall Street became fair?*
>
> *Introducing Portfolio Insider.  We want to put the tools of an entire investment bank in your pocket.  Together, we'll tear down the walls that create an unfair playing filed for the average investor."…..*
>
> *"With our simple portfolio tool, we aim to democratize access to the enormous market success that thousands of billionaires and financial institutions capitalize on every single day.  ….*
>
> *"With only a few minutes a day, we give you the insider advantage of modeling for yourself some of the most attractive portfolios of the wealthiest people in America….*

---

[18] App. at pp. 162-163, 288, and 296.
[19] App. at pp. 162, 260-265.

*"Investors can capitalize on insider knowledge legally by following proprietary tools invented by Portfolio Insider."*[20]

17.    On August 21, 2020, consultant Peter Coyne provided his feedback regarding the proposed marketing of the Portfolio Insider product and asked about the results of testing of the product: *"The numbers are great that you've shared so far, but they're on such a small sample size that they're probably not real."* Defendant Asher defiantly responded, *"We have $2,160,000 in annual revenue generated in the last 60 days. Granted, that is not a billion dollars yet. But I think multiple 7 figures wouldn't necessarily qualify for "small sample size."*[21]

## C.    PORTFOLIO INSIDER IS INCLUDED WITHIN THE "RECEIVERSHIP ESTATE"

18.    When the Court issued the *SRO* on September 22, 2020, all assets of the Defendants and Relief Defendant and the entities they owned or controlled were frozen and placed in receivership. This necessarily included Retirement Insider (doing business as Portfolio Insider), the domain name for Portfolio Insider and all of the intellectual property, programming, marketing, development, work, subscription fees, digital platform, and general intangibles of the Portfolio Insider product created by the Defendants with the use of investor funds.

## D.    THE MISAPPROPRIATION OF RECEIVERSHIP ASSETS BY DEFENDANTS

19.    Instead of complying with the *SRO* and the *Consent Order,* Defendants Asher and Batashvili blatantly ignored the Court's Orders and continued to operate and market Portfolio Insider, a Receivership Asset, after the *SRO* was entered. Specifically, they:

   a.    Continued working with Intrinio to facilitate licensing of market data feeds to be used as part of the Portfolio Insider product;[22]

---

[20] App. at pp. 278-294.
[21] App. at pp. 266-269.
[22] App. at pp. 161, 209-253.

b.  Continued use of the Portfolio Insider domain name;[23]

c.  Hired many of the same employees who worked on Portfolio Insider prior to the receivership. For example, Jennifer Hacker shows on her resume that she worked for Portfolio Insider continuously from July, 2020 (prior to the receivership) until January, 2021[24]. In addition,  Konstantin Yurchenko and Anthony Peterson also continued working for Portfolio Insider.[25]

d.  Hired the top salesmen who closed sales of metals to investors to close sales of the Portfolio Insider product to investors.  The closers include Walter Vera, Deric Ned, Kyle Sanna, and Dan Halimi.[26]

e.  Continued use of the same marketing taglines to promote the Portfolio Insider product, such as the power "*of an investment bank in your pocket*", and continued to say its mission "*is to democratize access*" to the world's most valuable financial data.[27]

f.  Continued the same business concept of Portfolio Insider that began as Retirement Insider in March, 2020 – sell financial information through a digital platform to investors regarding trades and portfolios of titans of the financial markets so that investors can model their own investing.[28]

---

[23] App. at pp. 164, 321-342.
[24] App. at pp. 255-256.
[25] App. at pp. 116, 129, 147, 149, 152, and 307.
[26] On September 13, 2021, the Receiver filed his Original Complaint against the brokers of metal sales to recover the commissions they were paid, *Civil Action No. 3:21-cv-02181-S in the United States District Court for the Northern District of Texas, Dallas Division*.  The Receiver is seeking to recover from, among other salespersons, Walter Vera and his entities, commissions of $4,533,519; Deric Ned and his entities, commissions of $2,975,316; Kyle Sanna and his entities, commissions of $1,274,143; and Dan Halimi and his entity, commissions of  $271,773. App. at pp. 111, 163-164.
[27] App. at pp. 321-323.
[28] App. at pp. 111, 321-323.

    g.   The Portfolio Insider website used today includes terms and conditions and privacy notifications that were created *prior to* the receivership.[29]  Indeed, as shown on the Portfolio Insider website, the privacy statement was last updated February 4, 2020 – more than 7 months prior to the receivership; and the terms and conditions of sale were last updated March 12, 2020 – more than 6 months prior to the receivership.

## E.    VIOLATION OF THE CONSENT ORDER

    20.    In operating Portfolio Insider, Defendants Asher and Batashvili engaged in activity expressly prohibited by this Court's Consent Order.  The Portfolio Insider product provides information and recommendations to customers regarding the purchase and sale of securities, mutual funds, and commodities such as crypto currency.[30]  Accordingly, Defendants Asher and Batashvili have been and are continuing to violate Paragraph 38 of the Consent Order that expressly provides *"Defendants Asher and Batashvili agree that they will not engage in any activity related to securities, commodities, or derivatives…."*

    21.    At no time did Defendants Asher and Batashvili request this Court to amend the Consent Order to allow them to engage in activities related to securities, commodities, or derivatives.

## F.    DEFENDANTS HID THEIR VIOLATIONS OF THE COURT ORDERS BY LYING TO THE COURT AND IN DEPOSITIONS

    22.    Hoping to hide their misappropriation of the Portfolio Insider Receivership Asset, Defendants Asher and Batashvili had their friend and associate Carlos Cruz form a Delaware limited liability company called "Portfolio Insider, LLC" on October 27, 2020.[31]  This is the

---

[29] App. at pp. 164-165, 324-342.
[30] App. at p. 111.
[31] App. at pp. 165, 344.

same Carlos Cruz who received more than $20 million from the Defendants through his company MagicStar Arrow.[32]  It is also the same Carlos Cruz who is using his entities to fund the retainers paid to the counsel for Asher and Batashvili seeking to have the Court's Orders revised to fund their defense of the Defendants.[33]

23.     With Cruz as their front man, Defendants Asher and Batashvili, with the assistance of Cruz, actively operated Portfolio Insider since the receivership was put in place. Indeed, Defendant Batashvili supervised employees who were hired to call potential customers to sell the Portfolio Insider product.[34]  Moreover, Batashvili prepared the scripts for the employees to use in making such calls.[35]  Meanwhile, Defendant Asher worked with Nasdaq and Intrinio to obtain data market feeds to provide Portfolio Insider customers and include in the marketing of the Portfolio Insider product.[36]  At all relevant times since the receivership Defendants Asher and Batashvili have been supervising and actively involved in the operations of Portfolio Insider, and holding themselves out to others as the owners and operators of Portfolio Insider.[37]

24.     Immediately after the *SRO* was entered, Defendant Asher sought to fund the operations of Portfolio Insider by unlawfully transferring $300,000 of the $550,000 in Receivership Assets he misappropriated to an account controlled by Carlos Cruz used to pay Portfolio Insider employees and expenses.[38]

---

[32] Mr. Cruz and his company MagicStar Arrow refused multiple requests by the Receiver for documents showing any goods or services provided in exchange for the more  than $20 million received by the Defendants.  Mr. Cruz and his company MagicStar Arrow claim they are not subject to this Court's SRO.  App. at p. 165.

[33] App. at p. 165.

[34] App. at pp. 110-112.

[35] Id.

[36] App. at  pp. 114-157, 238-253.

[37] App. at pp. 110-112, 129, 130, 137, 150-151, 152-153.

[38] Once Defendant Asher was caught in misappropriating the $550,000, and admitted to knowingly violating the *SRO*, the monies were returned to the receivership.  App. at pp. 164, 300-320; See also *Receiver's Emergency*

---

25.     On November 5, 2020, Defendant Asher testified at his deposition that to the best of his knowledge he had turned over all assets subject to the *SRO;* that "*I don't have a current source of income as I am standing before you today";* and that Retirement Insider *"was a failed attempt to start a newsletter."* [39]

26.     The truth is that Asher was actively using Retirement Insider/Portfolio Insider assets that belonged to the Receivership Estate and continuing the business of Retirement Insider/Portfolio Insider.[40]

27.     At his show cause hearing on December 4, 2020, Defendant Asher testified in open court that "*I don't control or own any businesses after the statutory restraining order,"* and that "*I have not asked anyone to open any businesses for me after the date you mentioned."*[41] Less than three weeks prior to this testimony, Defendant Asher executed a contract with Intrinio in the name of Portfolio Insider – the same Portfolio Insider, formerly known as Retirement Insider, that is part or the Receivership Estate and subject to the *SRO* and *Consent Orders.*[42] Asher was also listed as the Client/Distributor contact on Portfolio Insider's order with Nasdaq[43].

28.     At his deposition ordered by the Court on January 29, 2021, Defendant Asher was confronted about Portfolio Insider and blatantly lied under oath.

"*Q.   And what is this Portfolio Insider?  Do you know what that --- do you know what Portfolio Insider is?*

*A.   From what I understand, it's a website, like Business Insider or Market Insider.*

*Q.   Okay.  And who owns or operates Portfolio Insider?*

---

*Motion for "Show Cause" Hearing to Hold Defendant Asher in Civil Contempt* [Dkt. 195] and *Appendix in Support* [Dkt. 196].
[39] App. at pp. 172-176.
[40] App. at pp. 116-135, 238-253.
[41] App. at pp. 346-347.
[42] App. at pp. 250-251.
[43] App. at p. 129.

A. *I don't know.*

Q. *How did you come to know that it's a financial website?*

A. *From the name.*

Q. *Just the name?  Have you ever been to the website?*

A. *Yeah, I've heard of it.*

Q. *Okay.  And who did you hear about it from?*

A. *Some developers.*

Q. *Have you ever provided any consulting services or any work for Portfolio Insider?*

A. *So not—I never received any payment for any services, but I did talk to them about some computer code.  And I guess you could say, I volunteered technical advice on programming languages.  .....*

Q. *And you said Simon has worked with Portfolio Insider?*

A. *I don't –I don't – I don't recall if he's working for them.  I don't think he is."*[44]

The truth is that in the days preceding his deposition, Asher was actively communicating with Nasdaq as the decision maker for Portfolio Insider regarding obtaining data feed from Nasdaq for Portfolio Insider, using Corporate@PortfolioInsider.com as his email address and with Extension 777 at the Portfolio Insider office in Beverly Hills.[45]

29.     In addition, at his January 29, 2021, deposition Defendant Asher was asked if he was in compliance with paragraph 38 of the *Consent Order* that restricts him from engaging in any activity related to securities, commodities, or derivatives, and Defendant Asher testified unequivocally "*I am not engaged in these activities.*" [46]  Nothing could be further from the truth. Defendant Asher was actively operating and marketing Portfolio Insider as a product for

---

[44] App. at pp. 354-356.
[45] App. at pp. 149-156.
[46] App. at pp. 350-353.

investors to assist them in investing in securities and commodities, and is continuing to improperly engage in such activities today.

30.     When the Receiver asked Mr. Asher during his deposition what attempts he had made to gain employment, Mr. Asher testified he had not made any attempts because his life was disrupted, and *"I've been thinking a lot about what I wanted to do next with my life, and I don't have clarity yet on the direction I want to go."* [47]  Mr. Asher testified to this while actively running and marketing Portfolio Insider.

31.     While Asher falsely testified he had limited knowledge of Portfolio Insider; was only volunteering to provide technical advice to programmers; and that he didn't think Batashvili worked for Portfolio Insider, the truth is that Asher and Batashvili worked side by side in the Portfolio Insider offices[48], hired employees[49], and essentially ran the operation[50].  Indeed, Asher held himself out to Nasdaq and others as the CEO of Portfolio Insider, and executed contracts on behalf of Portfolio Insider.[51]

32.     As a result of Defendants Asher and Batashvili hiding their operation of Portfolio Insider from the Receiver, the Receiver devoted months investigating the role of Defendants Asher and Batashvili in Portfolio Insider and gathering evidence to demonstrate their violation of the Court's Orders.[52]  Moreover, Defendants Asher and Batashvili not only hid their involvement in Portfolio Insider from the Receiver, but they also obstructed the Receiver's investigation by lying to the Receiver regarding their activities.   Indeed, since the inception of this lawsuit Defendants Asher and Batashvili have consistently lied to the Receiver:

---

[47] App. at p. 352.
[48] App. at pp. 110-112.
[49] Id.
[50] Id.
[51] App. at pp. 129-130, 136-137, 147-156, 251.
[52] App. at pp. 165-166.

- *Asher lied about his attempt to sell his Ferrari in violation of the SRO;*

- *Asher lied about not knowing of the SRO at the time he transferred $550,000 out of an account in receivership;*

- *Batashvili lied about jewelry he owned and purchased for his wife;*

- *Batashvili lied about the existence of the bank account where he hid $492,500 from the Receiver;*

- *Asher lied about not knowing his cell phone number;*

- *Asher lied about not working with Batashvili on anything together since the receivership other than defense of their lawsuit;*

- *Asher lied about not working with Carlos Cruz on anything together since the receivership;*

- *Asher lied about having turned over all assets to the Receiver;*

33.     Once the Receiver was able to uncover the lies of Asher and Batashvili, and obtain evidence in support of this Motion, the Receiver was able to prepare this Motion.

## G.     DEMAND TO CURE THE DEMAND TO CURE THE CONTEMPT

34.     On September 16, 2021, the Receiver's counsel attempted to confer by telephone with Defendants' counsel to inform counsel of the Receiver's discovery regarding the contemptuous acts.  Unable to speak with Defendants' counsel, the Receiver's counsel attempted to confer by electronic mail with Defendants' counsel.  In such electronic mail, the Receiver made demand upon Defendants Asher and Batashvili to immediately cease and desist operating Portfolio Insider and turn over to the Receiver all assets and records of Portfolio Insider.

## III.

## ARGUMENT

District courts possess inherent power to enforce their orders though contempt proceedings. *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977); *see also, Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1302 (11th Cir. 1991). A party commits contempt when, with knowledge of a court's definite and specific order, he fails to perform or refrain from performing what is required of him in the order. *SEC v. First Financial Group of Texas, Inc.,* 659 F2d 660, 669 (5th Cir. 1981); *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009)("We have often stated that the elements of civil contempt are (1) that a court order was *in effect,* and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order")(internal quotation omitted). Further, civil contempt may serve two different purposes: "coercing compliance with an order or compensating a party who has suffered unnecessary injuries or costs because of contemptuous conduct." *In re Bradley*, 588 F.3d at 263.

### A.      The Court Orders were in effect at the time of the violations.

The *SRO* was in effect on September 25, 2020, and the *Consent Order* was in effect on October 14, 2020. The wrongful actions of Defendants Asher and Batashvili misappropriating the Portfolio Insider receivership asset and engaging in activity related to securities and commodities prohibited by the *Consent Decree* began almost immediately after the receivership was put in place and are continuing through the present.

### B.      The Defendants Had Knowledge of the Court Orders.

Defendant Batashvili had been served with and was aware of the *SRO* on September 24, 2020. Defendant Asher finally admitted to the Court as part of his contempt hearing that he too

was aware of the *SRO* on September 25, 2020, even though he thereafter intentionally transferred $550,000 out of monies that belonged in receivership and hid them from the Receiver.

Defendants Batashvili and Asher executed the *Consent Order* on October 14, 2020, and have no basis to disclaim knowledge of the *Consent Order*. [Dkt. No. 165].

C.    **The Defendants Knowingly Violated the Court Orders**

The domain name for Portfolio Insider, the Portfolio Insider product itself, and the marketing plan and other general intangibles for Portfolio Insider were acquired or created with investor funds prior to the receivership and are included within the "Receivership Estate" under the definitions of the Court Orders.

The *SRO* defines the "Receivership Estate" as including "all records, and all funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants". *SRO* at ¶30.

The *SRO* defines "assets" as encompassing "any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to…accounts (including, but not limited to, bank accounts and accounts at other financial institutions)….and all funds, wherever located, whether in the United States or outside the United States." *SRO* at ¶ 15.

Indeed, it is well recognized that intellectual property, business concepts, and marketing plans are "general intangibles" that fall within the definition of assets and included in the receivership. *See Matter of Nix,* 864 F.2d 1209 (5th Cir. 1989)(finding that "general intangibles" includes goodwill and intellectual property); *In re Hartman,* 102 B.R. 90 (Bankr. N.D. Tex. 1989)(holding that one-half partnership interest is a "general intangible"); *FTC v. J.K.*

*Publications, Inc.,* No. CV 99-00044 ABC AJW, 2009 WL 997421 (C.D. Cal. Apr. 13, 2009)(holding that intestate interest was included as "general intangible" placed in receivership). In addition, this Court previously found that Retirement Insider is a Receivership Entity subject to the *SRO* and *Consent Orders*. Portfolio Insider is Retirement Insider – they are one and the same, a common enterprise, and Portfolio Insider is subject to the *SRO* and *Consent Orders*, and part of the Receivership Estate. Indeed, because they operated out of the same office, used commingled funds, had common control, and used the same employees, Portfolio Insider, Retirement Insider and Defendants Chase Metals, LLC and Barrick Capital, Inc., as well as Relief Defendant Tower Equity, LLC, are common enterprises[53].

In determining whether several business entities are operating as a common enterprise, courts look to whether the companies "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing," *FTC v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 637 (6th Cir.2014), as well as whether "corporate formalities are observed," and whether the companies conduct business at arm's length, *Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171, 1175 (1st Cir.1973); *see also CFTC v. Wall Street Underground, Inc.,* 281 F.Supp.2d 1260, 1271 (D.Kan.2003) (finding existence of a "common enterprise" for the purposes of the CEA where defendant companies were under common control, did not operate at arm's length, shared a mailing address, commingled funds and one of the defendants advertised exclusively through the other); *FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) ("When determining whether a common enterprise exists, courts look at a variety of factors, including: common control, sharing of office space and officers, whether business is transacted through a 'maze of interrelated companies,' the commingling of corporate funds, unified advertising, and any other evidence

---

[53] App. at p. 160.

revealing that no real distinction existed between the corporate defendants."); *See also CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38–39 (D.D.C. 2015) and *Zale Corp. v. FTC,* 473 F.2d 1317, 1321 (5th Cir. 1973).

By failing to turn over the Portfolio Insider assets to the Receiver and misappropriating the assets that were included within the "Receivership Estate", Defendants Asher and Batashvili violated numerous provisions of the *SRO*, as follows:

1.  The *SRO* expressly restrained Defendants Asher and Batashvili from "withdrawing, transferring, removing, dissipating, or otherwise disposing of assets". *SRO*, at ¶ 19.

2.  The *SRO* expressly required Defendants Asher and Batashvili to "transfer possession of all funds, assets or other property subject to this Order to the Temporary Receiver…" *SRO,* at ¶20.

3.  The *SRO* expressly required Defendants Asher and Batashvili, within five business days following service of the *SRO,* to "[p]rovide the Temporary Receiver access to all records of the Receivership Estate and all assets of the Receivership Estate held by any financial or brokerage institution, business entity, or other person that receives actual notice of this Order by personal service or otherwise, located within or outside the territorial United States by signing any necessary consent forms." *SRO* at ¶32b.

4.  The *SRO* expressly required Defendants Asher and Batashvili to "immediately or within such time as permitted by the Temporary Receiver in writing, deliver over to the Temporary Receiver:  a. Possession and custody of all assets of the

Receivership Estate; owned beneficially or otherwise, wherever situated…" *SRO* at ¶33.

5. The *SRO* expressly restrained Defendants Asher and Batashvili from "[d]oing any act or thing to interfere with the Temporary Receiver taking control, possession, or management of the property subject to the receivership…."

In addition to the numerous violations of the SRO, Defendants Asher and Batashvili violated the Consent Order, as follows:

1. The Consent Order expressly restrained Defendants Asher and Batashvili from "indirectly withdrawing, transferring, removing, dissipating, or otherwise disposing of any of their funds, assets, or other property, wherever located…." Consent Order, ¶23.

2. The Consent Order expressly required Defendants Asher and Batashvili to "transfer possession of all funds, assets or other property subject to this Order to the Receiver in accordance with SRO and this Order."   Consent Order, ¶24.

3. The Consent Order expressly required Defendants Asher and Batashvili to "deliver over to the Receiver….[p]ossession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, of the Receivership Defendants." Consent Order, ¶32.

4. The Consent Order expressly prohibited Defendants Asher and Batashvili from engaging "in any activity related to securities, commodities, or derivatives…." Consent Order, ¶38.

Defendants' numerous violations of the *SRO* and *Consent Order* simply demonstrate that Defendants Asher and Batashvili have no respect for this Court or its authority.

## IV.

## RELIEF REQUESTED

Defendants Asher and Batashvili continue to thumb their nose at this Court and its orders. They are engaging in a consistent pattern of brazenly refusing to comply with the Court's *SRO* and *Consent Order*.

Moreover, in instances where a party fails and refuses to comply with a valid, lawful, clear order, and yet possesses the ability to comply, the Court may impose a coercive sanction such as incarceration to obtain the parties' compliance. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989)("As we have previously stated, civil contempt is appropriate when a party fails to comply with a specific and definite court order," citing *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984)).

Because the assets of Defendants Asher and Batashvili are in receivership, a financial sanction will have no coercive effect and the Defendants will likely continue their disregard of the Court's Orders with nothing to lose.  Indeed, they previously transferred collectively nearly $1 million in the days following issuance of the *SRO* that was required to be turned over to the Receiver, and hid such monies from the Receiver.  They still do not understand the severe consequences of violating this Court's Orders.  Accordingly, Defendants Asher and Batashvili should be incarcerated[54] at the nearest federal detention center until such time as they comply with the *SRO* and *Consent Orders*.

---

[54] Indeed, judges in the Northern District of Texas have often incarcerated persons who refuse to comply with a receivership order.  *See SEC v. Resource Development Int'l;* No. 3:02-CV-0605-R, 2004 WL 2599886, at *2 (N.D. Tex. 2004); and *Harris v. Joslin,* No. 3:02-CV-192-B, 2006 WL 3770506, at *1 (N.D. Tex. 2006).

In order to purge themselves of contempt and comply with the *SRO* and *Consent Orders,* Defendants Asher and Batashvili should be ordered to immediately cease and desist from engaging in any activity related to Portfolio Insider, and within three business days following entry of the Order:

1.    Turn over to the Receiver the Portfolio Insider assets, as "assets" are defined in the Court Orders, including, but not limited to the Portfolio Insider domain name, website, intellectual property, bank accounts, customer lists, personal property, cash, checks, notes, accounts, credits, receivables, contracts, goods, general intangibles, inventory, and all funds wherever located.[55]  To assist the Receiver in gathering such assets from third parties such as financial institutions, the business of Portfolio Insider should be expressly named as part of the Receivership Estate.

2.    Turn over to the Receiver all "records", as defined in the Court Orders, regarding the operations of Portfolio Insider from the inception of the receivership through the present; and

3.    Provide the Receiver with an accounting of all monies received by Portfolio Insider from the inception of the receivership through the present, including, but not limited to, identifying the disbursement of all funds received by Portfolio Insider, and all bank accounts that received monies of Portfolio Insider.

If Defendants Asher and Batashvili fail to timely comply with the Order of the Court they should be ordered to personally appear before the Court so that they may be taken into custody and remanded to the federal detention center closest to the Court.

In addition, due to the established record of Defendants Asher and Batashvili disregarding the Orders of this Court, and considering that the assets at issue in this motion are

---

[55] Indeed, the Court Orders extend to assets that existed as of the date of the receivership, as well as assets acquired after the receivership was put in place.  *SRO, ¶21; Consent Order, ¶25.*

already subject to the restraining orders contained in the *SRO* and the *Consent Order,* the Receiver requests this Court to immediately order that Defendants Asher and Batashvili preserve, and not destroy, all assets and records regarding or relating to Portfolio Insider until the hearing at which the Court may consider this Motion.

## V.

## CONCLUSION

This receivership was established so the Receiver could gather assets for distribution to the elderly investors who are victims of the Defendants.   The contemptuous actions of Defendants Asher and Batashvili are causing significant damages to the Receivership Estate and ultimately the elderly investor victims.   The Defendants' continued blatant disregard of this Court's *SRO* and *Consent Order* must stop.   In order to maintain the integrity of its own Orders, and to ensure that this Court's Orders are not casually disregarded, this Court should order Defendants Asher and Batashvili to appear in person before the Court and show cause as to why they should not be held in civil contempt for violating the Orders.   Moreover, the Receiver requests the Court at such hearing to find Defendants Asher and Batashvili in civil contempt and order that they be incarcerated at the nearest federal detention facility until such time as they fully comply with the Court's Orders.

WHEREFORE, PREMISES CONSIDERED, the Receiver respectfully requests that the Court enter an order scheduling an emergency hearing at which Defendants Lucas Asher and Simon Batashvili are ordered to appear and show just cause why they should not be held in contempt of court for their violation of  the Orders of this Court; that upon such hearing the Court order that Defendants Asher and Batashvili be incarcerated until such time as they comply

with the Court's Orders, and grant such other and further relief, to which the Receiver may be justly entitled.

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**

By:     */s/ Peter Lewis*
        Peter Lewis
        Texas State Bar No.12302100
        Peter.lewis@solidcounsel.com

500 N. Akard Street, Suite 2700
Dallas, Texas 75201
(214) 706-4200 – Telephone
(214) 706-4242 – Telecopier

**ATTORNEY FOR RECEIVER**
**KELLY M. CRAWFORD**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on September 16, 2021, the undersigned attempted to confer by electronic mail and telephone with Arnold Spencer, attorney for Defendants Lucas Asher and Simon Batashvili regarding this Motion and Mr. Spencer has not responded to date. Although Mr. Besen has made only a limited appearance for the Defendants, the undersigned also called Mr. Besen, and copied him on the electronic mail message to Mr. Spencer.  Mr. Besen indicated he was unable to take a position.

*/s/ Peter Lewis*
**PETER LEWIS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 16, 2021, I electronically filed the foregoing document with the clerk of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Peter Lewis*
**PETER LEWIS**