IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, et al. | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 3:20-CV-2910-L |
| TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI, | § § § § § § § | |
| Defendants, | § § | |
| TOWER EQUITY, LLC, | § § | |
| Relief Defendant. | § § | |

### RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR "SHOW CAUSE" HEARING TO HOLD DEFENDANTS LUCAS ASHER AND SIMON BATASHVILI IN CIVIL CONTEMPT

Kelly M. Crawford ("Receiver") respectfully submits this reply to the Defendants' Opposition to Receiver's Motion for Show Cause Hearing to Hold Defendants in Civil Contempt (the "Opposition").

### I.  INTRODUCTION

The Receiver's Emergency Motion for Show Cause Hearing (the "Motion") [Dkt. 311] seeks to hold the individual Defendants Lucas Asher and Simon Batashvili ("Defendants") in contempt for violating this Court's Orders (as defined in the Motion) by, amongst other things, engaging -- through Portfolio Insider ("PI") – in "activity related to securities, commodities, or

derivatives...." *See Consent Order,* ¶38. In the Opposition, Defendants contend they did not violate the Court's Orders because PI is a software company not engaged in any activity related to securities; they don't own PI; and the Motion seeks criminal, rather than civil contempt. The Opposition mischaracterizes the Court's Orders, the evidence submitted by the Receiver and/or the Plaintiffs in support of the Motion, and even the relief sought by the Receiver. And, in making these arguments, the Defendants do not submit an ounce of controverting evidence. Instead, they leave it to their attorney to make "factual allegations" such as:

- "Portfolio Insider does not engage in trading of any securities or commodities and does not provide investment advice." *Opposition ("Opp.")*. *p. 2*.
- "The defendants did not engage in trading or the solicitation of funds relating to the purchase or sale of securities, commodities, or derivatives." *Id.*
- "The company is not in the business of providing investment advice." *Opp. p. 8*.
- "The company does not engage in the trading of securities or commodities." *Id.*

The absence of any declaration from either of the Defendants is a glaring omission. The unadorned conclusions by Defendants' counsel in the Opposition cannot credibly contradict the hundreds of pages of evidence and declarations filed in support of the Motion, and should be wholly disregarded.

## II. DEFENDANTS CLEARLY ENGAGED IN ACTIVITY RELATED TO SECURITIES IN VIOLATION OF THE COURT'S ORDER

The *Consent Order* [Dkt. 165] entered by the Court and agreed to by Defendants expressly provides that "**Defendants Asher and Batashvili agree that they will not engage in any activity related to securities....**" ¶38 (emphasis added). Notwithstanding this Order, no less than six days a week, Defendants continuously engaged in activity related to securities through PI. *See infra pp. 7-8*. As an example, Defendant Asher continually negotiated on behalf of PI with NASDAQ for purposes of obtaining information regarding securities sales to sell to

investors. *Id.* Meanwhile, Defendant Batashvili wrote the scripts used by callers, and supervised the callers who solicited monies from customers to purchase information regarding securities to assist them in buying and selling securities. *Id.* Such activities are, on their face, engaging in an "activity related to securities." Any suggestion to the contrary is baseless.

The Defendants' Opposition opted to ignore this evidence while seeking to characterize PI as simply a computer software company. This false claim is contradicted by the fact that PI is marketed to assist investors purchase and sell securities, with a tag line that PI has "the power of an investment bank in your pocket" with a mission "to democratize access to the world's most valuable financial data."[1] It is a business devoted to securities.

Finally, the Defendants contend they did not violate the Court Orders because there is no evidence they provided "investment advice." This argument ignores the plain words of the Consent Order, which by no means is limited only to providing investment advice, but encompasses "any activity related to securities." Defendants blatantly violated the Consent Order[2], and indeed it is this violation that prompted the Receiver's investigation of the activities of the Defendants and their involvement in PI.

### III.   MISCHARACTERIZING THE COURT'S ORDERS

The *Statutory Restraining Order ("SRO")* [Dkt. 16] defines the "Receivership Estate" much broader than Defendants would have this Court believe, and the evidence in support of the Motion clearly and compellingly demonstrates that PI falls within the scope of the "Receivership Estate" as defined by the *SRO*. The evidence establishes that Defendants Asher and Batashvili

---

[1] App. at pp. 321-323.
[2] This violation of the *Consent Order* by the Defendants exists regardless of whether the Court finds that PI is part of the Receivership Estate.

began PI well before the receivership was in place and, with the help of their friend Carlos Cruz, seamlessly continued the business after the receivership in violation of the Court's Orders.

As part of his Motion, the Receiver requests the Court to expressly name PI as part of the Receivership Estate pursuant to the *SRO*. *See Motion,* p. 24, ¶1. The *SRO* specifically identifies the assets that fall within the definition of the "Receivership Estate". The Defendants argue the Receivership Estate is limited to only "assets owned, beneficially or otherwise, by the Receivership Defendants". Defendants ignore altogether the definition of "Receivership Defendants", which is defined as the *"Defendants and Relief Defendant and their affiliates or subsidiaries **owned or controlled by Defendants** or Relief Defendants".* SRO ¶*30* (emphasis added). In addition, Defendants wholly disregard that the "Receivership Estate" includes *"assets **directly or indirectly** owned, beneficially, or otherwise, by the Receivership Defendants."* Id. Moreover, *"assets"* as used in defining the Receivership Estate means *"any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, **directly or indirectly controlled,** and wherever located, including but not limited to…"* SRO ¶*15* (emphasis added). Thus, the relevant inquiry for the Court is not simply whether the Defendants own PI, but instead is much broader – do the Defendants *directly or indirectly control the business of PI.*

### IV.   MISCHARACTERIZING THE EVIDENCE

Defendants' Opposition not only makes bold denials unsupported by any evidence, but also ignores mountains of evidence that PI was created and existed *before* the receivership and is part of the Receivership Estate under the *SRO*; that the PI business was continued after the receivership in violation of the *SRO*; and that Defendants violated the *SRO* in participating with and controlling PI's business.

A.   **Portfolio Insider was created prior to the receivership.**

Significantly, the uncontroverted evidence shows that PI was created, owned and operated by Defendants *before the receivership*:

1. Defendants changed the name of Retirement Insider (an entity in receivership) to Portfolio Insider in July, 2020 *before the receivership*;[3]

2. Defendants hired a consultant to provide marketing expertise for the Portfolio Insider product *before the receivership*[4];

3. Defendants purchased the domain name for Portfolio Insider *before the receivership*[5];

4. Defendant Asher used a Portfolio Insider email address *before the receivership*[6];

5. Defendants developed content for the Portfolio Insider website *before the receivership*[7];

6. Defendants created the pitches and marketing campaign for Portfolio Insider *before the receivership*[8];

7. Defendant Asher boasted on August 21, 2020, that Portfolio Insider had generated $2,160,000 in annual revenue in the last 60 days (which would have been several months *before the receivership*)[9]; and

8. Defendants secured a data feed of securities sales from Intrinio *before the receivership* that was used by Portfolio Insider[10].

---

[3] App. at p.108; *see also* CFTC Memorandum of Law in Support and Appendix [Dkt. 313] ("CFTC et al.") at Ex. A ¶35, p. 11-12. The Defendants try to convince the Court to ignore the declaration of Jennifer Hacker. Jennifer Hacker was the Marketing Director for Retirement Insider and explained in detail the reason the name of Retirement Insider was changed to Portfolio Insider. She has not received any monies from the Receivership and there is no evidence to suggest her declaration is false or that she lacks credibility
[4] See Appendix in Support of Receiver's Motion for Contempt [Dkt. 312] ("App") at pp. 162, 260-265.
[5] App. at pp. 164, 321-342. The Defendants try to minimize the evidence of the purchase of the domain name as a ministerial act that involved only a few hundred dollars. If that was the case, then why was the domain name still used in the months and year following the receivership?
[6] App. at pp. 267, 271, 274, 276.
[7] App. at pp. 164-165, 324-342.
[8] App. at pp. 278-294; 321-323.
[9] App. at pp. 266-269.
[10] App. at pp. 161, 209-253.

PI was started, owned and operated by the Defendants prior to the receivership. Accordingly, pursuant to the *SRO*, the business of PI and its intellectual property are "assets" that are part of the Receivership Estate as defined by the *SRO*.

B.  **The "Portfolio Insider" after the receivership has been misappropriating the Portfolio Insider business that is subject to the SRO**

Because the business and intellectual property of PI were assets subject to the *SRO* at the time the *SRO* was entered, the Defendants were enjoined from continuing, disposing of, transferring, or using such assets after the receivership. Indeed, the business was required to be turned over to the Receiver pursuant to the *SRO*. But, rather than comply with the *SRO*, the Defendants seamlessly continued the business of PI with the assistance of their associate Carlos Cruz, whose entity MagicStar Arrow received of more than $20 million of investor victim funds prior to the receivership.[11] As noted in the Motion, since Defendants were enjoined from using assets subject to the *SRO* and prohibited from engaging in activities related to securities, Mr. Cruz set up a limited liability company using the name of "Portfolio Insider, LLC". This enabled Mr. Cruz to be identified to the public as the "owner" of the entity so the Defendants could argue as they are now, that they are not running afoul of the Court's Orders. But, a piece of paper forming an LLC, does not erase the origins and misappropriation of the PI business and its intellectual property.[12]

The uncontroverted evidence before the Court shows that *after the receivership* and in violation of the *SRO*, Portfolio Insider misappropriated the PI business and intellectual property.

---

[11] App. at p. 165.
[12] *See Ledford v. Keen*, 9 F.4th 335 (5th Cir. 2021) stating that Texas law permits courts to "disregard the corporate fiction...when the corporate form has been used as part of a basically unfair device to achieve an inequitable result", citing *citing SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008).

1. Portfolio Insider, *after the receivership,* used the intellectual property of PI developed prior to the receivership, including the business model of selling financial information through a digital platform to assist investors.[13];

2. Portfolio Insider, *after the receivership,* used the same marketing taglines for the business developed prior to the receivership[14];

3. Portfolio Insider, *after the receivership,* continued to use data feed from contracts with Intrinio entered into prior to the receivership[15];

4. Portfolio Insider, *after the receivership,* continued to use the domain name acquired prior to the receivership[16];

5. Portfolio Insider, *after the receivership,* continued to use the same website content developed prior to the receivership[17]; and

6. Portfolio Insider, *after the receivership,* employed the same persons who worked for the Defendants prior to the receivership.[18]

The idea that the Portfolio Insider business after the receivership is wholly independent of the PI business started before the receivership is a fiction that defies the evidence. Defendants have been violating the *SRO* by using and misappropriating the PI business that existed prior to the receivership and is subject to the *SRO*.

## C. The Defendants Controlled Portfolio Insider

Defendants' Opposition also mischaracterizes their role as simply dealing with the operational tasks of Portfolio Insider. This argument flies in the face of the substantial evidence of Defendants controlling Portfolio Insider's business after the receivership, as follows:

1. Defendant Lucas Asher hired employees of Portfolio Insider[19];

2. Defendant Simon Batashvili supervised employees of Portfolio Insider[20];

---

[13] App. at pp. 111, 321-323.
[14] App. at pp. 321-323.
[15] App. at pp. 161, 209-253.
[16] App. at pp. 164, 321-342.
[17] App. at pp. 164-165, 324-382.
[18] App. at pp. 111, 163-164.
[19] App. at p 110.

3. Defendant Simon Batashvili created the scripts used by callers hired by Portfolio Insider to solicit customers[21];

4. Defendant Lucas Asher continuously communicated and negotiated with NASDAQ on behalf of Portfolio Insider and with the authority to bind Portfolio Insider[22];

5. Defendant Lucas Asher executed contracts with Intrinio on behalf of Portfolio Insider and with the authority to bind Portfolio Insider[23];

6. Defendant Lucas Asher held himself out to vendors as the person in control of Portfolio Insider.[24]

It is this "control", direct or indirect, of the Portfolio Insider business after the receivership that makes it part of the Receivership Estate under the *SRO*, and that forms the basis for the Receiver's request in his Motion for the Court to expressly name it as part of the Receivership Estate.[25]

## V. MISCHARACTERIZING THE RELIEF SOUGHT BY THE RECEIVER

Defendants spend roughly half of their argument on the unsubstantiated proposition that the contempt proceeding is a criminal proceeding. *Opposition* at pages 13–16. The Court need only look at the coercive relief requested by Receiver to see that the proceeding is civil. Contrary to the Defendants' assertions, Defendants "carry the keys" to purge their contempt, and a show cause hearing provides the appropriate due process.

Defendants admit that civil contempt based on continued defiance "justifies holding civil contempt proceedings absent the safeguards' of criminal due process." *See Opposition* at p. 14 (citing, *inter alia, Topletz* v. *Skinner,* 7 F.4th 284, 295-96 (5th Cir. 2021). They further admit

---

[20] App. at pp. 110-112.
[21] Id.
[22] App. at pp. 114-157.
[23] App. at pp. 230-253.
[24] App. at pp. 110-112; CFTC App. at Ex. A, ¶44, pp. 13-14.
[25] *See SRO definition of Receivership Defendants as "Defendants and Relief Defendant and their affiliates or subsidiaries owned **or controlled by Defendants** or Relief Defendants". ¶30 (emphasis added).*

that whether a contempt proceeding is criminal or civil "depends upon the ability of the contemnor to comply with the court's order." *See* Opposition at p. 14 (citations omitted). The "oft-repeated aphorism" that "civil contemnors must 'carry the keys of their prison in their own pockets'" is not in dispute. *See* Opposition, at p. 14 (citing, *inter alia, Topletz,* 7 F.4th at 296). However, Defendant's claim that they "simply cannot comply," is not true.

Defendants can comply. To purge the contempt, Defendants can take the actions described at pages 24 and 25 of the Motion. They have control of Portfolio Insider and its "assets" and "records," as defined in the *SRO*. Even if a third party currently possesses some or all of the "assets" and "records" requested, civil contempt properly prevents Defendants from evading discovery simply by storing records with a third party. *See Topletz,* at 297.

Inability to comply does not make a contempt proceeding criminal. *See, e.g., M.D. bnf Stukenberg v. Abbot*, 509 F. Supp. 3d 683, 704 (S.D. Tex. 2020) (naming inability to comply as a defense and imposing civil contempt despite defenses to some of the allegations). Defendants have the burden of establishing they cannot comply as a defense to civil contempt. *F.D.I.C. v. LeGrand,* 43 F.3d 163, 170 (5th Cir. 1995) (affirming civil contempt aspects of order and vacating portions of criminal provisions). Thus, because Defendants "carry the keys" to any escape from any civilly imposed incarceration, the relief requested by the Receiver is wholly appropriate, and civil in nature.

"Due process requires 'that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses.'" *M.D. bnf Stukenberg,* 509 F. Supp. 3d at, 704 (citation omitted). "Adequate notice typically takes the form of a show-cause order and a notice of hearing . . ." *M.D. bnf Stukenberg,* at 704–05. All

of these due process protections exist for these Defendants, and the due process cases cited by Defendants are not applicable. Moreover, this case does not fall within the discrete category of cases where civil protections "may" be insufficient. *See Bagwell Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 585-86 *and n. 20* (5th Cir. 2000)(holding show cause hearing was the appropriate due process in a factually complex case); *see also M.D. bnf Stukenberg,* at 703 (show cause hearing satisfied due process in factually complex case).

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**

By: */s/ Peter Lewis*
Peter Lewis
Texas State Bar No.12302100
Peter.lewis@solidcounsel.com

500 N. Akard Street, Suite 2700
Dallas, Texas 75201
(214) 706-4200 – Telephone
(214) 706-4242 – Telecopier

**ATTORNEY FOR RECEIVER
KELLY M. CRAWFORD**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 21, 2021, I electronically filed the foregoing document with the clerk of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Peter Lewis*
**PETER LEWIS**