1  Daniel B. Spitzer - CA State Bar No. 121752
   16311 Ventura Boulevard, Suite 1200
2  Encino, California 91436-2152
   Telephone: 818-990-9700
3  Facsimile: 818-990-9705
   Email: dspitzer@spitzeresq.com
4
   Creditor Appearing In Pro Per
5

6

7                    **UNITED STATES DISTRICT COURT**

8                    **NORTHERN DISTRICT OF TEXAS**

9
   COMMODITY   FUTURES   TRADING )    Case No. 3:20-cv-02910-E
10 COMMISSION, et al.                )
                                     )    **MOTION   TO   DISMISS   UNDER**
11          Plaintiffs,              )    **F.R.C.P. RULE 12(b)(1) AND 12(h)(3);**
                                     )    **DECLARATIONS   OF   DANIEL   B.**
12 v.                                )    **SPITZER AND LUCAS ASHER**
                                     )
13 TMTE, INC., etc., et al.          )    *[No Hearing Scheduled or, If Required, to*
                                     )    *be Set by the Clerk of the Court]*
14                                   )
            Defendants.              )
15                                   )
                                     )
16                                   )
                                     )
17                                   )
                                     )
18 \\\
19 \\\
20 \\\
21 \\\
22 \\\
23 \\\
24 \\\
25 \\\
26 \\\
27
28 _____
   MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

**TABLE OF CONTENTS**

MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I. STATEMENT OF MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A. A Challenge to Subject Matter Jurisdiction May be Brought at Any Time . . . . 8

        B. This Court Lacks Subject Matter Jurisdiction Under the Commodities Exchange

            Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1. No Subject Matter Jurisdiction Arises Under 7 USC §2(c) Because of the

                Actual Delivery Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2. No "Independent" Basis for Subject Matter Jurisdiction is Stated Under 7

                USC §9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C. Federal Subject matter Jurisdiction *Cannot* Arise under 17 CFT §180.1 Because

            It Exceeds the Scope of Rulemaking Allowable Under the CEA. . . . . . . 17

        D. If the CFTC's Claims Under the Commodities Exchange Act are Dismissed, This

            Court May Not Exercise Supplemental Jurisdiction under 28 U.S.C. §1367

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DECLARATION OF DANIEL B. SPITZER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

DECLARATION OF LUCAS ASHER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

**TABLE OF AUTHORITIES**

**FEDERAL STATUTES**:

124 Stat. 1376 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 17

28 U.S.C. §1345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

28 U.S.C. §1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 21

28 U.S.C. §1915 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

40 U.S.C. §3133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7 U.S.C. §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7 U.S.C. §13a-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7 U.S.C. §2(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13-16, 18, 20

7 U.S.C. §9(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 15, 16, 18, 20

**FEDERAL RULES**:

17 C.F.R. §180.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 13, 14, 17, 18

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

1   Federal Rule of Civil Procedure, Rule 12(b)(1) .................................. 7, 8, 21, 22

3   Federal Rules of Civil Procedure, Rule 12(h)(3) ............................... 7, 22

5   **<u>FEDERAL CASES</u>:**

6   <u>Alabama Assn. of Realtors v. Department of Health and Human Servs.</u> (2021) 594 U. S. ——, 141

7   S.Ct. 2485 ............................................................................... 19

9   <u>Arena v. Graybar Elec. Co., Inc.</u> (5th Cir. 2012) 669 F.3d 214 ........................ 8, 21

11   <u>CFTC v. Zelener</u> (7th Cir. 2004) 373 F.3d 861 ........................................ 9

13   <u>Cochise Consultancy, Inc. v. United States ex rel. Hunt</u> (2019) – U.S. –, 203 L.Ed.2d 791, 139 S.Ct.

14   1507. ......................................................................... 14, 20

16   <u>Commodity Futures Trading Commission v. McDonnell</u> (USDC EDNY 2018) 321 F. Supp. 3d 36

17   ...................................................................................... 617

19   <u>Dataflux v. Atlas Global Group, L.P.</u>, 541 U.S. 567 ................................... 8

21   <u>Davis v. Michigan Dept. of Treasury</u> (1989) 489 U.S. 803 ............................ 14

23   <u>Duncan v. Walker</u> (2001) 533 U.S. 167 .............................................. 16

25   <u>FDA v. Brown & Williamson Tobacco Corp.</u> (2000) 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d

26   121................................................................................... 19

Gonzales v. Oregon (2006) 546 U.S. 243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Howery v. Allstate Ins. Co. (5th Cir. 2001) 243 F.3d 912 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kontrick v. Ryan (2004) 540 U.S. 443 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lomax v. Ortiz-Marquez (2020) – U.S. – , 207 L.Ed.2d 132, 140 S.Ct. 1721 . . . . . . . . . . . 14, 20

Menchaca v. Chrysler Credit Corp. (5th Cir. 1980) 613 F.2d 507 . . . . . . . . . . . . . . . . . . . . . 8

Morris v. U.S. Dept. of Justice (S.D.Tex.1982) 540 F.Supp. 898, 900, *affirmed,* 696 F.2d 994 (5th Cir.1983), *cert. denied,* 460 U.S. 1093 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Musson Theatrical, Inc. v. Federal Exp. Corp. (6th Cir. 1996) 89 F.3d 1244 . . . . . . . . . . . . . 21

Powerex Corp. v. Reliant Energy Services, Inc. (2007) 551 U.S. 224 . . . . . . . . . . . . . . . . . . . 20

Scott v. Pasadena Unified School District (9th Cir. 2002) 306 F.3d 646 . . . . . . . . . . . . . . . . . 21

U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities, LLC (11th Cir. 2014) 749 F.3d 967 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

U.S. Commodity Futures Trading Commission v. Monex Credit Company (9th Cir. 2019) 931 F.3d 966 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12

United Mine Workers of America v. Gibbs (1966) 383 U.S. 715 . . . . . . . . . . . . . . . . . . . . . . . 21

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

1    United States v. Menasche (1955) 348 U.S. 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2

3    West Virginia v. Environmental Protection Agency (2022) 213 L.Ed.2d 896 [142 S.Ct. 2587]

4    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 20

5

6    Williams v. Taylor (2000) 529 U.S. 362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

7

8    Yates v. U.S. (2015) 574 U.S. 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9

10   **OTHER AUTHORITIES**

11

12   A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) . . . . . . . . . 14, 16

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

**MOTION TO DISMISS**

TO THE HONORABLE BRANTLEY STARR, U.S. DISTRICT JUDGE, THE PARTIES HERETO AND COUNSEL OF RECORD:

Creditor Daniel B. Spitzer ("**Spitzer**") respectfully moves this Court to dismiss this action in its entirety on the grounds stated in Federal Rules of Civil Procedure ("**FRCP**"), Rule 12(b)(1) and 12(h)(3).

Spitzer further moves this Court to refrain from exercising ancillary jurisdiction under 28 U.S.C. §1367 and dismissing those claims, as well.

**I. STATEMENT OF MATERIAL FACTS**

On September 22, 2020, the Commodities Futures Trading Commission ("**CFTC**") and various agencies and attorneys general of 29 different states ("**State Plaintiffs**")[1] commenced this action with the filing, under seal, of their Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("**Complaint**") [Docket No. 1].

In their Complaint, at ¶16, plaintiffs allege that this Court has subject matter jurisdiction under 28 U.S.C. §1331 (2018) (federal question) and 28 U.S.C. §1345 (2018) (United States or its agencies as plaintiff). As to the State claims, the Complaint alleges that the Court has supplemental jurisdiction under 28 U.S.C. §1367(a) (2018).

At Complaint ¶14, plaintiffs allege that the defendants have committed violations of the anti-fraud provisions of the Commodity Exchange Act ("**CEA**"), 7 U.S.C. §9(1) (2018)[2] and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. §180.1(a)(1)-(3) (2019), and have furthermore violated "the laws of the States." *The only federal question alleged is as to the violations under the CEA.*

_____

[1] Alabama, Alaska, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia and Wisconsin.

[2] All statutory references herein, unless noted otherwise, pertain to the CEA.

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

1    The essence of plaintiffs' claims is that defendants "targeted a vulnerable population of

2    mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion to open

3    SDIRAs [self-directed individual retirement accounts] to purchase Precious Metals Bullion."

4    Complaint, ¶31. Plaintiffs allege that the defendants engaged in a variety of high-pressure sales

5    tactics and misleading advertisements and solicitations. Complaint ¶¶32-42. Plaintiffs further allege

6    that the defendants sold the Precious Metal Bullion at "fraudulently inflated prices over the

7    Prevailing Market Price." Complaint ¶43.

8    The plaintiffs' claims hinge on whether federal jurisdiction may be imposed by the

9    presentation of a federal question under 28 U.S.C. §1331. As set forth below, these claims are barred

10    because the retail sales of precious metals products involved in this case are subject to the "actual

11    delivery" exception for sales which result in actual delivery of the product within 28 days.

12    Based on the lack of subject matter jurisdiction, creditor Spitzer now moves to dismiss this

13    case on the basis of F.R.C.P. Rule 12(b)(1). Spitzer argues further that the Court may not exercise

14    ancillary jurisdiction under 28 U.S.C. §1367(a) and the action, in its entirety, must be dismissed.

15    ## II. ARGUMENT

16    **A. A Challenge to Subject Matter Jurisdiction May be Brought at Any Time**. The

17    defense of a lack of subject matter jurisdiction may not be waived and a challenge based on lack of

18    subject matter jurisdiction may be brought at any point in the litigation. Menchaca v. Chrysler Credit

19    Corp. (5th Cir. 1980) 613 F.2d 507, 511 ("It is axiomatic that a district court may inquire into the

20    basis of its subject matter jurisdiction at any stage of the proceedings."). "A litigant generally may

21    raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially

22    at the highest appellate instance." Kontrick v. Ryan (2004) 540 U.S. 443, 455; *accord,* Grupo

23    Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 576.

24    This motion to dismiss for lack of subject matter jurisdiction is therefore timely. Indeed, it

25    has been held that "[f]ederal courts must address jurisdictional questions whenever they are raised

26    and must consider jurisdiction *sua sponte* if not raised by the parties." Arena v. Graybar Elec. Co.,

27

28

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

1 │ Inc. (5th Cir. 2012) 669 F.3d 214, 223–24, quoting Howery v. Allstate Ins. Co. (5th Cir. 2001) 243

2 │ F.3d 912, 919.

3 │ Since the issue of a lack of subject matter jurisdiction has been duly raised by this motion,

4 │ if the CFTC contends that the contracts for sale of commodities alleged in its complaint are ***not***

5 │ within the Actual Delivery Exception of 7 USC §2(c)(2)(D)(ii)(III)(aa) (as set forth more fully

6 │ below), then it is incumbent on this Court to conduct an evidentiary hearing "to satisfy itself as to

7 │ the existence of its power to hear the case." Morris v. U.S. Dept. of Justice (S.D.Tex.1982) 540

8 │ F.Supp. 898, 900, *affirmed,* 696 F.2d 994 (5th Cir.1983), *cert. denied,* 460 U.S. 1093 (1983).

9 │ **B. This Court Lacks Subject Matter Jurisdiction Under the Commodities Exchange**

10 │ **Act.** From the outset of this litigation, the plaintiffs have contended that the CEA, 7 USC §1 et seq.,

11 │ applies to this case. Spitzer respectfully submits, however, that the transactions involved in this case

12 │ involve an exception to coverage by the CEA, the Actual Delivery Exception, since the retail

13 │ contracts of sale involved herein result in "actual delivery within 28 days..." 7 USC

14 │ §2(c)(2)(D)(ii)(III)(aa).

15 │ Prior to 2010, the CEA did not apply to retail commodity transactions because they were not

16 │ "futures contracts." CFTC v. Zelener (7th Cir. 2004) 373 F.3d 861, 866-67.

17 │ The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203

18 │ §742, 124 Stat. 1376 (2010) ("**Dodd-Frank**"), was designed, in part, to expand the enforcement

19 │ authority of the CFTC. U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities,

20 │ LLC (11th Cir. 2014) 749 F.3d 967, 970. Among the provisions added by Dodd-Frank was 7 U.S.C.

21 │ §2(c)(2)(D), which expanded the scope of the CFTC's enforcement powers to "retail commodity

22 │ transactions," but carved out an exception for transactions that resulted in "actual delivery" within

23 │ 28 days.[3] Id.; see also U.S. Commodity Futures Trading Commission v. Monex Credit Company (9th

25 │ [3] The Actual Delivery Exception is set out at 7 USC §2(c)(2)(D)(ii), which provides:

26 │ (ii) Exceptions

27 │ This subparagraph shall not apply to--

1   Cir. 2019) 931 F.3d 966, 973 (hereinafter "**Monex**"). Based on the plain definitional language of 7

2   U.S.C. §2(c)(2)(D), it is clear that a "contract of sale" of a commodity, as used in the CEA **does not**

3   **include** a retail sale resulting in actual delivery within 28 days.

4        Only two Circuit Court cases have considered the Actual Delivery Exception: CFTC vs.

5   Hunter Wise Commodities LLC (11th Cir. 2014) 749 F.3d 967 (hereinafter "**Hunter Wise**") and

6   Monex. Both of these cases are clearly distinguishable on their facts; and to the extent that they rely

7   on regulations promulgated under the CEA to establish federal question jurisdiction, both of them

8   may have been decided wrongly, in light of the U.S. Supreme Court's recent decision in West

9   Virginia v. Environmental Protection Agency (2022) 213 L.Ed.2d 896 [142 S.Ct. 2587] (hereinafter

10   "**EPA**").[4]

11        Hunter Wise and Monex are significant for their underlying facts and the clear distinction

12   to be made from the facts involved in this case. Hunter Wise involved a brokerage firm which

13   bought and sold precious metals, which it then marketed to retail customers through a network of

14   dealers. The brokerage did not maintain a physical inventory of its customers' metals; instead it

15   "managed its risk exposure from customers' trading positions … by trading derivatives in its own

16   margin trading accounts with precious metals trading companies." Hunter Wise, 749 F.3d at 971.

17   The Eleventh Circuit highlighted the District Court's finding that the brokerage did not actually

18   possess or control a physical inventory of metals from which it could deliver its products to retail

19   

---

20             \*   \*   \*   \*

         (III) ***a contract of sale that—***

21                (aa) ***results in actual delivery within 28 days*** or such other longer

22   period as the Commission may determine by rule or regulation based upon the
typical commercial practice in cash or spot markets for the commodity involved;

23   …

(Emphasis added.)

24   

25       [4] See section II.C. below. The CFTC's allegations, at Complaint, ¶¶14 and 16, attempt to

26   bootstrap subject matter jurisdiction based on 17 CFR §180.1(a)(1)-(a)(3), a federal regulation.
If, as argued below, that very regulation is in excess of the statutory grant of jurisdiction under

27   the CEA, then it cannot independently support federal subject matter jurisdiction.

28

customers; instead, it maintained its own margin accounts with the precious metals' suppliers, subject to margin calls in the same way that the brokerage's customers were subject to margin calls by the brokerage. Id., at 980. The Court of Appeal ultimately rejected the brokerage's argument, finding that the brokerage's transactions were akin to "book entries" which would not satisfy the requirements of the Actual Delivery Exception.

Similarly, Monex involved claims by the CFTC challenging Monex's "Atlas Program," which allowed consumers to purchase commodities on margin. Under that program, Monex retained control over the precious metals themselves and had sole discretion to liquidate a customer's trading position if the equity dropped too low. Monex, 931 F.3d at 970. The CFTC alleged that the Atlas Program constituted an illegal and unregistered leveraged retail commodity transaction market, in violation of CEA provisions. Id., at 971.

In Monex, the District Court had dismissed the CFTC's claim for lack of subject matter jurisdiction, predicated on the Actual Delivery Exception. The Court of Appeal reversed, finding that because "actual delivery" of the precious metals had *not* been made to the customer, the exception did not apply. The Court of Appeal first considered the definition of "actual delivery":

> The statute does not define "actual delivery," and undefined terms receive their ordinary meaning. … "Delivery" means "[t]he formal act of voluntarily transferring something; esp. the act of bringing goods, letters, etc. to a particular person or place." Black's Law Dictionary (9th ed. 2009). Black's defines "actual" as "[e]xisting in fact; real." *Id*. "Actual delivery" is the "act of giving real and immediate possession to the buyer or the buyer's agent." *Id*. By contrast, "constructive delivery" denotes "[a]n act that amounts to transfer of title by operation of law when actual transfer is impractical or impossible." *Id*

Monex, 931 F.3d at 974. Because the customer never assumed control over the metals, which remained in the possession and under the control of Monex, the Ninth Circuit held that "actual delivery" had *not* been effected and the alleged transactions were therefore not exempt from CEA coverage:

\\\

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

Thus, the plain language tells us that actual delivery requires at least some meaningful degree of possession or control by the customer. ***It is possible for this exception to be satisfied when the commodity sits in a third-party depository, but not when, as here, metals are in the broker's chosen depository, never exchange hands, and are subject to the broker's exclusive control, and customers have no substantial, non-contingent interests.***

Monex, 931 F.3d at 974 (emphasis added).

The contrast between the factual underpinnings of these two leading cases and the case before this Court could not be more stark. In this case, the plaintiffs' allegations clearly indicate that the "fraudulent scheme" alleged as against the defendants involved ***retail sales*** activity alone: "From at least September 1, 2017 through the present … Defendants … have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into ***purchasing*** gold and silver bullion …" Complaint, ¶1 (emphasis added); see also ¶¶4, 5, 8, 10, 11, *passim*. The CFTC Complaint does not allege that an investment was made in any fund, or margin account, or in collateral controlled by any of the defendants; these were outright sales.[5] Furthermore, "actual delivery" was made to the customers, either directly or by deposit of those metals into a precious metals' depository. Declaration of Daniel B. Spitzer ("**Spitzer**"), ¶¶6-7, 9. Once the purchases were made, the precious metals were transferred and the customers alone had the exclusive rights to possession and control over the precious metals. None of the defendants had any control over the precious metals products, could not transfer them, move them, possess them, sell them or dispose of them in any way. Spitzer, ¶¶6-7.

According to the allegations of the Complaint, customers were "deceived" into purchasing the precious metals with cash, in Cash Accounts, or by transferring retirement funds to self-directed individual retirement accounts ("**SDIRAs**"), which could then be used for the purchase of the

---

[5] See Spitzer, ¶9 and Exhibits C and D thereto. The CFTC's complaint refers only to sales. There is no allegation that any purchased goods were not actually delivered. The CFTC's allegations all pertain to alleged fraudulent inducements and overcharging in connection with retail sales of the precious metals products.

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

precious metals products. Complaint, ¶¶5-6. Once the purchases were made, the precious metals products were actually delivered, either to the customer or a depository over which the customer had exclusive dominion, within 28 days after the order was placed.

The standard-form contract used by TMTE, Inc. formerly known as Chase Metals ("**CM**") in connection with its sales of precious metals products provides in relevant part:

> CM shall deliver the Precious Metals specified in Customer's order to a suitable delivery service for delivery to Customer *no more than twenty-eight days* after CM verifies that the Purchase Funds provided are backed by good funds. …

(Emphasis added). Spitzer was informed that those who purchased precious metals products either took physical possession of those products, or stored them in a depository, well within 28 days after placing the customer orders. Declaration of Lucas Asher ("**Asher**"), ¶3; Spitzer, ¶6-7 and **Exhibit A** thereto. The fact that these customers had physical control over these products, either directly or through their control of the depository accounts – which is undisputed – and were able to sell, trade or otherwise dispose of them establishes "actual delivery." This entire lawsuit appears to be founded on a misapprehension of the scope of the CEA's enforcement powers and of the retail sales of precious metals products made by defendants.

In response to an early draft of this motion which was circulated to all counsel, CFTC's counsel responded that it believed subject matter under the CEA is proper:

> Plaintiffs oppose your motion. Section 6(c) of the Commodity Exchange Act (CEA) and CFTC Regulation 180.1 provide anti-fraud enforcement authority over deceptive conduct in connection with contracts of sale of a commodity in interstate commerce, independent of Section 2(c) of the CEA.

This statement requires a bit of unpacking in light of the other allegations of the Complaint. The CFTC is arguing that jurisdiction is proper based on (a) section 2(c) of the CEA (7 USC §2(c)); (b) section 6(c)(1) of the CEA (7 USC §9(1)); and (c) CFTC Regulation 180.1(a)(1)-(a)(3), 17 CFR

§180.1(a)(1)-(a)(3).[6]

**I. No Subject Matter Jurisdiction Arises Under 7 USC §2(c) Because of the Actual Delivery Exception.** The CFTC's position cannot be sustained. As to the first claimed basis of subject matter jurisdiction, Section 2(c) of the CEA does not prohibit fraud in *all* "contracts of sale of a commodity in interstate commerce." Instead, Section 2(c) prohibits fraud in a number of "Prohibited Transactions" subject to its provisions, including price manipulation in a commodity transaction (7 USC §§2(c)(a)(1) and (2)); prohibited contracts for sale of commodities, options or swaps involving federal employees, Members of Congress or judicial officers and employees (7 USC §§2(c)(a)(3)); illegal use by federal employees, Members of Congress or judicial officers and employees of nonpublic information in sales of commodities, options and swaps (7 USC §§2(c)(a)(4)); disruptive practices such as "spoofing" designed to manipulate market prices (7 USC §§2(c)(a)(5)); and use of swap transactions to defraud any third party (7 USC §§2(c)(a)(7)). None of these Prohibited Transactions has any application to what is in evidence before this Court: straightforward retail sales of precious metals products which are delivered within 28 days and therefore exempt from coverage under the Actual Delivery Exception.

Section 2, and more specifically its definition of "contract of sale," must not be read in isolation, but in the context of the entire CEA. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Michigan Dept. of Treasury (1989) 489 U.S. 803, 809; *accord*, Lomax v. Ortiz-Marquez (2020) – U.S. – . 207 L.Ed.2d 132, 140 S.Ct. 1721, 1724– 1725 (construing Prison Litigation Reform Act of 1995, 28 U.S.C. §1915(g)); Cochise Consultancy, Inc. v. United States ex rel. Hunt (2019) – U.S. – . 203 L.Ed.2d 791, 139 S.Ct. 1507, 1512 ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning. … We therefore avoid interpretations that would 'attribute different meanings to the same phrase.'"); *see also* A. Scalia &

---

[6]See Complaint ¶¶14 and 16. The third basis on which CFTC claim subject matter jurisdiction, under the CFTC's own rules, is treated below in section II(C) of this brief.

B. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73, 180 (2012) (there is "no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously").[7] Section 2 of the CEA, entitled "Jurisdiction," establishes the jurisdictional bases on which subject matter jurisdiction rests, in that it defines the scope of the CFTC's authority to act. There simply is no logical currency to the CFTC's stated position that one definition of "contract of sale" should obtain in Section 2, and a wholly different definition of "contract of sale" pertains to Section 9. The Actual Delivery Exception delimits the baseline jurisdiction of the CFTC by excluding retail sales resulting in 28 days from coverage by the CEA. It is illogical, and flies in the face of this well-established canon, for the CFTC to argue that a separate basis for federal question jurisdiction exists in the same statute based on a different definition of the same statutory term. Yet that is precisely what the CFTC argues in its second claim to subject matter jurisdiction.

### 2. No "Independent" Basis for Subject Matter Jurisdiction is Stated Under 7 USC §9.

Under 7 USC §2(c)(2)(D)(ii)(III)(aa), the jurisdiction of the CFTC extends to *all* retail sales of commodities – except for a "contract of sale" of commodities which results in actual delivery within 28 days, over which the CFTC has no jurisdiction. Notwithstanding the plain, clear language of 7 USC §2(c)(2)(D)(ii)(III)(aa), the CFTC argues in this case[8] that 7 USC §9(1) provides an *independent* basis for subject matter jurisdiction, because, according to the CFTC, the term "contract of sale" as used in 7 USC §9 means something different than it does in 7 USC §2(c)(2)(D)(ii)(III)(aa). Section 9(1) entitled "Prohibition against manipulation," provides:

---

[7] The interpretive principle that the same words have the same meaning has long been established in the context of Biblical hermeneutics. One of the thirteen principles of exegesis enunciated in the Jewish Talmud is *gezera shava* (literally, "equivalency" or "equal category"), in which the language of an obscure passage may be explicated by comparison to identical language appearing in another passage or context. This hermeneutic device was well known to St. Paul. See, e.g., Galatians 3:10-14 (where the meaning of deliverance from the divine "curse of the law" is explained with language drawn from Deuteronomy 21:23 and 27:26).

[8] See comments of Christine Ryall in response to an earlier draft of this motion which was circulated among all counsel. Spitzer, ¶10.

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a ***contract of sale of any commodity*** in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

(Emphasis added.) The CFTC's argument can thus be framed as follows. In spite of the fact that, under 7 USC §2(c)(2)(D)(ii)(III)(aa), the CFTC has no jurisdiction over retail contracts of sale which fall into the Actual Delivery Exception, the CFTC still has independent jurisdiction to proceed – or so *its* argument goes – as to ***any*** contract for the sale of commodities, even if it falls within the Actual Delivery Exception, if such "contract of sale of any commodity" entails the use of any "manipulative or deceptive device or contrivance …"

There is absolutely nothing in Section 6 of the CEA (7 USC §9) to support the CFTC's claim that its provisions are ***not*** subject to the Actual Delivery Exemption and, indeed, are broader than the grant – and exclusion – of jurisdictional authority under Section 2(c). The CFTC's position cannot be sustained because it renders the definition of the Actual Delivery Exception in Section 2(c) a nullity. "It is our duty 'to give effect, if possible, to every clause and word of a statute.' " United States v. Menasche (1955) 348 U.S. 528, 538–39 (internal citation omitted); see also Williams v. Taylor (2000) 529 U.S. 362, 404 (labeling this canon against surplusage "a cardinal principle of statutory construction"). The CFTC's argument that the definition of the Actual Delivery Exception in Section 2(c) does not apply to the provisions of Section 9 makes no sense, and renders the provisions of 7 USC §2(c)(2)(D)(ii)(III)(aa) superfluous. "[T]he canon against superfluity assists only where a competing interpretation gives effect " 'to every clause and word of a statute.'" Duncan v. Walker (2001) 533 U.S. 167, 174 (internal citation omitted); see also Scalia and Garner, *Reading*

*Law,* supra at 180 ("[I]t is invariably true that intelligent drafters do not contradict themselves."). Here, the task of harmonizing the meaning of the same words in different sections of the same statute is easy. The interpretation which will give full effect to both statutes is to apply the Actual Delivery Exception to *all* retail "contracts of sale" of a commodity, including the contracts and sales at issue in this case. Under this definition and analysis, as dictated by both logic and common sense, this case should never have been brought by the CFTC in the first place.

In short – the provisions of the CEA cannot be used as a jurisdictional anchor to establish federal question jurisdiction under 28 U.S.C. §1331, because the transactions at issue in this litigation are all within the Actual Delivery Exception. By definition, the retail sales of the precious metals products at issue herein are expressly *excluded* from coverage under the CEA; therefore the CFTC's claims for violation of the CEA do not "arise under" any laws of the United States and must be dismissed. There is not – and never was – federal subject matter jurisdiction over the claims asserted in this lawsuit.[9]

**C. Federal Subject matter Jurisdiction *Cannot* Arise under 17 CFT §180.1 Because It Exceeds the Scope of Rulemaking Allowable Under the CEA.** Finally, there is the CFTC's claim that subject matter jurisdiction exists predicated on CFTC Regulation 180.1. In their Complaint, at ¶16, Plaintiffs contend that this Court has subject matter jurisdiction over their claims based on federal-question jurisdiction:

> 16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA *or any rule, regulation, or order thereunder.*

---

[9] *But cf.* Commodity Futures Trading Commission v. McDonnell (USDC EDNY 2018) 321 F. Supp. 3d 366.

(Emphasis added.) It is clear that the CFTC and its co-plaintiffs predicate their claim to federal subject matter jurisdiction, at least in part, on the effect of the regulations promulgated thereunder.

The argument against subject matter jurisdiction is simply stated. As above, the claim to subject matter jurisdiction based on the CEA must fail because of the Actual Delivery Exception enacted in 2010 as part of the Dodd-Frank legislation. If subject matter jurisdiction does not exist under the CEA, then any rule promulgated thereunder must also fail as a jurisdictional anchor.

As part of their claim to subject matter jurisdiction based on a federal question, plaintiffs allege, at Complaint, ¶14, that "Defendants have engaged, are engaging, and/or are about to engage in violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and ***CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019)***, …". (Emphasis supplied.) In response to an earlier draft of this motion, the CFTC's counsel contended that "Section 6(c) of the Commodity Exchange Act (CEA) ***and CFTC Regulation 180.1*** provide anti-fraud enforcement authority over deceptive conduct in connection with contracts of sale of a commodity in interstate commerce, independent of Section 2(c) of the CEA." (Emphasis added.) To the extent the CFTC's claim to subject matter jurisdiction is premised on the rationale that Regulation 180.1 expands the jurisdiction of the CFTC beyond the statutory grant of authority, it must be rejected.

Sections 180.1(a)(1)-(3) of the CFTC's rules (17 CFR §180.1(a)(1)-(3)) provide:

> (a) ***It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce***, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; …

(Emphasis added). As set forth above, the scope of the CEA's jurisdiction for enforcement of its

1  provisions is limited by the application of the Actual Delivery Exception. To the extent that this

2  regulation purports to extend the CFTC's jurisdiction to cover *every* retail contract for sale of a

3  commodity – including those sales within the Actual Delivery Exception – it goes too far.

4       The U.S. Supreme Court recently considered regulations promulgated by the Environmental

5  Protection Agency in furtherance of its statutory mandate to find the "best system of emission

6  reduction," (EPA, 142 S.Ct. at 2599). In finding those regulations constitutionally wanting, the U.S.

7  Supreme Court considered a number of prior agency cases where the rules promulgated pursuant to

8  statute had been found overly expansive and in excess of the scope of the enabling legislation. EPA,

9  142 S.Ct. at 2608. See, among others, FDA v. Brown & Williamson Tobacco Corp. (2000) 529 U.S.

10  120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (enabling legislation granting agency power to regulate

11  "drugs" and "devices" did not give power to regulate or ban tobacco productions); Alabama Assn.

12  of Realtors v. Department of Health and Human Servs. (2021) 594 U. S. ——, 141 S.Ct. 2485, 2487,

13  210 L.Ed.2d 856 (Centers for Disease Control could not use authority to adopt measures "necessary

14  to prevent ... the spread of disease" to enact nationwide eviction ban during Covid-19 pandemic);

15  and Gonzales v. Oregon (2006) 546 U.S. 243, 126 S.Ct. 904, 163 L.Ed.2d 748 (attorney general

16  could not use statutory power to revoke license of physician he found to be "inconsistent with public

17  interest," where alleged offensive conduct was physician's prescribing of controlled substance for

18  assisted suicide, which was legal in Oregon). With language particularly apt to the facts before this

19  Court, the Supreme Court concluded,

20       Agencies have only those powers given to them by Congress, and "enabling

21  legislation" is generally not an "open book to which the agency [may] add pages and
     change the plot line." ... We presume that "Congress intends to make major policy

22  decisions itself, not leave those decisions to agencies." ...

23       Thus, in certain extraordinary cases, both separation of powers principles and

24  a practical understanding of legislative intent make us "reluctant to read into
     ambiguous statutory text" the delegation claimed to be lurking there. ... To convince

25  us otherwise, something more than a merely plausible textual basis for the agency

26  action is necessary. The agency instead must point to "clear congressional
     authorization" for the power it claims. ...

27

28

1  EPA, 142 S.Ct. at 2609 (citations omitted).

2        Here, that "clear congressional authorization" is nowhere to be found. To the contrary: the

3  CFTC's jurisdiction, spelled out in Section 2(c) of the CEA, and as augmented by Dodd-Frank, was

4  expanded to encompass retail commodity sales – subject to the Actual Delivery Exception. The

5  CFTC's twisted logic – asserting the existence of a purported analytical distinction between the use

6  of the same language in Section 2(c) and Section 9(1) and thus making application of the Actual

7  Delivery Exception **inapplicable** to the latter – cannot withstand scrutiny. This perverse logic also

8  violates the "standard principle of statutory construction … that identical words and phrases within

9  the same statute should normally be given the same meaning." <u>Powerex Corp. v. Reliant Energy</u>

10 <u>Services, Inc</u>. (2007) 551 U.S. 224, 232; <u>Lomax</u>, supra, 140 S.Ct. at 1724–25; <u>Cochise Consultancy</u>,

11 supra, 139 S.Ct. at 1512.

12       In abrogating the EPA regulations and enunciating its "major questions doctrine" in <u>EPA</u>,

13 the Supreme Court explained why this doctrine had become necessary:

14     [I]t took hold because it refers to an identifiable body of law that has developed over

15     a series of significant cases all addressing a particular and recurring problem:

16     ***agencies asserting highly consequential power beyond what Congress could***
    ***reasonably be understood to have granted.***

17 <u>EPA</u>, 142 S.Ct. at 2609 (emphasis added). In this regard, the Supreme Court has frequently relied

18 on the "principle of *nosciitur a sociis* – a word is known by the company it keeps – to 'avoid

19 ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus

20 giving unintended breadth to the Acts of Congress." <u>Yates v. U.S</u>. (2015) 574 U.S. 528, 543. Context

21 matters. In the CEA, the jurisdictional boundaries are established in Section 2(c) so as to exclude

22 contracts for sale of commodities – such as those involved in this case – which fall into the Actual

23 Delivery Exception. The CFTC cannot selectively ignore this exception so as to grant itself

24 additional, expanded powers which were never contemplated by the statutory grant of authority.

25       Thus the third and final basis on which the CFTC claims subject matter jurisdiction fails. An

26 overly expansive rule resting on a thin reed of statutory support must inevitably fail. Here, too, the

27

28
MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

CFTC's attempt to create an artificial distinction between fraud in the sale of commodities which **is** subject to the Actual Delivery Exception, and fraud in the sale of commodities which **is not** subject to the Actual Delivery Exception, must similarly fail. This case must be dismissed.

**D. If the CFTC's Claims Under the Commodities Exchange Act are Dismissed, This Court May Not Exercise Supplemental Jurisdiction under 28 U.S.C. §1367**. Once a federal claim has been dismissed for lack of subject matter jurisdiction, the Court has no discretion as to whether to retain supplemental jurisdiction of the plaintiffs' remaining state law claims; they must be dismissed. Scott v. Pasadena Unified School District (9th Cir. 2002) 306 F.3d 646, 664 (after federal claims dismissed for lack of standing, remaining state law claims had to be dismissed). This is particularly true where, as here, dismissal is sought under FRCP Rule 12(b)(1):

> If the court dismisses plaintiff's federal claims pursuant to Rule 12(b)(1), then supplemental jurisdiction can *never* exist. A Rule 12(b)(1) dismissal postulates that there never was a valid federal claim. Exercise of jurisdiction on a theory of supplemental jurisdiction would therefore violate Article III of the Constitution, because the original federal claim would not have "substance sufficient to confer subject matter jurisdiction on the court."

Musson Theatrical, Inc. v. Federal Exp. Corp. (6th Cir. 1996) 89 F.3d 1244, 1255, *amended on denial of rehearing* (6th Cir., Jan. 15, 1998, No. 95-5120) 1998 WL 117980 (quoting from United Mine Workers of America v. Gibbs (1966) 383 U.S. 715, 725) (emphasis in original).

In Arena, supra, 669 F.3d at 223–24, a subcontractor brought a claim against the general contractor under the Miller Act, 40 U.S.C. §§3133 et seq., but no bond was posted. The District Court dismissed the Miller Act claim, but nevertheless proceeded to trial on the related state law claims. On appeal, the Court of Appeal reversed, holding that the failure and dismissal of the Miller Act claim deprived the Court of supplemental jurisdiction under 28 U.S.C. §1367: "Without original jurisdiction on the federal claim, the court cannot assert jurisdiction over state-law claims, even if those claims derive from a common nucleus of operative facts." Arena, 669 F.3d 214, 222.

Here, too, once this Court has dismissed the CFTC's claims for lack of a federal question, the remaining state law claims must be dismissed, as well.

---

21

## III. CONCLUSION

Based on the foregoing, Spitzer requests that the within action be dismissed in its entirety under F.R.C.P. Rules 12(b)(1) and 12(h)(3).

Respectfully submitted,

DATED:        January 9, 2023

_____
Daniel B. Spitzer, In Pro Per

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

## DECLARATION OF DANIEL B. SPITZER

I, DANIEL B. SPITZER, hereby declare:

1. I am an attorney at law duly licensed to practice before all courts of the State of California, all District Courts in the State of California, the Ninth Circuit, and the Supreme Court of the United States. In this proceeding, I am appearing in propria persona, representing myself as the sole proprietor of my law firm, the Law Offices of Daniel B. Spitzer ("**Spitzer**").

2. The facts set forth in this declaration are based either on my own personal knowledge, documents in the public record, or business records established and maintained by my law office, which records: (a) are established at or about the time of the events and transactions recorded therein; (b) are relied upon for their trustworthiness and accuracy in the operation of my law practice; and (c) are established and maintained under my direct supervision and control. If called as a witness, I could and would testify competently as to these facts.

3. I undertook representation of TMTE, Inc., formerly known as Chase Metals, Inc., Lucas Asher, Simon Batashvili, and a number of related entities (collectively, "**TMTE Parties**") in September 2017. At that time, I was asked to represent an entity called Chasing Gold, Inc., a Delaware corporation (which, I am informed, is no longer active and is not involved in this proceeding) in defense of a claim asserted by a customer named Merle W. Crouch.

4. Subsequently, in or about January 2019, I was asked to expand the scope of my representation to other matters in which the TMTE Parties were named as parties. At that time, I undertook representation in a number of additional matters involving the TMTE Parties.

5. As of September 22, 2020, the date on which this case was commenced, my law office was continuing to represent the TMTE Parties in eight separate litigation matters:

   a. Chase Metals, Inc., etc., vs. Mark Benavides, etc., et al., Los Angeles County Superior Court Case No. BC709355, and related cross-claims ("**Benavides Action**"). The Benavides Action had originally been brought to stop a group of former

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

employees from competing unfairly with Chase Metals, using confidential customer lists and other trade secrets obtained during their employment. The employee group counter-claimed, as a putative class action, for wage and hour claims.

b.    Daniel Alway vs. Chase Metals, LLC, a California foreign limited liability company; Chase Metals, Inc., a California foreign corporation; Lucas Asher; Graham Norris; Simon Batashvili, et al., Los Angeles County Case No. BC720250, consolidated with Chase Metals, Inc. vs. Dan Alway, an individual; Alway Talent Transformation LLC, an unknown business entity, et al., Los Angeles County Superior Court Case No. BC719773 ("**Alway Action**"). The Alway Action arose out of claims by a former executive employee for breach of contract. The TMTE Parties counter-claimed for breach of contract and to prevent the use of trade secrets in Alway's competing business.

c.    TMTE, Inc., etc. vs. Mark Benavidez, etc., et al., Los Angeles County Superior Court Case No. 19 SMCV 00263 ("**Benavidez Action**"). This litigation involved the same employee group involved in the Benavides Action which, in collaboration with others, had formed a new company to compete with TMTE, using confidential information and trade secrets and literally copying the TMTE promotional materials and website. The Benavidez Action resulted in issuance of an injunction to prevent these unfair business practices.

d.    TMTE, Inc. vs. Richard Kirkpatrick, and related cross-claim, ADR Services, Inc. Case No. ADRS 19-0172, and related cross-claim ("**Kirkpatrick Arbitration**"). Kirkpatrick was a former customer who alleged fraud in the inducement.

e.    TMTE, Inc. vs. Alexander Spellane, etc., et al., Los Angeles County Superior Court Case No. 19STCV06787 and related cross-claims ("**Spellane Action**"). Spellane was a former employee who was sued to prevent him from making use of stolen trade secrets and confidential information.

---
24

f.   Jeff Batchelor vs. TMTE, Inc., Case No. ADR Services, Inc. Case No. ADRS 20-2502-JAC ("**Batchelor Arbitration**"). Batchelor was a former customer who claimed unfair business practices by TMTE. This case was commenced in August 2020 and was in very preliminary stages of the arbitration when this receivership action and its attendant stay were filed on September 22, 2020.

g.   Walter Henderson vs. TMTE, Inc., ADR Services, Inc. Case No. Case No. ADRS 20-4128-GSR ("**Henderson Arbitration**"). Henderson was a former customer who claimed unfair business practices by TMTE. Henderson's claim had been filed in August 2020 and was in very preliminary stages of the arbitration when this receivership action and its attendant stay were filed on September 22, 2020.

h.   James Herr vs. TMTE, Inc., etc., et al., ADR Services, Inc. Case No. ADRS Inquiry No. 2373 ("**Herr Arbitration**"). This case had been filed at the end of August 2020 and had not yet even resulted in a case number (only an "inquiry" number) before the receivership action was filed on September 22, 2020.

6.   During the course of litigating on behalf of the TMTE Parties, I had occasion to interview a number of TMTE salespeople and administrators concerning the process of generating sales of precious metals products, including Jonathan Sacks, Samara Mills, David Wolan and others whose names I can't remember. I was informed that the company routinely recorded sales calls, and I was provided tape recordings of certain sales calls which were germane to some of the cases I was handling, including among others sales calls made to customers Merle Crouch and Steven Matteo. I was also informed that the company uses a standard-form contract, the Shipping and Transaction Agreement, which the salespeople referred to as the "SNT." In fact, at one point in 2019, I had one of the salespeople, Samara Mills, actually open a customer order in my name with a Shipping and Transaction Agreement so that I could see for myself the process required of a customer to enter personal information and electronically sign the document using a service called "Pandadocs." A true and correct copy

of the Shipping and Transaction Agreement I set up on May 7, 2019 is attached as **Exhibit A** hereto and incorporated herein by this reference. I note that paragraph 1 of the Shipping and Transaction Agreement, the standard-form agreement, contemplates that the delivery of the precious metals products would be made within 28 days, either to the customer or to a precious metals depository in the customer's own name. In one specific instance, involving customer Merle Crouch, the first case I handled on behalf of the TMTE Parties, part of our settlement agreement involved the depository shipping to my office the items Mr. Crouch had purchased, which I was informed had been held in a segregated manner from products purchased by other customers. This shipment was made solely by the customer, since TMTE had no control over the precious metals products once they were held by the depository; only the customer had control over them.

7.    In at least one subsequent case, involving customer Richard Kirkpatrick, I had occasion to discuss with a representative of one of the depositories, New Directions, the process of opening an account. It was clear from our conversation, and the documents in our case file, that the precious metals products, once purchased, were either immediately deposited in the depository, pursuant to the instruction of the customer, or sent to the customer directly. I was informed by TMTE's representatives that this was the standard custom and practice of TMTE as to the handling of customer accounts. My clear understanding, which I verified with TMTE's personnel, was that TMTE did not maintain possession or control over the customer's precious metals products themselves, but either had its own inventory in a precious metals depository or would commonly purchase the precious metals products from a wholesaler (Bayside Metals or Dillon Gage Company) which would then be shipped to the customer, transferred to the customer's name in the depository, or shipped to another depository at the customer's instruction upon purchase. One way or the other, TMTE relinquished possession and control over the metals completely once the sale and transfer were made. And all of those with whom I spoke at TMTE agreed that immediately after

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

verification that funds had been received, a purchase order was issued by TMTE which was filled and delivered, either to the customer or to a depository in accordance with the customer's instructions, well in advance of 28 days from the time the order was placed.

8.  In at least two cases I handled on behalf of TMTE, involving customers Steven Matteo and Richard Kirkpatrick, I was also furnished with access to the email accounts of salespeople and investigated their communications with the customers who had lodged complaints. I noted that there were no high-pressure sales tactics in evidence; that the communications with customers sometimes spanned several weeks before a sale was made; and that there were no misrepresentations made by any of the salespeople. I was finally informed that, prior to consummating a sale, the customer had to go through a two-step process, which involved confirming the sale online, followed by a recorded telephone conversation in which a senior member of the sales staff, following a prescribed script, recited the details of the transaction and then polled the customer with a series of questions to confirm the details of the sales transaction; to indicate that the customer was acting of his or her own free will, with no coercion; and to confirm that the customer had had ample time to conduct investigations and confer with trusted professionals, among other questions. I am attaching to this declaration, for the Court's reference, as **Exhibit B** a true and correct transcription (which I myself transcribed) of the audio recordings I was provided of the confirmation calls made to one such customer, Steven Matteo, who made purchases on August 7 and 23, 2017. I am informed that for each customer claim I handled during my representation of the defendants, a similar confirming phone call was made and recorded at the time of purchase.

9.  The CFTC's complaint makes repeated references to *sales* activity – and not to any form of contingent sale, sale of a security, or sale on margin. See Complaint, ¶3 ("Defendants deceived investors into *purchasing* Previous Metals Bullion …"), ¶5 ("Defendants deceived at least 1,300 elderly investors into transferring funds from their retirement savings … *to purchase* Precious Metals Bullion"), ¶6 ("Defendants directed SDIRA and Cash Account

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

investors *to purchase* specific Precious Metals Bullion ..."). Although the Complaint is silent about the time of delivery, the CFTC's own evidence shows clearly that the products purchased were actually delivered and actually received by the customers. In support of its application for restraining order, the CFTC offered an appendix of documents [Docket No. 12], consisting of four separate declarations and exhibits thereto. The first declaration, submitted by Patricia Gomersall, who identifies herself as a Senior Futures Trading Investigator in CFTC's Division of Enforcement, in her initial summary, states that "Since at least September 2017 through the present ..., Defendants ... have solicited members of the general public, through internet advertising and direct telephone sales, *to purchase* gold and silver bullion ..." (Emphasis added.) To illustrate the CFTC's allegations of fraud, Ms. Gomersall attaches, among other exhibits, the following:

a.   Exhibit Z – A Precious Metals Exchange Form, showing the customer's authorization for liquidation of certain precious metals products and purchase of others. In Exhibit Z, the newly-purchased precious metals products are to be delivered to Delaware Depository Services Co., a true and correct copy of which is attached as **Exhibit C** hereto and incorporated herein by this reference.

b.   Exhibit EE – A Metals.com purchase invoice with delivery instructions to a customer's home, a true and correct copy of which is attached as **Exhibit D** hereto and incorporated herein by this reference.

It is clear from these invoices that delivery instructions were issued contemporaneously with the placement of the orders, which were delivered either to the customer directly or to a depository, for the benefit of the customer. And I note, as above, that the CFTC does not allege anywhere in its complaint that the precious metals products purchased by customers were either not delivered, or were not delivered within 28 days.

10.   On June 17, 2022, I emailed a copy of an earlier draft of this motion to all counsel of record. Christine Ryall, Counsel to the CFTC, responded by email on June 21, 2022, saying "I need

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

to confer with the other Plaintiffs.  We will get back to you as soon as possible." The following day, Ms. Ryall sent a follow-up email, in which she stated as follows:

> Plaintiffs oppose your motion.  Section 6(c) of the Commodity Exchange Act (CEA) and CFTC Regulation 180.1 provide anti-fraud enforcement authority over deceptive conduct in connection with contracts of sale of a commodity in interstate commerce, independent of Section 2(c) of the CEA.

If I may paraphrase, the plaintiffs have thus made it clear that their position

I declare under the laws of the United States that the foregoing is true and correct, and that this declaration is executed at Encino, California on January 9, 2023.



Daniel B. Spitzer

29

1

## DECLARATION OF LUCAS ASHER

2      I, LUCAS ASHER, hereby declare:

3   1.   At all material times, I have been an individual over the age of eighteen years and, prior to

4        commencement of this action by the Commodities Futures Trading Commission ("**CFTC**")

5        in September 2020, I was involved in the operations of TMTE, Inc., formerly known as

6        Chase Metals, Inc. dba Metals.com ("**TMTE**") and Barrick Capital, Inc. ("**Barrick**").

7   2.   The business of TMTE and Barrick was to make sales, as independent retailers, of various

8        gold and silver products, including bars, rounds and coins. These two companies did not sell

9        interests in any fund, or margin account, but in cash sales only.

10  3.   To my knowledge, the elapsed time from verification of receipt of a customer's funds until

11       the delivery of the product pursuant to the customer's instructions was no longer than 28

12       days.

13

14       I declare under penalty of perjury under the laws of the United States that the foregoing is

15  true and correct, and that this declaration is executed at Los Angeles, California on January   9   ,

16  2023.

17

18                                              Lucas Asher

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS UNDER F.R.C.P. RULE 12(b)(1) AND 12(h)(3); DECLARATION OF DANIEL B. SPITZER, etc.

# EXHIBIT A

## SHIPPING AND TRANSACTION AGREEMENT

<table>
<tr><td rowspan="8">CUSTOMER INFORMATION</td></tr>
</table>

Customer Name: **DANIEL B. SPITZER**

Street Address:                                                                  Evening Phone:

City / State / Zip:                                                              Daytime Phone:

Email Address: dspitzer@spitzeresq.com

By signing below, I acknowledge that I have read, understand, and hereby agree to the terms set forth on the front and back of this Agreement

Dated:                          Customer's Signature:    *D. Spitzer*

---

*D.S.*  By initialing in the space provided, and by your signature on this agreement, you hereby expressly authorize CM to telephone you at the number(s) provided above, irrespective of whether or not your telephone number appears in the National Do not Call Registry  16 CFR310.4(b)(1)(iii)(B)(ii) and (ii)

---

metals.com / TMTE, Inc.  (and its affiliates) (collectively, "metals") and the individual identified above ("Customer") agree that the following terms of this Shipping and Transaction Agreement ("Agreement") shall govern the pending and all future transactions between the parties involving all precious metals, in any form, that is the subject of all transactions between metals and Customer, and shall include, but is not limited to, bullion bars and coins, semi-Numismatic coins and bars, Numismatic coins and bars, "junk silver," and bags (and partial bags) of coins (collectively "Precious Metals.") This Agreement shall apply to all purchases from and sales to metals involving Customer, present and future.  metals is not an investment advisor, consultancy, licensed brokerage, or banking institution.

1. Delivery of Precious Metals Purchased: Customer must deliver funds sufficient to cover the entirety of Customer's purchase from metals within five (5) business days of Customer's placement of the order ("Purchase Funds"). Purchase Funds may be delivered by check, credit card, or wire transfer. With the limited exception noted in Paragraph 8a, all sales, including credit card sales, are final (i.e., the Precious Metals cannot be exchanged or returned for a refund). Checks may be made out to Metals.com (For wire transfer instructions, please contact your metals sales representative.) metals shall deliver the Precious Metals specified in Customer's order to a suitable delivery service for delivery to Customer no more than twenty-eight (28) days after metals verifies that the Purchase Funds provided are backed by good funds. (Please note that it may take 12 business days to verify personal checks.) If Customer fails to provide the Purchase Funds within five (5) business days of Customer's placement of the order, metals may exercise the rights set forth in Paragraph 4, below.

2. Delivery of Precious Metals:  metals shall cause all Precious Metals purchased and paid for to be delivered to Customer's address set forth above. metals only uses reputable, nationally recognized delivery services to deliver its Precious Metals. If, however, Customer's order is lost prior to delivery, Customer is instructed to notify metals, in writing, immediately. Notice of any such alleged loss should be sent to: metals.com, Attention: Customer Service, 330 S Center St,
suite 407 Casper, WY 82601. If the delivery service verifies that Customer's Precious Metals were never delivered, metals shall, within forty-five (45) days of such verification, in its sole discretion, either refund to Customer the full purchase price for such undelivered Precious Metals or replace such Precious Metals with other Precious Metals of the same denomination/type and grade. metals assumes no responsibility for Precious Metals lost, damaged, stolen, or otherwise subject to casualty after delivery to Customer. metals assumes no risk of loss for any Precious Metals

purchased from a Customer until such materials are delivered to and accepted by an authorized representative of metals.

3. Purchase Price:

a. Sales: The purchase price Customer has been quoted and agreed to pay includes metals operating margin on the transaction. Within the Precious Metals industry, the difference between metals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the "Spread." Spreads vary significantly - by Precious Metal, by customer, and over time. For Customer to make a profit, Customer must be able to sell the Precious Metals in the future for a price high enough to cover Customer's initial investment, including Spreads.  Spreads may be subject to negotiation, and Spreads charged to Customer in a specific transaction may be more or less than the Spread charged to others in similar transactions or charged to Customer in prior or future transactions. At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%), and (ii) metals's Spread on semi-Numismatic and Numismatic coins and bars is generally between seventeen percent and thirty-three percent (17 to 33%). Spreads for semi-Numismatic and Numismatic coins and bars are often in the range of approximately twenty-nine percent (29%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons.  The actual Spread on any particular transaction could be any amount within those ranges (or even possibly outside those ranges). For example, if a bullion coin or bar was quoted by metals at $400, and included a ten percent (10%) spread, metals cost for the bullion coin or bar would be $360. Similarly, if metals quoted a Numismatic coin or bar at $400, and included a twenty-five percent (25%) spread, metals cost for that coin would be $300. metals Spread range may be different (higher and/or lower), and the Spread metals charges may be higher or lower, at the time of and for any given transaction. Customer acknowledges that the spot prices of Precious Metals do not necessarily move in tandem with the Precious Metals the Customer purchases. That means that the spot price and the liquidation value of the Precious Metals purchased by the Customer under this Agreement may perform differently from one another.

b. IRA Sales: Individual retirement account ("IRA") transactions are more expensive to process and can require metals to assume certain investment risk in connection with the transaction. As such, notwithstanding the general ranges set forth in Paragraph 3a, at the time this Agreement was transmitted for Customer's signature, metals Spread on IRA Precious Metals transactions varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons. The actual Spread on any particular transaction could be any amount within that range (or even possibly outside that range). Moreover, metals Spread range may be different (higher and/or lower), and the Spread metals charges may be higher or lower, at the time of and for any given transaction. For example, a bullion coin or bar that ordinarily would be quoted by metals (outside an IRA) at $400, with a ten percent (10%) Spread, might be quoted at $480, with a twenty-five percent (25%) Spread, if the bullion coin or bar is purchased as an IRA investment. In both those examples, however, metals cost for the bullion coin or bar would be $360. metals makes no representations regarding the tax consequences of holding Precious Metals as an investment in an Individual retirement account ("IRA"). Client expressly acknowledges that Client has been advised to seek independent tax advice, from a qualified professional, regarding the tax consequences of such an investment. Further, please note that holding Precious Metals as an investment in an IRA may result in additional fees charged by third parties, not metals, such as depositary and custodial fees that would be charged directly to the Client by such third parties. metals makes no opinions, statements, or recommendations in regards to how much or what percentage of Client's retirement account should be invested in precious metals.

c. Re-purchases: metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells. metals may, at its sole discretion, elect to re-purchase the Precious Metals that metals sells, and metals does not guarantee that it will re-purchase Precious Metals that Customer purchases from metals.  In the event Customer seeks to sell its Precious Metals to metals, Customer understands and acknowledges that metals re-purchase offer may be raised or lowered on a daily, even hourly or more basis, depending upon various market conditions, inventory needs, and the price and availability of comparable Precious Metals. metals does not guarantee that any re-purchase offer will equal the price that metals would pay to acquire the same denomination/type and grade of Precious Metal from a wholesaler, or that any offer made will be higher or equal to what someone else might offer for the same Precious

Metals.

d. <u>Certification</u>: Customers who are selling Precious Metals to metals declare under penalty of perjury pursuant to 28 U.S.C. §1746 that (i) Customer either deals in such articles or otherwise by Customer's respective occupation or as a result of Customer's avocations as collector, speculator, or investor has and holds him or herself out as having knowledge or skill peculiar to such articles or the practices involved in the sale of such articles, and (ii) any sale to metals of coins, hallmark bars, registered ingots, and other items as Numismatic objects is for their Numismatic value. Customers who are buying Precious Metals from metals declare under penalty of perjury pursuant to 28 U.S.C. §1746 that (i) Customer either deals in such articles or otherwise by Customer's respective occupation or as a result of Customer's avocations as collector, speculator, or investor has and holds him or herself out as having knowledge or skill peculiar to such articles or the practices involved in the purchaser of such articles, and (ii) any purchase from metals of coins, hallmark bars, registered ingots, and other items as Numismatic objects is for their Numismatic value.

e. <u>Quotes on Customer's Holdings</u>: Customers may request a quote on their holdings at any time. When requesting a quote, please specify whether you are looking to purchase additional Precious Metals or sell your existing holdings - as metals bid (buy from customer) and ask (sell to customer) quotes will vary. metals bases such quotes on a variety of factors, which are not necessarily tied or related to the prices quoted by, or factors considered by, its competitors.

f. <u>Classification as Bullion, semi-Numismatic, or Numismatic:</u> Whether a Precious Metal is classified as Bullion, semi-Numismatic, or Numismatic may turn on a number of objective and subjective factors, including the age of the Precious Metal, its condition, the number of known copies, the likelihood of additional minting, the originating country, relevant historical events or owners (e.g., shipwreck; royalty), relevance to the formation of various Precious Metal collections, and an investor's personal attraction to the piece. metals classification of Precious Metals is only an opinion and may change over time (e.g., if additional quantities of the Precious Metal are discovered). In addition, given the subjective nature of the classification process, other dealers or investors may classify the same coin differently. metals prices and spreads are based on its classification determination.

g. <u>Customer Assumes Investment Risk; Investment Decisions</u>.  Customer acknowledges that purchases and sales of Precious Metals involve considerable risk. Market prices are at times volatile and may be affected by a variety of factors including, among others, general economic conditions, political events, monetary policies of various countries, fluctuations in production and demand, stock-piles, speculative activity and the degree of concern people have about these matters. It is impossible to forecast accurately how or to what degree these or other factors will affect prices. Customer acknowledges and agrees that Customer assumes the risk of all investment decisions regarding any and all Precious Metals the Customer purchases from metals and metals makes no guarantee or representation regarding Customer's ability to profit (or avoid loss) from any purchase or any representation regarding any tax implications of any purchase and the decision to purchase or sell Precious Metals. Any purchases from metals are made subject to Customer's own prudence, judgment and ultimate decision. Customer expressly acknowledges and agrees to hold metals harmless for any damages arising out of the performance by metals of this Agreement. Customer understands that past performance cannot be an indicative of future results.

4. <u>Remedy for Customer's Failure to Perform</u>: If Customer refuses to accept delivery of the Precious Metals ordered or fails to make payment when due, metals, in its sole discretion, may cancel the transaction and resell such Precious Metals on a wholesale basis. If the proceeds from such resale are less than the contract price with Customer, metals shall be entitled to recover from Customer the difference between the resale price and Customer's contract price, plus any incidental damages occasioned by Customer's breach. If the proceeds from such resale are more than the contract price with Customer, metals shall be entitled to keep the excess amount to cover metals incidental damages.

5. <u>Investment Objectives; Holding Period; Investment Risk; No Advice; Commissioned Sales Representatives</u>:

a. metals is a seller and purchaser of Precious Metals. While metals is always prepared to compare and contrast the different Precious Metals that are available for purchase or that metals is willing to purchase, Customer acknowledges and agrees that (i) no fiduciary relationship exists between metals and Customer, (ii) the decision to purchase or sell Precious Metals, and which Precious Metals to purchase or sell, are the Customer's decision alone, and (iii) purchases or sales are made subject to Customer's own prudence and judgment.

b. In metals opinion, Precious Metals should be considered a long-term investment. Customer should be prepared to hold any Precious Metals purchased - whether from metals or elsewhere - for at least a three to five year period, and preferably five to ten years, to maximize the potential for gains. In metals opinion, Customer should only invest capital that can be held for at least this period of time. However, Precious Metals, like all investments, carry capital risk. Precious Metals may appreciate, depreciate, or stay the same depending on a variety of factors. metals cannot guarantee, and makes no representation, that the Precious Metals will appreciate at all or appreciate sufficiently to make Customer a profit at the expiration of this or any other period of time.

c. In metals opinion, Customer should not invest more than twenty percent (20%) of Customer's available investment funds in Precious Metals. Moreover, Precious Metals do not yield income and thus are not an appropriate investment vehicle for investors seeking current or future income.

d. The success of an investment in Precious Metals is dependent, in part, upon extrinsic economic forces including but not limited to supply, demand, international monetary conditions, and inflation or the expectation of inflation. The impact of these forces on the values of Precious Metals in general or any particular Precious Metal cannot be predicted. Customer acknowledges that the Precious Metals market can be volatile and that Precious Metal prices may rise or fall over time. Customer further acknowledges that past performance is no guarantee of future performance.

e. metals does not provide tax, investment, or legal advice or advisory services, and no one associated with metals is authorized to provide any such advice or services. Any written or oral statements by metals, its officers, agents, sales representatives, or other representatives relating to future events or the attributes of certain Precious Metals are opinions only. Such statements, if any, are not representations of fact. Customer agrees, acknowledges, and represents that Customer has not, at any time, sought or been provided with tax, investment, or legal advice or advisory services, of any kind or nature from metals or any of its, affiliates, assigns, successors, agents, employees, contractors or other representatives.

f. metals sales representatives are commissioned salespersons - i.e., their salary is based, at least in part, on the amount and profit margin of the Precious Metals they sell. In addition, from time to time, metals sales representatives may receive other compensation tied to sales activity - e.g., sales contests; bonuses tied to the sale of certain denominations/types or grades of Precious Metals. metals sales representatives are not licensed brokers and their knowledge of Precious Metals and the Precious Metals marketplace varies markedly.

g. metals makes no representations regarding the tax consequences of holding Precious Metals as an investment in an IRA. Customer expressly acknowledges that Customer has been advised to seek independent tax advice, from a qualified professional, regarding the tax consequences of such an investment. Any written or oral statements by metals, its officers, agents, account executives, or other representatives relating to future events or the attributes of certain Precious Metals are opinions only. Such statements, if any, are not representations of fact.

h.  Customer understands, agrees, and acknowledges that metals records telephone calls with potential customers and/or including Customer, to avoid and/or prevent fraud, for purposes of verifying Customer's assent to the terms and conditions of the purchase from metals, for quality control and/or other reasons. Customer consents to all such recordings of Customer by metals to the extent consent is required under any state or federal laws or statutes.

6. <u>Grades</u>:

a. metals <u>is not a grading service</u>. metals purchases Precious Metals for re-sale to its customers. metals is not a grading service. metals does not independently assess the Precious Metals it purchases for re-sale, but relies upon the opinions and assessments of independent grading services such as Professional Coin Grading Service, Inc., Numismatic Guaranty Corporation of America, and ANACAS, or others. Grading is a subjective process and it is not uncommon for grading services, or individual examiners within the same grading service, to reach different conclusions regarding the appropriate grade for a particular Precious Metal. Moreover, grading standards are constantly evolving. metals does not guarantee that the Precious Metals it sells will achieve the same grades in the future. In selling graded Precious Metals, metals warrants that the Precious Metal is genuine (i.e., not a counterfeit) and states that the grade is as opined by the grading service when graded by that service, if graded.

b. <u>Grading is subjective</u>. Grading is a subjective determination. While numerical grading may give the impression of precision,  the numbers in fact represent a nuanced opinion that even experts cannot consistently and systematically agree upon. The grade reflects the opinion of the cataloger (or grader) as to the state of preservation, method of strike, and overall appearance of a particular Precious Metal or lot.

c. <u>Terminology</u>. The term "proof" or "specimen" is used to describe a method of manufacture. Those terms do not connote a grade, condition or attribution.

d. <u>Cleaning/Toning</u>. metals does not represent that a Precious Metal has or has not been cleaned, that any toning is natural or artificial, that a Precious Metal has a particular provenance or pedigree, that a Precious Metal is struck or not struck, that a Precious Metal is produced or not produced in a particular manner or style, and/or that a different grading service (or even a different grader within the same grading service) would assign the same grade now or in the future to the same Precious Metal.

e. <u>Acknowledgment</u>. Where metals sells a Precious Metal that is encapsulated by a grading service and bears the grade or condition ascribed to it by the grading service, Customer acknowledges and agrees that other grading services or knowledgeable purchasers might reach a different conclusion as to the item's grade. Customer further acknowledges that metals has provided the grader's description for the customer's information and makes no warranty as to its accuracy or the standards used to determine that grade.

7. <u>Representation/Warranty; Sales Representatives Not Authorized To Make Other Representations or Warranties</u>: metals represents and warrants that, upon the delivery of Purchase Funds (as provided for in Paragraph 1), and subject to the other terms and restrictions set forth in this Transaction Agreement, metals will cause to be delivered to Customer the denomination/type and grade of Precious Metals specified in Customer's order, as classified and/or graded by one of the following independent grading services: Professional Coin Grading Service, Inc. (PCGS), Numismatic Guaranty Corporation of America (NGC), ANACAS, or any other independent grading service of similar standing. The only representation and warranty that Customer may rely upon in purchasing Precious Metals from or selling Precious Metals to metals is the representation set forth in this Paragraph 7. Neither metals, nor any of its officers, agents, employees, sales representatives, or other representatives are authorized to make any other representations or warranties concerning any Precious Metals that metals is selling or purchasing under this Transaction Agreement.

8. <u>Exchange/Refund Policy</u>:

a. <u>Replacement of Semi-Numismatic or Numismatic Coins Where Grade Disputed</u>: Customer agrees to inspect each delivery carefully upon receipt. If, for any reason whatsoever, Customer is dissatisfied with the quality of a semi-Numismatic or Numismatic coin or bar (specific kinds of Precious Metals) purchased from metals, Customer should immediately notify metals. If Customer notifies metals of its dissatisfaction within fifteen (15) days of delivery of the semi-Numismatic or Numismatic coin or bar and the original holder in which the semi-Numismatic or Numismatic coin or bar in question was delivered has not been opened, removed, or tampered with in any respect, metals shall replace the semi-Numismatic or Numismatic coin or bar in question with another semi-Numismatic or Numismatic coin or bar (as appropriate) of the same denomination/type and grade. metals, in its sole discretion, may permit Customer to upgrade to a higher value semi-Numismatic or Numismatic coin or bar (either in denomination/type or grade) as part of this replacement process, provided Customer pays the difference between the contract price of the semi-Numismatic or Numismatic coin or bar previously purchased and metals current sale price for the higher value semi-Numismatic or Numismatic coin(s) or bar(s) to be substituted. If metals determines, in its sole discretion, that another semi-Numismatic or Numismatic coin or bar of the same denomination/type and grade is not reasonably, commercially available, metals may elect, at its sole option, to replace the semi-Numismatic or Numismatic coin or bar purchased with a reasonably comparable semi-Numismatic or Numismatic coin or bar, even though of a different denomination/type and grade.

b. <u>Cancellation Period; Certain States' Rights</u>. With the exceptions noted in Paragraph 8a and the Addendum attached hereto (certain state residents only), metals offers Customers a seven (7) day right to request cancellation of their purchase with metals for semi-Numismatic or Numismatic coin or bar purchases.  Because Precious Metals, including all other purchases other than semi-Numismatic or Numismatic coin or bars, are subject to price fluctuations

outside of metals control, the metals is unable to rescind, cancel, refund, or exchange Customer's order or this Agreement for all purchases other than semi-Numismatic or Numismatic coin or bars, other than as noted herein, in Paragraph 8a above, and as set forth in the attached Addendum.

9. Disclaimer of Express and Implied Warranties: EXCEPT AS SET FORTH IN PARAGRAPH 7, THE PRECIOUS METALS SOLD BY METALS PURSUANT TO THIS TRANSACTION AGREEMENT ARE SOLD ON AN "AS IS" BASIS AND METALS MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND OR FITNESS FOR A PARTICULAR PURPOSE.

10. No Liability for Consequential Damages; Limitation of Liability: IN NO EVENT SHALL METALS HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN TORT, CONTRACT, WARRANTY, OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, OR STRICT LIABILITY), FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES SUSTAINED OR ARISING FROM OR RELATED TO ANY TRANSACTION COVERED BY THIS TRANSACTION AGREE- MENT, EVEN IF METALS IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, METALS LIABILITY TO CUSTOMER FOR ANY REASON AND UPON ANY CLAIMS SHALL AT ALL TIMES BE LIMITED TO THE AMOUNT ACTUALLY PAID BY CUSTOMER FOR THE PRECIOUS METALS IN DISPUTE.

11. Application to Future Transactions: This Transaction Agreement shall control all transactions between metals and Customer unless and until such time as it is amended by metals. Customer agrees that metals may amend this Transaction Agreement at any time and from time to time, that metals may give notice to Customer of any amendment by mailing a copy of the amended Transaction Agreement to the address set forth above (or any updated address provided by Customer in the interim), and that following such mailing, the amended Transaction Agreement shall govern succeeding transactions and any interaction with metals.

12. Force Majeure: Neither metals nor Customer shall be liable for any failure or delay in its or their performance under this Transaction Agreement due to any cause beyond its or their respective reasonable control, including acts of war, terrorism, acts of God, earthquake, flood, embargo, riot, sabotage, labor shortage or dispute, governmental act or failure of the Internet including, but not limited to, any disruption, failure and/or error in or of metals internal computer systems, or any disruption, failure and/or error in or of any third-party Internet service providers as metals may use from time to time.

13. Arbitration of Disputes; Waiver of Jury Trial: ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS TRANSACTION AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION OR VALIDITY THEREOF, INCLUDING THE DETERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, OR ANY OTHER DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF ANY INTERACTION BETWEEN METALS AND CUSTOMER, SHALL BE BROUGHT AND BE DETERMINED BY ARBITRATION IN LOS ANGELES, CALIFORNIA, BEFORE ONE ARBITRATOR. THE ARBITRATION SHALL BE ADMINISTERED BY ADR SERVICES, INC.  CUSTOMER AND METALS WAIVE THEIR RIGHTS, IF ANY, TO BRING ANY CLAIM THAT IS SUBJECT TO THIS ARBITRATION PROVISION AS A CLASS ACTION, "MASS" ACTION, OR OTHERWISE ON A REPRESENTATIVE BASIS. JUDGMENT ON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION. THIS CLAUSE SHALL NOT PRECLUDE PARTIES FROM SEEKING PROVISIONAL INJUNCTIVE REMEDIES IN AID OF ARBITRATION FROM A COURT OF APPROPRIATE JURISDICTION.

14. Choice of Law: The substantive law of California shall govern all claims brought by or against metals in connection with this Transaction Agreement or otherwise arising out of any interaction between metals and Customer, without any regard for conflict of law principles.

15. Limitation on Time to Bring Any Claim: Except where the law prescribes a shorter applicable statute of limitation, or prohibits shortening the otherwise applicable longer statute of limitations, any claim or legal action of any kind arising in connection with or relating in any way Customer's purchases from metals, metals, or in any way relating to metals or this Agreement,  must be brought within one year after the purchase or sale or other event giving rise to the claim or legal action. If this clause is determined to be unenforceable as to any particular claim or claims under the law of the applicable jurisdiction, it shall remain fully enforceable as to all other claims.

16. <u>Jurisdiction</u>: Jurisdiction and venue for any dispute, claim or controversy arising out of or in any way relating to this Transaction Agreement or the breach, termination, enforcement, interpretation or validity thereof, or any other interaction between metals and Customer, shall be in Los Angeles, California, and any party making a claim against metals in whatever form hereby submits to personal jurisdiction in that forum for any and all purposes. By entering into this Agreement, Customer agrees to be subject to the personal jurisdiction of the State of California, agreeing and acknowledging that entering into this Agreement shall constitute sufficient minimum contacts with the State of California to confer both general and specific personal jurisdiction.

17. <u>Finality; Integration Clause</u>: This Agreement is intended by metals and Customer as a final expression of their agreement concerning the matters set forth herein, and is also intended as a complete and exclusive statement of the terms of their agreement. This Agreement supersedes any oral or written statements made prior to, contemporaneous with, or in the future regarding this Agreement or the transactions covered hereunder. Customer shall not rely upon any statement made by or on behalf of metals that is inconsistent with this Transaction Agreement.

18. <u>Severability</u>: If any provision of this Transaction Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in full force and effect.

ADDENDUM OF STATE-SPECIFIC PROVISIONS

*Alaska.* metals provides all customers the right to receive a full refund for the return of undamaged and unused metals or coins, provided the customer gives metals timely notice of the return within seven (7) calendar days after the date the customer receives the merchandise. Timely notice is given if the return request is made in person within the seven (7) days or if the return or request is mailed, properly addressed and postmarked, postage prepaid, within the seven (7) days. Receipt of metals or coins is deemed to occur at the earliest of: (a) the date the customer receives actual possession of the metals or coins; or (b) the date the customer receives written confirmation that the metals or coins have been deposited on the customer's behalf in an independent depository. metals, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Connecticut, Nebraska, Maryland, Louisiana, Kansas.* metals provides all **first time customers** the right to a refund for the return of undamaged and unused metal or coins, provided that TMTE, Inc. receive written notice of cancellation within seven (7) calendar days after the date you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Hawaii, Mississippi, West Virginia, Arizona, Colorado, Montana, Oklahoma, Utah, Texas (credit card purchases only), Oregon, Nevada.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within seven (7) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Indiana, Pennsylvania, Vermont, Wyoming, South Dakota.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within ten (10) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Michigan, Virginia, Arkansas.* metals provides all customers the right to a full refund provided that Metals.com receive written notice of cancellation (see notice provided with your trade confirmation) **within three (3) business days** after the date that you sign this Agreement.  metals shall, upon written notice of cancellation, issue a full refund within ten (10) calendar days from the date you send us the notice of cancellation (notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.) If you decide to cancel, **return all items shipped to you (if any) in substantially as good condition as when received to the address that appears on the form, ATTN: Operations Dept.**

*North Dakota.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within fifteen (15) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later.

*Maine.* metals provides all **first time customers** the right to a refund, provided that  Metals.com receive written notice of cancellation within seven (7) calendar days after the date your trade confirmation is mailed to you (based upon the postmark) or delivered to a third-party carrier such as FedEx. (Prior purchasers have the right to receive a full refund provided that metals receive written notice of the cancellation **within three (3) business days** after the date your trade confirmation is mailed or delivered, as above.) metals shall, upon written notice of cancellation, issue a full refund within fifteen (15) calendar days from the date you send us the notice of cancellation (notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.) If you decide to cancel, **return all items shipped to you (if any) in substantially as good condition as when received to the address that appears on the form, ATTN: Operations Dept.**

*West Virginia.* metals provides you the right to receive a full refund for the return of undamaged and unused metals or coins, provided that metals receive written notice of the return within seven (7) calendar days after the date that you receive the merchandise. Your "receipt" of metals or coins is deemed to occur at the earliest of: (a) the date that you receive actual possession of the metals or coins; or (b) the date that you receive written confirmation that the metals or coins have been deposited on your behalf in an independent depository. For purposes of this subsection, it will be presumed that goods were received seven days after they were mailed unless it can be clearly demonstrated that the goods were not received or received at a later date. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals, whichever is later. metals will provide a cash refund for a cash purchase or issuing a credit for a credit purchase, which credit is applied to the account to which the purchase was debited in connection with the return of its unused and undamaged merchandise or canceled services.

*Wisconsin.* metals provides all customers the right to a full refund provided that metals receive written notice of cancellation (see notice provided with your trade confirmation) **within three (3) business days** after the date that you sign the Addendum to this Trade Confirmation. metals shall, upon written notice of cancellation and receipt of the merchandise in the same condition as delivered, issue a full refund within thirty (30) calendar days from the date of cancellation or, where merchandise has been delivered, the returned merchandise is received by metals

whichever is later. (Notice of cancellation, if given by mail, is given when it is deposited in a mailbox properly addressed and postage prepaid.)

# Signature Certificate

Document Ref.: TNWCU-BANLG-4FUAO-ZR3TT

Document signed by:



### D. Spitzer

Verified E-mail:
dspitzer@spitzeresq.com

IP: 23.242.213.91     Date: 07 May 2019 21:36:22 UTC

*D. Spitzer*

Document completed by all parties on:
07 May 2019 21:36:22 UTC
Page 1 of 1



Signed with **PandaDoc.com**

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



# EXHIBIT B

**<u>Transcription of Confirmation Call - August 7, 2017</u>**

Matteo:      Hello.

TMTE:       Hello. Good afternoon.  This is the Chase Metals Trading Desk, and today is Monday. It's August 7, 2017.  We'd like to confirm we have our client, Steve Matteo, on the line. Is that you, Steve?

Matteo:      Yes, it is.

TMTE:       Great, and Mr. Matteo, please confirm we have your permission to record this call for accuracy.

Matteo:      You have my permission.

TMTE:       Great. And can you please confirm your shipping address where your statements will be sent to?

Matteo:      Okay, it's 1828 Puu Kaa Street, it's p-u-u, capital Puu, capital Kaa Street. Kataa, HI 96746.

TMTE:       Excellent. And can you please confirm that you have rolled over your IRA to SDIRA for the purpose of purchasing precious metals?

Matteo:      Yes, that's correct.

TMTE:       Good. And I have your account number 201 [INAUDIBLE] 36035, and we're confirming that we will be acquiring 100 of the .9999 one ounce silver Maple Leafs, at a unit price of $18.00 each per coin, for a subtotal of 1,800. In addition, 10 of the .999 five ounce America the Beautiful, various years, for $102.00 per five ounce coin, larger coin for a subtotal of 1020. 6,450 units of the .9999 1.5 ounce silver Canadian Polar Bear and Cub, at $56.00 per unit coin, for a subtotal of 361,200, 100 of the .9999 one ounce silver Maple Leafs, 18.00 per unit coin, for a subtotal 1800, and 10 of the 10 ounce generic silver bars, at $171.00 each 10 ounce bar, for a subtotal 1,710. Your grand total is 367,530. That leaves you a cash balance on your account $672.54 which will be reflected in your statements.

Precious metals and coins can be an important part of a diversified investment portfolio In our opinion, metals are appropriate for between 5-20% of an investment portfolio, however certain individuals or organizations may recommend a different percentage from time to time. We're confirming you've understood and signed the shipping and transaction agreement on the ChaseMetals.com website, are an accredited  investor, and you have been verbally reminded of your state's right of

1

rescission, and that we have your permission to call you.

We are waiving the shipping and insurance costs associated with delivery, so you have no costs for shipping or insurance. We guaranty the delivery of all your products ordered in under 28 days to your vault. Do you confirm this transaction so we can begin the shipping process?

Matteo:      Yes, I do. I confirm it.

TMTE:        Okay, congratulations. I'll be giving you a call back on the non-recorded line.

Matteo:      Okay.

TMTE:        Thank you.

2

**Transcription of Confirmation Call - August 23, 2017**

Matteo:        Hello.

TMTE:         Steve. Hi, Steve. This is the Chase Metals trade desk. Today is August 23, 2017. This call will be recorded for accuracy's sake. This recording is to confirm a precious metals trade for Mr. Steven Matteo. Is this Mr. Steve Matteo and do we have your permission to record this call.

Matteo:        Yes.

TMTE:         Great. Uh, and Mr. Matteo - can you please confirm your shipping address where your metals and/or statements will be sent?

Matteo:        It's 1828 Puukaa Street, Kapaa Hawaii 96746.

TMTE:         Great. And also please confirm that we're using the principal of this trade from your IRA with SDIRA Services, correct?

Matteo:        Yes, that's correct.

TMTE:         Alright, and we're going to be confirming a purchase of 50 of the one ounce silver Canadian maple leaf coins, price per unit $18.73, for a subtotal of 936.50. We're confirming 1600 of the 1.5 ounce silver Canadian polar bear and cub, priced per unit $56, subtotal  $89,600, and also 200 of the one ounce silver Canadian maple leaf coins priced per unit $18.73, subtotal $3,746.00. That gives us a grand total of $94,282.50. Do you confirm this transaction?

Matteo:        Yes, I do.

TMTE:         Great. You've read, signed and understood the Shipping and Transaction Agreement -- that's also on the chasemetals.com website, we have that on file. We've given you your verbal right of rescission according to the state's guidelines, and you're giving us permission to enter your precious metals product description in your signed investment directions. We're waiving your shipping and insurance costs. We're also confirming that you are an accredited investor. Chase Metals does not give legal, tax or investment advice because numismatic coins, precious metals can be an important part of an [INAUDIBLE] investment portfolio.  We believe that numismatic coins and precious metals are appropriate for 5 to 20% of an investment portfolio. However, certain individuals or organizations may recommend a different percentage from time to time. If you are purchasing numismatic coins or precious metals for investment purposes, they should be considered a long-term investment. We believe that numismatic coins and precious metals should be held for at least 3 to 5 years,

preferably 5 to 10 years. Any specific holding period may be affected by current market conditions, which may require a longer, or even a shorter, holding period.

Congratulations Steve. I'm going to go ahead and forward this off. I'll get you a call back in about 5 minutes. Okay?

Matteo:        Okay. Thanks a lot.

TMTE:        You're welcome.

# EXHIBIT C

# ATTACHMENT Z

**Metals Investor BB**

191

07/20/2018  11:58  6095180619                    Cactus_Flower W O              #1359 P.002 /002

**NEW DIRECTION IRA Inc.**
Self-Directed IRAs and more...

# Precious Metals Exchange Form

New Direction IRA, Inc.
1070 W. Century Dr., Ste. 101
Louisville, CO 80027
p: 303-546-7930 | f: 303-665-5962
email:docs@ndira.com

**NOTE:** All investment paperwork must be titled correctly: New Direction IRA , Inc. FBO (Account Owner's Name) IRA. If you have a 401(k) or beneficiary account, please call our office for correct vesting (titling).

## 1. ACCOUNT INFORMATION

Your Name: (as it appears on your account, not your title or vesting name)        New Direction Account Number:

Account Type: ☑Traditional IRA  ☐ Roth IRA  ☐SEP IRA  ☐ SIMPLE IRA ☐Inherited IRA ☐Individual 401(k) ☐HSA

Phone Number:                                          Email Address:
                                                       @comcast.net

## 2. TELL US ABOUT YOUR DEALER AND DEPOSITORY

Dealer Name:                        Depository Name:
Chase Metals                        Delaware Depository Service Co

I understand that New Direction IRA is not responsible for contacting the dealer and establishing a selling or buying price.

## 3. ACKNOWLEDGEMENT OF EXCHANGE INSTRUCTIONS

Initial Here

I acknowledge that by submitting this request I will contact my dealer of choice and agree upon a selling and buying price for my metals. I will submit an invoice, which will list all final prices. I further understand that my Precious Metals Dealer listed on this form may contact New Direction IRA to receive information regarding this investment and current holdings to complete the exchange.

## 4. HOW WOULD YOU LIKE TO PAY FOR THE TRANSACTION?

Choose One:
☐ Your Account
☑ Credit Card

Credit Card Type: (the following are accepted) ☐Visa ☐ MasterCard ☐Discover
Card Number: Chase Metals CC on file    3 Digit Security Code: _____   Exp Date: _____

Exact Name on Card:_____    Signature: _____

## 5. AUTHORIZATION

Signature:                                            Date: 7-20-18

Please read the disclosures listed here regarding signing and dating.

page 1 of 1                                Copyright 2013 New Direction IRA, Inc. PM EX rev 07/17

PMEX0003629

192



July 26ᵗʰ 2018

INVOICE

# **metals.com**
### *The #1 Name In Metals*

*433 N. Camden Dr, Suite 970*
*BEVERLY HILLS, CA 90210*
**Phone: 800-463-1326**
**Email: CORPORATE@METALS.COM**



B░░░░░░ B░░░░
## Liquidation Invoice
### New Direction
### Acct# ░░░░░░

**BILLING ADDRESS:**
*Metals.com*
*433 N. Camden Dr, Suite 970*
*BEVERLY HILLS, CA 90210*

**DELIVERY ADDRESS:**
*Delaware Depository Services Co.*
*3601 North Market Street*
*Wilmington, DE 19802*
*BMEA░░░░░░░*

## Comments or special Instructions:

| DESCRIPTION | Quantity | Unit Price | AMOUNT |
|---|---|---|---|
| Silver - Canadian Twin Maple Leaf - 2 oz | 7,492 | $37.00 | $277,204.00 |
| | | TOTAL | $277,204.00 |

RISK DISCLOSURE AND ACCOUNT AGREEMENT SIGNED AND UNDERSTOOD. Metals.com does not provide legal, tax, or investment advice. Nothing of the foregoing, or of any other written, electronic or oral statement or communication by Metals.com is to be construed as, is intended to be, or may be relied on, is legal, tax or investment advice, statements, opinions or disclosures. Prior to making any investment decisions, please consult with the appropriate legal, tax, and investment professionals for advice.

PMEX0003630

## 193

July 26th, 2018
INVOICE 

# metals.com
### The #1 Name In Metals

433 N. Camden Dr, Suite 970
BEVERLY HILLS, CA 90210
Phone: 800-483-1326
Email: CORPORATE@METALS.COM



B███ B█
**Purchase Invoice**
**New Direction**
**Acct#** ████

**BILLING ADDRESS:**
Metals.com
433 N. Camden Dr, Suite 970
BEVERLY HILLS, CA 90210

**DELIVERY ADDRESS:**
Delaware Depository Services Co.
3601 North Market Street
Wilmington, DE 19802

## Comments or special Instructions:

| DESCRIPTION | Quantity | Unit Price | AMOUNT |
|---|---|---|---|
| Silver - Buffalo Round .999 - 1.0 oz | 100 | $15.84 | $1,584.00 |
| Gold - Royal Canadian Mint Maple Leaf Coin .9999 - 1/20 oz | 100 | $80.56 | $8,056.00 |
| Silver - 2018 Royal Canadian Mint Polar Bear Coin .9999 - 1/2 oz | 8,207 | $28.98 | $237,838.86 |
| | | TOTAL | $247,478.86 |

RISK DISCLOSURE AND ACCOUNT AGREEMENT SIGNED AND UNDERSTOOD. Metals.com does not provide legal, tax, or investment advice. Nothing of the foregoing, or of any other written, electronic or oral statement or communication by Metals.com or its representatives, is intended to be, or may be relied on, legal, tax or investment advice, comments, opinions or predictions. Prior to making any investment decision, please consult with the appropriate legal, tax, and investment professionals for advice.

PMEX0003631

## 194

**New Direction IRA, Inc**       Prices as of 8/14/2018          8/14/2018          Page: **21.00** of **126.00**
                                                                                                **BRANCH: 11**

| Product Code | Product Description | Quantity | Fair Value / Unit | Fair Value |
|---|---|---|---|---|
| SML2TM | Canadian Twin Maple Leaf -- 2 oz | 7492.000 | $30.13 | $225,703.99 |
| | | | Total Fair Value | $225,703.99 |

**New Direction IRA, Inc**          Prices as of 8/14/4210          **9/12/2018**          **Page: 21.00 of 131.00**
**BRANCH: 11**

| Product Code | Product Description | Quantity | Fair Value / Unit | Fair Value |
|---|---|---|---|---|
| GMLTWA | Canadian Maple Leaf -- 1/30 oz | 100.000 | $70.39 | $7,039.00 |
| SMLHPB | Canadian Round, Polar Bear -- 1/3 oz. | 8305.000 | $5.14 | $58,579.37 |
| SR1RMCBUF | Bullion Round, RMC/Buffalo-- 1 oz. | 100.000 | $14.35 | $1,435.20 |
| | | | Total Fair Value | $66,245.56 |

PMEX0003634

# EXHIBIT D

# ATTACHMENT EE

**Metals Investor B.F.**

220

August 13th 2019
INVOICE 

# metals.com
*The #1 Name In Metals*

*433 N. Camden Dr, Suite 970*
**BEVERLY HILLS, CA 90210**
**Phone: 800-463-1326**
**Email: CORPORATE@METALS.COM**

B██████ F██████ 

## Purchase Invoice

**BILLING ADDRESS:**
*Metals.com*
*433 N. Camden Dr, Suite 970*
*BEVERLY HILLS, CA 90210*

**DELIVERY ADDRESS:**
B████ F█████
██████ RI 02882

## Comments or special instructions:

| DESCRIPTION | Quantity | Unit Price | AMOUNT |
|---|---|---|---|
| 1/10 oz Gold - 2019 Royal Canadian Mint Polar Bear Coin .9999 | 102 | $294.82 | $30,071.64 |
| 1/4 oz Gold - 2019 British Standard Coin .9999 | 18 | $731.80 | $13,172.40 |
| 1 oz Gold - American Eagle | 3 | $1,527.74 | $4,583.22 |
| 1 g Gold - Bar | 3 | $57.56 | $172.68 |
| | | **TOTAL** | $47,999.94 |

**FOIA Confidential Treatment Requested by Chase Metals**

TMTE_CFTC_07581

221