IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, *et al*.,<br><br> Plaintiffs,<br><br>v.<br><br>TMTE, INC. a/k/a METALS.COM, *et al*.,<br><br> Defendants;<br><br>and<br><br>TOWER EQUITY, LLC,<br><br> Relief Defendant. | Case No.: **3:20-CV-2910-X** |

**[PROPOSED] CONSENT ORDER OF PERMANENT INJUNCTION
AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST
DEFENDANTS TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC.,
CHASE METALS, LLC, BARRICK CAPITAL, INC.,
AND RELIEF DEFENDANT TOWER EQUITY, LLC**

On September 22, 2020, Plaintiffs Commodity Futures Trading Commission ("CFTC"),

and Alabama Securities Commission, State of Alaska, Arizona Corporation Commission,

California Commissioner of Business Oversight (now known as the Commissioner of Financial

Protection & Innovation), Colorado Securities Commissioner, State of Delaware, State of

Florida, Office of the Attorney General and State of Florida, Office of Financial Regulation,

Office of the Georgia Secretary of State, State of Hawaii, Securities Enforcement Branch, Idaho

Department of Finance, Indiana Securities Commissioner, Iowa Insurance Division, Office of the

Kansas Securities Commissioner, Kentucky Department of Financial Institutions, Maine

1

Securities Administrator, State of Maryland Ex Rel the Maryland Securities Commissioner, Attorney General Dana Nessel on Behalf of the People of Michigan, Mississippi Secretary of State, Nebraska Department of Banking & Finance, Office of the Nevada Secretary of State, New Mexico Securities Division, The People of the State of New York by Letitia James, Attorney General of the State of New York, Oklahoma Department of Securities, State of South Carolina, by and through Alan Wilson, South Carolina Attorney General, and Mark Hammond, South Carolina Secretary of State, South Dakota Department of Labor & Regulation, Division of Insurance, Commissioner of the Tennessee Department of Commerce and Insurance, State of Texas, Washington State Department of Financial Institutions, West Virginia Securities Commission, and State of Wisconsin (collectively "the States") filed a Complaint against Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Barrick Capital, Inc. and their principals, Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher, and Simon Batashvili and Relief Defendant Tower Equity, LLC, seeking injunctive and other statutory and equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1–26, and CFTC Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190, as well as violations of state laws.

The Court entered an ex parte statutory restraining order against Defendants on September 22, 2020 ("SRO," ECF No. 16), and Consent Orders for Preliminary Injunction and Other Statutory and Equitable Relief against Defendants and the Relief Defendant on October 14, 2020 (ECF Nos. 164, 165). Via the SRO, the Court appointed Kelly Crawford as Temporary Receiver with full equity receiver powers over Defendants and Relief Defendant, and any affiliates or subsidiaries owned or controlled by them ("Receivership Defendants") and of all

records, and all funds, properties, premises, accounts, income, now or hereafter due or owing to

the Receivership Defendants, and other assets directly or indirectly owned, beneficially or

otherwise, by the Receivership Defendants ("Receivership Estate").  (ECF No. 16 at ¶ 30).  Via

the Consent Orders of Preliminary Injunction, the Court appointed Kelly Crawford as Receiver

in this action, with all of the duties and powers set forth in the SRO.  (ECF No. 164 at ¶ 29; ECF

No. 165 at ¶ 30).

## I.    CONSENTS AND AGREEMENTS

To effect partial settlement of the matters alleged in the Complaint against Defendants

TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc. (collectively "Metals"),

Barrick Capital, Inc. ("Barrick"), and Relief Defendant Tower Equity, LLC ("Tower Equity"),

without a trial on the merits or any further judicial proceedings, Defendants Metals and Barrick

and Relief Defendant Tower Equity, each through Kelly Crawford, solely in his capacity as the

court-appointed Receiver in this matter ("Receiver"), acting on behalf of such entities, and based

upon the information provided to the Receiver and the Receiver's investigation:

1.    Consent to the entry of this *Consent Order of Permanent Injunction and Other

*Statutory and Equitable Relief Against Defendants TMTE, Inc. a/k/a Metals.com, Chase Metals,*

*LLC, Chase Metals, Inc., Barrick Capital, Inc., and Relief Defendant Tower Equity, LLC*

("Consent Order");

2.    Affirm that they have read and agreed to this Consent Order voluntarily, and that

no promise, other than as specifically contained herein, or threat, has been made by the CFTC,

the States, or any member, officer, agent or representative thereof, or by any other person, to

induce consent to this Consent Order;

3.    Acknowledge service of the summons and Complaint;

4.     Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Sections 6c and 6d(l) of the Act, 7 U.S.C. §§ 13a-1, 13a-2(1);

5.     Admit the jurisdiction of the CFTC and the States over the conduct and transactions at issue in this action pursuant to the Act and the state law violations alleged in the Complaint;

6.     Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e);

7.     Waive**:**

(a)     Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the CFTC in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2024), relating to, or arising from, this action;

(b)     Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

(c)     Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)     Any and all rights of appeal from this Consent Order;

8.     Acknowledge that they are not a prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act as specified in subpart (a) of the preceding paragraph.

9.     Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order, the terms and conditions of SRO (ECF No. 16) and Consent Order of Preliminary Injunction and Other Equitable Relief (ECF No. 164) entered in this matter, and for any other purpose relevant to this

action, even if Metals, Barrick, or Tower Equity now or in the future reside outside the jurisdiction of this Court;

10.     Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

11.     Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the CFTC or the States are not a party.  Metals, Barrick, and Tower Equity shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

12.     Admit to all of the findings made in this Consent Order and all of the allegations in the Complaint;

13.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against them in any other proceeding;

14.     Consent to pay restitution, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the CFTC and the States and/or hearing before this Court;

15.    Consent to pay disgorgement, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the CFTC and the States and/or hearing before this Court; and

16.    Consent to pay a civil monetary penalty, plus post-judgment interest, in an amount to be determined upon subsequent consent order or motion by the CFTC and the States and/or hearing before this Court.

## II.    FINDINGS AND CONCLUSIONS

17.    The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction, and statutory and equitable relief pursuant to Sections 6c and 6d(1) of the Act, 7 U.S.C. §§ 13a-1, 13a-2, as set forth herein.  The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.    Findings of Fact**

**1.    The Parties to this Consent Order**

**Plaintiffs**

18.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

19.    Plaintiff States are authorized under Section 6d(l) of the CEA, 7 U.S.C. § 13a-2(1), and their respective State laws, to bring this action on behalf of their State and their citizens to enforce the CEA and CFTC Regulations.  All Plaintiff States except Arizona and Wisconsin are parties to this Consent Order.

6

20.     Plaintiffs Alabama Securities Commission, State of Alaska, California Commissioner of Business Oversight (now known as the Commissioner of Financial Protection & Innovation), Colorado Securities Commissioner, State of Florida, Office of the Attorney General and State of Florida, Office of Financial Regulation, Office of the Georgia Secretary of State, Kentucky Department of Financial Institutions, State of Maryland ex rel. Maryland Securities Commissioner, South Carolina Attorney General, and South Carolina Secretary of State, and State of Texas are authorized under their respective State laws, to bring their State law claims on behalf of their State and their citizens to enforce State laws.

**Defendants**

21.     Defendant TMTE, Inc., d/b/a Metals.com is a Wyoming corporation with its headquarters at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming.  TMTE, Inc. uses or has used the business names Metals.com, Chase Metals, LLC, and Chase Metals, Inc.  TMTE had a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd Suite 700 Beverly Hills, California.  TMTE was originally organized as a Wyoming limited liability corporation on April 30, 2008.  It converted to a corporation on March 8, 2017, under the name Chase Metals, Inc.

22.     Defendant Chase Metals, Inc. is a Wyoming corporation now known as TMTE, Inc.  Its headquarters were located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it had a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

23.     Defendant Chase Metals, LLC, is a Wyoming limited liability company converted to a Wyoming corporation now known as TMTE, Inc.  Its headquarters were located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it had a place of business at 433 N.

Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

24.     Defendant Barrick Capital, Inc. is a Delaware corporation incorporated on August 20, 2019.  It had a place of business at 8383 Wilshire Blvd., Suite 700, Beverly Hills, California. Barrick shared common ownership, operations, employees, office space, and overnight mail account with Metals.

**Relief Defendant**

25.     Relief Defendant Tower Equity, LLC is a Wyoming limited liability company formed in June 2013.  It had a place of business at 8383 Wilshire Blvd., Beverly Hills, CA 90211.

### 2.     Defendants Metals and Barrick Defrauded Elderly Investors into Establishing SDIRAs to Purchase Precious Metals Bullion

26.     From at least September 1, 2017, through September 22, 2020 ("Relevant Period"), Defendants Metals and Barrick, by and through their sales representatives or other agents, engaged in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion ("Precious Metals Bullion").

27.     Defendants Metals and Barrick targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion.  By making material misrepresentations and omissions, Defendants Metals and Barrick deceived investors into purchasing Precious Metals Bullion at prices averaging from 100% to over 200% over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price").

28.     Defendants Metals and Barrick deceived at least 1,300 elderly investors into transferring funds from their retirement savings, including funds from liquidating securities, to self-directed individual retirement accounts ("SDIRAs") to purchase Precious Metals Bullion.

Defendants Metals and Barrick deceived elderly investors into investing in Precious Metals Bullion by misrepresenting the operation, risks, and safety of investors' retirement savings. Defendants Metals and Barrick also fraudulently induced by telephone over 300 elderly and retirement-aged investors to purchase Precious Metals Bullion with cash or credit ("Cash Account").

29.     Defendants Metals and Barrick, by and through their sales representatives or other agents, concentrated their solicitations on elderly or retirement-aged persons to gain access to their retirement savings, including but not limited to, retirement savings held in tax advantaged accounts such as Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

30.     Sales representatives or other agents of Defendants Metals and Barrick employed solicitations designed to instill fear in elderly and retirement aged investors and build trust with investors based on representations of political and religious affinity.

31.     Defendants Metals and Barrick targeted such elderly and retirement aged investors by, among other things, placing their advertisements on conservative media and websites.

32.     Defendants Metals and Barrick, by and through their sales representatives or other agents, directed investors to open SDIRAs and to transfer funds from their Qualified Retirement Savings to the newly established SDIRAs.

33.     Defendants Metals and Barrick, by and through their sales representatives or other agents, engaged in the business of advising investors to liquidate preexisting Qualified

Retirement Savings, including liquidating securities, and transferring those funds to a SDIRA in order to purchase Precious Metals Bullion.

34.     Defendants Metals and Barrick, by and through their sales representatives or other agents, solicited investors through telephonic solicitations, social media solicitations, and through their websites, http://www.metals.com and http://barrickcapital.com.

35.     During the Relevant Period, Defendants Metals and Barrick, by and through their sales representatives or other agents, directed at least 1,300 investors to open SDIRAs.  These SDIRAs were mostly opened by persons between the ages of sixty and ninety.

36.     Metals, by and through its sales representatives or other agents, defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to those accounts by making material misrepresentations and omissions intended to instill fear in the investors including, but not limited to:

> a.  Misrepresenting that the United States government was going to take Qualified Retirement Savings funds in a "Bail-in" to help banks and government programs;
>
> b.  Misrepresenting that IRA custodians are in financial trouble and are likely to collapse;
>
> c.  Misrepresenting that it is unclear who actually owns the underlying securities in IRA accounts; and
>
> d.  Misrepresenting that the government could seize funds held in Qualified Retirement Savings but could not seize Precious Metals Bullion held in SDIRAs.

37.     A large majority of the funds in the SDIRAs were transfers of funds from preexisting Qualified Retirement Savings. During the Relevant Period, Defendants Metals and Barrick directed investors to use over $140 million from SDIRAs to purchase fraudulently overpriced Precious Metals Bullion.

38.     During the Relevant Period, Defendants Metals and Barrick, by and through its sales representatives or other agents, instructed investors to send approximately $5 million to Relief Defendant Tower Equity.  Between November 2018 and July 2019, Metals sales representatives or other agents directed at least 11 investors to send funds, by check or wire transfer, to the Tower Equity bank account at Bank of America to purchase Precious Metals Bullion from Metals.  Tower Equity has no legitimate claim or interest to the funds that it received as a result of the Defendants Metals and Barrick's fraudulent conduct.

### 3.     Metals Defrauded Elderly Investors to Buy Overpriced Polar Bear Bullion That Bore No Relationship to The Prevailing Market Price

39.     Metals, by and through its sales representatives or other agents, solicited investors and sold them gold and silver Precious Metals Bullion at fraudulently inflated prices over the Prevailing Market Price.

40.     Silver and gold precious metals are statutorily-defined commodities under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

41.     The term "bullion" refers to precious metals in the form of bars, ingots, or coins in which the value is typically determined by the value of the precious metal content.

42.     Metals, by and through its sales representatives or other agents, fraudulently solicited and sold Precious Metals Bullion in the form of the following three gold and silver bullion coins (collectively "Polar Bear Bullion"):

        a.     The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

        b.     The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and

        c.     The 1/4 ounce Gold British Standard Bullion.

43.     The actual value of Polar Bear Bullion is the Prevailing Market Price of the gold and silver precious metal contained in the Precious Metals Bullion coins.

44.     Metals, by and through its sales representatives or other agents, failed to disclose the markup charged to customers over the Prevailing Market Price ("Markups").

45.     Metals, by and through its sales representatives or other agents, charged investors undisclosed excessive Markups on Polar Bear Bullion that bore no reasonable relation to the Prevailing Market Price.

46.     Metals' failure to disclose, by and through its sales representatives or other agents, unreasonable and excessive Markups on Polar Bear Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Polar Bear Bullion.

47.     Metals, by and through its sales representatives or other agents, failed to disclose to SDIRA and Cash Account investors that the fraudulently over-priced Polar Bear Bullion at the time of purchase averaged:

  a. 213% for 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of silver bullion;

  b. 120% for 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of gold bullion;

  c. 116% for 1/4 ounce Gold British Standard Bullion over the Prevailing Market Price of gold bullion; and

  d. 21% for all other Precious Metals Bullion over the Prevailing Market Price of the bullion.

48.     During the Relevant Period, Metals fraudulently sold to SDIRA and Cash Account investors:

  a. At least 4.1 million units of 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion for over $102.4 million;

  b. At least 106,123 units of 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion for over $31.2 million; and

  c. At least 34,120 units of 1/4 ounce Gold British Standard Bullion for over $24 million.

49.     During the Relevant Period, the percentages of Precious Metals Bullion sold to SDIRA and Cash Account investors by telephone by Metals were approximately:

     a.   58% of sales were 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

     b.   17% of sales were 1/10 Gold Royal Canadian Mint Polar Bear Bullion;

     c.   13% of sales were 1/4 ounce Gold British Standard Bullion; and

     d.   10% of sales were every other type of bullion sold by Metals to investors.

50.     During the Relevant Period, Metals, by and through its sales representatives or other agents, specifically selected and directed elderly and/or retirement-aged SDIRA and Cash Account investors to purchase fraudulently priced Polar Bear Bullion.

51.     As part of the scheme to defraud, Metals, by and through its sales representatives or other agents, directed investors to use Qualified Retirement Savings in their SDIRAs and funds in their Cash Accounts to purchase fraudulently priced Polar Bear Bullion.

52.     During the Relevant Period, approximately 90% of the total amount of investors' funds solicited and received by Metals from investors was to buy Polar Bear Bullion.

**4.     Metals Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses**

53.     Metals, by and through its sales representatives or other agents, failed to disclose to SDIRA and Cash Account investors that the undisclosed, excessive, and unreasonable Markups over the Prevailing Market Price on Polar Bear Bullion resulted in substantial investor losses.

54.     Metals, by and through its sales representatives or other agents, misrepresented that Precious Metals Bullion were safe and conservative investments and that investors would not lose their funds.

55.     Contrary to Metals' misrepresentations and omissions, Metals knew or had a reckless disregard for the truth that virtually all of its SDIRA and Cash Account investors immediately lost the majority of their funds invested in Polar Bear Bullion.

56.     Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that investors suffered large losses on Polar Bear Bullion. Instead, Metals, by and through its sales representatives or other agents, continued to misrepresent to prospective and current SDIRA and Cash Account investors that Precious Metals Bullion were a safe and conservative investment and that investors would not lose their funds.

57.     Metals, by and through its sales representatives or other agents, failed to disclose to its SDIRA and Cash Account investors that the fraudulently overpriced Polar Bear Bullion materially impacted their ability to profit and the risk of loss.

58.     Metals, by and through its sales representatives or other agents, failed to disclose to its SDIRA and Cash Account investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Polar Bear Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and that selling their Precious Metals Bullion could incur additional transaction costs.

59.     Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that because of Metals' undisclosed, fraudulent, and exorbitant Markups on Polar Bear Bullion, most investors lost the majority of their investment funds immediately upon consummating the transaction.  It is a material fact to an investor making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

**5.      Metals Fraudulently Charged Undisclosed Spreads on Polar Bear Bullion That Vastly Exceeded the Spread Represented in Customer Agreements**

60.     During the relevant period, Metals, by and through its sales representatives or other agents, executed with investors a shipping and transaction agreement ("Customer Agreement #1") for the purchase of Precious Metals Bullion.

61.     Customer Agreement #1 contains terms and conditions of the sale of Precious Metals Bullion. Customer Agreement #1 states, in pertinent part, that:

    a.   "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons . . ."

    b.   "At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) …"

    c.   "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells."

62.     Beginning on or about June 2019 and continuing thereafter, Metals, by and through its sales representatives or other agents, executed with at least 190 investors a new shipping and transaction agreement ("Customer Agreement #2") for the purchase of Precious Metals Bullion.

63.     Section 3(a) of both Customer Agreement #1 and Customer Agreement #2 states: "Within the Precious Metals industry, the difference between [M]etals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the 'Spread'" (herein: "Spread").

64.     Customer Agreement #2 was substantially similar to Customer Agreement #1, except that it represented that the Spread Metals charged on IRA Precious Metals Bullion

transactions was significantly smaller. Customer Agreement #2 represented that the Spread on IRA Precious Metals Bullion transaction only varies between 1% to 19.9%, rather than 2% to 33%. This is a material purported reduction in the Spread.

65.     Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains 1% to 5%, Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to 19.9%). Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."

66.     The Spread charged to investors pursuant to Customer Agreement #1 and Customer Agreement #2 represents the difference between what Metals paid for the Precious Metals Bullion and what they charged investors.

67.     As part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in Customer Agreement #1 and Customer Agreement #2.

68.     Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth when they represented in Customer Agreement #1 and Customer Agreement #2 that the Spread on IRA Precious Metals Bullion transactions varies between 2% and 33% or 1% and 19.9%, respectively. Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that the actual Spreads they were charging investors on Polar Bear Bullion vastly exceeded this range.

69.     For Customer Agreement #1, Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth when they represented the Spread on

Cash Account transactions was 1% to 5%. Metals knew or had a reckless disregard for the truth that the Spreads that they were actually charging investors on Polar Bear Bullion vastly exceeded this range.

70.    For Customer Agreement #2, Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth when they represented the Spread on Cash Account transactions varies between 1% and 19.9%. Metals knew or had a reckless disregard for the truth that the Spreads that they were actually charging investors on Polar Bear Bullion vastly exceeded this range.

71.    Metals, by and through its sales representatives or other agents, failed to disclose to their SDIRA and Cash Account investors the true Spread and excessive Markups on Polar Bear Bullion that they were charging them. Instead, Metals, by and through its sales representatives or other agents, instructed its sales representatives and other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price.

72.    Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that the Spreads charged by Metals to their elderly or retirement-aged SDIRA and Cash Account investors for the Polar Bear Bullion averaged:

a.    128% for Silver Royal Canadian Mint Polar Bear Bullion;

b.    91% for Gold Royal Canadian Mint Polar Bear Bullion; and

c.    108% for Gold British Standard Bullion.

73.    Metals, by and through its sales representatives or other agents, deceptively failed to disclose to investors the material fact that none of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in Customer Agreement #1 and Customer Agreement #2.

**6.    Metals Misrepresented That Polar Bear Bullion Have Numismatic or Semi-Numismatic Value to Deceive Investors and Conceal Defendants Metals and Barrick's Fraud**

74.    As part of the scheme to defraud, Metals, by and through its sales representatives or other agents, fraudulently misrepresented that Polar Bear Bullion were numismatic or semi-numismatic Precious Metals Bullion.

75.    Numismatic Precious Metals Bullion is rare, of limited availability, and has significant broad-based market demand and so has a value substantially more than the Prevailing Market Price of the precious metal contained in the bullion.  Semi-numismatic Precious Metals Bullion refers to bullion that is claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

76.    Contrary to Metals' false claims, Polar Bear Bullion has no numismatic or semi-numismatic value.  Polar Bear Bullion is readily available to the public and is not rare. In fact, there are over 4 million units of Polar Bear Bullion in circulation.

77.    Metals, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth when they falsely represented to investors that Polar Bear Bullion had numismatic or semi-numismatic value.

78.    Sometime after their initial purchase from Metals, investors received account statements from their SDIRA administrators showing an account value that was significantly smaller than what Metals, by and through its sales representatives or other agents, misrepresented to investors. The SDIRA statements showed the accurate value of the Polar Bear Bullion based on the Prevailing Market Price of the bullion.

79.    Metals, by and through its sales representatives or other agents, fraudulently represented to investors that Polar Bear Bullion were worth significantly more than the Prevailing Market Price.

80.    Metals, by and through its sales representatives or other agents, fraudulently represented to investors that the lower valuation on their SDIRA statements was an under valuation that did not reflect the resale value of the Polar Bear Bullion ("Post-Purchase Misrepresentations").

81.    Metals, by and through its sales representatives or other agents, materially omitted to inform investors that the value of Polar Bear Bullion listed on SIDRA statements was based on the Prevailing Market Price.  Metals, by and through its sales representatives or other agents, also materially omitted to disclose to investors that Polar Bear Bullion were worth significantly less than the value Metals misrepresented to investors because they carry no premium over the Prevailing Market Price of Precious Metals Bullion.

82.    Metals, by and through its sales representatives or other agents, referred to the deception or artifice to defraud in the Post-Purchase Misrepresentations as a "Tuck-In."  Metals, by and through its sales representatives or other agents, made the Post-Purchase Misrepresentations to placate and calm investors who were upset about the losses shown on their SDIRA statements.  In fact, Metals, by and through its sales representatives or other agents, knowingly or with reckless disregard for the truth, made these misrepresentations and omissions designed to conceal their fraudulent scheme.

### 7.    Metals Failed to Disclose State Enforcement Actions

83.    During the Relevant Period, Metals was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Orders and Complaints") taken against Metals and various officers, employees, or

other agents by State Securities Regulators, in Alabama, Alaska, Arkansas, Colorado, Georgia, Kentucky, Massachusetts, Minnesota, Missouri, Montana, Nevada, and Texas.

84.     Metals, by and through its sales representatives or other agents, failed to disclose to investors or prospective investors of the State Orders and Complaints.  This is a material fact to investors who were determining or agreed to do business with Metals.

### 8.      Barrick and Metals are a Common Enterprise

85.     On August 20, 2019, after States began issuing the State Orders and Complaints, Barrick was incorporated and continued to engage in the same fraudulent scheme that was perpetrated by Metals.

86.     Metals and Barrick are a common enterprise with little to no distinction between the ownership and operations of Metals and Barrick. Metals and Barrick have common ownership and control. Further, many of the sales representatives and other employees and agents of Metals moved to Barrick and have performed the same work for Barrick as they did at Metals. Further, Metals and Barrick operated out of the same office and shared the same overnight delivery service account.

### 9.      Barrick Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses on Fraudulently Overpriced Barrick Bullion

87.     As part of the scheme to defraud, Barrick, by and through its sales representatives or other agents, directed elderly SDIRA investors to purchase the following Precious Metals Bullion in the form of the following three Precious Metals Bullion coins at fraudulently inflated prices over the Prevailing Market Price ("collectively "Barrick Bullion"):

      a.   1/10 ounce Silver Spade Guinea;

      b.   1/10 ounce Silver Britannia; and

      c.   1/10 ounce Gold Royal Canadian Wildlife Series.

88.     During the Relevant Period, Barrick, by and through its sales representatives or other agents, directed elderly SDIRA investors to purchase Barrick Bullion.

89.     As part of Barrick's scheme to defraud and Barrick's and Metals' common enterprise, Barrick, by and through its sales representatives or other agents, failed to disclose to investors that the 1/10 ounce Gold Royal Canadian Wildlife Series was the same item sold by Metals as the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion.

90.     The actual value of Barrick Bullion is the Prevailing Market Price of the Precious Metals Bullion contained in the bullion coins.

91.     Barrick, by and through its sales representatives or other agents, charged investors undisclosed excessive Markups on Barrick Bullion that bore no reasonable relation to the Prevailing Market Price.

92.     Barrick's failure to disclose unreasonable and excessive Markups on Barrick Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Barrick Bullion.

93.     Barrick, by and through their sales representatives or other agents, failed to disclose to SDIRA investors that the Markup on the fraudulently over-priced Barrick Bullion at the time of purchase averaged:

    a.  312% for 1/10 ounce Silver Spade Guinea over the Prevailing Market Price of silver bullion;

    b.  287% for 1/10 ounce Silver Britannia over the Prevailing Market Price of silver bullion; and

    c.  128% for the 1/10 ounce Gold Royal Canadian Wildlife Series over the Prevailing Market Price of gold bullion.

94.     During the Relevant Period, Barrick, by and through its sales representatives or other agents, fraudulently sold to SDIRA investors:

    a.  At least 567,800 units of the 1/10 ounce Silver Spade Guinea for over $3.8 million;

    b.  At least 93,000 units of the ounce Silver Britannia for over $611,600; and

    c.  At least 17,660 units of the 1/10 ounce Gold Royal Canadian Wildlife Series for over $6.59 million.

95.   During the Relevant Period, the percentages of Precious Metals Bullion sold to investors by Barrick were approximately:

    a.  32.5% of sales were Silver Spade Guinea;

    b.  13.5% of sales were Silver Britannia;

    c.  56% of sales were Gold Royal Canadian Wildlife; and

    d.  6% of sales were every other type of Precious Metals Bullion sold by Barrick to investors.

96.   Barrick, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that the Spread charged by Barrick to their elderly or retirement-aged SDIRA investors for the Barrick Bullion averaged approximately:

    a.  114.5% for Silver Spade Guinea;

    b.  100% for Silver Britannia; and

    c.  97.5% for Gold Royal Canadian Wildlife.

97.   During the Relevant Period, approximately 93.9% of the total amount of investors' funds solicited and received by Barrick, by and through its sales representatives or other agents, from investors was to buy Barrick Bullion.

98.   Contrary to Barrick's misrepresentations and omissions, Barrick, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that virtually all of its SDIRA investors immediately lost the majority of their funds invested in Barrick Bullion.

99.    Barrick, by and through their sales representatives or other agents, failed to disclose to its SDIRA investors that the fraudulently overpriced Barrick Bullion materially impacted their ability to profit and the risk of loss.

100.    Barrick, by and through its sales representatives or other agents, failed to disclose to its SDIRA investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Barrick Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and that selling their Precious Metals Bullion could incur additional transaction costs.

101.    Barrick, by and through its sales representatives or other agents, knew or had a reckless disregard for the truth that Barrick's undisclosed, fraudulent, and exorbitant Markups on Barrick Bullion resulted in most investors losing the majority of their investment funds immediately upon consummating the transaction.  It is a material fact to an investor who is making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

**10.    Defendants Metals and Barrick Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives, Violated Their Fiduciary Duty, and Engaged in Fraud**

**a.    Defendants Metals and Barrick Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives**

102.    Defendants Metals and Barrick, by and through their sales representatives or other agents, offered and provided investment advice to investors for compensation.

103.    Defendants Metals and Barrick, by and through their sales representatives or other agents, engaged in the business of providing investment advice to investors in order to earn compensation from the liquidation of investors' Qualified Retirement Savings, some of which held securities.

104.     Metals financially and culturally incentivized its sales representatives or other agents to liquidate investors' Qualified Retirement Savings and transfer as much money as possible to a SDIRA to purchase Precious Metals Bullion.

105.     Defendants Metals and Barrick, by and through their sales representatives or other agents, offered and provided investment advice to investors to sell securities.

106.     As part of the scheme to defraud, when Defendants Metals and Barrick, by and through their sales representatives or other agents, recruited a potential investor, Defendants Metals and Barrick provided investment advice to induce the investors to liquidate their Qualified Retirement Savings, which included securities holdings.  Defendants Metals and Barrick, by and through their sales representatives or other agents, transferred those Qualified Retirement Savings into SDIRAs and assisted the investors in doing so.

107.     Defendants Metals and Barrick, by and through their sales representatives or other agents, sent investors electronic SDIRA transfer forms that were already filled out and ready for investors to sign.  In some cases, Defendants Metals and Barrick's sales representatives or other agents facilitated phone calls between an investor and the entity holding the investor's Qualified Retirement Savings, which included securities, to arrange the liquidation of investor's Qualified Retirement Savings and the transfer of their Qualified Retirement Savings into a SDIRA.

108.     Defendants Metals and Barrick, by and through its sales representatives or other agents, provided investment advice and directed investors to purchase Precious Metals Bullion through their SDIRAs.

109.     Metals and Barrick, by and through their sales representatives or other agents, generally designated themselves as an "interested party" on investors' SDIRA accounts.

Defendants Metals and Barrick, through Barrick's and Metals' designation as an interested party, received unlimited access to investors' SDIRA account information.

110.    Defendants Metals and Barrick, by and through their sales representatives or other agents, acted as Investment Advisers ("IAs") and investment adviser representatives ("IARs") (collectively, "IAs & IARs"), because Defendants Metals and Barrick, for compensation, engaged in the business of advising another, directly and by or through publications or writings, to wit:

a.    Defendants Metals and Barrick, by and through their sales representatives or other agents, held themselves out as IAs & IARs to investors;

b.    Defendants Metals and Barrick, by and through their sales representatives or other agents, solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling securities;

c.    Defendants Metals and Barrick, by and through their sales representatives or other agents, touted the advantages of Precious Metals Bullion as an alternative to stocks, bonds, and the Dollar;

d.    Defendants Metals and Barrick, by and through their sales representatives or other agents, advised about market trends, specifically that the stock market would fail or lose value;

e.    Metals, by and through its sales representatives or other agents, sent victims emails highlighting articles that would induce fear in the investors about their preexisting Qualified Retirement Savings;

f.    Defendants Metals and Barrick, by and through their sales representatives or other agents, advised and directed investors to sell securities held in Qualified Retirement Savings and transfer to SDIRAs in order to purchase Precious Metals Bullion, including Polar Bear Bullion and Barrick Bullion, from Defendants Metals and Barrick;

g.    Defendants Metals and Barrick, by and through their sales representatives or other agents, provided asset allocation advice, contrary their own websites' recommendations regarding the maximum percentage of Qualified Retirement Savings that should be allocated to Precious Metals Bullion, specifically recommending the full liquidation of Qualified Retirement Savings in order to purchase Precious Metals Bullion with all of the funds transferred; and

h.  Metals, by and through its sales representatives or other agents, advised investors to liquidate specific Qualified Retirement Savings or specific investments that contained securities.

111.    Metals and Barrick have never been registered as IAs, nor have their agents been registered as IARs required under state and/or federal law.  Defendants Metals and Barrick or their agents never submitted a notice filing with the appropriate State regulator as an IA or IAR, nor are they exempt from State registration as an IA or IAR.

**b.    As Investment Advisers or Investment Adviser Representatives, Defendants Metals and Barrick Violated Their Fiduciary Duty to Investors and Engaged in Fraud**

112.    Defendants Metals and Barrick acted as IAs & IARs. IAs & IARs have a fiduciary duty to their clients.  By acting as IAs & IARs, Defendants Metals and Barrick have a duty to their clients beyond the general prohibition on fraud arising from the CEA.

113.    The fiduciary duty requires IAs & IARs to act primarily for the benefit of their clients. At a minimum, to avoid violating their fiduciary duty, IAs & IARs:

a.  Must avoid conflicts of interest with investors;

b.  Must have reasonable grounds that their recommendations to investors are suitable based on a reasonable inquiry concerning the investor's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the investor's finances;

c.  May not charge unreasonable fees;

d.  Must disclose material facts to the investors, including conflicts of interest; and

e.  May not make material misrepresentations or omissions to investors;

114.    Defendants Metals and Barrick violated their fiduciary duty to investors by making recommendations where they have a conflict of interest with their clients, making unsuitable recommendations, charging unreasonable fees, failing to disclose conflicts of interest,

including those related to how Defendants Metals and Barrick and their sales representatives or other agents were paid, and making material misrepresentations or omissions to investors.

115.    Regarding suitability, Defendants Metals and Barrick engaged in fraud and violated their fiduciary duty through conduct including, but not limited to, the following:

    a.    Defendants Metals and Barrick targeted primarily senior and retirement-age investors with scare tactics to instill the fear that investors' Qualified Retirement Savings, including securities, were imperiled by government action or market forces;

    b.    Defendants Metals and Barrick failed to make reasonable inquiry into, or take consideration of, investors' investment objectives, financial situation and needs, or station in life when advising investors to liquidate their Qualified Retirement Savings;

    c.    Defendants Metals and Barrick used information gathered about investors' circumstances to encourage investment in Precious Metals Bullion instead of using the information to determine the suitability of the recommendations for the investors;

    d.    Defendants Metals and Barrick advised investors to transfer their entire Qualified Retirement Savings to Precious Metals Bullion—a single alternative asset class; and

    e.    Defendants Metals and Barrick failed to advise investors of the recommendation in Metals' Customer Agreements that no investor should invest more than 20 percent of the available investment funds in Precious Metals Bullion, and instead advised Defendants Metals and Barrick to transfer as much funds as they could, up to their entire Qualified Retirement Savings.

116.    Defendants Metals and Barrick further violated their fiduciary duty to investors by charging Spreads that constitute an unreasonable fee. The Spreads disclosed in the Customer Agreements lack definiteness and are unreasonable at the upper end of the range. Most egregiously, and fraudulently, the Spreads actually charged investors were far greater than the range represented in the Customer Agreements. In particular:

    a.    The Spread indicated by Metals' Customer Agreements for IRA transactions ranged from 2-33% in Customer Agreement #1 and from 1-19.9% in Customer Agreement #2. The Customer Agreement describes Precious Metals Bullion products with a Spread of 1-5% and actual purchases of other

Precious Metals Bullion had a Spread of between 6% and 11%;

b.   The Spread actually charged to investors for Polar Bear Bullion had no rational relationship to the Spread or fee Metals otherwise represented or charged for other Precious Metals Bullion;

c.   The range of the Spread indicated by Metals' Customer Agreements for IRA transactions lacked definiteness and disclosed an unreasonable range, leaving the true cost to prospective investors uncertain;

d.   Most of the range of the Spread indicated by Metals' Customer Agreements for IRA transactions provided a fee far in excess of IAs & IARs' industry standards; and

e.   Defendants Metals and Barrick knew that due to the size of the Spread actually charged investors, in addition to the upper ranges of the Spread represented in the Customer Agreements for IRA transactions, investors' ability to profit and not sustain a loss on the overpriced Precious Metals Bullion were dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

117.   Defendants Metals and Barrick, by and through their sales representatives or other agents, engaged in fraud and violated their fiduciary duty by making material misrepresentations and material omissions in providing investment advice to investors to transfer their Qualified Retirement Savings, including divesting themselves of securities, and purchase Precious Metals Bullion from Metals.

118.   Defendants Metals and Barrick, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding Qualified Retirement Savings, including securities, as compared to Precious Metals Bullion which included, but were not limited to, the following:

a.   Made misleading statements to instill fear in elderly and retirement-aged investors about their Qualified Retirement Savings in order to justify the advice to liquidate and transfer these funds to Defendants Metals and Barrick for purchase of Precious Metals Bullion;

b.   Misrepresented that the government was going to take their retirement funds from Qualified Retirement Savings in a "Bail-in" to help banks and

government programs;

c.  Misrepresented that IRA custodians are in bad shape, custodians are likely to fall apart, and that it is unclear who actually owns the underlying securities held in Qualified Retirement Savings accounts;

d.  Misrepresented that the government could seize funds held in Qualified Retirement Savings, but not Precious Metals Bullion accounts;

e.  Misrepresented that Precious Metals Bullion investments could not lose value;

f.  Misrepresented that investors would profit from Precious Metals Bullion;

g.  Misrepresented that Precious Metals Bullion would provide a greater rate of return that securities;

h.  Misrepresented that the tax benefits of Precious Metals Bullion were better than securities;

i.  Misrepresented that Precious Metals Bullion were definitively a safer, more conservative, or less volatile investment than securities; and

j.  Omitted that precious metals involve considerable risk and are at times volatile investments that are affected by economic conditions, political events, and speculative activities.

119.  Defendants Metals and Barrick, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their connections to and relationships with conservative media personalities which included, but were not limited to, the following:

a.  Misrepresented that Defendants Asher and Batashvili are friends with a conservative television and radio personality and that this conservative personality recommended buying Precious Metals Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation; and

b.  Misrepresented that this conservative television and radio personality was affiliated with, backed, or endorsed Metals despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation.

120.  Defendants Metals and Barrick, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding the experience and

expertise of their sales representatives or other agents which included, but were not limited to, the following:

  a. Misrepresented and/or omitted their lack of experience in determining whether securities and other investments constitute suitable investments for the investor;

  b. Misrepresented or omitted their lack of experience in valuing securities and calculating market volatility;

  c. Misrepresented or omitted their lack of experience in forecasting economic conditions, such as the likelihood of recession and the possibility of inflation, as well as predicting the exchange rate of the Dollar; and

  d. Misrepresented or omitted their experience in determining whether securities and other investments constitute appropriate products for these elderly investors.

121. Defendants Metals and Barrick, by and through their sales representatives or other agents, made material omissions by failing to disclose information about complaints, including complaints relating to fraudulent, deceptive, and illegal practices, sent, submitted, or otherwise levied by prior investors.

122. Defendants Metals and Barrick, by and through their sales representatives or other agents, made material omissions by failing to disclose the identities of Defendants Metals and Barrick's sales representatives or other agents during interactions with investors by using false names and not disclosing the true identity of Defendants Metals and Barrick's sales representatives or other agents.

123. Defendants Metals and Barrick, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their compensation structure which included, but were not limited to, the following:

  a. Misrepresented how the Defendants Metals' and Barrick's sales representatives or other agents were compensated; and

  b. Failed to reveal conflicts of interest arising from Defendants Metals' and

Barrick's sales representative compensation being tied to the amount of funds from investors' Qualified Retirement Savings invested in Precious Metals Bullion.

124.    Defendants Metals and Barrick, by and through their sales representatives or other agents, made material misrepresentations regarding their Spread and fees, which included, but were not limited to, the following:

    a.    Misrepresented to investors that Metals would pay any fees, such as storage fees, associated with their Precious Metals Bullion for the first 2-5 years, depending on the investor; and

    b.    Misrepresented to investors that the funds transferred from Qualified Retirement Savings and Cash Accounts were used to purchase Precious Metals Bullion, when in fact Metals and Barrick charged large percentages in excess of the Prevailing Market Price.

125.    Defendants Metals and Barrick, by and through their sales representatives or other agents, made material omissions regarding Defendants Metals and Barrick's Spread on Precious Metals Bullion, which included, but were not limited to, the following:

    a.    Failed to disclose the actual Spread charged to investors;

    b.    Failed to disclose the method of calculating compensation and amount of compensation actually paid to sales representatives or other agents who sold Precious Metals Bullion to investors;

    c.    Failed to disclose that the Spreads actually charged and that the Spreads represented in Customer Agreement #1 and Customer Agreement #2 materially impacted investors' ability to profit and the risk of loss;

    d.    Failed to disclose that an investor's ability to profit and not sustain a loss on the Precious Metals Bullion investment was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs;

    e.    Failed to disclose the losses that investors would incur upon transferring their Qualified Retirement Savings to a SDIRA and purchasing Precious Metals Bullion based on the Spread actually charged by Metals or the Spread represented in Customer Agreement #1 and Customer Agreement #2; and

    f.    Failed to disclose that Precious Metals Bullion might not appreciate enough to cover storage and SDIRA fees associated with Precious Metals Bullion

31

investments.

### 11.    Funds Received by Relief Defendant Tower Equity

126.    Between September 2018 and August 2019, Metals sales representatives or other agents directed twelve investors to send funds, by check or wire transfer, to the Tower Equity bank account at Bank of America to purchase Precious Metals Bullion from Metals.  These twelve investors deposited a total of $5,191,894 into Tower Equity Bank of America account *7454.  Tower Equity has no legitimate claim or interest to the funds that it received.

### B.    Conclusions of Law

### 1.    Jurisdiction and Venue

127.    This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

128.    Section 6d(l) of the CEA, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected due to violations of the CEA or CFTC Regulations.

129.    This Court has supplemental and pendant jurisdiction over the State-law claims of the States pursuant to 28 U.S.C. § 1367(a).

130.    Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because the Defendants reside in this jurisdiction and/or the acts and practices in violation of the Act occurred within this District.

### 2.    Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3)

131.    By the conduct described above, Defendants Metals and Barrick in connection with a contract of sale of commodities in interstate commerce, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon their customers in violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3).

132.    During the Relevant Period, one or more employees Defendants Metals and Barrick, acting as agents of Defendants Metals and Barrick, engaged in acts in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

133.    Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), Defendants Metals and Barrick are liable for their employees' violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

134.    Because Metals and Barrick operated as a common enterprise, each is liable for the violative acts of each member of the enterprise.

### 3.    State Law Violations

135.    By the conduct described above, Defendants Metals and Barrick violated various

State laws prohibiting:  (1) unlicensed investment advice; (2) investment advisers from employing a device, scheme or artifice to defraud or engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit; (3) making material misrepresentations or omissions in connection with the offer, purchase, or sale of securities; (4) making material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities; (5) employing any artifice, or scheme to defraud in connection with the offer, purchase, or sale of commodities; (6) Unfair or Deceptive Trade Practices; and (7) financial exploitation of the elderly in violation of the following:

a.    Ala. Code §§ 8-6-3(b) and (c), 8-6-17(b)(2), 8-6-17(a)(2), and 13A-6-195 (1975);

b.    Alaska Stat. § 45.50.471;

c.    Cal. Corp. Code §§ 25230, 25235, and 29536;

d.    Colo. Rev. Stat. §§11-51-501(1)(a)-(c), 11-53-107(1)(a)-(c);

e.    Fla. Stat. §§ 501.204 and 517.275;

f.    Ga. Code Ann. §§ 10-5-32, 10-5-51, 10-5A-2, and 10-5A-6;

g.    Ky. Rev. Stat. §§ 292.330(8) and 292.320(1);

h.    Md. Code, Corps. & Assn's §§ 11-401(b)(1), 11-402(b)(1), 11-301, 11-302 and COMAR 02.02.05.03;

i.    S.C. Code Ann. §§ 35-1-403 to 35-1-404, 35-1-501(1)-(3) and § 35-1-502(a), 39-73-20, 39-73-60(1)-(4); and

j.    Tex. Rev. Civ. Stat. Ann. Art. 581-12 and 581-32

(collectively, the "State Laws and Regulations").

136.    The facts, misrepresentations, and omissions described above are material because there is a substantial likelihood that a reasonable investor would consider them important in deciding whether to sell securities and/or invest in the coins sold by Defendants Metals and Barrick.

### 4. Disgorgement From Relief Defendant Tower Equity

137.    Between November 2018 and July 2019, Metals sales representatives or other agents directed 12 investors to send $5,191,894 by check or wire transfer, to the Tower Equity bank account at Bank of America to purchase Precious Metals Bullion from Metals. Tower Equity has no legitimate claim or interest to the funds that it received as a result of Defendants Metals' fraudulent conduct.

138.    During the Relevant Period, Relief Defendant Tower Equity received funds and/or property as a result of Defendants Metals' fraudulent conduct and has received benefits or otherwise has been unjustly enriched thereby.

139.    Relief Defendant Tower Equity has no legitimate entitlement to or interest in all of the funds and/or property received as a result of Defendants Metals' fraudulent conduct.

140.    Relief Defendant Tower Equity should be required to disgorge funds and/or property up to the amount it received from Defendants Metals' fraudulent conduct or the value of those funds that it may have subsequently transferred to third parties.

### 5. Injunction

141.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants Metals and Barrick will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## III.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

142.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c and 6d(1) of the Act, 7 U.S.C. §§ 13a-1, 13a-2(1), Defendants Metals and Barrick are permanently restrained, enjoined and prohibited from, directly or indirectly in connection with any contract of sale of any commodity in interstate commerce, intentionally or recklessly: (1)

using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; (2) making, or attempting to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaging, or attempting to engage, in acts, practices, or courses of business, which operate or would operate as a fraud or deceit upon any person, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3).

143.    Based upon and in connection with the foregoing conduct, pursuant to the laws of the States, Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly engaging in any conduct in violation of the State Laws and Regulations described in paragraph 135.

144.    Defendants Metals and Barrick are also permanently restrained, enjoined and prohibited from directly or indirectly:

    a.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    b.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3), or precious metals that are commodities, as that term is defined herein, for their own personal account or for any account in which they have a direct or indirect interest;

    c.    Having any commodity interests, or precious metals that are commodities, as that term is defined herein, traded on their behalf;

    d.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests, or precious metals that are commodities, as that term is defined herein;

    e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests, or precious metals that are commodities, as that term is defined herein;

    f.      Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and/or

    g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

## IV.    STATE BAR ORDERS

145.    Defendants Metals and Barrick consent and agree to the publication of this Consent Order by the States or to the entry of an administrative order by the States that ban or bar Defendants Metals and Barrick from participation in the commodities or securities industries, including, but not limited to, any position of employment, management, or control of any broker dealer, investment advisor, or commodity advisor.

146.    With respect to the States of Alabama, California, Colorado, Delaware, Georgia, Hawaii, Idaho, Indiana, Iowa, Kentucky, Maine, Maryland, Nevada, and Oklahoma, Defendants Metals and Barrick consent and agree to the issuance of administrative bar orders in the form set forth in Attachment 1 to this Consent Order.

147.    With respect to the States of New York and South Carolina:

a.  IT IS HEREBY ORDERED THAT in the State of New York, Defendants Metals and Barrick are permanently enjoined from engaging in any business related to the offer, issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution of securities or commodities, including any cryptocurrencies or digital assets, within or from New York State.

b.  IT IS HEREBY ORDERED THAT in the State of South Carolina, Defendants Metals and Barrick are barred from acting as an IA, and IAR, broker dealer, or agent in the connection with the offer, sale, or purchase of any security, directly or indirectly; and barred from selling commodities when not registered with the CFTC as a futures commission merchant or as a leverage transaction merchant, the Securities and Exchange Commission ("SEC") as a broker-dealer, or as an otherwise exempt entity.

148.    Defendants Metals and Barrick consent to waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to review which may be afforded by the applicable laws of the States, with full knowledge of their rights, voluntarily waive the right to an adjudicative hearing in accordance with applicable state laws, as well as any other appeal rights found therein.  Defendants Metals and Barrick waive the issuance, lawful service and receipt of any notice of allegations and charges against Defendants Metals and Barrick and stipulate to the jurisdiction of the state securities regulators in Alabama, Alaska, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Washington, and West Virginia.

149.     After being fully and adequately apprised of the right to appeal as set forth in

applicable state laws, Defendants Metals and Barrick knowingly and voluntarily consent to

waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to

review which may be afforded by the applicable laws of Alabama, Alaska, California, Colorado,

Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland,

Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, Oklahoma, South Carolina,

South Dakota, Tennessee, Texas, Washington, and West Virginia.  Defendants Metals and

Barrick expressly waive any requirement for the filing of a pleading or accusation.  By waiving

such rights, Defendants Metals and Barrick consent to the administrative orders filed by the

States that are states referenced in this and the preceding paragraph becoming final.

## V.      STATUTORY AND EQUITABLE RELIEF

150.     Defendants Metals and Barrick shall pay restitution, plus post-judgment interest,

to each defrauded customer.

151.     Defendants Metals and Barrick and Relief Defendant Tower Equity shall pay

disgorgement, plus post-judgment interest, to Plaintiffs.

152.     Defendants Metals and Barrick shall pay a civil monetary penalty, plus post-

judgment interest, to Plaintiffs.

153.     The Court shall determine the amounts of restitution, disgorgement and civil

monetary penalty and the procedures for payment and distribution of these monetary sanctions

by further order upon:  motion of the parties submitting to the Court a proposed consent order

setting out their agreement on the amounts of restitution, disgorgement, and civil monetary

penalty to be paid by Defendants Metals and Barrick and Relief Defendant Tower Equity in this

matter, subsequent motion by the CFTC and the States, and/or hearing before this Court.

154.     In connection with any motion by Plaintiffs for restitution, disgorgement and/or

civil monetary penalties, and at any hearing held on such a motion: (a) Defendants Metals and Barrick will be precluded from arguing that they did not violate the federal laws as alleged in the Complaint; (b) Defendants Metals and Barrick and Relief Defendant Tower Equity may not challenge the validity of their consents and agreements herein or this Consent Order; and (c) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, witness testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the CFTC's and/or the States' motion for restitution, disgorgement and/or civil monetary penalties, the parties may take discovery, including discovery from appropriate non-parties.

155.     Defendants Metals and Barrick and Relief Defendant Tower Equity shall cooperate fully and expeditiously with the CFTC and/or the States, including the CFTC's Division of Enforcement, in this action, and in any current or future investigation by the CFTC or the States related to the subject matter of this action. As part of such cooperation, Defendants Metals and Barrick and Relief Defendant Tower Equity shall comply, to the full extent of their abilities, promptly and truthfully with any inquiries or requests for information including but not limited to, requests for production of documents and authentication of documents, shall provide assistance at any trial, proceeding, or investigation related to the subject matter of this action, including but not limited to, requests for testimony, depositions, and/or interviews. Should the CFTC or the States file any additional action(s) related to the subject matter of this action, Defendants Metals and Barrick and Relief Defendant Tower Equity are directed to appear in the judicial district in which such action(s) is pending, or in a suitable judicial district agreed to by the parties, to provide deposition testimony and trial testimony should such testimony be

necessary.

156.    Defendants Metals and Barrick and Relief Defendant Tower Equity shall also cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

## VI.    <u>MISCELLANEOUS PROVISIONS</u>

157.    Until such time as Defendants Metals and Barrick satisfy in full their civil monetary penalty, restitution, and disgorgement obligation and Relief Defendant Tower Equity satisfies its disgorgement obligation that may be imposed in this action, upon the commencement by or against Defendants Metals and Barrick or Relief Defendant Tower Equity of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Defendants Metals' and Barrick's or Relief Defendant Tower Equity's debts, all notices to creditors required to be furnished to the CFTC under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership, bankruptcy or other proceedings, shall be sent to the address below:

> Secretary of the Commission
> Office of the General Counsel
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street N.W.
> Washington, DC 20581

All notices required to be sent to the States shall be sent to their counsel of record in these proceedings.

158.    Notice:  All notices required to be given by any provision in this Consent Order, except as set forth in paragraph 157 above, shall be sent certified mail, return receipt requested, as follows:

a.    Notice to CFTC, which shall reference the name and docket number of this action:

> Paul G. Hayeck
> Deputy Director
> Division of Enforcement
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street N.W.
> Washington, DC 20581

All such notices to the CFTC shall reference the name and docket number of this action.

b.    All notices required to be sent to the States shall be sent to their counsel of record in these proceedings, which names and addresses are set forth in the signature lines below.

c.    Notice to Defendants Metals and Barrick and Relief Defendant Tower Equity:

> Kelly Crawford
> Receiver
> Scheef & Stone
> 500 North Akard Street, Suite 2700
> Dallas, TX 75201

159.    Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

160.    Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

161.    Waiver:  The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

162.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees, including orders setting the appropriate amounts of restitution, disgorgement and civil monetary penalty, that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, to assure compliance with this Consent Order and for all other purposes relevant to this action, including any motion by Defendants Metals and Barrick or Relief Defendant Tower Equity to modify or for relief from the terms of this Consent Order .

163.    Injunctive and Equitable Relief Provisions:  The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise:  (1) Defendants Metals and Barrick and Relief Defendant Tower Equity; (2) any officer, agent, servant, employee, or attorney of the Defendants Metals and Barrick and Relief Defendant Tower Equity; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

164.    Authority:  Kelly Crawford, as Receiver, is hereby authorized, empowered and directed to sign and submit this Order on behalf of Defendants Metals and Barrick and Relief Defendant Tower Equity and to take all necessary and appropriate acts to carry out and

implement this Order in accordance with its terms and without further order of the Court.

165.    Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  The parties expressly agree that the signatures, particularly the signatures by the States, may be in the same form and format that the District allows for official filings with the Court.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

166.    Contempt:  Defendants Metals and Barrick and Relief Defendant Tower Equity understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

167.    Agreements and Undertakings:  Defendants Metals and Barrick and Relief Defendant Tower Equity shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent Order of Permanent Injunction and Other Statutory and Equitable Relief Against Defendants TMTE, Inc. a/k/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., and Barrick Capital, Inc., and Relief Defendant Tower Equity, LLC.*

**IT IS SO ORDERED** on this _____ day of _____, 2024.

_____

**BRANTLEY STARR**
**UNITED STATES DISTRICT JUDGE**

**CONSENTED TO AND APPROVED BY:**

_____
Kelly Crawford
Receiver for
TMTE, Inc., d/b/a Metals.com, Chase Metals,
LLC, Chase Metals, Inc., Barrick Capital,
Inc., Tower Equity, LLC
Scheef & Stone
500 North Akard Street, Suite 2700
Dallas, TX 75201
kelly.crawford@solidcounsel.com
*Acting in his capacity as Court-appointed*
*Receiver*

Dated: 12-20-24

/s/ Timothy J. Mulreany
_____
Timothy J. Mulreany
Chief Trial Attorney
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street NW
Washington, DC 20581
(202) 418-5306
(202) 418-5521 (facsimile)
tmulreany@cftc.gov

Dated: 12/31/2024

Approved as to form:

_____
Peter Lewis
Attorney for Kelly Crawford, Receiver for
TMTE, Inc., d/b/a Metals.com, Chase Metals,
LLC, Chase Metals, Inc., Barrick Capital,
Inc., Tower Equity, LLC
Scheef & Stone
500 North Akard Street, Suite 2700
Dallas, TX 75201
Peter.Lewis@solidcounsel.com

Dated: 12/20/2024

Dated:  December 31, 2024

Respectfully submitted,

By: /s/ Timothy J. Mulreany

TIMOTHY J. MULREANY, *pro hac vice*
Chief Trial Attorney
tmulreany@cftc.gov
Maryland Bar No. 8812160123

SEAN HENNESSY, *pro hac vice*
Trial Attorney
shennessy@cftc.gov
D.C. Bar No. 1011564

SARAH WASTLER, *pro hac vice*
Trial Attorney
swastler@cftc.gov
D.C. Bar No. 944534

DANIELLE KARST, *pro hac vice*
Chief Trial Attorney
dkarst@cftc.gov
D.C. Bar No. 481881

Attorneys for Plaintiff
COMMODITY FUTURES
    TRADING COMMISSION
1155 21st Street, NW
Washington, D.C.  20581-0001
Phone:  (202) 418-5000
Fax:  (202) 418-5521

FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr.
JEFFERY A. "BEAU" BROWN, JR., *pro hac vice*
Beau.Brown@asc.alabama.gov
Alabama Bar No. 7258R80B

Attorney for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
Montgomery, AL 36104
Telephone: (334) 242-2984

Fax: (334) 242-0240

FOR THE STATE OF ALASKA

By: /s/ John Haley

JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorney for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697
FOR THE STATE OF CALIFORNIA

By: /s/ Mary Ann Smith

MARY ANN SMITH
MaryAnn.Smith@dfpi.ca.gov
SEAN ROONEY
Sean.Rooney@dfpi.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice*
California Bar No. 264784
Danielle.Stoumbos@dfpi.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS
OVERSIGHT
(now known as the DEPARTMENT OF
FINANCIAL PROTECTION AND
INNOVATION)
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181

FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Janna Fischer

ROBERT FINKE*
robert.finke@coag.gov
Colorado Bar No. 40756
JANNA FISCHER*
janna.fischer@coag.gov
Colorado Bar No. 44952
*Counsel of Record

FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ T. Victor Clark

T. VICTOR CLARK, *pro hac vice*
Deputy Attorney General
Delaware Bar No. 4233
Victor.clark@delaware.gov

JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware

FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida
By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250
Patrick Crotty, *pro hac vice*
Special Counsel, Assistant Attorney General
Florida Bar No. 108541

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

By: /s/ A. Gregory Melchior
A. GREGORY MELCHIOR, *pro hac vice*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498

FOR THE STATE OF GEORGIA

By: /s/ Jonathan Loegel

JONATHAN D. LOEGEL, pro hac vice
Georgia Bar No. 755706
jloegel@law.ga.gov

RONALD J. STAY, *pro hac vice*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239

FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE,
*pro hac vice*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977

FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
RAUL R. LABRADOR

By: /s/ Amber K. Kauffman

AMBER K. KAUFFMAN, *pro hac vice*
Deputy Attorney General
amber.kauffman@finance.idaho.gov
Idaho Bar No. 10161

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 947-8733
Fax: (208) 334-4151

FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL

By: /s/ J. Derek Atwood

J. DEREK ATWOOD, *pro hac vice*
Deputy Attorney General
Derek.Atwood@atg.in.gov
Indiana Bar No. 33947-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979

FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: /s/ Amanda K. Robinson
AMANDA K. ROBINSON, *pro hac vice*
Iowa Bar No. AT0006753
Compliance Attorney
amanda.robinson@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6475
Fax: (515) 654-6500

FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen

THOMAS E. KNUTZEN, *pro hac vice*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872

FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice*
Gary.stephens@ky.gov
Kentucky Bar No. 87740

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL
INSTITUTIONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787
FOR THE STATE OF MAINE

By: /s/ Elizabeth T. Weyl

ELIZABETH T. WEYL, *pro hac vice*
elizabeth.weyl@maine.gov
Maine Bar No. 005783

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 626-8828
FOR THE STATE OF MARYLAND

ANTHONY G. BROWN, ATTORNEY
GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer

MAX F. BRAUER, *pro hac vice*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES
COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202

Telephone: (410) 576-6950
Fax: (410) 576-6532

FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin

Aaron W. Levin, *pro hac vice*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-6755

FOR THE STATE OF MISSISSIPPI

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: /s/ James M. Rankin
JAMES M. RANKIN
James.Rankin@ago.ms.gov
Mississippi Bar No. 102332

CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231

FOR THE STATE OF NEBRASKA

MICHAEL T. HILGERS
Attorney General

/s/Christopher A. Felts, *pro hac vice pending*
Assistant Attorney General
Nebraska Bar No. 26784
christopher.felts@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-2682
Fax: (402) 471-3297

FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston
Erin M. Houston, *pro hac vice*
Securities Administrator, Nevada Securities
Division
Nevada Bar No. 11814
ehouston@sos.nv.gov

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452

FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger

ALISSA N. BERGER, *pro hac vice*
New Mexico Bar No. 21769
alissa.berger@rld.nm.gov

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Regulation and Licensing
Department, Securities Division
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848

FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE
OF NEW YORK

By: /s/ Tatyana Trakht

TATYANA "TANYA" TRAKHT, *pro hac vice*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers

Attorney for Plaintiff
ATTORNEY GENERAL FOR THE STATE
OF NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816

FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

BRAD DAVENPORT, *pro hac vice*
bdavenport@securities.ok.gov
Oklahoma Bar No. 18687

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF
SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Andrew N. Cole

ANDREW N. COLE, *pro hac vice*
andrewcole@scag.gov
South Carolina Bar No. 68384

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-4731
Fax: (803) 734-7208

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661

FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us
Attorney for Plaintiff
South Dakota Department of Labor &
Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1
Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369

FOR THE STATE OF TENNESSEE
JONATHAN SKRMETTI
Attorney General and Reporter

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice*
Deputy Attorney General
TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department
of Commerce and Insurance

FOR THE STATE OF TEXAS:

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Alyssa Bixby-Lawson
ALYSSA BIXBY-LAWSON
Assistant Attorney General
Texas Bar No. 24122680
alyssa.bixby-lawson@oag.texas.gov
Telephone: (210) 270-1118
Fax: (512) 320-0667

General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station

Austin, Texas 78711-2548

FOR THE STATE OF WASHINGTON

By: /s/ Stephen Manning _____

Stephen Manning, *pro hac vice*
stephen.manning@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524

FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum _____

MICHAEL NUSBAUM, *pro hac vice*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES
COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305
Telephone: (304) 558-2251
Fax: (304) 558-4211