UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES AND TRADING COMMISSION et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 3:20-CV-2910-X |
| TMTE, INC. a/k/a METALS.COM et al., | § § § § | |
| *Defendants.* | § § | |

**MEMORANDUM OPINION AND ORDER DENYING
MOTIONS FOR SUMMARY JUDGMENT**

This is a fraud action the Commodity Futures Trading Commission (CFTC) and thirty States[1] (collectively, the "government") bring against Lucas Asher and Simon Batashvili (Individual Defendants) and the entities through which they operated. Today, the Court reviews six motions. First and foremost, the parties cross-motions for summary judgment (MSJs): Individual Defendants' motion for

---

[1] Alabama Securities Commission, State of Alaska, Arizona Corporation Commission, California Commissioner of Business Oversight (now known as the Commissioner of Financial Protection & Innovation), Colorado Securities Commissioner, State of Delaware, State of Florida, Office of the Attorney General and State of Florida, Office of Financial Regulation, Office of the Georgia Secretary of State, State of Hawaii, Securities Enforcement Branch, Idaho Department of Finance, Indiana Securities Commissioner, Iowa Insurance Division, Office of the Kansas Securities Commissioner, Kentucky Department of Financial Institutions, Maine Securities Administrator, State of Maryland Ex Rel the Maryland Securities Commissioner, Attorney General Dana Nessel on Behalf of the People of Michigan, Mississippi Secretary of State, Nebraska Department of Banking & Finance, Office of the Nevada Secretary of State, New Mexico Securities Division, The People of the State of New York by Letitia James, Attorney General of the State of New York, Oklahoma Department of Securities, State of South Carolina, by and through Alan Wilson, South Carolina Attorney General, South Dakota Department of Labor & Regulation, Division of Insurance, Commissioner of the Tennessee Department of Commerce and Insurance, State of Texas, Washington State Department of Financial Institutions, West Virginia Securities Commission, and State of Wisconsin (collectively "the States").

summary judgment (Doc. 770) and the government's motion for partial summary judgment (Doc. 773). Individual Defendants also moved to strike certain evidence in the government's MSJ (Doc. 788). Next, Individual Defendants moved to exclude the testimony of the government's expert, Dana Samuelson (Doc. 768); and the government moved, in turn, to exclude the testimony of Individual Defendants' expert Armen Moloian (Doc. 769).

Finally, Individual Defendants asked the Court to defer ruling on the MSJs until its motion to compel was resolved, which has since occurred. Therefore, the motion at Doc. 786 is moot.

After considering the parties' briefing, the evidence in the record, and the relevant law and statutes, the Court **DENIES** the Individual Defendants' motion to strike the government's MSJ evidence, **DENIES** both sides' motions for summary judgment, and **FINDS AS MOOT** Individual Defendants' motion to defer ruling on the MSJs. The Court further **DENIES** both sides' motions to exclude the other's expert testimony. By separate order, the Court is issuing a new scheduling order.

## I.    Factual Background

All that glitters is not gold. And even if it is, the CFTC might come after you for selling it at a markup. This case deals with Metals.com and the precious metals it sold to consumers from approximately 2017 to 2020. Through Metals.com, TMTE, Inc., Chase Metals, LLC, and Chase Metals, Inc. (collectively, "Metals"), and later through Barrick Capital, Inc. (Barrick), Individual Defendants sold gold and silver bullion to consumers on their website and over the phone—some as retail sales

2

delivered straight to the buyer and some as investments delivered to third-party depositories.

When customers opened Metals.com, a running ticker told them the live spot price for gold and silver.[2]  Then after completing a purchase, customers received a Shipping and Transaction Agreement (Transaction Agreement) that contained disclosures about the gold or silver they purchased and the risks of buying such products.

The Transaction Agreements explained the concept of a "spread"—the difference between the price at which Metals purchased bullion from suppliers and the price at which they sold it—and represented to customers the range in which their spread may fall.[3]  The agreement stated the spread for bullion, which it defined as "coins and bars that generally move in tandem with the spot price for the relevant commodity," was "generally between one and five percent," and the spread for semi-numismatic and numismatic coins and bars, which have value beyond the metal they are composed of due to being rare, unique, or otherwise significant, "[wa]s generally between seventeen percent and thirty-three percent."[4]

In other words, the agreement stated Metals typically sold bullion at a 1–5% markup and numismatic coins at a 17–33% markup.  The agreement also noted that these numbers were "only general ranges and approximations, which are subject to

---

[2]  Doc. 774 at 32 (linking an archived version of the website at http://web.archive.org/web/20190829190403/https://metals.com [https://perma.cc/RK3B-X8JY]).

[3]  Doc. 771-4 at 2.

[4]  Doc. 771-4 at 2.

change for a variety of reasons.  The actual [s]pread on any particular transaction could be any amount within those ranges (or even possibly outside those ranges)."[5]

Along with the potential price spreads, the Transaction Agreement contained a disclosure warning buyers that "purchases and sales of Precious Metals involve considerable risk" and disclaiming any "guarantee or representation regarding [customers'] ability to profit (or avoid loss)."[6]  Neither Metals nor the Individual Defendants were registered as investment advisors in any state.

## A.  CFTC Action

The CFTC initiated this action under section 6c of the Commodities Exchange Act (CEA),[7] and the States joined through the authority granted them in section 6d(1).[8]  In a thirty-count complaint, the government alleges that Individual Defendants, as the principals of Metals and Barrick, defrauded at least 1,600 people into buying gold and silver bullion at inflated prices.  All told, customers invested over $140 million in retirement savings and $45 million in cash accounts with Metals and Barrick, over 90% of which was spent on precious metals.

The government alleges the Individual Defendants deceived their mostly elderly or retirement-age investors through material misrepresentations and omissions.  By representing their products as a safe and conservative investment, Individual Defendants convinced many of these investors to convert their retirement

---

[5] *Id.*

[6] *Id.* at 3.

[7] CEA § 6c(a), 7 U.S.C. § 13a-1(a).

[8] CEA § 6d(1), 7 U.S.C. § 13a-2(1).

accounts into self-directed individual retirement accounts (SDIRAs) and purchase Individual Defendants' bullion.

The heart of this fraud scheme is the discrepancy between the potential spread presented in the Transaction Agreements and the actual spread on three main coins. The Transaction Agreements told customers the spread could be anywhere from 1% to 5% for bullion and 17% to 33% for semi-numismatic or numismatic coins.[9]  And while the Transaction Agreements noted the spread could be outside these ranges, the spreads—or markups—averaged 128% for the Silver Royal Canadian Mint Polar Bear Bullion, 91% for the Gold Royal Canadian Mint Polar Bear Bullion, and 108% for Gold British Standard Bullion, according to the CFTC.[10]

Because of this, the bullion was not quite the safe and conservative investment the Individual Defendants promised it was, and some customers lost money on their investment.  Individual Defendants assured any investors who questioned their high prices that their bullion were exclusive and collectible semi-numismatic or numismatic coins worth more than the melt value of standard precious metals bullion.  But the government alleges these assurances were false and the bullion was worth no more than market price.

On the grounds of these misrepresentations, the government charges Individual Defendants with violating section 6(c)(1) of the CEA[11] and CFTC

---

[9] *See* Doc. 771-4 at 2.

[10] Doc. 776-10 at 210, App. 2037.

[11] CEA § 6(c)(1), 7 U.S.C. § 9(1).

Regulation 180.1(a)(1)–(3),[12] which prohibit using manipulative or deceptive practices in connection to contracts to sell commodities. Section 6(c)(1) states,

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.][13]

Both sides on this enforcement action moved for summary judgment.

## II.    Legal Standards

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] So to defeat a motion for summary judgment, the non-movant must "identify specific evidence in the record and articulate the precise manner in which that evidence supports his claim."[15] In ruling on summary judgment, the court views all facts in a light most favorable to the nonmovant and resolves all factual disputes in its favor.[16] "A fact is material if it might affect the outcome of the suit," and a

---

[12] 17 C.F.R. § 180.1(a)(1)–(3).

[13] CEA § 6(c)(1), 7 U.S.C. § 9(1).

[14] Fed. R. Civ. P. 56(a).

[15] *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (cleaned up).

[16] *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).

"factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[17]

## III.    Analysis

Both the Individual Defendants and the government move for summary judgment.  To win on its enforcement claims, the government must establish that, (1) in connection with a commodity in interstate commerce, (2) Individual Defendants engaged in prohibited conduct (3) with scienter.[18]  Individual Defendants contest all three elements, but they focus on the first.  They argue their gold and silver bullion are not commodities under the Act and that, even if they are, a carveout exempts them from coverage under the CFTC's enforcement power.

### A.  CFTC Jurisdiction

The CFTC contends the Individual Defendants' arguments (about gold and silver not being "commodities" and being excepted) "misconstrue the structure of the CEA."[19]  But it seems the CFTC is the one that misunderstands how its own enforcement mechanisms interact.

### 1. Are Gold and Silver Commodities Under the CEA?

Congress gave us a mixed bag on whether gold and silver are commodities under the CEA.  Congress created the CFTC in 1974, granting the new commission authority to regulate the futures market for "commodities," which it defined as

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops,

---

[17] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (cleaned up).

[18] CEA § 6(c)(1), 7 U.S.C. § 9(1) & 17 C.F.R. § 180.1(a)(1)–(3).

[19] Doc. 814 at 3.

fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, *and all other goods and articles*, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) *in which contracts for future delivery are presently or in the future dealt in.*[20]

The CFTC hangs its hat on "all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in."[21]  But as the Supreme Court famously explained, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[22]  Rather, we must read *all other goods and articles* in its context, which is a lengthy, enumerated list of predominantly agricultural items—with onions getting very special treatment.[23]

When the terms of an enumerated list "all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage."[24]   This principle is the *ejusdem generis* canon of interpretation.  It constrains the scope of catchall terms tacked onto enumerated lists

---

[20] CEA § 1a(9), 7 U.S.C. § 1a(9) (emphasis added).

[21] *Id.*

[22] *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  The Supreme Court didn't always think so logically.  *See Wickard v. Filburn*, 317 U.S. 111 (1942) (holding that Filburn's wheat grown in his own backyard for his own personal consumption substantially affecting interstate commerce).

[23] *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)).

[24] Antonin Scalia & Bryan A. Garner, *Reading Law* 199 (2012).

to the general category of the listed items. *Noscitur a sociis*, or the associated-words canon, can also be of use. It instructs that "words grouped in a list should be given related meanings."[25] For example, when the Sarbanes-Oxley Act provided a penalty for anyone who "alters, destroys, mutilates, or conceals a record, document, or other object,"[26] the Supreme Court applied these canons to say *other object* did not include a fish.[27]

Section 1(a)(9)'s list has a clear common denominator: it names twenty-five agricultural goods (thirty if you count its further enumeration of fats and oils) from wheat and barley to wool and livestock. The Court is familiar with farms and gold mines but not a gold farm. The only outlier is motion picture box office receipts, which Congress added as an express carveout in 2010.[28] So section 1 does not encompass precious metals as commodities because they are neither agricultural products nor movie tickets.

But then there's section 19: the only place in the CEA that expressly mentions metals or precious metals of any kind. Section 19's caption relates to "Standardized contracts for certain commodities."[29] Under subsection (a), it prohibits people from entering "any transaction for the delivery of any commodity under a standardized

---

[25] *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977).

[26] 18 U.S.C. 1512(c).

[27] *Yates v. United States*, 574 U.S. 528, 545–49 (2015).

[28] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 721(a)(4), 124 Stat. 1659 (2010).

[29] CEA § 19, 7 U.S.C. § 23.

contract."[30]  Then subsection (b) prohibits people from entering "any transaction for the delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or platinum under a standardized contract described in subsection (a)."[31]

Here's the problem.  The CFTC never addresses section 19.  Instead, CFTC operates as though gold and silver are the types of agricultural products that section 1 defines as commodities.  But as addressed above, section 1 doesn't apply.  Section 19 might, but the parties never briefed whether the contracts in this case fall under section 19 and what the scope of CFTC's authority is under section 19.  As a result, the Court cannot resolve this thorny legal question at this stage, given the absence of briefing.  Assuming the case goes to trial, the Court asks the parties to brief this legal question in trial briefs.

## 2. The CEA Excepts Certain Transactions that Were Actually Delivered

An agency's power is limited to that which Congress chose to give it through a textual grant of authority.[32]  But the parties disagree about which congressional grant of jurisdiction controls in this enforcement action because Congress excepted certain contracts for actual delivery of commodities.

Section 2 gives the CFTC jurisdiction over "transactions involving swaps or contracts of sale of a commodity for future delivery."[33]  Then in 2010, Congress

---

[30] CEA § 19(a), 7 U.S.C. § 23(a).

[31] CEA, § 19(b)(1), 7 U.S.C. § 23(b)(1).  Section 19 does not itself grant jurisdiction over Individual Defendants' bullion transactions because the CFTC does not argue, nor does the evidence suggest, that any of the transactions were standardized.

[32] *West Virginia*, 597 U.S. at 723.

[33] CEA § 2(a), 7 U.S.C. 2(a).

expanded the CFTC's authority through the Dodd-Frank Act.[34]  Dodd-Frank added section 6(c), which grants the CFTC authority to regulate fraud "in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."[35]

Dodd-Frank also expanded the CFTC's jurisdiction under section 2 to include retail transactions involving leverage, margin, or financing, but excepted from that jurisdiction "contract[s] of sale that result[] in actual delivery within 28 days."[36]  This carveout is called the "actual delivery exception."[37]  Further, in the same section, Congress expressly made retail sales subject to enforcement under sections 4(a), 4(b), and 4b of the CEA, but not section 6.[38]

Section 2(c)(2)(D) on retail sales may not apply at all, if the transactions at issue were not entered or offered on a margined, leveraged, or financed basis.[39] Though Individual Defendants state their transactions were not leveraged, the briefing is silent on whether they were offered on a leveraged basis or entered on a margined or financed basis.  As a result, the Court cannot say the Individual Defendants have conclusively established the actual delivery exception applies because the Court cannot tell if the transactions at issue were entered or offered on

---

[34] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

[35] CEA § 6(c)(1), 7 U.S.C. § 9(1).

[36] CEA § 2(c)(2)(D)(i), (D)(ii)(III)(aa), 7 U.S.C. § 2(c)(2)(D)(i), (D)(ii)(III)(aa).

[37] *See, e.g.*, *CFTC v. Monex*, 2020 U.S. Dist. LEXIS 245992, at 4–5 (C.D. Cal. Dec. 28, 2020).

[38] CEA § 2(c)(2)(D)(iii), 7 U.S.C. § 2(c)(2)(D)(iii).

[39] CEA § 2(c)(2)(D)(i), 7 U.S.C. § 2(c)(2)(D)(i).

a margined, leveraged, or financed basis.[40]

But the government does not analyze the retail provisions at all; it merely claims that section 6 of the CEA provides authority separate and apart from section 2, so the actual delivery exception is "wholly irrelevant" to this enforcement action brought under section 6.[41]

## B.    State Law Claims

Of the thirty States that joined the CFTC in this enforcement action, ten bring their own claims. These States bring claims that fall into seven buckets: (1) commodities fraud,[42] (2) commodities regulation,[43] (3) securities fraud,[44] (4) acting as an unlicensed investment advisor or investment advisor representative,[45] (5) investment advisor fraud,[46] (6) unfair or deceptive trade practices,[47] and (7) financial exploitation of the elderly.[48] Both the Individual Defendants and the government move for summary judgment on the States' claims.

---

[40] The Individual Defendants also contend all the transactions were actually delivered. While they have evidence of delivery, the actual delivery exception is an affirmative defense requiring proof of delivery within 28 days. The Court has not found conclusive proof of the timing of the deliveries in the record, so this issue would also go to trial.

[41] Doc. 796 at 12.

[42] Cal. Corp. Code § 29536; Colo. Rev. Stat. § 11-53-107(1)(a)–(c); Fla. Stat. § 517.275; Ga. Code § 10-5A-6; S.C. Code § 39-73-60(1)–(4).

[43] Ga. Code § 10-5A-2; S.C. Code § 73-20.

[44] Ala. Code § 8-6-17(a)(2); Colo. Rev. Stat. §§ 11-51-501(1); Ky. Rev. Stat. § 292.320(1); Md. Code Corps. & Ass'ns § 11-301; S.C. Code § 35-1-501(1)–(3), 35-1-502(a).

[45] Ala. Code § 8-6-3(b)–(c); Cal. Corp. Code § 25230; Ga. Code § 10-5-32; Ky. Rev. Stat. § 292.330(8); Md. Code Corps. & Ass'ns §§ 11-401(b)(1), 402(b)(1); S.C. Code §§ 35-1-403–404; Tex. Civ. Code § 581-12.

[46] Ala. Code § 8-6-17(b)(2); Cal. Corp. Code § 25235; Ga. Code § 10-5-51; Md. Code Corps. & Ass'ns § 11-302; COMAR 02.02.05.03; Tex. Civ. Code § 581-32.

[47] Alaska Stat. § 45.50.471; Fla. Stat. § 501.204.

[48] Ala. Code § 13A-6-195.

Of the five States that bring claims arising under commodities fraud and regulation statutes, all but California have the same issues of fact as the CFTC's commodities enforcement claims. Florida's statute makes it unlawful to violate the CEA or the CFTC's regulations,[49] so the analysis above applies. And the statutes on which Colorado, Georgia, and South Carolina bring their claims all contain some version of the actual delivery exception.[50] Therefore, these claims must go to trial.

California's commodities fraud claim and the States' claims for securities fraud, investment advisor fraud, unfair and deceptive trade practices, and financial exploitation of the elderly all require an element of fraud, such as material misrepresentations and omissions of fact. The government argues Individual Defendants and their employees violated these statutes through their pricing itself as well as their statements about the value and safety of buying bullion through Metals.com.

The remaining claims from the States assert that Individual Defendants acted as investment advisors to their customers. Each state statute requires the offender to have advised people on the value of securities or the advisability of buying or selling them.[51] The government argues Individual Defendants violated this directly or vicariously through their employees by telling customers they should liquidate their

---

[49] Fla. Stat. § 517.275.

[50] Colo. Rev. Stat. § 11-53-102(4)–(5); Ga. Code §§ 10-5A-1(4), 10-5A-4; S.C. Code § 39-73-40(A)(2).

[51] Ala. Code § 8-6-2(18); Cal. Corp. Code 25009(a); Ga. Code § 10-5-2(17); Ky. Rev. Stat. § 292.310(11); Md. Code Corps. & Ass'ns § 11-101(i)(1); S.C. Code § 35-1-102(15); Tex. Civ. Code § 581-4(N).

securities investments and buy precious metals because of various political and market elements.

Individual Defendants counter that their Transaction Agreement dispelled any of the overblown claims they may have made about the safety and value of their bullion and that many of the statements the States point to are either true or mere puffery. Individual Defendants also highlight their internal policies prohibited any employee from providing investment advice to customers.

On these grounds, and because they claim the States did not point to individual customers harmed in each State, the Individual Defendants move for summary judgment. Also, Individual Defendants argue, the Court would be unable to issue a jury charge for all the State claims without violating the Seventh Amendment. But the Individual Defendants fail to point to any relevant examples of the State laws being inconsistent.

As to the State claims themselves, the government's evidence consists primarily of customer declarations. Many customers say Metals.com employees advised them to liquidate their investments and reinvest in precious metals, assured them Metals would buy back any precious metals the customers wanted to sell, and predicted the value of the precious metals inaccurately. But none of this is conclusive. The customers make these statements from memory, using conclusory allegations or generalizing the employees' statements.

Based on the statements in the record, a reasonable juror could find that Individual Defendants provided investment advice and committed fraud through

14

their statements to customers.  But a reasonable juror could also determine these statements were mere puffery and did not constitute investment advice.  Therefore, all the claims based on allegations of fraud or investment advice should continue to trial.

Because of this, the Court **DENIES** both the government's and the Individual Defendants' motions for summary judgment as to the States' claims.

### C.    Procedural Motions

### 1.  Individual Defendants' Motion to Exclude Plaintiffs' PMSJ Evidence

Though the Court already considered the MSJs, it now turns now to Individual Defendants' motion to exclude the majority of the government's MSJ evidence. Individual Defendants object under Rule 56(c)(2) that 108 of the government's 155 exhibits should be struck as inadmissible because they contain hearsay, statements by unidentified speakers, and opinions, puffery, and conjecture.

Rule 56 permits parties to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[52]  But evidence does not need to be "authenticated or otherwise presented in an admissible form" at the summary judgment stage.[53]  It must only be "*capable* of being presented

---

[52] Fed. R. Civ. P. 56(c)(2).

[53] *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017).

in a form that would be admissible in evidence," which "allows the court to consider the evidence that would likely be admitted at trial."[54]

While many of the exhibits—including the customer declarations—certainly contain hearsay, the government could conceivably admit them for purposes other than the truth of the matter asserted. Further, the Court did not rely on these statements, or any of the government's other exhibits that contained hearsay and statements of opinion, as the undisputed statements of fact the government claimed they were.

Therefore, the Court **DENIES** Individual Defendants' motion to strike the government's evidence.

### 2. Motions to Exclude Expert Testimony

Both sides in this case moved to exclude the other's expert testimony. The government retained a precious metals dealer, Dana Samuelson, to opine on the nature and value of the coins. Individual Defendants retained Armen Moloian to rebut that opinion. Both sides now claim the other's expert testimony is inadmissible. Federal Rule of Evidence 702 governs the admission of expert testimony.[55] It allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to offer an opinion if the proponent can show the Court

> it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on

---

[54] *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (cleaned up).

[55] *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019).

sufficient facts or data; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[56]

Put simply, an expert's opinion must be both relevant and reliable.[57] Though a party does not need to prove their expert is correct, they do have to establish, by a preponderance of the evidence, that the testimony is reliable.[58] Expert testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid."[59] It must be "more than subjective belief or unsupported speculation."[60] When evaluating expert testimony, the Court focuses on the reasonableness of the expert's approach and methods, not on the expert's conclusions.[61]

However, the Court's gatekeeping function applies only to expert testimony's admissibility, not to its weight, which "should be left for the jury's consideration."[62] "As a general rule, questions relating to the bases and sources of an expert's testimony affect the weight to be assigned that opinion rather than its admissibility."[63]  When the weight of testimony is at issue, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden

---

[56] Fed. R. Evid. 702.

[57] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

[58] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (2012).

[59] *Knight*, 482 F.3d at 352 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)).

[60] *Daubert*, 509 U.S. at 590.

[61] *Id.* at 595.

[62] *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (cleaned up).

[63] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[64]

### a.    Individual Defendants' Motion to Exclude

The government designated Dana Samuelson as an expert on coin classifications, precious metal valuations for the coins Individual Defendants sold, the spread between the prices Individual Defendants paid suppliers for the coins and the price they charged to customers, and the economic impacts of the pricing.[65] Individual Defendants move to exclude Samuelson's testimony, arguing that his methodology failed to take certain factors—like the market prices, exclusivity, and uniqueness of certain "Exclusive Coins"—into account and was subjective rather than relying on industry-accepted or scientific approaches to price analysis.[66]

There is no question that Samuelson's testimony is relevant, as it speaks to the proper classification and price of the coins at issue. And he has years of experience buying and selling precious metals like the ones at issue in this case, including a quarter decade acting as the president of a national exchange specializing in dealer-to-dealer trading and retail sales to the public.

Individual Defendants attack the reliability, not the relevance of Samuelson's testimony. They argue his approach is untested, but Samuelson estimated that nine out of ten dealers would use the same method he did. And while Individual Defendants call that method an economic model, the government counters that it is

---

[64] *Daubert*, 509 U.S. at 596.

[65] Doc. 769-1, Samuelson Report at ¶ 2.

[66] Doc. 768 at 2.

merely simple math that does not require error calculations. It is the jury's role to weigh conflicting opinions such as this.[67] And Individual Defendants' remedy to vindicate their view is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[68] Therefore, the Court will not exclude Samuelson's testimony.

### b.    Plaintiffs' Motion to Exclude

Individual Defendants designated Armen Moloian to testify on Samuelson's valuation methodology, the appropriate methodology for valuing the relevant precious metals, and the current valuation of their products.[69] The government seeks to exclude Moloian's testimony on the grounds that it is not the product of reliable methodology, is not based on sufficient facts or data, and is not a reliable application of his methodology to the facts of this case.[70]

Like Samuelson's, Moloian's testimony is clearly relevant, and he has years of experience in the industry—though admittedly less than Samuelson. And the alleged unreliability of Moloian's method is very similar to Samuelson's. Both experts appealed to their experience in the industry to confirm that their approaches aligned with the normal approach, even if there is no technical standard for calculating the market value of precious metal coins. Once again, it is the jury's role to weigh the two experts' competing approaches. The Court will not exclude Moloian's testimony.

---

[67] *Viterbo*, 826 F.2d at 422.

[68] *Daubert*, 509 U.S. at 596.

[69] Doc. 785 at 4.

[70] Doc. 769 at 1, 6.

## IV.     Conclusion

For the reasons listed above, the Court **DENIES** the Individual Defendants'

motion to strike the government's MSJ evidence (Doc. 788), **DENIES** both sides'

motions for summary judgment (Docs. 770 & 773), and **FINDS AS MOOT** Individual

Defendants' motion to defer ruling on the MSJs (Doc. 786).  The Court further

**DENIES** both sides' motions to exclude the other's expert testimony (Docs. 768 &

769).

**IT IS SO ORDERED** this 21st day of July, 2025.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE