## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

COMMODITY FUTURES TRADING
COMMISSION, *et al*.,

  Plaintiffs,

v.

TMTE, INC. a/k/a METALS.COM, *et al*.,

  Defendants;

and

TOWER EQUITY, LLC,

  Relief Defendant.

Case No.: **3:20-CV-2910-X**

## PLAINTIFFS' BRIEF IN SUPPORT OF AMENDED MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ASHER AND BATASHVILI

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................1

II.  JURISDICTION ............................................................................................2

A.  QUESTION 1: What was the ordinary public meaning of "commodity" at the time of the enactment and amendments of the CEA? ....................................................3

ANSWER: The ordinary public meaning of "commodity" has included precious metals since before the CEA was enacted, and since the passage of the CFTC Act of 1974 the term "commodity" in the CEA has been defined broadly to encompass "all goods and articles," including precious metals.

1.  The ordinary public meaning of "commodity" has included precious metals at all relevant times. ..................................................................................3

2.  The definition of "commodity" in the CEA has included precious metals since 1974. ..........................................................................................5

3.  The evolution of the CEA reflects a steady expansion of the scope of the term "commodity" culminating in the 1974 expansion to include precious metals. ..........................................................................................7

4.  A *corpus linguistic* analysis of the term "commodity" further supports that precious metals, like gold and silver, are commodities ............................10

B.  QUESTION 2:  Is the Court bound by *CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978) in light of: (a) the Supreme Court's development of the Major Questions Doctrine, and (b) the Supreme Court's holding in *Whitman v. American Trucking Ass'n*, 541 U.S. 457 (2001)? ...........................................................................14

ANSWER: Yes, the Court is bound by the *Muller* decision's holding that precious metals are "commodities" under CEA Section 1a.  The Major Questions Doctrine and the Supreme Court's Whitman decision do not affect this outcome.

1.  Shortly after the passage of the CFTC At of 1974, the Fifth Circuit held that the term "commodity" in the CEA includes precious metals. ..................14

2.  Since the *Muller* decision in 1978, the Fifth Circuit and district courts within the Fifth Circuit, have consistently found non-agricultural commodities to be "commodities" within the scope of the CEA. ....................................15

3.  The Major Questions Doctrine Is Not Implicated.....................................17

4.  The "Nondelegation" doctrine as described in *Whitman v. American Trucking Ass'n* is inapplicable to the question of whether precious metals are commodities because the language of the statute defines the term......19

C.  QUESTION 3:  Does the CFTC's interpretation implicate the Major Questions Doctrine? ..........................................................................................21

ANSWER: No, because the CEA explicitly defines the terms "commodity," "exempt commodity," and "excluded commodity."  Plaintiffs are not attempting to, or arguing in favor of, expanding the definitions in the plain text of the CEA

i

itself.

D.    QUESTION 4: Does 7 U.S.C.A. § 1a provide the CFTC with an intelligible principle?...............................................................................................21

ANSWER: Yes. CEA § 1a specifically defines the terms "commodity," "exempt commodity," and "excluded commodity." The non-delegation doctrine is not implicated because the CFTC has no discretion as to whether precious metals are commodities.

E.    QUESTION 5: What weight should be given to the CFTC's interpretation of "all other goods" in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)? .................................................................................................24

ANSWER: No deference is required with respect to the statutory definition of the term "commodity" in the CEA. But to the extent the Court finds the statute ambiguous, the Court can rely on the CFTC's explanation and interpretation of the term for guidance because it is based on the CFTC's body of experience and informed judgment.

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................25

A.    The Defendants .........................................................................................25

B.    Metals' Precious Metals Business ...............................................................

28

C.    Defendants Used a Common Sales Pitch and Scheme To Target Retirement-Aged Customers and Gain Access To Their Retirement Savings ...................................29

D.    Defendants Made Material Representations To Customers...................................39

    1.    Misrepresentation #1: Metals.com Made Material Misrepresentations About The Markup.......................................................................................39

    2.    Misrepresentation #2: Metals.com Sales Representatives Made Material Misrepresentations About The Safety Of Investing In Polar Bear Bullion And The Risk of Loss .............................................................................41

    3.    Misrepresentation #3: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Polar Bear Bullion Was Worth Significantly More Than Melt Value .......................................................42

    4.    Misrepresentation #4: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Metals.com Would Buy Back Their Bullion Coins At Any Time ...........................................................45

    5.    Misrepresentation #5: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Metals.com Would Pay Storage Fees ...................................................................................................46

    6.    Omission #1: Metals.com Failed To Disclose The Actual Markup On Polar Bear Bullion .................................................................................46

    7.    Omission #2: Metals.com Failed To Disclose That Polar Bear Bullion Was

Worth Significantly Less Than Customers Paid .......................................47

8.    Omission #3: Metals.com Failed To Disclose That The Majority Of Investors Who Purchased Polar Bear Bullion Lost Money ...................47

9.    Omission #4: Metals.com Failed To Disclose That It Was Subject To State Regulatory Actions ..................................................................................48

E.    Beginning In May 2019, State Regulators Brought Multiple Actions Against Metals.com And Its Employees Related To Metals.com's Fraudulent Sales Practices ...............................................................................................................48

F.    Defendants Formed Barrick After The State Regulator Actions .........................50

G.    Barrick Used A Common Sales Pitch And Scheme To Target Retirement-Aged Customers And Gain Access To Their Retirement Savings ................................51

1.    Omission #1: Barrick Failed to Disclose The Actual Markup On Polar Bear Bullion ..............................................................................................52

2.    Omission #2:   Barrick Failed To Disclose That The Vast Majority Of Investors Who Purchased Barrick Bullion Suffered Immediate, Large Losses .....................................................................................................54

3.    Misrepresentation #1:   Barrick Sales Representatives Made Material Misrepresentations About The Safety Of Investing In Barrick Bullion And The Risk Of Loss .................................................................................54

4.    Misrepresentation #2:   Barrick Sales Representatives Made Material Misrepresentations About The Fact That Barrick Bullion Was Worth Significantly More Than Melt Value ........................................................55

H.    Asher And Batashvili Controlled The Metals And Barrick Operations And Sales Practices ...............................................................................................................55

I.    Asher And Batashvili Controlled The Acquisition Costs And Retail Sales Prices .........................................................................................59

J.    Asher And Batashvili Knew The Actual Spread And Took Steps To Conceal It From Investors ...................................................................................................61

K.    Metals And Barrick Investors Suffered Financial Losses As A Result Of This Fraud ...........................................................................................62

L.    Asher and Batashvili Avoided Discovery By Broadly Asserting Their Fifth Amendment Rights ............................................................................................63

IV.    ARGUMENT .................................................................................................................64

A.    Summary Judgment Standard ...............................................................................64

B.    Defendants Committed Fraud In Violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) (COUNT I) .................................................................................64

1.    Defendants Made Material Misrepresentations And Omissions ...............66

a.    Defendants Made Material Misrepresentations And Omissions

| | | About The Spread And The Value Of The Coins | 66 |

b. Defendants Falsely Guaranteed Profits and Downplayed the Risk of Loss ..............................................................68

c. Defendants Failed to Disclose to Investors that Metals Was Subject to Numerous State Regulatory Actions..........................70

d. Defendants' Misrepresentations and Omissions Were Material....71

2. Defendants Acted with Scienter................................................72

3. Defendants' Fraud Was In Connection With Commodities In Interstate Commerce ................................................................74

C. Defendants Are Derivatively Liable for Each Other's Violations of the CEA......75

1. Metals And Barrick Are Liable For The Acts Of Their Agents ................75

2. Asher And Batashvili Are Liable As Controlling Persons Of Metals and Barrick........................................................................76

3. Metals And Barrick Operated As A Common Enterprise And Are Liable For Each Other's Violations of Law ..........................................79

D. Defendants Violated State Commodities Laws (California – Count IX; Colorado – Count X; Florida – XIII; Georgia – Counts XVI & XVII; and South Carolina – Counts XXVI & XXVII) ........................................................81

1. Defendants Committed Commodities Fraud In Violation Of State Law (California – Count IX; Colorado – Count X; Florida – Count XIII; Georgia – Count XVII; and South Carolina – Count XXVII)..................82

2. Defendants Failed to Register As Required Under State Commodities Laws (Georgia – Count XVI; and South Carolina – Count XXVI)...........84

E. Defendants Violated State Securities Laws (Alabama – Counts II, III & IV; California – Counts VII & VIII; Colorado – Count XI; Georgia – Counts XIV & XV; Kentucky – Counts XVIII & XVIX; Maryland – Counts XX, XXI, XXII & XXIII; South Carolina – Counts XXIV & XXV; and Texas – Counts XXVIII & XXIX) ..................................................................................84

1. Defendants Committed Securities Fraud In Violation Of State Laws (Alabama – Count IV; Colorado – Count XI; Georgia – Count XV; Kentucky – Count XVIX; Maryland – Count XXII; South Carolina – Count XXV; and Texas – Count XXIX)........................................86

2. Defendants Failed To Register As Investments Advisers and Investment Adviser Representatives As Required Under State Law (Alabama – Count II; California – Count VII; Georgia – Count XIV; Kentucky – Count XVIII; Maryland – Counts XX & XXI; South Carolina – Count XXIV; and Texas – Count XXVIII) ......................................................90

3. Defendants Committed Investment Adviser Fraud In Violation Of State Law (Alabama – Count III; California – Count VIII; Georgia – Count XV;

Maryland – Count XXIII; South Carolina – Count XXIV; and Texas – Count XXIX) ...................................................................................94

F.    Defendants Committed Unfair Or Deceptive Trade Practices (Alaska – Count VI; Florida – Count XII) .............................................96

G.    Defendants' Blanket Assertions Of The Fifth Amendment Preclude Them From Offering Contrary Evidence And Entitles The Court To Draw An Adverse Inference .........................................................................98

1.    Defendants Cannot Offer Evidence Relating To Topics On Which They Asserted The Fifth Amendment .................................................98

2.    The Court Should Draw An Adverse Inference Against Defendants ......100

V.    RELIEF REQUESTED.........................................................................103

A.    Permanent Injunction Is Warranted .............................................103

B.    Restitution and a Civil Monetary Penalty Are Warranted .................104

1.    Restitution ................................................................................105

2.    Civil Monetary Penalty ...............................................................107

3.    Post-Judgment Interest ...............................................................109

VI.    CONCLUSION...................................................................................109

# TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ............................................................................. 20

*Aaron v. SEC,*
   446 U.S. 680 (1980) ............................................................................. 87

*Affiliated Ute Citizens of Utah v. United States,*
   406 U.S. 128 (1972) ............................................................................. 84

*Alabama Association of Realtors v. Department of Health & Human Services,*
   594 U.S. 758 (2021) ....................................................................... 17, 19

*Alaska Tr., LLC v. Ambridge,*
   372 P.3d 207 (Alaska 2016) ................................................................. 97

*Am. Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) ........................................................................ 22, 23

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................. 64

*Arnold v. Life Partners, Inc.,*
   416 S.W.3d 577 (Tex. App.—Dallas 2013) ......................................... 85

*Aspen Tech., Inc. v. M3 Tech., Inc.,*
   569 F. App'x 259 (5th Cir. 2014) ...................................................... 101

*ASRC Energy Serv. Power and Comm., LLC v. Golden Valley Elec. Ass'n, Inc.,*
   267 P.3d 1151 (Alaska 2011) ............................................................... 96

*Baxter v Palmigiano,*
   425 U.S. 308 (1976) .................................................................... 101, 102

*Berko v. SEC,*
   316 F.2d 137 (2d Cir. 1963) ................................................................ 88

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ............................................................................. 18

*Bittner v. United States,*
   598 U.S. 85 (2023) ................................................................................. 9

*Black Diamond Fund, LLLP v. Joseph*,
    211 P.3d 727 (Colo. App. 2009) ................................................................ 88

*Branch v. Smith*,
    538 U.S. 254 (2003) ................................................................................... 5

*Brown v. State Dep't of Health*,
    86 Cal.App.3d 548 (1978) ......................................................................... 83

*Buffo v. State*,
    415 So.2d 1158 (Ala. 1982) ...................................................................... 85

*Cagle v. Mathers Fam. Tr.*,
    295 P.3d 460 (Colo. 2013) ........................................................................ 85

*Caucus Distrib., Inc. v. Md. Sec. Comm'r*,
    320 Md. 313 (Md. 1990) ........................................................................... 85

*Celotex Corp. v. Catrett*,
    477 U.S 317 (1986) ................................................................................... 64

*Celtic Marine Corp. v. James C. Justice Cos. Inc.*,
    760 F.3d 477 (5th Cir. 2014) .................................................................... 64

*CFTC v. Am. Bd. of Trade, Inc.*,
    473 F. Supp. 1177 (S.D.N.Y. 1979) ........................................................ 17

*CFTC v. Arrington*,
    998 F. Supp. 2d 847 (D. Neb. 2014) ...................................................... 106

*CFTC v. Baldwin*,
    No. 1:21-cv-5707, 2025 WL 1047372 (S.D.N.Y. Apr. 8, 2025) .............. 17

*CFTC v. Baragosh*,
    278 F.3d 319 (4th Cir. 2002) ............................................................... 8, 77

*CFTC v. Brisco*,
    No. 4:23-cv-336, 2024 WL 5198838 (S.D. Tex. July 26, 2024) ............ 108

*CFTC v. Cloud*,
    No. 4:10-cv-706, 2011 WL 1157530 (S.D. Tex. Mar. 24, 2011) ........... 108

*CFTC v. Cornett*,
    No. 1:12-cv-106, 2012 WL 4757871 (W.D. Tex. Aug. 24, 2012) .......... 103

*CFTC v. Cosmo*,
    No. 2:09-cv-351, 2012 WL 5986525 (E.D.N.Y. Oct. 1, 2012) .............. 109

*CFTC v. Driver*,
   877 F. Supp. 2d 968 (C.D. Cal. 2012) ................................................................. 106

*CFTC v. Fisher Cap. LLC*,
   No. 1:23-cv-3121, 2024 WL 3771781 (E.D.N.Y. July 12, 2024) ........................... 17

*CFTC v. Gibraltar Monetary Corp.*,
   No. 9:04-cv-80132, 2006 WL 1789018 (S.D. Fla. May 30, 2006) .................... 71, 72

*CFTC v. Gorman*,
   587 F.Supp.3d 24 (S.D.N.Y. 2022) ....................................................................... 89

*CFTC v. Hunt*,
   591 F.2d 1211 (7th Cir. 1979) ............................................................................. 103

*CFTC v. Hunter Wise Commodities, LLC*,
   21 F. Supp. 3d 1317 (S.D. Fla. 2014) ................................................ 65, 66, 79, 106

*CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*,
   323 F. Supp. 2d 482 (S.D.N.Y. 2004) ................................................... 68, 72, 77, 79

*CFTC v. Int'l Foreign Currency, Inc.*,
   334 F. Supp. 2d 305 (E.D.N.Y. 2004) ................................................................... 16

*CFTC v. Int'l Monetary Metals, Inc.*,
   No. 0:14-cv-62244, 2016 WL 8256852 (S.D. Fla. Aug. 1, 2016)........................... 17

*CFTC v. Kraft Foods Grp., Inc.*,
   153 F. Supp. 3d 996 (N.D. Ill. 2015).............................................................. 65, 72

*CFTC v. Kratville*,
   796 F.3d 873 (8th Cir. 2015) ................................................................................ 71

*CFTC v. Madonado*,
   No. 4:20-cv-3185, 2021 WL 4295250 (S.D. Tex. Sept. 21, 2021) ......................... 106

*CFTC v. Matrix Trading Grp., Inc.*,
   No. 9:00-cv-8880, 2002 WL 31936799 (S.D. Fla. Oct. 3, 2002)............................ 68

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................................................... 16

*CFTC v. McDonnell*,
   332 F. Supp. 3d 641 (E.D.N.Y. 2018) ...................................................... 66, 75, 106

*CFTC v. Mirror Trading Int'l Proprietary Ltd.*,
    No. 1:22-cv-635, 2023 WL 3190336 (W.D. Tex. Apr. 24, 2023).................................. 105, 106

*CFTC v. Muller*,
    570 F.2d 1296 (5th Cir 1978) .............................................................................Passim

*CFTC v. My Big Coin Pay, Inc.*,
    334 F. Supp. 3d 492 (D. Mass. 2018).................................................................... 16

*CFTC v. Noble Wealth Data Info. Serv., Inc.*,
    90 F. Supp. 2d 676 (D. Md. 2000)..................................................................... 71, 72

*CFTC v. Omega Knight 2, LLC*,
    No. 1:18-cv-22377, 2019 WL 6796128 (S.D. Fla. Sept. 16, 2019)......................... 17

*CFTC v. Premium Income Corp.*,
    No. 3:05-cv-0416B, 2007 WL 429092 (N.D. Tex. Jan. 26, 2007)......................... 108

*CFTC. v. Premium Income Corp.*,
    No. 3:05-cv-0416, 2007 WL 4563469 (N.D. Tex. Dec. 28, 2007) ........................... 68

*CFTC v. Ramos*,
    No. 3:20-cv-02985, 2021 WL 2806139 (J. Starr, July 6, 2021)....................... 16, 108

*CFTC v. Ross*,
    No. 1:09-cv-5443, 2014 WL 6704572 (N.D. Ill. Nov. 26, 2014)........................... 106

*CFTC v. S. Tr. Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018) ............................................................................ 66

*CFTC v. Sidoti*,
    178 F.3d 1132 (11th Cir. 1999) ............................................................................ 70

*CFTC v. Southern Trust Metals, Inc.*,
    180 F. Supp. 3d 1124 (S.D. Fla. 2016) ................................................................. 79

*CFTC v. Total Call Grp., Inc.*,
    No. 4:10-cv-513, 2012 WL 1642196 (E.D. Tex. Mar. 30, 2012)........................... 108

*CFTC v. Trade Exch. Network Ltd.*,
    117 F. Supp. 3d 29 (D.D.C. 2015)................................................................... 16, 80

*CFTC v. US Coin Bullion LLC*,
    No. 6:20-cv-40, 2021 WL 8946141 (M.D. Fla. Dec. 29, 2021) ............................. 17

*CFTC v. Wall St. Underground, Inc.*,
    281 F. Supp. 2d 1260 (D. Kan. 2003)............................................................. 68, 79

*CFTC v. Walsh*,
No. 1:20-cv-725, 2021 WL 4058913 (W.D. Tex. May 24, 2021)................................... 103, 105

*Chapman & Cole v. Itel Container Int'l B.V.*,
865 F.2d 676 (5th Cir. 1989) ................................................................................. 109

*Clayton Brokerage Co. v. CFTC*,
794 F.2d 573 (11th Cir.1986) ................................................................................ 70

*Cox v. Gavin*,
278 Ga. 903 (Ga. Sup. Ct. 2005) .......................................................................... 95

*Cymaticolor Corp.*,
106 F.R.D. 545 (S.D.N.Y. 1985) .......................................................................... 99, 100

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ............................................................ 96

*Davis-Lynch, Inc. v. Moreno*,
667 F.3d 539 (5th Cir. 2012) ................................................................................. 98

*Dohmen-Ramirez v. CFTC*,
837 F.2d 847 (9th Cir. 1988) ................................................................................. 76

*Dow Theory Forecasts*,
SEC Staff No Action Letter 1978 WL 9779 (Feb. 2, 1978) .................................... 92

*Dunkin' Donuts Inc. v. Taseski*,
47 F. Supp. 2d 867 (E.D. Mich. 1999) ................................................................. 99

*Dunn v. Sw. Airlines Co.*,
No. 3:21-cv-1393-X, 2023 WL 360246 (N.D. Tex. Jan. 23, 2023) ......................... 64

*Enservco, Inc. v. Ind. Sec. Div.*,
623 N.E.2d 416 (Ind. 1993) ................................................................................. 88

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ........................................................................................... 21, 22

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944) ........................................................................................... 23

*FTC v. AmeriDebt, Inc.*,
343 F.Supp.2d 451 (D. Md. 2004) ....................................................................... 80

*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564, 573 (7th Cir. 1989) ....................................... 97

*FTC v. E.M.A. Nationwide, Inc.*,
767 F 3d 611 (6th Cir. 2014) ..................................... 79, 80

*FTC v. GEM Merchandising Corp.*,
87 F.3d 466 (11th Cir. 1996) ..................................... 97

*FTC v. John Beck Amazing Profits, LLC*,
865 F. Supp. 2d 1052 (C.D. Cal. 2012) ..................................... 80

*FTC v. Kennedy*,
574 F.Supp.2d 714 (S.D. Tex. 2008) ..................................... 80

*FTC v. Standard Educ. Soc'y*,
302 U.S. 112 (1937) ..................................... 97

*FTC v. Tax Club, Inc.*,
994 F. Supp. 2d 461 (S.D.N.Y. 2014) ..................................... 80

*FTC v. Williams, Scott & Assocs., LLC*,
679 F. App'x 836 (11th Cir. 2017) ..................................... 99

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*,
No. 4:10-cv-04872, 2017 WL 3236110 (S.D. Tex. July 31, 2017) ..................................... 101

*Glazer Cap. Mgmt. L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..................................... 90

*Goss v. Clutch Exchange, Inc.*,
701 P.2d 33 (Colo. 1985) ..................................... 89

*Guttman v. CFTC*,
197 F.3d 33 (2d Cir. 1999) ..................................... 76

*Harrington v. Off. of Miss. Sec'y of State*,
129 So.3d 153 (Miss. 2013) ..................................... 88

*Harrison v. Dean Witter Reynolds, Inc.*,
974 F.2d 873 (1992) ..................................... 76

*Hassan v. City of Shreveport*,
No. 5:15-cv-2820, 2018 WL 3028951 (W.D. La. June 18, 2018) ..................................... 101

*Hinojosa v. Butler*,
547 F.3d 285 (5th Cir. 2008) ..................................... 101

*Hohensee v. State of Maryland*,
   42 Md. App. 329 (1979) ................................................................................. 87

*In the Matter of Roy D. Spiegel*,
   CFTC No. 85-19, 1988 WL 232212 (CFTC Jan. 12, 1988) .................................. 77

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ....................................................................................... 21

*James v. Frame*,
   6 F.3d 307 (5th Cir. 1993) ............................................................................ 105

*JCC, Inc. v. CFTC*,
   63 F.3d 1557 (11th Cir. 1995) ....................................................................... 108

*Kamen v. Lindly*,
   94 Cal.App.4th 197 (2001) ........................................................................ 81, 85

*Keller v. First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder],
   Comm. Fut. L. Rep. (CCH) ¶ 22, 402, 29, 823 (Oct. 22, 1984) .............................. 70

*Kenai Chrysler Ctr., Inc. v. Denison*,
   167 P.3d 1240 (Alaska 2007) ......................................................................... 97

*Kittilson v. Ford*,
   608 P.2d 264 (Wa. Sup. Ct. 1980) .................................................................. 88

*Langiano v. City of Fort Worth, Texas*,
   No. 4:21-cv-808, 2022 WL 6813630 (N.D. Tex. Sept. 10, 2022) ........................... 99

*Lawler Mobile Homes, Inc. v. Tarver*,
   492 So. 2d 297 (Ala. 1986) ............................................................................ 86

*Leedo Cabinetry v. James Sales & Distrib., Inc.*,
   157 F.3d 410 (5th Cir. 1998) ........................................................................ 105

*LiButti v. United States*,
   178 F.3d 114 (2d Cir. 1999) ......................................................................... 102

*Lichter v. United States*,
   334 U.S. 742 (1948) ....................................................................................... 23

*Living Benefits Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*,
   916 F.3d 528 (5th Cir. 2019) ......................................................................... 92

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ............................................................................... 24

*Lorenzo v. SEC,*
587 U.S. 71 (2019) ................................................................................. 88

*Macquarie Infrastructure Corp. v. Moab Partners,*
601 U.S. 257 (2024) ............................................................................... 67

*Majors v. South Carolina Securities,*
*Commissioner,* 644 S.E.2d 710 (S.C. 2007) .......................................... 85

*Mathews v. Cassidy Turley Md., Inc.,*
435 Md. 584 (Md. 2013) ....................................................................... 85

*McGee v. SEC,*
733 F. App'x 571 (2d Cir. 2018) ........................................................... 87

*Merdes & Merdes, P.C. v. Leisnoi, Inc.,*
410 P.3d 398 (Alaska 2017) .................................................................. 96

*Merrill Lynch, Pierce, Fenner & Smith v. Dabit,*
547 U.S. 71 (2006) ................................................................................. 86

*Mistretta v. United States,*
488 U.S. 361 (1989) ............................................................................... 22

*Monieson v. CFTC,*
996 F.2d 852 (7th Cir. 1993) ........................................................... 76, 77

*Nat'l Broad. Co. v. United States,*
319 U.S. 190 (1943) ............................................................................... 22

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.,*
58 F.4th 195 (5th Cir. 2023) ............................................................ 67, 89

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935) ............................................................................... 20

*People v. Pendergast,*
87 P.3d 175 (Colo. App. 2003) .............................................................. 89

*People v. Simon,*
9 Cal.4th 493 (1995) ............................................................................. 83

*Pinter v. Dahl,*
486 U.S. 622 (1988) ............................................................................... 84

*Porsche Cars N. Am., Inc. v. Diamond*,
  140 So.3d 1090 (Fla. Dist. Ct. App. 2014) ................................................................ 97

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) ................................................................................................ 105

*R.J. Fitzgerald & Co., Inc.*,
  310 F.3d 1321 (11th Cir. 2002) ............................................... 67, 69, 70, 79

*R&W Technical Servs. Ltd. v. CFTC*,
  205 F.3d 165 (5th Cir. 2000) .................................................................................. 71

*Roth v. Foris Ventures, LLC*,
  86 F.4th 832 (9th Cir. 2023) .................................................................................. 93

*Royal v. CCC & R TresArboles, L.L.C.*,
  736 F.3d 396 (5th Cir. 2013) .................................................................................. 64

*Sanders v. Genesee Cnty., Michigan*,
  No. 22-1596, 2023 WL 4543488 (6th Cir. July 14, 2023) ...................................... 99

*SEC v. Ahmed*,
  308 F. Supp. 3d 628 (D. Conn. 2018) ..................................................................... 91

*SEC v. Alliance Leasing Corp.*,
  28 F. App'x 648 (9th Cir. 2002) ........................................................................ 71, 89

*SEC v. Amah*,
  No. 7:21-cv-6694, 2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023) ........................... 91

*SEC v. Benson*,
  657 F. Supp. 1122 (S.D.N.Y. 1987) ........................................................................ 99

*SEC v. Blavin*,
  760 F. 2d 706 (6th Cir. 1985) .................................................................................. 88

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963) ................................................................................... 84, 95, 96

*SEC v. Life Partners Holdings, Inc.*,
  854 F.3d 765 (5th Cir. 2017) ................................................................................ 103

*SEC v. Lum's, Inc.*,
  365 F.Supp. 1046 (S.D.N.Y. 1973) ......................................................................... 88

*SEC v. Milles*,
  No. 1:19-cv-714-RP, 2022 WL 206808 (W.D. Tex. Jan. 24, 2022) ..................................... 102

*SEC v. Moran*,
  944 F. Supp. 286 (S.D.N.Y. 1996) ........................................................................................ 95

*SEC v. North American Research & Develop. Corp.*,
  424 F.2d 63 (2d Cir. 1970) ................................................................................................... 88

*SEC v. Seghers*,
  298 F. App'x 319 (5th Cir. 2008) .............................................................................. 68, 73, 78

*SEC v. Sethi Petroleum, LLC*,
  229 F. Supp. 3d 524 (E.D. Tex. 2017) ................................................................................ 102

*SEC v. Silea*,
  No. 4:20-cv-737-SDJ, 2022 WL 269105 (E.D. Tex. Jan. 27, 2022) ..................................... 102

*SEC v. Washington Investment Network*,
  475 F.3d 392 (D.C. Cir. 2007) .............................................................................................. 92

*SEC v. Woodley*,
  No. 4:15-cv-2767, 2018 WL 3303167 (S.D. Tex. July 7, 2018) ........................................... 104

*SEC v. World Tree Fin., L.L.C.*,
  43 F.4th 448 (5th Cir. 2022) ............................................................................................ 71, 72

*SEC v. Zandford*,
  535 U.S. 813 (2002) ......................................................................................... 84, 86, 87

*Sinclair-deMarinis*,
  SEC No-Action Letter 1981 WL 24975 (May 1, 1981) ......................................................... 92

*Sino Star Global Ltd. v. Shenzen Haoqing Tech. Co., Ltd.*,
  No. 4:22-cv-980, 2025 WL 1668216 (E.D. Tex. June 12, 2025) .......................................... 109

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ............................................................................................................. 24

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ............................................................................................... 77

*State v. O'Neill Investigations, Inc.*,
  609 P.2d 520 (Alaska 1980) ................................................................................................. 97

*Stotler & Co. v. CFTC*,
  855 F.2d 1288 (7th Cir. 1988) .............................................................................................. 76

*Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*,
    404 U.S. 6 (1971) ............................................................................................................ 87

Supreme Court overturned *Chevron U.S.A. v. Natural Resources Defense Council*,
    406 U.S. (1984) ................................................................................................................ 24

*TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*,
    945 F. Supp. 2d 1331 (M.D. Fla. 2013) ........................................................................ 96

*Tirapelli v. Advanced Equities, Inc.*,
    351 Ill. App. 3d 450Q CHAPTER \h \r 1 ...................................................................... 88

*Trivectra v. Ushijima*,
    112 Haw. 90, 144 P.3d 1 (Haw. 2006) .......................................................................... 88

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ............................................................................................................ 5

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................................................................ 89

*Turner v. Baylor Richardson Med Ctr.*,
    476 F.3d 337 (5th Cir. 2007) .......................................................................................... 65

*United States v. Brooks*,
    681 F.3d 678 (5th Cir. 2012) .......................................................................................... 15

*United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*,
    55 F.3d 78 (2d Cir. 1995) ............................................................................................... 98

*United States v. Elliott*,
    62 F.3d 1304 (11th Cir. 1995) ........................................................................................ 91

*United States v. Futch*,
    278 F. App'x 387 (5th Cir. 2008) ................................................................................... 15

*United States v. Ogale*,
    378 F. App'x 959 (11th Cir. 2010) ................................................................................. 91

*United States v. O'Hagan*,
    139 F.3d 641 (8th Cir. 1998) .......................................................................................... 95

*United States v. Radley*,
    659 F. Supp. 2d 803 (S.D. Tex. 2009) ........................................................................... 15

*United States v. Reed,*
    No. 1:20-cr-500, 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022)................................. 16

*United States v. Seefried,*
    639 F. Supp. 3d 8 (D.D.C. 2022)......................................................... 11, 14

*United States v. Valencia,*
    394 F.3d 352 (5th Cir. 2004) ........................................................... 15

*United States v. Wilkinson,*
    986 F.3d 740 (7th Cir. 2021) ........................................................... 16

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ................................................................. 17, 18

*Vestas-Am. Wind Tech., Inc. v. Salazar,*
    No. 6:19-cv-76, 2021 WL 1399296 (N.D. Tex. Feb. 1, 2021)................................ 101

*Wehling v. Columbia Broad. Sys.,*
    608 F.2d 1084 (5th Cir. 1979) .......................................................... 100

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................. 17, 18

*Western–Realco Ltd. P'ship 1983-A v. Harrison,*
    791 P.2d 1139 (Colo. App. 1989)........................................................ 88

*Whitman v. American Trucking Ass'n,*
    541 U.S. (2001) ...................................................................... 14

*Whitman v. American Trucking Associations,*
    *Inc.,* 531 U.S. 457 (2001) ........................................................ 19, 20, 22, 23

*Wonsover v. SEC,*
    205 F.3d 408 (D.C. Cir. 2000)........................................................... 95

*Yakus v. United States,*
    321 U.S. 414 (1944) ................................................................. 20, 23

*Ysleta Del Sur Pueblo v. Texas,*
    596 U.S. 685 (2022) ................................................................... 6

*Zinn v. Parish,*
    644 F.2d 360 (7th Cir. 1981) ........................................................... 91

**<u>Statutes</u>**

7 U.S.C. § 1(a)(13) ................................................................................................. 75

7 U.S.C. § 1(a)(20) ................................................................................................... 3

7 U.S.C. § 1a(19) ...................................................................................................... 6

7 U.S.C. § 2(a)(1)(A) ............................................................................................. 24

7 U.S.C. § 2(a)(1)(B) ............................................................................................. 75

7 U.S.C. § 5 ............................................................................................................. 24

7 U.S.C. § 5(b) ............................................................................................. 18, 22, 25

7 U.S.C. § 9(1) ............................................................................................. 1, 65, 75

7 U.S.C. § 13a-1 ......................................................................................... 105, 107

7 U.S.C. § 13a-1(a) ............................................................................................... 103

7 U.S.C. § 13a-1(d)(1) .......................................................................................... 107

7 U.S.C. § 13a-1(d)(3) .......................................................................................... 105

7 U.S.C. § 13c(b) ................................................................................................... 76

7 U.S.C. § 23(a), (b)(1) ........................................................................................... 6

7 U.S.C. § 23(c) ....................................................................................................... 7

7 U.S.C.A. § 1a ...................................................................................................... 21

7 U.S.C.A. § 1a(9) ....................................................................................... 2, 5, 75

7 U.S.C.A. § 2 ........................................................................................................ 15

15 U.S.C. § 80b-2(a)(11) ....................................................................................... 90

28 U.S.C. § 1961 .................................................................................................. 109

28 U.S.C. § 1961(a) ............................................................................................. 109

42 U.S.C. § 7409(b)(1) .......................................................................................... 23

Ala. Code 1975 § 8-6-23 ........................................................................................ 84

Ala. Code 1975 § 8-6-3(b) and (c) .................................................................... 94

Ala. Code 1975 § 8-6-2(24) ............................................................................. 85

Ala. Code 1975 § 8-6-2(18) ............................................................................. 90

Ala. Code 1975 § 8-6-2(19) ......................................................................... 93, 94

Ala. Code 1975 § 8-6-17(b)(2) ........................................................................ 94

Ala. Code 1975 §§ 8-6-17(a)(2), 8-6-2(7) ....................................................... 86

Alaska Stat. § 45.50.471(a) ............................................................................. 96

Alaska Stat. § 45.50.471(b)(11) ....................................................................... 97

Alaska Stat. § 45.50.545 ................................................................................. 97

Cal. Corp. Code § 25009 ................................................................................. 90

Cal. Corp. Code § 25009.5 .............................................................................. 94

Cal. Corp. Code § 25230(a) ............................................................................. 94

Cal. Corp. Code § 25235 ................................................................................. 94

Cal. Corp. Code § 25403 ................................................................................. 85

Cal. Corp. Code § 25403(b) ............................................................................. 86

Cal. Corp. Code § 25612.5 .............................................................................. 85

Cal. Corp. Code § 29505 ................................................................................. 82

Cal. Corp. Code § 29536 ................................................................................. 83

Cal. Corp. Code § 29552 ................................................................................. 82

Cal. Corp. Code §§ 25230, 25235 ................................................................... 85

Cal. Corp. Code §§ 29504 & 29515 ................................................................. 81

Cal. Penal Code § 7 ........................................................................................ 83

Colo. Rev. Stat. §11-53-111 ............................................................................ 81

Colo. Rev. Stat. §11-53-109(2) ........................................................................... 82

Colo. Rev. Stat. §11-53-107(1)(a)—(c) ................................................................ 83

Colo. Rev. Stat. § 11-53-107 .............................................................................. 83

Colo. Rev. Stat. § 11-51-101(3) .......................................................................... 85

Colo. Rev. Stat. § 11-51-604(5)(b) & (c) ............................................................ 85

Colo. Rev. Stat. §§ 11-53-102(4) & (13) ............................................................. 81

Colo. Rev. Stat. §§ 11-51-501(1), 11-51-201(12) .............................................. 86

Colo. Rev. Stat § 11-53-102(5) ........................................................................... 82

Colo. Rev. Stat § 11-53-109(1) ........................................................................... 82

COMAR 02.02.05.03 ........................................................................................... 95

Corps. & Assn's § 11-302 ............................................................................ 94, 95

Corps. & Assn's § 11-702(b) ............................................................................... 86

Corps. & Assn's § 11-101(i)(1) ........................................................................... 90

Corps. & Assn's § 11-401(b)(1) .......................................................................... 94

Corps. & Assn's §§ 11-301, 11-101(o) ............................................................... 86

Corps & Assn's § 11-804 ............................................................................. 84, 85

Corps & Assn's § 11-101(j) ................................................................................. 94

Corps & Assn's § 11-703(c)(1) ........................................................................... 86

Corps & Assn's § 11-402(b)(1) ........................................................................... 94

Fla. Stat. § 517.275 ............................................................................................ 81

Fla Stat. § 501.204 ............................................................................................. 96

Ga. Code Ann. § 10-5A-9 .................................................................................... 81

Ga. Code Ann. § 10-5A-6 .................................................................................... 83

Ga. Code Ann. § 10-5-2 ...................................................................................... 90

Ga. Code Ann. § 10-5-32 .................................................................... 94

Ga. Code Ann. § 10-5-51 .................................................................... 94

Ga. Code Ann. § 10-5A-7(b) ............................................................... 82

Ga. Code Ann. § 10-5A-7(a) ............................................................... 82

Ga. Code Ann. § 10-5-70(g) ............................................................... 85

Ga. Code Ann. § 10-5-58(g) ............................................................... 85

Ga. Code Ann. § 10-5A-1(4) ............................................................... 82

Ga. Code Ann. §§ 10-5A-2 and -3 ....................................................... 84

Ga. Code Ann. §§ 10-5A-1(3) & (12) ................................................... 82

Ky. Rev. Stat. Ann. § 292.310(11) ...................................................... 90

Ky. Rev. Stat. Ann. § 292.530 ........................................................... 84

Ky. Rev. Stat. Ann. §§ 292.320(1), 292.6501(4) .................................. 86

Ky. Rev. Stat. Ann § 292.330(8) ........................................................ 94

O.C.G.A. § 10-5-2(19) ....................................................................... 94

S.C. Code Ann. § 35-1-608 ................................................................ 85

S.C. Code Ann. § 35-1-502 ................................................................ 94

S.C. Code Ann. § 35-1-102(15) .......................................................... 90

S.C. Code Ann. § 35-1-102(16) .......................................................... 94

S.C. Code Ann. § 35-1-403(a) & 35-1-404(a) ....................................... 94

S.C. Code Ann. § 39-73-90 ................................................................ 81

S.C. Code Ann. § 39-73-60 ................................................................ 83

S.C. Code Ann. § 39-73-20 ................................................................ 84

S.C. Code Ann. § 39-73-70(B) ............................................................ 82

S.C. Code Ann. § 39-73-10(5) ................................................................................ 82

S.C. Code Ann. § 39-73-60(4) ................................................................................ 83

S.C. Code Ann. § 39-73-60(1)-(4) .......................................................................... 83

S.C. Code Ann. §§ 39-73-10(4) & (13) ................................................................. 82

S.C. Code §§ 35-1-501(1)-(3), 35-1-102(20) ....................................................... 86

Tex. Gov't Code § 4001.002 ............................................................................ 84, 85

Tex. Gov't Code § 4001.058 ............................................................................ 86, 95

Tex. Gov't Code § 4001.059 ................................................................................. 90

Tex. Gov't Code § 4001.060 ................................................................................. 94

Tex. Gov't Code § 4007.152 ................................................................................. 94

Tex. Gov't Code § 4008.102 ................................................................................. 86

Tex. Gov't Code §§ 4004.052 .......................................................................... 85, 94

## **Rules**

Fed. R. Civ. P. 56 ............................................................................................. 1, 64

## **Regulations**

17 C.F.R. § 1.2 (2025) ......................................................................................... 75

17 C.F.R. § 143.8(b)(1) (2025) ........................................................................... 107

17 C.F.R § 180.1 .................................................................................................. 72

17 C.F.R. § 180.1(a) ............................................................................................. 75

17 C.F.R. § 180.1(a)(1) –-(3) (2025) .................................................................. 1, 65

## **Other Authorities**

*Applicability of the Investment Advisers Act of 1940,*
    52 Fed. Reg. 38400-01, 1987 WL 154624 (F.R.) ....................................... 91, 92

*Commodity Exchange Act,*
    Pub. L. No. 74-675, 49 Stat. 1491 (1936) ........................................................ 7

*Commodity Futures Trading Commission Act of 1974,*
   H.R. Rep. No. 93–975 ............................................................................................ 8

*Commodity Futures Trading Commission Act of 1974,*
   S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 1974 WL 11581 (Aug. 29, 1974) ........................ 7, 9

*Federal Regulation of Margin in the Commodity Futures Industry—History and Theory,*
   64 Temple L. Rev. 59 (1991) .................................................................................. 8

*Grain Futures Act of 1922,*
   Pub. L. No. 67-331, 42 Stat. 998 (1922) ................................................................. 7

*Metals Reserve Company,*
   7 FR 10381-04 .................................................................................................. 20

PHILIP MCBRIDE-JOHNSON, ET AL., Derivatives Regulation § 1.02 (2024) ................................... 7

Uniform Securities Act § 204(a)(B) ........................................................................... 95

# I.    INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 56.1–56.7, and the Court's September 12, 2025, and September 29, 2025, Orders (ECF Nos. 938, 947), Plaintiffs respectfully submit this brief and the accompanying Appendix ("APP") in support of their Amended Motion for Summary Judgment. For the reasons set forth below, Plaintiffs are entitled to Summary Judgment against Defendants Lucas Asher and Simon Batashvili for violating Section 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9(1) and Commission Regulation ("Regulation") 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1) –-(3) (2025) (Count I), as well as State laws pertaining to commodities fraud, securities fraud, unregistered investment advice, investment adviser fraud, and unfair or deceptive trade practices (Counts II–IV and VI–XXIX).

First, in Section II of this Motion, Plaintiffs answer the Court's five questions relating to the CFTC's jurisdiction. Plaintiffs address the meaning of the term "commodity," the Fifth Circuit's interpretation of this term to include precious metals in *CFTC v. Muller*, 570 F.2d 1296 (5th Cir 1978), the lack of applicability of the Major Questions doctrine or need for deference in interpreting the meaning of "commodity" under the Commodity Exchange Act ("CEA"). Then, in Sections III and IV, Plaintiffs lay out the law and evidence showing that Defendants engaged in fraud and violated various state laws. The undisputed facts demonstrate that from at least September 2017 through September 2020 (the "Relevant Period"), Lucas Asher and Simon Batashvili orchestrated a nationwide scheme to defraud elderly victims of their retirement savings by selling them overpriced gold and silver bullion coins. Asher and Batashvili perpetrated this scheme through TMTE, Inc. a/k/a Metals.com, Chase Metals LLC, Chase Metals Inc., (collectively "Metals" or "Metals.com"), Barrick Capital, Inc. ("Barrick")—entities they

owned, controlled, and operated as a common enterprise. Finally, in Section V, Plaintiffs outline the relief sought, requesting that the Court impose a permanent injunction, restitution, and a civil monetary penalty against Asher and Batashvili.

For the reasons set forth below, the Court should grant Plaintiffs' Amended Summary Judgment Motion in its entirety.

## II.    <u>JURISDICTION</u>

In brief, on the legal question of whether precious metals are "commodities" within the scope of the CEA—they unquestionably are. The Commodity Futures Trading Commission Act of 1974 ("CFTC Act of 1974") created the CFTC and at the same time broadened the definition of "commodity" in the CEA to encompass "all other goods and articles," which includes precious metals. *See* Pub. L. No. 93–463 (H.R. 13-113), 88 Stat. 1389, 1395 (1974) (currently codified at 7 U.S.C.A. § 1a(9)). Legislative statements leading to the passage of the CFTC Act of 1974 express the explicit intent of Congress to broaden the scope of the CEA to allow the CFTC to oversee U.S. commodity derivatives markets that by that time included precious metals futures products. Shortly after the passage of this amendment to the CEA in 1974, the Fifth Circuit held in *CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978), that precious metals are commodities covered by the CEA. In addition, corpus linguistic evidence of the meaning of "commodity" at the time of the enactment of the CEA in the 1930's and the passage of the CFTC Act of 1974 are consistent with a broad definition of the term that includes precious metals.

Because the statute itself expressly defines the term "commodity" broadly to include all goods and articles, the Major Questions doctrine and the related "intelligible principle" question are not implicated. The CEA does not give the CFTC discretion to define these terms differently, and the plain language of the statute answers the question. It is relevant, however, for the Court

to consider the CFTC's interpretation of the term "commodity" in the various rules it has passed and the administrative decisions it has issued for support for this same conclusion—that precious metals are commodities.

While precious metals are not "agricultural commodities," they are nonetheless "commodities" under Section 1a of the CEA. Precious metals fall within the definition of "exempt commodities" in Section 1a(20) of the CEA, 7 U.S.C. § 1(a)(20). "Exempt commodities" under Section 1a(20) are a sub-category of the broader term "commodity" defined in Section 1a(9) of the Act. Physical commodities such as gold, silver, platinum, palladium, oil, and gas are all examples of "exempt" commodities that are not agricultural but are nonetheless "commodities" subject to the CEA.

A.    **QUESTION 1: What was the ordinary public meaning of "commodity" at the time of the enactment and amendments of the CEA?**

**ANSWER: The ordinary public meaning of "commodity" has included precious metals since before the CEA was enacted, and since the passage of the CFTC Act of 1974 the term "commodity" in the CEA has been defined broadly to encompass "all goods and articles," including precious metals.**

1. **The ordinary public meaning of "commodity" has included precious metals at all relevant times.**

Both before and after the enactment of the 1974 CFTC Act that expanded the CEA's definition of the term "commodity," dictionaries have defined the term "commodity" broadly to include precious metals. For example, the *American Heritage Dictionary* 286 (1975) defines it as "[a]n article of trade or commerce that can be transported, especially an agricultural *or mining product*" (emphasis added). Precious metals are and were articles of trade or commerce; indeed, they often are the products of mining. Other contemporaneous dictionaries confirm that ordinary meaning. *See*, *e.g.*, *Black's Law Dictionary* 248 (5th ed. 1979) (explaining that the term is "broader than merchandise" and "in referring to commerce may include almost any article of

3

movable or personal property"); *Black's Law Dictionary* 342 (4th rev. ed. 1968) (same); *Webster's Third New International Dictionary* 458 (1966) ("an economic good; *esp* : a product of agriculture, *mining* or, sometimes manufacture as distinguished from services") (emphasis added). Gold and silver are (and have been) commodities under the ordinary public meaning of that term, and more importantly precious metals clearly fall within the statutory definition of "commodity" in the CEA, as amended by Congress in 1974.

The term "commodity" has also been used in newspaper articles to refer to metals since before the CEA was enacted in 1936. Silver futures began trading on what is now the Chicago Mercantile Exchange in 1933. *See* https://www.cmegroup.com/media-room/historical-first-trade-dates.html#metals. In that year, the New York Times described silver as a commodity on its "Commodities" page: "Cheered by unexpected strength of the group in Congress in favor of silver, futures for this commodity rallied vigorously yesterday on the National Metal Exchange." *Silver Futures Up 90 Points on Capital News; Silk and Most Other Commodities Increase*, N.Y. TIMES, April 19, 1933, p. 30. In 1933, the National Metal Exchange was acquired by The Commodity Exchange, Inc., where silver futures continued to trade: "[trading] in silver futures [on The Commodity Exchange] broke all records for this market . . . compared with . . . the old National Metal Exchange during 1932." *Commodity Exchange, Six Months Old, Reports Records Made in Trading Here*, N.Y. TIMES, November 5, 1933, p. 9. Metals were also described as commodities in newspaper coverage in 1974. *See* Elizabeth M. Fowler, *Commodities Exchanges Beginning a Joint Venture*, N.Y. TIMES, June 28, 1974, p. 43. Whether in dictionary definitions or as described in newspaper coverage, the ordinary public meaning of "commodity" has included metals since before the enactment of the CEA.

## 2. The definition of "commodity" in the CEA has included precious metals since 1974.

Before 1974, the term "commodity" was defined in the CEA to mean only a specific list of agricultural commodities. But in 1974, Congress expanded the definition of "commodity" in the CEA to include "*all* other goods and articles . . . and *all* services, rights and interests in which contracts for futures delivery are presently or in the future dealt in." CFTC Act of 1974, 88 Stat. 1389 at 1395 (emphases added) (currently codified at 7 U.S.C.A. § 1a(9)). "All" means *all*, and precious metals unquestionably are included as goods or articles within that plain text.

In its July 21, 2025, Order (ECF No. 911 at 8–9), the Court relied on the *ejusdem generis* and *noscitur a sociis* canons to conclude that "all other goods and articles" includes only *agricultural* goods and articles in light of the immediately preceding list of items. Respectfully, that conclusion was mistaken in light of the statutory context, which makes those canons inapplicable for several reasons.

First, the statute expressly excludes "motion picture box office receipts" from the definition of a "commodity." 7 U.S.C. § 1a(9). That exclusion would be nonsensical if the definition encompassed only agricultural goods in the first place. Such an interpretation would improperly render the statutory amendment adding that exclusion a superfluity. *See TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (rejecting interpretation that "would in practical effect render [a statutory] exception entirely superfluous"). Nor should it matter that the amendment to exclude motion picture box office receipts from the definition of "commodity" came in 2010 instead of 1974; statutes are interpreted as a coherent whole, and subsequent amendments can shed light on the meaning of previously enacted text. *See Branch v. Smith*, 538 U.S. 254, 281 (2003) (Scalia, J.) (explaining that "courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes," and that "a subsequent statute"

5

on the same topic will "govern the construction of the first statute").

Second, the statute defines the term "exempted commodity" to mean "a commodity that is not an excluded commodity or an agricultural commodity." 7 U.S.C. § 1a(20). That definition makes clear that "commodity" must include *more* than just "agricultural commodit[ies]"; were it otherwise, an "exempted commodity" would be a null set. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 699 (2022) (rejecting interpretation that would render statutory provision "a nullity"). That definition also makes clear that an "excluded commodity" is a type of "commodity," and "excluded commodity" is expressly defined in subsection (19) to include a slew of items that are nonagricultural. *See* 7 U.S.C. § 1a(19). Limiting "commodity" to agricultural goods and services would thus be flatly inconsistent with those statutory provisions.[1]

Third, the statute prohibits "any transaction for the delivery of *any commodity* under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract," and then expressly creates an "except[ion]" wherein the agency may promulgate regulations to permit such transactions with respect to "the delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or platinum." 7 U.S.C. § 23(a), (b)(1) (emphasis added). That provision makes clear that silver bullion, gold bullion, etc. fall within the definition of "any commodity," and within the CFTC's regulatory ambit in the first instance. Indeed, Congress expressly directed the agency to conduct a survey regarding certain standardized contracts for precious metals and submit a report to Congress that included

---

[1] The CEA has evolved over time to classify the broader term "commodities" into three sub-categories: (i) "agricultural commodities"; (ii) "excluded commodities"; and—pertinent here—(iii) "exempt commodities." "Excluded commodities" include financial instruments such as interest rates, exchange rates, currencies, securities, indices, and contingencies and events. *See* 7 U.S.C. § 1a(19). An "exempt commodity" is defined to mean "any commodity that is not an agricultural commodity or an excluded commodity." 7 U.S.C. § 1a(20).

proposed regulations. 7 U.S.C. § 23(c). That directive would make no sense if "commodity" did

not include those precious metals in the first place.

### 3. The evolution of the CEA reflects a steady expansion of the scope of the term "commodity" culminating in the 1974 expansion to include precious metals.

While the amendments to the CEA by the CFTC Act of 1974 provide the definitive

answer to the question of whether precious metals are commodities, the gradual expansion of the

term "commodity" provides additional context for the current broad scope of the term. The

CEA's definition of "commodity" has undergone significant expansion over the past century,

keeping pace with the evolution of commodity derivatives markets in the United States.

Although the CEA initially included certain enumerated agricultural commodities, "Congress

[has] expanded the definition of *commodity* to encompass virtually anything that is or becomes

the subject of futures trading, intangible as well as tangible." PHILIP MCBRIDE-JOHNSON, ET AL.,

Derivatives Regulation § 1.02[1] (2024) (tracing evolution of the CEA term "commodity").

The CEA's roots are in the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998

(1922), in which Congress named seven grain commodities whose futures markets were to be

overseen by the Secretary of Agriculture.[2] In 1936, Congress passed the first iteration of the

CEA, which defined the term "commodity" to include the original seven grains, plus six more

agricultural products. Pub. L. No. 74-675, 49 Stat. 1491 (1936); s*ee also* S. Rep. No. 93-1131,

1974 U.S.C.C.A.N. at 5855 ("Under these amendments of 1936, the [Grain Futures Act] was

renamed the Commodity Exchange Act and the regulatory coverage was extended to cotton and

other specified commodities as well as grains."). In the following decades, Congress repeatedly

---

[2] An earlier law prohibiting gold futures was briefly enacted in July 1864, but it was repealed
within two weeks and did not define the term "commodity." *See* An Act to prohibit certain Sales
of Gold and Foreign Exchange, Thirty-Eighth Congress, Sess. I., Ch. 126,127 (July 17, 1864).
Although it's not clearly a precursor to the current CEA, it is evidence that metal and foreign
currency futures markets were active in 1864.

amended the "commodity" definition to cover additional commodities. *See id.* at 5855 ("Between 1936 and 1968, there were several minor amendments to the Commodity Exchange Act, including amendments bringing additional commodities under regulation."). These additions included, for example, butter, eggs, Irish potatoes, wool tops, fats and oils, cottonseed, cottonseed meal, peanuts, soybeans, soybean meal, wool, onions, livestock, livestock products, and frozen concentrated orange juice. *See CFTC v. Baragosh*, 278 F.3d 319, 324–25 (4th Cir. 2002) (describing the expansion of the definition of the term "commodity" in the CEA from agricultural products to other goods, articles, rights and services).

The practice of continuously adding to the list of specific commodities became untenable. This was particularly so in the early 1970s as financial futures, including "futures contracts on precious metals and foreign currency," began to proliferate. *See* Jerry W. Markham, *Federal Regulation of Margin in the Commodity Futures Industry—History and Theory*, 64 TEMPLE L. REV. 59, 87 (1991). Finally, in the CFTC Act of 1974, Congress dispensed with the piecemeal approach of adding various items to the list of enumerated commodities and broadly defined "commodity" to include all goods, articles, services, rights, and interests. According to the House Committee on Agriculture, these changes were intended to "significantly increase public confidence in the futures markets by providing the same protection to the unregulated commodity customers that is now afforded the regulated commodity customers." H.R. Rep. No. 93–975 at 62, 93d Cong., 2d Sess. (1974).

The preamble to the CFTC Act of 1974 makes the broadening of this statutory definition explicit, describing the purpose of the Act as to "amend the Commodity Exchange Act to strengthen the regulation of futures trading, ***to bring all agricultural <u>and other commodities</u> traded on exchanges under regulation***, and for other purposes." *Id.* (emphasis added). "A

8

preamble, purpose clause, or recital is a permissible indicator of meaning." *Bittner v. United States*, 598 U.S. 85, 99 n.6 (2023) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 217 (2012)); s*ee also* 1 J. Story, Commentaries on the Constitution of the United States § 459, p. 443 (1833) ("[T]he preamble of a statute is a key to open the mind of the makers, as to the mischiefs, which are to be remedied, and the objects, which are to be accomplished by the provisions of the statute"). Precious metals such as silver were among the various commodities that were traded on commodity exchanges at that time. *See* Appx. III to S. Rep. No. 93-1131, 1974 WL 11581 (Leg. Hist.), 1974 U.S.C.C.A.N. 5843 (Aug. 29, 1974) (containing a list of commodities traded on exchanges in 1974, including "Copper, various Foreign Currencies (such as the British Pound), Canadian Silver Coins, Mercury, Palladium, Platinum, Propane Gas, Silver, and Silver Coins").

The legislative history leading to this 1974 amendment provides further detail regarding the purpose of expanding the statutory definition of the term "commodity" to include precious metals. The Senate Report described in the opening paragraph that a key purpose of the CFTC Act of 1974 was to "bring all agricultural ***and other commodities*** traded on exchanges under regulation." *Id.* at 5843–44 (emphasis added). "While the futures markets in a number of agricultural commodities have been regulated in varying degrees since 1922, many large and important futures markets are completely unregulated by the Federal Government. These include such agricultural and forest commodities as coffee, sugar, cocoa, lumber, and plywood, ***plus various metals, including the highly sensitive silver market and markets in a number of foreign currencies***." *Id.* at 5859 (emphasis added). The goal was to establish a regulatory authority with a "a strong law which will enable it to regulate ***both agricultural and nonagricultural goods and services*** in the public interest." *Id.* at 5860 (emphasis added). With

these 1974 amendments to the CEA, Congress explicitly provided that "[a]ll goods, articles, services, rights, and interests traded for future delivery [were] brought under Federal regulation." *Id.* at 5845.

### 4. A *corpus linguistics* analysis of the term "commodity" further supports that precious metals, like gold and silver, are commodities.

Pursuant to the Court's September 29, 2025 Order, Plaintiffs performed a corpus linguistics analysis of the term "commodity" and have attached the results to this Motion as Exhibits 125–127. *See* APP 2317-2572. The search results show that word "commodity" has consistently been used broadly to describe various goods and articles including precious metals, whether this usage is examined in the 1930's around the time of the enactment of the CEA, or in the 1970's around the time of the passage of the CFTC Act of 1974. Unsurprisingly, the term "commodity" has been used to describe agricultural commodities in many publications; but it also has been used to describe a broad variety of goods and articles such as metals, and even more broadly to describe intangible things such as "courtesy" (Exhibit 126 (APP 2341), 1930s COHA Entry # 62: "Courtesy. . . is so valuable a human commodity that we are justified in extending ourselves mightily to promote it;") or "death" (Exhibit 127 (APP 2490), 1970's COHA Entry # 38: "we have made death another mass-produced, impersonal commodity . . ."). The search results reflect that almost anything can be described as a "commodity." There is certainly no lack of usage of the term "commodity" to describe non-agricultural commodities including oil, gas, metals, and precious metals specifically.

Plaintiffs' search and analysis reflect that both in the 1930's (when the CEA was initially enacted) and in the 1970's (when the CFTC Act of 1974 established the CFTC and broadened the definition of "commodity" in the statute to include non-agricultural commodities) the term "commodity" has been used to describe precious metals. Plaintiffs explored various databases,

but for purposes of this analysis used The Corpus for Historical American English (COHA), a large corpus of American English that contains 475 million words of text from the 1820s–2010s. *See* https://www.english-corpora.org/coha/ (last checked December 8, 2025). "[COHA] collects sources across genres, including fiction, magazines, newspapers, and academic articles." *United States v. Seefried*, 639 F. Supp. 3d 8, 13 (D.D.C. 2022) (citation omitted).

A search of COHA for the decade 1930–40 resulted in 445 unique uses of the term "commodity" from at least 189 unique sources.[3] Several results specifically described gold or other precious metals like silver as a commodity. *See, e.g.,* Exhibit 126 (APP 2338, 2427, 2441, 2446), COHA 1930s Entries # 54, 321, 362, and 375. For example, one article from 1931 referred to gold as a "durable commodity." Exhibit 126 (APP 2427), COHA 1930s Entry # 321. An article in Time magazine from 1933 noted that "we have to remember that [gold] is a commodity the value of which is enshrined in human instincts for over 10,000 years." Exhibit 126 (APP 2328), COHA 1930s Entry # 25. Another article from the Christian Science Monitor published in 1937 described silver as a commodity. Exhibit 126 (APP 2446), COHA 1930s Entry # 375.

Many additional textual usages of the term "commodity" from various sources in the 1930's support an expansive interpretation of the term that goes far beyond agricultural goods. Some examples are references in the text data to copper (Exhibit 126 (APP 2327, 2385), 1930's COHA Entries # 22 and 194), scrap iron and steel (Exhibit 126 (APP 2345), 1930's COHA Entry

---

[3] Many sources in the COHA text extracts contain multiple unique uses of the word "commodity" as well as different senses of the term. For the usage totals, each use was counted. For the source totals, each source was counted once in each sense category where it was represented. This methodology was chosen to avoid undercounting less prevalent and more specific senses of commodity as might occur with random sampling given how prevalent ambiguous uses were. Results in the corpus that were merely duplicates were omitted entirely.

# 74), tungsten (Exhibit 126 (APP 2345), 1930's COHA Entry # 75), building materials (Exhibit 126 (APP 2347–48), 1930's COHA Entry # 82), and soap (Exhibit 126 (APP 2367), 1930's COHA Entry # 139). These results show that non-agricultural goods were regularly described as "commodities" in the 1930's around the time of the enactment of the original CEA.

Overall, most results were ambiguous as to the precise usage of the term "commodity." Even where the results describe commodities in an agricultural context, it is not clear that the usage of the term to describe agricultural commodities forecloses a broader usage. Other results were ambiguous without any clear indications regarding what kind of commodity was being described, and some texts even used "commodity" in a metaphorical or abstract sense. For example, describing "immortality" as a commodity (Exhibit 126 (APP 2323), 1930s COHA Entry # 8: "I think immortality is an overrated commodity") or "women" as a commodity (Exhibit 126 (APP 2334), 1930s COHA Entry # 41: "he will regard women as I myself regard them – merely as a commodity").

A search of historical language databases such as COHA has substantial limitations. For example, the database clearly is not capturing every usage of the term "commodity," even in the periodicals it has captured and sampled within the database. Take the New York Times extracts: COHA captures some text from the New York Times which show up in the database search results, but it does not capture *all* text from *every* issue of the New York Times. If it did, there would be many more results for a search of the word "commodity" in the 1930's given that the New York Times published a daily page titled "News and Prices in the Commodity Markets" where it cataloged daily prices of agricultural and non-agricultural products including metals. *See, e.g.*, New York Times, Dec. 11, 1936 "News and Prices in the Commodity Markets" (describing commodity news and prices including copper, tin, lead, zinc, iron, steel billets,

antimony, aluminum, quicksilver, gasoline, and crude oil).[4] On this single day in 1936 there are numerous usages of the word "commodity" and many references to metals and other non-agricultural products such as gasoline and oil as "commodities."

The analysis of the 1970's COHA search results for the term "commodity" show a similarly broad usage of the term "commodity" to describe a wide degree of goods, articles or other tangible or intangible things. A search of COHA for the decade 1970–80 resulted in at least 241 unique uses of the term "commodity" from at least 105 unique sources. At least fourteen entries from twelve unique sources expressly described gold or other precious metals as a commodity. For example, one article described gold as a "gilt-edged commodity." Exhibit 127 (APP 2513), COHA 1970s Entry # 109: "gold prices this week have been soaring to new all-time peaks in what some traders say is unprecedent trading in the gilt-edged commodity." Another article described the London Metal Exchange potentially adding gold futures contracts to the list of commodity contracts it then offered for trading on the exchange. Exhibit 127 (APP 2512), COHA 1970s Entry # 107. In 1974, an article in the Wall Street Journal noted that "Commodity exchanges will trade gold futures." Exhibit 127 (APP 2488), COHA 1970s Entry # 31. And a 1978 article in Time Magazine discussed gold "commodity options" alongside "cotton and pork bellies." Exhibit 127 (APP 2507), COHA 1970s Entry # 89.

The search results reflect that a wide array of goods, articles, or things was regularly described as a "commodity" in the 1970's. This includes oil, iron ore, copper, pork bellies, and even jeans. At least twenty-five entries from fifteen sources employed these types of broad uses of commodity. *See, e.g.,* Exhibit 127 (APP 2494), COHA 1970s Entry # 48: "Third World

---

[4] The New York Times maintains a searchable historical archive of its print newspaper at: https://timesmachine.nytimes.com/browser (last visited Dec. 12, 2025).

nations, some of whom depend heavily on commodities production for income…" The largest number of results remained ambiguous (*see, e.g.,* Exhibit 127 (APP 2480), COHA 1970s Entry # 5: "it will not do in abating the demand for a commodity like food, which is urgently and immediately needed . . . .") or abstract in usage (*see, e.g.,* Exhibit 127 (APP 2479), COHA 1970s Entry # 1: The money buys a precious commodity -- influence.").

To the extent the Court uses this corpus linguistics analysis as a "cross-check on established methods of interpretation," as in *United States v. Seefried*, 639 F. Supp. 3d at 16, this cross-check confirms that the word "commodity" has at all relevant times been used to reference a broad variety of goods, articles and things, whether tangible or intangible. This analysis is additional evidence beyond the already conclusive text of the statute, legislative history, and court decisions which also confirm that the defined term "commodity" in the CEA includes precious metals such as gold and silver.

**B.    QUESTION 2: Is the Court bound by *CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978) in light of: (a) the Supreme Court's development of the Major Questions Doctrine, and (b) the Supreme Court's holding in *Whitman v. American Trucking Ass'n*, 541 U.S. 457 (2001)?**

**ANSWER: Yes, the Court is bound by the *Muller* decision's holding that precious metals are "commodities" under CEA Section 1a. The Major Questions Doctrine and the Supreme Court's *Whitman* decision do not affect this outcome.**

**1.    Shortly after the passage of the CFTC At of 1974, the Fifth Circuit held that the term "commodity" in the CEA includes precious metals.**

In *CFTC v. Muller*, 570 F.2d 1296, 1298 n.2 (5th Cir. 1978), the Fifth Circuit considered and rejected the argument that precious metals are not "commodities" because they are not enumerated agricultural commodities. *Muller* involved a type of transaction described as a "London commodity option" that was designed as a means to speculate on "'hard' commodities, like gold, silver and other metals, traded on the London Metal Exchange." *Id.* at 1298. The defendant in *Muller* argued that the CFTC could "regulate only option transactions involving

those agricultural commodities that are explicitly enumerated . . . ." *Id*. The Court rejected this argument, writing:

> The restrictive interpretation urged by [defendant-appellant] is foreclosed by the wording of the Act and its legislative history. Prior to the passage of this Act, the Commodity Exchange Act did apply only to certain agricultural commodities that were specifically enumerated in s 2. It totally banned option transactions in these commodities. The 1974 Act was passed to fill the regulatory gaps in commodities trading. It expanded the definition of "commodity" to include, in addition to those commodities expressly enumerated, "all other goods and articles . . . and all services, rights and interests in which contracts for future delivery are presently or in the future dealt in . . . ." 7 U.S.C.A. s 2. The Act continues the Commodity Exchange Act's ban on all option transactions involving the specifically enumerated agricultural commodities . . . In addition, however, s 6c(b) subjects option transactions in non-enumerated commodities to regulations promulgated by the Commission. The Act clearly applies to option transactions ***in non-enumerated commodities***.

*Id.* at 1298–99 (emphasis added). The *Muller* decision has been binding precedent since 1978 and conclusively addresses the question of whether precious metals are "commodities" within the scope of the CEA.

**2. Since the *Muller* decision in 1978, the Fifth Circuit and district courts within the Fifth Circuit, have consistently found non-agricultural commodities to be "commodities" within the scope of the CEA.**

The Fifth Circuit and district courts within the Fifth Circuit have addressed the question of whether other non-agricultural products such as natural gas or propane (i.e., "exempt" commodities under CEA Section 1a(20)) are "commodities" and have consistently concluded that they are. For example, in *United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012), the Fifth Circuit held that "natural gas . . . is a 'commodity' within the meaning of the CEA." *Id*. at 696. *See also, e.g.*, *United States v. Futch*, 278 F. App'x 387, 395 (5th Cir. 2008) (rejecting argument that natural gas was not a commodity under the CEA). In *United States v. Valencia*, 394 F.3d 352, 353 (5th Cir. 2004), the court described natural gas as "a commodity in interstate commerce." And in *United States v. Radley*, 659 F. Supp. 2d 803, 810 (S.D. Tex. 2009), *aff'd*,

15

632 F.3d 177 (5th Cir. 2011), the court determined that propane is a non-agricultural commodity. *See also CFTC v. Ramos*, No. 3:20-cv-02985, 2021 WL 2806139 (J. Starr, July 6, 2021) (entering default judgment in favor of CFTC and against a defendant who operated a commodity pool to trade binary options and forex).

Courts throughout the country have also addressed the question of whether various other goods or articles (such as precious metals) or other rights or services are "commodities" within the scope of the CEA, and all conclude they are. For example:

- **Currencies, interest rates or indexes**: In *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021), the Seventh Circuit held that futures indexes are "excluded commodities" that are "'commodities' under the Act as a whole." *Wilkinson*, 986 F.3d at 745; *see also CFTC v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004) (rejecting defendants' argument that currency is not a commodity because it is not an agricultural product).

- **Events or occurrences**: *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38 (D.D.C. 2015) (finding that the "span" of the CEA's definition of commodity covered contracts in gold, crude oil, and currencies as well as contracts covering a result, climate and weather contracts, and economic statistics).

- **Digital Assets / Cryptocurrencies**: *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (holding virtual currency "My Big Coin" is a commodity); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) (virtual currencies such as bitcoin "fall well-within the [CEA's] definition of 'commodity' as well as the definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in'"); *United States v. Reed*, No. 1:20-cr-500, 2022 WL

597180, at *4 (S.D.N.Y. Feb. 28, 2022) ("[U]nder the plain language of the CEA, cryptocurrencies fall within the definition of commodities.").

- **Precious Metals**: *CFTC v. Am. Bd. of Trade, Inc.*, 473 F. Supp. 1177, 1180 (S.D.N.Y. 1979) ("The options dealt in on the Board pertain to silver bullion, silver coins, gold bullion, platinum, copper, and plywood, and to foreign currencies such as the Swiss franc and the German mark, all of which are commodities encompassed within the statutory definition."); *CFTC v. Baldwin*, No. 1:21-cv-5707, 2025 WL 1047372, at *5 (S.D.N.Y. Apr. 8, 2025) (finding precious metals are commodities, as defined by Section 1a(9) of the Act); *CFTC v. Fisher Cap. LLC*, No. 1:23-cv-3121, 2024 WL 3771781, at *8 (E.D.N.Y. July 12, 2024) (denying motion to dismiss on jurisdictional grounds and finding Section 6(c)(1) of the CEA extends "to the fraud alleged here in connection with the sale of precious metals, which are commodities under the Act"); *CFTC v. US Coin Bullion LLC*, No. 6:20-cv-40, 2021 WL 8946141, at *8 (M.D. Fla. Dec. 29, 2021) (finding precious metals are commodities, as defined by Section 1a(9) of the Act); *CFTC v. Omega Knight 2, LLC*, No. 1:18-cv-22377, 2019 WL 6796128, at *8 (S.D. Fla. Sept. 16, 2019) (same); *CFTC v. Int'l Monetary Metals, Inc.*, No. 0:14-cv-62244, 2016 WL 8256852, at *4 (S.D. Fla. Aug. 1, 2016) (same).

There is no shortage of cases where courts treat various non-agricultural goods, articles, rights or services (including precious metals) as "commodities" within the scope of CEA Section 1a. The CFTC is not aware of any cases holding that precious metals are not commodities.

### 3.  The Major Questions Doctrine Is Not Implicated

The Major Questions doctrine is not implicated in this case because that doctrine applies only to interpret "ambiguous" statutory terms, not unambiguous ones. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *Alabama Association of Realtors v. Department of Health & Human*

*Services*, 594 U.S. 758, 764 (2021) (per curiam); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014). As explained above, the statutory text, context, and history make clear that "commodity" unambiguously includes nonagricultural commodities, such as the metals at issue here. *See supra,* Section II.A.1–II.A.3.

 Even if that were not the case, the Major Questions doctrine would not justify an unduly narrow reading of the statutory term "commodity" here. That doctrine counsels "skepticism" where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *Utility Air*, 573 U.S. at 324 (citation omitted), invokes some "little-used backwater" of a statute, *West Virginia*, 597 U.S. at 730, or relies on a "'mismatch[]'" between the asserted power and the "narrow[ness]" of the statute, *Biden v. Nebraska*, 600 U.S. 477, 517 (2023) (Barrett, J., concurring) (citation omitted). None of these situations is present here.

The CFTC is not claiming in this case to have discovered "an unheralded power." *Utility Air*, 573 U.S. at 324 (citation omitted). Since 1974, the CEA has explicitly included precious metals as commodities. The CFTC has regularly used its authority to regulate precious metals transactions and to pursue fraudulent conduct in precious metals transactions since that time. An express purpose of the expansion in 1974 of the definition of the term "commodity" in the CEA was to ensure that the CFTC had sufficiently broad authority over commodity transactions in the United States including precious metals transactions to ensure that the CFTC can achieve its Congressionally mandated purposes, specifically the protection of "market participants from fraudulent or other abusive sales practices and misuses of customer assets." *See* 7 U.S.C. § 5(b). *See supra*, Section II.A.2–II.A.3. Nor is this a little-used backwater: it is the core statutory definition of what constitutes a "commodity." And there is no mismatch in scope between the

claimed power and the scope of the statute; the term "commodities" is purposefully broad to give the CFTC power to regulate transactions involving agricultural commodities (e.g., wheat futures), "excluded" commodities (e.g., interest rate swaps) and "exempt" commodities (e.g., oil and gas options), all of which can be described as having great economic and political significance. The CFTC is not claiming any greater power to regulate metals like gold and silver.

The statute itself defines the scope of the term "commodity" leaving the CFTC with no discretion to further define the term, and the statute is specifically designed to grant the CFTC authority to regulate specific transactions in or in connection with commodities including precious metals.

### 4. The "Nondelegation" doctrine as described in *Whitman v. American Trucking Ass'n* is inapplicable to the question of whether precious metals are commodities because the language of the statute defines the term.

"In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency." *Whitman v. American Trucking Associations, Inc.,* 531 U.S. 457, 472 (2001). There is no "delegation" issue in this case as to the definition of "commodity" because the statute defines the term "commodity" and does not delegate to the CFTC any legislative power to define the term differently. In *Whitman*, the Supreme Court addressed a statute that directed the administrator of the EPA to use "judgment" to set ambient air quality standards that allowed "an adequate margin of safety" and "are requisite to protect the public health." *Id.* at 912. Despite this substantial degree of discretion, the Supreme Court found the statute provided a sufficiently "intelligible principle" such that it did not violate the nondelegation doctrine. Justice Scalia wrote for the majority that "the scope of discretion [the statute] allows is in fact well within the outer limits of our nondelegation precedents." *Id.* at

913.[5]

Here, as in *Whitman,* "the text of [the statute], interpreted in its statutory and historical context and with appreciation for its importance to [the statute] as a whole, unambiguously" covers gold and precious metals as "commodities." *See Whitman*, 531 U.S. 457 at 471. Congress put an intentionally broad definition of the term "commodity" in the statute. It would require reading in words that are not there to limit the term, as Congress did with onions and box office receipts, for example. Moreover, any effort to limit the scope of the term "commodity" is unnecessary given the other limitations on the scope of the transactions governed by the CEA.

"In the history of the Court we have found the requisite "intelligible principle" lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring "fair competition." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 474–75, (2001) (citing *Panama Refining Co. v. Ryan,* 293 U.S. 388 (1935) and *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495 (1935)). As to the question of whether precious metals are commodities, there is no delegation of authority, and the statutory language itself provides the clear answer to the question.

---

[5] Justice Scalia references the Supreme Court's approval of the wartime conferral of agency power to fix the prices of commodities at a level that "will be generally fair and equitable and will effectuate the [in some respects conflicting] purposes of the[e] Act." *Yakus v. United States,* 321 U.S. 414, 420 (1944). The statute in question dealt with commodities and applied to metals. For example, this wartime agency issued maximum prices for metals under its authority to set prices for "commodities." *See, e.g.,* Part 1499 – Commodities and Services, Order 177 Under 1499.3(b) of GMPR, Metals Reserve Company" setting the maximum prices for South African crystal corundum ore to the American Abrasive Company." 7 Fed. Reg. 10381.

C.    **QUESTION 3: Does the CFTC's interpretation implicate the Major Questions Doctrine?**

**ANSWER: No, because the CEA explicitly defines the terms "commodity," "exempt commodity," and "excluded commodity." Plaintiffs are not attempting to, or arguing in favor of, expanding the definitions in the plain text of the CEA itself.**

*See supra*, Section II.A.2, for the argument on this point.

D.    **QUESTION 4: Does 7 U.S.C.A. § 1a provide the CFTC with an intelligible principle?**

**ANSWER: Yes. CEA § 1a specifically defines the terms "commodity," "exempt commodity," and "excluded commodity." The non-delegation doctrine is not implicated because the CFTC has no discretion as to whether precious metals are commodities.**

As noted above in Section II.B.4, the non-delegation doctrine and related question of whether the statute provides an "intelligible principle," are not implicated in this case because the statute clearly defines the term "commodity." Even if the non-delegation doctrine were implicated in this case, the CFTC is acting well within the scope of its grant of authority. While legislative power "belongs to the legislative branch, and to no other," "[a]t the same time, [courts] have recognized that Congress may 'seek[] assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation.'" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). "And in particular, Congress may 'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of [their] execution.'" *Id.* (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. at 406). As the Supreme Court recently reaffirmed in *FCC v. Consumers Research*, "[t]o distinguish between the permissible and the impermissible in this sphere, [courts] have long ask[ed] whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Id.* at 657 (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409). "[I]n examining a statute for the requisite intelligible principle, we have generally

21

assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id.* at 673 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). "If Congress has done so—as [courts] have almost always found—then [courts] will not disturb its grant of authority." *Id.*

Congress has made both clear here. The "general policy" is in the statute itself: "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b). The "boundaries" also are clear. The CEA prescribes the CFTC's authority to regulate certain transactions involving commodities (such as futures, options and swaps), to oversee market participants involved in commodity derivatives transactions, and to pursue fraud in connection with commodity derivatives transactions and interstate commodity transactions. There is no need to search for a limitation on the scope of the CFTC's authority in the definition of the term "commodity."

The Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)). Applying those principles, the Supreme Court has upheld nearly every delegation it has confronted, including delegations to the:

- Federal Communication Commission to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190,

225–26 (1943);

- Federal Power Commission to determine "just and reasonable" rates for wholesale sales of natural gas, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944);

- Price Administrator to fix commodity prices that would be "fair and equitable" and would "effectuate the purposes of th[e] [Emergency Price Control Act of 1942]," *Yakus v. United States*, 321 U.S. 414, 420 (1944) (citation omitted);

- SEC to prevent unfair or inequitable distribution of voting power among security holders, *Am. Power & Light*, 329 U.S. at 104–05;

- Secretary of War to determine and recover "excessive profits" from military contractors, *Lichter v. United States*, 334 U.S. 742, 785–86 (1948) (citation omitted); and

- Environmental Protection Agency to set nationwide air-quality standards limiting pollution to the level required "to protect the public health." *Am. Trucking*, 531 U.S. at 472 (quoting 42 U.S.C. § 7409(b)(1)).

The exercise by the CFTC of its authority is governed by statutory standards and criteria that easily satisfy the forgiving "intelligible principle" test. The CFTC is constrained by the explicit definitions in the CEA. These delegations—either in isolation, or when considered in the context of the statutory scheme as a whole—are "constitutionally sufficient," because "Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Am. Power & Light*, 329 U.S. at 105.

E.    **QUESTION 5: What weight should be given to the CFTC's interpretation of "all other goods" in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)?**

**ANSWER: No deference is required with respect to the statutory definition of the term "commodity" in the CEA. But to the extent the Court finds the statute ambiguous, the Court can rely on the CFTC's explanation and interpretation of the term for guidance because it is based on the CFTC's body of experience and informed judgment.**

In *Loper Bright*, 603 U.S. 369 (2024), the Supreme Court overturned *Chevron U.S.A. v. Natural Resources Defense Council*, 406 U.S. 837 (1984), which held that courts must defer to reasonable agency interpretations of ambiguous statutes. Nonetheless, the Supreme Court in *Loper Bright* reaffirmed the vitality of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which stated "interpretations and opinions" of the relevant agency demonstrated "a body of experience and informed judgments to which courts and litigants [could] properly resort for guidance." *Id.* at 139–40. And the weight of such a judgment would be dependent "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking in power to control." *Id.* at 140. When a statutory question is within the realm of an agency's technical expertise, courts still can take guidance from an agency's body of experience and informed judgement. *Loper Bright,* 603 U.S. at 402 (citing *Skidmore*, 323 U.S. at 140).

Under *Skidmore v. Swift & Co.*, an agency's interpretation of a statute "made in pursuance of official duty" and "based upon . . . specialized experience," while not controlling, "constitute[s] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139–40). One of the CFTC's fundamental responsibilities is the oversight of commodity derivatives markets in the United States. *See* 7 U.S.C. § 2(a)(1)(A) (outlining the CFTC's exclusive jurisdiction over certain futures, options and swaps); *see also* 7 U.S.C. § 5 (describing the

CFTC's market oversight mandate). There are hundreds of futures, swaps and options contracts based on non-agricultural commodities, including precious metals such as gold, silver, platinum and palladium, that trade on CFTC-regulated markets daily. In fact, the CFTC has regulated precious metals transactions since October 23, 1974, the effective date of the CFTC Act of 1974, in furtherance of its statutory mission, including to prevent "price manipulation," "systemic risk," "fraudulent or other abusive sales practices," and "misuses of customer assets." 7 U.S.C. § 5(b). To the extent the Court believes that the CEA's definition of "commodity" is ambiguous, it should look to the CFTC's guidance in explaining the breadth of this term as it has evolved in the CEA along with the markets, products, and market participants under the supervision of the CFTC.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Defendants

1.    Defendant TMTE, Inc. d/b/a Metals.com is a Wyoming Corporation with its headquarters at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming. TMTE, Inc. uses or has used the business names Metals.com. Chase Metals, LLC. and Chase Metals, Inc. TMTE has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd Suite 700 Beverly Hills, California. TMTE was originally organized as a Wyoming limited liability corporation on April 30, 2008. It converted to a corporation on March 8, 2017, under the name Chase Metals, Inc. *See* Def. Lucas Asher's First Am. Ans. ("Asher Am. Ans.") ¶ 24 (ECF No. 459); Def. Simon Batashvili's First Am. Ans. ("Batashvili Am. Ans.") ¶ 24 (ECF No. 458).  Defendant TMTE, Inc. has admitted all of the facts alleged in the Complaint. *See* Proposed Consent Order of Permanent Injunction ¶ 12 (ECF No. 841-1).

2.    Defendants Chase Metals, Inc. is a Wyoming corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyeene, Wyoming, and

it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California. *See* Asher Am. Ans. ¶ 25 (ECF No. 459); Batashvili Am. Ans. ¶ 25 (ECF No. 458). Defendant Chase Metals, Inc. has admitted all of the facts alleged in the Complaint.  *See* Proposed Consent Order of Permanent Injunction ¶ 12 (ECF No. 841-1).

3.      Defendant Chase Metals, LLC is a Wyoming limited liability company converted to a Wyoming Corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills California. *See* Asher Am. Ans. ¶ 26 (ECF No. 459); Batashvili Am. Ans. ¶ 26 (ECF No. 458). Defendant Chase Metals, LLC has admitted all of the facts alleged in the Complaint. *See* Proposed Consent Order of Permanent Injunction ¶ 12 (ECF No. 841-1).

4.      Defendant Barrick Capital, Inc. ("Barrick") is a Delaware corporation incorporated on August 20, 2019. *See* Asher Am. Ans. ¶ 27 (ECF No. 459); Batashvili Am. Ans. ¶ 27 (ECF No. 458). Defendant Barrick Capital, Inc. has admitted all the facts alleged in the Complaint. *See* Proposed Consent Order of Permanent Injunction ¶ 12 (ECF No. 841-1).

5.      Defendant Simon Batashvili holds himself out as Founder, Chief Executive Officer and Principal of Metals.com. Batashvili is a signatory on Metals' bank accounts, supervises employees, and has authority to hire and fire Metals.com employees. Batashvili is also a Founder, Chief Executive Officer, and Principal of Barrick. Batashvili is a signatory on Barrick's bank accounts, supervises employees, and has authority to hire and fire Barrick employees. *See* Asher Am. Ans. ¶ 28 (ECF No. 459); Batashvili Am. Ans. ¶ 28 (ECF No. 458).

6.      Defendant Lucas Asher is a Founder and co-owner of Metals.com. He held the

domain names www.metals.com and www.barrickcapital.com. *See* Asher Am. Ans. ¶¶ 29, 90 (ECF No. 459); Ex. 57, APP 996, 1014 (Asher 2020 Tr. 128:10–20; 241:10–11).

7.      Asher and Batashvili had common ownership and control of Defendants TMTE, Inc. a/k/a Metals.com, Chase Metals LLC, Chase Metals Inc., and Barrick Capital, Inc. *See* Asher Am. Ans. ¶ 90 (ECF No. 459); Batashvili Am. Ans. ¶ 90 (ECF No. 458).

8.      Many of the sales representatives and other employees and agents of Metals.com[6] moved to Barrick Capital, Inc. and performed the same work for Barrick as they did at Metals. *See* Asher Am. Ans. ¶ 90 (ECF No. 459); Batashvili Am. Ans. ¶ 90 (ECF No. 458).

9.      Defendants represented to customers via their website *www.metals.com* that: "We deal exclusively in physical bullion, we ship gold or silver directly to your door or within an IRA account." *See* Ex. 121, APP 2157.

10.     Metals.com and Barrick have never been registered as Investment Advisers ("IA"), nor have their agents or Asher or Batashvili been registered as Investment Adviser Representatives ("IARs") as required under state and/or federal law. Defendants or their agents never submitted a notice filing with the appropriate state regulator as an IA or IAR. *See* Asher Am. Ans. ¶ 119 (ECF No. 459); Batashvili Am. Ans. ¶ 119 (ECF No. 458).

11.     Neither Metals.com nor Barrick were registered with the South Carolina Secretary of State to conduct business as a domestic or foreign company in the State of South Carolina. *See* Ex. 70, APP 1483-84; Ex.71, APP 1487-98).

12.     Neither Metals.com, Barrick, Asher, or Batashvili were registered with the Alaska Department of Law as telephonic sellers. *See* Ex. 72, APP 1500.

---

[6] References to "Metals.com" or "Metals" refer collectively to Defendants TMTE, Inc., Chase Metals, LLC, and Chase Metals, Inc.

### B.    Metals' Precious Metals Business

13.    From at least September 2017 through September 2020, Metals operated as a precious metal retailer—meaning it solicited and sold precious metal products (including gold and silver bars, rounds, and coins) directly to members of the public. *See* Asher Am. Ans. ¶ 43 (ECF No. 459); Batashvili Am. Ans. ¶ 43 (ECF No. 458); Ex. 57, APP 996–97 (Asher 2020 Tr. 128:21–129:11); Ex. 85, APP 1654; Defs. Lucas Asher & Simon Batashvili's Br. in Supp. of their Mot. for Summ. J. ("Defs. MSJ"), at 3 (ECF No. 774).

14.    Typically, in the retail precious metals industry, coins are manufactured by a sovereign mint, such as the Royal Canadian Mint. *See* Ex. 110, APP 2027 (Samuelson Rpt. at ¶ 28). The mint then sells the coins to an authorized metals distributor, here, A-Mark Precious Metals, Inc. *See* Ex. 52, APP 789 (Madge Tr. 14:19–15:18); Ex. 110, APP 2027 (Samuelson Rpt. at ¶¶ 28, 30). Authorized distributors, in turn, sell the coins to precious metals wholesale dealers. The wholesalers—here, Bayside Metal Exchange ("Bayside") and Dillon Gage Inc. of Dallas ("Dillon Gage")—then sell the coins to a precious metals retailer, such as Metals.com. *See* Ex. 51, APP 789 (Madge Tr. 17:12–18); Ex. 54, APP 833 (Fogel Tr. 11:25–12:15, 12:19–13:11); Ex. 57, APP 992–93 (Asher 2020 Tr. 96:9–97:1); Ex. 85, APP 1667; Ex. 110, APP 2027 (Samuelson Rpt. at ¶ 31).

15.    At the mint, dealer, and wholesale levels the prices charged to buyers are based on the intrinsic value or "melt value" of the precious metal content in the coin plus a mark-up or premium. *See* Ex. 110, APP 2027–29 (Samuelson Rpt. at ¶¶ 31–41). The melt value of a coin is determined by multiplying the coin's weight by the "spot" or market value of its precious metals content. For example, if the spot price of silver is $16.00 per ounce, the melt value of a half-ounce silver coin would be $8.00. *See* Ex. 110, APP 2026, 2032 (Samuelson Rpt. at ¶¶ 23, 62–63). The mark-up or premium charged is typically a percentage of the gold value or a dollar

amount per ounce over the silver value of a coin. *See* Ex. 54, APP 837 (Fogel Tr. 38:21–39:11);
Ex. 110, APP 2028 (Samuelson Report at ¶ 36).

16.     Metals made money by charging a mark-up on the precious metals products it
sold to investors. Metals referred to this mark-up as the "Spread"—the difference between
(i) Metals' cost to acquire the precious metals and (ii) the retail price it quoted to customers. *See*
Asher Am. Ans. ¶ 67 (ECF No. 459); Batashvili Am. Ans. ¶ 67 (ECF No. 458); Ex. 81, APP
1661; Ex. 86, APP 1677 at ¶ 3.a; Ex. 110, APP 2026 (Samuelson Rpt. at ¶ 24).

17.     Metals offered a variety of products for purchase through its website,
www.metals.com. *See* Defs. MSJ, at 3, n.9 (ECF No. 774).

18.     Metals' business of selling precious metals involved the use of instrumentalities
of interstate commerce. *See* Asher Am. Ans. ¶ 19 (ECF No. 459); Batashvili Am. Ans. ¶ 19
(ECF No. 458).

19.     Among the coins sold by Metals.com were the 1/2 ounce Silver Royal Canadian
Mint Polar Bear Bullion; the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and the
1/4 ounce Gold British Standard Bullion (collectively hereinafter, "Polar Bear Bullion"). *See*
Asher Am. Ans. ¶ 46 (ECF No. 459); Batashvili Am. Ans. ¶ 46 (ECF No. 458).

20.     Polar Bear Bullion comprised 89% of Metals.com's total sales. *See* Ex. 110, APP
2030, 2034 (Samuelson Rpt. at ¶ 47, 71); Ex. 49, APP 601 (Moloian Tr. at 202:7–15).

**C.    Defendants Used a Common Sales Pitch and Scheme To Target Retirement-Aged Customers and Gain Access To Their Retirement Savings**

21.     Defendants solicited investors through social media, its website
(www.metals.com) and, through its sales representatives, by telephone. *See* Asher Am. Ans. ¶ 38
(ECF No. 459); Batashvili Am. Ans. ¶ 38 (ECF No. 458).

22.     Defendants placed their advertisements on conservative media and websites. *See*

Asher Am. Ans. ¶ 34 (ECF No. 459); Batashvili Am. Ans. ¶ 34 (ECF No. 458).

23.    Metals.com's solicitations targeted elderly or retirement-aged individuals. Ex. 51, APP 676, 689 (Bowers Tr. 31:23–32:15; 83:23–84:21); Ex. 55, APP 878 (Marquez Tr. 92:1–6); Ex. 64, APP 1330, 1342–43.

24.    Some Metals.com investors had little or no experience investing in precious metals. *See* Ex. 10, APP 108 at ¶ 10; Ex. 21, APP 202 at ¶ 2; Ex. 24, APP 270 at ¶¶ 7–8; Ex. 34, APP 346 at ¶ 6; Ex. 35, APP 381 at ¶ 6; Ex. 37, APP 459 at ¶ 6; Ex. 48, APP 589 at ¶ 15; Ex. 50, APP 647 (Mossman Tr. 91:7–17).

25.    During the course of their solicitation, Metals.com sales representatives would repeatedly contact a potential investor. *See* Ex. 4, APP 47 at ¶¶ 7,12; Ex. 5, APP 68–71 at ¶¶ 7–8, 13; Ex. 12, APP 136 at ¶ 4; E. 16, APP 184 at ¶¶ 5, 12; Ex. 20, APP 198; Ex. 26, APP 300 at ¶ 2; Ex. 33, APP 342 at ¶ 2; Ex. 35, APP 381 at ¶ 7; Ex. 36, APP 417–18 at ¶¶ 6–7, 10; Ex. 37, APP 460 at ¶ 15; Ex. 41, APP 483 at ¶ 4; Ex. 42, APP 486 at ¶ 3; Ex. 43, APP 489 at ¶ 3; Ex. 48, APP 588 at ¶ 9.

26.    For example, Kentucky investors Bill and Mary Linda Cravens stated that they had "about 10 phone conversations" with Metals.com sales representatives before purchasing metals. *See* Ex. 25, APP 296 at ¶ 6; Ex. 28, APP 315 at ¶ 6.

27.    Georgia investor James Thurbert Hendersen stated that, prior to purchasing Polar Bear Bullion, Metals.com sales representative Walter Vera "would contact me on the telephone every day, usually two or three times per day" and that once he initiated the roll-over process, "[Metals.com] representatives began contacting me relentlessly numerous times per day on the telephone, urging me along to complete the process." *See* Ex. 24, APP 270–71 at ¶¶ 12, 17.

28.    Maryland investor Tammera Schisler stated she had near daily contact from

Metals.com sales representatives over a period of several months. *See* Ex. 34, APP 346–47 at ¶¶ 8, 13.

29.    Metals.com investors have stated that Metals.com sales representatives built relationships with them based on shared political or religious affinity. *See* Ex. 13, APP 143 at ¶ 11; Ex. 30, APP 327 at ¶ 4; Ex. 48, APP 588 at ¶ 10; Ex. 56, APP 884 (Kane Tr. 11:1–17).

30.    South Carolina investor Barbara Mossman testified about the relationship Metals.com sales representative Randy Kohl built with her:

> I'm talking about someone that I talked to many, many, many, many -- I can't tell you how many times. Probably 30 times on the phone. You're building up a relationship with somebody like that. He sent me e-mails all day. He sent me e-mails about how -- about God on the Internet. He sent me things about -- because I am a Christian. I know there's a lot of people out there saying they're Christian and they got doggone horns. But he was telling me -- I mean, we became true friends. I mean, I felt like I was a friend. I could go out there to California and visit with him. That's how much of a friend . . . .

Ex. 50, APP 649 (Mossman Tr. 100:9–22).

31.    Colorado investor Richard Craighead reported that Metals.com Vice President of Sales, Deric Scott Ned, "bonded with me over my Southern roots and political beliefs." *See* Ex. 11, APP 131 at ¶ 4.

32.    To assist in building relationships with investors, Metals.com falsely claimed a connection with popular conservative media personalities. *See* Ex. 3, APP 9 at ¶ 8; Ex. 10, APP 107 at ¶ 3; Ex. 24, APP 270 at ¶ 9; Ex. 32, APP 337 at ¶ 34; Ex. 56, APP 884 (Kane Tr. 11:1–17); Ex. 89, APP 1692–94.

33.    Metals.com sales representatives falsely represented to investors that their existing retirement funds were not safe and that precious metals were the only safe investment, because, among other things:

- the United States government was going to take their retirement funds in a "Bail-in" to help banks and government programs;

31

- traditional IRA custodians are in financial trouble and are likely to collapse;

- the government could seize funds held in traditional retirement accounts, but could not seize precious metals held in self-directed IRA accounts ("SDIRAs")[7].

*See* Ex. 3, APP 10 at ¶ 12; Ex. 4, APP 48 at ¶ 11; Ex. 12, APP 136 at ¶¶ 4–6; Ex. 13, APP 143 at ¶ 9; Ex. 24, APP 270 at ¶ 12; Ex. 26, APP 300 at ¶ 3; Ex. 35, APP 382 at ¶ 9.

34.     Metals.com sales representatives sent potential investors articles with similar predictions. *See* Ex. 5, APP 69–71 at ¶ 13; Ex. 21, APP 203 at ¶ 4; Ex. 35, APP 382 at ¶ 10, APP 387.

35.     On April 25, 2018, Vice President of Sales, "Deric Scott" (a/k/a/ Deric Scott Ned), emailed Alabama investor Larry Henderson links to numerous articles, the titles of which appear to describe the "scary" or "panic[ked]" state of the market and/or predict future market turmoil:

- U.S. Debt Bomb Exacerbating Stock Market Panic!

- Could the Fed Set Off a Debt Bomb?

- Head of world's largest hedge fund says U.S. in a 'pre-bubble phase' with a 70% chance of recession

- Market correction was just an 'appetizer' for what's to come later this year, Morgan Stanley says

- Vanguard: Correction Odds Climb to 70%

- Bank of America's recession warning: This market is scary.

*See* Ex. 5, APP 69–71 at ¶ 13, APP 77–80.

36.     Defendants touted the advantages of precious metals as an alternative to stocks,

---

[7] Many large brokerage firms that act as IRA custodians ("conventional" IRA custodians) limit account holders' investment options to stocks, bonds, mutual funds, ETFs, and CDs. A "self-directed IRA" is an industry term for an IRA custodian that allows account holders to invest in a broader range of alternative or unconventional assets such as real estate, precious metals, private equity, private company stock, and cryptocurrency.

bonds, and the dollar. *See* Asher Am. Ans. ¶ 117 (ECF No. 459); Batashvili Am. Ans. ¶ 117 (ECF No. 458).

37.     Metals.com sales representatives touted precious metals as a safer alternative to securities. *See* Ex. 3, APP 10 at ¶¶ 12–14; Ex. 4, APP. 48 at ¶ 11; Ex. 7, APP 100 at ¶ 4; Ex. 17, APP 187 at ¶¶ 4–8; Ex. 25, APP 296 at ¶¶ 4–5; Ex. 28, APP 315 at ¶ 5; Ex. 36, APP 417 at ¶ 6; Ex. 41, APP 483 at ¶ 5; Ex. 43, APP 489 ¶ 7; Ex. 47, APP 585 at ¶¶ 9–10; Ex. 50, APP 634 (Mossman Tr. 19:16–20:9).

38.     Metals.com sales representatives advised on market trends, including the likelihood that the stock market would crash or lose value. *See* Ex. 4, APP 48 at ¶ 11; Ex. 16, APP 184 at ¶ 9; Ex. 20, APP 198; Ex. 36, APP 203 at ¶ 4; Ex. 25, APP 296 at ¶ 5; Ex. 27, APP 300 at ¶ 3; Ex. 29, APP 315 at ¶ 5; Ex. 40, APP 479 at ¶ 5; Ex. 42, APP 486 at ¶ 5; Ex. 43, APP 489 at ¶ 7; Ex. 50, APP 633 (Mossman Tr. 15:1–9); Ex. 57, APP 677 (Bowers Tr. 34:8–19).

39.     Metals.com sales representatives told investors that the tax benefits of precious metals were superior to securities. *See* Ex. 9, APP 104 at ¶ 5; Ex. 20, APP 198; Ex. 24, APP 270 at ¶ 12; Ex. 35, APP 383 at ¶ 15; Ex. 56, APP 887–88 (Kane Tr. 29:14–30:3).

40.     Metals.com sales representatives advised investors to sell securities in order to buy precious metals. *See* Ex. 9, APP 104 at ¶ 4; Ex. 5, APP 69 at ¶¶ 9–10; Ex. 10, APP 107 at ¶ 4; Ex. 16, APP 184 at ¶ 10; Ex. 17, APP 187 at ¶ 4; Ex. 20, APP 198; Ex. 24, APP 270–71 at ¶¶ 12, 13; Ex. 25, APP 296 at ¶ 4; Ex. 26, APP 300 at ¶ 4; Ex. 28, APP 315 at ¶ 4; Ex. 33, APP 342 at ¶ 4; Ex. 56, APP 884 (Kane Tr. 13:4–14:1).

41.     Georgia investor James Thurbert Henderson stated that Metals.com sales representative, Walter Vera, advised him that:

> [M]y retirement savings, which were then invested in a traditional IRA at
> Voya, were at risk of being seized by Democratic political elements in the

> U.S. government. I was told that if I moved my retirement savings to a self-directed IRA and invested it in precious metals with Metals, the government would not be able to seize it. I was further told that precious metals bullion had a high rate of return, no downside risk, and was tax-favored versus the traditional equities investments I then held in my traditional IRA at Voya.

Ex. 24, APP 270 at ¶ 12.

42.     Metals.com sales representative Randy Kohl warned California investor Harry Kane of an imminent collapse of securities and stock investments and the dollar in general, and advised him that he should seek more security by investing in metals. *See* Ex. 6, APP 97 at ¶ 4; Ex. 56, APP 884 (Kane Tr. 10:17–22). Kohl told Kane that the securities in his current portfolio were about to take a nosedive and it would be more secure to have his IRA in gold and silver. *See* Ex. 56, APP 884 (Kane Tr. 13:4–14:1). Kohl further advised that selling securities for metals would be a wise move, because the returns would be better than what he was earning on his current investments and the precious metals would also be a tax shelter. *See* Ex. 56, APP 887 (Kane Tr. 29:11–20).

43.     Alabama investor Larry Henderson recounted that:

> Scott advised me on how to invest my money throughout the process that culminated in me liquidating my existing retirement accounts and purchasing precious metals with those funds. In fact, that is why I was talking to him. He appeared very knowledgeable in both precious metals and stocks. He encouraged me to liquidate because I was scared of the economy and of taking losses in my current investments. I did not know what I was doing. Scott acted like he was going to help me avoid losing money. Scott basically told me that he could help me, and that gold was a good choice and that gold is better than stocks. Scott knew these were my retirement funds.

Ex. 5, APP 69 at ¶¶ 9, 10.

44.     Metals.com also advised investors to allocate as much of their savings as possible to the purchase of precious metals, without regard to individual circumstance and in contravention of their own disclosure documents, which suggested that a "Customer should not

34

invest more than twenty percent (20%) of Customer's available investment funds in Precious Metals." *See* Ex. 3, APP 11–12 at ¶¶ 21–22; Ex. 4, APP 49 at ¶ 13; Ex. 5, APP 74 at ¶ 30; Ex. 18, APP 190 at ¶ 10; Ex. 24, APP 271 at ¶ 13; Ex. 35, APP 382–83 at ¶¶ 12, 17; Ex. 37, APP 460 at ¶ 13; Ex. 50, APP 634 (Mossman Tr. 20:3–9); Ex. 56, APP 887 (Kane Tr. 28:24–29:4); Ex. 86, APP 1679 at ¶ 5.c.

45.    Metals.com sales representative, Randy Kohl, advised Georgia investor Jimmy R. Tuders "to invest my retirement savings entirely in silver and gold via Metals" and based on this advice, Tuders liquidated an Edwards Jones IRA worth $160,000 and invested the entire amount in metals, including $141,000 in Polar Bear Bullion. *See* Ex. 23, APP 229–31 at ¶¶ 12, 15, 18, APP 234, APP 264.

46.    A Metals.com sales representative advised Oklahoma investor Jana Cheaney that "it was in [her] best interest to liquidate [her] entire IRA through Morgan Stanley to purchase precious metals to secure . . . against the instability of the stock market." After partially liquidating her IRA, Ms. Cheaney purchased more than $400,000 of Polar Bear Bullion. *See* Ex. 38, APP 467–68 at ¶¶ 5–6, 11–12.

47.    To incentivize Colorado investor Joe Cisneros to invest the entirety of his approximately $85,000 401(k) in precious metals, Metals.com sales representative Michael Peralta offered to "add in $2,000 in silver." *See* Ex. 18, APP 190 at ¶ 10.

48.    Although some Metals' investors made cash purchases, most Metals' investors purchased precious metals using funds from their retirement account. Ex. 17, APP 187 at ¶ 9; Ex. 51, APP 687 (Bowers Tr. 75:6–15); Ex. 85, APP 1654.

49.    Metals.com sales representatives encouraged prospective investors to open a SDIRA and transfer or roll-over their traditional retirement accounts into the new account, so

35

that the funds could be used to purchase precious metals. Ex. 3, APP 10–11 at ¶¶ 13, 19; Ex. 10, APP 107–08 at ¶¶ 7–8; Ex. 22, APP 207–08 at ¶ 3; Ex. 23, APP 229 at ¶¶ 11–12; Ex. 39, APP 474–75 at ¶¶ 4–7; Ex. 40, APP 479 at ¶ 6; Ex. 41, APP 483 at ¶¶ 7–8; Ex. 42, APP 486–87 at ¶¶ 6–10.

50.     It was Metals.com's practice to select the custodian and depository for the investor. *See* Ex. 4, APP 49 at ¶ 15; Ex. 5, APP 71–72 at ¶ 16; Ex. 8, APP 100 at ¶ 9; Ex. 10, APP 108 at ¶ 9; Ex. 23, APP 229–30 at ¶¶ 12, 14–15; Ex. 34, APP 347 at ¶¶ 14, 19; Ex. 35, APP 383 at ¶ 19; Ex. 37, APP 460–61 at ¶¶ 17–18; Ex. 39, APP 475 at ¶ 7; Ex. 40, APP 479 at ¶¶ 6–7; Ex. 41, APP 483 at ¶¶ 7–9; Ex. 42, APP 486 at ¶¶ 6–8; Ex. 47, APP 585–86 at ¶¶ 12–14.

51.     Metals.com provided the investor with a packet of forms that were required to open and fund a SDIRA account. With the exception of the customer's signature, the forms were often pre-filled with the required information, including designating Metals.com as their precious metals representative and granting them unlimited access to investors' SDIRA account information, including the amount of funds in the account and available for purchasing precious metals. *See* Ex. 4, APP 49–50 at ¶¶ 15, 18, APP 53–54; Ex. 5, APP 71–72 at ¶¶ 16–18; Ex. 10, APP 107 at ¶ 7; Ex. 11, APP 131 at ¶ 5; Ex. 24, APP 271 at ¶¶ 16, 18; Ex. 33, APP 342 at ¶ 6; Ex. 35, APP 383 at ¶ 18, APP 403; Ex. 36, APP 418 at ¶¶ 14–15; Ex.39, APP 475 at ¶ 7; Ex. 47, APP 585 at ¶ 12; Ex. 50, APP 635 (Mossman Tr. 21:9–22:24); Ex. 56, APP 885 (Kane Tr. 16:7–25, 17:1–3).

52.     Metals.com representatives also caused funds to be transferred from retirement accounts to newly opened SDIRA accounts by participating in three-way telephone calls with investors and their traditional IRA custodians. *See* Ex. 4, APP 72 at ¶ 18; Ex. 20, APP 198; Ex. 23, APP 230 at ¶ 16; Ex. 36, APP 418 at ¶ 14; Ex. 42, APP 486 at ¶¶ 7–9; Ex. 48, APP 589 at ¶

36

14; Ex. 117, APP 2075–82.

53.     Maryland investor Tammera Schisler explained that, after many communications

with Metals, they called her and arranged the transfer of funds as follows:

> Finally, one day I was in the grocery store parking lot when Metals.com called me
> and we hurried through transferring my entire 401(k) from Merrill Lynch,
> $236,194.18. We did a three-way call with Merrill Lynch and New Direction
> Trust, an IRA company selected by or associated with Metals.com, and
> Metals.com help make the transfer.

Ex. 34, APP 347 at ¶ 14.

54.     Alabama investor Evelyn Phillips noted that "[Metals.com sales representative

Randy] Kohl called T. Rowe Price with me on the line and handled the liquidation call on my

behalf . . . I authorized Kohl to have information about my T. Rowe Price IRA. Kohl did all of

the talking, acted as my adviser, and presented himself as someone in authority with

Metals.com." Ex. 3, APP 12 at ¶ 24.

55.     Often these SDIRA roll-overs involved the liquidation of securities. *See* Ex. 3,

APP 11–12 at ¶¶ 22–23; Ex. 10, APP 108 at ¶ 8; Ex. 11, APP 132 at ¶¶ 5, 10, 12; Ex. 23, APP

228–30 at ¶¶ 4, 15–17 and Att. 1; Ex. 33, APP 342 at ¶ 5; Ex. 34, APP 346–47 at ¶¶ 14, 16 and

Ex. A1; Ex. 40, APP 479 at ¶¶ 5–7; Ex. 41, APP 483 at ¶¶ 5, 7–8; Ex. 42, APP 486–487 at ¶¶ 5,

10; Ex. 43, APP 489 at ¶ 17; Ex. 47, APP 586 ¶ 14; Ex. 50, APP 634, 646–47 (Mossman

Tr.17:9–15; 87:21–89:3); Ex. 56, APP 887 (Kane Tr. 26:9–21, 28:4–29:7); Ex. 117, APP 2075–

82.

56.     Alabama investor Evelyn Phillips liquidated the entirety of her T. Rowe Price

account, approximately $50,000 that was invested in a stable value fund and Metals.com

invested this entire amount in Polar Bear Bullion. *See* Ex. 3, APP 11–12 at ¶¶ 21–22.

57.     For example, Maryland investor Margaret Renn rolled over her entire Fidelity

IRA, also valued at almost $50,000 and containing a variety of domestic and foreign stock, bonds, and short-term securities, and Metals.com invested about $44,000 of this amount in Polar Bear Bullion. *See* Ex. 36, APP 418–20 ¶¶ 15–16, 18, APP 424–45 at Ex. A1-6.

58.    Metals.com sales representatives selected the type and quantity of precious metals to be purchased, often without discussing the selections or the value of the coins with the investor. Ex. 3, APP 12–13 at ¶¶ 25–27; Ex. 4, APP 49 at ¶¶ 16–17; Ex. 7, APP 100 at ¶¶ 7, 10, 13; Ex. 9, APP 104 at ¶ 8, APP 105 at ¶¶ 9–11; Ex. 10, APP 108 at ¶¶ 10–12; Ex. 11, APP 131 at ¶ 6; Ex. 12, APP 137 at ¶ 14; Ex. 13, APP 143 at ¶¶ 11–13; Ex. 18, APP 190–91 at ¶¶ 15–18; Ex. 20, APP 198; Ex. 24, APP 271–72 at ¶¶ 14, 19, 21; Ex. 25, APP 296 at ¶ 6; Ex. 28, APP 315 at ¶ 6; Ex. 34, APP 347 at ¶¶ 15, 19; Ex. 35, APP 383 at ¶¶ 16–17; Ex. 37, APP 461 at ¶¶ 19–20; Ex. 38, APP 468 at ¶ 8; Ex. 39, APP 475 at ¶ 8; Ex. 40, APP 480 at ¶¶ 10–12; Ex. 41, APP 483 at ¶ 6; Ex. 42, APP 487 at ¶ 12; Ex. 43, APP 489 at ¶¶ 11–13; Ex.47, APP 585 at ¶ 13; Ex. 48, APP 587 at ¶ 15; Ex. 50, APP 648 (Mossman Tr. 95:21–96:12).

59.    As Georgia investor Jimmy R. Tuders stated, he "place[d] [his] trust" in the Metals.com sales representative "to select the best investments for his needs." *See* Ex. 23, APP 230–31 at ¶ 17.

60.    In rejecting Colorado investor Joe Cisneros's requests to invest in a mix of silver and gold, bars instead of coins, and American coins instead of Canadian, Metals.com sales representative Walter Vera told Mr. Cisneros to "rely on his experience." Vera then used the majority of Mr. Cisneros's funds to purchase ½ oz Silver Polar Bear coins. Ex. 18, APP 190–91 at ¶¶ 15–18, 22.

61.    Once an investor agreed to purchase precious metals, a Metals.com employee recorded a portion of the call to confirm the purchase. That recorded conversation set forth the

type, quantity, and price of the metals. *See* Ex. 4, APP 49 at ¶ 17; Ex. 17, APP 187 at ¶ 11; Ex. 18, APP 191 at ¶ 20; Ex. 21, APP 204 at ¶ 12; Ex. 23, APP 230–31 at ¶ 17; Ex. 88, APP 1688–1690.

62.     Some investors reported that the confirmation call was the first time they learned what they were purchasing and at what price. *See* Ex.4, APP 49 at ¶ 17; Ex. 23, APP 230–31 at ¶ 17.

63.     Metals.com provided investors with written invoices that included the customer's name, account number, delivery address, and a description of the items purchased (including quantity, unit price, and total amount). *See* Ex. 93, APP 1780; Ex. 94, APP 1782; Ex. 95, APP 1784; Ex. 96, APP 1786; Defs. MSJ, at 5 (ECF No. 774).

64.     Metals.com provided these invoices after the transactions were complete. *See* Ex., 7, APP 100 at ¶ 12; Ex. 10, APP 108 at ¶ 12; Ex. 20, APP 199; Ex. 22, APP 208 at ¶¶ 7–11; Ex. 40, APP 480 at ¶¶ 10–12; Ex. 42, APP 487 at ¶¶ 12, 14; Ex. 43, APP 489 at ¶ 19.

**D.     Defendants Made Material Representations To Customers**

**1.     Misrepresentation #1: Metals.com Made Material Misrepresentations About The Markup**

65.     Metals.com executed a Shipping and Transaction Agreement with investors. *See* Asher Am. Ans. ¶ 64 (ECF No. 459); Batashvili Am. Ans. ¶ 64 (ECF No. 458).

66.     The Shipping and Transaction Agreement was available on the Metals.com website. *See* Ex. 51, APP 687 (Bowers Tr. 77:15–77:19).

67.     The Shipping and Transaction Agreement provided that:

> Within the Precious Metals industry, the difference between [M]etals cost on the day of the purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to Customer is known as the "Spread."

Asher Am. Ans. ¶ 67 (ECF No. 459); Batashvili Am. Ans. ¶ 67 (ECF No. 458). In other words,

Metals.com referred to its mark-up over cost as the Spread.

68.     During the Relevant Period at least two different versions of the Shipping and Transaction Agreement existed. *See* Asher Am. Ans. ¶¶ 64–65, 67–69 (ECF No. 459); Batashvili Am. Ans. ¶¶ 64–65, 67–69 (ECF No. 458).

69.     One version of the Shipping and Transaction Agreement stated that the Spread on IRA transactions was between 2% and 33%. *See* Asher Am. Ans. ¶ 65 (ECF No. 459); Batashvili Am. Ans. ¶ 65 (ECF No. 458).

70.     Another version of the Shipping and Transaction Agreement stated that the Spread on IRA transactions was between 1% and 19.9%. *See* Asher Am. Ans. ¶ 68 (ECF No. 459); Batashvili Am. Ans. ¶ 68 (ECF No. 458).

71.     The Shipping and Transaction Agreements indicated that the Spreads on non-IRA sales were equal to or less than those of IRA sales, because IRA sales were "more expensive to process." *See* Ex. 59, APP 1141 at ¶ 3b, APP 1151 at ¶ 3b.

72.     In reality, Metals.com sold investors Polar Bear Bullion at markups averaging between 91% and 128%. *See* Ex. 110, APP 2030, 2034–36 (Samuelson Rpt. at ¶¶ 47, 71, 74, 82); Ex. 49, APP 599 (Moloian Tr. 179:6–180:3).

73.     For example, on November 28, 2017, California investor Michael Milligan purchased 3,955 1/2 oz Silver Polar Bears at a unit price of $23.52 for a total of $93,021. Metals.com purchased those 3,955 1/2 oz Silver Polar Bears from Bayside at a unit price of $11.35, a difference of $12.17. These prices reflect a markup of 107%. *See* Ex. 90, APP 1728–29; Ex. 91, 1742; Ex. 92, APP 1777–78; Ex. 93, 1780.

74.     On August 8, 2018, Tennessee investor Sue Swilley purchased 365 1/10 oz Gold Polar Bears from Metals.com at a unit price of $267.11 totaling $97,495.15. Metals.com

purchased those 365 1/10 oz Gold Polar Bears from Bayside at a unit price of $139.64, a difference of $127.47, and reflecting a markup over Metals.com's wholesale costs of 91%. *See* Ex. 94, APP 1782; Ex. 91, APP 1753.

75.     On December 20, 2018, Washington investor Steve Hunt purchased 2,114 1/2 oz Silver Polar Bears at a unit price of $22.83 for a total of $48,262, and 39 1/10 oz Gold Polar Bears at a unit price of $270.79 for a total of $10,560. Metals.com purchased the Silver Polar Bears from Bayside at the unit price of $10.32, a difference of $12.51. Metals.com purchased the Gold Polar Bears from Bayside at the unit price of $145.50, a difference of $125.29. These prices reflect a markup over Metals.com's wholesale costs of 121% on the Silver Polar Bears and 86% on the Gold Polar Bears. *See* Ex.95, APP 1784; Ex. 91, APP 1759.

76.     On April 8, 2019, Alaska investor Joan Lower purchased 14,874 1/2 oz Silver Polar Bears from Metals.com at unit price of $26.00 for a total of $386,724. Metals.com obtained these Silver Polar Bears from Bayside at a unit price of $10.55, a difference of $15.45. These prices reflect a mark-up over Metals.com's wholesale costs of 146.45%. *See* Ex. 96, APP 1786; Ex. 91, APP 1767.

### 2.     Misrepresentation #2: Metals.com Sales Representatives Made Material Misrepresentations About The Safety Of Investing In Polar Bear Bullion And The Risk of Loss

77.     Metals.com sales representatives repeatedly told customers that they would not lose money invested in Polar Bear Bullion. *See* Ex. 1, APP 2 at ¶ 3; Ex. 3, APP 10 at ¶ 14; Ex. 4, APP 47–48 at ¶ 9; Ex. 5, APP 49 at ¶ 13, APP 71 at ¶¶ 14b, g, APP 74 at ¶ 29; Ex. 6, APP 97 at ¶ 5; Ex. 11, APP 134 at ¶ 26; Ex. 12, APP 137 at ¶ 11; Ex. 13, APP 143 at ¶ 7; Ex. 24, APP 270 at ¶ 12, APP 271 at ¶¶ 13, 15; Ex. 34, APP 347 at ¶ 10; Ex. 36, APP 417 at ¶ 6; Ex. 37, APP 460 at ¶ 12.

78.     Metals.com sales representative Jonathan Sachs told Alaska investor George

Notter that he "would not lose any money" if he invested in metals. Sachs told Notter that if he moved the $430,000 in his traditional IRA into metals, he would be able "to retire comfortably within 3 to 4 years with at least a million plus." Ex. 1, APP 2 at ¶ 3.

79.      Metals.com sales representative Randy Kohl told California investor Harry Kane that "Metals.com would pick the best distribution [of metals] for growth and stability, with rock solid value and stability" and assured him he would "earn money, not lose it." Ex. 6, APP 97 at ¶ 5.

80.      Contrary to those promises, the majority of investors who purchased Polar Bear Bullion suffered financial losses as a result of the undisclosed mark-up. *See* Ex. 110, APP 2036–40 (Samuelson Rpt. at ¶¶ 82–91); Ex. 49, APP 595–598 (Moloian Tr. 145:22–146:2; 153:8–153:12 156:25–157:2).

81.      Investor losses have persisted despite the price of gold and silver generally increasing during the Relevant Time Period. For most investors to break even on their investment, the price of gold and silver would need to appreciate significantly above historical all-time high prices. *See* Ex. 110, APP 2041–42 (Samuelson Rpt. ¶¶ 93–96); Ex. 49, APP 595–98 (Moloian Tr. 145:22–146:2; 153:8–153:12; 156:25–157:2).

### 3.      Misrepresentation #3: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Polar Bear Bullion Was Worth Significantly More Than Melt Value

82.      After purchasing Polar Bear Bullion, investors received periodic statements from their SDIRA custodian reflecting the "fair market value" of the coins held in the SDIRA account. The listed fair market value was often significantly lower than the purchase price paid by the customer. *See* Ex. 37, APP 462 at ¶ 25, E. 38, APP 465; Ex. 39, APP 475 at ¶ 12; Ex. 22, APP 208 at ¶¶ 10–12; Ex. 23, APP 232 at ¶¶ 21–23; Ex. 24, APP 272 at ¶ 23; Ex. 40, APP 480 at ¶¶ 12–15.

83. After purchasing 3,955 1/2 oz Silver Polar Bears from Metals.com on November 28, 2017, at a price of $93,021 a December 20, 2017, account statement from New Direction listed the "fair market value" of California investor Michael Milligan's 3,955 1/2 oz Silver Polar Bear coins at $32,104.71—a difference of more than $60,000. *See* Ex. 92, APP 1777–78; Ex. 93, APP 1780; Ex. 90, APP 1728–29; Ex. 91, APP 1742.

84. Approximately two weeks after her August 8, 2018, purchase of 365 1/10 oz gold Polar Bear coins from Metals.com at a price of $97,495, a New Direction account statement dated August 24, 2018, showed the "fair value" of Tennessee investor Sue Swilley's Gold Polar Bears as $44,059—a difference of more than $53,000. *See* Ex. 94, APP 1782; Ex. 91, APP 1753; Ex. 98, APP 1790.

85. A New Direction account statement for Washington investor Steve Hunt indicated the "fair value" for his purchase of 2,114 1/2 oz Silver Polar Bears was $16,824—more than $31,000 less than his purchase price of $48,262 from Metals. *See* Ex. 95, APP 1784; Ex. 91, APP 1759; Ex. 99, APP 1792.

86. Three weeks after her April 8, 2019, purchase, a New Direction account statement for Alaska investor Joan Lower indicated that "fair value" for her 14,874 1/2 oz Silver Polar Bears was $111,212—approximately $275,500 less than her original purchase price. *See* Ex. 96, APP 1786; Ex. 91, APP 1767; Ex. 100, APP 1794.

87. When customers called Metals.com to inquire about why their SDIRA account value was significantly lower than the value of their liquidated retirement account, Metals.com sales representatives told investors that the lower valuation on their SDIRA statements was an under valuation and that did not reflect the resale value of the Polar Bear Bullion. *See* Asher Am. Ans. ¶ 84 (ECF No. 459); Batashvili Am. Ans. ¶ 84 (ECF No. 458).

43

88.     Metals.com sales representatives advised that investors could only learn the true value of their metals holdings by calling Metals. *See* Ex. 3, APP 17 at ¶ 45; Ex. 4, APP 50–51 at ¶ 24; Ex. 34, APP 348 at ¶ 23; Ex. 36, APP 418 at ¶ 9; Ex. 40, APP 480 at ¶¶ 12–15; Ex. 50, APP 638–39 (Mossman Tr. 36:9–38:1); Ex. 49, APP 889 (Kane Tr. 35:4–25); Ex. 118, APP 2092.

89.     After being told that he would "need to call Metals.com in order to learn the real value of [his] Polar Bear coins," Alabama investor Sherman William Cobb would periodically call to check the value of his investment. On one occasion, he "called Metals.com about [his] SDIRA invoice dated October 31, 2019" that "listed the value of $35,787.04." A Metals.com representative told Mr. Cobb that the "actual value was $108,004.14." *See* Ex. 4, APP 50–51 at ¶ 24.

90.     After viewing a New Direction Trust account statement online listing the market value of her $229,540 purchase of ½ Ounce Silver Polar Bears as $85,000, Maryland investor Tamara Schissler contacted Metals.com and was told "that the account was still worth the amount of [her] initial investment, and that the $85,000 was not the true value, but just the value of the coins for tax purposes." *See* Ex. 34, APP 348 at ¶ 23.

91.     The Polar Bear Bullion coins had no material value above the melt value. *See* Ex. 110, APP 2026, 2030, 2040 (Samuelson Rpt. at ¶¶ 25, 49, 92).

92.     When some Metals.com investors attempted to resell their Polar Bear Bullion, they realized large losses. *See* Ex. 22, APP 209–10 at ¶¶ 14–16; Ex. 21, APP 204 at ¶¶ 13–14; Ex. 31, APP 333 at ¶ 11; Ex. 43, APP 489–91 at ¶¶ 19–20, 26–28; Ex. 56, APP 890 (Kane Tr. 40:1–13).

93.     California investor Harry Kane sold his Polar Bear Bullion to a different dealer

who paid him approximately $170,000 for the Polar Bear Bullion Metals.com recommended he purchase. This was substantially less than his $357,949 initial investment. *See* Ex. 6, APP 98 at ¶ 13; Ex. 56, APP 890 (Kane Tr. 40:1–13).

94.     Georgia investor Jimmy Tuders liquidated approximately $160,000 of his retirement savings to buy bullion that was later valued at $48,000 by the SDIRA. Eventually, he was able to get another company to buy his total metals investment, but only for approximately $42,000—even less than the prior SDIRA valuation. *See* Ex. 23, APP 231–32 at ¶ 21, 25.

### 4.    Misrepresentation #4: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Metals.com Would Buy Back Their Bullion Coins At Any Time

95.     Metals.com sales representatives told investors they could access their funds at any time and/or that, in the future, Metals.com would always be willing to buy back the bullion coins they purchased. *See* Ex. 7, APP 100 at ¶¶ 6, 14; Ex. 10, APP 107 at ¶ 6; Ex. 11, APP 132 at ¶ 8; Ex. 12, APP 137 at ¶ 9, APP 139 at ¶¶ 31–32; Ex. 17, APP 187 at ¶ 6; Ex. 18, APP 190 at ¶ 8; Ex. 21, APP 203 at ¶ 5; Ex. 24, APP 272 ¶¶ 20–24; Ex. 35, APP 383 at ¶ 14; Ex. 36, APP 418 at ¶ 9; Ex. 36, APP 423 at ¶ 30; Ex. 34, APP 349 at ¶ 24; Ex. 36, APP 418 at ¶ 9; Ex. 50, APP 637 (Mossman Tr. 29:9–30:11).

96.     When investors contacted Metals.com requesting to liquidate a portion or all of their precious metals, Metals.com sales representatives often advised investors that Metals.com would not buy back their coins or would buy them back only in small increments, usually $5,000. *See* Ex. 7, APP 100 at ¶¶ 6, 14; Ex. 10, APP 109 at ¶ 20; Ex. 15, APP 180 at ¶¶ 15–17, APP 181 at ¶¶ 21–22, 26; Ex. 17, APP 187 at ¶ 14; Ex. 21, APP 204 at ¶ 13; Ex. 12, APP 137 at ¶ 9, APP 139 at ¶¶ 31–32; Ex. 24, APP 272–73 at ¶¶ 20–24; Ex. 36, APP 418 at ¶ 9, APP 423 at ¶ 30; Ex. 42, APP 487 at ¶¶ 14–16; Ex. 51, APP 682 (Bowers Tr. 54:7–55:6); Ex. 118, APP 2089, 2100; Ex. 119, APP 2113–26.

45

97.     On some occasions, Metals.com sales representatives stopped communicating with investors who wanted to sell their coins. *See* Ex. 24, APP 272 at ¶ 23; Ex. 31, APP 333 at ¶¶ 9–10.

**5.     Misrepresentation #5: Metals.com Sales Representatives Made Material Misrepresentations About The Fact That Metals.com Would Pay Storage Fees**

98.     Metals.com sales representatives told investors they would pay storage and associated fees for various periods of time ranging from 2–5 years. *See* Ex. 10, APP 107 at ¶ 5; APP 203 at ¶ 7; Ex. 21, APP 347 at ¶ 12; Ex. 34, APP 349 at ¶ 24; Ex. 36, APP 418 at ¶ 8; Ex. 35, APP 382 at ¶ 11.

99.     Metals.com often failed to pay storage and associated fees as promised. *See* Ex. 10, APP 108 at ¶ 14, APP 109 at ¶¶ 17–18; Ex. 34, APP 349 at ¶ 24; Ex. 37, APP 462 at ¶ 26.

**6.     Omission #1: Metals.com Failed To Disclose The Actual Markup On Polar Bear Bullion**

100.    As set forth above, Metals.com charged investors average mark-ups of between 91% and 128%. *See supra* at ¶ 72.

101.    Metals.com did not disclose, in customer invoices or otherwise, the actual mark-up charged investors in connection with its purchases. *See, e.g.,* Ex. 59, APP 1140–59; Ex. 10, APP 107 at ¶ 11; Ex. 18, APP 192 at ¶ 30; Ex. 20, APP 199; Ex. 56, APP 888 (Kane Tr. 33:19–25), APP 889 (Kane Tr. 34:2–7, 16–18), APP 890 (Kane Tr. 41:5–8)

102.    Each invoice Defendants provided to customers after a purchase of precious metal bullion omitted material information; specifically, Defendants never disclosed to customers the actual markup associated with each transaction. *See* Ex. 93, APP 1779–80; Ex. 94, APP 1781-82; Ex. 95, APP 1783-84.

103.    The IRS 5498 Forms that were issued following customers' purchases of precious

metal bullion shows the losses sustained by customers as a result of Defendants' omissions of material facts. For example, Debra Davenport rolled over $403,510 from her Thrift Savings Plan into a SDIRA account for the purpose of converting those funds into precious metals. The required IRS Form 5498 that was issued a just few months later shows that the "fair market value" of the precious metals purchased from Defendants' was only $139,387.18—representing a loss in value of more than 65%. *See* Ex. 122, APP 2260–76.

### 7.     Omission #2: Metals.com Failed To Disclose That Polar Bear Bullion Was Worth Significantly Less Than Customers Paid

104.     Metals.com failed to disclose the fact that the Polar Bear Bullion was worth significantly less than what the investors paid. *See* Ex. 1, APP 2–3 at ¶ 7; Ex. 5, APP 74 at ¶ 28; Ex. 6, APP 98 at ¶¶ 9–10; Ex. 7, APP 100 at ¶ 11; Ex. 9, APP 105 at ¶ 10; Ex. 10, APP 107 at ¶ 11; Ex. 11, APP 132–133 at ¶¶ 15–16, APP 134 at ¶¶ 27–28; Ex. 12, APP 137 at ¶¶ 8, 12; Ex. 14, APP 143 at ¶¶ 15–16; Ex. 14, APP 151 at ¶ 25; Ex. 18, APP 192 at ¶ 30; Ex. 20, APP 199; Ex. 23, APP 229–230 at ¶ 13, APP 231 at ¶¶ 18–19; Ex. 24, APP 271 at ¶ 15, APP 272 at ¶¶ 22–23, APP 273 at ¶¶ 25–26; Ex. 26, APP 300 at ¶ 7; Ex. 33, APP 342 at ¶ 7; Ex. 34, APP 347 at ¶¶ 11, 15, APP 348 at ¶ 22; Ex. 36, APP 418 at ¶ 11; Ex. 37, APP 460 at ¶ 11, APP 468 at ¶¶ 9–10; Ex. 39, APP 475 at ¶¶ 9–10; Ex. 50, APP 649 (Mossman Tr. 97:13–20); Ex. 60, APP 1192 (Martin Tr. 47:13–16; 48:22–24), APP 1194 (Martin Tr. 57:9–21).

### 8.     Omission #3: Metals.com Failed To Disclose That The Majority Of Investors Who Purchased Polar Bear Bullion Lost Money

105.     The majority of investors who purchased Polar Bear Bullion suffered financial losses as a result of the undisclosed mark-up that Metals.com charged. *See* Ex. 110, APP 2036–40 (Samuelson Rpt. at ¶¶ 82–91); Ex. 49, APP 595, 597–98 (Moloian Tr. 145:22–146:2, 153:8–153:12, 156:25–157:2).

106.    Metals.com failed to disclose this fact to its investors. *See* Ex. 59, APP 1140-59; Ex. 4, APP 50 at ¶ 20; Ex. 5, APP 73 at ¶ 25; Ex. 23, APP 231–32 at ¶¶ 21–23; Ex. 41, APP 483 at ¶¶ 9–10; Ex. 42, APP 487 at ¶ 14; Ex. 43, APP 489 at ¶¶ 19–20, APP 491 at ¶¶ 26–28; Ex. 49, APP 595–98; Ex. 50, APP 638 (Mossman Tr. 35:6–25); Ex. 110, APP 2036–2040 (Samuelson Rpt. at ¶¶ 82–91).

### 9.    Omission #4:  Metals.com Failed To Disclose That It Was Subject To State Regulatory Actions

107.    As discussed further below, beginning in May 2019, Metals.com was subject to State enforcement actions. *See infra* SUF ¶ 111; Ex. 59, APP 1150–58.

108.    Metals.com did not notify investors of the State Enforcement Action on its website, www.metals.com. *See* Ex. 121, APP 2153–259.

109.    Metals.com did not inform investors of the State Enforcement Actions in its Shipping and Transaction Agreement. *See* Ex. 159, APP 1150–58.

110.    Metals.com sales representatives did not disclose the fact that Metals.com was subject to State Enforcement Actions to investors solicited by telephone after May 1, 2019. *See* Ex. 18, APP 192 at ¶ 31; Ex. 51, APP 688 (Bowers Tr. 78:12–79:2); Ex. 62, APP 1270 (Mills Tr. 93:9–93:11).

### E.    Beginning In May 2019, State Regulators Brought Multiple Actions Against Metals.com And Its Employees Related To Metals.com's Fraudulent Sales Practices

111.    During the Relevant Period, Metals.com was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders taken against Metals.com and various officers, employees, or other agents by State Securities Regulations, including:

- An Emergency Order issued May 1, 2019, and Agreed Order and Undertaking entered July 1, 2019, by the Texas State Securities Board;

- A Consent Cease and Desist Order entered May 16, 2019, by the Minnesota Department of Commerce Commissioner;

- A Consent Cease and Desist Order issued July 12, 2019, by the Colorado Securities Commissioner;

- An Emergency Cease and Desist Order issued July 30, 2019, by the Georgia Commissioner of Securities;

- A Cease and Desist Order issued August 8, 2019, by the Alabama Securities Commission;

- An Emergency Cease and Desist Order entered September 6, 2019, by the Kentucky Department of Financial Institutions;

- An Order to Cease and Desist and Order to Show Cause issued November 1, 2019, and Consent Order entered May 26, 2020, by the Missouri Securities Commissioner;

- An Administrative Complaint filed December 3, 2019, by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth;

- A Cease and Desist Order entered March 9, 2020, by the Arkansas Securities Commissioner;

- A Complaint for Summary Order filed May 26, 2020, and Summary Order to Cease and Desist issued May 26, 2020, by the Nevada Securities Division of the Office of the Secretary of State;

- A Notice of Proposed Agency Action filed June 4, 2020, and Temporary Cease and Desist Order entered June 4, 2020, by the Montana State Auditor, Commissioner of Securities and Insurance; and

- A Temporary Cease and Desist Order and Notice of Final Order issued July 20, 2020, by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

(hereinafter, collectively the "State Enforcement Actions"). *See* Asher Am. Ans. ¶ 87 (ECF No. 459); Batashvili Am. Ans. ¶ 87 (ECF No. 458).

112.    These State Enforcement Actions charged Metals.com and/or its employees with, among other things, acting as an unregistered investment advisor, falsely telling potential investors that investment in precious metals is safe and reliable, and failing to disclose to

investors the Spread. *See generally,* Ex. 74, APP 1507–20; Ex. 75, APP 1522–33; Ex. 76, APP 1535–42; Ex. 77, APP 1553–78; Ex. 78, APP 1580–82; Ex. 79, APP 1584–91; Ex. 80, APP 1597–1609; Ex. 81, APP 1612–17; Ex. 82, APP 1620–22; Ex. 109GG, APP 2044–53; Ex. 112, APP 2057–65.

113.    By no later than May 16, 2019, Asher and Batashvili were aware that at least one state had taken an action against Metals.com. *See* Ex. 109X, APP 1934–35.

114.    Asher and Batashvili told Metals.com employee Brock Bowers that the state cease and desist orders were "nothing to be concerned about." Ex. 51, APP 688 (Bowers Tr. 78:13–21).

115.    On May 21, 2019, Batashvili texted Metals.com sales representative Josh Ferdman: "I'm glad to hear that. I'm * committed to squashing this whole Texas ordeal and making sure our team is prosperous and in a safe environment." Ex. 109R, APP 1897.

116.    On August 25, 2019, Asher sent a text message to Batashvili along with an image of himself, stating: "Is this someone who looks like he is afraid of rat * thief competitors, CFTC, class actions, and state security boards and growth challenges? Nope! See you bright and early to crush everyone macher." Batashvili responded: "OG!" "Let's go!" Ex. 109GG, APP 2004–05.

117.    Metals.com did not alter its sales practices in response to the State enforcement actions. *See* Ex. 3, APP 9 at ¶¶ 6, 12–19, 25; Ex. 18, APP 190 at ¶¶ 2, 23–25, 30–31; Ex. 26, APP 300 at ¶¶ 2–4, 7–8; Ex. 31, APP 332 at ¶¶ 2–8; Ex. 33, APP 342 at ¶¶ 2, 7; Ex. 42, APP 486 at ¶¶ 2, 5, 12–13.

## F.    Defendants Formed Barrick After The State Regulator Actions

118.    Barrick Capital, Inc. was incorporated in the State of Delaware in August of 2019. *See* Asher Am. Ans. ¶ 27 (ECF No. 459); Batashvili Am. Ans. ¶ 27 (ECF No. 458).

119.    Barrick and Metals.com have common ownership and control by Asher and

Batashvili. *See* Asher Am. Ans. ¶ 90 (ECF No. 459); Batashvili Am. Ans. ¶ 90 (ECF No. 458).

120.    In October 2019, Asher acquired the domain www.barrickcapital.com. *See* Asher Am. Ans. ¶ 29 (ECF No. 459); Ex. 57, APP 1014 (Asher 2020 Tr. 241:10–11).

121.    Barrick operated as a precious metals retailer. *See* Ex. 51, APP 686 (Bowers Tr. 72:14–73:11); Ex. 63, APP 1286 (Batashvili 2020 Tr. 108:14–19).

122.    Barrick operated out of the same office space as Metals.com. *See* Ex. 51, APP 686 (Bowers Tr. 73:3–73:5).

123.    Barrick's business of selling precious metals involved the use of instrumentalities of interstate commerce. *See* Asher Am. Ans. ¶ 19 (ECF No. 459); Batashvili Am. Ans. ¶ 19 (ECF No. 458).

124.    Among the products sold by Barrick were the following coins: 1/10 oz. Gold Canada Wildlife coins;1/10 oz. Silver Spade Guinea coins; and 1/10 oz. Silver Britannia coins (collectively, "Barrick Bullion"). *See* Ex. 110, APP 2030, 2034–35 (Samuelson Rpt. at ¶¶ 48, 72). The "1/10 oz Gold Canada Wildlife Series" coin sold by Barrick was the same coin as the 1/10 oz Gold Royal Canadian Mint Polar Bear coin sold by Metals.com. *See* Ex. 109BB, APP 1947.

125.    These three coins, i.e., Barrick Bullion, constituted 93.9% of Barrick's total sales. *See* Ex. 110, APP 2030, 2034–35 (Samuelson Report ¶¶ 48, 72); Ex. 49, APP 601 (Moloian Tr. 203:2–17).

**G.    Barrick Used A Common Sales Pitch And Scheme To Target Retirement-Aged Customers And Gain Access To Their Retirement Savings**

126.    Barrick used the same sales practices as Metals.com, including cold calling or emailing elderly or retirement-aged persons, establishing trust through political or religious affinity, and relying on scare tactics, such as providing alarming articles about the state of the

economy. *See* Ex. 46, APP 545–48 at ¶¶ 1, 8, 11; Ex. 73, APP 1502–05 at ¶¶ 6–9, 11–14; Ex. 106, APP 1812–13.

127.    Barrick assisted customers in opening SDIRA accounts, including by recommending SDIRA custodians, providing account opening paperwork for signature, and initiating telephone calls with traditional IRA custodians to liquidate securities and rollover funds into the newly opened SDIRA. *See* Ex. 29, APP 319–24 at ¶¶ 7–10; Ex. 45, APP 526–28 at ¶¶ 17–20; Ex. 73, APP 1502–05 at ¶¶ 15, 18.

128.    Barrick provided investors with written invoices that included the customer's name, account number, delivery address, and a description of the items purchased (including quantity, unit price, and total amount). *See* Ex. 60, APP 1221.

### 1.    Omission #1: Barrick Failed to Disclose The Actual Markup On Polar Bear Bullion

129.    None of the Barrick invoices identify the actual markup, or "spread," associated with the transaction covered by the invoice. *See* Ex. 44, APP 499; Ex. 45, APP 540; Ex. 46, APP 579; Ex. 60, APP 1221.

130.    During the Relevant Period, Barrick sold Barrick Bullion at average markups that ranged between 95.6% and 114.5% and that were between 128% and 312% above the melt value. *See* Ex. 110, APP 2030–37 (Samuelson Rept. ¶¶ 48, 72, 74–75, 82); Ex. 49, APP 601 (Moloian Tr. 203:2–204:5).

131.    On February 3, 2020, Washington investor Von Greiff purchased 14,470 1/10 oz Silver Spade Guinea" coins at a unit price of $6.77 for a total purchase price of $97,961.90. He also purchased 561 "Gold 1/10[th] oz Canadian Wildlife Series" coins at unit price of $359.89 for a total purchase price of $201.898.29. Both were to be delivered to Brinks Depository. On the same date, Barrick acquired 14,475 Silver Spade Guinea coins and 561 "Gold Canadian Polar

Bear 1/10-oz" coins from Bayside (for delivery to Brinks Depository) for the unit prices of $3.27 and $181.37, respectively, reflecting markups of approximately 107% and 98%. *See* Ex. 101, APP 1796–98; Ex. 91, APP 1731.

132.    On February 26, 2020, Indiana investor Danny Chandler purchased 7,240 1/10 oz Silver Spade Guinea coins at a unit price of $6.85 for a total purchase price of $49,594. Chandler also purchased 201 "1/10 oz Gold - Canadian Wildlife Series Coin" at a unit price of $370.25 totaling $74,420.25. On the same date, Barrick acquired 7,240 Silver Spade Guinea coins and 201 "Gold Canadian Polar Bear 1/10-oz" coins from Bayside for a price of $3.28 and $189.34, respectively. These prices reflect a Spread of 108% on the Silver Spade Guineas and a 95% Spread on the Gold Wildlife Series coins. *See* Ex. 102, APP 1800–01; Ex. 91, APP 1732.

133.    On March 13, 2020, Florida investor Brad Ballenger purchased 6,491 1/10 oz Silver Brittania coins at a unit price of $6.75 for a total purchase price of $43,814.25. Ballenger also purchased 168 "1/10 oz Gold - Canadian Wildlife Series Coin" at a unit price of $390.95 totaling $65,679.60. On the same date, Barrick acquired 6,491 1/10 oz Silver Brittania coins and 168 "Gold Canadian Polar Bear 1/10-oz" coins from Bayside for a price of $3.16 and $175.24, respectively. These prices reflect a Spread of $113.61% on the Silver Spade Guineas and a 123.09% Spread on the Gold Wildlife Series coins. *See* Ex. 103, APP 1803–04; Ex. 91, APP 1733.

134.    In connection with their purchase, Barrick sent customers an Account Agreement. The Barrick Account Agreement contained no information regarding its markup charged. *See* Ex. 44, APP 494–95 at ¶ 11, APP 500–24 at Ex. C; Ex. 46, APP 545–48 at ¶ 24, APP 554–78.

135.    Moreover, Barrick's sales representatives did not provide investors with any information about the markup, let alone disclose that Barrick was selling bullion coins at

markups in excess of 100%. *See* Ex. 29, APP 319–24 at ¶¶ 11, 14–16; Ex. 44, APP 494–95 at

¶¶ 8, 11–13; Ex. 46, APP 545–48 ¶¶ 23, 29–30; Ex. 73, APP 1502–05 at ¶ 17.

### 2. Omission #2: Barrick Failed To Disclose That The Vast Majority Of Investors Who Purchased Barrick Bullion Suffered Immediate, Large Losses

136.    As a result of these markups, virtually all Barrick investors suffered large losses

on the Barrick Bullion sold to them—a fact which Barrick failed to disclose to prospective

investors. *See* Ex. 110, APP 2036–40 (Samuelson Rpt. at ¶¶ 82–91); Ex. 49, APP 595–98

(Moloian Tr. 145:22–146:2, 153:8–153:12, 156:22–157:2); Ex. 60, APP 1197 (Martin Tr. 68:5–

69:2); Ex. 73, APP 1502-05 at ¶ 23.

### 3. Misrepresentation #1: Barrick Sales Representatives Made Material Misrepresentations About The Safety Of Investing In Barrick Bullion And The Risk Of Loss

137.    Barrick sales representatives touted the advantages of precious metals as an

alternative to stocks, bonds, and the dollar. *See* Asher Am. Ans. ¶ 117 (ECF No. 459); Batashvili

Am. Ans. ¶ 117 (ECF No. 458).

138.    Barrick sales representatives advised investors that precious metals bullion was a

safer alternative to securities, carried no risk, and it was the only safe investment. *See* Ex. 46,

APP 545–48 at ¶¶ 11–14, 20; Ex. 59, APP 1035, 1039–40 (Asher 2024 Tr. 65:1–2, 78:8–21,

81:12–83:16); Ex. 64, APP 1312, 1315 (Batashvili 2024 Tr. 69:20–23, 78:23–81:18).

139.    Acting as a Barrick sales representative, Deric Scott Ned "advised" Kentucky

investor Kathleen Yager Perkinson to "invest in precious metals because it was the only safe

investment" and that "due to the Dodd-Frank Act, the government could take away the money

[she and her husband] had put away in the bank or securities firm." *See* Ex. 29, APP 319–24 at

¶ 6.

140.    Barrick sales representative "William Davis," claiming to be Barrick's CEO,

advised Maryland investor Clayton McManus that he had years of experience in the stock market, that it would be wise to invest in gold as the stock market continued to fall, and that there was "no risk" in converting securities to precious metals. *See* Ex. 45, APP 526–28 at ¶¶ 11–12, 14.

141.    Alabama investor Michael Martin testified that he received a "cold call" from a Barrick sales representative who advised him about a "new law" that would allow the "government to dip into my 401(k)" and "take money out of my account" but that he could protect himself by purchasing precious metals. *See* Ex. 60, APP 1184–85 (Martin Tr. 17:17–19:1).

### 4.    Misrepresentation #2: Barrick Sales Representatives Made Material Misrepresentations About The Fact That Barrick Bullion Was Worth Significantly More Than Melt Value

142.    When Barrick investors raised concerns about a SDIRA statement showing the "fair market value" of the coins as significantly lower than the price they paid, Barrick representatives would assure the investors that the coins were actually worth significantly more. *See* Ex. 29, APP 319–24 at ¶ 15; Ex. 120, APP 2134–47.

143.    Acting as a Barrick sales representative, Deric Scott Ned told Kentucky investor Kathleen Yager Perkinson that her coins would "sell for twice or triple the amount shown on the [SDIRA] account statement." *See* Ex. 29, APP 319–24 at ¶ 16.

### H.    Asher And Batashvili Controlled Metals And Barrick Operations And Sales Practices

144.    Metals.com and Barrick have common ownership and control by Asher and Batashvili." *See* Asher Am. Ans. ¶ 90 (ECF No. 459); Batashvili Am. Ans. ¶ 90 (ECF No. 458).

145.    Asher and Batashvili were the "executive team" at Metals.com and the "top" of the hierarchy. *See* Ex. 51, APP 675–76, 686 (Bowers Tr. 29:25–30:5; 72:6–13).

146.    According to one Metals.com sales representative, "Nobody else made decisions for the company besides [Asher and Batashvili]." Ex. 51, APP 687 (Bowers Tr. 76:16–17).

147.    Batashvili shared management responsibility over Barrick with Asher and they made "mutual" decisions about whether to disburse funds on behalf of the business. *See* Ex. 63, APP 1278–79, 1286 (Batashvili 2020 Tr. 90:21–91:6, 108:1–7).

148.    Asher was responsible for Metals.com marketing and negotiated advertising contracts on behalf of Metals.com which were intended to generate leads of potential investors. *See* Ex. 55, APP 874 (Marquez Tr. 58:21–25); Ex. 62, APP 1266 (Mills Tr. 43:22–44:2); Ex. 59, APP 1027–28 (Asher 2024 Tr. 33:25–34:9); Ex. 89, APP 1700–26.

149.    Asher and Batashvili set up and supervised Metals.com and Barrick's sales floor operations. *See* Ex. 51, APP 674–675 (Bowers Tr. 25:2–27:19).

150.    Asher and Batashvili had the authority to hire and fire Barrick and Metals employees. *See* Asher Am. Ans. ¶¶ 28, 29 (ECF No. 459); Batashvili Am. Ans. ¶ 28 (ECF No. 458); Ex. 57, APP 1022–24 (Asher 2024 Tr. 13:2–9, 15:3–10, 17:7–15, 19:17–24); Ex. 64, APP 1300 (Batashvili 2024 Tr. 21:8–19); Ex. 109Z, APP 1939–40.

151.    Asher and Batashvili also set the compensation for sales representatives and were responsible for determining and approving payment on "discretionary commissions" whereby representatives were eligible to earn "up to eight percent (8%) commission ("Commission") on the gross revenues of actual, final non-rescinded, and closed transactions of sales of Company's exclusive precious metals products to customers ("Sales") which Sales are originated, developed, and closed by Employee." *See* Ex. 51, APP 719; Ex. 59, APP 1022–24 (Asher 2024 Tr. 13:2–9; 15:3–25, 17:15–18:4, 19:25–20:8); Ex. 64, APP 1299–1300 (Batashvili 2024 Tr. 16:4–17:9; 19:12–15; 21:16–24); Ex. 109, APP 1829–30; Ex. 109B, APP 1836; Ex. 109D, APP 1850–51;

Ex. 109H, APP 1859–66.

152.    Asher and Batashvili initially directly supervised the sales representatives. *See* Ex. 51, APP 675 (Bowers Tr. 27:14–19); Ex. 62, APP 1265 (Mills Tr. 19:9–19:13). Later, sales managers supervised the sales team, but those managers reported to Asher and Batashvili. *See* Ex. 51, APP 674–75, 677–78 (Bowers Tr. 25:2–27:19, 37:4–38:9).

153.    Asher and Batashvili provided training to members of the sales team. *See* Ex. 51, APP 675 (Bowers Tr. 27:3–19), Ex. 109D, APP 1845, Ex. 109Q, APP 1895; Ex. 109Y, APP 1937; Ex. 109HH, APP 2014.

154.    Metals.com and Barrick held daily meetings for its sales representatives which were typically led by Asher or Batashvili. *See* Ex. 51, APP 678, 687 (Bowers Tr. 38:10–41:6, 75:25–76:3); Ex. 55, APP 875 (Marquez Tr. 65:21–66:16); Ex. 109E, APP 1853, Ex. 109F, APP 1855; Ex. 109J, APP 1873, Ex. 109K, APP 1875.

155.    During those sales meetings, Asher and Batashvili incentivized sales by rewarding sales representatives with bonuses and prizes, including cash, cars, and watches. *See* Ex. 51, APP 678–79 (Bowers Tr. 40:20–43:6); Ex. 55, APP 875 (Marquez Tr. 66:17–67:15). Specifically, sales representatives were rewarded for obtaining current IRA paperwork and closing deals. *See* Ex. 51, APP 678–79 (Bowers Tr. 40:20–43:6); Ex. 55, APP 875 (Marquez Tr. 68:4–12).

156.    Asher and Batashvili distributed articles to sales representatives to reference in their conversations with customers. *See* Ex. 59, APP 1028 (Asher 2024 Tr. 36:13–37:6).

157.    The sales representatives were provided with scripts to be used during calls with potential customers. *See* Ex. 59, APP 1028 (Asher 2024 Tr. 35:16–20); Ex. 64, APP 1305 (Batashvili 2024 Tr. 38:8–17); Ex. 87, APP 1686, Ex. 88, APP 1688–90. Asher and Batashvili

57

were involved in drafting, reviewing, and approving, and distributing those scripts. *See* Ex. 59, APP 1028–29 (Asher 2024 Tr. 35:16–36:1, 38:1–25); Ex. 64, APP 1305 (Batashvili 2024 Tr. 38:8–40:24); Ex. 109D, APP 1846; Ex. 109M, APP 1880–81; Ex. 109P, APP 1890–91.

158.    Asher and Batashvili were responsible for the acquisition of sales leads. *See* Ex. 59, APP 1028 (Asher 2024 Tr. 35:4–7); Ex. 64, APP 1305 (Batashvili 2024 Tr. 38:4–7); Ex. 89, APP 1700–26; Ex. 109DD, APP 1953–57.

159.    Asher and Batashvili distributed "leads" to sales representatives and considered the order in which they were distributed to be "privellaged [sic] info." *See* Ex. 109, APP 1831; Ex. 109C, APP 1838–39, 1841; Ex. 109I, APP 1868; Ex. 109DD, APP 1953–54, 1956, 1959–60.

160.    Asher and Batashvili shared office space directly off the sales floor and were frequently on the sales floor. *See* Ex. 53, APP 796 (Ned. Tr. 25:12–17); Ex. 59, APP 1028 (Asher 2024 Tr. 37:7–25); Ex. 64, APP 1305 (Batashvili 2024 Tr. 41:7–13).

161.    Asher and Batashvili monitored sales representatives' attendance, outgoing dials, "call time," transfers to more senior sales representatives, and the value of in-progress and completed sales. *See* Ex. 109*O*, APP 1888; Ex. 109R, APP 1898; Ex. 109S, APP 1900–02; Ex. 109T, APP 1904; Ex. 109W, APP 1918–20; Ex. 109W, APP 1924–28, 1931–32; Ex. 109Z, APP 1940, 1943.

162.    At least some calls between sales representatives and investors were recorded and Asher and Batashvili had access to those recordings. *See* Ex. 51, APP 676 (Bowers Tr. 32:16–33:10); Ex. 55, APP 871 (Marquez Tr. 33:20–34:4); Ex. 59, APP 1028 (Asher 2024 Tr. 37:20–25); Ex. 64, APP 1305–06 (Batashvili 2024 Tr. 41:14–43:4). On at least some occasions, Asher and Batashvili monitored and/or reviewed recordings of calls between sales representatives and potential investors. *See* Ex. 59, APP 1028 (Asher 2024 Tr. 37:7–25); Ex. 64, APP 1305–06

(Batashvili 2024 Tr. 41:14–43:4); APP 1129, APP 1886.

163.    Asher and Batashvili were in frequent contact with sales representatives via text message and the Telegram messaging application. *See* Ex. 109M, APP 1884; Ex. 109P, APP 1892–93; Ex. 109CC, APP 1949; Ex. 109HH, APP 2020.

164.    On at least some occasions, Asher and Batashvili directed sales representatives to call a specific investor and/or to relay specific information. *See* Ex. 51, APP 677, 684–85 (Bowers Tr. 34:24–35:5, 62:17–63:3, 69:1–25); Ex. 109L, APP 1877–78; Ex. 109W, APP 1923; Ex. 109W, APP 1930–31; Ex. 109DD, APP 1957; Ex. 109HH, APP 2013.

**I.    Asher And Batashvili Controlled The Acquisition Costs And Retail Sales Prices**

165.    Metals' Shipping and Transaction Agreement was reviewed, approved, and distributed by Asher and Batashvili. *See* Ex. 51, APP 687 (Bowers Tr. 77:15–77:19); Ex. 59, APP 1029 (Asher 2024 Tr. 40:13–41:25); Ex. 64, APP 1306 (Batashvili 2024 Tr. 44:23–46:14); Ex. 62, APP 1269 (Mills Tr. 62:19–62:21).

166.    In early 2017, Asher and Batashvili negotiated with a wholesaler, Bayside, to purchase "exclusive" or "custom" coins—meaning coins that Metals.com had the exclusive right to sell in the United States. Ex. 54, APP 836 (Fogel Tr. 34:12–35:3); Ex. 109U, APP 1910–11.

167.    Bayside contracted with an authorized Royal Canadian Mint dealer, A-Mark Precious Metals, Inc., to obtain the exclusive product from the Royal Canadian Mint. Ex. 54, APP 836 (Fogel Tr. 34:12–37:5); Ex. 109U, APP 1908.

168.    In 2017, Bayside's CEO, Eugene Fogel, sent Asher and Batashvili an agreement reflecting the terms for the purchase of Royal Canadian Mint "2018 Silver .5 Polar Bear coins." Ex. 54, APP 838–39 (Fogel Tr. 51:23–56:5), APP 845–51; Ex. 109U, APP 1908. The agreement indicated that Defendants would purchase the Silver Polar Bear coins at a price of spot value plus a premium of $2.90 per coin. *See* Ex. 54, APP 838–39 (Fogel Tr. 51:23–56:5), APP 847–48 at

¶ 2. Under the contract, Metals.com was obligated to purchase a minimum of 200,000 coins, but by the time Bayside sent the written agreement to Asher and Batashvili, Metals.com had already presold more than half that amount. *See* Ex. 54, APP 845, 847 at ¶ 1.

169.    There was no limitation on the number of coins that the Royal Canadian Mint could mint and no limitation on the number of coins Bayside could make available to sell. *See* Ex. 54, APP 836 (Fogel Tr. 36:13–36:5).

170.    Asher and Batashvili also negotiated the purchase of Royal Canadian Mint 1/10 ounce gold Polar Bear coins through Bayside. *See* Ex. 54, APP 841–42 (Fogel Tr. 62:17–66:4); Ex. 109U, APP 1907. They also later purchased 2019 versions of the same coin. *See* Ex. 109U, APP 1913; Ex. 109FF, APP 1965.

171.    Later, Asher and Batashvili negotiated with Bayside to purchase exclusive coins on behalf of Barrick Capital, including the 1/10 Ounce Silver Spade Guinea coin and the 1/10 ounce silver Britannia coin. *See* Ex. 54, APP 840–43 (Fogel Tr. 58:5–62:16, 67:14–68:11, 73:6–73:23), APP 853–64 (Fogel Tr. Ex. 5).

172.    Asher and Batashvili engaged in similar negotiations with another wholesaler, Dillon Gage, including specific negotiations on pricing and premiums for the ¼ ounce Gold British Standard Bullion coin. *See* Ex. 109V, APP 1915–16.

173.    In connection with the sale of Polar Bear Bullion and Barrick Bullion, Batashvili would decide the type of metals to be sold, the quantity, and price. *See* Ex. 51, APP 680 (Bowers Tr. 46:17–47:13); Ex. 62, APP 1269, 1271 (Mills Tr. 63:24–64:4, 106:19–106:21); Ex. 59, APP 1032 (Asher 2024 Tr. 51:2–14); Ex. 64, APP 1309 (Batashvili 2024 Tr. 55:21–56:10); Ex. 109C, APP 1840, 1842–43; Ex. 109D, APP 1847–49; Ex. 109G, APP 1857; Ex. 109P, APP 1892–93; Ex. 109W, APP 1922; Ex. 109AA, APP 1945; Ex. 109HH, APP 2015.

174.     All of the investors' funds were deposited into bank accounts owned and controlled by the Defendants. *See* Asher Am. Ans. ¶ 11 (ECF No. 459); Batashvili Am. Ans.¶ 11 (ECF No. 458).

**J.     Asher And Batashvili Knew The Actual Spread And Took Steps To Conceal It From Investors**

175.     Asher and Batashvili, sometimes operating under the moniker the "Trade Desk," also determined whether or not Metals.com and Barrick would buy back (or "liquidate") precious metals held by investors and the quantity and price at which it would do so. *See* APP Ex. 51, 682–83 (Bowers Tr. 54:7–55:12, 56:1–14, 58:14–59:18); Ex. 109A, APP 1833–34; Ex. 109CC, APP 1949–50; Ex. 120, APP 2140, 2142, 2145–46.

176.     Asher and Batashvili knew that the actual spreads charged by Metals were significantly more than the ranges disclosed in its Shipping and Transaction Agreement.

177.     In an effort to court corporate investors to Metals.com, Asher and Batashvili drafted and circulated a Business Plan to at least one potential investor. *See* Ex. 60, APP 1089–117; Ex. 59, APP 1025–26 (Asher 2024 Tr. 23:10–28:5); Ex. 64, APP 1301–02 (Batashvili 2024 Tr. 24:16–28:16); Ex. 64, APP 1326–53. The Business Plan explained how its large markups contributed to Metals' "formidable presence" in the precious metals industry:

> The Company currently has long-term contractual relationships with government mints worldwide to be the only provider of certain low minted exclusive gold and silver coins. **The Company can earn in excess of 100% gross margins through the sale of these premium products**. Other companies do not have the ability to offer these products to their customers.

Ex. 59, APP 1103 (emphasis added). The Business Plan further explained that:

> For every $1 million in customer acquisition capital we typically will capture between 7,136 and 9,812 purchases of premium retail products with 100% markups. Using these benchmarks $1 billion in annual revenue can be achieved with attractive margins by deploying only $30 million in marketing expenses. **We are able to cloak profit margins by being market makers in an unregulated sector without any benchmark for our diverse product line**.

Ex. 59, APP 1107 (emphasis added).

178.    Asher and Batashvili took steps to conceal Metals.com's actual markups from investors. Asher and Batashvili caused large inventories of Polar Bear Bullion to be purchased from third-party retailers to prevent the coins from being publicly listed for sale online at a "low cost." *See* Ex. 109FF, APP 1968–71, 1978–79.

179.    In addition, they obtained a "first right of refusal" from one metals retailer to repurchase any Polar Bear Bullion before the retailer would publicly list it for sale on their website. *See* Ex. 109FF, APP 1980, 1982–83.

**K.    Metals And Barrick Investors Suffered Financial Losses As A Result Of This Fraud**

180.    As a result of the above conduct, investors have suffered financial losses. *See* Ex. 9, APP 105 at ¶ 13; Ex. 12, APP 139 at ¶ 36; Ex. 34, APP 349 at ¶ 25; Ex. 36, APP 418 at ¶ 13, APP 423 at ¶ 31; Ex. 37, APP 467 at ¶ 2; Ex. 39, APP 474 at ¶ 2; Ex. 47, APP 586 at ¶ 18; Ex. 60, APP 1197 (Martin Tr. 68:16–69:2).

181.    For example, California investor Josephine Udasco described the consequences she suffered after liquidating an annuity worth approximately $300,000 to purchase Polar Bear Bullion from Metals:

> From December of 2019 through June of 2020, Anthony Bowers with Metals.com was hard to get a hold of, and told me that I could only cash a limited number of precious metals at a time, and I would have to wait to get more. I am retired and on Social Security. From December of 2019 through June of 2020, I had to borrow money to pay for rent and basic living expenses because I was not able to sell metals each month in a timely manner. I suffered anxiety and apprehension not knowing when I would be able to access my funds.

Ex. 7, APP 100 at ¶¶ 14–15.

182.    Maryland investor Rodney Cross and his wife were forced to move out of their house due to lack of funds after purchasing Polar Bear Bullion with $249,478 of his retirement savings. *See* Ex. 35, APP 383, 385 at ¶¶ 17, 32.

183.    As a result of his interactions with Metals, Alabama investor Sherman Cobb

feared his retirement plans would be delayed indefinitely:

> My retirement plan was to retire from my full-time job working in the
> maintenance department at a hospital and then take a part-time job until I turned
> 70. Upon turning 70, my plan was to live off my IRA and Social Security. The
> Metals.com sales representatives knew my plan. Now I must keep working
> indefinitely because of the loss of my retirement funds.

Ex. 4, APP 51 at ¶ 28.

184.    As a result of the above conduct, Barrick investors suffered financial losses and

emotional hardships. *See* Ex. 46, APP 545–48 at ¶ 31; Ex. 73, APP 1502–05 at ¶ 26. For

example, Alabama investor Michael Martin testified that he cannot afford to retire after losing

more than $130,000 in retirement savings by purchasing Barrick Bullion. *See* Ex. 60, APP 1197

(Martin Tr. 68:5–69:2).

## L.    Asher and Batashvili Avoided Discovery By Broadly Asserting Their Fifth Amendment Rights

185.    During the June 24, 2024, deposition of Lucas Asher, upon the advice of counsel,

Asher invoked his Fifth Amendment right against self-incrimination and declined to answer

every substantive question put to him. *See generally* Ex. 59, APP 1020–47 (Asher 2024 Tr.).

186.    During the June 26, 2024, deposition of Simon Batashvili, upon the advice of

counsel, Batashvili invoked his Fifth Amendment right against self-incrimination and declined to

answer every substantive question put to him. *See generally* Ex. 64, APP 1296–1324 (Batashvili

2024 Tr.).

187.    On February 20, 2025, Lucas Asher served Plaintiffs with Amended Answers and

Objections that asserted his Fifth Amendment right against self-incrimination as to each of

Plaintiffs' twenty-five interrogatories. *See* Ex. 123, APP 2277–96.

188.    On February 28, 2025, Simon Batashvili served Plaintiffs with Amended Answers

and Objections that asserted his Fifth Amendment right against self-incrimination as to each of Plaintiffs' twenty-five interrogatories. *See* Ex. 124, APP 2297–316.

## IV.    ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has met its initial burden of identifying the absence of a genuine issue of material fact, to defeat summary judgment, the non-movant must "designate specific facts showing that there is a genuine issue for trial." *Celtic Marine Corp. v. James C. Justice Cos. Inc.,* 760 F.3d 477, 481 (5th Cir. 2014) (*quoting Celotex Corp. v. Catrett,* 477 U.S 317, 324 (1986)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact." *Dunn v. Sw. Airlines Co.*, No. 3:21-cv-1393-X, 2023 WL 360246, at *2 (N.D. Tex. Jan. 23, 2023) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)). A factual dispute is not genuine unless the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R TresArboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013) (citation omitted). A party cannot defeat summary judgment by relying on conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Turner v. Baylor Richardson Med Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted).

### B.  Defendants Committed Fraud In Violation of 7 U.S.C. § 9(1) And 17 C.F.R. § 180.1(a)(1)–(3) (COUNT I)

Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), makes it unlawful "for any person, directly or indirectly, to use or employ, in connection with any. . . contract of sale of any commodity in

interstate commerce, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the CFTC shall promulgate." Pursuant to this authority, the CFTC promulgated Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2025), which make it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.[8]

To establish a violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)–(3), the Plaintiffs must stablish three elements: (1) that Defendants attempted to engage or engaged in prohibited conduct (*i.e.*, employed a scheme, or artifice to defraud; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that would operate as a fraud or deceit); (2) with scienter (i.e. intentionally or recklessly); and (3) in connection with any commodity in interstate commerce.[9] *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317,

---

[8] In construing Section 6(c)(1) of the Act and Regulation 180.1(a), federal courts rely on case law developed under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, because the statutory language is "nearly identical." *See, e.g., CFTC v. Kraft Foods Grp., Inc*., 153 F. Supp. 3d 996, 1008-09 (N.D. Ill. 2015); *CFTC v. Hunter Wise Commodities, LLC,* 21 F. Supp. 3d 1317, 1346-47 (S.D. Fla. 2014).

[9] Unlike a private litigant, Plaintiffs do not need to show reliance on the misrepresentations or omissions to establish liability. *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018).

1347 (S.D. Fla. 2014); *S. Tr. Metals, Inc*., 894 F.3d at 1325. Here, the undisputed facts plainly establish each element.

### 1. Defendants Made Material Misrepresentations And Omissions

The undisputed facts establish that Defendants repeatedly made material misrepresentations and omissions both in writing and orally through Metals and Barrick sales representatives including, as set forth further below, by misrepresenting the spread in the Shipping and Transaction Agreement and failing to disclose the actual spread charged to customers on their purchases; making false promises of profitability and downplaying the risk of loss; and failing to disclose that several State Regulators had issued cease and desist orders against Metals and certain of its sales representatives in connection with its sales practices.

### a. Defendants Made Material Misrepresentations And Omissions About The Spread And The Value Of The Coins

In connection with the sale of precious metals to investors, Metals disseminated a Shipping and Transaction Agreement to each of its investors. SUF ¶¶ 65–66. At least two versions of the Shipping and Transaction Agreement were used by Metals during the Relevant Time Period, but each provided a range for typical Spreads on IRA transactions falling between 1% and 33%. SUF ¶¶ 67–71. Notwithstanding certain caveats and other disclaimers in the agreement, the "overall message" conveyed is that the Spread on *most* Metals' transactions would fall within the disclosed range. *R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002). They did not. On average, Metals charged its customers Spreads on Polar Bear Bullion between 91% and 128%, approximately 3 to 4 times the high end of the disclosed range. SUF ¶¶ 72–76. The spread ranges Metals conveyed in its Shipping and Transaction Agreement are false.

Moreover, Metals failed to disclose the actual spreads charged. Once Metals chose to speak on the topic in its Shipping and Transaction Agreement, it had an obligation to speak truthfully. *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("Once the defendants engaged in public discussions . . . they had a duty to disclose a 'mix of information' that is not misleading."). Metals had a duty to disclose any "any information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257, 258 (2024) ("Rule 10b-5(b) requires disclose of information necessary to ensure that statements already made are clear and complete."). For example, in *R.J. Fitzgerald* the Eleventh Circuit the Court held that it was "misleading and deceptive to speak of 'limited risk' and '200–300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money." *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1333.

Here, once Metals chose to disclose the typical spread range on its transactions, it was required to disclose the actual spreads charged on customer transactions. The actual spread is plainly information an "investor would reasonably want to know before deciding to commit money." *Id*. Yet, this "highly material information" appeared nowhere in Metals' Shipping and Transaction Agreement or Purchase Invoices, and was not orally conveyed by Metals Sales Representatives. *Id.*; SUF ¶¶ 100–03.

Defendants also falsely told investors that the metals they purchased were worth significantly more than the melt value and failed to disclose their actual value. SUF ¶¶ 82–94; 104. By withholding this material, "decision-altering information[,]" Defendants "eviscerated" investors ability to "exercise free choice in the marketplace." *Id.*; *cf. SEC v. Seghers*, 298 F. App'x 319, 330 (5th Cir. 2008) ("The value of an investor's account and the month-to-month

performance of the Funds are indisputably relevant to the investor's investment decision."); *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2004) ("reasonable investors would consider . . . the accuracy of [defendants'] representations regarding past customer gains and losses . . . important in making an investment decision") (internal quotations and citations omitted).

### b. Defendants Falsely Guaranteed Profits And Downplayed The Risk Of Loss

In addition to the blatantly false statements and omissions about the spread, Defendants repeatedly made oral misrepresentations through Metals and Barrick sales representatives by guaranteeing that investors would profit on their purchases and misleading customers about the risk of loss. *See CFTC. v. Premium Income Corp.*, No. 3:05-cv-0416, 2007 WL 4563469, at *4 (N.D. Tex. Dec. 28, 2007) (finding Defendant made fraudulent misrepresentations by suggesting that investment would "produce guaranteed profits and that the investors' principal was completely safe"); *CFTC v. Matrix Trading Grp.*, *Inc.*, No. 9:00-cv-8880, 2002 WL 31936799, at *6 (S.D. Fla. Oct. 3, 2002) ("It is well established that promises of large and certain profits, like the promises made by the Defendants here, are material and fraudulent."). Such "promises and guarantees of profit, in light of the uncertainties of the marketplace, are inherently fraudulent." *CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1270 (D. Kan. 2003), *modified sub nom. CFTC* v. *Wall St. Underground, Inc.*, No. 2:03-cv-2193, 2004 WL 1900588 (D. Kan. June 24, 2004), *and aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005).

Metals sales representatives routinely made promises of profitability to investors and/or suggested that they could not lose money. SUF ¶¶ 77–81.  For example, Metals Sales representative Michael Sachs assured Alaska customer George Notter that he would not lose any money if he invested in metals. Moreover, he promised Notter that if he moved the $430,000 in

his traditional IRA into metals, he would be able "to retire comfortably within 3 to 4 years with at least a million plus." SUF ¶ 78. Similarly, Metals sales representative Randy Kohl told California investor Harry Kane that "Metals.com would pick the best distribution for growth and stability, with rock solid value and stability" and assured him that he would "earn money, not lose it." SUF ¶ 79. Many Metals investors believed their funds were not at risk, because Metals sales representatives falsely told them they would buy back their coins at any time. SUF ¶¶ 95–97. Such promises are precisely the types of fraudulent statements that courts find are prohibited under the CEA.

Defendants further exacerbated this "unbalanced" presentation of risks and profits by emphasizing the risks of traditional investments while suggesting that precious metals were an inherently safe investment. *R.J. Fitzgerald*, 310 F.3d at 1329. Defendants' website was replete with links to articles warning of the imminent collapse of the stock market, government bail-ins, and other dangers of traditional IRA investments. APP 2330–411; *cf. R.J. Fitzgerald*, 310 F.3d at 1322 (finding seminar "mislead[] potential customers by suggesting that historical movements and known and expected seasonable patterns can by be used to predict profits on options"); *id.* at 1325–26 (finding that "overall message" of commercial was false and misleading because it suggested "to the potential investor, that truly enormous profits (200–300%) can be made on options on futures contract by looking at known and expected weather patterns"). Metals Sales Representatives gave similar false impressions in their oral representations and email communications. SUF ¶¶ 33–35; 41–43. Moreover, Defendants failed to disclose that, as a result of the egregious and undisclosed spread, most investors suffered significant losses. SUF ¶¶ 105–06; 136. These statements and omissions created a "a distinctly unbalanced picture" of the

relative potential for profit and risk of loss between traditional IRA investments and precious metals. *Id.* at 1332.

Defendants may attempt to evade liability by pointing to the Risk Disclosure statements in the Shipping and Transaction Agreement. But, the law is clear that a risk disclosure document does not preclude liability under the Act where, as here, the overall message is clearly and objectively misleading or deceptive. *Id.* at 1330; *see also CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999) (holding that post-solicitation boilerplate risk disclosures provided in account opening documents would not render an earlier material misrepresentation concerning the profitability of trading immaterial); *Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580 (11th Cir.1986) (per curiam) ("oral statements may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customer's particular situation"); *Keller v. First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22, 402, 29, 823 (Oct. 22, 1984) ("[S]tatements that lead a customer to believe that a particular investment is virtually risk-free and will almost certainly yield a profit are not protected from claims of fraud simply because the broker has made a *pro forma* disclosure of risk").

### c.    Defendants Failed To Disclose To Investors That Metals Was Subject To Numerous State Regulatory Actions

Additionally, Metals failed to disclose to investors that it was subject to numerous state regulatory actions related to its sales practices. "A party may also be liable for a deceptive omission if it fails to disclose previous regulatory violations to its customers and potential customers." *CFTC v. Gibraltar Monetary Corp.*, No. 9:04-cv-80132, 2006 WL 1789018, at *15 (S.D. Fla. May 30, 2006), *aff'd*, 575 F.3d 1180 (11th Cir. 2009). Rather than disclose the actions to its customers, Metals incorporated a new entity and began operating the same scheme under a new name—clearly misleading investors. SUF ¶¶ 118–43. That Metals and numerous of its sales

70

representatives had previously been subject to state cease and desist actions for the same conduct and effectively the same company is clearly a material fact. *See id*. at *17 ("[A] reasonable investor would most certainly have considered the previous regulatory violations . . . especially the CFTC cease and desist order . . . an important factor in deciding whether to use Gibraltar's services.").

### d.    Defendants' Misrepresentations And Omissions Were Material

There can be no dispute that Defendants' misrepresentations and omissions were material. A statement or omission is material if there is a "substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 461 (5th Cir. 2022); *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). When a statement or omission is so obviously important to an investor that reasonable minds cannot differ, the Court can determine materiality as a matter of law. *See*, *e.g., SEC v. Alliance Leasing Corp.*, 28 F. App'x 648, 652 (9th Cir. 2002) (failure to disclose 30% commissions material as a matter of law).

Courts have routinely found that statements about profits and risk are material. *See, e.g., CFTC v. Kratville*, 796 F.3d 873, 895 (8th Cir. 2015) (quoting *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 686–87 (D. Md. 2000) ("[R]epresentations about profit potential and risk '*go to the heart of a customer's investment decision* and are therefore material as a matter of law.'") (emphasis in original)); *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 686–87 (D. Md. 2000) (holding misrepresentations and omissions concerning profit and risk are material as a matter of law because they "go to the heart of a customer's investment decision."). Misrepresentations and omissions about the Spread, value of coins, risk, likelihood of profit, and the fact that Metals was the subject of multiple state enforcement actions

related to its sales practices are precisely the types of information an investor would consider important when making an investment decision. *See, e.g., CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2004) ("reasonable investors would consider . . . the accuracy of [defendants'] representations regarding past customer gains and losses . . . important in making an investment decision") (internal quotations and citations omitted); *CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, at *17 ("[A] reasonable investor would most certainly have considered the previous regulatory violations . . . especially the CFTC cease and desist order . . . an important factor in deciding whether to use Gibraltar's services."). Moreover, declarations and testimony provided by Metals and Barrick investors in this action confirm that they considered this information to be material to their investment decisions. *See, e.g.*, APP 489 at ¶ 15; 342 at ¶ 15.

## 2.    Defendants Acted with Scienter

To establish liability under 6c(1) and Regulation 180.1, Plaintiffs must also show that Defendants engaged in the prohibitive conduct "intentionally or recklessly." 17 C.F.R § 180.1. Plaintiffs can satisfy the scienter element by showing that defendants intended to "deceive, manipulate, or defraud" or that their conduct represents "an extreme departure from the standards of ordinary care." *Kraft Foods Grp., Inc.*, 153 F. Supp. at 1007; *see also SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (noting that "[s]cienter is a mental state embracing intent to deceive, manipulate or defraud" which can be satisfied by showing "an extreme departure from the standards of ordinary care") (citations omitted). "Scienter may be found if a reasonable jury can conclude that the defendant knew his statements were false when made." *SEC v. Seghers*, 298 F. App'x at 333. Here, the record establishes that Defendants acted intentionally in making the material misrepresentations and omissions.

Asher and Batashvili knew that the Spread ranges stated in the Shipping and Transaction Agreement (between 1% and 33%) were false. They were directly responsible for contracting with Metals' and Barrick's wholesalers. SUF ¶¶ 166–72. Asher and Batashvili also controlled the other side of the equation by setting the prices on the Metals retail transactions. SUF ¶ 173. Batashvili was also a signatory on the bank accounts used to purchase coins and receive investor payments. SUF ¶¶ 5, 174. As a result, Defendants knew or were reckless in not knowing both the costs of acquiring the Polar Bear Bullion and Barrick Bullion and the retail prices charged investors. The only reasonable conclusion is that Defendants were aware of the Spreads. And *they chose to lie to investors.*

But the Court need not rely on this reasonable inference, because the Business Plan that was partially drafted, reviewed, and circulated by Asher and Batashvili leaves no room for doubt: Asher and Batashvili knew about the egregious Spreads. Asher and Batashvili knew, and they wanted their potential business partners to know, that "**[t]he Company can earn in excess of 100% gross margins through the sale of these premium products**." SUF ¶ 177. There is ample evidence that Asher and Batashvili acted with scienter, because they knew the true Spreads charged by Metals on Polar Bear Bullion but chose to circulate the smaller, false ranges to investors. *See SEC v. Seghers*, 298 F. App'x at 333 (finding that "there was ample evidence that [defendant] acted with the knowledge that he was misleading investors" where evidence established that defendant "knew the market values of the Funds' assets and chose to report higher values").

In addition, Asher and Batashvili were aware that the coins could not be resold at the same high prices they charged and, thus, the vast majority of Metals customers would lose money. Asher and Batashvili contracted with Bayside to obtain the rights to sell Polar Bear

Bullion on an "exclusive" basis in the United States. By definition, an "exclusive" coin is hard to "shop" (*i.e.*, obtain pricing information from multiple retailers)—and that was precisely the point. SUF ¶ 166. As Asher and Batashvili described in the Metals Business Plan, selling exclusive coins allowed Metals to "earn in excess of 100% gross margins" and "**cloak the profit margins** by being market makers in an unregulated sector without any benchmark for our diverse product line." SUF ¶ 177 (emphasis added). Additionally, Asher and Batashvili purchased Polar Bear Bullion that appeared on the secondary market at lower prices in order to conceal the high mark-ups Metals was charging its customers. SUF ¶¶ 178–79.

The record also supports a finding that Defendants acted at least recklessly in not disclosing the numerous state enforcement actions to investors. Text message communications confirm that Individual Defendants as well as Defendants' Vice Presidents of Sales, Vera and Ned, were aware of the Texas Emergency order no later than May 16, 2019. SUF ¶ 113. Text message communications further reveal that negative information on the internet, including "lawsuits," was hurting broker's ability to close deals. *Id.* Despite this knowledge, Individual Defendants did not disclose this information to investors and told at least one Metals employee that the regulatory actions were "nothing to be concerned about." SUF ¶ 114. Moreover, Defendants' decision to incorporate a new entity and continue selling the same 1/10 Ounce Gold Polar Bear coins rebranded as "wildlife series" suggests that Defendants were concerned about how negative information about Metals, including the state regulatory actions, would impact its business if investors learned of it. SUF ¶¶ 118-19, 124.

### 3. Defendants' Fraud Was In Connection With Commodities In Interstate Commerce

The record establishes that Defendants' fraudulent acts were "in connection with" contracts of sale of a commodity in interstate commerce. Section 1a(13) of the Act, 7 U.S.C.

§ 1(a)(13), defines the term "contract of sale" to include sales, agreements of sale, and agreements to sell. As set forth above in Section II, the gold and silver coins at issue in this case are commodities pursuant to 7 U.S.C § 1a(9). *See supra* Section II.

The "in connection with" requirement of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) "is construed broadly." *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 722 (E.D.N.Y. 2018). "It is satisfied where the contract of sale of a commodity is in interstate commerce and the fraud are not independent events." *Id.* (finding that in connection with requirement was satisfied where "fraudulent acts, including making material misrepresentations and omissions" were "contemporaneous with contracts of sale of virtual currencies"). Defendants' material misrepresentations and omissions to customers and prospective customers were made directly in connection with the purchase and sale of precious metals bullion coins to customers located throughout the United States by use of the instrumentalities of interstate commerce. *See* Asher Am. Ans. ¶ 19; Batashvili Am. Ans. ¶ 19.

### C. Defendants Are Derivatively Liable For Each Other's Violations Of The CEA

#### 1.    Metals And Barrick Are Liable For The Acts Of Their Agents

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2025), provide that the "act, omission, or failure of any official, agent, or other person acting for any . . . corporation . . . within the scope of his employment or office, shall be deemed the act, omission, or failure of such . . . corporation . . . , as well as such official, agent, or other person." Pursuant to these provisions, "it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Dohmen-Ramirez v. CFTC*, 837 F.2d 847, 858 (9th Cir. 1988) (finding "[i]t is not necessary to show control to establish agency under the [Act]"). Additionally, the fact that an agent's actions are illegal does not automatically place those acts outside of his scope of

employment. *See, e.g.*, *Guttman v. CFTC*, 197 F.3d 33, 39–40 (2d Cir. 1999) (upholding principal-agent liability where agent engaged in trading that was both within scope of employment and illegal). Here, Metals and Barrick are liable for the actions of its sales representatives, who were acting within the scope of their employment when they made fraudulent misrepresentations and omissions.

### 2.    Asher And Batashvili Are Liable As Controlling Persons Of Metals and Barrick

Asher and Batashvili are derivatively liable for the actions of Metals and Barrick because they acted as "controlling persons" of those entities under Section 13(b) of the CEA, 7 U.S.C. § 13c(b). Section 13(b) provides that:

> Any person who, directly or indirectly, controls any person who
> has violated any provision of this chapter or any of the rules,
> regulations, or orders, issued pursuant to this chapter may be held
> liable for such violation in any action brought by the commission
> to the same extent as the controlled person. In such action, the
> Commission has the burden of providing that the controlling
> person did not act in good faith or knowingly induced, directly or
> indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b). Courts have held that this provision should be "construed liberally" and that it "requires only some indirect means of discipline or influence, short of actual direction to hold a control person liable." *See Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993) (quoting *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (1992)).

To find a control person liable, Plaintiffs must first show that "the defendant exercised general control over the operation of the entity principally liable and possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002)); *Monieson*, 996 F.2d at 859–60. Plaintiffs must also prove that the "controlling person" acted with lack of good faith or that he

knowingly induced the acts constituting the violation." *Id.* at 860. Proof of recklessness is sufficient to establish lack of good faith. *Id.* (finding chairman of Futures Commission Merchant liable as controlling person because he failed to diligently enforce supervision system, including failing to respond to repeated charges of illegal behavior). To establish "knowing inducement," the CFTC must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In the Matter of Roy D. Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (CFTC Jan. 12, 1988). The undisputed evidence easily satisfies this standard.

Defendants concede that "Barrick and Metals have common ownership and control by Asher and Batashvili." SUF ¶¶ 7, 119, 144. Additional facts in the record support a finding of general control, including that they each had the authority to hire, fire, and supervise employees; that Batashvili was the signatory on bank accounts held in the name of Barrick and Metals; that they negotiated contracts on behalf of Metals; and that they controlled the day-to-day operations of the business. SUF ¶ ¶5–7, 144–79.

In addition, Asher and Batashvili were directly responsible for the misrepresentations and omissions regarding the spread in the Shipping and Transaction Agreement. As the Fifth Circuit explained in *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004), "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." Here, although the Shipping and Transaction Agreements were not countersigned by any agent of Metals, the undisputed facts provide a clear link between Asher and Batashvili and the statements in the Shipping and Transaction Agreement. Testimony provided by Metals employees shows that Individual

77

Defendants provided the agreements to employees for distribution to investors. APP 687
(Bowers Tr. 77:15–77:19); 1269 (Mills Tr. 62:19–62:21). Moreover, the record further
demonstrates that Individual Defendants had ultimate authority over the content in the Shipping
and Transaction Agreements related to the Spread ranges, because, as the evidence establishes,
they were the persons within Metals and Barrick with knowledge and control over both the
acquisition costs and retail prices. SUF ¶¶ 165–74; *cf. SEC v. Seghers*, 298 F. App'x at 330
(concluding that there was "sufficient evidence for a jury to conclude defendant had made
statements" when the third-party who sent the statements to investors had "no other source for
those values").

    In addition, Asher and Batashvili controlled nearly every other aspect of the sales
process, including: purchasing the coins from wholesalers, SUF ¶¶ 166–72; acquiring and
distributing leads, SUF ¶ 159; hiring, training, supervising, and firing sales representatives, SUF
¶¶ 8, 145–47, 149–50, 152–54, 161–62; supplying the content for customer communications in
the form of daily meetings, scripts, and direct instructions, SUF ¶¶ 156–57; setting the type,
quantity, and pricing for investor transactions, SUF ¶ 173; and deciding if, how much, and at
what price Metals would repurchase coins from investors, SUF ¶ 175. Such facts are more than
sufficient to establish that Asher and Batashvili had the power to control the fraudulent
solicitations and transactions at issue.

    Moreover, Individual Defendants also knowingly induced or did not act in good faith,
because, as set forth above, they failed to maintain an adequate compliance program. *R.J.
Fitzgerald & Co., Inc.*, 310 F.3d at 1334 (finding principal who "exercised the ultimate choice-
making power within firm regarding its business decisions" liable as a controlling person where
he "reviewed and approved the activities" that "violated the Act and its regulations" because he

had the "power and authority to prevent the conduct" or to "alter its content to comply with the extant law"); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1350–51 (S.D. Fla. 2014) (finding on summary judgment that individual defendants controlled their relevant entities and induced companies to violate CEA); *CFTC v. Southern Trust Metals, Inc.*, 180 F. Supp. 3d 1124, 1132 (S.D. Fla. 2016) (granting partial summary judgment and finding that individual defendant owner was a controlling person and induced companies to violate CEA).

### 3. Metals And Barrick Operated As A Common Enterprise And Are Liable For Each Other's Violations of Law

Defendants are jointly and severally liable for their violations of law because the entities and individuals operated and functioned as a common enterprise. When entities and individuals operate as a common enterprise, each may be held liable for the unlawful acts and practices of other members of the enterprise. *See, e.g., FTC v. E.M.A. Nationwide, Inc.,* 767 F 3d 611, 636–37 (6th Cir. 2014) (finding a common enterprise where each of the corporate and individual defendants made up a "messy maze of interrelated business entities"); *CFTC v. Int'l Fin. Servs.,* 323 F. Supp. 2d at 508 (common enterprise existed where one company created another and capitalized it to transact the same business at the direction of the same corporate officers and directors); *CFTC v. Wall Street Underground, Inc.,* 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (individual and others held to be part of a common enterprise where each of them operate as a "single economic entity").

In determining whether a "common enterprise" exists, courts look to a variety of factors, including but not limited to: (1) common control, (2) the sharing of office space, (3) common employees, (4) commingling of funds, (5) whether business is conducted through a maze of interrelated companies, and (6) sharing advertising and marketing. *See, e.g., CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38–39 (D.D.C. 2015) (quoting *E.M.A. Nationwide,*

*Inc.,* 767 F.3d at 637) (finding common enterprise where two entities were under common control, shared offices on multiple occasions, and intermingled funds); *FTC v. Kennedy,* 574 F.Supp.2d 714, 722 (S.D. Tex. 2008) (citing *FTC v. AmeriDebt, Inc.*, 343 F.Supp.2d 451, 462 (D. Md. 2004)) (FTC adequately pled common enterprise theory where it alleged that there was a common control group, that business was transacted through a member of interrelated companies, and that there was commingling of corporate funds, unified advertising, and/or other facts that revealed no real distinction between the entities in question.); *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (non-dispositive facts that the court found to plausibly support the existence of a common enterprise included:  (1) maintaining offices and employees in common, (2) operating under common control, (3) sharing offices, (4) commingling funds, and (5) sharing advertising and marketing); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (found common enterprise where there was no dispute that corporate defendants were controlled by the same persons and shared the same business address and office space).

Barrick and Metals are a common enterprise with little to no distinction between the ownership and operations. Barrick and Metals have common ownership and control by Asher and Batashvili. SUF ¶¶ 7, 119, 144. Barrick was incorporated on August 20, 2019, after the issuance of state enforcement actions against Metals. SUF ¶¶ 111–13, 118. Through Barrick, Individual Defendants continued the same fraudulent scheme that they perpetrated at Metals. SUF ¶¶ 118–43. As one sales representative put it, "Nothing" changed about the workplace once Metals transitioned to operating under the name Barrick. APP 686. Many of the same "sales representatives and other employees or agents of Metals" later "performed the same work for Barrick as they did for Metals." SUF ¶ 8.

In sum, Batashvili and Asher used both Metals and Barrick interchangeably to perpetuate the fraudulent scheme. Defendants' business activities were inextricably intertwined and no real distinction existed between them. The evidence demonstrates that Defendants operated as a common enterprise, and are, thus, jointly and severally liable for violations of the CEA, CFTC Regulations, and, as set forth below in Section IV.D, the laws of the Plaintiff States.

**D.   Defendants Violated State Commodities Laws (California – Count IX; Colorado – Count X; Florida – XIII; Georgia – Counts XVI & XVII; and South Carolina – Counts XXVI & XXVII)**

Five states (California, Colorado, Florida, Georgia, and South Carolina) brought claims for commodities fraud against the Defendants. Georgia and South Carolina also brought commodities registration charges. Generally, these states' commodities statutes are based on the Model State Commodity Code. The exception is Florida, whose statute simply creates a state law violation for violations of the CEA. *See* Fla. Stat. § 517.275. These state laws are to be construed "to maximize coordination with federal law and other states' laws and the administration and enforcement thereof." Colo. Rev. Stat. §11-53-111; Ga. Code Ann. § 10-5A-9; S.C. Code Ann. § 39-73-90; *see also Kamen v. Lindly*, 94 Cal.App.4th 197, 203 (2001).

The precious metals in this matter are explicitly included in the definition of "commodities". *See* Cal. Corp. Code §§ 29504 & 29515; Colo. Rev. Stat. §§ 11-53-102(4) & (13); Ga. Code Ann. §§ 10-5A-1(3) & (12); S.C. Code Ann. §§ 39-73-10(4) & (13). The transactions in this case also involve commodity contracts, which include "any account, agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for use or consumption by the offeree or purchaser, of one or more commodities . . . ." Cal. Corp. Code § 29505; Colo. Rev. Stat § 11-53-102(5); Ga. Code Ann. § 10-5A-1(4); S.C. Code Ann. § 39-73-10(5). Commodity contracts are presumed to be sold for investment

purposes. *Id.* Metals and Barrick customers entered into contracts to purchase precious metals for investment purposes. *See* SUF ¶¶ 48, 65, 134.

State commodity statutes also provide for control person liability. *See* Cal. Corp. Code § 29552 (imposing liability on persons who materially assist in the violations); Colo. Rev. Stat. §11-53-109(2); Ga. Code Ann. § 10-5A-7(b); S.C. Code Ann. § 39-73-70(B). Corporate entities, such as Metals and Barrick, are liable for the acts of their agents. *See* Colo. Rev. Stat § 11-53-109(1); Ga. Code Ann. § 10-5A-7(a); S.C. Code Ann. § 39-73-70(B). Since Asher and Batashvili both were control persons over Metals and Barrick, they are responsible for the fraudulent acts of the corporate Defendants and their agents.

> **1.    Defendants Committed Commodities Fraud In Violation Of State Law (California – Count IX; Colorado – Count X; Florida – Count XIII; Georgia – Count XVII; and South Carolina – Count XXVII)**

The laws of Colorado, Georgia, and South Carolina provide that no person shall directly or indirectly in connection with the solicitation, offer, purchase, or sale of any commodity contract: "(1) . . . employ any device, scheme, or artifice to defraud any other person; (2) . . . make any untrue statement of a material fact or fail to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (3) engage in any transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operates or would operate as a fraud or deceit upon any person; or (4) willfully misappropriate or convert the funds, security, or property of any other person in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract . . . ."[10]

---

[10] California brings claims only for violations of definitions (1) – (3). As discussed below, each of these definitions under California law also include a willfulness element. *See* Cal. Corp. Code § 29536. Additionally, South Carolina does not require willful intent in its prohibition of

*See* Colo. Rev. Stat. §11-53-107(1)(a)—(c); Ga. Code Ann. § 10-5A-6; S.C. Code Ann. § 39-73-60(1)-(4). California's commodity fraud statue is substantially similar except it includes the sale or purchase of a commodity (in addition to commodity contracts) and requires that each act must be done willfully. *See* Cal. Corp. Code § 29536.

Unlike Rule 180.1, the state commodity fraud statutes do not require scienter. Instead, subparagraph (4) requires "willful" conduct in Georgia, and subparagraphs (1)–(3) require "willful" conduct in California. South Carolina and Colorado do not require "willful" conduct; the fraudulent act itself is prohibited. *See* Colo. Rev. Stat. § 11-53-107; S.C. Code Ann. § 39-73-60. Willfulness is "simply a purpose or willingness to commit the act, or make the omission referred to" not acting with knowledge of violating law, injuring another, or acquiring any advantage. *See* Cal. Penal Code § 7; *Brown v. State Dep't of Health*, 86 Cal.App.3d 548, 554 (1978) (relying on Penal Code § 7 in a civil case); *People v. Simon*, 9 Cal.4th 493, 515–16 (1995). Defendants committed commodity fraud through the same material misrepresentations and omissions that violated the CEA. *See supra*, Section IV.B.

### 2. Defendants Failed to Register As Required Under State Commodities Laws (Georgia – Count XVI; and South Carolina – Count XXVI)

Both Georgia and South Carolina law provide that "[n]o person may sell or purchase or offer to sell or purchase a commodity under commodity contract or under commodity option or offer to enter into or enter into as seller or purchaser a commodity contract or a commodity option" unless that person meets certain registration exceptions, or, in Georgia, certify a minimum net worth to the Commissioner. *See* Ga. Code Ann. §§ 10-5A-2 and -3; S.C. Code Ann. § 39-73-20 and -30. Defendants, however, made no such filings and do not meet these

---

misappropriation or conversion of funds, security, or property of a person. *See* S.C. Code Ann. § 39-73-60(4).

exceptions. SUF ¶ 10; APP 1479. Moreover, these exceptions do not apply to any transaction or activity prohibited by the CEA or a CFTC Rule. *See id.*

**E. Defendants Violated State Securities Laws (Alabama – Counts II, III & IV; California – Counts VII & VIII; Colorado – Count XI; Georgia – Counts XIV & XV; Kentucky – Counts XVIII & XVIX; Maryland – Counts XX, XXI, XXII & XXIII; South Carolina – Counts XXIV & XXV; and Texas – Counts XXVIII & XXIX)**

Both state and federal securities laws are interpreted flexibly and broadly to carry out their remedial purposes, not technically and restrictively. *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *Pinter v. Dahl*, 486 U.S. 622, 653 (1988). When it passed the federal Securities Act of 1933, Congress sought "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186 (1963)).

State laws encourage that each State Plaintiffs' securities acts be construed in conformity and consistently with the laws of other jurisdictions. *See* Md. Code Ann., Corps & Assn's § 11-804; *accord* Ala. Code 1975 § 8-6-23; Ky. Rev. Stat. Ann. § 292.530; Tex. Gov't Code § 4001.002; *cf.* Cal. Corp. Code § 25612.5; Colo. Rev. Stat. § 11-51-101(3); Ga. Code Ann. § 10-5-70(g); S.C. Code Ann. § 35-1-608. *See also Kamen v. Lindly*, 94 Cal.App.4th 197, 203 (Cal. Ct. App. 2001); *Mathews v. Cassidy Turley Md., Inc.*, 435 Md. 584, 604 (Md. 2013) (citing *Caucus Distrib., Inc. v. Md. Sec. Comm'r*, 320 Md. 313, 324-37 (Md. 1990)). State Plaintiffs' securities claims in this matter are based generally on provisions in the Uniform Securities Act.[11]

---

[11] All State Plaintiffs except California and Texas adopted a version of the Uniform Securities Act. However, the securities claims brought by California in this case follow the language of the Uniform Securities Act. *See* Uniform Securities Act (1956) as amended; Cal. Corp. Code §§ 25230, 25235. Also Texas's claims are substantively similar, s*ee* Tex. Gov't Code §§ 4004.052;

Where state case law is silent, the states look to federal case law applying the federal securities laws for guidance. *See, e.g.*, *Buffo v. State*, 415 So.2d 1158, 1162 (Ala. 1982); *Kamen v. Lindly*, 94 Cal.App. 4th 197, 203 (Cal. Ct. App. 2001); *Cagle v. Mathers Fam. Tr.*, 295 P.3d 460, 465 (Colo. 2013); Md. Code Ann., Corps. & Assn's § 11-804; *Mathews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 80 A.3d 269 (Md. 2013); *Majors v. South Carolina Securities Commissioner*, 644 S.E.2d 710, 715 (S.C. 2007); S.C. Code Ann. § 35-1-608; *Arnold v. Life Partners, Inc.*, 416 S.W.3d 577, 586 (Tex. App.—Dallas 2013) *aff'd*, 464 S.W.3d 660 (Tex. 2015). The emphasis on uniformity with federal and state law, and broad, flexible interpretation, is consistent with the investor-protection purposes of the States' securities acts.

The same conduct that violates state and federal commodities laws also violates these States' securities acts prohibitions against (1) fraud in connection with the sale of a security, (2) unlicensed investment advisory activity, and (3) investment advisory fraud. Control person liability exists for these violations as well. *See* Ala. Code 1975 § 8-6-2(24); Cal. Corp. Code § 25403; Colo. Rev. Stat. § 11-51-604(5)(b) & (c); Ga. Code Ann. § 10-5-58(g); Md. Code Ann., Corps & Assn's § 11-703(c)(1); S.C. Code Ann. § 35- 1-509(g); Tex. Gov't Code § 4008.102. Similarly, Individual Defendants "knowingly or recklessly provided substantial assistance" to another person in connection with an act, practice, or a course of business constituting a violation of this title." Md. Code Ann., Corps. & Assn's § 11-702(b), *accord* Cal. Corp. Code § 25403(b). Just as Individual Defendants knowingly and recklessly violated Rule 180.1, they are liable for providing substantial assistance as well for Metals' and Barrick's violations. Finally, Asher and Batashvili are liable for orchestrating this fraudulent scheme and making misrepresentations and

---

4007.152, and Texas's statute was adopted to "maximize coordination with federal and other states' laws." *Id.* § 4001.002.

material omissions in their roles at Metals and Barrick. *See, e.g.*, *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 305 (Ala. 1986) (employer vicariously liable for employee's fraud).

1. **Defendants Committed Securities Fraud In Violation Of State Laws (Alabama – Count IV; Colorado – Count XI; Georgia – Count XV; Kentucky – Count XVIX; Maryland – Count XXII; South Carolina – Count XXV; and Texas – Count XXIX)**

Securities fraud applies to "any person" (registered or otherwise, individual or corporation) who, directly or indirectly, (1) employs any device, scheme, or artifice to defraud, (2) makes material misrepresentations or omissions, or (3) engages in any act, practice, or course of business which operates as a fraud or deceit on any person, "in connection with" the offer, purchase, or sale of securities. *See* Ala. Code 1975 §§ 8-6-17(a)(2), 8-6-2(7); Colo. Rev. Stat. §§ 11-51-501(1), 11-51-201(12); Ky. Rev. Stat. Ann. §§ 292.320(1), 292.6501(4), Md. Code Ann., Corps. & Assn's §§ 11-301, 11-101(o); S.C. Code §§ 35-1-501(1)-(3), 35-1-102(20); Tex. Gov't Code § 4001.058. A person need not provide investment advice to commit securities fraud. *See id*.

The "sale" of securities includes investors selling securities and purchasing a non-security investment. *See Zandford*, 535 U.S. at 819–20 (applying securities fraud when the scheme to defraud and the liquidation of investors' securities coincide); *accord Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 85 (2006); *McGee v. SEC*, 733 F. App'x 571, 573 (2d Cir. 2018) (finding securities fraud when investor sold securities to purchase a non-security investment). With Defendants' assistance, investors sold securities in their original retirement accounts in order to open new SDIRAs to purchase precious metals from Defendants. SUF ¶¶ 48–57, 127.

Prohibited activity meets the "in connection with" requirement whenever it "touches" or "coincides" with a securities transaction. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* 547 U.S.

86

7at 85 ("[I]t is enough that the fraud alleged 'coincide' with a securities transaction.");

*Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13 (1971) ("deceptive

practices touching [a] sale of securities").

Defendants' conduct satisfies this requirement because the sale of securities by investors

was an integral aspect of the Defendants' fraudulent scheme. In *Zanford*, for example, the court

found the "in connection with requirement" was satisfied where a broker sold his customer's

securities and used the proceeds for his own benefit. Here, as in *Zanford*, Metals and Barrick

sales representatives encouraged investors to sell securities held in their retirement accounts to

use the proceeds to purchase precious metals from Defendants at exorbitant, undisclosed

Spreads. SUF ¶¶ 21–76, 100–03. Like *Zanford*, "the fraud was not complete before the sale of

securities occurred." *Id*. at 824–35.

State Plaintiffs' securities fraud statutes are modeled generally on the Uniform Securities

Act of 1956, which follows 17(a)(1)-(3) of the Securities Act of 1933. Like section 17(a), state

securities statutes only require scienter for violations of subsection (1), but not (2) and (3). *See*

*Aaron v. SEC*, 446 U.S. 680, 696–697 (1980); *Hohensee v. State of Maryland*, 42 Md. App. 329,

330 (1979) (emphasizing that the Maryland Securities Act is modeled on the Uniform Securities

Act of 1956); *In re Trivectra v. Ushijima*, 112 Haw. 90, 104, 144 P.3d 1 (Haw. 2006) (noting an

almost unanimous interpretation among Uniform Act states and citing cases from other states

lacking the *scienter* requirement); *Harrington v. Off. of Miss. Sec'y of State*, 129 So.3d 153, 162–

64 (Miss. 2013); *Enservco, Inc. v. Ind. Sec. Div.*, 623 N.E.2d 416, 423 (Ind. 1993); *Tirapelli v.*

*Advanced Equities, Inc*., 351 Ill. App. 3d 450, 455 (Ill. App. 2004); *Kittilson v. Ford*, 608 P.2d

264, 265 (Wa. Sup. Ct. 1980). Since Plaintiffs are entitled to summary judgment under the

CEA's higher scienter standard, the State Plaintiffs here are entitled to summary judgment here.

The three forms of securities fraud—(1) scheme liability, (2) material misrepresentations or omissions, (3) acts, practices, or courses of business that would operate as a fraud or deceit on any person—are otherwise generally similar to Rule 180.1 under the CEA. Reliance is not an element. *See SEC v. Blavin*, 760 F. 2d 706, 711 (6th Cir. 1985) (citing *SEC v. Lum's, Inc.,* 365 F.Supp. 1046, 1059 (S.D.N.Y. 1973)); *SEC v. North American Research & Develop. Corp.,* 424 F.2d 63, 84 (2d Cir. 1970); *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir. 1963); *Harrington v. Off. of Mississippi Sec'y of State*, 129 So.3d 153, 169–70 (Miss. 2013). These categories are not mutually exclusive, and conduct can violate multiple subsections. *Lorenzo v. SEC*, 587 U.S. 71 (2019). Subsections (1) and (3) "capture a wide range of conduct." *Id.* at 79.

With respect to subsection (2) "the burden of not making untrue statements of material fact, and not omitting to state material facts, is placed on any person connected with the offer, sale, or purchase of any security." *Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 737 (Colo. App. 2009) (citing *Western–Realco Ltd. P'ship 1983-A v. Harrison*, 791 P.2d 1139, 1144 (Colo. App. 1989)). A fact is "material" if a reasonable person would attach importance to that fact, or if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the "total mix" of information available, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445–46, 449 (1976); *accord People v. Pendergast*, 87 P.3d 175 (Colo. App. 2003) (citing *Goss v. Clutch Exchange, Inc*., 701 P.2d 33, 36 (Colo. 1985)). When the statement or omission is so obviously important to an investor that reasonable minds cannot differ on the question of materiality, the Court can determine materiality as a matter of law. *See*, *e.g., SEC v. Alliance Leasing Corp.*, 28 F. App'x 648, 652 (9th Cir. 2002) (failure to disclose 30% commissions material as a matter of law).

Like Defendants' failure to disclose 30% commissions in *SEC v. Alliance Leasing Corp.*, Defendants' failure in this case to disclose the Spread to investors is material here. *See* 28 F. App'x 648, 652 (9th Cir. 2002). The Spread affects the price and price of an investment is material. *See CFTC v. Gorman*, 587 F.Supp.3d 24, 46 (S.D.N.Y. 2022) (discussing price manipulation and noting that "someone commits securities fraud by stating half-truths, which are 'literally true statements that create a materially misleading impression'"). Since the state standard for materiality is the same as the CEA, Defendants other misrepresentations and omissions are material as well, and their conduct violates all three securities fraud subsections.

Defendants' undisputed misrepresentations are not puffery. "Statements are non-actionable puffery when they are 'of the vague and optimistic type . . . and contain no concrete factual or material misrepresentations.'" *Oklahoma Firefighters Pension and Retirement System v. Six Flags Entertainment Corp.*, 58 F.4th 195, 220 (5th Cir. 2023) (citations omitted). Defendants made concrete factual, material misrepresentations. The difference between the false Spread disclosed by Defendants and the actual, exorbitant, undisclosed Spread is mathematically certain and certainly material. Similarly, a false representation that investors could access their funds at any time, when they could not, is concrete. Moreover, failure to disclose any risks, the true value of Polar Bear Bullion, and sales representatives commission-based compensation are also cold, hard factual omissions. Finally, misrepresentations about the safety and security of Polar Bear Bullion are not puffery when it is mathematically calculable that Defendants' victims suffered massive losses immediately upon making their investment due to the undisclosed Spread charged by Defendants. The materiality is clear where a reasonable investor would want to know the actual Spread before purchasing precious metals from Defendants.

Far more abstract misrepresentations have been held actionable by courts. "General statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Glazer Cap. Mgmt. L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (citations omitted). In *Glazer,* such actionable, general statements include representations that sales representative numbers were "tracking very well against our sales productivity" and "a very large pipeline" of potential deals that would likely close by the end of the year, when the facts established that the number of sales representatives were shrinking and the company pressured sales representatives to inflate the number of deals in the pipeline. *Id.* at 770–71. Defendants' misrepresentations are more concrete than these actionable misrepresentations.

2.     **Defendants Failed To Register As Investments Advisers and Investment Adviser Representatives As Required Under State Law (Alabama – Count II; California – Count VII; Georgia – Count XIV; Kentucky – Count XVIII; Maryland – Counts XX & XXI; South Carolina – Count XXIV; and Texas – Count XXVIII)**

Every State Plaintiff law includes the federal definition of "investment adviser" ("IA"). *Compare* 15 U.S.C. § 80b-2(a)(11) *with* Ala. Code 1975 § 8-6-2(18); Cal. Corp. Code § 25009; Ga. Code Ann. § 10-5-2; Ky. Rev. Stat. Ann. § 292.310(11); Md. Code Ann., Corps. & Assn's § 11-101(i)(1); S.C. Code Ann. § 35-1-102(15); Tex. Gov't Code § 4001.059. An "investment adviser" is a person who, (1) for compensation, (2) engages in the business of (3) providing advice to others or issuing reports or analyses about securities. *Id*. Once a person is an IA to at least one client, the Advisers Act applies to all their client relationships. *See SEC v. Amah*, No. 7:21-cv-6694, 2023 WL 6386956, at *18 (S.D.N.Y. Sept. 28, 2023). "Puffery" is not a defense to the provision of unlicensed investment advice. Rather, as described previously, the concept of puffery deals with vague and optimistic statements that contain no concrete misrepresentations. Plaintiffs are aware of no decisions applying puffery to investment advice.

First, the compensation requirement is met with any economic benefit and need not be a separate advisory fee. *See Applicability of the Investment Advisers Act of 1940*, Advisers Act Rel. No. 1092, 52 Fed. Reg. 38400-01, 1987 WL 154624 (F.R.) (Oct. 16, 1987) ("Advisers Act Rel. No. 1092") at 10; *United States v. Elliott*, 62 F.3d 1304, 1311 (11th Cir. 1995) (holding receipt of any compensation is enough); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 653 (D. Conn. 2018) (citing *United States v. Ogale*, 378 F. App'x 959, 960–61 (11th Cir. 2010)). It is undisputed that Defendants received substantial commissions and fees in the form of undisclosed Spreads on Polar Bear Bullion and Barrick Bullion. SUF ¶¶ 72–76, 130.

Second, a person engages in the business of providing advice when the advice is provided with "some regularity," but the advice "need not constitute the principal business activity or any particular portion of the business activities of a person." Advisers Act Rel. No. 1092, at 5–6; *Zinn v. Parish*, 644 F.2d 360 (7th Cir. 1981). Factors include whether a person holds themselves out as an IA, the frequency, and specificity of the investment advice provided, and whether the person receives a separate fee for investment advice. *See* Advisers Act Rel. No. 1092, at 8–9.

Defendants provided investment advice as a regular part of their business. The undisputed facts include sworn affidavits from 48 separate investors consistently describing the advice provided to them. *See* APP 1–590. Individual Defendants do not dispute this evidence of consistent, regular investment advice. Specifically, Defendants' principal business was advising investors personally to sell their securities, SUF ¶¶ 40–57, transferring investors' funds to a SDIRA, SUF ¶¶ 48–57, and swindling substantial amounts of their retirement savings through undisclosed Spreads. SUF ¶¶ 72–76, 100–03, 129–35. Moreover, Defendants advised investors to open SDIRA accounts, SUF ¶¶ 49–50, selected SDIRA custodians and depositories, *id.*, helped set up the SDIRAs, SUF ¶ 51, facilitated liquidating securities, SUF ¶¶ 52–54, and

controlled investors' SDIRA accounts as their designated representative, SUF ¶ 51.[12]  The

investment advice described here and in the below paragraph were integral to Defendants' boiler

room scheme.

The final prong is satisfied when the advice includes "the relative advantages of investing

in securities in general as compared to other investments" or "the desirability of investing in,

purchasing or selling securities, as opposed to, or in relation to, any non-securities investment[.]"

Advisers Act Rel. No. 1092, at 6. The assets acquired by an investor need not be securities if the

advice relates to securities. *See Living Benefits Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916

F.3d 528, 534 (5th Cir. 2019) (interpreting securities advice to include "both positive and

negative advice," noting that "reading it otherwise . . . would categorically exclude those who

advise against trading in securities, which would make little policy sense"); *Dow Theory*

*Forecasts*, SEC Staff No Action Letter 1978 WL 9779 (Feb. 2, 1978) (industry trends and

market-timing advice is advice about securities); *Sinclair-deMarinis*, SEC No-Action Letter

1981 WL 24975 (May 1, 1981) (advice concerning the advisability of investing in metals relative

to securities may be investment advice); *SEC v. Washington Investment Network,* 475 F.3d 392

(D.C. Cir. 2007) (asset allocation advice is investment advice); *see also* Regulation of

Investment Advisers by the U.S. Securities and Exchange Commission (March 2013), available

at https://www.sec.gov/about/offices/oia/oia_investman/rplaze-042012.pdf.[13]

Defendants extensively provided such "negative securities advice" along with allocation

advice. Defendants advised clients as to the value of securities, the advisability of selling

---

[12] Barrick provided the same regular investment advice as Metals. SUF ¶¶ 126–27.

[13] SEC no-action letters are persuasive authority. *See Roth v. Foris Ventures, LLC*,
86 F.4th 832, 836 (9th Cir. 2023).

securities, and encouraged investors to liquidate their securities holdings to buy precious metals. SUF ¶¶ 36–47. They advised about stock market trends, that traditional IRAs would be subject to government seizure or would collapse, discussed the disadvantages of investing in securities versus other types of investments, advised that precious metals would be a better or safer investment vehicle than securities, claimed that the tax benefits of precious metals were superior to securities, and provided advice that investors should allocate as much of their savings as possible to the purchase of precious metals. *Id.* ¶¶ 36–47. Above all, Defendants personally advised investors to sell their securities and buy Polar Bear Bullion and Barrick Bullion. SUF ¶¶ 36–49. These consistent, detailed, voluminous, and undisputed facts are investment advice. Defendants provide no evidence to the contrary, nor can they because Individual Defendants invoked their Fifth Amendment rights.

Individual Defendants also acted as investment adviser representatives ("IARs"). An IAR is any partner, officer, director (or a person performing similar functions) or other individual employed by an IA who: makes recommendations or renders advice regarding securities; manages client accounts; determines which recommendations or advice regarding securities should be given; solicits, offers, or negotiates for the sale or sells investment advisory services; or supervises employees who perform any of these duties. *See* Ala. Code 1975 § 8-6-2(19); O.C.G.A. § 10-5-2(19); Cal. Corp. Code § 25009.5; Md. Code Ann., Corps & Assn's § 11-101(j); § 8-6-2(19); S.C. Code Ann. § 35-1-102(16); Tex. Gov't Code § 4001.060. Asher and Batashvili were both principals of the Corporate Defendants, SUF ¶¶ 5–8, supervised the employees that gave investment advice, SUF ¶¶ 5–6, 149-64, and designed the sales scripts used by those employees to provide investment advice. SUF ¶ 157. They are textbook IARs.

93

IAs and IARs must register with the state before providing investment advice. *See* Ala. Code 1975 § 8-6-3(b) and (c); Cal. Corp. Code § 25230(a); Ga. Code Ann. § 10-5-32; Ky. Rev. Stat. Ann § 292.330(8); Md. Code Ann., Corps. & Assn's § 11-401(b)(1); S.C. Code Ann. § 35-1-403(a) & 35-1-404(a); Tex. Gov't Code § 4004.052. In addition, Maryland prohibits an IA from employing an unregistered IAR. *See* Md. Code Ann., Corps & Assn's § 11-402(b)(1). It is undisputed that no Defendant or their employees registered as an IA or IAR, SUF ¶ 10. In fact, the Individual Defendants admitted on October 28, 2022, in their respective First Amended Answers to the Complaint that they have never been registered. *See* Batashvilli Am. Ans. at ¶¶ 119, 227, 229, 241, 243, 263, 265, 302, 317; Asher Am. Answer at ¶¶ 119, 227, 229, 241, 243, 263, 265, 302, 317.

### 3.    Defendants Committed Investment Adviser Fraud In Violation Of State Law (Alabama – Count III; California – Count VIII; Georgia – Count XV; Maryland – Count XXIII; South Carolina – Count XXIV; and Texas – Count XXIX)

These State Plaintiffs' IA fraud laws apply when a defendant receives consideration from another person for advising that person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise. *See* Ala. Code 1975 § 8-6-17(b)(2); Cal. Corp. Code § 25235; Ga. Code Ann. § 10-5-51; Md. Code Ann., Corps. & Assn's § 11-302; S.C. Code Ann. § 35-1-502; Tex. Gov't Code § 4007.152. Similar to the other fraud claims in this matter, IA fraud prohibits: (1) employing any device, scheme, or artifice to defraud any client or prospective client (California, Georgia, Maryland, South Carolina); (2) engaging in an act practice or course of business which operates or would operate as a fraud or deceit upon the other person (Alabama, California, Georgia, Maryland, South Carolina); (3) engaging in

dishonest or unethical practices (Maryland);[14] or (4) willfully making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (Maryland).[15] *Id.*[16]

IAs must make "full and fair disclosure of all material facts." *Capital Gains*, 375 U.S. at 194. "[W]hat is required is a picture not simply of the show window, but of the entire store[;] not simply truth in the statements volunteered, but disclosure." *Id.* at 201. An IA's "[f]ailure to disclose material facts must be deemed fraud or deceit." *Id.* at 200. "[P]roof of intent to injure and actual injury to the client" are not required. *Id.* at 195. Simple negligence suffices to prove a

---

[14] Maryland also alleged that Defendants committed dishonest and unethical practices as IAs, in particular violating their fiduciary duty to act in the best interest of its clients. *See* Md. Code Ann., Corps. & Assn's § 11-302; The Code of Maryland Regulations, COMAR 02.02.05.03B; *Capital Gains*, 375 U.S. at 191; *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y. 1996). Defendants, through their sales representatives, engaged in dishonest and unethical practices in breach of their fiduciary duty to their clients by: (1) making unsuitable recommendations to sell securities and buy precious metals that were not based on a reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known or acquired by the IA after reasonable examination of the client's financial needs (COMAR 02.02.05.03B(1)); (2) misrepresenting or omitting to state the fees charged (COMAR 02.02.05.03B(8)); and (3) guaranteeing that a certain or specific result will be achieved, for example, gain or no loss, as a result of their advice. (COMAR 02.02.05.03B(12)). It is undisputed that Defendants, through their sales representatives, engaged in all of these practices. SUF ¶¶ 36-47, 65-81, 100-103, 126-127, 129-135, 137-141.

[15] In Maryland, "willful" misrepresentations and omissions for the purposes of IA fraud means that "the person acted intentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate meaning of the law, or knowledge that the law was being violated, is not required." Uniform Securities Act § 204(a)(B) (amended 1956), 5524 Blue Sky Law Reporter 1549-50 (2004); *accord Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000); *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998); *Cox v. Gavin*, 278 Ga. 903, 906 (Ga. Sup. Ct. 2005). Since the undisputed misrepresentations and omissions in this matter also meet the higher burden of scienter under the CEA, they are also "willful" here. *See supra,* Section IV.B.2.

[16] Texas utilizes a slightly different definition that encompasses similar conduct. Texas prohibits, among other conduct: (1) any misrepresentation, in any manner, of a relevant fact; (2) an intentional failure to disclose a material fact; (3) unconscionable fees; and, (4) any scheme or artifice to obtain such profit, fee, or commissions. Tex. Gov't Code § 4001.058.

violation of § 206(2) of the Act. The same undisputed facts that constitute commodities and securities fraud also constitute IA fraud.

### F. Defendants Committed Unfair Or Deceptive Trade Practices (Alaska – Count VI; Florida – Count XII)[17]

Alaska and Florida's Unfair and Deceptive Trade Practice Acts (UDTPA) outlaw unfair or deceptive acts or practices in the course of trade or commerce. *See* Fla Stat. § 501.204; Alaska Stat. § 45.50.471(a). Unfairness and deceptiveness are extremely broad concepts, and the states' UDTPAs are liberally construed. *See TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1344 (M.D. Fla. 2013); *Merdes & Merdes, P.C. v. Leisnoi, Inc.*, 410 P.3d 398, 411 (Alaska 2017).

"Intent, scienter, actual reliance or damages, and even actual deception are unnecessary"; instead "[a]ll that is required is proof that a practice has a tendency or capacity . . . to deceive even a significant minority of consumers." *ASRC Energy Serv. Power and Comm., LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1163 (Alaska 2011); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000). An unfair trade practice is one which causes a risk of substantial injury, which is not outweighed by any countervailing benefits to consumers or competition that the practice provides, and which consumers could not reasonably have avoided. *Porsche Cars N. Am., Inc. v. Diamond*, 140 So.3d 1090, 1096 (Fla. Dist. Ct. App. 2014).[18] In

---

[17] Plaintiff State Alabama moved to dismiss Count V of the Complaint (ECF No. 945), which the Court granted. *See* Order dated Sept. 29, 2025 (ECF No. 946).

[18] Alaska law allows courts to consider "[a] variety of factors . . . including '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska 2007) (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980)); *see also Alaska Tr., LLC v. Ambridge*, 372 P.3d 207, 226

addition, to hold a corporate officer liable for monetary restitution, a plaintiff is also required to establish that the defendant had or should have had knowledge or awareness of the misrepresentations. *Amy Travel Serv.*, 875 F.2d at 574.

The same undisputed facts are also unfair or deceptive acts and practices committed against numerous Florida and Alaska investors.[19] Control person liability also applies to the Individual Defendants similar to other claims in this matter. *See, e.g.*, *FTC v. Standard Educ. Soc'y*, 302 U.S. 112 (1937); *FTC v. GEM Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).[20] As previously noted, it is undisputed that the Individual Defendants orchestrated the misrepresentations and omissions about, among other things, Polar Bear Bullion's Spread and markup, safety and security, risks, and value.

---

n.113 (Alaska 2016) ("[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser degree it meets all three").

[19] Defendants also violated several *per se* sections of Alaska's UDTPA, including conduct creating a likelihood of confusion or misunderstanding that misleads, deceives, or damages a buyer of goods, Alaska Stat. § 45.50.471(b)(11), the use of "deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission," *Id.* at (b)(12), and failing to register as a telephone solicitor, *id.* at (b)(35). Defendants, via their sales representatives, solicited investors via telephone, and encouraged them to liquidate their funds, establish SDIRA's, and purchase precious metals from Defendants, yet they never registered with the Alaska Department of Law. APP 5 at ¶¶ 2–10; 4 at ¶¶ 2–8.

[20] Both Florida and Alaska law require that courts give "due consideration and great weight . . . to the interpretations of the [Federal Trade Commission Act]." § 501.204(2), Florida Statutes; Alaska Stat. § 45.50.545.

### G. Defendants' Blanket Assertions Of The Fifth Amendment Preclude Them From Offering Contrary Evidence And Entitles The Court To Draw An Adverse Inference

By blanketly asserting their Fifth Amendment Privilege during discovery, Defendants Asher and Batashvili have deprived Plaintiffs of the opportunity to learn information relevant to the prosecution of their case. Specifically, Plaintiffs were unable to learn Defendants' version of events, to elicit their defenses, or to uncover information that could have led to additional avenues of discovery. Defendants should not now be allowed—after years of litigation—to break their silence and offer evidence they shielded during discovery in an effort to defeat summary judgment. Permitting such an eleventh-hour reversal would unduly prejudice Plaintiffs and is precisely the type of Fifth Amendment gamesmanship that courts routinely prohibit. Additionally, in weighing Plaintiffs' Amended Motion for Summary Judgment, the Court should draw an adverse inference against Defendants Asher and Batashvili.

#### 1. Defendants Cannot Offer Evidence Relating To Topics On Which They Asserted The Fifth Amendment

It is axiomatic that a party in a civil proceeding "may invoke the Fifth Amendment privilege during the discovery process to avoid answering questions at a deposition, responding to interrogatories or requests for admissions, or to produce documents." *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012). "Though constitutionally protected, a civil litigant's invocation of the privilege against self-incrimination during the discovery process is far from costless. It will, for example, always disadvantage opposing parties—at least to some extent— since it keeps them from obtaining information they could otherwise get." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995). In order to preserve the truth-seeking function of civil litigation and to prevent the privilege from being transformed from a shield into a sword, courts may exercise their

discretion to prohibit a party from later presenting evidence on topics about which they have refused to provide discovery. *See Dunkin' Donuts Inc. v. Taseski*, 47 F. Supp. 2d 867, 872–73 (E.D. Mich. 1999) (collecting cases holding that a "once a civil litigant invokes his Fifth Amendment privilege on an issue, he will be barred thereafter from introducing other evidence on that issue"); *FTC v. Williams, Scott & Assocs., LLC*, 679 F. App'x 836, 838 (11th Cir. 2017) (district court did not abuse its discretion in refusing to consider documentary evidence submitted by Defendant on summary judgment because it "asserts the same fact" defendant "refused to testify about at his deposition"); *Sanders v. Genesee Cnty.*, 605 F. Supp. 3d 969, 980 (E.D. Mich. 2022), *aff'd sub nom. Sanders v. Genesee Cnty., Michigan,* No. 22-1596, 2023 WL 4543488 (6th Cir. July 14, 2023) (barring litigant "from presenting any counter evidence concerning issues related to questions where he responded with his Fifth Amendment privilege").

As this Court has recognized, a litigant's "decision to assert his Fifth Amendment rights precludes him from offering a contrary account of events" on summary judgment. *See Langiano v. City of Fort Worth, Texas,* No. 4:21-cv-808, 2022 WL 6813630, at *11 (N.D. Tex. Sept. 10, 2022). "By hiding behind the protection of the Fifth Amendment as to his contentions, [a defendant] gives up the right to prove them." *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) (holding that defendant "forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials."). For example, in *Cymaticolor Corp.*, 106 F.R.D. 545 (S.D.N.Y. 1985), the SEC sought a "total preclusion order" preventing defendant from "offering into evidence any matter relating to the factual bases for his denials and defenses as to which he has asserted his fifth amendment rights." *Id.* at 549. The Court rejected defendants' request to limit the preclusion order to only "evidence that the SEC [had] not received from other sources,"

99

explaining that a limited order is "contrary to one of the purposes of discovery which is to ascertain the position of the adverse party on the controverted issues." *Id.* The Court explained:

> [I]t is irrelevant that the party seeking discovery already knows the facts as to which he seeks discovery. While the limited preclusion order would eliminate surprise regarding the existence of the evidence, ***surprise may still occur regarding the defendant's theory and use of the evidence***.

*Id.* (emphasis added).

Here, on the basis of their Fifth Amendment privilege, Asher and Batashvili refused during their depositions to answer any substantive questions and, in response to written interrogatories, declined to provide the factual bases of asserted denials. SUF ¶¶ 185–88. Having thwarted Plaintiffs' attempts at reasonable and relevant discovery, Defendants should not now be permitted to mount a surprise defense. Such a surprise attack would convert the Fifth Amendment privilege from a shield to a sword and undermine the discovery process provided for under the Federal Rules of Civil Procedure. *See Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 (5th Cir. 1979) ("The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do.").

Accordingly, the Court should preclude Defendants Asher and Batashvili from offering any evidence on summary judgment about topics as to which they previously asserted their Fifth Amendment rights.

### 2.    The Court Should Draw An Adverse Inference Against Defendants

Consistent with the Fifth Amendment, a finder of fact may draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v Palmigiano*, 425 U.S. 308, 318 (1976); *Hinojosa v. Butler*, 547

F.3d 285, 295 (5th Cir. 2008) ("[I]t is well settled that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.") (internal quotations and citations omitted); *Vestas-Am. Wind Tech., Inc. v. Salazar*, No. 6:19-cv-76, 2021 WL 1399296, at *3 (N.D. Tex. Feb. 1, 2021) ("While parties are free to invoke their Fifth Amendment right in civil cases, a court is equally free to draw adverse inferences from that invocation.").

The adverse inference, generally stated, is that the witness' testimony, had it been given, would have been unfavorable to the witness' interests. *See, e.g.*, *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 266 (5th Cir. 2014) (jury instructed that witness' refusal to answer questions meant his answers would have been adverse to his interests); *Hassan v. City of Shreveport*, No. 5:15-cv-2820, 2018 WL 3028951, at *6 (W.D. La. June 18, 2018) ("When a party testifies at a civil trial, admission of the [Fifth Amendment] privilege takes the form of an instruction that the jury may infer that the answer to a question as to which the party has invoked the privilege would be unfavorable to that party."); *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, No. 4:10-cv-04872, 2017 WL 3236110, at *15 (S.D. Tex. July 31, 2017) (holding court properly instructed jury that it may draw an adverse inference to infer that witness' "testimony would have been unfavorable to the Defendants").

Courts may draw an adverse inference against a defendant not only at trial, but also at the summary judgment stage provided there is independent evidence that supports the finding of fact. *See SEC v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524, 532 (E.D. Tex. 2017) ("inference is available to the court on summary judgment"), *aff'd sub nom. SEC v. Sethi*, 910 F.3d 198 (5th Cir. 2018); *SEC v. Milles*, No. 1:19-cv-714-RP, 2022 WL 206808, at *6 (W.D. Tex. Jan. 24, 2022), *appeal dismissed*, No. 22-50736, 2023 WL 8253756 (5th Cir. Nov. 29, 2023) (granting

SEC's motion for summary and "draw[ing] an adverse inference based on Defendants' failure to respond to the SEC's incriminating evidence during discovery, as the SEC has provided ample evidence to bolster the inference and Defendants have not directed the Court to any evidence that would dispute their liability").

Here, Asher and Batashvili had many opportunities to contest Plaintiffs' assertions that they committed the violations alleged in the Complaint. The deposition questions and interrogatories comprehensively addressed the fraud allegations in the Complaint. At each opportunity, Asher and Batashvili invoked their privilege against self-incrimination and declined to answer. Their silence deprived Plaintiffs of the opportunity to learn Defendants' version of the facts and the ability to explore and pressure-test any of their denials, explanations, or defenses. Accordingly, the Court is entitled to infer that, if Asher and Batashvili had answered the questions asked, the answers would have been adverse to their interests. *See SEC v. Silea*, No. 4:20-cv-737-SDJ, 2022 WL 269105, at *12 (E.D. Tex. Jan. 27, 2022) (finding "evidence of scienter" was "reinforced by the adverse inference to be drawn from their repeated invocation of the Fifth amendment right against self-incrimination during their depositions"). When considered in the context of the other evidence marshalled by Plaintiffs in support of this Motion, Asher and Batashvili's silence is damning. *Baxter*, 425 U.S. at 318 ("[S]ilence is often evidence of the most persuasive character."); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) ("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader.").

## V.        RELIEF REQUESTED

The Court has broad discretion to grant the relief sought here, and the Act provides the

statutory basis for the Court to impose a permanent injunction, restitution, and civil monetary

penalty. As discussed below, all such relief is warranted here.

### A.        A Permanent Injunction Is Warranted

Under the Act, Plaintiffs may seek a permanent injunction "[w]henever it shall appear to

the Commission that any . . . person has engaged, is engaging, or is about to engage in any act or

practice constituting a violation of any provision of this chapter or any rule, regulation, or order

thereunder." 7 U.S.C. § 13a-1(a). In actions for a statutory injunction, such as this, the CFTC

"need not prove irreparable injury or the inadequacy of other remedies as required in private

injunctive suits." *CFTC v. Mueller*, 570 F.2d 1296, 1300 (5th Cir. 1978). "The CFTC is entitled

to injunctive relief upon a showing of illegality," and a "'reasonable likelihood' of future

violations." *CFTC v. Walsh*, No. 1:20-cv-725, 2021 WL 4058913, at *3 (W.D. Tex. May 24,

2021) (citing *Mueller,* 570 F.2d at 1300; *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

A district court may infer a reasonable likelihood of future violations based on a

defendant's past unlawful conduct. *See, e.g.*, *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765,

784 (5th Cir. 2017) (permanent injunctions must be premised on inferring from a defendant's

past conduct "that, in light of present circumstances, there is a 'reasonable likelihood' of future

transgressions" (citations omitted))*; CFTC v. Cornett*, No. 1:12-cv-106, 2012 WL 4757871, at

*8 (W.D. Tex. Aug. 24, 2012) (Yeakel, J.) (granting default permanent injunction upon finding

"reasonable likelihood" that the defendant would continue to violate the Act and Regulations

given the egregiousness of his past conduct). In determining whether a "reasonable likelihood"

of future violations exists, courts generally consider (1) the egregiousness of the defendant's

conduct, (2) the isolated or recurrent nature of the violation, (3) the degree of scienter, (4) the sincerity of the defendant's recognition of his transgression, and (5) the likelihood of the defendant's job providing opportunities for future violations." *SEC v. Woodley*, No. 4:15-cv-2767, 2018 WL 3303167, at *2 (S.D. Tex. July 7, 2018).

Here, there is ample evidence to support a permanent injunction in this case, including permanent registration and trading bans against Defendants Asher and Batashvili, as set forth in the proposed order submitted herewith. As described above, Defendants repeatedly made misrepresentations and omissions both in writing and orally through Metals and Barrick sales representatives, including about the Spread, value of the coins, risk, likelihood of profit, and the fact that Metals was the subject of multiple state enforcement actions related to its sales practices. *See supra* Section III.D–III.E. It is undisputed that Asher and Batashvili were controlling persons of the corporate entities (a fact they admit to in their amended answers) and controlled their sales representatives' communications with potential and existing investors. *See supra* Section III.H. Asher and Batashvili systematically violated the Act and continued to fraudulently solicit customers even after receipt of numerous cease and desist letters from various state authorities. *See supra* Section III.E–III.F. Their conduct was intentional and is unlikely to be deterred absent an order by this Court. Given the systematic nature of the past conduct, the high degree of scienter involved, Defendants' failure to accept responsibility, and a lack of any constraints on future misconduct, there is a reasonable likelihood that both Defendants will engage in future violations.

## B.    Restitution And A Civil Monetary Penalty Are Warranted

Section 6c of the Act, 7 U.S.C. § 13a-1, authorizes Plaintiffs to seek both restitution and civil monetary penalties ("CMPs"). Although the Court must make an independent determination

regarding damages, an evidentiary hearing is not required "where the amount claimed is a liquidated sum or one capable of mathematical calculation." *Leedo Cabinetry v. James Sales & Distrib., Inc.*, 157 F.3d 410 (5th Cir. 1998) (quoting *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993)). The Court may rely on affidavits or documentary evidence in the record to determine the appropriate sum. *See James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993) (finding damages "could be computed with certainty by reference to the pleadings and supporting documents alone, rendering an evidentiary hearing unnecessary"); *see also CFTC v. Mirror Trading Int'l Proprietary Ltd.,* No. 1:22-cv-635, 2023 WL 3190336, at *16–17 (W.D. Tex. Apr. 24, 2023) (ordering default judgment and awarding requested equitable relief, including restitution and a civil monetary penalty, based on consideration of the record and filings); *CFTC v. Walsh*, 2021 WL 4058913, at *4 (ordering default judgment and awarding requested equitable relief, including the statutory maximum CMP amount for each of the charged counts, based on consideration of the record and filings). Here, the court-appointed Receiver's calculations of customer losses—already approved by the Court—provide the necessary support for the Court to ascertain the amount of restitution and CMP appropriate in this case.

### 1.    Restitution

Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3), authorizes Plaintiffs to seek, and the Court to order, "restitution to persons who have sustained losses proximately caused by [a] violation [of the Act or Regulations] (in the amount of such losses)." Restitution exists to restore the status quo and make the injured party whole. *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946) (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant"); *CFTC v. Madonado*, No. 4:20-cv-3185, 2021 WL 4295250, at *9 (S.D. Tex. Sept. 21, 2021). Accordingly, courts calculate

restitution "as the difference between what Defendants obtained and the amount customers have already received back." *CFTC v. Ross*, No. 1:09-cv-5443, 2014 WL 6704572, at *3 (N.D. Ill. Nov. 26, 2014); *see also CFTC v. Driver*, 877 F. Supp. 2d 968, 981 (C.D. Cal. 2012) (finding that restitution exists to "restore the status quo" and reflects "the difference between what defendants obtained and the amount customers received back"). District courts routinely grant the CFTC's request for restitution on behalf of defrauded persons. *See, e.g.*, *CFTC v. Mirror Trading Int'l Proprietary Ltd.,* No. 1:22-cv-635, 2023 WL 3190336, at *16–17 (W.D. Tex. Apr. 24, 2023) (ordering default judgment and awarding requested equitable relief, including restitution of over $1.7 billion to defrauded customers); *CFTC v. Arrington*, 998 F. Supp. 2d 847, 874–75 (D. Neb. 2014) (granting summary judgment in favor of CFTC and ordering defendant to pay restitution as requested). Where, as here, a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution. *See McDonnell*, 332 F. Supp. 3d at 726–27 (holding that in cases of pervasive fraud under the Act, the appropriate calculation of restitution includes all customer losses even where only a subset of those customers testify to the losses they sustained on the grounds that reliance on defendant's fraud is presumed); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1352 (S.D. Fla. 2014) (determining in connection with violations of the Act and the Regulations that "[t]he systematic and pervasive nature of [the defendant's] fraud necessitates restitution not only for the retail customers who testified to the losses they sustained due to [the defendant's] scheme, but for all of [defendant's] customers as well").

According to the Receiver's analysis of claims by Defendants' customers, Defendants' violations resulted in them fraudulently receiving at least $68,158,731 from customers. Plaintiffs accept the calculations of the court-appointed Receiver, who was appointed with the full powers

of an equity receiver in this case in October 2020,[21] and has acted reasonably and diligently in carrying out his responsibilities. The Receiver identified customers who sent money to Defendants, responded to inquiries from customers who learned of the receivership through the website maintained by the Receiver, and reviewed claims submitted by customers, among other things. *See, e.g.*, Receiver's Claims Report (ECF No. 290); Receiver's Unopposed Motion to Approve Specific Amounts (ECF No. 865). Therefore, the Court should order Defendants to pay restitution, jointly and severally, in the amount of $68,158,731.

### 2. Civil Monetary Penalty

Finally, Plaintiffs request that the Court order Defendants to pay a CMP of three times the gain from their fraudulent conduct. Section 6(c)(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(b)(1), 17 C.F.R. § 143.8(b)(1) (2025), provide that the "the Commission may seek and the Court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the CEA], a civil monetary penalty in the amount of not more than the greater of $[227,220] or triple the monetary gain to the person for each violation."[22] "The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent." *CFTC v. Cloud*, No. 4:10-cv-706, 2011 WL 1157530, at *12 (S.D. Tex. Mar. 24, 2011). Civil penalties "signify the importance of

---

[21] Pursuant to the September 22, 2020 Statutory Restraining Order ("SRO"), the Court appointed Kelly Crawford as Temporary Receiver for the Receivership Defendants and their principles, Asher and Batashvili. *See* SRO (ECF No. 16). The Receiver assumed permanent status as the Receiver pursuant to Court's subsequent approval of Consent Orders of Preliminary Injunction against the Receivership Defendants and Defendants on October 14, 2020. *See* Receivership Defendants' Consent Order ¶¶ 27-29 (ECF No. 164); Individual Defendants' Consent Order ¶¶ 28-30 (ECF No. 165).

[22] Pursuant to 17 C.F.R. § 143.8(b)(1) (2025), the allowable inflation-adjusted civil monetary penalty is $227,220 per violation of the Act for non-manipulation claims brought in federal injunctive actions under 7 U.S.C. § 13a-1.

particular provisions of the Act and the Commission's rules" and also "remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost." *CFTC v. Total Call Grp., Inc*., No. 4:10-cv-513, 2012 WL 1642196, at *12 (E.D. Tex. Mar. 30, 2012) (citations omitted). Conduct that violates the core provisions of the CEA such as defrauding customers "should be considered very serious even if there are mitigating facts and circumstances." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995) (citations omitted).

Defendants' conduct in perpetrating a years-long fraudulent scheme through misrepresentations and omissions warrants the imposition of a significant CMP. They committed repeated violations of core antifraud provisions of the Act that caused significant monetary losses to over a thousand senior citizens and retirees. *See supra* Section IV.B. Given Defendants' egregious conduct, Plaintiffs request that the Court impose a CMP of $204,476,193 against Defendants, jointly and severally, which is equal to three times the investor losses of $68,158,731, together with post-judgment interest. *See, e.g., CFTC v. Ramos*, No. 3:20-cv-2985-X, 2021 WL 2806139, at *6 (N.D. Tex. July 6, 2021) (on default judgment, imposing CMP of three times the amount defendant received from pool participants); *CFTC v. Premium Income Corp.*, No. 3:05-cv-0416B, 2007 WL 429092, at *14 (N.D. Tex. Jan. 26, 2007) (on summary judgment, imposing CMP of "triple the monetary gain as measured by triple the amount of customer funds received by [defendants], less the funds returned to customers"); *CFTC v. Brisco*, No. 4:23-cv-336, 2024 WL 5198838, at *11 (S.D. Tex. July 26, 2024) (on default judgment, ordering CMP equal to triple defendant's monetary gain, as measured by "the total amount accepted into the [Defendant's] Pools, minus funds returned"); *CFTC v. Cosmo*, No. 2:09-cv-351, 2012 WL 5986525, at *3-4 (E.D.N.Y. Oct. 1, 2012) (on default, ordering maximum allowable CMP of $240 million (triple defendant's monetary gain), plus post-judgment interest,

based on finding that defendant's fraud violations were intentional and significantly harmed numerous investors). Such a penalty is clearly within the Court's statutory authority to impose, will protect the CFTC's regulatory scheme and integrity of the markets, and send a clear message to deter others from engaging in a similar, pervasive fraudulent scheme.

### 3.    Post-Judgment Interest

Plaintiffs are entitled to and seek post-judgment interest on any restitution and civil monetary penalty ordered by the Court, which accrues at the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of judgment. 28 U.S.C. § 1961(a).[23]

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court conclude that precious metals are commodities within the scope of the CEA, find that Asher and Batashvili engaged in fraud in violation of the CEA and violated Plaintiff States' laws; and enter summary judgment in favor of Plaintiffs against Defendants on Counts I–IV and VI–XXIX. In the alternative, the CFTC requests that the Court either (1) certify the issue of whether precious metals are commodities under CEA Section 1a for immediate appeal pursuant to 28 U.S.C. § 1292(b) and stay the case pending a decision by the Fifth Circuit Court of Appeals; or (2) enter a final judgment dismissing this case so that the CFTC can appeal this issue immediately.

---

[23] "Post-judgment interest is mandatory under 28 U.S.C. § 1961, which states that '[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court.'" *Sino Star Global Ltd. v. Shenzen Haoqing Tech. Co., Ltd.*, No. 4:22-cv-980, 2025 WL 1668216, at *6 (E.D. Tex. June 12, 2025) (citing *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 689 (5th Cir. 1989) ("Section 1961 applies to all civil cases in federal courts.").

Dated: December 18, 2025

Respectfully submitted,

By: /s/ Danielle Karst

DANIELLE KARST, *pro hac vice*
Associate Director
dkarst@cftc.gov
D.C. Bar No. 481881

TIMOTHY J. MULREANY, *pro hac vice*
Investigative Counsel
tmulreany@cftc.gov
Maryland Bar No. 8812160123

SARAH WASTLER, *pro hac vice*
Trial Attorney
swastler@cftc.gov
D.C. Bar No. 944534

Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581-0001
Phone: (202) 418-5000
Fax: (202) 418-5521

FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr.
JEFFERY A. "BEAU" BROWN, JR., *pro hac vice*
Beau.Brown@asc.alabama.gov
Alabama Bar No. 7258R80B

Attorney for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
Montgomery, AL 36104
Telephone: (334) 242-2984
Fax: (334) 242-0240

FOR THE STATE OF ALASKA

By: /s/ John Haley

110

JOHN HALEY, *pro hac vice*
john.haley@alaska.gov
Alaska Bar No. 1402010
HELEN MENDOLIA, *pro hac vice*
Helen.mendolia@alaska.gov
Alaska Bar No. 2405051

Attorney for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-3783
Fax: (907) 276-3697

FOR THE STATE OF ARIZONA
By: /s/ Elizabeth Schmitt

ELIZABETH SCHMITT, *pro hac vice*
eschmitt@azcc.gov
Arizona Bar No. 034699

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.
Phoenix, AZ 85007
Telephone: (602) 542-1922
Fax: (602) 714-8120

FOR THE STATE OF CALIFORNIA

By: /s/ Danielle A. Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dfpi.ca.gov
SEAN ROONEY
Sean.Rooney@dfpi.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice*
California Bar No. 264784
Danielle.Stoumbos@dfpi.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS
OVERSIGHT

111

(now known as the DEPARTMENT OF
FINANCIAL PROTECTION AND
INNOVATION)
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181

FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Graham Gerhart

ROBERT FINKE*
robert.finke@coag.gov
Colorado Bar No. 40756
GRAHAM GERHART*
graham.gerhart@coag.gov
Colorado Bar No. 57767
*Counsel of Record

FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ T. Victor Clark

T. VICTOR CLARK, *pro hac vice*
Deputy Attorney General
Delaware Bar No. 4233
victor.clark@delaware.gov

JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware

112

FOR THE STATE OF FLORIDA
JAMES UTHMEIER

Attorney General for the State of Florida

By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Diane Marger Moore, *pro hac vice*
Special Counsel, Assistant Attorney General
Diane.MargerMoore@myfloridalegal.com
Florida Bar No. 268364

Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

By: /s/ A. Gregory Melchior
A. GREGORY MELCHIOR, *pro hac vice*
Assistant General Counsel
Greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498

FOR THE STATE OF GEORGIA

By: /s/ Jonathan Loegel

JONATHAN D. LOEGEL, *pro hac vice*
Georgia Bar No. 755706
jloegel@law.ga.gov

113

RONALD J. STAY, *pro hac vice*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239
FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe
RAYNI M. NAKAMURA-WATANABE,
*pro hac vice*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977

FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
RAUL R. LABRADOR

By: /s/ Dallin Creswell

DALLIN CRESWELL, *pro hac vice*
Deputy Attorney General
dallin.creswell@ag.idaho.gov
Idaho Bar No. 7741

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 947-8731

114

Fax: (208) 334-4151

FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL

By: /s/ Meredith McCutcheon

MEREDITH McCUTCHEON, *pro hac vice*
Deputy Attorney General
Meredith.McCutcheon@atg.in.gov
Indiana Bar No. 32391-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 233-9357
Fax: (317) 232-7979

FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: /s/ Amanda K. Robinson
AMANDA K. ROBINSON, *pro hac vice*
Iowa Bar No. AT0006753
Compliance Attorney
amanda.robinson@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6475
Fax: (515)-654-6500

FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen
THOMAS E. KNUTZEN, *pro hac vice*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872

FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice*
Gary.stephens@ky.gov
Kentucky Bar No. 87740

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL
INSTITUITONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787

FOR THE STATE OF MAINE

By: /s/ Kathryn M. Horst

KATHRYN M. HORST, *pro hac vice*
Kathryn.Horst@maine.gov
Maine Bar No. 005495

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 287-3120

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN, ATTORNEY
GENERAL OF THE STATE OF
MARYLAND

116

By: /s/ Max F. Brauer

MAX F. BRAUER, *pro hac vice*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES
COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532

FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin

Aaron W. Levin, *pro hac vice*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-6755

FOR THE STATE OF MISSISSIPPI

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: /s/ James M. Rankin
JAMES M. RANKIN
James.Rankin@ago.ms.gov
Mississippi Bar No. 102332
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231

FOR THE STATE OF NEBRASKA
MICHAEL T. HILGERS
Attorney General

/s/ Christopher A. Felts
Christopher A. Felts, *pro hac vice*
Assistant Attorney General
Nebraska Bar No. 26784
christopher.felts@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-2682
Fax: (402) 471-3297

FOR THE STATE OF NEVADA

By: /s/ Shady Sirsy
Shady Sirsy, *pro hac vice*
Chief of Enforcement,
Nevada Securities Division
Nevada Bar No. 15818
s.sirsy@sos.nv.gov

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452

FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger

118

ALISSA N. BERGER, *pro hac vice*
New Mexico Bar No. 21769
ABerger@nmdoj.gov

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Regulation and Licensing
Department, Securities Division
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848

FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE
OF NEW YORK

By: /s/ Tatyana Trakht

TATYANA "TANYA" TRAKHT, *pro hac vice*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers

Attorney for Plaintiff
ATTORNEY GENERAL FOR THE STATE
OF NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816

FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

BRAD DAVENPORT, *pro hac vice*
bdavenport@securities.ok.gov
Oklahoma Bar No. 18687

119

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF
SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Andrew N. Cole

ANDREW N. COLE, *pro hac vice*
andrewcole@scag.gov
South Carolina Bar No. 68384

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-4731
Fax: (803) 734-7208

FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor &
Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1
Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369

FOR THE STATE OF TENNESSEE
JONATHAN SKRMETTI
Attorney General and Reporter for the State
of Tennessee

120

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice*
Senior Deputy Attorney General
TN B.P.R. No. 033599
james.urban@ag.tn.gov

BOTUM CHHAY, *pro hac vice*
Assistant Attorney General
TN B.P.R. No. 040083
botum.chhay@ag.tn.gov

PABLO A. VARELA, *pro hac vice*
Assistant Attorney General
TN B.P.R. 029436
pablo.varela@ag.tn.gov

Office of Tennessee Attorney General
Financial & Regulatory Section
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department
of Commerce and Insurance

FOR THE STATE OF TEXAS:

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

121

/s/ Stephanie A. Criscione Houser
STEPHANIE A. CRISCIONE HOUSER
Assistant Attorney General
General Litigation Division
Office of the Texas Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Texas Bar No. 24109768
Stephanie.criscione@oag.texas.gov
Telephone: (512) 936-1675
Fax:  (512) 320-0667


FOR THE STATE OF WASHINGTON

By: /s/ Stephen Manning

Stephen Manning, *pro hac vice*
stephen.manning@atg.wa.gov
Telephone: (360) 534-4846
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524


FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum

MICHAEL NUSBAUM, *pro hac vice*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES
COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305
Telephone: (304) 558-2251
Fax: (304) 558-4211

122

FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice

By: /s/ Lewis W. Beilin

LEWIS W. BEILIN, *pro hac vice*
Assistant Attorney General
Wisconsin Bar No. 1038835
beilinlw@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-3076
Fax: (608) 294-2907

*Attorneys for Plaintiff State of Wisconsin*