

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, *et al.,* | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:20-CV-2910-X |
| TMTE, INC. a/k/a METALS.COM, et al., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| TOWER EQUITY, LLC, | § | |
| | § | |
| Relief Defendant. | § | |

---

**DEFENDANTS LUCAS ASHER AND SIMON BATASHVILI'S**
**BRIEF IN SUPPORT OF THEIR AMENDED MOTION FOR SUMMARY JUDGMENT**

---

4916-1715-4691

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 2

TABLE OF AUTHORITIES ........................................................................................ 4

APPENDIX .................................................................................................................. 13

I.     INTRODUCTION ............................................................................................ 16

II.    BACKGROUND .............................................................................................. 18

III.   LEGAL STANDARD ...................................................................................... 20

IV.    ARGUMENT ................................................................................................... 21

    A.   The Plaintiffs Lack Authority to Prosecute their CEA Fraud Claims. ............ 21

       1.   Gold and Silver Are Not  "Commodities" Under the CEA. ........................ 21

         a.   Neither Gold nor Silver Fall Within the Statutory Definition
           of "Commodity." ................................................................................. 22

           i.    The Catchall Phrase in the CEA's Definition of Commodity
             Only Includes Organic Goods ......................................................... 25

           ii.   The CFMA Did Not Expand the CEA's Definition of "Commodity"
             to Include Gold, Silver, or Other Precious Metals ......................... 27

              A.   The CFMA Is Irrelevant in Interpreting the Earlier-Enacted
                 CEA ......................................................................................... 29

              B.   The CFMA Defined "Exempt Commodity" as a Sub-Class
                 of "Commodity." .................................................................... 29

              C.   The CFMA Curbed the CFTC's Jurisdiction Over Financial
                 Derivatives, Instead of Expanding It to Include Precious
                 Metals ..................................................................................... 29

         b.   Gold and Silver Do Not Fall Within the Original Public Meaning of
           "Commodity." ..................................................................................... 34

         c.   The CEA's Legislative History Is Not a Worthwhile Aid in
           Statutory Interpretation. ...................................................................... 37

         d.   The Court Should Not Defer to the CFTC's Own Regulations. ............ 38

         e.   The Fifth Circuit Has Not Held that "Commodity" Includes
           Inorganic Goods, such as Gold and Silver Coins. ............................... 41

         f.   The Nondelegation Doctrine Does Not Apply ..................................... 44

       2.   Under the Major Questions Doctrine, the CFTC Lacks Authority
        Over Non-Leveraged Spot and Forward Contracts to Sell Gold
        and Silver Coins. ........................................................................................ 45

         a.   The CFTC Claims Sweeping Authority Over Any Contract to
           Sell Any Commodity in Interstate Commerce. .................................... 45

      b.   This is a Major Questions Case. ................................................................... 49

      c.   The CEA Does Not Contain Clear Congressional Authorization to Make and Enforce Anti-Fraud Regulations Governing Non-Leveraged Contracts that Result in Actual Delivery. ............................................... 54

   3.  Precedent Mandates That Any Doubt be Resolved in the Individual Defendants' Favor. ........................................................................................ 57

B.  Plaintiffs Fail to State a Claim for Control Person Liability. ............................................ 58

C.  (Count I) Plaintiffs' Fraud Claim Fails as a Matter of Law. ............................................ 59

   1.  Plaintiffs' "Fraudulent Pricing" Theory Fails. ............................................................. 59

   2.  Many of the Alleged Statements or Omissions Are True or Not Misleading. ............. 66

   3.  Other Alleged Misstatements are Not Actionable. ..................................................... 67

   4.  Plaintiffs' Allegations that Customers Lost Money Are Baseless. ............................. 68

   5.  Other Alleged Misstatements Are Not Material. ....................................................... 71

   6.  Statements or Omissions About Retail Value of Coins ............................................. 71

D.  This Court Should Decline to Exercise Supplemental Jurisdiction over the State-Law Claims. ......................................................................................... 73

V.      CONCLUSION ...................................................................................................... 75

CERTIFICATE OF SERVICE ................................................................................... 76

4916-1715-4691

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**U.S. Supreme Court**

*Abramski v. United States,*
   573 U.S. 169 (2014) ................................................................................................38

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
   594 U.S. 758 (2021) (per curiam) ..........................................................49, 52, 53

*Atl. Cleaners & Dyers, Inc. v. United States,*
   286 U.S. 427 (1932) ................................................................................................28

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ................................................................................................67

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ....................................................................................... *passim*

*BNSF Ry. Co. v. Loos,*
   586 U.S. 310 (2019) ................................................................................................21

*CBOCS W., Inc. v. Humphries,*
   553 U.S. 442 (2008) ................................................................................................40

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..........................................................................................19, 20

*Chaing Ming Li v. Gain Cap. Grp., LLC,*
   CFTC No. 10-R024 (C.F.T.C.), Comm. Fut. L. Rep. P. 31906, 2011 WL
   457271 (Feb. 8, 2011) ............................................................................................50

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ..............................................................................37, 38, 39, 40

*Chicago Bd. of Trade v. Olsen*
   262 U.S. 1 (1923) ....................................................................................................22

*Conn. Nat'l Bank v. Germain,*
   503 U.S. 249 (1992) ................................................................................................24

*Dunn v. CFTC,*
   519 U.S. 465 (1997) ................................................................................................51

*EPA v. EME Homer Generation, L.P.,*
   572 U.S. 489 (2014) ................................................................................................33

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)................................................................................25, 36

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)................................................................................36, 37

*FCC v. Consumers' Research*,
    606 U.S. 656 (2025)......................................................................................43

*FDA v. Brown & Williams Tobacco Corp.*,
    529 U.S. 120 (2000)................................................................................50, 55

*Fischer v. United States*,
    603 U.S. 480 (2024)................................................................................54, 55

*Fox v. Standard Oil Co. of N.J.*,
    294 U.S. 87 (1935)........................................................................................20

*Gutierrez v. Ada*,
    528 U.S. 250 (2000)......................................................................................28

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024)................................................................................25, 26

*Hill v. Wallace*,
    259 U.S. 44 (1922)........................................................................................22

*Hubbard v. United States*,
    514 U.S. 695 (1995)......................................................................................21

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)..........................................................................................57

*Loper Bright Enterprises, Inc. v. Raimondo*,
    603 U.S. 369 (2024)........................................................................37, 38, 39, 40

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................63

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
    595 U.S. 109 (2022) (per curiam)................................................................49, 52

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)......................................................................................65

*Pereira v. Sessions*,
    585 U.S. 198 (2018)......................................................................................38

*United States v. Butler*,
    297 U.S. 1 (1936)..........................................................................................41

*United States v. Morton Salt*,
    338 U.S. 632 (1950)..................................................................................52

*United States v. Woods*,
    571 U.S. 31 (2013)...................................................................................54

*Van Buren v. United States*,
    593 U.S. 374 (2021).............................................................20, 24, 28, 33

*West Virginia v. EPA*,
    597 U.S. 697 (2022)......................................................................*passim*

*Whitman v. Am. Trucking Assns., Inc.*,
    531 U.S. 457 (2001).............................................................15, 29, 33

**Federal Circuit Courts**

*All. for Fair Bd. Recruitment v. SEC*,
    125 F. 4th 159 (5th Cir. 2024) .......................................................52, 55

*Andersons, Inc. v. Horton Farms, Inc.*,
    166 F.3d 308 (6th Cir. 1998) .........................................................45, 51

*Caesars Ent. Corp. v. Int'l Union of Operating Eng'rs Loc. 68 Pension Fund*,
    932 F.3d 91 (3d Cir. 2019)..................................................................34

*Cargill v. Garland*,
    57 F. 4th 447 (5th Cir. 2023) .........................................................38, 57

*Carter v. Welles-Bowen Realty, Inc.*,
    736 F.3d 722 (6th Cir. 2013) .............................................................57

*CFTC v. EOX Holdings, L.L.C.*,
    90 F. 4th 439 (5th Cir. 2024) .............................................................56

*CFTC v. Erskine*,
    512 F.3d 309 (6th Cir. 2008) .....................................................39, 45, 54

*CFTC v. Zelener*,
    373 F.3d 861 (7th Cir. 2004) .....................................................39, 45, 55

*City of Pontiac Policeman & Fireman's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..........................................................66, 70

*Clarke v. CFTC*,
    74 F. 4th 627 (5th Cir. 2023) .............................................................56

*CTFC v. Monex Credit Co.*,
    931 F.3d 966 (9th Cir. 2019) .............................................................45

4916-1715-4691

*CTFC v. Muller,*
570 F.2d 1296 (5th Cir. 1978) ...............................................................40, 41, 43

*Heggemeier v. Caldwell Cnty., Tex.,*
826 F.3d 861 (5th Cir. 2016) .........................................................................72

*Hershey v. Energy Transfer Partners, L.P.,*
610 F.3d 239 (5th Cir. 2010) .........................................................................46

*Jarkesy v. SEC,*
34 F. 4th 446 (5th Cir. 2022) .........................................................................44

*Nagel v. ADM Inv. Servs., Inc.,*
217 F.3d 436 (7th Cir. 2000) .........................................................................45

*In re Pharm. Indus. Average Wholesale Price Litig.,*
582 F.3d 156 (1st Cir. 2009)..........................................................................53

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.,*
499 F. App'x 345 (5th Cir. 2012) ...................................................................66

*Shushany v. Allwaste, Inc.,*
992 F.2d 517 (5th Cir. 1993) .........................................................................66

*Texas v. U.S. Dep't of Homeland Sec.,*
123 F. 4th 186 (5th Cir. 2024) .......................................................................21

*Trs. of AFTRA Health Fund v. Biondi,*
303 F.3d 765 (7th Cir. 2002) .........................................................................53

*United States v. Brooks,*
681 F.3d 678 (5th Cir. 2012) ..............................................................40, 41, 42, 43

*United States v. Futch,*
278 F. App'x 387 (5th Cir. 2008) ...................................................................43

*United States v. Koutsostamatis,*
956 F.3d 301 (5th Cir. 2020) ...................................................................25, 26

*United States v. Morgan,*
230 F.3d 1067 (8th Cir. 2000) .......................................................................53

*United States v. Phillips,*
155 F. 4th 102 (2d Cir. 2025) ........................................................................45

*United States v. Rice,*
36 F. 4th 578 (4th Cir. 2022) .........................................................................34

*United States v. Valencia,*
394 F.3d 32 (5th Cir. 2004). ..........................................................................43

4916-1715-4691

**Federal District Court Cases**

*CFTC v. Gorman*,
   587 F. Supp. 3d 24 (S.D.N.Y. 2022) ........................................................................58

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ......................................................................48

*CFTC v. McDonnell*,
   332 F. Supp. 3d 641 (E.D.N.Y. 2018) ......................................................................58

*CFTC v. My Big Coin Pay, Inc.*,
   334 F. Supp. 3d 492 (D. Mass. 2018) .......................................................................48

*CFTC v. Red Rock Secured*,
   LLC, No. 2:23-cv-3680 (C.D. Cal.) ..........................................................................63

*Fabozzi v. StubHub*,
   No. C-11-4385 EMC, 2012 WL 506330 (N.D. Cal. Feb. 15, 2012) ........................59

*Garrison v. Ringgold*,
   Case No. 19cv244-GPC(RBB), 2019 WL 2089509 (S.D. Cal. May 13, 2019) .......72

*Inv. Co. Inst. v. CFTC*,
   891 F. Supp. 2d 162 (D.D.C. 2012) ..........................................................................32

*LifeVoxel Va. SPV, LLC v. LifeVoxel.AI, Inc.*,
   622 F. Supp. 3d 935 (S.D. Cal. 2022) ......................................................................59

*SEC v. Mapp*,
   240 F. Supp. 3d 569 (E.D. Tex. 2017) ......................................................................72

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) ......................................................................59

*United States v. Seefried*,
   639 F. Supp. 3d 8 (D.D.C. 2022) ..............................................................................34

**Other Cases**

*In re GNP Commodities, Inc.*,
   CFTC Doc. No. 89-1, 1992 WL 248972 (Sept. 25, 1992) .........................................58

*McCann v. Lucky Money*,
   129 Cal. App. 4th 1382 (2005) ..................................................................................59

*McNulty v. Comm'r of Internal Rev.*,
   157 T.C. 120 (2021) ...................................................................................................18

4916-1715-4691

## Statutes

7 U.S.C. § 1a(9) .................................................................................21, 24, 25, 39

7 U.S.C. § 1a(19)–(20) ...................................................................................27, 32

7 U.S.C. § 2(c)(2)(D)(i)–(ii) ................................................................................55

7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa) .........................................................................46

7 U.S.C. §§ 6(a), 6c ..............................................................................................29

7 U.S.C. § 6a(a)(2) ...............................................................................................32

7 U.S.C. § 9 ...........................................................................................................34

7 U.S.C. § 13 .........................................................................................................57

7 U.S.C. § 13a(5) ..................................................................................................53

7 U.S.C. § 13a-2(1) ...............................................................................................72

7 U.S.C. § 13c(b) ..................................................................................................57

15 U.S.C. § 45(a) ..................................................................................................52

17 U.S.C. § 9(1) ............................................................................................ *passim*

26 U.S.C. § 408(m)(2) ..........................................................................................69

## Statutes At Large

Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-365–461 (2000) .................................................................................26

Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, § 101(13), 114 Stat. 2763, 2763A-371 (2000) .......................................................31

Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, § 107, 114 Stat. 2763, 2763A-382–83 (2000) ...............................................................33

Commodities Futures Trading Commission Act of 1974, Pub. L. No. 93-943, 88 Stat. 1389 (1974) (CFTC Act) ............................................................................23

Commodities Futures Trading Commission Act of 1974, Pub. L. No. 93-943, § 402(c), 88 Stat. 1389, 1412–13 (1974) .............................................................41

Commodity Exchange Act, 74-675, §§ 1–2, 49 Stat. 1491, 1491 (1936) .....................22

Commodity Exchange Act, 74-675, §§ 8(a), 49 Stat. 1491, 1498 (1936) ....................45

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (Dodd-Frank Act) ...................................................................24

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 723, 124 Stat. 1376, 1675 (2012)...........................................................32

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 742, 124 Stat. 1376, 1732–33 (2010) (codified at 7 U.S.C. § 2(c)(2)(D)(i)(II)) ........................................................................................46

Futures Trading Act, Pub. L. No. 77-66, 42 Stat. 187 (1921) ......................................22

Futures Trading Practices Act of 1992, Pub. L. No. 102-546, § 502, 106 Stat. 3590, 3629–32 (codified at 7 U.S.C. § 6(c))................................................30

Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922)........................................22

International Development Association Appropriations Act of 1974, Pub. L. No. 93-373, § 2, 88 Stat. 445, 445 (1974) ....................................................23

Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 760, 112 Stat. 2681, 2681–35 (1998) .............................30

## Federal Regulations

7 C.F.R. § 80.1(1)-(3) .................................................................................................15

17 C.F.R. § 1.3 ............................................................................................................39

17 C.F.R. § 180.1(a).............................................................................................54, 72

17 C.F.R. § 180.1(a)(1)–(2) .......................................................................................47

*Exemption for Certain Swap Agreements*, 58 Fed. Reg. 5,587 (Jan. 22, 1993)............................30

*Exemption for Certain Swap Agreements*, 58 Fed. Reg. at 5,594–95...........................................30

*Over-the-Counter Derivatives*, 63 Fed. Reg. 26,114, 26,115–16 (May 12, 1998) ......................30

*Policy Statement Concerning Swap Transactions*, 54 Fed. Reg. 30,694, 30,694 (July 21, 1989) ...........................................................................................29

*Prohibition of Market Manipulation*, 75 Fed. Reg. 67,657, 67,658 (Nov. 3, 2010) (codified at 17 C.F.R. pt. 180) .................................................................47

*Prohibition on Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011) ......................................................................47

*Regulation of Hybrid Instruments*, 58 Fed. Reg. 5,580 (Jan. 22, 1993) .......................................30

*Rules Under the Commodity Exchange Act*, 41 Fed. Reg. 3,192, 3,194 (1976) ........................... 38

**Federal Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................ 66

Fed. R. Civ. P. 56(a) .......................................................................................................... 19

Fed. R. Evid. 201 ............................................................................................................... 60

Fed. R. Civ. P. 56 .............................................................................................................. 15

**Other Sources**

Antonin Scalia & Bryan A. Garner,
    *Reading Law: An Interpretation of Legal Texts* (2012) ........................... 21, 25, 26, 37, 43

*Over-the-Counter Derivative Markets and the Commodity Exchange Act* 4 (1999),
    *available at* https://home.treasury.gov/system/files/236/Over-the-Counter-
    Derivaties-Market-Commodity-Exchange-Act .......................................................... 29

*Donated Property*, Internal Revenue Serv. (Feb. 2024),
    https://www.irs.gov/publications/p561 ...................................................................... 69

*H. Beales, et al., "Government Regulation: The Good, The Bad, & The Ugly"*
    Consumer Protection of the Committee on Energy and Commerce
    https://www.govinfo.gov/content/pkg/CHRG-111hhrg78137/html/CHRG-
    111hhrg78137.htm ................................................................................................... 17

*Hearing Before the Subcomm. on Gen. Farm Commodities & Risk Mgmt. of the
    H. Comm. on Agric.*, 111th Cong. 26 (1999) ............................................................ 50

*Historical First Trade Dates*, CME Grp., https://www.cmegroup.com/media-
    room/historical-first-trade-dates.html (last visited Dec. 2, 2025) ............................. 29

*Historical First Trade Dates*, CME Grp., https://www.cmegroup.com/media-
    room/historical-first-trade-dates.html#metals (last visited Sept. 26, 2025) ............... 23

Press Release PR Newswire, *Metals.com Is Ranked #1 Leader In Customer
    Satisfaction Out Of Over Three Dozen Companies In Minnesota 2019 (Survey
    Finds)* (June 11, 2019, 6:00 AM),
    https://markets.businessinsider.com/news/stocks/metals-com-is-ranked-1-
    leader-in-customer-satisfaction-out-of-over-three-dozen-companies-in-
    minnesota-2019-survey-finds-1028269003 .............................................................. 17

Jerry W. Markham, *Manipulation of Commodity Futures Prices—The
    Unprosecutable Crime*, 8 Yale J. on Reg. 281, 283 (1991) ....................................... 46

Lynn A. Stout, *Derivatives and the Legal Origins of the 2008 Credit Crisis* ........................ 31, 32

Mike Beard, *The World Cries Out for Onion Derivatives*, Wall St. J., July 13, 2019.................................................................................................................................23

*New Bailouts*, Investopedia, https://www.investopedia.com/articles/markets-economy/090716/why-bank-bailins-will-be-new- bailouts.asp (last visited Sept. 30, 2024) .......................................................................................................65

Paul G. Mahoney, *Deregulation and the Subprime Crisis*, 104 Va. L. Rev. 235, 273 (2018).............................................................................................................31

*Report: Final Report of the National Commission on the Causes of the Economic and Financial Crisis in the United States*, 48–49 (2011) .......................................................32

*Risk*, NewsMaxMoney (Jul. 23, 2018), https://www.newsmax.com/finance/oliviergarret/ gold-ira-retirement-risk/2018/07/23/id/873289/.........................................................................................66

Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 828–29 (2018).............................................................................................33

U.S. Energy Information Admin., *Natural Gas Explained*, https://www.eia.gov/energyexplained/natural-gas/ (last updated Oct. 10, 2024)....................42

4916-1715-4691

## APPENDIX

| Ex. No | Exhibit Name |
|---|---|
| 1 | About the Commission - CFTC |
| 2 | CFTC Release No. 8784-23 |
| 3 | Press Release PR Newswire, *Metals.com Is Ranked #1 Leader In Customer Satisfaction Out Of Over Three Dozen Companies In Minnesota 2019 (Survey Finds)* (June 11, 2019, 6:00 AM) |
| 4 | Sample Transaction Agreement #1 (customer information redacted) |
| 5 | Sample Transaction Agreement #2 (customer information redacted) |
| 6 | Samuelson Analysis of Chase Sales (produced to chambers natively) |
| 7 | Samuelson Analysis of Barrick Sales (produced to chambers natively) |
| 8 | Regulation of Investment Advisors by the U.S. Securities & Exchange Commission, March 2013 |
| 9 | Application, New Direction Trust Company (customer information redacted) |
| 10 | Sample Purchase Invoices |
| 11 | Senate Report No. 93-1131 |
| 12 | U.S. General Accounting Office, Report to Congressional Committees: The Commodity Exchange Act - Legal and Regulatory Issues Remain |
| 13 | N. Feder, Deconstructing Over-The-Counter Derivatives, 2002 Colum. Bus. L. Rev. 677 |
| 14 | F. Easterbrook, Monopoly, Manipulation, and the Regulation of Futures Markets, The Journal of Business, Apr. 1986 |
| 15 | U.S. General Accounting Office, Report to Congressional Committees: Issues Related to the Commodity Futures Trading Commission's Reauthorization |
| 16 | R.R. Enfield, The World's Wheat Situation, The Economic Journal, Vol. 41, No. 164 (Dec. 1931). |
| 17 | U.S. General Accounting Office, Report to Congressional Requesters: SEC and CFTC Fines Follow-up - Collection Programs are Improving, but Further Steps are Warranted |
| 18 | Congressional Record, Proceedings and Debates of the 111th Congress, First Session - Vol. 155, No. 77 (May 19, 2009) |
| 19 | CFTC, Speech by Commissioner Bart Chilton, "Moment of Inertia" before the Institutional Investors Carbon Forum (Sept. 15, 2009) |
| 20 | Congressional Record - Senate (September 17, 2009) |
| 21 | Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation (July 14, 2021) |
| 22 | U.S. Mint, American Silver Eagle 2024 One Ounce Silver Uncirculated Coin (Sept. 30, 2024) |
| 23 | APMEX, Silver Spot Price Sept. 30, 2024 |
| 24 | CFTC Press Release No. 8822-23, CFTC Releases FY 2023 Enforcement Results (Nov. 7, 2023) |

| 25 | 17 C.F.R. 180 - Prohibition on the employment, or attempted employment, of manipulative and deceptive devices |
|---|---|
| 26 | CFTC, Commodity Futures Archive - Selected Materials, Bank Activities involving the Sale of Precious Metals (Aug. 6, 1985) |
| 27 | CFTC, 17 CFR Part 180, Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation |
| 28 | Congressional Record - Senate (July 15, 2010) |
| 29 | Congressional Record - House of Representatives (Sept. 17, 2009) |
| 30 | Congressional Record - House of Representatives (May 6, 2010) |
| 31 | Congressional Record - House of Representatives (June 30, 2010) |
| 32 | H.R. 6149, A Bill to require disclosures to consumers by coin and precious metal bullion dealers (introduced September 16, 2010) |
| 33 | Revised Expert Report of A. Moloian, Sept. 12. 2024 (App'x H produced to chambers natively) |
| 34 | R. Best, Investopedia, Why Bank Bail-Ins are the New Bailouts (Sept. 5, 2023) |
| 35 | O. Garrett, Newsmax, If You Don't Have a Gold IRA, Your Retirement Is at Risk (July 23, 2018) |
| 36 | Congressional Record - House of Representatives (Dec. 5, 1995) |
| 37 | U.S. Mint, Frequently Asked Questions, "How do you price your products?" |
| 38 | Kane-266423 Monthly Depository Statements |
| 39 | IRS, Issue Snapshot - Investments in collectibles in individually directed qualified plan accounts (updated Aug. 19, 2024) |
| 40 | IRS Publication 561 (02/2024), Determining the Value of Donated Property (revised Feb. 2024) |
| 41 | Summary of Plaintiffs' Commodity Allegations |
| 42 | Summary of Plaintiffs' Allegations on Elderly Customers |
| 43 | SEC, Release No. IA-1092, Applicability of the Investment Advisors Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services (Oct. 8, 1987) |
| 44 | The Dreyfus Letters |
| 45 | Deposition of Samara Mills, taken Aug. 30, 2023 |
| 46 | Deposition of Harry Kane, taken March 22, 2023 |
| 47 | Deposition of Dana Samuelson, taken March 24, 2024, in *CFTC v. Red Rock Secured, LLC*, No. 2:23-cv-3680 |
| 48 | Deposition of Dana Samuelson, taken June 10, 2024 |
| 49 | Deposition of Eugene Fogel, taken April 16, 2024 |
| 50 | Deposition of David Madge, taken March 19, 2024 |
| 51 | Deposition of Gabriel Marquez, taken Aug. 29, 2023 |
| 52 | Declaration of Angela Laughlin Brown (dated December 18, 2025) |

| | |
|---|---|
| **52-1** | Corpus Linguistics Evidence Spreadsheet (COHA) and (NOW) (produced to chambers natively) |
| **53** | Declaration of Derek M. Younkers (dated December 18, 2025) |
| **53-1** | Corpus Linguistics Evidence Spreadsheet (CRC) and (COSCO-US) (produced to chambers natively) |
| **54** | December 17, 2025 Update to App'x H from Armen Moloian's Expert Report [Ex. 33] |

Pursuant to the Court's Order (ECF 947) and Federal Rule of Civil Procedure 56, Defendants Lucas Asher and Simon Batashvili (together, the Individual Defendants) file this brief in support of their Amended Motion for Summary Judgment seeking dismissal of all claims.

## I.    INTRODUCTION

If ever an agency attempted to pull an elephant out of a mousehole, this is it.[1] The Commodities *Futures* Trading Commission's (CFTC) self-described mission is "to promote integrity, resilience, and vibrancy of the U.S. derivatives markets through sound regulation."[2] However, this matter does not involve futures, derivatives, or any kind of leveraged transaction. In fact, it does not involve regulation of commodities at all. Rather, this case involves the policing of retail cash sales of exclusive coins that were actually delivered to their buyers. Nevertheless, the CFTC and thirty States filed this enforcement action against Metals.com[3] and the Individual Defendants, in their individual capacities, based on alleged violations of § 6c(1) of the Commodities Exchange Act (CEA), codified at 17 U.S.C. § 9(1), and CFTC Rule 180.1, codified at 7 C.F.R. § 80.1(1)-(3).

These are novel and aggressive—even unprecedented—claims. The crux of the allegations is that the Metals.com's exclusive coins from the Royal Canadian Mint—one of the most well-respected mints in the world—were "fraudulently overpriced."[4] Plaintiffs allege fraud in

---

[1] *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").

[2] [*See* Ex. 1] https://www.cftc.gov/About/AboutTheCommission (last visited December 17, 2025).

[3] For simplicity's sake, the entity defendants are collectively referred to as "Metals.com."

[4] (*See* ECF 2 at ¶ 46). "Metals, Asher, and Batashvili, directly and by and through their sales representatives or other agents, fraudulently solicited and sold Precious Metals Bullion in the form of the following three gold and silver bullion coins ("collectively "Polar Bear Bullion"): a. The 1/2-ounce Silver Royal Canadian Mint Polar Bear Bullion; b. The 1/10-ounce Gold Royal Canadian Mint Polar Bear Bullion; and c. the 1/4 ounce Gold British Standard Bullion." *See also id.* at ¶¶ 7, 9, 11, 41, 61-62, 104-05 (claiming that Metals.com engaged in commodities fraud because it sold "fraudulently overpriced" coins).

individual retail transactions (not market manipulation)—based solely on their own say-so.[5] They do not allege that Defendants failed to deliver the coins the customers or misappropriated their customers' funds.[6] That's because they can't—Defendants held up their end of the bargain.[7] Plaintiffs object to the bargain itself: claiming in effect that they have the right to set retail prices on goods they weren't even given the right to regulate in the first place. This is the government picking winners and losers—pure and simple.[8]

This Court should grant this Motion and render summary judgment on Plaintiffs' federal claims under the CEA and Rule 180.1 for at least three reasons. First, gold and silver coins are not commodities under the CEA's definition. Second, interpreting the CEA to grant the CFTC jurisdiction over retail contracts for the sale of a commodity runs afoul of the major questions doctrine. Third, Plaintiffs' fraud allegations fail as a matter of law. After disposing of the federal question raised here, this Court should decline to exercise supplemental jurisdiction over the remaining state-law claims and dismiss them.

---

[5] Technically, this assertion is also based on the opinion of the CFTC's "expert," Dana Samuelson. As detailed in the Individual Defendants' Motion to Exclude Expert Testimony of Dana Samuelson, Samuelson's opinion is completely improper and unreliable—as it is based wholly on his subjective judgement, and that judgment is compromised by the fact that he is a competitor of Metals.com. (*See* ECF 76).

[6] *See* (ECF 929) [Ex. 1] Declaration of Chris Davis (CFTC concedes that the coins were delivered).

[7] This stands in stark contrast to another case recently filed by the CFTC in this district—where it alleged that the defendants "misappropriated most of the funds they received, purchasing metals for only a fraction of their total transactions." *See* [Ex. 2] CFTC Release No. 8784-23, *available at* https://www.cftc.gov/PressRoom/PressReleases/8784-23 (last visited May 19, 2024).

[8] When the government picks winners and losers—as here—it stifles innovation and may inadvertently harm those the government purports to be protecting. *See, e.g.*, *H. Beales, et al., "Government Regulation: The Good, The Bad, & The Ugly"* at 3, released by the Regulatory Transparency Project of the Federalist Society, June 12, 2017 (available at https://rtp.fedsoc.org/wp-content/uploads/RTP-Regulatory-Process-Working-Group-Paper.pdf) (last visited Dec. 18, 2025).

## II.    BACKGROUND

For over ten years, Metals.com was a leading retailer of precious metals with top customer satisfaction ratings.[9] Metals.com sold tangible products.[10] It did not provide investment advice or securities brokerage services.[11] It was not an investment advisor, consultancy, licensed brokerage, or banking institution. Accordingly, Metals.com did not have "investors."[12] Metals.com had two aspects to its business: (i) direct retail sales of exclusive coins and precious metals through its website and over the phone, and (ii) retail sales of exclusive coins and precious metals to customers who intended to hold them using a self-directed Individual Retirement Account (SDIRA) held by a third-party custodian.[13]

Once a customer purchased products—either online or by phone—Metals.com delivered them to either the customer's physical address or the depository.[14] The depository held the

---

[9] [Ex. 3] Press Release PR Newswire, *Metals.com Is Ranked #1 Leader In Customer Satisfaction Out Of Over Three Dozen Companies In Minnesota 2019 (Survey Finds)* (June 11, 2019, 6:00 AM), https://markets.businessinsider.com/news/stocks/metals-com-is-ranked-1-leader-in-customer-satisfaction-out-of-over-three-dozen-companies-in-minnesota-2019-survey-finds-1028269003.

[10] The Metals.com website listed a variety of products that all customers could view. Following the appointment of the Receiver, all control over Metals.com—including its website—transferred to the Receiver, who does not pay to maintain the old version of the website. If you visit the website today, it provides information about the receivership. Accordingly, the Individual Defendants rely on the Wayback Machine, an online archive, to share what the website looked like during Metals' operation: https://web.archive.org/web/20190626231052/https://metals.com/ (Archive.org copy of Metals.com from June 26, 2019) (accessed Sept. 28, 2024). *See, e.g.,* [Exs. 4, 5] Shipping and Transaction Agreements; [Ex. 45] Deposition of Samara Mills, Aug. 30, 2023 ("Mills Depo.") at 121:14-25.

[11] *See* [Ex. 4] Shipping and Transaction Agreement at §§ 3 and 5; [Ex. 5] Shipping and Transaction Agreement at §§ 3 and 5; [Ex. 45] Mills Depo. 70:16-71:23.

[12] *See* [Ex. 4, 5] Shipping and Transactions Agreements. Unlike stock purchases or the purchase and sale of other securities, the retail customers purchased physical products from Metals—whether precious metal bars or coins. [Ex. 45] Mills Depo. 121:14-25. Each of those purchases was analyzed by Plaintiffs' purported expert Dana Samuelson, who examined the products that each customer received. *See* [Ex. 6] Samuelson Analysis of Chase Sales; [Ex. 7] Samuelson Analysis of Barrick Sales.

[13] Plaintiffs' proffered expert, Dana Samuelson, relies on a spreadsheet detailing every sale of coins to retail customers, regardless of how they made their purchase. *See* [Exs. 6, 7] Samuelson Spreadsheets. These spreadsheets further identify how customers purchased from Metals.com. *See also* [Ex. 45] Mills Depo. 121:14-25.

[14] *See* [Ex. 45] Mills Depo. 122:15-20; s*ee, e.g.* [Exs. 6, 7] Samuelson Spreadsheets.

products in the customer's name.[15]

Metals.com's customers were provided a Shipping and Transaction Agreement (Transaction Agreement) governing the transaction.[16] The Transaction Agreement contained multiple disclosures about the risks of buying precious metals and related products.[17] It also advised the customer to hold any item purchased for at least three to five years—and preferably for five to ten years.[18]

Prospective customers voluntarily provided their contact information in response to online advertisements (e.g., Facebook ads).[19] During conversations with prospective customers, Metals.com did not provide investment advice.[20]

Consistent with decades-old guidance from the U.S. Securities and Exchange Commission (SEC) and industry practice, Metals.com staff could only: (1) generally discuss the stock market and compare it to the precious metals market; (2) explain the inherent differences between investments in precious metals and other investments; and (3) discuss the possible effect of government actions on precious metals values.[21] If a prospective customer chose to purchase precious metals, Metals.com staff would also explain how customers could hold precious metals,

---

[15] This practice of delivering coins to the customer's designated depository account was necessary for the customer to receive the tax benefits of holding their investment in an SDIRA account. *See McNulty v. Comm'r of Internal Rev.*, 157 T.C. 120, 129 (2021).

[16] *See, e.g.,* [Exs. 4, 5] Shipping and Transaction Agreements. Due to the voluminous number of records, only two sample agreements are attached.

[17] *Id.*

[18] *Id.* at ¶ 5b.

[19] *See, e.g.,* [Ex. 45] Mills Depo. 122:21-123:1.

[20] *Id.* [Ex. 45] Mills Depo. 82:19-83:6; *see also* [Ex. 4] Shipping and Transaction Agreement at ¶5e.

[21] *See, e.g.,* [Ex. 8] https://www.sec.gov/about/offices/oia/oia_investman/rplaze-042012.pdf (SEC guidance explaining that the sale of precious metals is not advice about securities and explaining the parameters).

including via an unaffiliated third-party custodian.[22] Post-purchase, the only ongoing relationship was between the customer and the custodian.[23]

To ensure that its business practices were consistent with the law and its core ethical principles, Metals.com instituted policies that prohibited its employees from providing investment advice.[24] Metals.com also had a compliance program that included training its sales staff on what constituted investment advice (and was thus prohibited).[25]

Each Metals.com customer signed the Transaction Agreement confirming that Metals.com did not provide investment advice and that its employees were not authorized to do so.[26] In addition to the Transaction Agreement, Metals.com's customers received an invoice that included the customer's name, account number, delivery address, and a description of the items purchased (including quantity, unit price, and total amount).[27]

### III.    LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court should render summary judgment if, after an adequate time for discovery, the nonmovant fails to make a sufficient showing of an essential element of its case with respect to which it bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movants must initially demonstrate the lack of evidence supporting the nonmovant's case. *Id.* The

---

[22] *See, e.g.*, [Ex. 9] Application, New Direction Trust Company at 3 § 8.

[23] *Id.*

[24] [Ex. 45] Mills Depo. 70:16-24, 71:3-23, 80:24-81:1, 83:2-6, 126:23-127:12, 135:8-20.

[25] [Ex. 51] Deposition of Gabriel Maraquez (Marquez Depo.) 36:2-7, 36:25-37:25, 73:20-74:21, 75:23-77.

[26] *See, e.g.*, [Ex. 4] Shipping and Transaction Agreement ¶¶ 5(a), 5(e), p. 1, p.24; [Ex. 5] Shipping and Transaction Agreement ¶¶ 5(a), 5(e), p. 1, p.24

[27] *See* [Ex. 10] Sample Purchase Invoices.

burden then shifts to the non-movant to present some evidence showing there is a genuine issue for trial. *Id.*

## IV.    ARGUMENT

### A.    The Plaintiffs Lack Authority to Prosecute their CEA Fraud Claims.

The Individual Defendants are entitled to summary judgment on Plaintiffs' federal claims because they do not have the authority to prosecute them. This is true for at least two reasons. First, gold and silver coins are not commodities under the CEA's definition. Second, interpreting the CEA to grant the CFTC jurisdiction over retail sales like those here runs afoul of the major questions doctrine.

### 1.    Gold and Silver Are Not "Commodities" Under the CEA.

Neither section 6c(1) of the CEA nor Rule 180.1 can apply here, because the coins that Metals.com sold were not commodities under the CEA. Section 6c(1) grants the CTFC authority to make and enforce anti-fraud rules for "contract[s] of sale of any *commodity* in interstate commerce, or for future delivery on or subject to the rules of a registered entity." 7 U.S.C. § 9(1) (emphasis added). To determine whether the exclusive gold and silver coins at issue here meet the definition of "commodity," this Court should follow to the CEA's definition of that term. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)). That definition controls "even if it varies from [commodity's] ordinary meaning." *Id.*; *Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 96 (1935) ("[D]efinition by the average man or even by the ordinary dictionary with its studied enumeration of subtle shades of meaning is not a substitute for the definition set before us by lawmakers with instructions to apply it to the exclusion of all others. There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves.").

a.    **Neither Gold nor Silver Fall Within the Statutory Definition of "Commodity."**

The CEA's definition of "commodity," codified at 7 U.S.C. § 1a(9), is cluttered and cumbersome:

> The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of [the CEA]), and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value, or data related to such receipts) in which contracts for future delivery are or in the future dealt in.

7 U.S.C. § 1a(9). That definition was cobbled together by eight different Congresses over the course of seventy-seven years.

When determining its meaning, this Court can—and should—consider the definition's evolution, because the amendments to CEA "form part of the context of the statute, and (unlike legislative history) can properly be presumed to have been before all members of the legislature when they voted." Antonin Scalia & Bryan A. Garner, *Reading Law: An Interpretation of Legal Texts* 256 (2012); *see also Hubbard v. United States*, 514 U.S. 695, 702–03 (1995) (explaining that "the historical evolution of a statute based on decisions by the entire Congress should not be discounted for the reasons that may undermine confidence in the significance of excepts from congressional debates and committee reports"); *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (distinguishing "statutory history" from "unenacted legislative history" and stating that "the record of *enacted* changes Congress made to the statutory text over time" is "the sort of textual evidence that everyone agrees can sometimes shed light on meaning"); *Texas v. U.S. Dep't of Homeland Sec.*, 123 F. 4th 186, 201 (5th Cir. 2024) ("Statutory history (unlike legislative history) can sometimes illuminate a statute's meaning.").

Federal oversight of futures trading began in 1921, when Congress enacted the Futures Trading Act, Pub. L. No. 77-66, 42 Stat. 187 (1921), which imposed a prohibitive tax on any "grain" futures transaction that were not sold on a board of trade that the Secretary of Agriculture designed as a "contract market." *Id.* §§ 3–5, 42 Stat. at 187–88. "Grain" was defined as "wheat, corn, oats, barley, rye, flax, and sorghum." *Id.* § 2, 42 Stat. at 188. The Supreme Court, however, held that the Futures Trading Act was an unconstitutional exercise of the taxing power in *Hill v. Wallace*, 259 U.S. 44, 68 (1922).

Congress responded four months later by enacting the Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922), relying on its power to regulate interstate commerce, rather than its power to tax. Like its predecessor, the Grain Futures Act defined "grain" as "wheat, corn, oats, barley, flax and sorghum" *Id.* § 2(a), 42 Stat. at 998. And it generally required that all trading in grain futures take place on contract markets approved and regulated by the Secretary of Agriculture. *Id.* § 4, 42 Stat. at 999–1000. The following year, the Supreme Court upheld the Grain Futures Act in *Chicago Bd. of Trade v. Olsen*, 262 U.S. 1, 43 (1923).

In 1936, Congress revised the Grain Futures Act, changing its name to the CEA and replacing "grains" with "commodity." *See* Commodity Exchange Act, 74-675, §§ 1–2, 49 Stat. 1491, 1491 (1936). The CEA originally defined "commodity" as "wheat, cotton, rice, corn, oats, barley, flaxseed, grain sorghums, mill feeds, butter, eggs, and Solanum tuberosum (Irish potatoes)." *Id.* § 3(a), 49 Stat. at 1491. Over the next thirty-nine years, Congress periodically updated the definition to include new agricultural products in which futures were traded. It added: "wool tops" in 1938, Act of Apr. 7, 1938, Pub. L. No. 75-471, 52 Stat. 205, 205 (1938); "fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and other facts and oils), cottonseed meal, cottonseed, peanuts, soybeans, and soybean meal" in 1940, Act of Oct. 9, 1940, Pub. L. No. 76-818, § 1, 54 Stat. 1059, 1059 (1940); "wool" in 1954, National Wool Act of 1954,

Pub. L. No. 83-690, § 710(a), 68 Stat. 897, 913 (1954); "onions" in 1955, Act of July 26, 1955, Pub. L. No. 84-174, § 1, 72 Stat. 1013, 1013 (1955); and "livestock and livestock products" and "frozen concentrated orange juice" in 1968, Act of Feb. 19, 1968, Pub. L. No. 90-258, § 1, 82 Stat. 26, 26 (1968); Act of July 23, 1968, Pub. L. No. 90-418, 82 Stat. 413, 413 (1968).

Congress, however, did not add every good in which futures were traded to the definition of "commodity." Silver futures were trading by 1933.[28] And platinum futures and palladium futures have traded since 1956 and 1968, respectively. *See id.* But Congress did not add silver, platinum, palladium, or any other precious metal[29] to the CEA's definition of "commodity."

Congress did single out onions for special treatment during that period. Less than a year after onions were added to the CEA's definition of "commodity," two traders cornered the market in physical onions and onion-futures contracts, resulting in a steep drop in prices. *See* Mike Beard, *The World Cries Out for Onion Derivatives*, Wall St. J., July 13, 2019. In response, Congress enacted the Onion Futures Act in 1958, which still prohibits futures trading in onions. Onion Futures Act, Pub. L. No. 85-839, § 1, 72 Stat. 1013, 1013 (1958). But it did not remove onions from the definition of "commodity" at that time. *See id.*

The next significant amendment to the CEA was the Commodities Futures Trading Commission Act of 1974, Pub. L. No. 93-943, 88 Stat. 1389 (1974) (CFTC Act). As its name suggests, the CFTC Act created the CTFC and authorized it to assume the powers previously exercised by the Secretary of Agriculture. *Id.* §§ 101(3), 103, 88 Stat. at 1389, 1392. The CFTC

---

[28] *See Historical First Trade Dates*, CME Grp., https://www.cmegroup.com/media-room/historical-first-trade-dates.html#metals (last visited Sept. 26, 2025).

[29] Trading in gold futures did not begin until December 31, 1974. *See Historical First Trade Dates*, CME Grp., https://www.cmegroup.com/media-room/historical-first-trade-dates.html#metals (last visited Sept. 26, 2025). Before that date, it was illegal for Americans to own gold and related products. *See* Exec. Order No. 6,102 (1933), *reprinted in* 2 The Public Papers of Franklin D. Roosevelt 111, 111–12 (Samuel I. Rosenman ed., 1938) (requiring persons to deliver all gold coins, gold bullion, and gold certificates to the Federal Reserve Bank by May 1, 1933); International Development Association Appropriations Act of 1974, Pub. L. No. 93-373, § 2, 88 Stat. 445, 445 (1974) (lifting the prohibition).

Act also altered the definition of "commodity." *See id.* § 201(a)–(b), 88 Stat. at 1395. It removed "onions" from the list of enumerated products and added the catchall language on which the CFTC now relies: "all other goods and articles, except onions as provided in Public Law 85-839, and all services rights, and interests in which contracts for future delivery are presently or in the future dealt in . . . ." *Id.*

Although Congress subsequently amended the CEA, the definition of "commodity" remained unchanged until 2010, when Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (Dodd-Frank Act). In the Dodd-Frank Act, Congress, *inter alia*, banned futures trading in motion-picture box office receipts. *Id.* § 721(e)(10), 124 Stat. at 1672. It also removed "motion picture box office receipts (or any index, measure, value, or data related to such receipts)" from the definition of "commodity." *Id.* § 721(a)(4), 124 Stat. at 1659.

### i.    The Catchall Phrase in the CEA's Definition of Commodity Only Includes Organic Goods.

The statutory text and history of "commodity" demonstrates that it does not include gold, silver, or other precious metals. The analysis begins with the text. *Van Buren v. United States*, 593 U.S. 374, 381 (2021). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Here, neither gold nor silver is one of the twenty-five goods specifically identified in the statutory definition of "commodity." *See* 7 U.S.C. § 1a(9). Gold or silver qualifies as a "commodity" if and only if it falls within the catchall phrase that Congress added in the CFTC Act—"all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." *See id.* Plaintiffs argues that they do, because the catchall language "includes almost anything other than onions and box office receipts . . . ." (*See* Pl.'s Resp.

in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 6, ECF 934).

Plaintiffs, however, improperly divorce "all other goods and articles" from its context. *See United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) ("Text should never be divorced from context."). That catchall language follows a "long and detailed list" of twenty-five specific goods, implicating the canon of *ejusdem generis*. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217–18 (2024). Under that canon, courts do not afford a catchall phrase preceded by an enumeration of two or more items "the broadest construction [the phrase] can bear. Instead, [courts] generally appreciate that the catchall must be interpreted in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it." *Id.* (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) (explaining that the "principle of *ejusdem generis* . . . implies the addition of *similar* after the word *other*"). Thus, this Court should interpret the CEA's definition of "commodity" to encompass the enumerated items and "all other [similar] goods and articles." *See* 7 U.S.C. § 1a(9).

Gold, silver, and other precious metals, however, are not remotely similar to the other "goods and articles" enumerated in the definition of "commodity." As this Court has recognized, all those items are organic. They: (1) are living organisms (e.g., "livestock"); (2) were living organisms (e.g., "wheat, cotton, rice, corn, barley," and "soybeans"); or (3) were derived from living organisms (e.g., "butter, eggs, . . . wool, wool tops, . . . livestock products, and frozen concentrated orange juice"). *See id.* But gold, silver, and other precious metals are inorganic. Thus, "there is no textually sound reason to suppose the final catchall term should bear such a radically different object than all of its predecessors." *See Epic Sys. Corp.*, 584 U.S. at 512.

The statutory history confirms that "commodity" does not include gold, silver, or other precious metals. Between 1933 and 1974, Congress periodically added organic products to the definition of "commodity" as futures trading in those products became available. But Congress never included any metals—even though futures trading in silver, platinum, and palladium were all available by 1968. Had Congress decided to abandon this approach and give the newly created CFTC jurisdiction over previous metals—and every other good and article (except onions)—in interstate commerce, it would not have retained the list of twenty-five specific goods in the definition in "commodity." Scalia & Garner, *supra*, at 199 (stating that, "when the tagalong general term is given its broadest application, it renders the prior enumeration superfluous"). And Congress would have made the change in approach explicit instead of inserting a broad catchall phrase that any truly knowledgeable drafter would know would be limited to organic goods. *See id.* at 212 (stating that "the *ejusdem generis* canon . . . has become part of the accepted terminology of legal documents"); *Koutsostamatis*, 956 F.3d at 307 (Because courts have applied the canon to interpret statutes for centuries, courts "presume that 'Congress legislates with knowledge of these basic rules of statutory construction.'" (quoting *McNary v. Haitan Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991)). Therefore, neither gold nor silver is a "commodity" under the CEA's definition.

> ii.    **The CFMA Did Not Expand the CEA's Definition of "Commodity" to Include Gold, Silver, or Other Precious Metals.**

In addition, subsequent amendments to the CEA do not demonstrate that "commodity" includes gold, silver, or other precious metals. In its earlier briefing, Plaintiffs pointed to the Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-365–461 (2000) (CFMA). The CFMA did not alter the definition of "commodity," but rather added two new definitions of "excluded commodity" and "exempt commodity." *See id.* at §101(4)(13)–(14), 114 Stat. at 2763A-371 (codified at 7 U.S.C. § 1a(19)–(20)).

The CFMA does not define "excluded commodity" in relation to "commodity." *See id.*

Excluded commodity means:

> (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

> (ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

>> (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

>> (II) based solely on one or more commodities that have no cash market;

> (iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

> (iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

>> (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

>> (II) associated with a financial, commercial, or economic consequence.

*Id.* § 101(4)(13).

But the CFMA does define "exempt commodity" in relation to "commodity." It "means a commodity that is not an excluded commodity or an agricultural commodity." *Id.* § 101(4)(14).[30] In an earlier brief, Plaintiffs contended that precious metals, such as gold and silver, are "exempt commodities" because they are neither agricultural commodities nor excluded commodities. (Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 4–5, ECF 934). That argument does not withstand scrutiny for three reasons.

---

[30] The CFMA does not define "agricultural commodity."

### A. The CFMA Is Irrelevant in Interpreting the Earlier-Enacted CEA.

First, Congress adopted the definitions of "exempt commodity" and "excluded commodity" twenty-six years after it adopted the catchall language at issue here. As the Supreme Court has repeatedly instructed, "later laws that 'do not seek to clarify an earlier enacted general term' and 'do not depend for their effectiveness upon clarification, or a change in meaning of an earlier statute,' are 'beside the point' in reading the first enactment." *Gutierrez v. Ada*, 528 U.S. 250, 257–58 (2000) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998)).

### B. The CFMA Defined "Exempt Commodity" as a Sub-Class of "Commodity."

Second, Congress defined "exempt commodity" as a sub-class or sub-category of "commodity," as Plaintiffs conceded in earlier briefing. (Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 1, ECF 934). "[C]ommodity," as used in the definition of "exempt commodity," bears the meaning that Congress gave that term in the CEA. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021) ("When 'a statute includes an explicit definition' of a term,' 'we must follow that definition even if it varies from a term's ordinary meaning." (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)); *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."). To be an "exempt commodity" under the CFMA, a good or article must first be a "commodity" under the CEA. As explained above, gold and silver are not.

### C. The CFMA Curbed the CFTC's Jurisdiction Over Financial Derivatives, Instead of Expanding It to Include Precious Metals.

Third, any argument that Congress expanded the definition of "commodity" to include any good (except onions) by defining *other* terms in CFMA contradicts both the CFMA's own

statutory history and the presumption that Congress does not "alter the fundamental details of a regulatory scheme in vague terms and ancillary provisions." *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

The CFMA's text and statutory history demonstrate that Congress intended to limit the CFTC's jurisdiction over derivatives whose prices are based on financial or market phenomena, such as the value of foreign currency, U.S. Treasury bonds, stock indices, and interest rates— rather than the price of goods. Trading in such financial derivatives began in the 1970s and "expanded steadily and rapidly."[31] But the question arose whether the financial derivates fell within the CFTC's jurisdiction because they were "services, rights, and interests in which contracts for future delivery [were] dealt in" under the CFTC Act's expanded definition of "commodity." *See* President's Working Group, *supra*, at 6–7. If so, selling them over the counter (OTC) would likely have been illegal. *See* 7 U.S.C. §§ 6(a), 6c.

In 1989, the CFTC issued a policy statement that the OTC financial derivatives that satisfied specified criteria would "not be regulated as futures or commodity options transactions under the [CEA] or the related regulations" and, hence, the CFTC would "take no action to preclude the effectuation of or to regulate such transactions." *See Policy Statement Concerning Swap Transactions*, 54 Fed. Reg. 30,694, 30,694 (July 21, 1989). That was a statement of interpretation rather than exemption, *id.* at 30, 694–95, because the CTFC lacked authority to exempt futures or option contracts from the requirement that they be traded only on contract

---

[31] *See* The President's Working Group on Financial Markets, *Over-the-Counter Derivative Markets and the Commodity Exchange Act* 4 (1999), *available at* https://home.treasury.gov/system/files/236/Over-the-Counter-Derivaties-Market-Commodity-Exchange-Act. While those financial derivatives were traded on CFTC-approved contract markets, they were also sold over the counter. *Compare id. with Historical First Trade Dates*, CME Grp., https://www.cmegroup.com/media-room/historical-first-trade-dates.html (last visited Dec. 2, 2025) (stating that futures trading in 13-Week Treasury Bills began in 1976 and futures trading in the S&P 500 began in 1982).

markets. The CFTC gained that authority three years later in the Futures Trading Practices Act of 1992, Pub. L. No. 102-546, § 502, 106 Stat. 3590, 3629–32 (codified at 7 U.S.C. § 6(c)).

Promptly acting on that new exemptive authority, the CFTC exempted OTC financial derivatives from regulation under the CEA so long as they satisfied certain criteria. *See generally Regulation of Hybrid Instruments*, 58 Fed. Reg. 5,580 (Jan. 22, 1993); *Exemption for Certain Swap Agreements*, 58 Fed. Reg. 5,587 (Jan. 22, 1993). The exemption covered derivatives that, *inter alia*, were not standardized as to their material economic terms entered solely between "eligible swap participants"—which the CFTC defined to mean various regulated financial institutions, businesses that met certain tests relating to total assets or net worth, certain pension funds, state and local governments, and wealthy individuals. *See Exemption for Certain Swap Agreements*, 58 Fed. Reg. at 5,594–95.

Five years later, the CTFC considered changing course. It issued a "concept release" requesting "comments on whether the regulatory structure applicable to OTC derivatives under the [CFTC's] regulations should be modified in any way in light of recent developments in the marketplace." *Over-the-Counter Derivatives*, 63 Fed. Reg. 26,114, 26,115–16 (May 12, 1998). The CFTC claimed that it was "open both to evidence in support or broadening its exemptions and to evidence indicating the need for additional safeguards." *Id.* at 26,116. That concept release triggered a hostile response from Congress. It added a rider to an appropriations bill that precluded the CFTC from promulgating new rules or regulations. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 760, 112 Stat. 2681, 2681–35 (1998). In addition, the chairmen of the Senate and House Agricultural Committees requested that the President's Working Group on Financial Markets "conduct a study of OTC derivatives markets and provide legislative recommendations to Congress." The President's Working Group on

Financial Markets, *Over-the-Counter Derivative Markets and the Commodity Exchange Act* 1 (1999) (citing H.R. Rep. No. 105-825 (1998)).

The President's Working Group delivered its report on November 9, 1999. *See generally id.* It unanimously recommended "the enactment of legislation to clearly exclude most OTC financial derivative transactions from the CEA." *Id.* at 3. Doing "otherwise would perpetuate legal uncertainty or impose unnecessary regulatory burdens and constraints upon the development of these markets within the United States." *Id.*

Acting on the President's Working Group's recommendations, Congress enacted the CFMA—which largely codified the status quo and prevented "the CFTC from revisiting its hands-off approach to the institutional OTC derivatives market." Paul G. Mahoney, *Deregulation and the Subprime Crisis*, 104 Va. L. Rev. 235, 273 (2018); *see also* Lynn A. Stout, *Derivatives and the Legal Origins of the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1, 21 (2011) (explaining that the CFMA "simply exclude[ed] most financial derivative transactions from the CEA and its ban on off-exchange trading" (footnote omitted)). As discussed above, the CFMA defined "excluded commodity" to mean financial metrics and indices, such as "an interest rate, exchange rate" and "debt or equity instrument[s]," contingencies and events. Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, § 101(13), 114 Stat. 2763, 2763A-371 (2000). It then stated that nothing in the CEA "govern[ed] or applie[d] to an agreement, contract, or transaction in an excluded commodity" that satisfied two criteria. *Id.* § 103, 114 Stat. at 2763A-377. In addition, the CFMA defined "exempt commodity" as "a commodity that is not an excluded commodity or an agricultural commodity." *Id.* § 101(14), 114 Stat. 2763A-371. It then stated that some provisions of the CEA did not "apply to a contract, agreement, or transaction in an exempt commodity" that satisfied certain criteria. *Id.* § 106, 114 Stat. 2763A-379–2. Similarly, the CFMA stated that the CEA did not "apply to or govern any agreement, contract, or transaction in a

commodity other than an agricultural commodity" that satisfied three criteria. *Id.* § 105(b), 114 Stat. at 2763A-379.

Furthermore, the CFMA instructed that the fact that it excluded or exempted certain agreements, contracts, and transactions in excluded and exempt commodities should "not be construed as implying or creating any presumption" that any agreements, contracts, or transactions were or would be subject to the CEA in the first place. *Id.* § 107, 114 Stat. 2763A-382–83.

The CFMA was cited as one of the culprits of the 2008 financial crisis.[32] In the Dodd-Frank Act, Congress repealed much of the CFMA, including its exclusion and exemptions for agreements, contracts, and transactions in excluded and exempt commodities. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 723, 124 Stat. 1376, 1675 (2012); *see also Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172–73 & n.8 (D.D.C. 2012). But the definitions of "exempt commodity" and "excluded commodity" remain in the CEA as vestiges of the CFMA.[33] *See* 7 U.S.C. § 1a(19)–(20).

That detour through the CFMA's statutory history demonstrates that Congress did not expand the definition of "commodity" by defining "excluded commodity" and "exempt commodity." On the contrary, the CFMA was a *deregulatory* statute, designed to expressly codify the CFTC's lack of jurisdiction over agreements, contracts, or transactions in non-agricultural commodities. And Congress explicitly instructed that the limitations it imposed in the CFMA

---

[32] *See, e.g.*, *Fin. Crisis Inquiry Comm'n, the Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Economic and Financial Crisis in the United States*, 48–49 (2011) available at https://www.govinfo.gov/app/details/GPO-FCIC/; Lynn A. Stout, *Derivatives and the Legal Origins of the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1, 3 (2011) (arguing that the CFMA was "the most direct and significant cause of the 2008 credit crisis").

[33] Aside from the definitions section, "exempt commodity" and "excluded commodities" appear only in one section, which requires the CFTC to "establish limits on the amount of positions, as appropriate, other than bona fide hedge positions, that may be held by any person with respect to contracts of sale for future delivery or with respect to options on contracts" for exempt and agricultural commodities. 7 U.S.C. § 6a(a)(2).

should "not be construed as implying or creating a presumption" that the CEA would have otherwise applied. *See* Commodities Futures Modernization Act of 2000, Pub. L. No. 106-554, § 107, 114 Stat. 2763, 2763A-382–83 (2000). Thus, the statutory history provides no support for Plaintiffs' position—quite the opposite, in fact.

Finally, it would be odd for Congress to significantly expand the meaning of "commodity"—and the CFTC's jurisdiction—by defining two *other* terms in a statute that *limited* the CFTC's jurisdiction. The Supreme Court has often remarked that Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague or ancillary provisions." *EPA v. EME Homer Generation, L.P.*, 572 U.S. 489, 528 (2014) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)). Plaintiffs' "textual arguments ultimately founder upon this principle." *Whitman*, 531 U.S. at 468.

> **b.    Gold and Silver Do Not Fall Within the Original Public Meaning of "Commodity."**

Because the CEA's definition of "commodity" is unambiguous, the term's plain meaning is immaterial. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021). Congress would not have defined "commodity" if it intended that word to carry its ordinary and plain meaning at the time of enactment. But, to the extent the plain meaning of "commodity" is relevant, corpus-linguistics analysis illustrates the CEA's reach does not grasp gold or silver coins.

Corpus linguistics is a methodology designed to best capture a word's ordinary meaning. It is an "empirical approach" that involves large electronic databases, or corpora, that provides replicable and falsifiable data on the linguistic patterns of a particular word across time. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 828–29 (2018). Corpus linguistics has assisted many courts in determining the meaning of statutory text. *See, e.g.*, *United States v. Rice*, 36 F. 4th 578, 583 n.6 (4th Cir. 2022) (relying upon corpus linguistics to interpret "strangulation"); *Caesars Ent. Corp. v. Int'l Union of Operating Eng'rs Loc. 68 Pension*

*Fund*, 932 F.3d 91, 95 (3d Cir. 2019) (using corpus linguistics to interpret "previously"); *United States v. Seefried*, 639 F. Supp. 3d 8, 13 (D.D.C. 2022) (relying upon corpus linguistics to interpret "administration of justice").

The first step in a corpus-linguistics analysis is choosing a corpus. When statutes can have criminal implications, the best corpus to use is one that collects sources the public consumes or writes. *See Rice*, 36 F. 4th at 583 n.6 (choosing a database that provides sources an ordinary English speaker would interact with when interpreting a criminal statute). While this suit is civil, violations of the CEA can be criminally prosecuted, and its reading must be interpreted with an eye towards how the public will understand the statute. *See* 7 U.S.C. § 13. The Corpus of Historical American English (COHA) compiles sources the public consumes and writes, such as newspapers, magazines, fiction, and articles.[34] But, to provide the Court with a larger swath of data, the Individual Defendants also conducted corpus-linguistic analysis for the following corpora: (1) News on the Web Corpus (NOW);[35] (2) Congressional Record Corpus (CRC);[36] and (3) the Corpus of Supreme Court Opinions – United States (COSCO-US).[37] Once a corpus is selected, a search is run to view the collocations (the words most often associated with the search term) and the key words in context (KWIC), sometimes referred to as concordance—which allows a person to view the search terms place in a given context. *See* Lee & Mouritsen, *supra*, at 832. The Corpus-

---

[34] A corpus consisting of 475 million words from texts published from 1820-2019. COHA is available at https://www.english-corpora.org/coha/.

[35] A corpus consisting of 23.6 billion words collected from the internet from 2010 through the present. NOW is available at https://www.english-corpora.org/.

[36] A corpus consisting of the entire Congressional Record published from 1873-2021 by the Government Publishing Office. CRC is available at https://lawcorpus.byu.edu/crec.

[37] A corpus consisting of all Supreme Court opinions in the United State Reports through the 2017 term. COSCO-US is available at https://lawcorpus.byu.edu/coscous.

linguistics data is attached to this Motion.[38] As discussed above, the definition of "commodity" was stitched together by eight different Congresses. As such, the corpora data encompasses the decades surrounding the dates of each significant amendment: the 1930s, 1940s, and the 1970s.

What the corpus linguistics analysis indicates is that the ordinary meaning of "commodity" was associated at all relevant times with organic products—almost exclusively agricultural—in raw form. Importantly, the collocations show no association between "commodity" and words that represent products created from combining or transforming raw products. For example, in each corpora "commodity" collocated with a raw product, such as cotton, milk, or wheat. However, in none of the corpora does "commodity" collocate with altered products of these materials—such as clothes, cheese, or bread. While there is evidence of collocations with "gold" and "silver" in some corpora, such as CRC in 1930, such collocations are not emblematic of the linguistic associations of the ordinary English speaker. In the CRC data, the collocations for "gold" and "silver" represent only 0.41% and 0.27%, respectively, of all of "commodity" collocations. Not only does the data refute the proposition that "commodity" extends to gold or silver coins—subsequent products of raw gold and silver ore—it also demonstrates the ordinary English speaker did not associate "commodity" with any non-agricultural products, including raw gold and silver. What corpus linguistics makes clear is that gold and silver did not fall within the ordinary public meaning of "commodity" when Congress passed the CEA or its significant amendments. And that is especially true of products made from gold and silver, like the coins at issue here. Thus, Plaintiffs' enforcement authority does not extend to the exclusive gold and silver coins that Metals.com sold.

---

[38] *See* [Ex. 52] Declaration of Angela L. Brown; [Ex. 52-1] COHA & NOW data; [Ex. 53] Declaration of Derek M. Younkers; [Ex. 53-1] CRC & COSCO-US data.

c.    **The CEA's Legislative History Is Not a Worthwhile Aid in Statutory Interpretation.**

Unable to find support for its position in the CEA's text, structure, or history, Plaintiffs ask the Court to look elsewhere. They have cited the Senate Committee on Agriculture and Forestry's report on the CFTC Act, which states that "[a]ll goods, articles, services, rights, and interests traded for future delivery are brought under Federal regulation."[39] (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 8, ECF 934 (quoting S. Rep. No. 93-1131, at 3 (1974), *reprinted in* 1974 U.S.C.A.A.N. 5843, 5845)).

Legislative history, however, "is not the law. 'It is the business of Congress to sum up its own debates in legislation,' and once it enacts a statute, '[courts] do not inquire what the legislature meant; [they] ask only what the statute means.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material."). "To be 'a government of laws, not of men' is to be governed by what the laws *say*, and not by what the people who drafted the laws intended." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 375 (2012) (emphasis in original).

Even if this Court were attempting to ascertain what the drafters of the CTFC Act meant when they included the catchall phrase, it is unlikely to find it in the Senate committee report that the CFTC cited. Committee reports "are drafted by the committee staff and are not voted on (and rarely even read) by the committee members, much less by the full house. And there is little reason to believe that the members of the committee reporting the bill hold views representative of the

---

[39] To be clear, the exclusive coins at issue here have never been traded for future delivery—as previously noted.

full chamber." *Id.* at 376; *see also Exxon Mobil*, 545 U.S. at 568 (noting that "judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and incentive to attempt strategic manipulation of legislative history to secure results that they were unable to achieve through the statutory text"). Even if the Committee on Agriculture and Forestry's views were identical to the full Senate's, that says nothing about the views of the House of Representatives—or the President who signed the CFTC Act.

"The stark reality is that the only thing that one can say for sure was agreed to by both houses and the President (on signing the bill) is the text of the statute." Scalia & Garner, *supra*, at 376. And, under the CEA's text, gold and silver coins are not commodities.

### d.    The Court Should Not Defer to the CFTC's Own Regulations.

In addition to legislative history, the CFTC asks this Court to consider its own regulations. According to the CFTC, it "has consistently interpreted the term 'commodity' to include non-agricultural commodities such as precious metals" and that interpretation is entitled to deference. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 10–11, ECF 934).

In *Loper Bright Enterprises, Inc. v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which required courts to defer to an agency's permissible interpretation of a silent or ambiguous statute administered by it. *See Loper Bright Enters.*, 603 U.S. at 379, 412. Courts must now exercise "independent judgment in construing statutes administered by agencies" and "in deciding whether an agency has acted within its statutory authority." *Id.* at 406, 412. That requires use of "all relevant interpretative tools" to determine the "best" reading of the statute. *Id.* at 400.

One of those tools can be the Executive Branch's interpretation, which is still entitled to "due respect" under *Loper Bright*. *See id.* at 385. Such respect is especially warranted when "an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time" and when "it rests on factual premises within the agency's expertise." *See id.* at 386, 402 (quoting *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n.8 (1983)). But "due respect" is "just that." *Id.* at 386. The Executive Branch's views can "inform the judgment of the Judiciary, but [cannot] supersede it." *Id.*; *see also id.* at 413 (holding that "courts need not and under the APA may not defer to an agency's reasonable interpretation of the law simply because the statute is ambiguous").

Even giving the CFTC's regulations all respect to which they are entitled, they do not alter the analysis for three reasons. First, the CEA is unambiguous. The Executive Branch's views are a helpful tool "in the construction of a *doubtful and ambiguous law*." *Id.* at 385–86 (quoting *Edwards' Lessee v. Darby*, 25 U.S. (1 Wheat.) 206, 210 (1827)) (emphasis added). But, if the statute is clear and unambiguous, the matter is at an end—"for the court, as well as an agency, must give effect to the unambiguously expressed intent of Congress." *Pereira v. Sessions*, 585 U.S. 198, 208 (2018) (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). That was true under *Chevron*, *id.*, and remains true under *Loper Bright*.[40]

Second, the CFTC has never defined "commodity" or even "exempt commodity" to include gold or silver coins—or any other precious metal. In the first regulations promulgated after the CFTC Act's enactment, the CFTC simply repeated the new statutory definition of "commodity." *See Rules Under the Commodity Exchange Act*, 41 Fed. Reg. 3,192, 3,194 (1976); *see also id.* at

---

[40] Because violations of the CEA and the CFTC's rules and regulations can be criminally prosecuted, courts could not give the CFTC's interpretation any deference under the *ancient regime* of *Chevron*. *See Abramski v. United States*, 573 U.S. 169, 191 (2014); *Cargill v. Garland*, 57 F. 4th 447, 466–67 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024). Instead, any "reasonable doubt" about the CEA's meaning must be resolved against the CFTC. *Cargill*, 57 F. 4th at 469 (discussing the rule of lenity).

3,193 ("Since the definition basically tracked the definition of the term in the Act, and since that statutory definition has been amended, the section 1.3(e) definition is being revised to read the same as the Act."). Even today, the definition of the "commodity" in the CFTC's regulations is identical to the statutory definition. *Compare* 7 U.S.C. § 1a(9), *with* 17 C.F.R. § 1.3. And the CTFC's current regulations do not contain any definition of "exempt commodity," much less one that includes gold, silver, or other precious metals. *See generally* 17 C.F.R. § 1.3. They simply refer to the statutory definition. *See id.* (referring to "an exempt commodity, as that term is defined in section 1a(20) of the [CEA]").

In short, the CFTC has asked the Court to defer to its interpretation of words that it has never interpreted. Under *Loper Bright*, courts must consider an agency's reasoning and give it due respect when the statute is ambiguous. *Loper Bright Enters.*, 603 U.S. at 385–86. But the CFTC has avoided rather than addressed the central issue in this case: is gold or silver a "commodity" or an "exempt commodity" under the CEA? The CFTC assumes it is one or the other—but has never provided explanation or support for that assumption. Consequently, its assumption is not entitled to any respect. *See, e.g., CFTC v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008) (holding that the CFTC's interpretation of "futures contract" was not entitled to *Chevron* deference because it had never defined the term by rule-making or in adjudication); *CFTC v. Zelener*, 373 F.3d 861, 867 (7th Cir. 2004) (holding that the CTFC's unexplained assumption was not entitled to *Chevron* deference).

Third, an interpretation of the statutory language "all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in" is not the sort of "factbound" determination based on the CFTC's specialized experience that is entitled to any special weight— but is rather a straightforward and pure question of law. *See Loper Bright Enters.*, 603 U.S. at 389,

402. "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." *Id.*

at 400–01. Thus, the CFTC's self-serving interpretation does not affect the analysis.[41]

### e.    The Fifth Circuit Has Not Held that "Commodity" Includes Inorganic Goods, such as Gold and Silver Coins.

Plaintiffs' reliance on precedent is also misplaced. In its earlier briefing, Plaintiffs have

pointed to the Fifth Circuit's decisions in *CTFC v. Muller*, 570 F.2d 1296 (5th Cir. 1978), and

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012), in support of their argument that precious

metals are commodities under the CEA. (CFTC's Resp. in Opp'n to Defs.' Mot. to Reconsider

Summ. J. Order & Cross-Mot. for Reconsideration at 12, ECF 934).

Although *Muller* remains good law, it is inapposite.[42] There, the CTFC obtained

preliminary injunction against John Muller, whose company "sold 'London commodity options'

to the public. A 'London commodity option' is a contractual right to buy or sell a specified futures

contract for a particular commodity traded on the London markets, at a specified price within a

specified period of time.'" *Muller*, 570 F.2d at 1298. Both "hard" goods, "like gold, silver, and

other metals," and "soft" goods, "like cocoa, grain, coffee, rubber, and sugar" were traded on the

London markets. *Id.* On appeal, Muller did *not* argue that gold, silver, and other metals fell outside

the CEA's definition of "commodity." *See id.* Rather he contended, *inter alia*, that the CFTC had

---

[41] What's more, as further detailed below, the CFTC has previously confirmed on multiple occasions that it does not have jurisdiction over retail sales of gold and silver. If anything, the Court should give more credence to those statements than the CFTC's current self-serving interpretation of its own authority—which stands in stark contradiction to its earlier statements.

[42] *Muller* has not been overruled. Additionally, in *Loper Bright* and elsewhere, the Supreme Court has instructed that a case interpreting a federal statute remains binding even if the court subsequently abandoned or modified the principles upon which it relied in interpreting that statute. *See, e.g., Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (stating that it was not "call[ing] into question prior cases that relied on the *Chevron* framework" and those cases' holdings were "still subject to statutory *stare decisis* despite [the court's] change in interpretive methodology"). "Principles of *stare decisis*, after all, demand respect for precedent whether judicial methods of interpretation change or stay the same. Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

authority "to regulate only option transactions involving those agricultural commodities that are *explicitly enumerated* in § 2 of the [CEA]." *Id.* (emphasis added and footnote omitted); *see also id.* ("Muller appeals from this injunction" because "the regulatory agency has no jurisdiction over the London commodity options he sells because they are not *specifically enumerated* in the statute" (emphasis added)).

The Fifth Circuit rejected that argument. *Id.* at 1298–99. It relied on a now-repealed provision of the CEA that prohibited persons from entering or confirming the execution of a transaction "involving any commodity regulated under this chapter, *but not specifically set forth in section 2 of this title, prior to the enactment of the [CFTC Act]*, which is of the character of, or is commonly known in the trade as, as an 'option'" contrary to the CFTC's rules, regulations, or orders. *Id.* at 1299 n.5 (quoting 7 U.S.C. § 6c(b)); *see also* Commodities Futures Trading Commission Act of 1974, Pub. L. No. 93-943, § 402(c), 88 Stat. 1389, 1412–13 (1974) (emphasis added). Based on that statutory text, the Fifth Circuit held that the CEA "clearly applies to option transactions in non-enumerated commodities." *Id.* at 1299.

Here, no one disputes that the CEA's definition of "commodity" includes certain "non-enumerated commodities," such as "cocoa, grain, coffee, rubber, and sugar." *See id.* at 1298–99. It must—or the catchall language that Congress added in the CFTC Act would be superfluous. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). Instead, the issue is whether the catchall language encompasses goods and articles that are dissimilar from the twenty-five organic goods that are specifically enumerated in the definition. *Muller* says nothing about that.

The Fifth Circuit's decision in *United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012), is also distinguishable. James Brooks was convicted of "false reporting of natural gas trades in violation of the [CEA] and the federal wire fraud statute." *Id.* at 684. One of his arguments on

4916-1715-4691

appeal was "only natural gas traded at Henry Hub is a commodity under the CEA because only natural gas traded at Henry Hub underlies the natural gas futures contracts traded on" the New York Mercantile Exchange. *Id.* at 694. The Fifth Circuit rejected that argument. *Id.* at 694–95. It explained that natural gas moves through a national pipeline system, and "it would be peculiar that natural gas at another hub is not a commodity, but suddenly becomes a commodity solely on the basis that it passes through Henry Hub, and ceases to be a commodity once it moves onto some other locale." *Id.* "While the price of that commodity may fluctuate with its location, and the forces of supply and demand at that location," the Fifth Circuit concluded that "the actual nature of the 'good' does not change." *Id.* (footnote omitted).

*Brooks* is not controlling here. The Fifth Circuit had no need to decide whether natural gas, in general, was a "commodity" under the CEA. Brooks assumed that it was a commodity when traded at the Henry Hub, and his brief asserted that natural gas was an "exempt commodity." *See id.* at 694; *see also* Appellants' Consolidated Brief in *United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012) (No. 09-20871), 2011 WL 2687884, at *116, 121 (5th Cir. 2011). The only issue before the Fifth Circuit was wholly different—did the natural gas, assumed to be a commodity, lose its status as such when it was traded at another hub? And, even if the Fifth Circuit had held that natural gas is a commodity, that does not mean that gold and silver coins are. Like all twenty-five goods and articles expressly enumerated in the CEA's definition of "commodity," natural gas is organic.[43] Metals are not. And gold and silver products are even further removed from the bulk gas at issue in *Brooks*. Thus, *Muller* and *Brooks* are both readily distinguishable.[44]

---

[43] *See* U.S. Energy Information Admin., *Natural Gas Explained*, https://www.eia.gov/energyexplained/natural-gas/ (last updated Oct. 10, 2024) (explaining that natural gas is derived from "the remains of plants and animals (such as diatoms)").

[44] Plaintiffs have also cited two other distinguishable precedents, *United States v. Futch*, 278 F. App'x 387 (5th Cir. 2008) (per curiam), and *United States v. Valencia*, 394 F.3d 32 (5th Cir. 2004). (Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 12–13, ECF 934). In *Futch*, the Fifth Circuit stated that natural gas was a "commodity" under the CEA. *Futch*, 278 F. App'x

When, as here, "a governing precedent deserving of stare decisis effect does not dictate a contrary disposition, judges ought to use proper methods of textual interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 414 (2012). Because those methods demonstrate that neither gold nor silver is a "commodity" under the CEA, the Individual Defendants are entitled to summary judgment on Plaintiffs' claims.

### f.    The Nondelegation Doctrine Does Not Apply.

Because Congress has not delegated its power to define "commodity" to the CFTC, this Court has no need to determine whether the statutory definition contains an intelligible principle. The intelligible-principle test is part of the nondelegation doctrine. *See FCC v. Consumers' Research*, 606 U.S. 656, 673 (2025). Courts use that doctrine to distinguish between the delegation of legislative power to the Executive Branch, which is impermissible, and the vesting of discretion in the Executive Branch to implement and apply the laws Congress has enacted, which is permissible. *Id.* at 672–73. To satisfy the test, Congress must have "made clear both the general policy that the agency must pursue and the boundaries of its delegated authority," as well as provide "sufficient standards to enable both the courts and the public to ascertain whether the agency has followed the law." *Id.* at 673 (quotations omitted).

The intelligible principle test, however, does not come into play here, because the CEA's definition of "commodity" does not purport to delegate any power to CFTC. The first step in the nondelegation analysis is to determine "whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use." *Jarkesy v. SEC*, 34 F. 4th 446, 461 (5th Cir. 2022), *aff'd*, 603 U.S. 109 (2024). "Government actions are 'legislative' if

---

at 390. But the defendant never argued otherwise, and his plea agreement stated that "natural gas was a commodity in interstate commerce under the CEA." *Id.* at 395. The Fifth Circuit had no need to decide the issue, and its statement is dicta. And, in *Valencia*, the Fifth Circuit was merely recounting the indictment when it referred to natural gas as "a commodity in interstate commerce." *Valencia*, 394 F.3d at 353. The sole issue in that case was whether the CEA was "unconstitutional as overbroad." *Id.*

they have 'the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the legislative branch." *Id.* (quoting *INS v. Chada*, 462 U.S. 919, 952 (1983)).

Although other provisions in the CEA may give the CFTC that power, the definition of "commodity" does not. Congress did not grant the CFTC the power to decide whether a particular good is a "commodity" and, thus, determine or alter the "legal rights, duties, and relations" of persons trading in futures contracts for that good. *See id.* Rather, Congress defined "commodity" itself and did not grant the CFTC the power to expand or retract that definition—as Plaintiffs impermissibly attempt to do here. Because the definition of "commodity" did not delegate any power, much less legislative power, to the CFTC, the intelligible principle test is inapplicable.

        **2.    Under the Major Questions Doctrine, the CFTC Lacks Authority Over Non-Leveraged Spot and Forward Contracts to Sell Gold and Silver Coins.**

In addition, summary judgment is proper because interpreting the CEA to grant the CFTC enforcement authority over retail sales of "almost anything other than onions and box office receipts" would violate the major questions doctrine. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 6, ECF 934). Courts "'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism'" and require the agency making those assertions to point to "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Such clear authorization is sorely lacking here.

        **a.    The CFTC Claims Sweeping Authority Over Any Contract to Sell Any Commodity in Interstate Commerce.**

To understand the breadth of authority that the CFTC is asserting, some background is necessary. The CEA limited the CFTC's jurisdiction to futures contracts and options: "Congress never purported to regulate 'spot' transactions (transactions for the immediate sale and delivery of a commodity) or 'cash forward' transactions (in which the commodity is presently sold but its

delivery is, by agreement, delayed or deferred)." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 318 n.14 (6th Cir. 1998) (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)); *see also United States v. Phillips*, 155 F. 4th 102, 112 (2d Cir. 2025); *Nagel v. ADM Inv. Servs., Inc.*, 217 F.3d 436, 440 (7th Cir. 2000) ("It is because commodity-futures contracts are a type of security that Congress has seen fit to subject them to a regulatory scheme, the [CEA] . . . . There was no intention of regulating the commerce in agricultural commodities itself."). This was true even when the spot or forward contract had the same economic effect as a futures contract. *See CTFC v. Monex Credit Co.*, 931 F.3d 966, 971 (9th Cir. 2019); *CFTC v. Erskine*, 512 F.3d 309, 313 (6th Cir. 2008); *CFTC v. Zelener*, 373 F.3d 861, 869 (7th Cir. 2004).

That "differential treatment" between spot and forward contracts, on the one hand, and futures contracts, on the other, was "by design [,] [t]he CEA was enacted during the Great Depression in response to concerns about 'manipulation, speculation, and other abuses' from trading derivatives; spot and forward transactions were seen as posing less market risk than derivatives." *Phillips*, 155 F. 4th at 112 (quoting *Salomon Forex*, 8 F.3d at 970–71) (footnote omitted).

The CEA also authorized the CFTC to file complaints against persons who had "manipulated or [had] attempt[ed] to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any board of trade." *See* Commodity Exchange Act, 74-675, §§ 8(a), 49 Stat. 1491, 1498 (1936) (current version at 7 U.S.C. § 9(1)). Both the CFTC and the courts interpreted that provision to require evidence that the defendant specifically intended manipulation of prices and actually caused an artificial price. *See Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010) (listing the elements of a manipulation claim under the CEA). Those limitations made market manipulation "virtually unprosecutable." Jerry W. Markham, *Manipulation of Commodity Futures Prices—The*

*Unprosecutable Crime*, 8 Yale J. on Reg. 281, 283 (1991); *see also id.* at 356–57 (explaining that all manipulation cases brought by the CFTC were either settled or dismissed).

Congress altered those limitations in the Dodd-Frank Act. First, it allowed the CFTC to regulate certain forward contracts that functioned like futures contracts. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 18, ECF 934 (stating that "'leveraged' retail commodity transactions" are "a type of trading activity that resembles trading of commodity 'futures'")). The CTFC now has jurisdiction over commodity transactions entered or offered "on a leveraged or margined basis, or financed by the offeror" "as if" they were futures contracts. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 742, 124 Stat. 1376, 1732–33 (2010) (codified at 7 U.S.C. § 2(c)(2)(D)(i)(II)). But Congress created an exception for leveraged spot or forward contracts that resulted in actual delivery of the commodity purchased within twenty-eight days.[45] *Id.* (codified at 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa)).

In addition to expanding the types of transactions within the CFTC's jurisdiction, the Dodd-Frank Act expanded the CFTC's authority to make and enforce anti-fraud rules. *See id.* § 753(a), 124 Stat. at 1750. Section 6c(1) of the CEA now states:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or any contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the [CFTC] shall promulgate by not later than 1 year after July 21, 2010 . . . .

7 U.S.C. § 9(1).

---

[45] Because the contracts at issue here were not entered on a leveraged or margined basis and resulted in actual delivery of the coins within twenty-eight days, the CFTC has conceded that this provision does not apply. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 18, ECF 934).

Acting on its expanded authority,[46] the CFTC promulgated Rule 180.1, which mirrors the SEC's Rule 10b-5. *See Prohibition of Market Manipulation*, 75 Fed. Reg. 67,657, 67,658 (Nov. 3, 2010) (codified at 17 C.F.R. pt. 180). It prohibits, *inter alia*, using or employing "any manipulative device, scheme, or artifice to defraud" and making "any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make statements made not untrue or misleading." 17 C.F.R. § 180.1(a)(1)–(2). Importantly, the CFTC was silent on whether Rule 180.1 was limited to transactions in futures contracts, options, and leveraged contracts—though it said that it "expect[ed] to exercise it authority" over "transactions related to futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in those markets." *Prohibition on Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,401 (July 14, 2011).[47]

The CFTC, however, abandoned those self-imposed restraints—in defiance of Congress's will. In this case and others, the CFTC has asserted that it has the authority to enforce its anti-fraud rule for *any* contract in interstate commerce for the sale of *any* good that conceivably falls the CFTC's own impermissibly broad definition of commodity. *See CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497 (D. Mass. 2018); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 229

---

[46] This was not a radical expansion. As the CFTC acknowledged in a fact sheet accompanying new Rule 180.1, its expanded authority to regulate manipulative or fraudulent behavior covered two areas: (1) eliminating the requirement to show an artificial price, and (2) lowering the scienter standard to recklessness for fraud-based manipulations. *See* Fact Sheet: Anti-Manipulation and Anti-Fraud Final Rules, available at https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/amaf_factsheet_fin al.pdf (last visited Dec. 18, 2025).

[47] Earlier, in 1990, the CFTC issued a Statutory Interpretation Concerning Forward Transactions in which it noted that "the Act's regulatory scheme for futures trading should simply not apply to private commercial merchandising transactions which create enforceable obligations to deliver but in which delivery is deferred for reasons of commercial convenience or necessity." 55 Fed. Reg. 39188, 39190 (Sept. 25, 1990).

(E.D.N.Y. 2018). For example, the CFTC contends that precious metals are commodities under the CEA. But it claims that this definition includes not only bulk precious metals—*but all products made of precious metals*. Hence, the CFTC says, Rule 180.1 applies to any contract for the sale of any precious metal—whether it is for bulk gold or silver, bullion, coins, jewelry, or silverware. And not only any to any of these products—but to any type of contract, including retail sales where the product is delivered, as is the case here.

Under the CFTC's self-serving interpretation, its authority extends to every good sold aside from onions and movie tickets, including everyday grocery purchases (most of which are "agricultural commodities"), sales of clothing ("cotton" and "wool" are both commodities), and horse auctions ("livestock" is a commodity). If a salesman at a department store misrepresents the thread count for cotton sheets, the CFTC can make a federal case out of it.

### b.    This is a Major Questions Case.

That sweeping assertion of authority implicates the major questions doctrine. Under that doctrine, administrative agencies must be able to point to "clear congressional authorization" when they claim power to make "decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The doctrine "reflects both separation of powers principles and a practical understanding of legislative intent." *Id.* at 723; *see also id.* at 737 (Gorsuch, J., concurring) (arguing that the major questions doctrine "protect[s] the Constitution's separation of powers); *Biden v. Nebraska*, 600 U.S. 477, 508 (2023) (Barrett, J., concurring) (arguing that "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation"). Agencies are "creatures of statute" that "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) (per curiam). And "[e]xtraordinary grants or regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle

devices.' Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to the statutory scheme." *West Virginia*, 597 U.S. at 723 (citations omitted).

Under the Supreme Court's precedent, this is a major questions case. First, the CFTC is claiming enforcement authority over "a significant portion of the American economy." *Id.* at 744 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). According to recent estimates, retail sales nationwide totaled $733.258 billion in September 2025.[48] In that same month, retail sales at grocery stores alone totaled $77.142 billion.[49] *One month* of retail sales is more than the student-loan relief ($469 to $519 billion) that the Supreme Court held was sufficient to trigger the major questions doctrine in *Biden v. Nebraska*, 600 U.S. 477, 502 (2023)—and more than fourteen times the "economic impact" of the Center for Disease Control and Prevention's eviction moratorium ($50 billion), which the Court held was sufficient in *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758, 764 (2021) (per curiam). The CFTC cannot seriously dispute that it claims authority to exercise control over vast swaths of the American economy.

Second, the CFTC has previously disavowed the authority to regulate spot and forward contracts. The Supreme Court has stated that "the want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred." *West Virginia*, 597 U.S. at 725 (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)); *see also Biden*, 600 U.S. at 504 (noting the then-Speaker of the House's statement that the president did not have the power for debt forgiveness); *FDA v. Brown &*

---

[48] *See Advance Monthly Sales for Retail and Food Services, September 2025*, U.S. Census Bureau 1 (Nov. 25, 2025 8:30 AM), https://www.census.gov/retail/marts/www/marts_current.pdf.

[49] *See id*. at 2.

*Williams Tobacco Corp.*, 529 U.S. 120, 158–59 (2000) (noting that, for decades, the FDA had stated that it lacked statutory power to regulate cigarettes). Here, the CFTC's former acting enforcement director testified, "Our middle name is futures and we don't see any issue where actual dealing is occurring." *Hearing to Review Implications of the* CFTC v. Zellner *Case: Hearing Before the Subcomm. on Gen. Farm Commodities & Risk Mgmt. of the H. Comm. on Agric.*, 111th Cong. 26 (1999) (testimony of Stephen J. Obie, Acting Director, Division on Enforcement, Commodities Futures Trading Commission). He also stated that "regulating the spot market is not something we are interested in." *Id.*; *see also Chaing Ming Li v. Gain Cap. Grp., LLC*, CFTC No. 10-R024 (C.F.T.C.), Comm. Fut. L. Rep. P. 31906, 2011 WL 457271 (Feb. 8, 2011) (spot transactions are "transactions for the immediate sale and delivery of a commodity" and lie outside the CFTC's jurisdiction).

With respect to precious metals in particular, the CTFC explicitly confirmed in a 1996 no-action letter: "Whether . . . any person may sell gold coins and/or gold bullion to another person without being subject to the [CFTC's] jurisdiction *depends on whether the transaction involves a futures contract or a commodity option*."[50] Before that, in 1985, the CTFC's Office of General Counsel confirmed that retail precious metal sales, like the ones here,[51] "could not be subject to [the CFTC's] regulation as transactions in futures contracts."[52]

---

[50] *See* CFTC Letter No. 97-01, Division of Trading & Markets, available at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/97-01.pdf (Dec. 12, 1996) (emphasis added).

[51] There, the bank sold gold and silver bullion and coins to a dealer—with payment made within two business days, followed by delivery of the metals to the dealer or segregation of the metals within the bank's vault. Then, in some cases, the dealer resold the metals to retail customers.

[52] *See* CFTC Interpretive Letter No. 85-02, Office of General Counsel, available at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/85-02.pdf (Aug. 6, 1985).

Third, the CFTC's assertion of authority over spot and forward contracts "would 'effect a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind.'" *Biden,* 600 U.S. at 502 (quoting *West Virginia v. EPA*, 597 U.S. 697, 728 (2022)). From its enactment in 1922, the CEA was aimed at overseeing "the 'volatile and esoteric' *market in futures contracts* in fungible commodities." *Dunn v. CFTC*, 519 U.S. 465, 468–69 (1997) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982)) (emphasis added); *see also Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 318 n.14 (6th Cir. 1998) (stating that the CEA "was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options" (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)). "Transactions in the commodity itself which anticipate actual physical delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented." *Andersons*, 166 F.3d at 318 n.14 (quoting *Salomon Forex*, 8 F.3d at 970–71). Under its newly asserted authority, however, the CFTC asserts it can police trades of the underlying products themselves. And here, the purported "fraud" involves not any sort of manipulative trading in the products—but instead supposedly "fraudulent" markups on products sold in arms-length transactions where thousands of alternative products are readily available.

Fourth, the CFTC's efforts "raise an eyebrow" by stepping outside of its ordinary regulatory domain of futures and option contracts and intruding into the province of other agencies. *See West Virginia*, 597 U.S. at 730 (2022). "'When an agency has not comparative expertise' in making certain policy judgments, [the Supreme Court has] said, 'Congress presumably would not' task it with doing so." *Id.* at 729 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117–18 (2022) (per curiam) (rejecting an effort by OSHA to ordain "broad public health measures" that "f[ell] outside [its] sphere of

expertise"); *All. for Fair Bd. Recruitment v. SEC*, 125 F. 4th 159, 182 (5th Cir. 2024) (en banc) (rejecting an effort by SEC to enact a diversity mandate). If Congress had granted any agency authority to police fraud in retail sales, it presumably would have given it to the Federal Trade Commission (FTC)—which "has a continuing duty to prevent unfair methods of competition and unfair or deceptive acts or practices in commerce." *See United States v. Morton Salt*, 338 U.S. 632, 639 (1950); *see also* 15 U.S.C. § 45(a) (declaring "deceptive acts or practices in or affecting commerce" unlawful). To wit, the "Coin and Precious Metal Disclosure Act,"which would have regulated the exact conduct at issue here—that act would have been enforced by the FTC.[53]

Fifth, the CTFC's assertion of authority over retail sales seeks to "intrud[e] into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health & Human Safety*, 594 U.S. 758, 764 (2021) (per curiam). Under the federalism canon, "courts must 'be certain of Congress's intent' before finding that it 'legislated in areas traditionally regulated by the States.' But unsurprisingly, the major questions doctrine and the federalism canon often travel together. When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 459–60 (1991)); *see also All. for Fair Bd. Recruitment*, 125 F. 4th at 182 (holding the SEC's diversity mandate triggered the major questions doctrine because, *inter alia*, the States have the primary authority to regulate corporations). Here, fraud has long been prohibited by state law and is a paradigmatic example of conduct falling within the domain of traditional state regulation. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 177 (1st Cir. 2009); *Trs. of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 775 (7th Cir. 2002); *United States v. Morgan*, 230

---

[53] *See* H.R. 6149, 111th Cong. § 3 (2010), *available at* https://www.congress.gov/bill/111th-congress/house-bill/6149/text (last visited Dec. 18, 2025).

F.3d 1067, 1074 (8th Cir. 2000) (Bye, J., concurring). The fact that ten States have intervened to enforce their own laws in this action proves that point.

Sixth, the CFTC's assertion of authority over retail sales has criminal implications. *See Ala. Ass'n of Realtors*, 594 U.S. at 764 (noting the "CDC's decision to impose criminal penalties" when deciding whether the eviction moratorium triggered the major questions doctrine). A willful violation of the CEA "or any rule or regulation thereunder" is "a felony punishable by a fine of not more than $1,000,000 or imprisonment for not more than ten years, or both." 7 U.S.C. § 13(a)(5). Thus, this is a major questions case.

### c.    The CEA Does Not Contain Clear Congressional Authorization to Make and Enforce Anti-Fraud Regulations Governing Non-Leveraged Contracts that Result in Actual Delivery.

Given those circumstances, "precedent counsels skepticism toward [the CFTC's] claim" that the CEA empowers it make and regulate anti-fraud regulations governing retail commodity sales at all—much less sales of products made from commodities. *See West Virginia*, 597 U.S. at 732. "To overcome that skepticism, the [CFTC] must—under the major questions doctrine—point to 'clear congressional authorization' to regulate in that manner." *Id.* (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). A "colorable textual basis" is not enough. *Id.* at 722

Section 6c(1) of the CEA, however, is anything but clear. As discussed above, the current version of § 6c(1) provides that it is "unlawful for any person. . . . to use or employ . . , in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance," in violations of the CFTC's rules and regulations. 7 U.S.C. § 9(1). In other words, § 6c(1) bars fraud "in connection with [1] any swap, [2] or a contract of sale of any commodity in interstate commerce, or [3] or for future delivery on or subject on or subject to the rules of any registered entity." *See id.*

Under the CTFC's reading, each part has a separate meaning, with part [2] covering any contract for the sale of a commodity, including spot and forward contracts, in interstate commerce and part [3] covering futures contracts. *See* 17 C.F.R. § 180.1(a) (stating that Rule 180.1 applies to "contract for sale of any commodity in interest commerce, or contract for future delivery on or subject to the rules of a regulated entity"). And that interpretation arguably has a colorable textual basis, because a comma and the word "or" separates each part. *See United States v. Woods*, 571 U.S. 31, 45 (2013) (words connected by "or" are to given separate meanings); *but see West Virginia*, 597 U.S. at 722 (stating that "textual plausibility" is not enough under the major questions doctrine)

But problems abound with that interpretation of § 6c(1). Part [3] cannot be read separately because it is obviously incomplete. Stating that it is "unlawful for any person to use or employ . . . in connection with . . . for future delivery on or subject to the rules of any registered entity" is nonsensical. *See id*.

In addition, the CFTC's interpretation of part [2] is so broad that it "consumes" part [3], "leaving that . . . provision with no work to do." *See Fischer v. United States*, 603 U.S. 480, 490 (2024). That is because futures contracts traded on or subject the rules of a registered entity are a type of "contract of sale of any commodity in interstate commerce." *See* 7 U.S.C. § 9(1); *see also CFTC v. Erskine*, 512 F.3d 309, 323 (6th Cir. 2008) (defining "futures contract" as a standardized, fungible agreement to buy or sell a stated unit quantity of a stated commodity at a stated unit price at or before a stated future time"). "Every commodity futures contract traded on the Chicago Board of Trade calls for delivery. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity." *CFTC v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004). By interpreting part [2] to encompass any contract for the sale of a commodity in interstate

commerce, the CFTC has rendered part [3] superfluous, in violation of a cardinal canon of construction. *See Fischer*, 603 U.S. at 496.

Moreover, the CFTC's interpretation of § 6c(1) is incompatible with the remainder of the CEA. "'[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme' and 'fit, if possible, all parts into a harmonious whole.'" *FDA v. Brown & Williams Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted). Recall that, in the Dodd-Frank Act, Congress only extended the CFTC's jurisdiction over forward contracts *that function like futures contracts*. (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. to Reconsider Summ. J. Order & Cross-Mot. for Reconsideration at 18, ECF 934 (stating that "'leveraged' retail commodity transactions" are "a type of trading activity that resembles trading of commodity 'futures'"). To fall within the CFTC's jurisdiction, forward contracts must be entered or offered "on a leveraged or margined basis, or financed by the offeror" and not result in actual delivery of the commodity within twenty-eight days. *See* 7 U.S.C. § 2(c)(2)(D)(i)–(ii). Interpreting § 6c(1) to grant the CFTC anti-fraud authority over *all* contracts for the sale of any commodity is inconsistent with the limited extension of its jurisdiction over *some* leveraged forward contracts.

Furthermore, the CFTC's interpretation of § 6c(1) renders other provisions of the CEA superfluous. Those provisions address fraudulent conduct related to commodities exchanges, brokers, and transactions over which the CFTC has regulatory authority. *See, e.g., id.* § 6b(a)(2)(A) (making it unlawful for "any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . to cheat or defraud or attempt to cheat or defraud the other person"); § 6o(1) (making it "unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator . . . to employ any device, scheme, or artifice to defraud any client

or participant or prospective client or participant"); § 6c(a)(7) (prohibiting swaps to defraud a third party). Under the CFTC's interpretation, its expanded authority to prosecute fraud generally swallows up those more specific provisions that bar fraud involving futures contracts, swaps, and commodities exchanges.

The upshot is that the CEA does not provide "clear congressional authorization" for the CFTC to make and enforce anti-fraud rules for every contract for the sale of a commodity in interstate commerce, regardless of whether the commodity was sold on the Chicago Board of Trade, a grocery store, a pawnshop, or a roadside stand. *See West Virginia v. EPA*, 597 U.S. 697, 793 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). If Congress intends to vest such authority in the CFTC, it must do so explicitly. It has not.

### 3. Precedent Mandates That Any Doubt be Resolved in the Individual Defendants' Favor.

To the extent there remains any doubt that Plaintiffs do not possess power to prosecute their CEA claims, it must be resolved in favor of the Individual Defendants. To wit, in multiple decisions since this case was filed, the Fifth Circuit has reigned in the CFTC for exactly the type of regulatory overreach employed here. *See Clarke v. CFTC*, 74 F. 4th 627, 643-44 (5th Cir. 2023) (invalidating CFTC's attempt to revoke prior no action letter and assert jurisdiction over futures market for trading in predicted outcomes of political events); *CFTC v. EOX Holdings, L.L.C.*, 90 F. 4th 439, 446 (5th Cir. 2024) (dismissing CFTC claims on fair notice grounds where—as here— "this enforcement action is the first time the CFTC has advanced this interpretation of the Rule"). As in those cases, the CFTC advances a new and expansive interpretation of its own power in contradiction of the CEA and the agency's own prior statements. The lack of fair notice therefore presents an independent ground for dismissal.

The Rule of Lenity likewise applies to the extent the statute is ambiguous (which the Individual Defendants do not believe it is—since it clearly does not extend to gold and silver

products). *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also Cargill v. Garland*, 57 F. 4th 447, 451 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ("A rich legal tradition supports the well known rule that penal laws are to be construed strictly." (quotation omitted)); *Carter v. Welles-Bowen Realty, Inc.,* 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J. concurring) (applying rule of lenity to a statute—like the CEA—which can be enforced civilly or criminally because "a statute is not a chameleon. Its meaning does not change from case to case."). The CEA is explicitly penal—allowing the government to seek crippling monetary penalties, the revocation of the defendant's ability to earn a living, and even incarceration and other criminal sanctions. *See* 7 U.S.C. § 13. Therefore, this Court must construe it narrowly.

### B.    Plaintiffs Fail to State a Claim for Control Person Liability.

Plaintiffs assert a CEA claim against the Individual Defendants in their individual capacities, alleging they had control over Metals.com's operations. Plaintiffs rely on CEA § 13(b) for this authority. It provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b). Thus, the elements of control-person liability are: (1) an underlying violation; (2) control by the defendant, direct or indirect, over the person or entity that committed the underlying violation; and (3) either (a) absence of good faith of the controlling person, or (b) knowing inducement, directly or indirectly, by the controlling person. *In re GNP Commodities, Inc.*, CFTC Doc. No. 89-1, 1992 WL 248972, at *3–4 (Sept. 25, 1992).

This claim fails for the same reason as the claims against Metals.com. Because Plaintiffs exceeded the scope of their authority under the CEA, this Court should render summary judgment on any claim against the Individual Defendants in their individual capacities.

### C.    (Count I) Plaintiffs' Fraud Claim Fails as a Matter of Law.

In the alternative, Plaintiffs' claim for fraud fails as a matter of law. Count One alleges that Metals.com violated CEA § 6c(1), which makes it "unlawful for any person" to use "any manipulative or deceptive device or contrivance" "in connection with any swap, or a contract of sale of any commodity" in such a way as to contravene regulations promulgated by the CFTC. To state a prevail on a claim under § 6c(1) and Rule 180.1, Plaintiffs have the "burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or deceptive omission; (2) scienter; and (3) materiality." *CFTC v. McDonnell,* 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018); *see CFTC v. Gorman*, 587 F. Supp. 3d 24, 40 (S.D.N.Y. 2022).

### 1.    Plaintiffs' "Fraudulent Pricing" Theory Fails.

Plaintiffs' core theory is that Metals.com committed fraud by selling "fraudulently overpriced" coins. (ECF 2 at ¶ 7). This was the case, they say, because Metals.com sold gold and silver coins at prices that were "fraudulently inflated" above the "Prevailing Market Price." (ECF 2 at ¶ 43). The Prevailing Market Price (PMP) is defined as the melt value of the metal in the coins. (ECF 2 at ¶3). This conclusory allegation permeates the Complaint, including, for example, allegations that the coins were sold at "grossly inflated prices," that they "grossly overpriced," and that they were sold at "exorbitant and fraudulent markups." (*See, e.g.*, ECF 2 at ¶¶ 10, 63, 96). This allegation forms the basis for the CFTC's sole CEA claim, even though customers received exactly what they purchased from Metals.com—exclusive coins minted by one of the most well-respected mints in the world. There was no deception, misrepresentation, or deceit involved—much less any sort of manipulative device or scheme.

Plaintiffs allege that Metals.com committed fraud by: (1) "failing to disclose the markup charged;" and (2) charging "excessive," "unreasonable," or "excessive" markups on the exclusive coins. (ECF 2 at ¶¶ 48-50). Presumably also alleging a CEA § 6c(1) "manipulative device or contrivance" rather than a misstatement, Plaintiffs also vaguely claim that the exclusive coins were "fraudulently over-priced [*sic*]." (ECF 2 at ¶ 51).

First, there is no material omission or misstatement here. "[O]missions are actionable only where they make the actual statements misleading; it is not sufficient that an investor merely considered the omitted information significant." *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 880 (N.D. Cal. 2020), *aff'd*, 29 F. 4th 611 (9th Cir. 2022) (citations omitted).

Here, Plaintiffs seek to hold Metals.com liable for not disclosing its markup on premium coins—period. (*See* ECF 2 at ¶ 97). But "[s]ilence, absent a duty to disclose, is not misleading." *LifeVoxel Va. SPV, LLC v. LifeVoxel.AI, Inc.*, 622 F. Supp. 3d 935, 945 (S.D. Cal. 2022) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).[54]

No statute requires a coin retailer to disclose its markup. In fact, Congress had the opportunity to enact such a mandate *and declined to do so*.[55] In 2010, the House Subcommittee on Commerce, Trade, and Consumer Protection of the Committee on Energy and Commerce debated the "Coin and Precious Metal Disclosure Act," which would have required that metals dealers

---

[54] *See also McCann v. Lucky Money*, 129 Cal. App. 4th 1382, 1394 (2005) (rejecting plaintiff's argument that Lucky Money's practice of failing to disclose the markup was unlawful). The court also rejected the argument that Lucky Money's failure to disclose its markup, even if not unlawful, was unfair. *Id.* at 1395. It noted that defendants are engaged in business for profit, and their failure to disclose their own costs or profit margins is not unfair. *Id.*; *see also Fabozzi v. StubHub*, No. C-11-4385 EMC, 2012 WL 506330, at *5-6 (N.D. Cal. Feb. 15, 2012) (holding that a reseller and no duty to disclose face-value of tickets: "In order for StubHub's failure to print the face value on a reissued ticket to be deceptive, a buyer would have to believe that a reseller in possession of a limited resource … does not charge a premium for her goods. This line of reasoning attributes to consumers a level of stupidity that the Court cannot countenance."). In short, courts may not simply impose their own notions of the day as to what is fair or unfair. This is the legislature's job.

[55] This only reinforces the major questions doctrine problem with Plaintiffs' case. *See Biden v. Nebraska*, 600 U.S. 477, 503 (2023) (noting Congress' consideration and failure to pass a student loan relief bill).

disclose not only the purchase price, but also all fees, the melt value, and the reasonable resale value of coins or bullion.[56] At the hearing, Howard Beales, the former Director of the FTC's Bureau of Consumer Protection, testified against the bill, which he described as "essentially requir[ing] disclosure to reveal the seller's markup on the product."[57] Congressman Ed Whitfield also highlighted the inequity of requiring private dealers to disclose their markups when the U.S. Mint does not have disclose its own.[58] The bill stalled in committee. Therefore, Congress rejected the notion that metals retailers have a duty to disclose their markups. Nevertheless, Plaintiffs attempt to circumvent Congress and in effect enact the legislation through enforcement actions.

What's more, Metals.com *did* disclose current spot gold and silver prices—*which were in fact the first thing a customer saw on the website*:[59]



Therefore, any customer with a grasp of grade school level math could easily determine the markup over spot. This is the *exact same thing Plaintiffs' own expert does*:

---

[56] Transcript of the September 23, 2010 hearing before the Subcommittee on Commerce, Trade, and Consumer Protection of the Committee on Energy and Commerce https://www.govinfo.gov/content/pkg/CHRG-111hhrg78137/html/CHRG-111hhrg78137.htm; and Status report on the Coin and Precious Metal Act, https://www.congress.gov/bill/111th-congress/house-bill/6149, and https://www.congress.gov/bill/111th-congress/house-bill/6149/all-actions?overview=closed#tabs.

[57] *Id.*

[58] [Ex. 32] The Coin and Precious Metal Disclosure Act, H.R. 6149, 111th Cong. (2010), https://www.congress.gov/bill/111th-congress/house-bill/6149/text.

[59] https://web.archive.org/web/20190829190403/https://metals.com/ (archived version of Metals.com website as of August 29, 2019).

```
10        Q.   And in selling coins to consumers, does
11   American Gold Exchange disclose its markups?
12        A.   We have published online pricing on our
13   website.
14        Q.   Does the published online pricing on
15   American Gold Exchange website tell consumers what
16   American Gold Exchange paid to acquire the coins
17   that it is selling to consumers?
18        A.   No.
19        Q.   So you don't disclose the markups; correct?
20        A.   You just asked me about my cost.

21        Q.   Well, let me -- you use the term "markup"
22   in your report; correct?
23        A.   Yes.
24        Q.   You know what markup means; right?
25        A.   Yes.
```

Page 17

1    Q.   Using your definition of markup, does

2   American Gold Exchange disclose its markups to

3   consumers?

4    A.    No.  However, it is transparent on our

5   website what the price a client is paying for a

6   bullion item over the intrinsic metal content

7   because we have published prices online.  That can

8   be easily discerned.

9    Q.   When you say you have published prices

0   online, do you mean the publish -- you publish the

1   price that you are selling your coins at to

12   consumers?

13    A.   Yes.

14    Q.   And you're saying that the consumer also

15   has available to them what the intrinsic value is of

16   those coins?

17    A.   Yes.

18    Q.   And how do consumers have the intrinsic

19   value available to them?

20    A.   Well, the metal content of the coins is

21   listed on the website.  The live spot price, which

22   is the current unfabricated price of an ounce of

23   gold or silver is published, and the sell price is

24   published at the same time on the same page.

25        So anyone with a calculator or a mind for

Page 18

4916-1715-4691

```
 1    math can discern pretty easily the metal value and
 2    the price they are paying for that ounce of metal or
 3    half ounce or quarter ounce or tenth ounce or fifth
 4    ounce, depending upon the intrinsic content of the
 5    coin.
 6         Q.   So is it correct, then, that consumers who
 7    go to the American Gold Exchange website can
 8    determine what premiums are being charged over melt
 9    value?
10         A.   Yes.
11         Q.   But they don't know the markup; correct?

12         A.   Correct.
```

[Ex. 47] Deposition testimony of Dana Samuelson in *CFTC v. Red Rock Secured,* LLC, No. 2:23-cv-3680 (C.D. Cal.) taken on Mar. 24, 2024, at17:10-19:12.

In other words, unless Plaintiffs' own expert is engaged in fraud—which would be its own reason for this case to be dismissed—Metals.com did not engage in fraud by charging supposedly "fraudulent" markups or omitting to disclose their markups.

The explicit disclosure of the markups also would have made no difference. That is because to a *reasonable* customer, the disclosure would not have altered the "total mix" of information available—rendering it immaterial. *See, e.g., Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45–46 (2011). This is common sense—as gold and silver spot prices are available with a ten-second Google search, just as they were available on the very front page of the Metals.com website. Consequently, disclosure of the markups was immaterial, since—to quote Plaintiffs' own expert—

any reasonable customer could "discern pretty easily" the markup.[60]

Plaintiffs offer no evidence for why or how the coins were overpriced. As Plaintiffs own expert acknowledged, the market determines the categorization of a coin with its "checkbook.[61] In short, these were arms-length transactions in a robust market where the purchasers had many choices. There was nothing "fraudulent" about the prices charged.

With respect to Metals.com's own markups, a reasonable customer would not care about how much the company marked up it product. Rather, the customer cares about what alternative products sell for in the market. For example, a customer purchasing a piece of jewelry would not care about the retailer's markup on the product. On the contrary, a reasonable purchaser would care only about what similar products sell for in the market. The customer is then free to choose which product to buy. So too here—where the customer could have chosen from thousands of alternative products in the marketplace.

In addition, Plaintiffs do not identify any specific sale—either by customer or by specific coin sold—along with the price the coins were sold for, and then compare that price to "market value" for the same date, as would be required to show that the coin was in fact overpriced *vis a vis* the market.[62] The Complaint makes reference to purported but unidentified PMP, but at no time does it say what that value was for the coins at issue here. These *ipse dixit* allegations are plainly

---

[60] [Ex. 48] Deposition of Dana Samuleson (Samuelson Depo.) 39:5-20. In addition, Samara Mills—a Metals.com manager—testified that: (1) customers could easily research pricing information on the internet, and Metal.com did not discourage them from doing so; (2) that they could rescind the transaction within a set timeframe if they found a better deal; and (3) that these rescissions happened "regularly." [Ex. 45] Mills Depo. 130:17-132:7, 132:21-134:3. This testimony is unrebutted

[61] [Ex. 47] Samuelson Depo. 39:5-20. In addition, Samara Mills—a Metals.com manager—testified that: (1) customers could easily research pricing information on the internet, and Metals.com did not discourage them from doing so; (2) that they could rescind the transaction within a set timeframe if they found a better deal; and (3) that these rescissions happened "regularly." [Ex. 45] Mills Depo. 130:17-132:7, 132:21-134:3. This testimony is unrebutted.

[62] *See* [Ex. 33] at 14, 17.

insufficient. Furthermore, at what point does an item become "fraudulently overpriced?" And even if it is overpriced, the solution is for the customer to go somewhere else—not for the government to eliminate the supposedly offending company from the market. As Plaintiffs' own expert testified: "[T]he internet is rife with competitive industry pricing. It's easy to shop around."[63]

There is no limiting theory here, no statutory mandate, no basis in case law—this theory must fail.

### 2. Many of the Alleged Statements or Omissions Are True or Not Misleading.

In Section IV.A. of the Complaint, Plaintiffs allege that "Metals, directly and by and through its sales representatives or other agents, defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to those accounts by making material misrepresentations and omissions to instill fear in the investors . . . ." ([ECF 2 at ¶ 40].) These supposed misrepresentations or omissions include:

- "Misrepresenting that the United States government was going to take Qualified Retired Savings funds in a "Bail-in" to help banks and government programs;"

- "Mispresenting that IRA custodiams are in financial trouble and are likely to collapse;"

- "Misrepresenting that it is unclear who actually owns the underlying securities in IRA accounts;" and

- "Misrepresenting that the government could seize funds held in Qualified Retirement Savings but could not seize Precious Metals Bullion held in SDIRAs."

(ECF 2 at ¶ 41a-d). At most, these statements are non-actionable opinions.[64] *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (holding that

---

[63] [Ex. 48] Samuelson Depo. 39:23-24.

[64] To the extent Defendants held and conveyed these opinions, they were by no means the only ones. [Ex. 34] *Why Bank Bail-Ins Are the New Bailouts*, Investopedia, https://www.investopedia.com/articles/markets-economy/090716/why-bank-bailins-will-be-new-bailouts.asp (last visited Sept. 30, 2024); [Ex. 35] Oliver Grant, *If You Don't Have a Gold IRA, Your Investment Is at Risk*, NewsMaxMoney (Jul. 23, 2018), https://www.newsmax.com/finance/oliviergarret/gold-ira-retirement-risk/2018/07/23/id/873289/.

statements of opinion not actionable). Further, these statements are not attributed to any employee or officer of Metals.com. And Plaintiffs provide no information on the "who, what, where, when, and how," these statements were allegedly made. Fed. R. Civ. P. 9(b); *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 349 (5th Cir. 2012); *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).[65]

### 3.    Other Alleged Misstatements are Not Actionable.

Plaintiffs do not explain why alleged statements by Metals.com that gold and silver were "safe and secure" investments constitute actionable misrepresentations—much less the "who, what, when, where, or how" of these statements. In fact, Plaintiffs provide no support for their allegation that statements that gold and silver—traditional investments particularly in times of high volatility or inflation—are "safe and secure investments" were false or misleading.

Further, the Transaction Agreement contains multiple additional risk disclosures, including:

- "[Metals.com] is not an investment advisor[.]"

- "Customer acknowledges that purchases of Precious Metals involve considerable risk."

- "In Metals opinion, Precious Metals should be considered a long-term investment. Customer should be prepared to hold any Precious Metals purchases—whether from [] Metals or elsewhere—for at least a three to five year period, and preferably five to ten years, to maximize the potential for gains."

- "In Metals' opinion, Customer should not invest more than twenty percent of Customer's available investment funds in Precious Metals."

---

[65] Other vague and unattributed statements are not actionable because they amount to nothing more than sales puffery. Vague statements of optimism or ordinary sales tactics are not actionable. *See City of Pontiac Policeman & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (aspirational statements about reputation and integrity are too general and not actionable); *Rombach*, 355 F.3d at 175 ("[P]uffery or 'misguided optimism' is not actionable as fraud" and "plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why."); *Shields*, 25 F.3d at 1129-30 (dismissing fraud claim because defendant's statements "predicting a prosperous future" were insufficient to support an inference of fraud).

- "The success of an investment in precious metals is dependent, in part, upon extrinsic economic forces."

- "Metals does not provide tax, investment, or legal advice or advisory services."[66]

As these disclosures make clear, Metals.com did not attempt to mislead customers. On the contrary, it plainly explained that buying precious metals involves considerable risks, and customers knowingly assumed such risks—and hoped to achieve such gains *over time*—when they decided to purchase precious metals.

### 4. Plaintiffs' Allegations that Customers Lost Money Are Baseless.

Similarly, Plaintiffs allege that customers "lost" their investment when they purchased coins from Metals.com due to the supposedly "exorbitant and fraudulent markups." Even the U.S. Mint substantially marks up the coins that it sells into the market.[67] This conclusory allegation that customers "lost" their investment is similarly misleading and lacks any support in the record. This was a purchase: customers exchanged money for a physical object—one they were advised to hold for years, and that has, in fact, appreciated significantly over time.[68]

The fallacy of Plaintiffs' allegation that customers "lost" money can be illustrated by example. If a person decided to put money into jewelry as an investment, does that person lose

---

[66] [Exs. 4, 5] ¶ 3; *see also* [Ex. 48] Samuelson Depo. 16:10-17:3.

[67] The U.S. Mint acknowledges that it needs to charge a premium in order to cover its costs including "enough margin to cushion against volatility." [Ex. 37] Discover FAQs: Get Answers to the Most Popular Questions | US Mint, https://catalog.usmint.gov/customer-service/faqs/ ("How do you price your products?"); *see also* [Ex. 36] Congressional Record, Volume 141 Issue 192 (Tuesday, December 5, 1995) (govinfo.gov) ("The price would be that of the bullion plus cost of manufacture, with a reasonable profit added for proof versions."). Congressional testimony identifying the U.S. Mint markups was provided in context of a bill proposed in the U.S. House of Representatives that would have required precious metals companies like Metals.com to disclose their price markups to customers. Congress, however, did not pass the bill into law. Indeed, there is no general duty for a seller to disclose its profit margin to a buyer in an ordinary retail transaction. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1998) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). *See also* [Ex. 48] Samuelson Depo. 117:6-120:5.

[68] *See also* [Ex. 33] Moloian Report at 6 ¶ 3, 11¶ A, 14, App'x H; Ex. 54 (Updated App'x H Calculations as of December 17, 2025, showing an overall gain of almost $150 million on the products sold by Metals.com).

money by purchasing the jewelry? After the purchase is completed at a retailer (and particularly from a brand name retailer), the resale value of the jewelry is likely to be lower than what the customer purchased it for. And it will certainly be worth far less than the value of the raw materials. But the customer gets the security of owning the physical item, which he or she may expect to appreciate in value over time. More importantly, ownership of the physical item provides the customer with security in case of unstable financial markets and possibly other types of risks that would apply to more traditional investments. While Plaintiffs might not agree with this investment strategy,[69] it is not their role to second-guess individuals' decisions—much less to destroy a business or its industry, as they have done here.

Furthermore, only the Individual Defendants' expert analyzed whether customers actually experienced losses based on the market price of the coins—the only legitimate methodology to value the coins. His unrebutted testimony determined that because the customer actually received the coins purchased, the only method for determining whether the customers incurred a financial "loss" is at the time they are later sold. However, many of the customers still own their coins.[70] And if they sold their coins today, many customers would gain in value far above their purchase price. *Id*. That is undisputed.

Plaintiffs attempt a bait-and-switch—arguing that customers "lost" money because their SDIRA account statements were based on the weight of the coins and spot value of the metal they were made of. (*See, e.g.*, ECF 2 at ¶ 86). But, as they well know, statements issued by SDIRA

---

[69] Moreover, should the Court find that the CFTC has jurisdiction here, the CFTC would also have jurisdiction over these kinds of transactions. This includes from brand name jewelry retailers whose jewelry products are made of precious metals, often held (at least in part) for investment purposes, and sell for far more than the melt value and far more than the purportedly exorbitant markups here.

[70] *See* [Ex. 33] Moloian Supp. Rep. at 9, ¶ 3.

custodians are based on the spot price and are not intended to represent what the coin would sell for in the marketplace.[71]

According to the IRS, an individual may hold collectible coins in the form of a self-directed IRA as defined in the Internal Revenue Code section 408(m). This is not the only collectible permitted to be held; the IRS also allows for stamps, antiques, works of art, and even rugs to be held as collectibles.[72] What typically makes something collectible is that it has some form of additional value based on rarity and market demand. For example, the IRS states that "[l]ike many other collectors' items, the value of a coin depends on the demand for it, its age, and its rarity.[73] Self-directed IRAs may also hold precious metals in the form of bullion, if not otherwise a collectible.[74]

Valuation of precious metals and collectibles depends on fair market value—not melt value. For example, a one-ounce gold coin is worth about $1,200 based upon the value of the metal, but would not be considered a collectible by the IRS. However, a rare antique double-eagle gold coin produced in the 19th century could be worth $20,000 to a collector, regardless of whether it is made of exactly the same amount of gold as another coin trading for far less.[75] In other words, a coin's metallic composition may produce one value, while other attributes of that same coin may produce a significantly different value.

---

[71] [Ex. 50] Deposition of David Madge at 70:1-73:23; [Ex. 38] (KANE-266423) (showing proof U.S. Mint Silver Eagles valued at spot price on SDIRA statement—even though they sell for far higher in the market). This testimony is unrebutted.

[72] [Ex. 39] *Issue Snapshot - Investments in Collectibles in Individually Directed Qualified Plan Accounts*, Internal Revenue Serv., https://www.irs.gov/retirement-plans/investments-in-collectibles-in-individually-directed-qualified-plan-accounts (last updated Aug. 19, 2024) (interpreting definition of "collectable" under 26 U.S.C. § 408(m)(2)).

[73] [Ex. 40] *Publication 561 (02/2024), Determining the Value of Donated Property*, Internal Revenue Serv. (Feb. 2024), https://www.irs.gov/publications/p561.

[74] *See* [Ex. 4] Transaction Agreement at ¶ 3e; [Ex. 5] Transaction Agreement at ¶ 3e

[75] [Ex. 48] Samuelson Depo. 82:7-83:9 (the market accepts that some items have a very high premium despite being "bullion").

Finally, precious metals dealers such as Metals.com do not control how SDIRA custodians value the assets in their customers' accounts—just as SDIRA custodians have no control over how dealers and retailers price the goods they buy and sell. It is for this reason that SDIRA customers are encouraged to contact their precious metals dealers for real-time pricing if they are interested in knowing the retail price at which they can sell their precious metals.[76] A customer typically can sell his or her precious metals at a price above the spot price listed by the SDIRA custodian.[77]

In short, Plaintiffs' allegations that customers "lost" money is unfounded and misunderstands the nature of Metals.com's sales and therefore cannot form the basis of a fraud claim—or a claim for resulting damages.

### 5. Other Alleged Misstatements Are Not Material.

A number of other statements made to customers are not actionable because they amount to nothing more than sales puffery. Such vague statements of optimism or ordinary sales tactics are not actionable. *See City of Pontiac Policeman & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (aspirational statements about reputation and integrity are too general and not actionable); *Rombach*, 355 F.3d at 175 ("[P]uffery or 'misguided optimism' is not actionable as fraud" and "plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why."); *Shields*, 25 F.3d at 1129-30 (dismissing fraud claim because defendant's statements "predicting a prosperous future" were insufficient to support an inference of fraud).

### 6. Statements or Omissions About Retail Value of Coins

Plaintiffs fail to demonstrate falsity with respect to Metals.com's pricing of the Polar Bear coins. In summarizing this theory, Plaintiffs allege: "Defendants did not disclose the actual value

---

[76] *See* [Ex. 4] Transaction Agreement at ¶ 3e; [Ex. 5] Transaction Agreement at ¶ 3e.

[77] *See, e.g.*, [Ex. 33] Moloian Supp. Rep. at 14-15 (comparing actual retail transactions to spot prices and determining that it would be a "windfall" to acquire certain semi-numismatic coins at spot prices); [Ex. 33] Appendix H.

of the Precious Metals Bullion and instead provided investors with invoices showing exorbitant and unreasonable prices." (ECF 2 at ¶6.).

This claim must fail. First, as Plaintiffs effectively concede, what was disclosed—an invoice showing the prices charged for the coins—was true. Plaintiffs do not allege that Defendants charged anything different than the price reflected on the invoice—because they didn't. They confusingly allege that the invoices were misleading because Metals.com did not disclose "the actual value of the Precious Metals Bullion." If this means the spot price of the underlying metal, this was indisputably disclosed on the front page of the Metals.com website and also readily available with a ten-second Google search—as detailed above.

To the extent Plaintiffs imply that Defendants broke the law by not disclosing the then-current value of the coins, this is not legally required and Plaintiffs cite no authority for the proposition that it is. Ford doesn't disclose the Blue Book value of its trucks on its sticker price. The CEA sets no higher bar. What's more, what should the "actual value" be based upon, and who should determine it? The government? Like all for-profit business, coin dealers are free to set their own prices. And buyers are likewise free to comparison shop the hundreds of comparable products available in the market. Further, the Transaction Agreement discloses to prospective customers the basis for premium charged on the coins: "[t]his premium is based on various factors, including, but not limited to, speculative interest, collector and investor demand, available supply, industry promotions, perceived value, and economic conditions." Any customer who didn't want to pay this premium was free to go elsewhere.

Finally, Plaintiffs' claims based on purported misrepresentations made after Metals.com closed its transactions with customers must fail because such statements were not made "in connection with any … contract of sale of any commodity." 17 C.F.R. § 180.1(a). *See SEC v. Mapp*, 240 F. Supp. 3d 569, 580 (E.D. Tex. 2017) (explaining that "statements following a sale of

securities are not made 'in connection with the purchase or sale' of securities"); *Garrison v. Ringgold*, Case No. 19cv244-GPC(RBB), 2019 WL 2089509, at *8 n.7 (S.D. Cal. May 13, 2019) ("To the extent Plaintiffs will claim, in an amended pleading, that the Offering Memo was provided in connection with their investment…, any alleged misrepresentations must have occurred prior to the purchase of the securities").

### D.    This Court Should Decline to Exercise Supplemental Jurisdiction over the State-Law Claims.

Plaintiff States are here only because § 6d(1) of the CEA, codified at 7 U.S.C. § 13a-2(1), allows them to sue in federal district court to seek injunctive and other relief based on violations of the CEA or the CFTC's regulations. (*See* Pls.' Original Compl. at ¶ 17, ECF 2). But, as detailed above and in the MSJ Order, this Court should render a summary judgment that Plaintiffs take nothing by those claims.

This leaves only the individual state-law claims to be litigated. The Court should decline to exercise jurisdiction over these remaining claims. The Fifth Circuit has "elucidated the general rule that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial." *Heggemeier v. Caldwell Cnty., Tex.*, 826 F.3d 861, 872 (5th Cir. 2016) (cleaned up). Although this rule is neither mandatory nor absolute, *id.*, the Court should exercise its discretion to dismiss the remaining state law claims.

First, there is no reason to depart from the general rule that the court "should" decline to exercise jurisdiction over the state law claims. *See id.* On the contrary, it is especially important for the Court to follow this general rule here. Critically, pushing forward with just the individual state law claims will place the Court on the horns of a dilemma: either violate the *Erie* doctrine or violate the Individual Defendants' due process rights. As detailed in the Individual Defendants' original summary-judgment motion (ECF 774 at 46-48, Ex. 41) and their earlier motion regarding

pretrial procedures (ECF 708), the state laws at issue are replete with inconsistencies.[78] For example, the Complaint alleges throughout that "elderly" individuals were targeted—but Alabama and Florida define "elderly" as a person who is sixty or older, while California defines such a person as sixty-five or older. (*Id.* at 15). Additionally, some of the States' claims raise important issues of state law and would require this Court to opine on matters best left to the States and their respective courts and lawmakers.

Perhaps most problematic, none of the States have the same definition of "commodity"—in a case that is fundamentally based on allegations of commodities fraud. (*Id.*) In California and Colorado, commodities include farm products, fuels, gems, and foreign currencies—but not "a numismatic coin whose fair market value is at least 15 percent higher than the value of the metal it contains." (*See* Ex. A to Mot. Regarding Pretrial Procedures at 13, ECF 708). Florida, however, incorporates the CEA's definition of "commodity" into its statute—which, as the Court has held, does not include gold or silver coins. (*Id.* at 13–14; MSJ Order at 9). Georgia's and South Carolina's definitions—while in some respects similar to California and Colorado—contain important differences, including that South Carolina includes "a precious metal" in the definition of a commodity. Mot. Regarding Pretrial Procedures (*See* Ex. A to Mot. Regarding Pretrial Procedures at 14, ECF 708).

This mismmash of disparate definitions—including the definition of what is arguably the key term in this entire case—weighs strongly against the Court departing from the general rule. It should dismiss the state-law claims and let the States prosecute their claims in their home states, should they so choose—as they should have done in the first place.

---

[78] *See also* Mot. Regarding Pretrial Procedures (ECF 708, Ex. A at 12-15a).

Finally, as the MSJ Order details, many of the States cannot recover on their state-law claims for the same reason that they (and other Plaintiffs) cannot recover on their federal claim. (*See* MSJ Order at 13 (noting that various state claims, including claims from Florida, Colorado, Georgia, and South Carolina, track the CFTC's claims)). So this Court should render summary-judgment on those claims, even if it chooses not to dismiss all state-law claims.

## V.    CONCLUSION

As detailed above, this case represents an unprecedented and improper exertion of agency power not granted by the legislature. It also embodies aggressive and unprecedented prosecutorial theories—most notably that by charging more than the government sees fit, a retailer commits fraud (never mind that the government itself is charging the same markups on its coins). The Court should restore the appropriate balance of power, render a summary judgment that Plaintiffs take nothing on their claims under the CEA and the state-law claims that track the CEA, and dismiss the remaining state-law claims.

DATED: December 18, 2025                    Respectfully submitted,


                                           **GRAY REED**

                                           BY:  /s/ Chris Davis
                                                Chris Davis
                                                State Bar No. 24050483
                                                Angela L. Brown
                                                State Bar No. 24034533
                                                Drake Rayshell
                                                State Bar No. 24118507
                                                Ryder McCool
                                                State Bar No. 24122967
                                                1601 Elm Street, Suite 4600
                                                Dallas, Texas 75201
                                                Tel: (214) 954-4135
                                                Fax: (214) 953-1335
                                                Email: cdavis@grayreed.com
                                                Email: abrown@grayreed.com
                                                Email: drayshell@grayreed.com
                                                Email: rmccool@grayreed.com

                                           *ATTORNEYS FOR DEFENDANTS LUCAS ASHER*
                                           *and SIMON BATASHVILI*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing instrument was electronically filed with the Clerk of the court using the CM/ECF system on, which will send notification to the attorneys of record for all parties to this suit.


                                           */s/ Chris Davis*
                                           Chris Davis

4916-1715-4691