UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES AND TRADING COMMISSION et al., | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § § | Civil Action No. 3:20-CV-2910-X |
| TMTE, INC. a/k/a METALS.COM et al., | § § § § | |
| *Defendants*. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the Commodity Futures Trading Commission's (the "CFTC") Amended Motion for Summary Judgment (Doc. 977); Defendants Simon Batashvili and Lucas Thomas Erb's Amended Motion for Summary Judgment (Doc. 980); and the CFTC's Motion for a Default Judgment against Barrick Capital Inc., Chase Metals Inc., Chase Metals LLC, TMTE Inc., and Tower Equity LLC (Doc. 984). After due consideration, the Court **DENIES** all three motions and sets this matter for trial on March 1, 2027.

This case involves, in part, whether the CFTC can regulate gold and silver trading. Overall, the Court concludes that Fifth Circuit precedent binds it to hold that the CFTC has that authority. While that opinion's analysis was scant, a full textualist and originalist analysis would show that the preamble allows the CFTC to regulate commodities traded on exchanges, including included gold and silver as they

1

were traded in 1974. But that could change if the Fifth Circuit adopts Justice Gorsuch's view of the major questions doctrine.

### I.    Background

This is the second attempt by the CFTC and Batashvili and Erb to obtain summary judgment. In the previous attempt, the Court denied summary judgment to the CFTC because the Court held that the CFTC lacked jurisdiction over silver and gold trades under the Commodity Exchange Act (the Act).[1] This holding flowed, in large part, from the CFTC's inability to identify a case or statutory text that gave it jurisdiction over gold and silver. In that holding, the Court relied on semantic canons, namely *noscitur a sociis* and *ejusdem generis*, to conclude that "all other goods and articles" are limited to agricultural products.[2]

The parties moved for reconsideration, and the Court ordered renewed motions for summary judgment addressing: (1) the precedential effect of an old but newly discovered case: *CFTC v. Muller*[3]; (2) the ordinary public meaning of "commodity" at the time of the amendment to the Commodity Exchange Act; (3) the implications of the major questions doctrine, the nondelegation doctrine, and the effect of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*.[4]

---

[1] Doc. 911 at 7–10.

[2] *Id.* at 8–9.

[3] 570 F.2d 1296 (5th Cir. 1978).

[4] 603 U.S. 369 (2024).

## II.    Analysis

Based on the parties' far better briefing in this round of motions, the Court makes the following conclusions.

### A.    Binding Precedent

First, the Fifth Circuit has held that the CFTC can regulate gold and silver trades, and that decision is binding.  In *CFTC v. Muller*, the Fifth Circuit directly considered whether the CFTC's authority reached non-agricultural commodities.[5] The court noted that the 1974 amendments to the Commodity Exchange Act "was passed to fill the regulatory gaps in commodities trading."[6]  With that change, "the definition of 'commodity' [includes], in addition to those commodities expressly enumerated, 'all other goods and articles . . . and all services, rights and interests in which contracts for future delivery are presently or in the future dealt in.'"[7]

The Fifth Circuit concluded that the CFTC "has jurisdiction not only over options in specifically enumerated commodities, but over all other commodity option transactions, including Muller's 'London commodity options.'"[8]    And London commodity options included "hard commodities, like gold, silver and other metals."[9] So while the CFTC did not raise *Muller* during the first round of summary judgment

---

[5] 570 F.2d at 1298.

[6] *Id.*

[7] *Id.* at 1298–99 (quoting a prior version of 7 U.S.C. § 2).

[8] *Id.* at 1298.

[9] *Id.* at 1298–99. (cleaned up).

briefing, it establishes that the CFTC has jurisdiction over gold and silver in this circuit.[10]

### B.     The Original Public Meaning of "Commodity"

The analysis of *Muller* seems a bit conclusory.  It expressly relies on "the wording of the Act and its legislative history."[11]  Courts currently run from legislative history, not to it.  And the assessment of the wording of the Act did not use the tools of textualism and originalism.  Plus, in *Muller* there seemed to be agency deference at play and no major questions analysis.

But this Court's duty—by virtue of the oath of office and fealty to the Constitution—is to assess the meaning of the Act using the current Fifth Circuit's tools for interpreting text—namely textualism and originalism.

As then-Judge Kavanaugh aptly summarized:

Courts should try to read statutes as ordinary users of the English language might read and understand them.  That inquiry is informed by both the words of the statute and conventional understandings of how words are generally used by English speakers.  Thus, the "best reading" of a statutory text depends on (1) the words themselves, (2) the context of the whole statute, and (3) any other applicable semantic canons, which at the end of the day are simply a fancy way of referring to the general rules by which we understand the English language.[12]

This outstanding summary of textualism raises a couple of questions, which have simple answers.  First, what do we look to for an understanding of the English language?  The statute, for starters.  Sometimes, laws define the words at issue or

---

[10] *Id.*

[11] *Id.* at 1298.

[12] Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2144–45 (2016) (book review).

the context of the broader law answers the question. And we look to dictionaries, corpus linguistics, and the canons of interpretation when the text and context do not conclusively resolve the question of how the public understands the English language.

Second, at what point in time are we trying to find the public meaning? When the words were selected or now? The time period that matters is when the words were selected. As the author of the first major dictionary told us, words shift meaning over time.[13] This is why one of Scalia and Garner's canons of textualism says "[w]ords must be given the meaning they had when the text was adopted."[14] We've come to call this method of finding the text's original meaning originalism.

So off we go to the text. The Commodity Exchange Act states that

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions [!] (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts).[15]

So gold and silver are not expressly commodities under the Act. But the Act includes a catch-all phrase—"*all other goods and articles*"—after a laundry list of agricultural

---

[13] *See* SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1775), Preface, *available at* https://www.lexilogos.com/document/johnson_dictionary_preface.htm (last visited July 9, 2026) ("Total and sudden transformations of a language seldom happen; conquests and migrations are now very rare: but there are other causes of change, which, though slow in their operation, and invisible in their progress, are perhaps as much superiour to human resistance, as the revolutions of the sky, or intumescence of the tide.").

[14] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 78 (2012).

[15] Commodity Exchange Act, 7 U.S.C. § 1a(9) (cleaned up) (humorous exclamation point added).

products.[16]    That catch-all phrase is the textual hook that the CFTC hangs its jurisdictional hat on.

But seizing on a catch-all phrase is not how we do textualism.  Just take the case of *Yates v. United States*.[17]  After the Enron scandal, Congress made it a crime for anyone to "knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object" with the intent to harm a federal investigation.[18]  Captain John Yates was convicted under this law for tossing overboard three undersized fish, with the government arguing the fish were tangible objects.[19]    The plurality (getting help in the judgment from Justice Alito's concurrence) tossed the conviction overboard, concluding "'[t]angible object' . . . is better read to cover only objects one can use to record or preserve information, not all objects in the physical world."[20]  The opinion rejected the broad dictionary definitions the government provided in favor of context and canons like *noscitur a sociis* and *ejusdem generis* to understand that the catch-all was referring to tangible objects that store information.[21]  Fish store delicious protein and occasionally a person[22] or a

---

[16] *Id.* (emphasis added).

[17] 574 U.S. 528 (2015).

[18] *Id.* at 531 (cleaned up).

[19] *Id.* at 534–36.

[20] *Id.* at 536.

[21] *Id.* at 544–46.

[22] Jonah 1:17 (New Int'l Version 2011) ("Now the Lord provided a huge fish to swallow Jonah, and Jonah was in the belly of the fish three days and three nights."). *See also* JAWS (Universal Pictures 1975).

coin[23]—but not information.  The broader lesson from *Yates* is that our normal tools for textualism and originalism (like looking to dictionaries) yield too expansive a reading of a catch-all phrase at the end of a list.  So we look to canons like *noscitur a sociis* and *ejusdem generis* to figure out what the list is really about and read the catch-all in conjunction with that list.

### 1.    In Isolation, the Catch-All Catches All

If you read the catch-all in isolation, as the dissent in *Yates* did, the words "all other goods and articles" are broad.  At the time, dictionaries defined "goods" as something "useful, advantageous, or profitable, as an idea or a trade; genuine or legally valid, as money or title."[24]  And an "article" was "a particular commodity or substance" or "an individual thing in a class; an item: an article of clothing."[25] Dictionaries from the same period likewise broadly define "commodity" to be "[a]n article of trade or commerce that can be transported, especially an agricultural or mining product"[26] or "[s]omething that is of use or is valuable; an article of trade or commerce."[27]  So dictionary evidence from the time Congress amended the Commodity Exchange Act to include the statutory catch-all phrase at issue indicates

---

[23] Matthew 17:27 (New Int'l Version 2011) ("But so that we may not cause offense, go to the lake and throw out your line.  Take the first fish you catch; open its mouth and you will find a four-drachma coin.  Take it and give it to them for my tax and yours.").

[24] *Good*, NEW WEBSTER'S DICTIONARY 655 (1975).

[25] *Id.* at 90; *Article*, AMERICAN HERITAGE DICTIONARY 74 (1973).

[26] *Commodity,* AMERICAN HERITAGE DICTIONARY 286 (1975).

[27] *Commodity,* NEW WEBSTER'S DICTIONARY 319 (1975).  What's not an article in trade or commerce?  Filburn's wheat.

that commodities can be from agriculture or mining, or that they can be something of economic value.

Accordingly, the Act's catch-all on its face truly catches all.

### 2. In Context, the Catch-All Catches All Agricultural Products (But Not Onions!)

However, the Supreme Court in *Yates* showed us that catch-alls are different. And that is precisely why we use the canons of *noscitur a sociis* and *ejusdem generis* to understand what a catch-all phrase really means instead of "everything on earth." The *ejusdem generis* canon directs that "where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."[28]  And, because the defined commodities are agricultural products, *ejusdem generis* indicates that "commodity" under the Act is limited to an agricultural good or article.[29]

*Ejusdem generis's* judicial best friend is the *noscitur a sociis* canon.  It means "a word is known by the company it keeps" and is a doctrine designed to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."[30]  (Major questions doctrine anyone?  We'll get to that later.)  Because the catch-all keeps company with

---

[28] *Yates*, 574 U.S. at 545 (cleaned up).

[29] *See id.*

[30] *See id.* at 543 (cleaned up).

agricultural products (except onions!), *noscitur* directs the catch-all to be limited to agricultural products.

### 3.    Preambles

But wait, there's a nugget more (than in *Yates*).    Another canon of interpretation states that prefatory statements and preambles also "can shed light on the meaning of the operative provisions that follow."[31]   To be sure, when the text is clear, preambles cannot be invoked.[32]   That said, courts have found that a "preamble of a statute is a key" to resolve "which of various permissible meanings the dispositive text bears."[33]

Here, the text presents two permissible readings.   On one hand, the catch-all phrase can be broad enough to include almost anything of value in trade (except onions and movie box office receipts futures).   On the other hand, it can be read far more narrowly to include agricultural products (minus onions).   So consulting the preamble of the Act is appropriate here.

The 1974 amended Act's preamble reads that the purpose is "[t]o amend the Commodity Exchange Act to strengthen the regulation of futures trading, *to bring all*

---

[31] SCALIA & GARNER, at 218.

[32] *Id.*

[33] *Id.* (cleaned up). Now for the elephant in the room. Is a preamble legislative history? We've come to loathe legislative history as nothing more than the exercise of finding one's friends at a cocktail party. ANTONIN SCALIA, A MATTER OF INTERPRETATION 36 (1997) ("As Judge Harold Leventhal used to say, the trick is to look over the heads of the crowd and pick out your friends."). While this judge has a well-placed disdain for legislative history, a preamble is not legislative history. First, the majority that voted for the bill voted for the preamble. It was not a statement of a member who wields only one vote (or a committee clerk who gets none). Second, a preamble isn't a secret. The preamble gets published in the bill itself. So while Justice Scalia would detest relying on secretive legislative history to change the meaning of the text of a bill, the preamble is the text of the bill we're addressing. *Id.* at 29 (defining legislative history to be "the statements made in the floor debates, committee reports, and even committee testimony, leading up to the enactment of the legislation").

agricultural and *other commodities traded on exchanges under regulation.*"[34]  This is more than agriculture.

But we have to look to history to find out what commodities other than agricultural ones were traded on exchanges in 1974.  The New York Iron and Metal Exchange; Iron and Metal, Limited; the New York Metal Exchange; and National Metal Exchange show that Americans viewed silver and other metals as commodities before the passage of the Act.[35]

Gold is a bit different than silver.  Before 1971, the United States was on the gold standard, where the gold in Fort Knox that Auric Goldfinger tried to irradiate[36] and the gold in places like the Federal Reserve in New York that Officer John McClane saved[37] were used to back up the value of paper money.[38]  Because of the United States government's need for gold, gold trades were far less frequent than silver during the gold-standard era.[39]  But the United States left the gold standard in 1971, which caused gold to be traded more extensively by the time the Act called for CFTC regulation of exchanges in 1974.[40]  So silver and gold were both traded on exchanges when Congress told CFTC to regulate commodities traded on exchanges.

---

[34] Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) (emphasis added).

[35] *See* Ivan Reitler, *The Metal Exchange*, 155 ANNALS AM. ACAD. POL. & SOC. SCI. 127 (1931).

[36] GOLDFINGER (Eon Productions 1964).

[37] DIEHARD WITH A VENGEANCE (20th Century Fox 1995).

[38] Michael David Bordo, *The Classical Gold Standard: Some Lessons for Today*, 63 FED. RSRV. BANK ST. LOUIS REV. 2 (1981).

[39] *See* GARY O'CALLAGHAN, THE STRUCTURE AND OPERATION OF THE WORLD GOLD MARKET 1–2 (1993).

[40] *Id.*

On balance, the preamble changes the outcome of the textual analysis. Without the preamble, *Yates* teaches that *ejusdem generis* and *noscitur a sociis* limit the catch-all to other agricultural products. So under that analysis, Congress needed to have said something like "wheat, cotton, mining products, and all other goods and articles" to include metals like gold and silver. But the preamble does the same work. It brings in "all other commodities traded on exchanges," and silver and gold were traded on exchanges then.

### 4.    *Extratextual Evidence*

So we have dueling canons: *ejusdem generis/noscitur sociis* v. the preamble. Accordingly, extratextual evidence such as corpus linguistics can "serve as a cross-check" to see if the analysis is right.[41]  Corpus linguistics refers to sizeable, publicly available databases of documents.[42]  As Judge McFadden's stellar deep dive into corpus linguistics shows, dictionaries are not fortresses because words typically have more than one meaning or sense.[43]  We can look to customary usage of the term at the time to understand which dictionary meaning or sense reflects the meaning of the word used in the law.[44]

The CFTC's corpus linguistics evidence confirms that Americans viewed gold and silver as commodities in public documents at the time Congress enacted and

---

[41] *See, e.g., Wilson v. Safelite Grp., Inc.,* 930 F.3d 429, 440 (6th Cir. 2019) (Thapar, J., concurring in part).

[42] *United States v. Seefried*, 639 F.Supp.3d 8, 13–14 (2022).

[43] *Id*. at 13.

[44] *Id*.

amended the Commodity Exchange Act.[45]  To be sure, that evidence does not show that "gold" and "silver" were dominant referents—the tangible actual thing in the world that a word picks out.[46]  But it confirms what the historical evidence shows: gold and silver were recognized as commodities in the relevant time periods and thus fell within the scope that the preamble and text of the Act establishes.

### C.      The Major Questions Doctrine

The textualist and originalist analysis isn't the end of the inquiry.  The Court still needs to assess the major questions doctrine.  Some argue that it has always operated in the background of statutory, constitutional, and common law.[47]  Others argue that this is a new doctrine.[48]  In any event, the *Muller* court did not address whether the Act's catch-all provision would delegate power over vast swaths of the nation's economy in a way the major questions doctrine forbids.[49]

The Fifth Circuit has since weighed in on the doctrine in other contexts.  Although the Fifth Circuit has recognized that there is a debate among the Supreme Court justices about the nature of the major questions doctrine (whether it is a common sense tool or a clear statement rule), the Fifth Circuit has identified "three indicators that each independently trigger the doctrine":

> (1) when the agency claims the power to resolve a matter of great political significance; (2) when the agency seeks to regulate a significant

---

[45] Doc. 978-126 at 107 (quoting a source from 1931 stating "Gold is a durable commodity").

[46] *See generally* Doc. 978-126–27.

[47] *See Biden v. Nebraska*, 600 U.S. 477, 521 (2023) (Barrett, J., concurring); *Learning Res., Inc. v. Trump*, 607 U.S. 229, 261, 275 (2026) (Gorsuch, J., concurring).

[48] *See West Virginia v. EPA*, 597 U.S. 697, 766–77 (2022) (Kagan, J., dissenting).

[49] *See Muller*, 570 F.2d at 1298.

portion of the American economy or require billions of dollars in spending by private persons or entities; and (3) when an agency seeks to intrude into an area that is the particular domain of state law.[50]

Here, the second independent indicator is implicated. The statutory text gives the CFTC power to regulate a significant portion of the American economy, even if the Act's catch-all was limited to regulating gold and silver.

To be sure, gold and silver are not as big of a deal as they used to be. We are far past the time of the gold rushes in California and Alaska. And Fort Knox doesn't back up all our currency with gold anymore. Instead, the might of the American military and the Fed's printer keeps the dollar afloat now.[51] Even so, any boomer watching cable news knows that gold and silver are, in the words of then-Vice President Biden to then-President Obama, a "Big F'ing deal!"[52] The value of United States mineral production rose to $112 billion in 2025 and mineral-reliant industries in the United States represent $4.09 trillion—more than one-eighth of the United States economy.[53] Accordingly, giving the CFTC regulatory control over the exchange of precious metals is a pretty big deal to our nation's economy.

---

[50] *Mayfield v. United States Dep't of Labor*, 117 F.4th 611, 616 (5th Cir. 2024) (cleaned up) (noting that there's a debate whether the major questions doctrine "is one interpretative tool among many or a clear-statement rule" and concluding that "[w]e need not opine on that heady question.").

[51] As young people say today, "money printer go brrrrrrrr."

[52] Brian Montopoli, *Biden Swears at Bill Signing: Just Biden Being Biden?*, CBSNEWS (Mar. 23, 2010) https://www.cbsnews.com/news/biden-swears-at-bill-signing-just-biden-being-biden/ [https://perma.cc/ZD5C-7YBT].

[53] United States Geological Survey, *Value of U.S. Mineral Production Rose Last year, Driven by Precious Metals Prices* (Feb. 6, 2026) https://www.usgs.gov/news/national-news-release/value-us-mineral-production-rose-last-year-driven-precious-metals-prices [https://perma.cc/SDX8-KQ8X].

So under the Fifth Circuit's framework in *Mayfield*, the Act triggers major questions doctrine scrutiny.  That said, the Fifth Circuit in *Mayfield* noted that often "the Supreme Court's major-questions analysis turns in part on whether the agency has previously claimed the authority at issue."[54]  In *Mayfield*, the Department of Labor's claim of authority since 1938 weighed in favor of finding that the Department of Labor's regulation did not violate the major questions doctrine.[55]  To be fair, the Fifth Circuit also had concluded that the regulation was not one of economic or political significance.[56]

So while the economic significance of the CFTC's claimed authority is great, perhaps the Fifth Circuit would find that the CFTC's exercise of this authority since the 1970s is sufficient to evade invalidation under the major questions doctrine.

That analysis, however, presumes that the Fifth Circuit will remain undecided on the "heady question" of whether the major questions doctrine is "one interpretative tool among many or a clear statement rule."[57]  While that question seems academic, it might make a difference here.

Under Justice Barrett's approach, the major questions doctrine is a common-sense lens to view whether Congress gave the agency the power it claims.[58] Her approach would likely add the preamble to the statute, the corpus evidence, and

---

[54] *Mayfield*, 117 F.4th at 617.

[55] *Id.*

[56] *Id.* at 616–17.

[57] *Id.* at 616.

[58] *Biden*, 600 U.S. at 511 (Barrett, J., concurring).

historical practice to allow the CFTC to regulate metals and anything traded on exchanges.[59]

Justice Gorsuch's approach to major questions is a substantive rule requiring Congress to use a clear statement when granting an agency power to regulate broad swaths of the American economy.[60]  Justice Gorsuch's approach might not give such significant weight to a handful of words in a preamble.  (Preambles aren't secrets. But they also aren't important enough to make it into the United States Code.)  And without the preamble, the canons of interpretation do not allow the words "goods and articles" to encompass absolutely anything of value when they follow a list of agricultural products.

### III.    Summary Judgment

Now that the Court has confirmed the CFTC's reach over Batashvili and Erb's gold and silver dealings, the Court turns to the parties' dueling summary judgment claims.  Summary judgment is inappropriate if there are genuine disputes of material fact.[61]

The Court concludes that, like the State Plaintiffs' claims, factual disputes predominate the CFTC's claims against Batashvili and Erb, such as the nature of the "Polar Bear Bullion," the availability of markups on Metals.com's website, customer

---

[59] *Id.* (noting that "the major questions doctrine situates text in context, which is how textualists, like all interpreters, approach the task at hand" and that "context is not found exclusively within the four corners of a statute") (cleaned up).

[60] *Learning Resources, Inc.*, 607 U.S. at 261–62 (Gorsuch, J., concurring).

[61] *Williams v. Lyondell-Citgo Refin. Co., Ltd.*, 247 Fed. Appx. 466, 468 (5th Cir. 2007).

sophistication, and whether Metals.com disclosed the price spreads. These fact disputes mean the case must go to trial.

## IV.    Default Judgment

If an issue is being litigated by some parties and another defendant defaults, it is inappropriate for a Court to grant summary judgment on the defaulting party.[62] The reason why is that the ruling becomes the law of the case and binds the parties who are still litigating the issue. That would be terribly silly.

Here, the CFTC wants a default judgment against Defendants Barrick Capital Inc, Chase Metals Inc, TMTE Inc, Tower Equity LLC. But Batashvili and Erb are still litigating and will go to trial. The Court will not enter a default while some parties are still litigating. The CFTC may move again for default judgment at the appropriate time.

## V.    Conclusion

Accordingly, the Court **DENIES** the CFTC and Batashvili and Erb's Amended Motions for Summary Judgment (Docs. 977, 980) and the CFTC's Default Judgment Motion (Doc. 984). The Court sets this matter for trial on March 1, 2027.

**IT IS SO ORDERED** this 3rd day of August, 2026.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[62] *Escalante v. Lidge*, 34 F.4th 486, 495 (5th Cir. 2022) ("When a case involves multiple defendants, courts may not grant default judgment against one defendant if doing so would conflict with the position taken by another defendant.").

16